# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:13-cr-00270 |
| | ) | |
| ATIBA WARREN | ) | Judge Mark R. Hornak |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

On October 8, 2013, a federal grand jury indicted the Defendant, Atiba Warren, for possessing a firearm as a convicted felon. ECF No. 1. The charge arose out of a series of events which occurred on October 23, 2012 at 520 Lincoln Avenue in Pittsburgh ("Residence"). Mr. Warren has filed a Motion to Suppress Evidence. ECF No. 42. Based on this Court's review of the Motion, along with all filings in support and in opposition thereto, ECF Nos. 46; 78; 81; 82; 87; 88, the evidentiary hearing and oral argument conducted in open Court on March 3, 2015, ECF No. 73, and for the reasons set forth below, Defendant's Motion will be DENIED.[1]

As an initial matter, the Court finds and concludes[2] that Mr. Warren has established that he had a reasonable expectation of privacy in 520 Lincoln Avenue such that he has standing to challenge the search. *See* ECF No. 42, at ¶¶ 1–2 (stating that Mr. Warren had two residences on the date in question, but that he slept, received mail, and stored his belongings at the Lincoln

---

[1] This Court previously denied without prejudice as moot all Motions pending before the Court as of March 3, 2015, except for Defendant's Motion to Suppress Evidence, based on the stipulation of the parties. *See* ECF No. 68; Hr'g Tr. at 178:23–179:25.

[2] The Court also so stated on the record in open Court on March 3, 2015. Hr'g Tr. at 15:24–16:17.

Avenue address); Hr'g Tr. at 7:17–8:11 (Estelle Hayes's testimony that she resided at 520 Lincoln Avenue on October 23, 2012 and that Mr. Warren resided there with her); *id.* at 11:22–12:10 (Estelle Hayes's testimony that Mr. Warren paid rent each month while living at the Residence); Def.'s Exs. I–K (mail addressed to Mr. Warren at 520 Lincoln Avenue). Based on the proffers of defense counsel in the initial motion and the evidence presented, the Court therefore concluded it was proper to proceed with conducting an evidentiary hearing on the suppression issues.

Testifying at the evidentiary hearing held on March 3, 2015 for the United States were Steven Sywyj and Lance Hoyson, two Pittsburgh Police Officers involved in arresting Mr. Warren. Witnesses called on behalf of the Defendant were Ms. Estelle Hayes, Mr. Warren's landlord on the date in question, and Mr. Travis Johnson, who in his profession at a company specializing in creating three-dimensional models of architectural structures, created a "virtual model" of the layout of the Residence.

I. **FACTUAL FINDINGS**

The Court initially observes that there did not appear to be any direct contradictions among the various fact witnesses' testimony. Rather, each fact witness offered a unique viewpoint dealing with specific events of the evening that largely did not overlap (or where they overlapped, they were not inconsistent with one another). The testimony of Mr. Johnson, the Defense's expert witness, was presented to cast doubt on some of the factual observations of Officer Sywyj (who had experienced the scene firsthand), using three-dimensional modeling and animations that attempted to mimic the spacing, depth, and lighting conditions as they existed on October 23, 2012 at around 10:30 p.m. The Court will review Mr. Johnson's testimony in greater detail below, but first will recount and assess the testimony of the three fact witnesses.

### A.  Officer Sywyj's Testimony

On the night of October 23, 2012, Steven Sywyj, a Police Officer with the Pittsburgh Police Department, responded to a call at 520 Lincoln Avenue based on a report that a man had been stabbed.  Hr'g Tr. at 21:15–19.  Upon Officer Sywyj's arrival at what he described as a "chaotic" scene,[3] he found the "bloody" and "barely conscious" victim on the front porch of the Residence receiving aid from another man, later identified as DeShawn Weathers.  *Id.* at 23:4–10; 24:14–17; 30:9–11.  Medics arrived within a few minutes and removed the victim from the front porch, at which point Officer Sywyj turned his attention to Mr. Weathers.  *Id.* at 24:4–17.  Mr. Weathers asked Officer Sywyj's permission to go inside the Residence and speak with the family, and Officer Sywyj agreed, although he still needed to interview Mr. Weathers as a witness to the stabbing, and told him so.  *Id.* at 24:19–25:16.  Mr. Weathers then proceeded into the living room of the Residence to speak with those inside.  *Id.* at 25:21–22.

According to Officer Sywyj, he stood at the "threshold of the [front] door," which was wide open,[4] and watched Mr. Weathers speak with the family to confirm that Mr. Weathers did not attempt to leave the scene through the back door.  *Id.* at 26:3–8; 32:14–16.  As Mr. Weathers conversed with the family in the living room, Officer Sywyj witnessed another individual, later identified as the Defendant, "behind everybody, where everybody was, with a firearm," which the Defendant held "in his right hand at chest level."  *Id.* at 25:22–24; 26:17–18.[5]  Later, Officer Sywyj testified in response to the Court's question, and using Defendant's Exhibit A-6 as a demonstrative aid, that while he stood at the threshold of the front door, he first saw Mr. Warren

---

[3] The Court refers at various points in this Opinion to multiple Officers' descriptions of the scene as "chaotic."  The Court would note that no one testified that the scene at the Residence was anything other than chaotic or that the events occurred in less than a compressed period of time.

[4] The Officer could not recall whether the screen door was also wide open, but recalled that the larger door was.  *Id.* at 31:23–32:16.

