1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3      UNITED STATES OF AMERICA,

4         vs.
                                         Criminal No. 13-270
5      ATIBA WARREN,
                    Defendant.
6

7

        Transcript of Pretrial Proceedings on Monday, October 19,
8   2015, United States District Court, Pittsburgh, Pennsylvania,
    before Mark R. Hornak, District Judge.
9

10
    APPEARANCES:
11
       For the Government:              Katherine King, Esq.
12                                       Jonathan Ortiz, Esq.
                                         Assistant U.S. Attorney
13                                       400 US Courthouse
                                         700 Grant Street
14                                       Pittsburgh, PA 15219

15
       For the Defendant:               Mark Sindler, Esq.
16                                       310 Grant Street
                                         Suite 2330 Grant Building
17                                       Pittsburgh, PA  15219

18

19

20
    Court Reporter:                     Juliann A. Kienzle, RMR, CRR
21                                       5300 U.S. Courthouse
                                         700 Grant Street
22                                       Pittsburgh, PA 15219
                                         (412) 261-6122
23

24
        Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

1  (Proceedings held in open court; Monday, October 19, 2015.)

2          THE COURT:  We're here this morning in the case of

3  the United States of America versus Atiba Warren pending on the

4  docket at 13-CR-270.

5          Will counsel for the United States please enter

6  their appearance.

7          MS. KING:  Katherine King for the United States.

8          MR. ORTIZ:  Jonathan Ortiz.

9          THE COURT:  Good morning.

10          Will counsel for Mr. Warren please enter his

11  appearance.

12          MR. SINDLER:  Mark Sindler.

13          Good to see you also, Mr. Sindler.

14          We're here for the pretrial conference in this case.

15  Everyone can remain seated at counsel table throughout the

16  proceeding.

17          Mr. Warren, you can actually pull that mic closer to

18  you in the event you need to speak today so we can hear

19  everyone.

20          This case is set for trial a week from today with

21  jury selection beginning shortly after 9:00 a.m. as we can get

22  the jury up here.

23          Ms. King and Mr. Ortiz, is the United States

24  prepared to proceed at that time?

25          MS. KING:  Yes, Your Honor.

1                THE COURT:  Mr. Sindler, is the defense prepared to

2  proceed at that time?

3                MR. SINDLER:  Yes.

4                THE COURT:  Counsel, I'm anticipating two alternates

5  in addition to the 12 seated jurors.

6                Does anyone see that as being a problem?

7                MS. KING:  No, Your Honor.

8                THE COURT:  Mr. Sindler?

9                MR. SINDLER:  No, Your Honor.

10                THE COURT:  Mr. Sindler gets ten peremptory

11  challenges and the United States gets six, correct?

12                MS. KING:  Yes, Your Honor.

13                THE COURT:  We're going to need 30 -- we're going to

14  have in excess of 50 jurors brought up for the venire panel

15  that will be up here.

16                It's my practice to do the general questions, which

17  elicit simply a yes or no answer in the courtroom.  Any

18  follow-up we do back in chambers.  I have found it too hard to

19  do standing at sidebar, and it's uncomfortable for the jurors

20  and they never know who can hear what.

21                What I try and do is using the standard voir dire

22  questions that are in the local rules and then suggested ones

23  from you is phrase them so that they are capable of a yes or no

24  question.  We'll have each member of the panel stand in turn,

25  state their juror number and read their answers to the standard

1  questions that come from the juror questionnaire, I'm juror

2  number whatever, I do this for a living, I'm this old, all of

3  those things.

4          I will ask questions based on your requested voir

5  dire and ask them to stand and state their juror number only if

6  their answer is yes.  If their answer to the question is no,

7  they remain seated.

8          If you would like, during the time that they're

9  doing that, if counsel wants to slide their chairs to the other

10  side of the counsel table so you can see the jurors, you're

11  more than welcome to do that.  You don't have to ask permission

12  and we'll allow you to do that so that you can take whatever

13  notes you want and those sorts of things.

14          We keep a master list, Mr. Babik does as we're going

15  through.  If, for example, the fourth juror in the first row

16  has no yes answers, they're automatically in the group of 30

17  that we need to strike from.

18          If the sixth person in the first row has one yes

19  answer or six yes answers, one yes answer gets you a visit to

20  chambers.  What I'll do is I'll note which question and I'll

21  read it that they said yes to, and I'll ask the juror,

22  prospective juror something like, I noted you said yes to

23  question No. 17, which you recall was as follows.  Can you

24  please tell us why you said yes.  Just let them talk.  I will

25  then ask some follow-up.

1              As long as counsel behaves, I will let you ask some

2  follow-up.  What I'll do is I'll try to alternate who gets to

3  ask the follow-up for each one, but I'll say something like,

4  Ms. King, do you have any follow-up for Juror No. 172?  And you

5  may or may not.

6              Then I'll say Mr. Sindler, do you have any follow up

7  for Juror No. 182.

8              As a result of your follow-up, I think there's

9  something else to be brought out, then I'll do that.

10             What we'll then do is we'll have that juror leave

11 chambers and Mr. Babik or another member of my staff,

12 Mr. Greer, Mr. Zimmerman, will bring them back out here.

13 Before we bring the next person in, I'll ask you if there are

14 any issues for cause.  I'll make any rulings at that time and

15 we'll know that that person is still in the loop or not in the

16 loop.  Once we get a little bit of a rhythm going, it goes

17 pretty well.  It probably is more time consuming than just

18 trying to do it at sidebar, but for me, and I suspect for

19 counsel, it allows a little more accuracy and a little more

20 reflectiveness.

21             Ms. King, Mr. Ortiz, if we do it that way, does the

22 United States have any problem with that?

23             MS. KING:  No, Your Honor.

24             THE COURT:  Mr. Sindler, does that all work for you?

25             MR. SINDLER:  Yes, you're fine.

1              In your experience on the bench in the last four or

2 five years --

3              THE COURT:  Four.

4              MR. SINDLER:  In a single defendant criminal trial,

5 is it your sense that it will take the better part of the day,

6 or are we going to start getting into openings and testimony on

7 the 26th?

8              THE COURT:  That's a terrific question, Mr. Sindler.

9              I've had only single defendant -- all of the

10 criminal trials I've had have been single defendant.  The first

11 couple we got it all done in one day -- we got the jury

12 selection all done in one day and we may have had the openings.

13              In the other one, we didn't get the jury selected

14 until the following morning.  I don't know why that was.  There

15 was -- the first one was a single count, the next one were six

16 counts but they were all related.  It was a white collar

17 financial crime type thing and it just took a little longer.

18 It involved bankruptcy and it turned out we had a surprising

19 number of jurors that had either been through bankruptcy or had

20 family members go through bankruptcy, so the follow-up ended up

21 being from where I sat surprisingly extensive.

22              I think in all likelihood, we should not plan on

23 more than the jury selection and perhaps openings for Monday.

24 I'm fine if counsel want to agree that that's all we'll do,

25 with the risk being that the jury selection goes really fast

1 and they're done at three o'clock rather than four-thirty.

2            Ms. King and Mr. Ortiz, you have to go first, so.

3            MS. KING:  We are fine with starting with the

4 evidence on Tuesday morning, Your Honor.

5            THE COURT:  Tuesday morning right off the bat?

6            MS. KING:  Yes.

7            THE COURT:  Mr. Sindler, does that cause you any

8 heartburn if we do jury selections and openings on Monday?