[5] Officer Sywyj identified the weapon as a Taurus Judge.  Gov.'s Ex. 1; Hr'g Tr. at 28:20–24.

standing "within a couple feet of the archway" between the living room and dining room areas to the left of the fireplace. *Id.* at 168:13–169:1.

At that point, Officer Sywyj drew his own firearm, shouted "gun" to the other officers on the scene, and ordered everyone from the Residence. *Id.* at 26:1–2; 27:11–12. Officer Sywyj testified that Mr. Warren then "disappeared from one doorway and re-emerged a second or two later from a doorway further to the right, sans gun." *Id.* at 27:13–16. Officer Sywyj ordered Mr. Warren from the Residence, entered the Residence himself, and recovered the gun from "under a magazine on a table" behind the wall in between the two doorways.[6] *Id.* at 27:19–24. The firearm's serial number had been obliterated. *Id.* at 28:1–2. Because of that fact, Officer Sywyj requested that Mr. Warren be arrested. *Id.* at 29:24–30:4.

### B. Officer Hoyson's Testimony

Officer Hoyson testified that the scenes at these types of police calls were normally chaotic, and that the scene at 520 Lincoln on October 23, 2012 was no exception. *Id.* at 45:8–9; 16–19. Officer Hoyson initially assisted medics in loading the stabbing victim into an ambulance and then remained on the scene to gather evidence about the stabbing. *Id.* at 46:5–10. He testified that he heard Officer Sywyj "alert other officers on scene that he saw someone with a gun inside the house." *Id.* at 46:12–14. Officer Sywyj then entered the Residence and ordered the occupants to go outside, while Officer Hoyson entered the Residence to "perform a protective sweep for any other occupants with Officer Sywyj." *Id.* at 46:16–18. Officer Hoyson testified that Officer Sywyj found the gun, and that he, Officer Hoyson, "could hear noises upstairs." *Id.* at 46:19. Believing people may still be upstairs, the Officers again ordered anyone in the Residence to exit. *Id.* at 46:19–22. Officer Hoyson and another officer then proceeded upstairs to

---

[6] These refer to the internal archways between the first-floor rooms in the Residence.

find that a television set was turned on, which accounted for the noises heard from below.  *Id.* at 46:23–47:1.

After realizing the noise had come from a television, Officer Hoyson left the Residence and joined Mr. Warren in the police car where he was detained.  *Id.* at 47:3–4.  Officer Hoyson testified that he "advised [Mr. Warren] of his Miranda rights, and interviewed him about the firearm."  *Id.* at 47:4–5.  Mr. Warren then made several statements, including that he bought the gun on the street with the serial numbers already filed off, and that he went and got his gun that night after hearing that his cousin had been stabbed.  *Id.* at 47:6–15.  On cross-examination, Officer Hoyson stated that he did not present Mr. Warren with any form informing him of his rights, but on redirect, he further explained that such forms are not typically carried by officers "on the streets."  *Id.* at 47:20–48:6; 49:18–25.

### C.  Estelle Hayes's Testimony

Ms. Estelle Hayes has been a resident at 520 Lincoln Avenue since July of 2011, and was Mr. Warren's landlord at that address on October 23, 2012.  *Id.* at 7:16–21; 8:5–11.[7]  The residence is a two-story, standalone home.  *Id.* at 52: 2–10.  At the hearing, Ms. Hayes identified various photographs of the Residence's exterior and interior,[8] one of which depicts the view of the interior of the Residence from the front door.  Def.'s Ex. A-5.[9]

---

[7] Ms. Hayes and Mr. Warren were the only residents of the house on October 23, 2012.  *Id.* at 14:7–14.

[8] The photographs were taken on February 9, 2015, at approximately 9:00 a.m., and were offered into the record based on Ms. Hayes's testimony generally describing the residence, though some aspects such as the interior wall paint color had changed between when the incident occurred and when the photographs were taken.  *Id.* at 69:24–70:8.

[9] The view that Officer Sywyj would have had when he initially saw Mr. Warren.  Although according to the transcript, defense counsel referred to the photograph in a question during the hearing as A-4, the Court notes that A-4 is in fact a photograph of the outside of the residence and the descriptions provided by Ms. Hayes in response to questioning in fact match those depicted in A-5.  Hr'g Tr. at 55:18–56:3.

Ms. Hayes testified that on October 23, 2012, she retired to her bedroom at around 7:00 p.m. and that Mr. Warren was already upstairs in his bedroom at that time. *Id.* at 61:7–12. Later in the evening, Ms. Hayes heard Mr. Weathers calling out to her from downstairs, saying that her son had been stabbed. *Id.* at 61:17–20; 62:10–12.[10] Upon hearing this, Ms. Hayes "jumped out of bed and ran downstairs." *Id.* at 62:13–14. Several people were on the front porch when Ms. Hayes arrived, including the police, medics, and her son, the victim. *Id.* at 63:12–16.

Ms. Hayes also testified that her general routine when she retired in the evenings was to "check all the doors" and "turn off the lights," though she would leave both the porch light and a kitchen light over the stove on. *Id.* at 60:17–18. It was also part of her general routine to keep the windows covered, *id.* at 155:15–24; 157:10–12, and although the curtains she used were not "black-out curtains," *id.* at 158:3–4, they were also not see-through and light from street lights generally did not come in through the front window, *id.* at 158:18–159:8.

Ms. Hayes stated that on October 23, 2012, the main lights were off when she ran downstairs after hearing that her son had been stabbed. *Id.* at 68:1–3. However, she did not need to turn on a light when she went downstairs because the light coming from outside, including the police lights, made it bright enough to see. *Id.* at 68:4–13. Indeed, when counsel for the United States asked on cross-examination if it was "pretty bright in [Ms. Hayes's] house," Ms. Hayes responded, "Uh-huh." *Id.* at 68:8–9.