9            MR. SINDLER:  Not at all.

10           THE COURT:  I think you can tell your witnesses you

11 don't need them for Monday.

12           If you want them, Ms. King, whoever you're going to

13 have seated with you at counsel table, if you want them to be

14 seen, they should be here.

15           But I'm fine with that.  Frankly, I suspect the jury

16 will be also.

17           Mr. Babik, have you posted my trial tips?

18           MR. BABIK:  I believe I have.

19           THE COURT:  The one thing I really try to do is tell

20 the jury that absent something really compelling, we get them

21 out of here at 4:30 each day, particularly if we have someone

22 coming from a distance.  If that means on a given day we're

23 done at 4:20 because the next witness or the cross-examination

24 is going to take more than five or ten minutes, we will send

25 them home.

1           Let's talk about your proposed voir dire.

2           I will post maybe as early as today the Court's

3 proposed opening instructions to the jury and the voir dire.

4 Each of you have submitted your witness list -- when I post

5 them, when it's the -- any material that is for the benefit of

6 counsel before it's done in open court, I post it as Case

7 Participants Only so you can see it, but somebody that has a

8 Pacer account can't.  Once we do the voir dire and once I do

9 the opening instructions, Brian will lift the Case Participants

10 Only flag because it has happened in the courtroom.

11          I'll put them as the Court's Proposed Final

12 Instructions as Case Participants Only, you'll get to see them,

13 but they will not be open on the docket until the instructions

14 are actually given.

15          When it comes to the voir dire, I go through the

16 list of witnesses.  You have each sent me those separately.

17 They're under seal.

18          I can post the voir dire just simply with a paren,

19 Judge reads names of witnesses because you know who your

20 witnesses are, but then come Monday morning, they're all going

21 to be out there.

22          Do you have a preference, Ms. King?

23          MS. KING:  We have no secrets.

24          THE COURT:  Mr. Sindler knows who your witnesses

25 are?

1          MS. KING:  Yes, he does.

2          THE COURT:  Mr. Sindler, do you have a preference?

3          MR. SINDLER:  The later the better.

4          THE COURT:  We'll work through that.

5          Mr. Sindler, do you know at this point -- and you're

6  not bound by what you tell me but you may know, do you know

7  whether you're going to give your opening right after the

8  government's or wait until the close of evidence?

9          MR. SINDLER:  I don't wait.

10         THE COURT:  You come right at them.

11         It shapes how I phrase it in my opening instructions

12  to the jury.

13         Ms. King and Mr. Ortiz, do you have any objections

14  to any of the voir dire questions requested by Mr. Sindler?

15         And Mr. Sindler, I'll be asking you the same

16  question about the government.

17         MS. KING:  Yes, Your Honor.

18         THE COURT:  Which ones does the United States have

19  an objection to as requested by Mr. Sindler?

20         MS. KING:  On Page 2, Paragraph 6, this is not

21  really a question.  I don't know if the defendant is requesting

22  the Court read this to the prospective jurors.

23         THE COURT:  I didn't sense that.  I sense it was

24  Mr. Sindler asking me to ask the individual questions in

25  private.

1          MS. KING:  Which we don't have a problem with, but

2   we would request this not be read to the jury.

3          THE COURT:  I didn't view 1, 2, 3, 4, 5 or 6 as

4   being anything that is said to the prospective jurors but is

5   being said to me in terms of how Mr. Sindler wants me to do it.

6          Was I correct, Mr. Sindler?

7          MR. SINDLER:  It was a forward, yes.

8          THE COURT:  As it turns out, that pretty much is how

9   we do it.

10          MS. KING:  With respect to Paragraph 7(c), it's the

11   government's position that this question really is covered by

12   Question (b), 7(b) and so I think that 7(b) is sufficient,

13   however, it's up to the Court whether to read 7(c) or not.

14          THE COURT:  Let me ask Mr. Sindler this about (b)

15   and (c).

16          Mr. Sindler, I suspect, just as Ms. King and

17   Mr. Ortiz do, you choose your words and phrasing with

18   precision.  If I read something along the lines of (b) and/or

19   (c) or some combination of them, do you want me to refer to

20   Mr. Warren as a black male, a black man, an African-American

21   male, an African-American man?

22          MR. SINDLER:  I'll need a moment.

23          THE COURT:  We'll give you a moment.

24          (Whereupon, there was a brief pause in the proceedings.)

25          MR. SINDLER:  It's fine the way it is, black male,

1  talking to Mr. Warren.

2          THE COURT:  I will ask, there is a U.S. Supreme

3  Court case called Hamm versus South Carolina that says the due

4  process clause requires that a question along at least the

5  lines of 7(b) be asked, if requested, and I'm going to ask it.

6          I'll look at whether --

7          Mr. Sindler, do you believe (b) or some expansion of

8  (b) does the trick?  Or do you want (c) also?

9          MR. SINDLER:  I don't file things to fill space, so,

10  I don't believe that even though (c), Charlie, may overlap (b),

11  beta, they're different in their own respects and in their own

12  rights.

13          THE COURT:  Okay, we'll take a look at it.

14          Ms. King.

15          MS. KING:  With respect to 7(r), which says:  Do you

16  believe that Mr. Warren is required to testify in this case or

17  provide his version of what occurred?

18          The government did have the opportunity to look at

19  the Court's sample voir dire and I think that Question 32 of

20  the Court's sample voir dire, which is on Page 23, which says

21  that:  I shall also instruct the jury that the defendant in a

22  criminal case does not have to testify or present any evidence

23  on his own behalf and that decision to not do so is not to be

24  considered evidence against him of his guilt.

25          Do you have any doubt or reservation about being

1  able to follow this instruction?

2         I feel like that might be the same.  We don't have a

3  problem with (r), but if the Court was going to use its sample

4  voir dire.

5         THE COURT:  A number of the ones that both

6  Mr. Sindler and that you've asked for touch on both similar

7  topics.

8         Mr. Sindler, do you have a strong feeling either

9  way?

10        MR. SINDLER:  I have just found in the cases I've

11 tried over the last several years that people answer honestly

12 that they want to hear from the defendant in a case in which

13 he's being criminally tried.  And we are being a bit redundant

14 there, we are, but I think it's important for that reason

15 because people do have an innate desire to hear from the

16 defendant when it's not his obligation at all to do that.

17        THE COURT:  I'll take a look at it.  I'll try and

18 ask -- I'll see whether or not there are very direct but not

19 insulting ways -- I'm not saying your suggestion was insulting,

20 but that it directly gets to the topic.  So I understand,

21 Mr. Sindler.

22        Ms. King?

23        MS. KING:  That's all, Your Honor.

24        THE COURT:  Mr. Sindler, I had one, I'm not saying I

25 won't give it, I tend to resolve doubts in favor of asking

1 questions that lawyers want asked.

2          I am a curious sort, Question (f):  Have you or a

3 member of your immediate family ever been employed as a

4 firefighter or affiliated with any fire department?

5          I don't think it goes to any intrinsic privacy

6 interest, so I'm not bothered by asking it, I just -- I was

7 trying -- you don't have to reveal any trial strategies,

8 Mr. Sindler, but it was a curiosity.  If you can't answer it,

9 that's fine.