**D. Travis Johnson's Expert Testimony**

Mr. Travis Johnson has worked for seven (7) years at Cadnetics, a company which specializes in producing precision drawings and three-dimensional modeling of structures using a

---

[10] Mr. Weathers had entered the house by breaking in through the back door, according to Ms. Hayes. *Id.* at 61:21–62:5.

laser scanner[11] and related computer software. *Id.* at 73:10–18; 82:1–12; 84:14–19. The company is typically engaged by architects, engineers, and building contractors. *Id.* at 76:12–19. Based on defense counsel's initial questioning and counsel for the United States's *voir dire*, the Court found that based on Mr. Johnson's education and experience, he would be permitted to testify in the form of an opinion during the suppression hearing. However, the Court reserved ruling during on the ultimate admissibility of any opinion offered by Mr. Johnson under Federal Rule of Evidence 702. *Id.* at 90:15–22.[12]

On December 19, 2014, Mr. Johnson visited 520 Lincoln Avenue and performed laser scans of the first floor interior and exterior of the Residence, which he then used to produce scaled models and animations of the residence. *Id.* at 91:5–92:25. Mr. Johnson used the measurements gathered and additional information provided by defense counsel to attempt to recreate the scene at the Residence as it was on October 23, 2012 at approximately 10:30 p.m. *Id.* at 99:10–19; 101:17–18. Among the exhibits introduced were animations showing the Residence from exterior to interior based on the viewpoint of a male whose line of sight would be approximately five-feet, six-inches off the ground. Def.'s Exs. E; F; Hr'g Tr. at 100:25–101:11. The exhibits include a rendering of an individual near the bottom of the staircase, which is information provided by defense counsel and is meant to represent the Defendant's position when Officer Sywyj saw him. Hr'g Tr. at 101:12–18. The difference between Exhibits E and F is that Exhibit E used lighting conditions from during the day, while Exhibit F was "created for the night scene." *Id.* at 102:2–9. For the night scene, Mr. Johnson testified that he applied various lighting

---

[11] Mr. Johnson stated that a laser scanner "is an object that you place in a room and it measures distances to surfaces that it can see." *Id.* at 82:5–6. Laser scanners can take "[m]illions" of measurements of a given space when operating. *Id.* at 82:10–12.

[12] It is to the advocacy credit of defense counsel to identify and then attempt to use such technological analysis. As noted below, however, the actual applicability of it as an evidentiary tool in this specific case comes up short.

sources based on "given information," attempting to account for various amounts of light emitted from the kitchen light Ms. Hayes leaves on, the porch light, and various other sources. *Id.* at 102:6–103:25. He also identified exhibits showing a birds-eye vantage point based on the models, which presumably replicate the scene at 10:30 p.m., and also show the scene as viewed from the front door looking toward the kitchen and include an individual who presumably represents Mr. Warren. Def.'s Exs. H-2–4; Hr'g Tr. at 107:5–15.

Cross-examination of Mr. Johnson focused on potential flaws in his process that could have thrown off the accuracy (and hence probative value) of his models of the scene, specifically with regard to the lighting and the research Mr. Johnson conducted to obtain that information, and also with regard to the information provided about where the person representing Mr. Warren was standing in the models. *E.g.,* Hr'g Tr. at 113:15–16; 119:21–120:8; 121:13–122:18; 124:9–10. Notably, the models do not take into account lights from the police cars or flashlights on the scene (of which there were likely several, since there were roughly twelve (12) Officers present). *Id.* at 127:21–24.

Mr. Johnson also testified that in his conversation with defense counsel, they talked about Mr. Johnson's prospective that "the animation was not to prove what the person can or cannot see," but rather that it accurately reflects "what physics are" without being indicative of what any specific person could see at a specific point, because people's eyes adjust to lighting differently. *Id.* at 124:11–125:5. However, on redirect examination, Mr. Johnson then testified by way of his opinion that based on where the representative person in the model was standing, a person at the front door would not be able to see that person in his entirety given the lighting conditions at the time. *Id.* at 142:1–9.[13]

---

[13] In this regard, the Court would observe that notwithstanding his expertise in laser-assisted architectural renderings, Mr. Johnson was not shown to have any particular expertise as to issues of visual acuity.

Additionally, Mr. Johnson testified on cross-examination that the person in the diagram representing Mr. Warren was positioned based on "a point in that general area" (referring to the bottom of the staircase in the dining room) rather than a point closer to the front door as had been stated in the testimony of Officer Sywyj. *Id.* at 144:10–18. Mr. Johnson also testified that his model did not take into account any light that was coming through the window of the living room, *id.* at 145:11–16, although Ms. Hayes explained that her curtains were not "black-out curtains," *id.* at 158:3–4.