10          MR. SINDLER:  I'd rather stand down on that.

11          THE COURT:  Okay, I'm going to ask it.

12          Mr. Sindler, do you have any objections to any

13 question that was proposed by the United States?

14          MR. SINDLER:  We don't, no.

15          THE COURT:  We'll get those taken care of and should

16 get them posted probably this afternoon.

17          So then it appears that for trial purposes, the only

18 other question that the parties have disagreement on is some of

19 the exhibits, exactly what is going to be offered and what

20 isn't.  So, we'll look at the joint exhibit list, which is ECF

21 104.

22          There is an objection from the United States to five

23 exhibits to be proposed to be offered by the defendant, J, as

24 in John through N, as in Nancy.

25          Ms. King, let me ask you this.  Putting aside the

1 video, which is at J, is the concern of the United States or as

2 a principle or maybe exclusive basis of the objection that it

3 shows a digital depiction of a human being.

4          MS. KING:  That is one of our concerns, Your Honor,

5 yes.

6          THE COURT:  So let me ask you this.  If the witness,

7 that generated them did not show the human being but showed

8 what the Court would describe as looking down on the first

9 floor as though the roof and second floor had been removed and

10 had the arrows with distances to certain points, would the

11 United States still be objecting?

12          MS. KING:  Well, as the government did point out in

13 our filings, Your Honor, I don't know what basis there is for

14 the distances, in fact.  I'm not arguing that those are, in

15 fact, 18 feet, 22 feet, et cetera, but I don't know what

16 witness is going to testify about the relevance of those

17 distances.

18          THE COURT:  Relevance would seem to me to be an

19 argument, that it matters that the one distance -- I'm going to

20 open up my copy of the exhibits here, so let's look at K.

21          K has no distances on it.  It does have a digital

22 representation of a human being.

23          L shows a distance measured with a green line of 18

24 feet from a point to a different point.

25          So, I guess the question is, Mr. Sindler, are you

1  going to make an argument -- you don't have to tell the Court

2  or the United States what it is -- but is there going to be an

3  argument that it matters that it's 18 feet as opposed to 16

4  feet or 22.3 feet or something like that?

5           MR. SINDLER:  We --

6           THE COURT:  Or it's just helpful to know how far

7  that is?

8           MR. SINDLER:  We made several remarks back in March

9  that given the sight line that Mr. Sywyj was operating on from

10 the position he took at the front of the house looking into the

11 dining room.  I'm not going to stand up here and say, well,

12 gee, Sywyj saw Mr. Warren 26 feet away.  But there is argument

13 to be made with respect to where Mr. Warren was, and as

14 arbitrary as the government may seem that we were in depicting

15 certain distances, those are just three different distances.

16 We could have done 18 1/2 feet, I suppose, or 21 feet, but I

17 picked closest to the archway that separates the front room

18 from the dining room.  We picked a position that is somewhat in

19 the middle of the dining room.  We also picked a position that

20 is somewhat around where you would come off of or go up the

21 stairway to the second floor.  A lot of this was dependent upon

22 testimony that was received from Estelle Hayes, and the jury is

23 entitled to have, if we can provide it, evidence that

24 demonstrates her testimony that provides context for where the

25 police or the government says this crime scene evolved from or

1 developed from.  And that's all that we're trying to do.

2           THE COURT:  Let me ask you this, Mr. Sindler.

3           One of the arguments made by the United States was,

4 and I've not gone back and re-read the 188 pages of the

5 suppression hearing transcript, but I will, there was no

6 witness at the suppression hearing that placed a human being,

7 contended by the government, to be Mr. Warren at the spot that

8 the person from Cadnetics put that virtual depiction of a human

9 being at.

10          Do you have any different thoughts on that?

11          MR. SINDLER:  No.  My thoughts are consistent with

12 that.  The record does not show that he was at that exact spot

13 at some point.  He was in the room at that point because -- or

14 rather it's proper argument from us, given Ms. Hayes'

15 testimony, that he was asleep upstairs, there's no other way

16 downstairs to this first floor, according to her, and that he

17 would have had to have come from that stairway and gone to his

18 right, so to speak, to eventually be seen by Mr. Sywyj.  I

19 think it's proper argument to put him somewhere in the room.

20 We're not recreating the crime scene, but it is based upon

21 testimony that has been and will hopefully be --

22          THE COURT:  The guts of the government's argument is

23 that when any rational juror looks at this, no matter what you

24 argue, Ms. King argues, or I instruct them, they'll view it as

25 a reconstruction of the crime scene.  I think that's part of

1  the guts of the government's argument.

2          MR. SINDLER:  I'm sorry for interrupting.  So often,

3  Judge, and like other sister or brother jurors in this

4  district, judges often in jury selection, not during a trial,

5  will instruct jurors that despite what they may be thinking to

6  perhaps see things a different way.  I believe it's unfair to

7  say that, well, gee, no matter what it is that I as a judge

8  say, that they're still going to come --

9          THE COURT:  I said that was the government's

10  argument.

11          MR. SINDLER:  But it is argument.

12          THE COURT:  Let me ask you this, Mr. Sindler.  Is

13  your presentation of what I'll call the still graphic, the

14  non-video, is it impaired if your witness uses them exactly as

15  they are but without a human being being shown in it?  All the

16  arrows, all the distances, everything remains exactly the same,

17  and then you make whatever argument when you have any witness

18  on the stand, or Ms. King, if you're on cross-examination, make

19  any argument you want, or ask any series of questions about

20  placements of people without it being shown on there?

21          MR. SINDLER:  That would resolve the matter for now

22  in terms of permitting us to use this material, which is --

23          THE COURT:  K, L, M, N.

24          MR. SINDLER:  K through N, Nancy.

25          THE COURT:  Ms. King, help me understand.  If the

1 human being wasn't shown on K through N, what would be the

2 government's objection to its admissibility or use at trial?

3 Reserving all of your arguments, and Mr. Sindler having all of

4 his.

5          MS. KING:  I think, again, Your Honor, with the

6 removal of the figure, it's not as problematic.  However, just

7 generally, a top-down view of the room, in the government's

8 review of all of the evidence that has come out at the hearing

9 in this case and all of the filings, it doesn't really go to

10 any fact that's at issue in this case.  Officer Sywyj was

11 not -- did not have a top-down view of the room, no one had a

12 top-down view of the room, so I just don't see how a top-down

13 view would help the jury to resolve any facts that are in

14 issue, particularly when we do have photographs, actual

15 photographs of the residence.

16          THE COURT:  Here are photographs I have, Defendant's

17 Hearing Exhibits A1, A2, A3, A4, which are all exterior; A5,

18 which is interior; A6, which is interior; A7, which is

19 interior; A8, A9.

20          Are those all potential trial exhibits, Mr. Sindler?

21          MR. SINDLER:  Those are mine.

22          THE COURT:  Right.

23          MR. SINDLER:  I have to renumber them, but that's

24 true.

25          THE COURT:  Ms. King, do you have any objection to

1 | any of those?

2 |       MS. KING:  No, Your Honor.

3 |       THE COURT:  Then, we have from Mr. Sindler's

4 | presentation at the hearing, we have C1 through 3, which appear

5 | to be generated by Cadnetics.

6 |       Are these being proposed as exhibits, Mr. Sindler?

7 |       MR. SINDLER:  No.

8 |       THE COURT:  Then we have D1 and 2, which were

9 | generated by Cadnetics.