## II.    ANALYSIS

Searches performed without a warrant are presumptively unreasonable under the Fourth Amendment, and the United States bears the burden of proving the reasonableness of officer conduct under the circumstances. *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). One well-known exception to the warrant requirement is the presence of probable cause[14] coupled with exigent circumstances, which include a threat to the safety of law enforcement officers or the public. *See Warden v. Hayden*, 387 U.S. 294, 298–99 (1967) (finding officers acted reasonably to protect their lives and the lives of others when they entered a home to search for both a man who

---

[14] In neither the hearing nor their briefs did the parties call into question or meaningfully address the probable cause element. Probable cause to enter a house to search is different from the probable cause required to make an arrest. *United States v. Myers*, 308 F.3d 251, 263–64 (3d Cir. 2002). Upon consideration of the record, the Court finds and concludes that probable cause existed to enter the home as soon as Officer Sywyj saw a person less than twenty (20) feet away from him with a gun, and that he acted reasonably to secure the gun and the Residence while other individuals may have remained present inside. *See Warden v. Hayden*, 387 U.S. 294, 299 (1967) (search of house for weapons that could be used against police proper); *United States v. Parrott*, 450 F. App'x 228, 230 (3d Cir. 2011) (probable cause and exigent circumstances existed to allow search of the house when several factors were present, including that officers did not know the number of people inside the house and that someone inside may attempt to use a shotgun against officers); *cf. Maryland v. Buie*, 494 U.S. 325, 334 (1990) (authorizing limited protective sweep incident to arrest when it was possible that "an attack could be immediately launched" from certain spaces). Then, the fact that the serial number was obliterated gave officers probable cause to arrest Mr. Warren, who had been witnessed holding the weapon. *See Myers*, 308 F.3d at 264 (explaining that a child's account to police officers that her mother and father were fighting inside the house and that her father had a gun "created a sufficient exigency to allow [the officer] to enter her home to investigate," though it did not itself authorize the officer to arrest anyone). An officer's sighting of an individual with a gun less than twenty (20) feet away, in the immediate aftermath of a violent crime still being actively investigated, justified that entry to ensure that no one else was present who had access to the firearm while the area remained an active, unsecured crime scene.

perpetrated an armed robbery and for the weapons "he had used in the robbery or might use against them"); *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) ("Examples of exigent circumstances include, but are not limited to . . . danger to the lives of officers or others."); *Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003) ("[A] warrantless seizure in a person's home violates the Fourth Amendment unless both probable cause and exigent circumstances are present.").[15]  Whether exigent circumstances justify a warrantless search is an objective inquiry based on the totality of the circumstances encountered by law enforcement officers "*at the time they took their actions*."  *Marasco*, 318 F.3d at 518 (emphasis added).  An officer's subjective state of mind is irrelevant to the inquiry.  *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

Even if exigent circumstances are present at some point during the course of events based on the need to protect officer safety, an exigency justifying a warrantless search may dissipate if, for instance, the search occurs after the premises has been secured and after a suspect has been arrested, as opposed to prior to securing the premises and prior to or contemporaneous with the arrest.  *United States v. Mallory*, 765 F.3d 373, 386 (3d Cir. 2014).[16]  "Imminence" is a touchstone of exigent circumstances.  *Id.* at 384.

---

[15] In such a situation, "the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Coles*, 437 F.3d at 366 (citing *Hayden*, 387 U.S. at 298–99).  Our Court of Appeals has recognized that when officers "had reason to believe that a laser-sighted weapon was being pointed at them, they had reason to fear for their own safety.  Consequently, there were exigent circumstances." *Marasco*, 318 F.3d at 518.

[16] The full set of factors identified by the Third Circuit in *Mallory* as relevant, though not exhaustive, are:

> [(1)] how soon after the alleged offense the search occurred; [(2)] whether the alleged offense was violent in nature; [(3)] whether the search occurred prior to or contemporaneous with [the defendant's] apprehension; [(4)] whether the premises as a whole had been secured, or whether it was possible that unknown individuals remained in the house; [(5)] whether [the defendant] or any of his family members had acted in an aggressive or threatening manner toward the police; [(6)] whether other members of the family were free to move about the house unsupervised by an officer; [(7)] how easily [the defendant] or a family member could have obtained and used the firearm; and [(8)] the degree of intrusiveness of the search.

*Id.* at 386.

The core issues with regard to Mr. Warren's Motion to Suppress are (1) whether exigent circumstances existed to justify Officer Sywyj's entry into the Residence and subsequent seizure of the firearm without a warrant, and (2) whether any exigency which existed at any point had dissipated by the time the search was actually conducted. With regard to the first issue, Mr. Warren's argument essentially boils down to an allegation (which he attempts to bolster through Mr. Johnson's testimony) that Officer Sywyj could not possibly have seen Mr. Warren inside the Residence with the firearm if he remained standing in the open doorway—he must have entered the Residence before seeing the gun. ECF No. 78, at 13–20. Mr. Warren attempts to undermine Officer Sywyj's credibility in a larger sense as well, alleging the existence of various inconsistencies and omissions in his testimony and report from the incident. *Id.* at 18–19.[17]

In assessing Officer Sywyj's credibility, the Court considers the following factors:

> 1) the opportunity and ability of the witness to see or hear or know the things about which the witness testified; 2) the quality of the witness's knowledge, understanding, and memory; 3) the witness's appearance,

---

[17] Mr. Warren specifically points out that Officer Sywyj (1) placed Mr. Warren in two different places on the first-floor level for his initial sighting; (2) stated that multiple individuals were present inside the living room not counting Mr. Weathers or Mr. Warren when in fact only those men and Ms. Hayes were inside the house at the time; (3) testified to but did not place in his report any conversation between himself and Mr. Warren in which Mr. Warren apparently claimed the firearm was a "toy"; and (4) testified for the first time at the hearing that Mr. Warren "emerged, disappeared, and then re-emerged from different portions of the first floor." *Id.* at 18–19.