10 |       Are these being proposed, Mr. Sindler?

11 |       Feel free to come up if you need to get a closer

12 | look.

13 |       MR. SINDLER:  No.

14 |       THE COURT:  Then, Mr. Sindler, it appears that the

15 | H series of exhibits from the suppression hearing are the four

16 | we're talking about here, only -- yes, they are, only they're

17 | lighter than shown here.

18 |       MR. SINDLER:  They're lighter on paper, but we'll be

19 | using the electronic version if they're admissible.

20 |       THE COURT:  The electronic version appears to be

21 | brighter than the printed version.

22 |       MR. SINDLER:  That's true.

23 |       THE COURT:  Those are the ones you want to use.

24 |       Let me ask you this, Ms. King.

25 |       Is your objection for the United States an objection

1  to the admissibility as an exhibit or objection to the use as a

2  demonstrative at trial?

3            Here's the reason I'm asking the question.

4            Let's assume 20 years ago we have a white board here

5  or a flip chart, are you saying it would be objectionable if

6  Mr. Sindler, or you, got up and drew a floor plan?

7            MS. KING:  No, Your Honor.  But that also would not

8  constitute expert testimony.  It's our position that this still

9  is an expert opinion.  I can't -- I do not know how and I don't

10 know many people that are capable of creating a rendering like

11 this.  So it's our belief that this is still subject to Rule

12 702, and specifically, I do not believe that the defendant has

13 shown how this fits the fact that is at issue.  I don't have --

14           THE COURT:  I think one of the facts at issue is,

15 Mr. Sindler's argument or opening or both, he's going to argue

16 that the United States has not proven beyond a reasonable doubt

17 that Mr. Warren was in the possession of a firearm --

18           MS. KING:  Yes, Your Honor.

19           THE COURT:  -- on the night in question.

20           MS. KING:  These top-down views do not show any

21 person that was in that residence.

22           THE COURT:  Right, but it also doesn't show the

23 furniture, the couches, the other stuff, but it does show the

24 layout of the house.

25           I guess I'm -- I didn't sense with Mr. Johnson's

testimony when he testified, it occurred to the Court where I
said in my suppression opinion that I was giving Mr. Johnson
the benefit of the doubt, it really, the benefit of the doubt
on 702 issues went to lighting.  And Mr. Johnson was quite open
on the stand when he said he was not engaged to and he was not
opining on what anyone could or couldn't see on the night in
question, that he does drawings.  But I never sensed that there
was any question about either the mechanisms he used or the
accuracy of the results in generating these four still overlays
that were here.

There was a question that was specifically asked of
him by I believe you, which was you have -- you show a
gentleman standing at the bottom of the stairs and the question
was something like, how did you know to put him there?  And his
answer was, that's where Mr. Sindler told me to put the person.
Which there was nothing wrong in Mr. Sindler telling him that,
and there was nothing wrong in him doing that, but it was not
based on any evidence in the record.  But if the gentleman,
human being is not shown on the graphic and there's no question
as to the reliability of the methods, there's no question as to
the outcome of the measurements, what would be the fit issue?
Because fit usually is, here's the evidence, and the expert is
giving an opinion based on something other than the evidence
that is in the record.  But if it's undisputed that his
mechanism is accurate and it really is 18 feet on the one arrow

1 and 22 on the other and 26 on the third --

2          MS. KING:  I think specifically with those

3 measurements, Your Honor, Mr. Sindler just said those are

4 measurements that he just picked.  So, while it's all well and

5 good that those measurements are accurate, how are those

6 measurements going to be used?  I can't ask him to tell me now,

7 but if he's going to say Mr. Warren was standing at 26 feet

8 away, there's no evidence for that in the record.  So that's

9 our real concern with those measurements being placed --

10          THE COURT:  Mr. Sindler, do you have any reason to

11 believe that if Mr. Johnson testifies that he's going to offer

12 in any form in his oral testimony that he has any idea where

13 anyone was standing that night?

14          MS. KING:  Your Honor, I'm not saying that I think

15 Mr. Johnson would testify to that.  When Your Honor said --

16          THE COURT:  The only question to admissibility is to

17 what Mr. Johnson testifies.

18          Mr. Sindler is going to be free to argue that

19 Mr. Warren -- I'm not saying he will or won't argue it -- but

20 he'll be free to argue Mr. Warren wasn't even in the room that

21 night, if he wants, he'll have to have some facts to argue

22 from.

23          MR. SINDLER:  Mr. Johnson is not going to say

24 anything about where Mr. Warren was standing at a given time or

25 a given point that night in the room or at what time.  But,

this is argument.  I'm repeating myself when I say that I'm
permitted to give the context and the perspective to twelve
strangers, plus the two alternates who, unlike all of us in
this room, don't have the foggiest idea what happened that
night.  So, it's just a way to make them become in a couple
days they're going to be together as familiar as possible with
the alleged crime scene.

THE COURT:  I think as to the still photos,
Ms. King, I think Mr. Sindler's argument carries the day.  If
there's no question about that that actually is the floor plan
of the home in question and that those arrows are actually that
length.

MS. KING:  I guess the government's question is what
witness will be testifying to show that those are relevant
distances in this case?  Mr. Johnson's testimony is separate
and apart --

THE COURT:  You and Mr. Ortiz and Mr. Sindler make
things relevant.  Witnesses testify to facts.

MS. KING:  What witness will testify about the
factual basis for the placement of those specific measurements
within the rendering?  That is something --

THE COURT:  Mr. Johnson, I suppose, will say in
response to either a question by Mr. Sindler or
cross-examination by you, how do you know that was 18 feet?  I
measured it.

1           MS. KING:  To what fact that's at issue in this case

2  do those distances apply?  That's our problem with those

3  measurements.  Those distances do not fit any issue that is

4  contested in this case, that the government is aware of.  So

5  for him to just arbitrarily put in random distances in the

6  exhibit -- I understand that he can testify that that is in

7  fact 18 feet, that is in fact 22 feet, but to what disputed

8  issue do those particular measurements go?

9           THE COURT:  Isn't it relevant -- isn't a fact

10 relevant if it makes a fact of consequence more or less likely?

11 A fact of consequence here is, was Mr. Warren observed

12 possessing a firearm?

13          MS. KING:  Yes, Your Honor.  Those particular

14 distances, I don't see how they go to that, especially when the

15 only testimony which was given by Officer Sywyj says that he

16 was just beyond the door frame.  So to put an arrow that goes

17 back to 26 feet --

18          THE COURT:  He could have put an arrow through the

19 back window into the backyard.  I don't mean to be a wise guy

20 about it, and then you would argue if Mr. Sindler made

21 something up that through his examination of witnesses or in

22 his closing argument, you do get to go last, you get to go

23 twice in closing and you get to go last, wouldn't you be in a

24 position to argue, ladies and gentlemen of the jury, you heard

25 about all sorts of distances here, don't let that confuse you,

here's what X testimony was, Y testimony was, Z testimony was.
But I don't know that Mr. Sindler is not allowed, so that the
jury can have context, rather than wondering how far was it
from the doorway to the bottom of the steps?  Well, it's 26
feet.  How far was it from the doorway, the entrance doorway
off the front porch to the middle of the room?  It's 22 feet.
How far was it from the entrance doorway to just inside the
living room?  That's 18 feet.  I don't know -- I guess I can't
say it's irrelevant at the moment and the proponent of the
evidence, I think, has made the case that it's relevant for the
jury to have some understanding of the scene and some context
of the distances.