As to the first point, the Court finds and concludes that the spot to which Officer Sywyj pointed in Court and the place he described first seeing Mr. Warren are consistent when reviewing the testimony in conjunction with the hearing Exhibits. Looking at Defendant's Exhibits A-5 and A-6, if the family members were positioned on the left side of the living room, from Officer Sywyj's viewpoint at the front door he undoubtedly could have seen Mr. Warren both "behind everybody, where everybody was," holding a firearm "at chest level," Hr'g Tr. at 25:22–24; 26:17–18, and "within a couple of feet of the archway" between the living room and dining room areas to the left of the fireplace, *id.* at 168:13–169:1. As to the second point, the number of people in a room at a given time is not necessarily indicative of an inability to see an individual holding a firearm. As to the third point, the Court found Officer Sywyj's explanation as to why he did not include the conversation in his report in the first instance worthy of belief. At the time he prepared his report, Mr. Warren had already confessed to possessing the weapon to Officer Hoyson so Officer Sywyj did not believe it was necessary to include it, and any failure to include it was otherwise an innocent omission (if an "omission" at all). As to the fourth point, the Court concludes that any description of Mr. Warren appearing and reappearing is not conclusive as to the reasonableness or urgency involved in the decision of whether the circumstances warranted entering the house. The situation remains that Mr. Warren was seen with a gun in his hand roughly eighteen (18) feet from Officer Sywyj, and that he no longer had the weapon after Officer Sywyj ordered him from the house. Exactly where he placed the gun in the meantime is irrelevant to the objectively reasonable assessment by law enforcement that they next needed to secure the home to prevent any other occupants from getting and using the gun Officer Sywyj had just seen against them or others.

behavior, and manner while testifying; 4) whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; and 5) whether the witness's testimony was consistent or inconsistent with other evidence.

*United States v. Terry*, No. 10-0029, 2010 WL 4639068, at *2 (W.D. Pa. Nov. 8, 2010) *aff'd*, 518 F. App'x 125 (3d Cir. 2013). The Court finds and concludes that taking all of these factors into account, Officer Sywyj was in the best position of any law enforcement officer on the scene to observe the scene—he responded to the stabbing, spoke to one of the witnesses (Mr. Weathers), and was positioned in the doorway of the Residence (keeping an eye on Mr. Weathers) when he saw Mr. Warren with the firearm. Officer Sywyj had four-plus years of experience with the Pittsburgh Bureau of Police at the time of the incident and had responded to various types of calls in the neighborhood ranging "from the mundane . . . to very violent crime." Hr'g Tr. at 19:10–21; 21:22–22:6. Officer Sywyj forthrightly admitted when he did not remember some details, such as whether the screen door was open or closed, but was unequivocal in his testimony as it related to the facts material to the Court's analysis. And although police officers might not be generally considered to be wholly disinterested in the outcome of a proceeding, the Court finds and concludes that Officer Sywyj's testimony did not contradict, and in fact lined up with, the accounts provided by Ms. Hayes and/or Officer Hoyson, who also testified. Of specific importance, the Court notes the consistency in Officer Sywyj's testimony that he could see Mr. Warren holding a gun from his position in the doorway and Ms. Hayes's testimony that she did not need to turn on a light when she went downstairs because the light coming from outside, including the police lights, made it bright enough to see. *Id.* at 68:1–13. In sum, though he described an incident that occurred over two and a half years ago, based on the consideration of his testimony in the context of all of the evidence, and the Court's personal observations and assessment of the witnesses and testimony in open Court, the Court finds Officer Sywyj credible

and his factual account plausible. Given that, and the fact that no other fact witness or other evidence from the scene[18] contradicted his testimony, the Court finds and concludes that exigent circumstances existed to justify Officer Sywyj's actions in ordering everyone from the house and entering it.

This is true even considering Mr. Johnson's testimony and the accompanying Defense exhibits. The Court finds and concludes that the models and animations he created may indeed assist the trier-of-fact based on sufficient data and facts, in that they stem from facially reliable architectural and technological principles and methods consistent with the standards set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–92 (1993). The problem with regard to Mr. Johnson's testimony, both at the hearing and to this day, is whether those principles and methods actually apply to the facts of this case. In other words, do they "fit"? "Fit" is a central element to the Daubert standard applying Federal Rule of Evidence 702. In considering the tests laid out in *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146–47 (3d Cir. 2000), and *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 743–45 (3d Cir. 1994), the Court concludes that Mr. Johnson's testimony and the accompanying exhibits will be accepted into the record for purposes of the suppression hearing, and views the United States's objections to his testimony for these purposes as going principally to the weight they should be given, although its arguments also question whether his methods were reasonably reliable. Nonetheless, doing so gives the Defendant a pretty significant benefit of the doubt as to "fit," as noted and explained below. Should the United States seek to exclude that evidence at trial on *Daubert* grounds, the Court will

---

[18] While the Defendant argues that Mr. Johnson's testimony contradicted the observations set forth by Officer Sywyj, the Court concludes that because Mr. Johnson's animations and images were based partially but materially on somewhat speculative information provided to him by defense counsel as to important facts, such as where Mr. Warren was standing and the amount of light in the house, Mr. Johnson's testimony and the exhibits in this regard cannot be viewed as actually contradicting the otherwise credible testimony of Officer Sywyj.

readdress the issue at that time and the Court's consideration of that testimony here is not conclusive of its ultimate admissibility applying Federal Rules of Evidence 702 and 403.