     MS. KING:  It's our position that the photographs
provide that.  And those are actual photographs of the
residence.  Jurors, most of them live in some type of house,
apartment, and have a general sense for how big a room is.

     THE COURT:  How is this prejudicial to the United
States if I allow it in?

     MS. KING:  Are you talking about just the distances
and not the figure?  I do think the figure is very prejudicial.

     THE COURT:  Unless there is somebody who takes the
stand, anybody, and says, that's approximately where Mr. Warren
was standing.

     MS. KING:  Yes.

     THE COURT:  I think, I think the figure being in

1  does go to fit because there was no testimony at the

2  suppression hearing that placed Mr. Warren at the bottom of the

3  steps when he was -- when Officer Sywyj said he saw him.

4          So, I think the figure does go to fit, but without

5  the figure in there, how do the four top-down schematics

6  prejudice the United States, particularly if the photos are

7  also in because then they provide context in two directions?

8          MS. KING:  Again, Your Honor, I do think that the

9  distances themselves, it's the same as the figure, there's no

10 one that will testify that those distances have any basis in

11 fact in this case.  So we just think that showing those to the

12 jury -- that's something they'll look at and say, look at these

13 distances, it's right there.  Instead of them seeing the whole

14 room.  It's would be one thing if it was just one line saying

15 2, 3, 4 feet.

16         THE COURT:  It's your job, yours and Mr. Ortiz's, as

17 advocates to tell the jury what to pay attention and what

18 weight to give it, just as Mr. Sindler will do that on

19 Mr. Warren's behalf.

20         For the time being, I'm going to overrule the

21 objection as to what we'll call the overhead views that are in

22 Exhibits K, L, M, and N, if the figure of the human being is

23 removed.

24         The other thing is, I don't anticipate we're going

25 to hear from Mr. Johnson or see these --

1        Let me ask you this, Mr. Sindler.

2        Are you going to use these possibly on

3 cross-examination of a government witness?  I guess you might.

4        MR. SINDLER:  It's hard to say.

5        THE COURT:  I'm going to let those in.  I'll allow

6 counsel to use those with the figure removed, with the figure

7 of the human being removed.

8        Now, I anticipate, and I -- it's not obvious to the

9 Court what the objection would be, that when they're used with

10 various witnesses, each of you might ask them to do things

11 along the line, or not along the line, or somewhere else in the

12 room.  Once they're usable, they're usable by both sides, and

13 you're going to ask -- may ask witnesses about them, but I'll

14 let those in.

15        So let's talk about the video.

16        Mr. Sindler, what would you anticipate Mr. Johnson's

17 testimony to be regarding the video?

18        MR. SINDLER:  The animation that he did is the

19 daylight version.  We did not use the nighttime version.  We

20 did not use the hybrid, if you remember that, which is a

21 combination of both day and night.  It doesn't get much

22 brighter, if you will, than what is shown in Exhibit J.  It's

23 30 seconds.  The animation begins from outside of 520 Lincoln

24 Avenue and takes you --

25        THE COURT:  From the sidewalk up the steps.

1          MR. SINDLER:  Up the back, through the front door,

2  through both rooms.

3          The reason that this is important is because that is

4  the general path that both government witnesses -- well, I

5  don't think Ms. Hayes testified to it, but --

6          THE COURT:  She was inside the house.

7          MR. SINDLER:  I would concede that Mr. Sywyj took

8  that path upon arriving at 520 Lincoln Avenue.  I would also

9  concede he stood at the doorway, although we'll dispute

10 infinitum when he entered the house.

11          But in any event, he did go into the doorway, and he

12 did go inside of the house in the direction that the animation

13 shows to retrieve the firearm from what we call the dining

14 room, which is that middle room that has the stairway that can

15 be ascended or descended from the second floor.  We're not

16 depicting the place at which he found the firearm.  We're not

17 depicting any possessions because, again, the animation shows a

18 first floor that is devoid of any personal property, if you

19 will, and --

20          THE COURT:  The A series of photographs show all

21 that.

22          MR. SINDLER:  Show that, but that's as of February

23 9, 2015.

24          So, whether or not that was the same as two and a

25 half years before, we don't know, but it's the same property

1  except for the paint on the wall, I suppose.  But that's no

2  longer an issue because lighting is now out.  That's what it

3  would show.

4          THE COURT:  Ms. King?

5          MS. KING:  Again, there's a figure in the animation,

6  so we do have an objection to that.

7          Just generally with respect to the video, we're not

8  contesting that that generally is the path that Officer Sywyj

9  took, however, he was on the porch for a long period of time

10 with a victim that was there, he was standing at the door.  It

11 wasn't a direct path from the sidewalk up.  I don't know that

12 he ever actually testified that he walked up the sidewalk, but

13 he definitely did not walk from the front door straight back

14 toward the kitchen.  I think he testified that he went directly

15 where the firearm was, which was directly behind the door --

16 directly behind the wall, pardon me, Your Honor, that had the

17 fireplace on it.

18         So, I just don't know what the relevance is to show

19 a walk-thru that walks straight through back toward the

20 kitchen.  We don't necessarily have a problem with the

21 dimensions or anything of that nature.  I guess it's just to

22 give the jurors a view of walking into the house.  I think a

23 video could do the same -- could do the same thing for the

24 jurors.  I'm sure Mr. Sindler -- I have a video that we took

25 when we went to the residence that we could use instead, but if

1 the Court is going to let in the top-down views --

2          THE COURT:  And the photos, they'll be renumbered A1

3 through 9.

4          Mr. Sindler, any rebuttal to what Ms. King said?

5          MR. SINDLER:  I really dispute what Ms. King said

6 about the record from March 3rd.  Sywyj said during his first

7 or second time on the stand back on March 3rd that just beyond

8 the doorway that was part of the line of sight from the front

9 door is where Warren was seen.  Now, there was some testimony

10 that I believe was embellished later on where he said, was said

11 to have seen him to the far right side, which has a different

12 doorway from the front room and the dining room.  But Sywyj

13 went from the doorway at the front porch into the home as shown

14 by the animation, finding some table, I think, to the right

15 side of that dining room once he was inside that dining room.

16          THE COURT:  He called it a magazine table, something

17 like that.

18          MR. SINDLER:  He supposedly found the firearm

19 beneath a magazine or two on a table, but maybe it was a

20 magazine table.

21          So, we used, based upon, although we didn't hear his

22 testimony yet because this animation was produced before March

23 3, but at least that part was consistent with what he said in

24 his report because he said he had seen him, line of sight from

25 the front door looking into the dining room through that front

 1  room, and we're permitted to provide the context.  I think that

 2  the images are fine with respect to what -- I don't know which

 3  letters we have, but it was known as A1 through A9 back in

 4  March, as well as the isometric, which you've already spoken

 5  to, and it's simply 30 seconds.  But even if it was 30 minutes,

 6  it provides rather than putting up one screen shot after

 7  another, a fluid, seamless rendering with accuracy as to how he

 8  approached the house.

 9          You know what, if he approached the house walking

10  across the front yard, I'll concede that point, but he probably

11  used the pathway that was to the right of the front yard.