Even with that more liberal evidentiary approach, however, the Court also concludes that Mr. Johnson's testimony and exhibits are of limited (if any) aid to the fact-finder (here, the Court) in determining what could or could not have been seen by Officer Sywyj on the night in question. Indeed, there are meaningful internal contradictions within Mr. Johnson's testimony. *Compare* Hr'g Tr. at 124:11–125:5 (explaining that the animation is not meant to take into account what could be seen) *with id.* at 142:1–9 (stating that the person represented in the animations could likely not be seen in his entirety by someone standing in the doorway). The animations and other exhibits simply do not obviate the testimony of both Officer Sywyj that he could see Mr. Warren holding the gun and Ms. Hayes that it was bright enough in her home as she ran downstairs such that she did not need to turn on any lights. *Id.* at 68:1–13.[19] This is especially true when Officer Sywyj's testimony was that Mr. Warren would have been positioned in a materially different spot, significantly closer to the front door, than the individual depicted in the Johnson animations. *See id.* at 168:13–169:1 (indicating that Mr. Warren was standing "within a couple of feet of the archway" between the living room and dining room areas to the left of the fireplace [rather than near the staircase, as the animation shows]). Therefore, while the Court declines to strike on *Daubert* grounds the testimony and exhibits relating to Mr. Johnson's testimony, as requested by the United States, the Court also concludes that the presentation does not undercut the testimony of the fact witnesses such that the Court should conclude either (1) that Officer Sywyj "must have

---

[19] And indeed, although defense counsel argues that the animation "gave the Government a bit of the benefit of the doubt" in terms of erring on the side of making it lighter in the depiction and hence easier to see, Hr'g Tr. at 149:19–23, the Court would note that turning on the light in the foyer for purposes of the night animation shown in Defendant's Exhibit F just as likely could make it harder, rather than easier, for a human eye to adjust and see into a dark room immediately beyond than it would be if that foyer light was off, as well as those in the next room. Along with the lack of accounting for other lights entering the Residence, including from multiple emergency or law enforcement vehicles, this example further demonstrates the issue of "fit" with regard to the exhibits associated with Mr. Johnson's testimony.

been" inside the Residence at the time he saw Mr. Warren holding the firearm or (2) he could not have possibly seen it at all.

As this is the case, the Court's overall conclusion is that Officer Sywyj acted reasonably and lawfully under the circumstances. The Court found him quite credible when he spoke of the relevant events, and the Defendant has not presented evidence to discredit that testimony, which placed Mr. Warren, carrying a firearm, within Officer Sywyj's line of sight from the front doorway. His reaction to this sighting given the surrounding circumstances was reasonable.[20]

Turning to the second issue, Mr. Warren argues that since the Residence was actually empty after Officer Sywyj first ordered the occupants out, any exigent circumstances which arose when he saw the firearm had dissipated before the Officer entered the Residence and found the

---

[20] The Court also declines to accept the Defendant's invitation to view the Residence to assist the Court's decision as to what Officer Sywyj could or could not see. The decision of whether to view a scene, at least when dealing with jury views, is discretionary. *See Gov't of Virgin Islands v. Taylor*, 375 F.2d 771, 771–72 (3d Cir. 1967) (per curiam) ("A view is not a matter of right; a grant or denial thereof rests in the sound discretion of the trial court."); *United States v. Sanford*, 173 F. App'x 943, 947 (3d Cir. 2006). Courts making such a determination weigh multiple factors, including whether there is "'sufficient evidence describing the scene in the form of testimony, diagrams, or photographs.'" *St. Paul Fire & Marine Ins. Co. v. Nolen Grp., Inc.*, No. 02-8601, 2007 WL 2571524, at *21 (E.D. Pa. Aug. 31, 2007) (quoting *Kelley v. Wegman's Food Markets, Inc.*, No. 02-1377, 2003 WL 21091390, at *5 (E.D. Pa. May 15, 2003) *aff'd*, 98 F. App'x 102 (3d Cir. 2004)). In this case, the Court has seen and assessed numerous exhibits depicting the Residence, both in the form of traditional photographs and in the form of models and animations. From that evidence, the Court is more than equipped to understand the distances at issue. *See, e.g.*, Def.'s Exs. H-2–H-4 (indicating distances from front doorway to areas inside the Residence). With regard to lighting, the Court finds and concludes that not only would a site visit require an exceptional commitment of resources to coopt more than a few (enough as would have been on the scene when twelve (12) officers were present) police vehicles and other emergency vehicles in order to recreate the lighting conditions as they existed on October 23, 2012, but even doing that would create a highly uncertain (at best) duplication of the conditions on the night in question. Even if that were done, it would be highly improbable (if not impossible) to get the night sky, positions of all persons and vehicles, internal/external/ambient light, shadows, and the like to "match" the night in question in order to provide anything more accurate or precise than what is already in the record. Reviewing Def.'s Ex. H-2, for instance, the Court concludes that even if the lighting was configured in exactly the manner depicted, it does not sufficiently undercut Officer Sywyj's testimony that he could see Mr. Warren so as to render his otherwise credible testimony improbable or implausible. With the amount and quality of evidence introduced at the hearing, the Court therefore concludes that a view is not necessary to further educate it regarding the Residence's layout or conditions. *Cf. United States v. Woolfolk*, 197 F.3d 900, 906 (7th Cir. 1999) (holding despite arguments that the jury needed to see the lighting in a lounge to determine whether a partition could have obstructed a view, ample evidence was presented to allow the jury to make a fair and reasonable determination without a view). Although Mr. Warren advocates that another court in this District performed such a viewing in what he describes as a similar case, the Court points out that in that case, "both sides requested a view." ECF No. 82, at 7. In this case, the United States's position is that a view is not necessary. ECF No. 81, at 8 n.4 (citing *United States v. Simmons*, 174 F. App'x 913, 918 (6th Cir. 2006), which held that no view was necessary when ample evidence was provided at the suppression hearing). Notwithstanding that, based on the Court's review of the record and relevant law, it concludes that a view is not required, nor is it necessary, to aid the Court in its determinations here.