12          But in any event, we all agree where the front door

13  was and we seem to agree that for some period of time, he stood

14  there looking inside.  And the record furthermore shows where

15  he saw Mr. Warren supposedly and then went to that place inside

16  of that room to look for this firearm.

17          THE COURT:  I'm going to take that one under

18  advisement, although I will say, Mr. Sindler, I think it is

19  more likely than not, and I want to re-read the suppression

20  hearing transcript, but based on my read of it, the Court's

21  prior opinion and the examination of the other exhibits that

22  will be coming in or will be used by the parties, at this

23  point, I would say it's more likely than not I will not allow

24  Mr. Johnson to testify using the animation, or to put it into

25  the record.  I will re-read the suppression hearing transcript

1 one more time.

2         The basis of my ruling is really two-fold.  One, in

3 terms of fit, I think that it is far more of a projected, if

4 you will, recreation than the isometric floor plan depictions.

5 I think those are an essentially indisputable recordation of

6 what the layout is, and I think it's -- it's not inconsistent

7 with any testimony the Court is currently aware of, those

8 isometric floor plans, and they are helpful to a factfinder in

9 discerning the layout of the place where the events in question

10 occurred, and they also are not prejudicial to the rights or

11 interests of either party.

12         The animation is a different ball game because it

13 requires, in the Court's estimation, far more precision of what

14 happened that night, and there is a high likelihood in the

15 Court's mind that no matter the argument made by counsel or the

16 instructions by the Court that the prejudicial effect of the

17 jury believing that that is, in essence, a movie of what

18 happened that night outweighs its probative value, given that

19 the photographs A1 through 9 will come in, if any party offers

20 them, as will the four isometrics, that is, the static floor

21 plans with one without the green measurement arrow and three of

22 them with green measurement arrows of three lengths.

23         So, I'm going to reserve my judgment on the

24 animation.  I want to re-read the suppression hearing

25 transcript, but in fairness to you, for preparation,

1 Mr. Sindler, based on right now, I think it is more likely than

2 not I will not allow use of the animation.

3          MR. SINDLER:  I respectfully take exception for two

4 reasons.

5          THE COURT:  You're welcome to.

6          MR. SINDLER:  One, when you read the record as a

7 whole, the overriding --

8          THE COURT:  Which I just told you I'm going to do

9 again.

10          MR. SINDLER:  The overriding objection by the

11 government had to do with lighting.  Having made a calculating

12 decision several weeks ago, we put that aside.  That's the

13 first thing.

14          The second thing concerns the fact that the record

15 is going to show that the archway, not the one that Mr. Sywyj

16 was standing inside of, but the one that separates the living

17 room from the dining room was no more than 4 feet.  The

18 isometrics do not give a proper perspective to 12 plus 2

19 strangers sitting in that jury box -- -

20          THE COURT:  But the photographs A1 through 9 may.

21          MR. SINDLER:  I'm sorry.

22          THE COURT:  The photographs A1 through 9 may.

23          MR. SINDLER:  They may, but they don't give it from

24 the perspective of somebody who is walking, or at the speed the

25 animation was going from one point to another.  More

1 importantly, not even walking, what was it that he was able to

2 see under the conditions that we'll have under separate

3 testimony that were rather poor visibility, and the isometrics

4 don't do justice to that argument.

5         THE COURT:  I'll take a look at it.

6         MR. SINDLER:  I'm sorry for just stomping my feet

7 here, but --

8         THE COURT:  Well, in fairness to you, Mr. Sindler,

9 get it out of your system now because I'm about to tell you

10 that under the rules of evidence, when a ruling is made on an

11 objection, no exception is needed.  If you start making them in

12 trial, you and I are going to have a problem and it will be

13 because you're not acting in accordance with the rules.

14         So, whether you're sorry to or not, if you want to

15 keep on going after I have definitively ruled, or in this case,

16 not definitively ruled, I've done two things, I've said I'll

17 give it a whole other look because you've said it's important

18 to you and in fairness to your trial preparation, I have told

19 you it's more likely than not at the moment I would not permit

20 it.

21         So, you have one clear win in that I'm going to look

22 at it again and one half win in that I've not sandbagged you.

23         But you get it out of your system now.

24         MR. SINDLER:  I'll quit while I'm behind.

25         I just wanted to make those two points.

1              THE COURT:  They're made.

2              So we'll figure that out.  I will issue a ruling on

3  that.  I'll issue a text order that says the other one, the

4  isometrics, based on the record that's now available to the

5  Court, will come in.

6              Now, Mr. Sindler, you brought up, I think properly,

7  what the Court views as the results of the discussions between

8  counsel.  I'm assuming, but either counsel is free to correct

9  me, that there will be some arguments made by one or both of

10 you or some observation made by one or both of you to the jury

11 about the time of year, the date when this incident occurred,

12 the time of day, and that the photographs that you're seeing,

13 meaning ladies and gentlemen of the jury, were taken at a

14 different time of year at a different time of day.  And the

15 jury -- and you'll then make some arguments to the jury as to

16 what they should do with that.  In fact, you may, I'm

17 anticipating, ask questions of one or more witnesses as to how

18 any of those things would or wouldn't make a difference.

19             Am I assuming correctly, Ms. King?

20             MS. KING:  Yes, Your Honor.

21             THE COURT:  Do you have any problem with that when

22 you or Mr. Sindler do that?

23             MS. KING:  No, Your Honor.

24             THE COURT:  Mr. Sindler, am I assuming correctly, at

25 least some of the lines of interrogation that you will be

1   making at trial?

2          MR. SINDLER:  Yes.

3          THE COURT:  And do you have any problem if either

4   Ms. King or you go down those -- I can't think of any problems,

5   but I just figured we'd clear it up now.

6          MR. SINDLER:  I don't.

7          THE COURT:  It's germane.  So you're each going to

8   talk about that with the witnesses.

9          So, I've ruled on all of the contested exhibits.

10          I've heard from each of you on the importance of

11   voir dire.  And I cannot recall when I have not asked a voir

12   dire question that a lawyer has asked for in either a criminal

13   or civil case.  Where they're duplicative, I may roll them into

14   other ones, often they overlap, but I will take, Mr. Sindler,

15   your point on the two areas that Ms. King raised.  I think

16   there is a Supreme Court case on one.  We've clarified the

17   nomenclature that you want used in the voir dire question, and

18   I don't have a problem with that, and I didn't hear Ms. King

19   say there was a problem with that.

20          Ms. King, I'll start with you because your side of

21   the case goes first, what else should we either resolve today,

22   or do you or Mr. Ortiz have any questions in terms of how we

23   sort of do things in Courtroom 6A?

24          MS. KING:  The only other -- not the only other, one

25   other issue just with respect to the proposed points for charge

1 and jury instructions.

2 THE COURT:  The final instructions.

3 MS. KING:  The final instructions.  This actually

4 might be better addressed at the end of trial, but I did just

5 want to bring it up now, Your Honor.

6 We did file a joint set of instructions and we

7 largely agree on the instructions that should be given.

8 However, the defendant did propose instruction Third Circuit

9 Model Jury Instruction 4.15, although that might be a typo, but

10 with respect to eyewitness identification of the defendant.

11 THE COURT:  So it's not that Mr. Sindler changed the

12 model instruction, you're wondering why he would propose the

13 instruction at all or whether it should be given at all?