gun.  ECF No. 78, at 19–20.  On this point Mr. Warren explains that no one else was found in the

Residence, "although a human voice on the top floor was actually that of an audible television

set."  *Id.* at 19.  It is this point that the Court finds determinative as to that argument, though other

factors also demonstrate the reasonableness of law enforcement's actions.  Officer Hoyson

testified that after the occupants of the Residence's first floor had exited, he and Officer Sywyj

entered the Residence to secure it, and he heard noises from the second floor.  Hr'g Tr. at 46:19.

The Court concludes that when the Residence had not yet been secured, and an Officer downstairs

heard noise coming from above, it was reasonable under the circumstances to believe that

someone else may be in the Residence who could have access to the gun if the Officers waited to

obtain a warrant before reentering.  This view comports with case law in this Circuit.  *Compare*

*United States v. Parrott*, 450 F. App'x 228, 229–30 (3d Cir. 2011) (holding officers had probable

cause and a reasonable basis to believe exigent circumstances existed after the defendant had been

handcuffed but before the house had been secured when they recovered a weapon they had seen

the defendant carrying) *with Mallory*, 765 F.3d at 388 (holding the exigency had dissipated once

officers had secured the premises and apprehended the defendant, and noting that the case fell

"just outside" the outer limit of the Fourth Amendment).  Here, as in *Parrott*, the Officers had not

yet secured the Residence to confirm that no one else was inside at the time when Officer Sywyj

searched for and recovered the weapon.

The reasonableness of their actions is also bolstered by consideration of the other factors

set out in *Mallory*.  First, the search occurred immediately after Officer Sywyj saw a man with a

weapon in the wake of responding to a violent crime with the victim having been removed from

the porch of the Residence only shortly before.  Second, both the stabbing (though not perpetrated

by Mr. Warren) and possession of a weapon could be viewed as violent in nature.  Third, the

search occurred prior to Mr. Warren's arrest, although it was contemporaneous with his being essentially in the custody of law enforcement when he exited the Residence. Fourth, and most importantly in this Court's view, the search occurred before the premises had been secured and while it was objectively reasonable to believe unknown individuals remained in the Residence, presumably with access to the gun the Officer had just seen. The fifth and sixth factors tip in Mr. Warren's favor, as he did peacefully exit the Residence and did not threaten officers after his exit, and his family (or any individuals associated with him known to have been inside the Residence) similarly acted without aggression. The seventh factor pertaining to the ease with which a family member could access and use the firearm is a closer issue but relates to the fourth factor, as police did not at the moment know whether all occupants were out of the Residence[21] or where the gun was. The eighth and final factor dealing with the degree of intrusiveness of the search counsels that the search was reasonable: although Officers did proceed throughout the Residence to secure the premises, no Officer testified that their search included opening drawers or anything similarly intrusive. Indeed, Officer Sywyj recovered the gun after observing it "protruding from under a magazine on a table," which would place it in plain view. Hr'g Tr. at 27:21–24.[22]

This situation is notably distinguishable from the facts as related in the Third Circuit's opinion in *Mallory*. In that case, officers saw a revolver on the defendant while speaking with him outside, and pursued him when he fled into a house. 765 F.3d at 377. Police searched for Mallory inside the home and also searched for the firearm. *Id.* The officers ordered everyone out of the house, and after searching the remainder of the house they came across the locked bathroom "which they had at first overlooked" and found Mallory inside. *Id.* at 377–78. They handcuffed the defendant inside the house and brought him through the first floor toward the front

---

[21] This is a big difference from the facts in *Mallory*.

[22] This is another significant difference from the facts in *Mallory*.

door. *Id.* at 378. As the officers were on their way out, someone checked behind the open front door and found the revolver under some umbrellas. *Id.*

The District Court held that exigent circumstances existed when officers first entered the house, and the Third Circuit noted that this fact was not disputed. *Id.* at 378, 383. However, both the District Court and the Third Circuit concluded that once the police had secured the defendant and house, those exigent circumstances had dissipated and the continued search for and seizure of the gun was unreasonable. *Id.* at 378, 388. Our Court of Appeals found it important that "[b]y the time Officer Hough searched behind the door and under an umbrella to find the gun, the police had secured Mallory, the family, and the home, and were in control of the situation." *Id.* at 386. "The house had been thoroughly swept and there were no persons left unaccounted for who might attack the officers by surprise." *Id.* at 387. Regardless of whether the police were in control of the first emergency situation for which they were called to the scene (the stabbing), the Court also finds and concludes that at the moment Officer Sywyj saw Mr. Warren with the gun, a new exigency existed. That exigency must be viewed in the context of all of the circumstances faced by the Officers and those circumstances included that a stabbing had taken place, no suspect was then in custody, officers did not know whether the Residence was completely secured, and there were other ways into and out of the Residence other than the door that they monitored. As the Court emphasized above, the reasonable belief that others remained in the Residence justified a continued search even after Mr. Warren had left the Residence.