14 MS. KING:  Yes, Your Honor.  It's our position, at

15 this point at least, that that would not be an appropriate

16 instruction in this case.

17 THE COURT:  Which ECF document?  Are you looking at

18 ECF 108, Item No. 2, Eyewitness Identification of the

19 Defendant.

20 MS. KING:  Yes, Your Honor.

21 Just reading the commentary to that instruction,

22 Your Honor, the commentary says that this instruction should be

23 given in any case in which eyewitness identification of the

24 defendant is an issue.

25 Then I would just direct the Court's attention to

United States versus Brown, which is an unpublished decision
from the Third Circuit.  I have a copy for the Court and for
defense counsel.  The citation is 416 Fed.Appx. 150.  It's from
the Third Circuit from 2010.  In that case, the defendant had
requested that the court give the eyewitness identification
instruction, and at trial, the law enforcement officer
testified that he had seen the defendant leaving a residence, I
believe, a controlled buy of drugs happened there, and he
specifically testified that he was able to see the defendant's
face as the defendant drove away, and the district court there
refused to give that instruction.

   The Third Circuit found there was no abuse of
discretion, noting that there was no support in the record for
mistaken eyewitness identification and as a result refused to
give the instruction.  So I obviously don't know how the
evidence is going to come in at trial, but at this point, I
don't believe that that would be an appropriate instruction in
this case.

   THE COURT:  Mr. Sindler, without prejudice at all to
your ability to make whatever argument or presentation after we
hear the evidence, I was not surprised by your observation
earlier that you don't ask things of the Court to fill up
space, you thought that an eyewitness instruction is likely to
be one that would be appropriately given in the final charge.

   Do you want to say now why you think that, or do you

1 want to reserve until we get to that point?

2          MR. SINDLER:  We can talk about it now, but you look

3 at the first sentence of the second paragraph and

4 identification is the expression of a belief by the witness.

5          Sywyj is not giving his opinion, he's giving his

6 belief that he saw Warren with a firearm.  Well, that

7 instruction is appropriate.  I don't need to state the obvious.

8 I didn't look at this unpublished opinion, I suppose if this is

9 more of an important matter there would be something published

10 and I suppose the government would have that available for us

11 and the Third Circuit, but it's his belief that Mr. Warren was

12 there inside of the house with a firearm.

13          He may have been identified later on once the home

14 was in an orderly way evacuated, it was actually just two or

15 three people, and later on, within moments, finding the firearm

16 on that table inside of that room, the decision was made to

17 arrest him.

18          Well, he was identified outside of the house.  We're

19 permitted to object, we're permitted to contest what happened

20 moments earlier inside of the house.

21          THE COURT:  Thank you, Mr. Sindler.

22          Ms. King, I'll want to look at the case.  I will say

23 it does seem to the Court that an essential element of the

24 government's proof is that Mr. Atiba Warren was possessing a

25 firearm, and as I recall the testimony at the suppression

1 hearing, it started with the police officer saying he saw

2 Mr. Warren possessing a firearm.

3          I think the jury will have to make a decision and

4 find beyond a reasonable doubt if there is to be a conviction

5 to be sustained that, in fact, it was Mr. Warren and that he

6 was, in fact, possessing a firearm.

7          So, I think unless there's a concession or an

8 admission, I'm not saying there is or should be or shouldn't

9 be, it does strike the Court that one of the key elements in

10 this case is going to be the jury's determination of whether,

11 in fact, Mr. Warren was seen possessing a firearm.

12          So, the odds are I'll give that instruction, but I

13 think you're right, we'll see how all the testimony plays out,

14 but I suspect even if four people took the stand and said we

15 all saw Mr. Warren possessing a firearm, that if Mr. Sindler

16 asks for an instruction on how a jury is to evaluate eyewitness

17 testimony relative to the identification of a person, I think

18 he'd be entitled to that instruction.  We'll play it out.  It

19 does seem to be sort of at the heart of the case.

20          Anything else we should take care of today,

21 Ms. King, either in terms of matters to be resolved or any

22 questions about how we do things?

23          MS. KING:  I don't believe so, Your Honor.

24          THE COURT:  Or suggestions about how we should do

25 things?  We try and adapt them to the presentations that

 1  counsel is going to make.

 2         Mr. Sindler, we'll start with the first one,

 3  anything else you think we ought to resolve while we're here

 4  today?

 5         MR. SINDLER:  No.

 6         I do have two remarks, though.

 7         THE COURT:  Nothing to be resolved.

 8         So, remark No. 1.

 9         MR. SINDLER:  We did not have an objection to

10  Government Exhibits 1 through 1 Charlie.  We're going to have a

11  rolling objection, I don't want to do this in front of a jury

12  panel, that even though we disagree with the suppression ruling

13  that the firearm is at the heart of the evidence, so I don't

14  want the record to seem that we've conceded that suppression is

15  no longer an issue.  The gun should have been suppressed.  It

16  wasn't.  And any time that this weapon is referred to either by

17  picture or in physical form, just so it's out there, we just

18  have an objection.

19         THE COURT:  Let me ask you this, Mr. Sindler.

20         So what are you concerned will happen from the

21  government's side and how should whatever your concern be

22  preserved?

23         MR. SINDLER:  I think I've just preserved it.

24         THE COURT:  You did reference your concern that when

25  the firearm is referred to.  Are you concerned that it's going

1 to be referred to in a certain way and that whatever objection

2 you have to the suppression, that beyond that, the firearm

3 would be referred to in a certain way that would be a different

4 and nonetheless important objection?

5          MR. SINDLER:  I don't think so.  It's just the fact

6 of the firearm that's going to be in this case by photograph

7 and physical form.

8          THE COURT:  I suspect by the original suppression

9 motion you made on Mr. Warren's behalf and the points you've

10 made now, you object to the firearm being part of the quantum

11 of proof that comes out in the trial of this case.  As far as

12 I'm concerned, you've preserved it.

13          Ms. King, do you believe Mr. Sindler needs to do

14 anything further or different to preserve his objection to the

15 firearm being presented as evidence in this case?

16          MS. KING:  No, Your Honor.

17          THE COURT:  I think you've covered that.  As far as

18 I'm concerned, Mr. Sindler, you've done everything you need to

19 do to preserve that.

20          MR. SINDLER:  The other matter is of a delicate

21 issue.

22          I was put on notice, it was actually now twice in

23 this case last week with respect to the evidence that you're

24 going to consider.  Well, we've considered part of it, the

25 isometrics which appear to have been admitted in this case as

1 well as the animation.  The notice went out yesterday -- went

2 out last week, excuse me, from you that I missed a deadline.

3          THE COURT:  You're in compliance.  The Court does

4 not believe that you're in violation of any directive of the

5 Court.

6          MR. SINDLER:  This is now the second time in this

7 case.  It happened several months ago when I was supposed to

8 file a transcript request.  I'm not asking you to retract it,

9 I'm not sure you would retract an order that you issued last

10 week, but I did give Ginelle, whose last name I don't know who

11 is one of the front desk people.