To sum up, although Mr. Warren appropriately identifies some similarities between this case and *Mallory*, in that neither defendant was armed or posed a danger to others at the time the weapon was found, and he emphasizes that he "peacefully departed from the home, remained orderly outside amidst the police presence, and offered no resistance upon a later decision to

arrest him," two stark differences between *Mallory* and this case remain: police had not yet secured the Residence in this instance, while that task had been completed prior to recovering the weapon in *Mallory*, ECF No. 78, at 19–20, and unlike the situation in *Mallory*, the Officer here saw the gun both in an occupant's hand and then in plain view. Mr. Warren admits that a television set was turned on upstairs, *id.* at 19, which is consistent with Officer Hoyson's testimony that he heard noises in the Residence. Granted, as it turned out, there was in fact no one else in the Residence who might have access to the gun—but the Officers had to make a swift and reasonable determination based on the circumstances as they existed at the time. *Marasco*, 318 F.3d at 518. At the time, the Officers knew they were responding to a violent crime, that they saw someone inside with a gun, and when they entered the Residence they heard voice-like noises from upstairs. The Court concludes that it was reasonable for them to believe that someone else might be present in the Residence and that a gun was just seen but had not yet been located and secured, all of which justified a warrantless search for any other people and for the firearm. While this would be a much closer call if the premises had been secured prior to the recovery of the weapon, as was the case in *Mallory*, in this "chaotic" aftermath of a violent crime when a suspect had not been apprehended, the investigation was very much ongoing, and the witness had just been permitted to enter the Residence, the Court concludes that this limited search of the Residence, and seizure of the firearm, was reasonable.[23]

In his original Motion to Suppress, Mr. Warren made the point that "[t]he mere existence of a gun in one's home . . . is not of itself incriminating or indicative of an ongoing criminal activity." ECF No. 42, at ¶ 8(a). True enough. But when the Court examines the totality of the

---

[23] Indeed, the United States makes the legitimate point that since Officer Sywyj could not see behind the wall of the fireplace, and he last saw Mr. Warren with the gun on one side of that wall, he had no way of knowing before entering the house if another person was standing on the other side of that interior wall with access to the weapon. ECF No. 87, at 2. Moreover, this concern was relevant even before Officer Hoyson heard noises from upstairs.

circumstances as they existed at the time, the Court finds and concludes that the Officers faced the following situation: (1) they were called to the scene of a violent crime and assisted medics on the front porch of a home after a man had been stabbed; (2) the scene was chaotic, with law enforcement, medics, residents of the home, and at least one other person (Mr. Weathers) on site; (3) Mr. Weathers, a witness to the stabbing, went inside the Residence to speak to family members, and Officer Sywyj watched these actions because he had not finished interviewing Mr. Weathers; and (4) Officer Sywyj then saw an individual holding a firearm at chest level inside the Residence. With the amount of police vehicles positioned outside (Officer Sywyj confirmed in his testimony that there were likely twelve (12) police officers at the scene, Hr'g Tr. at 36:21–25), the Court finds and concludes that it was reasonable for Officer Sywyj to believe that anyone in the Residence would know police were present, and that anyone openly carrying a firearm within the Residence was a potential threat. The Court concludes that Officer Sywyj acted objectively reasonably under the circumstances in ordering everyone out of the Residence, conducting a security sweep of it, and seizing the gun he had seen moments before.[24]

Finally, Mr. Warren makes much of the United States's reference to the fact that the neighborhood in question was a "high-crime area" and argues that the Court should not give that factor disproportionate weight in applying the totality of the circumstances test. ECF No. 82, at 1–2. The Court agrees that the Fourth Amendment applies in every neighborhood. That said, the Court also concludes that regardless of the neighborhood involved, the police officers in this case were responding at night to the scene of a stabbing[25] that occurred quite recently with no suspect

---

[24] Officer Hoyson also testified that (5) he heard noises coming from upstairs upon entering the Residence. It was therefore reasonable to continue the search while ensuring no other individuals remained inside who could access the weapon.

[25] As the United States pointed out, Officers did not know at the time of their arrival that the stabbing had taken place in a different location and that the victim had been moved to the front porch of the home before their arrival. ECF No. 46, at 11.

in custody. Given the events as they further unfolded, the Court concludes it would have been objectively reasonable to perform the search, regardless of the neighborhood police found themselves in at the time.[26]

Based on the foregoing findings of fact and applying the relevant law, the Court concludes that the search performed by the Officers at 520 Lincoln Avenue on October 23, 2012 was objectively reasonable under the exigent circumstances exception to the warrant requirement.[27]

## III.    CONCLUSION

Because the Court concludes that both the search, and the seizure of the gun, were reasonable and lawful under the Fourth Amendment, Defendant's Motion is DENIED.  Further, in light of this ruling, and Officer Hoyson's uncontroverted testimony that he "Mirandized" Mr. Warren after placing him in custody, the Motion as it pertains to suppression of post-arrest statements made by the Defendant is similarly DENIED.


s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

cc:  All counsel of record

Dated: July 7, 2015

---

[26] Because the Court concludes that the search did not violate the Fourth Amendment, the Court will not reach the issue of whether the good faith exception should apply to the Officers' conduct, as argued by the United States. ECF No. 87, at 2–5.

[27] This conclusion means that the Court need not reach the question of whether Mr. Warren's incriminating statements should also be suppressed as the fruit of the poisonous tree.  Nor would the statements be suppressed for any other reason, such as failure to Mirandize Mr. Warren, as Officer Hoyson's testimony that he informed Mr. Warren of his Miranda rights was not contradicted and was otherwise credible.