12          THE COURT:  One of the docket clerks.

13          MR. SINDLER:  I gave her this information.  Some of

14 it was not available in paper form, which I suppose is my

15 fault, even though I was never intending and still don't intend

16 to present the isometrics in paper form.  So, she and I will

17 disagree as to whether or not she took my disk, I say she did,

18 she said she didn't --

19          THE COURT:  I ended up getting it the same day when

20 Ms. King walked a copy up to our chambers.

21          MR. SINDLER:  We would both agree if she were here

22 that I tried to file it that way.  It was just surprising to

23 me, eyebrow raising, that something I was to do I was called

24 out on the next morning.  As you may or may not know, later

25 that day, I delivered when I then heard from Ginelle that she

and I disagree about what happened the day before, I delivered these paper versions of the isometrics.  It's not anything for you to say, this is my chance to say something about it, that's all I was intending to do.

THE COURT:  That's fine, Mr. Sindler.  There's no problem with you saying something about it.  If you want, because it would be true, I will post a text order that says the Court received all the information it directed to be received in a timely manner.  I'm happy to do that.

I will also say you should not feel lonely in those regards.  There were two other lawyers in other cases where last week I entered similar orders, something was due on the 15th, it didn't come in.  As far as I knew, the morning of the 16th, I entered an order and said, I don't have it, and I may proceed in this way.

They were both in civil cases, and I don't normally do that.  I would say in four years here, those are the three times I've done it.  The only reason I did it was we were dealing with very compressed time frames between when something was due and a trial was going to begin.  The other two related to matters I have set for trial the week after yours, and matters set for trial the week after that one, and a bunch of other deadlines were triggered by those things coming in.  So I didn't do it to be a meany.  Again, I didn't do it uniquely in your situation, I did it in two other cases because they had

1  similar tight time frames for something else, either that I was

2  expected properly by the lawyers to do something about, or that

3  all of us were expecting the other lawyer to do about.  And the

4  date I have in mind when I entered the order was today, that we

5  were going to be here, Mr. Warren was going to be coming in

6  today and I wanted to make sure I had a chance to look at it

7  all before we got here today.  But I'm happy, because I

8  don't -- the intention was not either in your case or the case

9  of the other lawyers to place any blemish on their otherwise

10  earned professional reputation.

11       It was also signaled both to you and the lawyers in

12  the other cases, I got half of what we understood was coming, I

13  don't have the other half and I have had multiple occasions in

14  the time I've been on the bench where lawyers in good faith

15  have believed the judge has it and it turned out I didn't have

16  it and I regretted not telling the lawyers I don't have it.

17       So, that was the basis for my order.

18       We'll enter another order today to indicate that I

19  have everything and that it was to the Court in an appropriate

20  fashion.  It wasn't delicate for me for you to bring it up.

21  I'll leave it up to you whether it was delicate for you, but

22  that's the kind of stuff you should bring up.

23       Anything else, Mr. Sindler, in terms of matters to

24  be resolved or questions about procedures or anything else?

25            MR. SINDLER:  No.

1          THE COURT:  Mr. Sindler, will you be making

2   arrangements with the marshals for clothes for Mr. Warren so

3   that he has all that?

4          MR. SINDLER:  It's already underway.

5          THE COURT:  I didn't doubt that, the only reason I

6   brought it up is one of my colleagues had a trial and it turned

7   out that morning we didn't have clothes.

8          Anything else, Ms. King or Mr. Ortiz?

9          MS. KING:  No, Your Honor.

10          MR. ORTIZ:  No, Your Honor.

11          THE COURT:  Mr. Babik, anything else we need to take

12   up?

13          MR. BABIK:  Nothing else.

14          THE COURT:  What we will do with the screens, you'll

15   obviously have them on counsel table.  This screen will be back

16   over a little bit on this side of the jury.  We usually put the

17   other screen up sort of back behind Mr. Ortiz.  That way the

18   alternate jurors have a clear view of it also without having to

19   strain their eyes.

20          So that no one is surprised if you have colleagues

21   or family members or others coming, you'll see signs we keep

22   the first row of the pews on each side empty on both sides.  We

23   ask that no one sit in those first rows on either side.

24          Will anyone be asking for sequestration of

25   witnesses?

1          MR. SINDLER:  I will, but I'll also instruct any

2  witnesses we may have to do the same.

3          THE COURT:  Under the rules, once sequestration is

4  asked, I'll treat that as a request on the record.  I'm

5  obligated to grant it.  We will sequester witnesses.

6          I will ask when witnesses are done testifying or

7  when they're done for the moment testifying, whether any party

8  anticipates recalling them during the course of the trial.

9  You're not forever bound by that, but I will then ask is there

10  any reason I can't tell the witness they may go about their

11  business.  If you think you need them hanging around the

12  courthouse, just tell me and I'll tell them you need to remain

13  in the vicinity of the courthouse.

14          I do try and take a break.  We'll definitely take a

15  midmorning break, but if we have been on a long run of things,

16  I may ask between witnesses, I may tell the jury they're free

17  to stand and just stretch out.  If we do have a sidebar, we'll

18  do it over there.  The chair is for Ms. Kienzle.  I do tell the

19  jury they are free to stand while we're at sidebar so they can

20  stretch out.  We'll put the fuzz box on when we are at sidebar.

21  Mr. Warren can be at sidebar, if we're over there.

22          I know I say in the trial procedures and I'm sure a

23  number of judges elsewhere in the building and around the

24  country talk somewhat negatively about sidebars and too many of

25  them are a bad idea, but if either of you think that we're

1  headed somewhere dangerous and we need to address it outside

2  the presence of the jury and it's not disrupting the

3  examination of the other side, or if I see what I think is a

4  red flag coming, I'll ask to see counsel at sidebar.  It's one

5  of my goals to provide a fair trial one time for both sides, so

6  if you do see a problem coming, you're not going to get in hot

7  water with me if you have a good faith basis for saying, Your

8  Honor, may we approach, and we'll go over to sidebar.

9            With that, we'll adjourn the hearing.  I'll enter

10 two orders, I'll enter an order now on the isometric, what I'll

11 call fixed depictions, saying that they're presumptively going

12 to be allowed in, and I'll then enter a subsequent order on the

13 animation.  I'll enter an order on the docket so it's there

14 confirming I got the material in an appropriate and timely

15 fashion from defense counsel, and then we'll get posted the

16 proposed voir dire and the proposed opening instructions.  I'll

17 put a date in probably Thursday or Friday, if you have any

18 objections to anything in there to let me know, and then I'll

19 ask you again on Monday morning when we're here with the jury.

20           Also, I do provide bottled water.  You're welcome to

21 bring bottled water.  I'll provide all the water for the

22 defense table, I don't know what the marshal's rules are in

23 bringing beverages for a defendant in custody, so I'll make

24 sure there is a bottle of water available there.  You're free

25 to bring, Mr. Ortiz or Ms. King, any soft drink as long as it

1   has a mechanically closing lid.  We provide water to the jury.

2           With that, Mr. Babik, why don't we adjourn this

3   proceeding.

4           I see Mr. Haller from the U.S. Attorney's office is

5   here on a different case that Mr. Sindler is involved in.

6   We'll take care of that business separately.

7           We can adjourn the pretrial conference, Mr. Babik.

8       (Court adjourned.)

9                           -----

10

11                      CERTIFICATE

12

13           I, Juliann A. Kienzle, certify that the foregoing is
    a correct transcript from the record of proceedings in the
14  above-titled matter.

15
    s/Juliann A. Kienzle, RMR, CRR
16  _____
    Juliann A. Kienzle, RMR, CRR
17

18

19

20

21

22

23

24

25