1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA,

4       vs.
                                    Criminal No. 13-270
5    ATIBA WARREN,
                    Defendant.
6

7

        Transcript of Jury Trial Proceedings on Monday, October
8   26, 2015, United States District Court, Pittsburgh,
    Pennsylvania, before Mark R. Hornak, District Judge.
9

10
    APPEARANCES:
11
        For the Government:          Katherine A. King, Esq.
12                                    Jonathan B. Ortiz, Esq.
                                      Assistant U.S. Attorney
13                                    400 US Courthouse
                                      700 Grant Street
14                                    Pittsburgh, PA 15219

15
        For the Defendant:           Mark A. Sindler, Esq.
16                                    310 Grant Street
                                      Suite 2330 Grant Building
17                                    Pittsburgh, PA  15219

18

19

20
    Court Reporter:                  Juliann A. Kienzle, RMR, CRR
21                                    5300 U.S. Courthouse
                                      700 Grant Street
22                                    Pittsburgh, PA 15219
                                      (412) 261-6122
23

24

        Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.

1  (Proceedings held in open court; Monday, October 26, 2015.)

2              THE COURT:  Good morning, everyone.

3              This is the date and time set for jury selection in

4  trial in the case of the United States of America versus

5  Atiba Warren, pending on the docket of the Court at 13-CR-270.

6              Will counsel for the United States please enter

7  their appearance.

8              MS. KING:  Good morning, Your Honor.  Katherine King

9  for the United States.

10             THE COURT:  Good morning, Ms. King.

11             MR. ORTIZ:  Jonathan Ortiz.

12             THE COURT:  Good morning, Mr. Ortiz.

13             Will counsel for Mr. Warren please enter his

14 appearance.

15             MR. SINDLER:  Mark Sindler.

16             THE COURT:  Good morning, Mr. Sindler.

17             Mr. Warren is seated next to you at counsel table.

18             MR. SINDLER:  Yes.

19             THE COURT:  In a few moments we'll bring the jury

20 panel up for jury selection in the case.  I just wanted to go

21 over a few matters before we did that.

22             First, last week, we posted the Court's proposed

23 voir dire and proposed opening instructions to the jury.

24             Ms. King, does the United States have any objections

25 or requested modifications to any of those?

1          MS. KING:  Just one very minor one.

2          Mr. Ortiz is going to be giving the opening

3 statement, so I think in the proposed jury instructions you say

4 that counsel for the government will give her opening

5 statement, so it will be "his."

6          THE COURT:  Other than that?

7          MS. KING:  No, Your Honor.

8          THE COURT:  Mr. Sindler, same questions of you?

9          MR. SINDLER:  Nothing from us.

10          THE COURT:  In terms of the voir dire, on the one

11 question where we go through the list of witnesses, I've placed

12 in all the names from each of your lists.  When we get to

13 Mr. Steven Sywyj, I intend on not only stating it but spelling

14 it because someone may have seen the name spelled but not heard

15 it.  The articulation of it is so significantly different than

16 the spelling, just for completeness, in case somebody might

17 know him by spelling and not by pronunciation.

18          Any objection with that, Mr. Sindler?

19          MR. SINDLER:  No.

20          THE COURT:  Ms. King?

21          MS. KING:  No.

22          THE COURT:  Will Mr. Scuilli be seated with you at

23 counsel table during jury selection and the trial?

24          MS. KING:  Yes, Your Honor.

25          THE COURT:  I will add his name.

1           Ms. King, I note that on your witness list, there
2    are a number of people in law enforcement.  Will any of them be
3    testifying or being proposed to be testifying in uniform?

4           MS. KING:  No, Your Honor.

5           THE COURT:  I'm not saying there is anything wrong
6    with that, I just thought we ought to talk about that.

7           So those will all be good to go.

8           I'm not going to raise this during voir dire or the
9    opening instructions, but in looking at the proposed final
10   instructions from each of you, it would appear that the parties
11   are stipulating or not contesting to two facts, that the
12   firearm that the United States will be saying is involved in
13   this case was manufactured outside of Pennsylvania.

14          Is that a stipulation, or a not contested fact, or
15   neither?

16          Ms. King, what is your position?

17          MS. KING:  We believe it's a stipulation.

18          MR. SINDLER:  I don't.  I'd like to explain myself,
19   if I can.

20          Ms. King and I have differences of opinion with
21   regard to how the matter of the interstate commerce element
22   comes into this case, which is I think what you're referring
23   to, that the firearm traveled in interstate commerce.  I find
24   in the course of my work there is a difference between
25   stipulating to what somebody would have said and whose

1  testimony is not needed and, therefore, you can accept or give

2  whatever weight you want to that person's testimony versus the

3  effect of giving that evidence what I would call judicial

4  notice.

5       THE COURT:  Actually, I think there are three

6  levels.  I think the parties could agree that if John Jones

7  came to court and testified under oath, he would say X.

8       Then I would tell the jury, they give that whatever

9  weight they choose to give it.

10      I think the parties can also stipulate, counsel can

11 stipulate on behalf of their clients that on Tuesday, Jones was

12 wearing a red sweatshirt.

13      I would still tell the jury, it's a stipulation, no

14 further evidence is required, but because you're the judges of

15 the facts, you and you alone will determine whether Jones was

16 wearing a red sweatshirt on Tuesday.

17      The third level is judicial notice.  I instruct the

18 jury that a fact is conclusively determined.

19      So, I think case law says those are the three

20 levels.

21      MR. SINDLER:  We're open, and we're willing to agree

22 that as to the interstate commerce element.  I think that Kevin

23 Kaufmann would be the one to come in and testify.  I think he's

24 an ATF investigator.  I would say that this item traveled in

25 interstate commerce.  I'm agreeing or allowing the government

1  to say that we don't need Mr. Kaufmann to come in, but had he

2  taken the stand, this is what he would have said.  I think we

3  potentially have it as a jury instruction where you would then

4  tell the jury that this is what this man would have said, you

5  can give it whatever weight you believe is appropriate.

6          THE COURT:  You and you alone, as the judges of the

7  facts, determine whether it did or didn't move in interstate

8  commerce.

9          Ms. King?

10          MS. KING:  Your Honor, that is our proposed

11  stipulation.  I had sent that to Mr. Sindler.

12          THE COURT:  I view it as a stipulation and not as a

13  judicial notice.

14          MS. KING:  Yes.

15          THE COURT:  The other thing is it appears that the

16  parties, to the same level, stipulate that as of the date

17  listed in the indictment, Mr. Warren had previously been

18  convicted of a crime punishable by more than one year in

19  prison.

20          Is that contested, Ms. King?

21          MS. KING:  Not in our view.

22          THE COURT:  Mr. Sindler?

23          MR. SINDLER:  It is, for the same reasons.  I don't

24  know how the government would have brought in this evidence had

25  we not agree or tried to agree to a stipulation, maybe a

1    records custodian, I'm not sure, but a person would come in to

2    testify to say that this record belongs to Mr. Warren.

3              THE COURT:  They bring a certified judgment in of

4    conviction.

5              MR. SINDLER:  That's fine.  I would say that in lieu

6    of having to bring in a certified judgment of conviction, that

7    we stipulate that that document or that piece of paper or that

8    item is not needed, and, therefore, you can accept that had

9    this document been brought in or been given to you for

10   deliberation purposes, that you can give it whatever weight you

11   believe is appropriate.

12             THE COURT:  You're not --

13             Ms. King, are you asking me to take judicial notice

14   of the fact that Mr. Warren had previously been convicted of a

15   crime punishable by more than one year in prison?

16             MS. KING:  No, Your Honor.

17             What we are asking and what I had sent to

18   Mr. Sindler last week is the following stipulation, and I will

19   read it.

20             The United States and Atiba Warren stipulate and

21   agree that Atiba Warren was convicted of a crime in state

22   court, that that crime is punishable by imprisonment for a term

23   exceeding one year, and that the prior conviction occurred

24   before October 23, 2012, the date that Atiba Warren is alleged

25   to have possessed the firearm charged in the indictment.

1          That's the stipulation.

2          THE COURT:  Mr. Sindler, do you agree to that

3  stipulation?

4          MR. SINDLER:  I don't.

5          THE COURT:  Okay.  So then what happens, Ms. King?

6          MS. KING:  We can put in -- we have the certified

7  conviction which says he was convicted of armed robbery and

8  that will go into the jury.  We're trying to avoid that for the

9  defendant, but we can put that in.  I'm happy to do that.

10          MR. SINDLER:  That's fine.  Just that that --

11          THE COURT:  No, are you saying it's fine that the

12  United States will put in a certified conviction showing that

13  Mr. Warren had previously been convicted of armed robbery?

14          MR. SINDLER:  I was trying to explain what I meant

15  by "that's fine."  I had not seen the certified conviction.  I

16  wasn't aware of how the government was planning to proving that

17  point had we not come to a stipulation.  The state of matters

18  is that right now we're disagreeing about it.  I'd like to look

19  at the certified conviction or certified judgment, share what I

20  see with my client, and try to reach some kind of resolution

21  where it is a stipulation and we're not going to bother the

22  Court about it any further.

23          THE COURT:  I'm not bothered.  I just want to know

24  so that both counsel know what they have to put into evidence.

25          MS. KING:  We would appreciate --

1           THE COURT:  I play them as they lie.

2           MS. KING:  We would appreciate to know that before

3 opening arguments, Your Honor.

4           THE COURT:  This is all going to get worked out for

5 both sides before we do openings.

6           Can you show Mr. Sindler the certified judgment of

7 conviction that you have?

8           MS. KING:  I can.  It's in my office.

9           THE COURT:  You can have it brought up.

10          MS. KING:  Yes.

11          THE COURT:  We'll make sure before anyone has to do

12 an opening statement to the jury we have these things ironed

13 out.

14          Ms. King, I note in your notice of 404 and 609

15 material, you indicate that should Mr. Warren elect to take the

16 stand, the United States may using the application of 609(a)

17 seek to impeach him.

18          Am I reading your filings correctly?

19          MS. KING:  Yes, Your Honor.

20          THE COURT:  At some point, I'm going to need -- you

21 reference the pre-plea report which contains the criminal

22 history of Mr. Warren.  At some point before all that happens,

23 I'm going to need to know exactly what -- and Mr. Sindler is

24 going to need to know exactly which offenses in there you would

25 seek to invoke 609(a) on so I can do the balancing test.

1          MS. KING:  Yes, Your Honor, tomorrow morning we can

2    provide that.

3          THE COURT:  Okay.

4          Now, the motions in limine that Mr. Sindler filed

5    over the weekend.

6          As I understand it, there are two things.  Something

7    about --

8          Mr. Sindler, if I understand your motion, you

9    believe there's reference to some separate event involving an

10   arrest at the property in question here that you have reason to

11   believe the United States may seek to use?

12         MR. SINDLER:  Yes.  I note -- I don't know if

13   they're going to.  They might use it as what I was told or

14   heard or learned rather Friday afternoon.  Ms. King shared with

15   me a very brief account that occurred or that was posted on an

16   Internet website the same day two and a half years ago,

17   concerning my client being taken down from a home that was

18   probably 520 Lincoln Avenue by members of a fugitive squad with

19   the Allegheny County Sheriff's Department because he was

20   supposedly on a most-wanted list.

21         THE COURT:  Referencing the arrest involved in these

22   events or a different arrest?

23         MR. SINDLER:  No, involving this event.  Apparently,

24   he didn't show up -- apparently, didn't show up for some

25   proceeding that this case evolved initially from, state court

1    proceedings.

2           THE COURT:  Ms. King, you filed a response

3    yesterday?

4           MS. KING:  Yes, Your Honor.

5           THE COURT:  At 5:20 p.m. that I think said whatever

6    Mr. Sindler was concerned about wasn't going to be part of the

7    United States' case in chief.

8           What is it that is going on here in?

9           MS. KING:  Your Honor, we just became aware on

10   Friday, and Mr. Sindler is correct, apparently, the defendant

11   was on a fugitive list for not showing up for court in state

12   court in this case, and the sheriffs went out and arrested him

13   at 520 Lincoln Avenue in February of 2013.

14          THE COURT:  Which was?

15          MS. KING:  Prior to time he was indicted federally

16   and is the same location he was arrested originally in October

17   of 2012 with the gun in this case.

18          Just this morning, we received a copy of the

19   sheriff's report regarding that arrest, and so I have it.  It

20   has Mr. Warren's Social Security number, we just redacted it.

21   I'll give Mr. Sindler a copy.  We're putting him on notice that

22   we obtained more information that we might consider introducing

23   in some fashion at trial.  That's all, we're trying to be as

24   forthcoming as possible.

25          THE COURT:  You should give that to Mr. Sindler.

1              Based on what you know now, what is it you think it

2 is possible the United States might do?

3              MS. KING:  At this time, Mr. Ortiz and I have yet to

4 discuss it, but generally I think we would use it for

5 impeachment purposes if some witness were to testify going --

6 contrary to what is documented in this report.  We may use it

7 for impeachment purposes or in a rebuttal case.  I can't

8 foresee --

9              THE COURT:  So if somebody said Mr. Warren was never

10 at 520 Lincoln Avenue?

11             MS. KING:  Right.

12             THE COURT:  Ever?

13             MS. KING:  Ever.

14             THE COURT:  Then we get into a 403 question, might

15 be relevant, but the question is is it so relevant that it

16 outweighs the prejudice of the circumstances that you would

17 attempt to prove he was at 520 Lincoln Avenue.

18             MS. KING:  That's correct.

19             THE COURT:  If you think that's --

20             MS. KING:  We also believe that it could be

21 considered 404(b) evidence in a certain circumstance, Your

22 Honor, given the fact that the circumstances of this arrest

23 were that the sheriffs showed up to arrest Mr. Warren, and they

24 saw an individual peering out of the window, and they were

25 saying we have an arrest warrant, we have an arrest warrant,

1  and no one came to the door.  So eventually they had to breach

2  the door.  As they entered the house, they were saying things

3  to the effect, it's the sheriffs, we have a warrant, let me

4  hear your voice.  They heard no voice.  And they ended up

5  finding Mr. Warren under a bed and hiding from being arrested.

6  So, we do believe that this could be consciousness of guilt,

7  trying to avoid arrest for this very incident.

8              THE COURT:  For this incident?

9              MS. KING:  Yes.

10             THE COURT:  For the one that is involved in this

11  indictment?

12             MS. KING:  Yes, Your Honor, because he was

13  originally arrested in October with this gun and was supposed

14  to go to court to appear to defend himself for that arrest.

15             THE COURT:  In state court?

16             MS. KING:  In state court, and was then a fugitive

17  from appearing in state court, and then was arrested so that he

18  could make his appearance in that case.

19             THE COURT:  Well, I guess it is the same thought, if

20  you sense that the United States wants to go down that road,

21  then you're going to have to tip me off, and Mr. Sindler off

22  because we have to have -- I don't think the Court of Appeals

23  calls it yet, but I have a feeling it's going to become the

24  nomenclature, we'll have to have a Caldwell hearing, a little

25  104 hearing but specific to Caldwell because I do have to go

1  through the four-step analysis and one -- well, counsel and the

2  courts will overtime read Caldwell as they read it, but I do

3  think that there is a high level of precision specifically now

4  required of the district judges.  I'm not saying it wasn't

5  required in the past, but it's very specifically required now.

6  We'd have to go through all of that to determine the relevance,

7  the non-propensity use, the 403 balancing, and then if it

8  passed muster under all of those, what and when the limiting

9  instruction would be given to the jury.  So if you're headed

10 down that road, if you think the United States is head down

11 that road, Mr. Sindler, you have preserved your objection with

12 the motion in limine.  You'll have to give notice and then

13 we'll figure it out.

14          Mr. Sindler.

15          MR. SINDLER:  Can I be heard?

16          THE COURT:  Absolutely.

17          MR. SINDLER:  I would have to look in my book, but I

18 think 404(b) allows us reasonable notice.  I don't want to wait

19 until tomorrow to get notice that as part of the government's

20 case in chief, we plan on using --

21          THE COURT:  She said they're not going to use it in

22 their case in chief.

23          Are you going to use it in your case in chief?

24          MS. KING:  Probably not, Your Honor.

25          THE COURT:  Well, there's a difference between

1  probably not and we know we're not.

2           MR. ORTIZ:  Judge, just so that it's clear, we

3  became aware of this late on Friday.  We still haven't spoken

4  with the officers.  We don't know whether or not we have a

5  witness that could testify in a way that is meaningful for the

6  trial, so we had told Mr. Sindler, and I think our filing with

7  the Court even said that until we speak to him and know exactly

8  what it is we do or don't have, we can't say what the purpose

9  is going to be.  So that's why at this point we have to sort of

10 couch our statement as to whether or not we would use it on our

11 case in chief.

12          THE COURT:  Okay.  That's fair, but the longer it

13 goes, the more the prejudicial value or the prejudicial effect

14 would accumulate.

15          I will also say this.  I'm not prejudging anything,

16 but I think the concept of consciousness of guilt is pretty

17 soupy to start with.  I think there's a difference between

18 being caught at the gate at the airport headed to Bolivia and

19 being under your bed.  There's probably a lot of real estate in

20 between there, but my first inclination is if the reason it

21 would be offered would be to show some consciousness of guilt,

22 let's assume you have a sheriff come in and say, I was there,

23 this is what I personally witnessed and observed happen.  It

24 seems to me that the potential relevance of that is

25 significantly outweighed by the circumstances because you'd

1  have a law enforcement officer, we'd be getting into a separate

2  proceeding, if you will, regarding the enforcement of the

3  criminal laws as opposed to, for instance, a civilian that sees

4  somebody charged with a crime hightailing it out of a

5  neighborhood or out of town or something like that.

6          So, I think you're going to have to decide, and then

7  you're going to have to let Mr. Sindler know and you're going

8  to have to let me know.

9          If I have to pause the proceedings, Mr. Sindler, to

10  let you look at it, I'll do it.

11          MR. SINDLER:  Two things.  One, I know personally

12  the sheriff department has personnel that work on these task

13  forces on a regular basis and they have for years now.  The

14  government is presumed to have known as of two and a half years

15  ago, regardless of when the U.S. Attorney's office found out

16  about this event two and a half years ago at 520 Lincoln

17  Avenue.  Mr. Ortiz is saying we just learned about it on

18  Friday.  This has been known to law enforcement with whom they

19  work for a good amount of time.

20          THE COURT:  There is no such presumption,

21  Mr. Sindler.  What is known or not known -- now, that doesn't

22  mean that you and Mr. Warren's position may not be prejudiced

23  and you'll have a winner on that, but it's not because Ms. King

24  and Mr. Ortiz are presumed to know what Sheriff Mullen and his

25  assistants are up to.

 1            MR. SINDLER:  The second thing is from my quick

 2  research over the weekend, it appears that consciousness of

 3  guilt in various opinions I've looked at, primarily from this

 4  circuit, deal with two things.  One, risk -- not risk, flight

 5  from the jurisdiction in which the person is supposed to be

 6  found or reporting.  And then No. 2 would be witness tampering.

 7  We don't have either one of those things in this case.  We do

 8  have hiding.  Hiding is not known to be -- I have not yet found

 9  a case where that's an indication of consciousness of guilt.

10            THE COURT:  I think that's why I drew the

11  distinction between being at the gate headed to Bolivia and

12  hiding under a bed.  We'll see how it plays out.

13            Secondly, Mr. Sindler, you filed another motion in

14  limine regarding four photographs which have been described in

15  Ms. King's response filing as essentially two versions of each

16  of two photographs relative to serial numbers on the I guess

17  trigger guard area and barrel of the firearm in question.

18            What is exactly the objection?

19            Let me ask this.  Ms. King, what do you intend on

20  doing?  And then we'll make sure there is still an objection.

21            MR. ORTIZ:  Your Honor, as you know from the

22  statement that was listed at the time of arrest, Mr. Warren

23  admitted he knew the serial number had been scratched off when

24  he bought the gun.

25            THE COURT:  It's my understanding there will be

1  testimony to that effect.

2          MR. ORTIZ:  Exactly.  During the course of the

3  trial, we have an expert, someone from the county crime lab --

4          THE COURT:  Mr. Best.

5          MR. ORTIZ:  Mr. Best, who examined the firearm and

6  took those pictures.  So the pictures are simply what it looked

7  like before the number was resurrected and then afterwards.

8  That's all it's for.  The indictment itself actually lists the

9  specific serial number as attributed to this very firearm.  So

10 being able to put that testimony in, obviously, is something

11 that we need to do, and we're going to do that through Bill

12 Best.  That is the purpose of these four photographs, to

13 explain it to the jury, to show them exactly the process that

14 is walked through by way of his examination of the gun.

15         THE COURT:  As I read the papers last night from the

16 United States, it's to show that when the gun was received at

17 the crime lab or at the bureau where Mr. Best works, that the

18 serial number was obliterated, so it was a Taurus Judge firearm

19 with an obliterated serial number, then he's going to explain

20 the mechanisms he used to unobliterate it.

21         MR. ORTIZ:  Exactly.

22         THE COURT:  Thank you, Mr. Ortiz.

23         Mr. Sindler?

24         MR. SINDLER:  The second motion is headlined

25 Exclusion of the Imagery.  In asking for the relief at the end,

1  I made a mistake in asking to exclude his testimony about it.

2  You had directed us to follow a deadline, which I think was

3  October 8 by which this photography or exhibits and such could

4  be either agreed upon or not agreed upon.  The report that

5  Mr. Best did has been around since January of 2013.  I'm

6  assuming that the photographs have been around as long because

7  I'm not sure they would have been done any time later.  So,

8  again, it's something where -- I know this personally in this

9  case where a deadline was breached by the government and if

10 Mr. Best wants to testify to it, I would retract any part of my

11 second motion in limine where I would seek to exclude that

12 testimony, but the evidence or the exhibits were not given to

13 me in time.

14         Now Ms. King says, well, the parties jointly or

15 respectfully request we can amend or add to the exhibit list.

16         THE COURT:  Had they been given to you six weeks

17 ago, what would be different today?

18         MR. SINDLER:  I don't know that anything would be

19 different.  I can't explain that to you right now, except that

20 we were supposed to abide by a deadline.

21         THE COURT:  You're right.

22         MR. SINDLER:  And the information has been in their

23 possession for two and a half years and I get it about five or

24 six days ago.  And, quite honestly, I think it's cumulative to

25 his testimony.  The fact of obliteration or defilement has no

1  bearing upon any of the elements stipulated to or not that the

2  jury has to consider in whether or not Mr. --

3          THE COURT:  I think it does.  It makes more

4  probable -- the government, based on their papers is going to

5  argue it makes it more probable than not that this firearm was

6  possessed by Mr. Warren because they say in their papers they

7  will have testimony from which a jury could conclude that

8  Mr. Warren was in the possession of a Taurus Judge firearm that

9  had obliterated serial numbers.  And they believe they have to

10  prove to sustain a conviction beyond a reasonable doubt that

11  this firearm was possessed by Mr. Warren, and one of its

12  identifying characteristics is it had obliterated serial

13  numbers.  You'll argue how much weight any of that should be

14  given, but it does make it slightly more probable than not.

15          MR. SINDLER:  The testimony does, the photography is

16  cumulative to that testimony.

17          THE COURT:  I have a feeling there is going to be a

18  lot of cumulative stuff in this trial on both sides, but how is

19  that prejudicial, let alone unfairly prejudicial?

20          MR. SINDLER:  I'm not able to articulate that right

21  now, except that, one, the photography is cumulative, and we

22  have four pieces of the photography, two that go before and two

23  after the fact.

24          THE COURT:  I'm going to deny that motion in limine

25  without prejudice.  I want to see the photography.

 1              MS. KING:  I have them here.

 2              THE COURT:  Before it goes on the stand, I'd like to

 3 see it.

 4              MS. KING:  Would you like to see it now?

 5              THE COURT:  Does Mr. Sindler have a copy of it?

 6              MS. KING:  I'll give it to him right now.

 7              THE COURT:  Counsel for the United States has

 8 delivered to counsel for the defendant and to the Court a

 9 three-ring binder that has several photographs in it.

10              She's directed the Court's attention to what has

11 been premarked as Government's Exhibit 1C.  I presume I should

12 look at that.  1D, 1E and 1F.

13              Ms. King or Mr. Ortiz, 1C as in Charlie, through 1F,

14 as in Frank.

15              MR. ORTIZ:  Judge, just so you're clear as to

16 exactly what you are looking at, 1C is the before picture of

17 the serial number that was on the barrel of the gun.

18              1D is the after picture of the serial number that

19 was on the barrel of the gun.

20              1E is the serial number on the receiver or the frame

21 of the gun before.

22              And 1F is the photo of the serial number on the

23 receiver or frame after.

24              THE COURT:  Do you intend on arguing, Mr. Ortiz,

25 should it become necessary, or even if it's part of the case,

1 that the photographs in 1E, as in Edward, and 1F, as in Frank,

2 appear to say:  Made in Brazil?

3          MR. ORTIZ:  I think we have a stipulation as to the

4 nexus, so there really won't be an argument on that point.

5          THE COURT:  I'm going to deny the motion without

6 prejudice.  If it looks like it's overly cumulative or if

7 there's some specific prejudice, let alone substantial

8 prejudice, or what I'll call outweighing prejudice,

9 Mr. Sindler, we'll hear you at the appropriate time.

10          Mr. Babik, I'll hand that to you.

11          That then leaves Defense Exhibit J, the automation.

12          I've not entered a written ruling on it.  I've read

13 the material each of you have submitted.  I've watched Defense

14 Exhibit J a number of times.  I think under the Altman rule,

15 which appears to be the controlling rule of law in our circuit,

16 although I would note it appears it's in an unpublished

17 opinion, it says when demonstrative evidence closely resembles

18 the actual accident, there it was a products liability case,

19 the courts generally require the proponent to establish that

20 the demonstration shares substantial similarity to, in that

21 case, the accident conditions.  By contrast, if the

22 demonstration does not appear to recreate the accident, Rule

23 403 generally does not require a foundational showing of

24 similarity with accident conditions.

25          Judge Aldisert writing for the court went on to say:

1  The test is not one of labels, but whether the demonstration is

2  sufficiently close in appearance to the original accident to

3  create the risk of misunderstanding by the jury, for it is that

4  risk that gives rise to the special requirement that show

5  similar conditions.

6       In reflecting on the record in that case, Judge

7  Aldisert said that the trial court, in this case Judge Ambrose,

8  had carefully considered the objection, determined that unfair

9  prejudice, confusion could be mitigated by cross-examination

10  and limiting jury instructions, and concluded that the jury

11  understands it is not an accident reconstruction.  And went on

12  to explain that the depiction that Altman used was a series of

13  sketches interspersed with brief animations that was, quote,

14  not at all lifelike.  Clearly, to quote Judge Aldisert, clearly

15  illustrates Ferrone's testimony and does not appear even

16  remotely to be a recreation of the accident.

17       Then he goes on to say:  To remove all doubt, the

18  court instructed the jury that the animation was not a

19  re-creation and highlighted differences between the animation

20  and the facts as adduced at trial.

21       One important distinction in sort of the procedural

22  and factual setup between what we have here and in Altman was

23  we had an expert, essentially an engineer, talking about

24  product safety using a simulation as to which there was really

25  no need for in that case, explanation of how it came to be.

1          Here, it's sort of all merges with Mr. Johnson.

2          Having reviewed the animation at Defense Exhibit J,

3    I conclude that it is and -- it is a re-creation.  That doesn't

4    mean it can't be used, but it is for purposes of the Altman

5    test, it would appear to any rational viewer as re-creating the

6    scene of the events on the night when these matters in this

7    case occurred.

8          Ms. King, as I understand, and Mr. Ortiz, as I

9    understand the objection to that, this is at Page 2 of ECF 122,

10   the United States says here Exhibit J cannot be seen as

11   anything other than an attempted re-creation of the scene on

12   the night in question.

13         Putting aside what is attempted or not attempted, I

14   think that it is, except for the light, which is a very big

15   except.  The United States says, well, Ms. Hayes may be able to

16   testify to the layout of the building in the animation is

17   substantially similar to her residence, she cannot testify that

18   the prospective and trajectory of the video is substantially

19   similar to Officer Sywyj's perspective on October 23, 2012.

20   The point of view of this animation has no basis in the record.

21   For example, the positioning of the point of view of the

22   animation within the door frame, i.e., where within the 3 to 4

23   foot wide door frame the animation enters the residence and the

24   exact trajectory of the animation as it enters the residence

25   has no basis in the record.

1          Let me ask you this, Ms. King and Mr. Ortiz, if that

2 animation had been shown, and I've already ruled that if it

3 would be used, there would not be a human figure in it, if the

4 animation had previously been shown to Ms. Hayes, and I don't

5 think it was at the suppression hearing, and was shown to

6 Officer Sywyj, and they said one way or the other how it looked

7 the same or didn't look the same, would that have resolved,

8 potentially resolved that issue?

9          MS. KING:  No, Your Honor, because I think as has

10 been brought up in Altman and as the Court has indicated, the

11 jury will bring this exhibit back to the jury room --

12          THE COURT:  That's a if I allow it in as actual

13 evidence, as opposed to a demonstration aid to illustrate

14 someone's testimony.

15          I agree with you, it is so powerful it would be hard

16 to not have it be evidence, but also let it be shown.

17          But that being said, please continue.

18          MS. KING:  Yes, Your Honor, but I guess so the only

19 person whose testimony this could be seen to demonstrate would

20 be Officer Sywyj.  I don't recall if I have shown him this

21 re-creation.  He might have been shown this at the suppression

22 hearing.

23          THE COURT:  I don't believe he was.

24          Was he shown this at the suppression hearing?

25          MR. SINDLER:  He was not.

1             THE COURT:  I didn't think so.

2             I'll cut to the chase.  Aren't I obligated -- maybe

3    that's stating it too strongly --

4             Mr. Sindler, do you want a Rule 104 hearing on that

5    demonstration?

6             MR. SINDLER:  Before I answer that, can I just speak

7    briefly.

8             I'm reiterating something that you've already read

9    in one of my pleadings and that is, how else could Mr. Sywyj

10   have seen my client?  It's the perspective that we're trying to

11   show.  He didn't look around the corner or through a wall --

12            THE COURT:  That's why I think it's a re-creation.

13            MR. SINDLER:  You are right.

14            THE COURT:  But until Sywyj says or somebody says

15   that is or isn't what it looks like but for the lighting, and

16   the lighting is a pretty big but for here.  I'm not sure I can

17   exclude it or let it in.  That's why I'm wondering if we need a

18   104 hearing.

19            MR. SINDLER:  That's fine by us.  I'm not sure, I'm

20   not ready to do so right at this moment because this is the

21   first --

22            THE COURT:  It would be pretty soon.

23            MR. SINDLER:  It would be pretty soon.

24            MS. KING:  Your Honor, it's also not just the

25   lighting.  There's no furniture in here.  I think to put

1  Officer Sywyj on the stand and say, is this exactly what you

2  saw?  Clearly, it's not exactly what he saw.  Is he going to

3  say, I was taller, I was shorter, I was a little bit more to

4  the left, I was a little bit more to the right.  I just think

5  that it's too much -- it's too prejudicial.  It's too much to

6  expect -- he's testified this is what I saw.  For him to say --

7  he wasn't there when then animation was created.  We don't have

8  it --

9          THE COURT:  I didn't sense the United States was

10 arguing that Mr. Johnson's techniques were flawed or lacking in

11 some way.

12         MS. KING:  No, not necessarily.  But with respect to

13 where exactly, as I've said in my papers, this animation

14 occurred, the door was wide open, as Officer Sywyj testified,

15 he could have been standing all the way over on the left.

16         THE COURT:  He said the security door was wide open,

17 his memory was not precise on whether the screen door was open.

18         MS. KING:  Yes, but he could have been standing all

19 the way on the left of the door and he would have a completely

20 different perspective than this video.  If that's what he

21 testifies to, the animation is not --

22         THE COURT:  Mr. Sindler, let me ask you this.  If I

23 had allowed J in, at what procedural juncture of the trial do

24 you anticipate using it?

25         MR. SINDLER:  I would be using it during

1  Mr. Johnson's testimony because he's the one who created it.

2  We would indicate during that part of his testimony that the

3  widest perspective was used or employed because -- take what

4  Ms. King said, I would agree that from an argument standpoint,

5  let's say Mr. Sywyj was standing at the far left.  The farther

6  you are to the left or the right of the doorway in which he was

7  stationed, the less of a perspective you have to see somebody

8  like Mr. Warren standing in that passageway or just inside the

9  middle room.

10             THE COURT:  I understand the argument, but just so I

11 know for sure, if I had ruled that J was in, if I rule right

12 now that J is in, you do not intend on using it during Sywyj's

13 direct or cross or redirect or recross?

14             MR. SINDLER:  No, because I expect or could

15 anticipate what his testimony would be.

16             THE COURT:  Well, we all -- the world full of

17 surprises.

18             Ms. King.

19             MS. KING:  I'd also like to remind the Court that

20 Travis Johnson at the suppression hearing specifically said

21 this re-creation is not intended to recreate what the human eye

22 could see.

23             THE COURT:  That's when we were using ones that had

24 different lighting.

25             MS. KING:  Yes, Your Honor, but just generally I

might have a broader range of vision in my own eyes to the left

and right than Mr. Ortiz might or this video might, so to show

it to the jury as a re-creation, we didn't take any testimony

on that as to how wide it was, but I do think that this is

different than what the human eye could see.

THE COURT:  Appreciate that, Ms. King.

Appreciate that, Mr. Sindler.

Here's what we're going to do.  My ruling that the

motion in limine as conditionally granted stands.  No one can

make reference to J until I have the definitively ruled on it,

which means not referenced in anyone's opening, direct, cross,

redirect during the government's case in chief.

I'll hear after that is done, before you put --

before, Mr. Sindler, you decide whether you're going to put any

witnesses on the stand, I'll revisit this.  I'm not going to

excuse Officer Sywyj to go about his business so that we can't

find him.  I'll make a determination after the government's

case comes in and there's been all that examination whether we

need to outside the presence of the jury have a short 104

hearing on the admissibility of J.

I think it is a re-creation.  That doesn't make it

inadmissible, Mr. Sindler.  We'll see what foundation occurs as

a consequence of Officer Sywyj or anybody else during the

government's case.  We may -- I may reoffer up Mr. Sindler an

opportunity to have a 104 hearing on the admissibility of J and

1  it's use during your case on Mr. Warren's behalf.  I would --

2  it will not be taken as untoward by the Court if before we

3  proceed you remind me that you think you want to do something

4  with J with Mr. Johnson, or with somebody else, and we'll make

5  sure there's an opportunity to take that up as need be outside

6  the presence of the jury, and I'd make a ruling under the

7  Altman standard as to whether J comes in.

8          I will say with the human figure out of it, it may

9  be something that would be helpful to the jury, and I see it as

10 Judge Aldisert said in Altman as principally being a 403

11 question, in essence, is it so effective at misrepresenting

12 something that its prejudicial effect outweighs the probative

13 value it might have to the jury.  But with the human figure not

14 in it, there may well be a basis to have it come in.  We just

15 may need to determine what the foundation is.  So that's my

16 ruling on Defense Exhibit J for the moment.

17         Are there any other matters, Ms. King or Mr. Ortiz,

18 that we should take up or the Court should resolve before we go

19 and get our jury panel?

20         MS. KING:  No, Your Honor.

21         THE COURT:  Mr. Sindler, same question of you?

22         MR. SINDLER:  Two things.

23         Mr. Babik and I spoke on Friday and he sent me an

24 e-mail afterwards that is limiting my ability to address the

25 jury during the summation.

```
 1              THE COURT:  How is that?

 2              MR. SINDLER:  I don't mean disrespect to the Court,

 3  but it is something I thought Mr. Babik said would be brought

 4  up.

 5              I have conducted jury trials in a couple of other

 6  courtrooms where I have been permitted to be behind the

 7  government's table, and it has not been in one of these

 8  courtrooms, which I think is an original courtroom to the

 9  building from when it was built.

10              THE COURT:  It is.

11              MR. SINDLER:  It's the newer ones to which I was

12  just speaking.  I don't pace a lot, I don't wear holes in the

13  carpet, but to limit me to an area which I think if I

14  understood his e-mail correctly to just in front of the witness

15  stand --

16              THE COURT:  Oh, no, you can go up and down the jury

17  rail.

18              MR. SINDLER:  Conceptually leaves me at a

19  disadvantage.  This is subjective opinion on my part with the

20  respect to the people who are at the further end of the jury

21  box, the alternates --

22              THE COURT:  You can go up and down the jury rail.

23              MR. SINDLER:  I got a different sense -- I'm not

24  trying to disparage Mr. Babik --

25              THE COURT:  Mr. Babik asked me about this.  My view
```

1 of behind the government table is behind the government table.

2 That's different than being parallel to the jury box.

3          MR. SINDLER:  But I'm going to be limited, though, a

4 bit because there's going to be apparently a TV set up where

5 their stand is currently located and I'm not permitted to block

6 a TV.  I don't want to block a TV if somebody is trying to look

7 at it.

8          THE COURT:  Are you going to have the TV on during

9 your closing?

10          MR. SINDLER:  I am, but we're going to have a second

11 TV --

12          THE COURT:  Well, it seems to me you're running your

13 own risk then.  If you want to block material you've put up on

14 the TV, that's your business.  What would be a problem is if

15 Mr. Ortiz or Ms. King were blocking something you put up on the

16 TV, or vice versa, you were physically blocking something

17 Ms. King or Mr. Ortiz put on the TV, but if you're block what

18 you put up on the TV, that's your business.

19          MR. SINDLER:  I understand.  I wanted to have that

20 conversation.

21          THE COURT:  We don't have people stand behind other

22 people.  It's just not a good idea.

23          Anything else, Mr. Sindler?

24          MR. SINDLER:  No.

25          THE COURT:  Anyone need a break, a momentary break

1 to use facilities before we bring the jury up?

2          MS. KING:  No, Your Honor.

3          MR. SINDLER:  I'm good.

4          MR. BABIK:  The jury is ready for us.

5      (Jury panel enters the courtroom.)

6          THE COURT:  Good morning, everyone.

7          I'm the United States District Judge Mark Hornak.

8 You have been summoned to our courtroom for the selection of a

9 jury to serve in a trial of a criminal case.  The case is

10 entitled the United States of America versus Atiba Warren.

11          Ladies and gentlemen, but for service in our United

12 States military, serving as a juror in our justice system is

13 the highest form of civic duty and responsibility which one is

14 called upon to perform as a citizen in our form of government.

15 Citizens sitting in judgment of the actions of fellow citizens

16 is a basic tenet of our justice system, which we believe to be

17 the fairest system in the world and which could not function

18 without you.

19          We know that it is a personal and professional

20 sacrifice, an inconvenience for you to be here, but it is truly

21 very important and I will do everything in my power to make

22 this a meaningful experience for you with as little

23 inconvenience as possible.

24          Believe me, this trial is very important to all

25 parties in the proceeding.  Mr. Warren, the United States

1 government, and this Court, and we are all most appreciative of

2 your participation as citizen jurors.

3        The trial of this case is estimated to last several

4 days.  We will commence trial as soon as the jury has been

5 selected and sworn and then proceed daily for the requisite

6 number of days needed to complete the trial.  If we conclude

7 selection of the jury today, we may not begin with more

8 substantive proceedings until tomorrow.

9        The United States government is pursuing this case

10 by an indictment, which is formal document used solely for the

11 purpose of charging a defendant with having committed a crime

12 and informing the defendant of the nature of the pending

13 charges.  It is merely a statement of charges.  It is not

14 evidence or proof of any criminal conduct.  Under the law, a

15 defendant is presumed to be innocent.  The government has the

16 burden of proofing the charge set forth in the indictment

17 through witness testimony and evidence beyond a reasonable

18 doubt.

19        The mere fact that Mr. Warren has been charged with

20 criminal conduct and is present in this courtroom is not

21 evidence or proof that he's guilty of anything.  You should

22 have no opinion as to his guilt at this moment in time.  As a

23 matter of fact, if you were called upon to render your verdict

24 at this moment, under the law, you would have to find

25 Mr. Warren not guilty.  Why?  Because by law, he is presumed to

1  be innocent, unless proven guilty beyond a reasonable doubt,

2  and at this time, there's been no witness testimony or evidence

3  whatsoever presented to establish guilt.

4          It is the jury's function to decide the facts of the

5  case without bias or prejudice to the defendant or the

6  government.  The law does not permit jurors to be governed or

7  influenced by sympathy, bias, prejudice or public opinion.  You

8  are at all times to be fair-minded.

9          Therefore, I must exclude from the jury anyone who

10  has such strong feelings about the person or issues involved in

11  the case that he or she is unable to evaluate the evidence

12  impartially.  The law also affords the government and the

13  defendant the opportunity to participate in the jury selection

14  process through the exercise of what are known as peremptory

15  challenges or excusals, which means they will be permitted to

16  exclude a number of prospective jurors from the case for any

17  reason whatsoever.  In fact, the lawyers must exclude a certain

18  number of you to get to the requisite number of jurors for

19  trial.

20          The jury in this case will consist of twelve members

21  and two alternates.  An alternate may take the place of any

22  seated juror if a juror must be excused for any legitimate

23  reason during the course of the trial.  If none of the original

24  twelve jurors is excused during the trial or deliberations, the

25  alternate will be excused from further service.  The alternates

will participate in all phases of the trial but will not
participate in deliberations unless called upon to fill a slot
as necessitated by some disability on the part of a seated
juror.

          To assist both the Court and the lawyers in the jury
selection process, I will conduct what is known as voir dire.
That means I will ask you certain questions about your feelings
and experiences which might influence your thinking about the
case.  These questions are designed to supply information to
both the government and the defense which will enable the
lawyers to exercise their peremptory challenges more
intelligently and effectively.  Certain questions will be asked
of you here in open court and other questions may be asked
individually in a private setting out of the hearing of one
another.

          The exercise of peremptory challenges does not
constitute any reflection whatsoever on the prospective jurors
who are excused from deliberating on this case.  It should not
be interpreted as a decision that those persons who are excused
are biassed or prejudiced.  It simply means that the lawyers
based on their trial experience, knowledge of the case, and the
information learned through voir dire have decided that someone
else should sit as a juror to hear and decide this particular
case.

          Now that I've explained the purpose of voir dire to

1  you, I will tell you a little bit about the case on which we're

2  about to have a trial.  I will not at this time explain the

3  applicable laws to you, but in order that you have some

4  familiarity with the case, which you may be selected to hear, I

5  will read a summary of the indictment to you.

6          The grand jury has returned a one-count indictment

7  against the defendant.  Count One charges Mr. Warren with

8  knowingly possessing a firearm in or affecting interstate

9  commerce on or about October 23, 2012, in the Western District

10 of Pennsylvania, after having been convicted of a crime

11 punishable by imprisonment for a term exceeding one year.

12         As previously stated, the charge against the

13 defendant is set forth in an indictment, which is simply the

14 description of the charge made by the government against the

15 defendant, but the indictment is not evidence that the

16 defendant committed a crime or crimes.  The defendant has pled

17 not guilty to the charges.

18         A defendant is presumed to be innocent and may not

19 be found guilty by you unless all twelve of the selected jurors

20 unanimously find that the government has proved the defendant's

21 guilt beyond a reasonable doubt as to such charge.

22         Mr. Warren is present in court and is seated at

23 counsel table to my right with his attorney, Mark Sindler.

24         The Court would note for the record that they have

25 been present since these proceedings began.

1            The attorneys for the government, Assistant United

2    States Attorneys Katherine King and Jonathan Ortiz, are seated

3    at counsel table to my left with law enforcement agent Steven

4    Scuilli.

5            The Court would note for the record they have been

6    present since these proceedings began.

7            My courtroom deputy is Mr. Brian Babik, who is

8    seated directly in front of me.

9            My judicial law clerks are Mr. Matt Greer and

10   Mr. Kevin Zimmerman.

11           My judicial assistant is Ms. Judy Dressler, all of

12   them are seated to my right, your left.

13           They are officers of the Court and will help with

14   the selection of the jury.

15           The court reporter is Ms. Julie Kienzle.  She's

16   seated to my left, your right, and she will stenographically

17   transcribe everything that is said in this proceeding.

18           Ladies and gentlemen, please rise and raise your

19   right hand to be administered an oath.

20           Mr. Babik, please administer the oath to the jurors.

21        (Administration of the oath.)

22           THE COURT:  Ladies and gentlemen, we're going to

23   start the selection process by asking each of you to stand and

24   answer aloud the questions which are on the preprinted data

25   sheet that was provided to you this morning.  One of my law

1 clerks will have a microphone that we will pass down and I ask

2 you that you pass it to the next person so they can use it as

3 you read your answers.

4        Please take your time, speak up loudly and clearly

5 so that all of your answers will be heard and understood.  If

6 you do not understand any of the questions, please feel free to

7 ask me for an explanation.  As noted, if you do not understand

8 any of the questions, please feel free to ask me for an

9 explanation and we'll provide that.

10        Mr. Babik, we can now start with the first juror.

11        JUROR NO. 38:  I am Juror No. 38.  I am 61 years

12 old.  I live in Mars, Butler County, PA.  I have lived there

13 approximately 23 years.  I own a home.  I am licensed to drive

14 an automobile.  My educational background is high school with

15 some college.  My employer is the Davey Tree Expert Company.  I

16 am a crew leader.  I am married.  My wife's employer is Kohl's

17 Department Store.  I have two children, two boys, one is 20

18 years old and third year of college, and an 18-year-old high

19 school.  I do not have an attorney.

20        THE COURT:  Thank you, sir.  Pass the mic to the

21 next person.

22        JUROR NO. 7:  I'm Juror No. 7.  I'm 54 years old.  I

23 live in Uniontown, Fayette County.  I have lived there

24 approximately 20 years.  I own my home.  I am licensed to drive

25 an automobile.  My educational background is college and

professional.  My major area of study was medicine.  My

employer is Fayette Physician Network.  My job title is

physician.  My wife is a homemaker.  I have two daughters, 16

and 19, one in high school, one in college.  I do not have an

attorney.

THE COURT:  Thank you, sir.

JUROR NO. 28:  I am Juror No. 28.  I am 55 years

old.  I live in Ardara, Westmoreland County.  I have lived

there approximately 18 years.  I own my home.  I am licensed to

drive an automobile.  My educational background is some college

with a food service management.  My employer is Allegheny

Refrigeration Sales.  My job title is sales account manager.  I

am married.  My wife works for first national bank of

Pennsylvania.  She's a senior administrative assistant.  I have

no children.  I am currently represented in a civil matter as a

result of being in a car accident in May.

THE COURT:  Thank you, sir.

JUROR NO. 5:  I am Juror No. 5.  I am 27 years old.

I live in Sewickley, Allegheny County.  I lived there for

approximately 27 years.  I own my home.  I am licensed to drive

an automobile.  My educational background is college.  My major

was nursing.  My employer is Verland.  I am a direct support

professional.  I'm not married, I don't have any children and I

don't have an attorney.

Juror No. 34:  I am Juror No. 34.  I am 60 years

1  old.  I live in Amity, which is in Washington County.  I have

2  lived there approximately 35 years.  I own my own home.  I am

3  licensed to drive.  My educational background is college.  I

4  was a med tech biology major.  My employer is Washington

5  Hospital.  My job title is medical technologist.  I am married.

6  My spouse works for the U.S. Postal Service.  He is a mail

7  carrier.  I have one son.  He is a electrician apprentice for

8  IBEW and I do not have an attorney at this time.

9          JUROR NO. 16:  Juror No. 16.  I am 29 years old.  I

10 live in the city of Bridgeville, Allegheny County.  I lived

11 there approximately 20 years.  I rent my home.  I am not a

12 licensed driver of an automobile.  My educational background is

13 college.  My college major was elementary education and

14 theater.  My employer is the Allegheny Intermediate Unit.

15          Would you like further details on where I'm placed?

16          THE COURT:  What location are you at?

17          JUROR NO. 16:  Allegheny county jail.

18          My job title is educator.  I am not married.  I do

19 not have any children, and I currently do not have an attorney.

20          JUROR NO. 47:  Good morning.  I am Juror No. 47.  I

21 am 37 years old.  I live in Lemont Furnace and that's in

22 Fayette County.  I have lived there approximately ten years.  I

23 own my home.  I am licensed to drive an automobile.  My

24 educational background is high school.  My employer is Frick

25 Tri-County Federal Credit Union.  My job title is compliance

1  officer.  I am married.  My spouse's employer is McCabe

2  Industrial.  He is a project manager.  I do have two children,

3  eight and twelve.  I do have an attorney at this time for a

4  civil matter against my builder.

5          THE COURT:  Thank you, ma'am.

6          JUROR NO. 24:  I am Juror No. 24.  I am 34 years

7  old.  I live in Verona in Allegheny County.  I have lived there

8  approximately 12 years.  I own my home.  I am licensed to drive

9  an automobile.  My educational background is college.  My area

10 of study was occupational therapy.  My employer is Apex Rehab

11 Solutions.  My job title is occupational therapy assistant.  I

12 am not married.  I do not have children and I do not have an

13 attorney.

14         THE COURT:  Thank you, ma'am.

15         JUROR NO. 57:  I'm Juror No. 57.  I am 42 years old.

16 I live in Latrobe, Westmoreland County.  I have lived there for

17 six and a half years.  I own my home.  I am licensed to drive

18 an automobile.  My educational background is college and my

19 major area of study was marketing.  My employer is Audubon

20 United Methodist Church.  My job title is administrator.  I am

21 married.  My husband works for X1 and he is in research and

22 development.  I do have a child, she's 11, and she's in

23 elementary school.  I do not have an attorney.

24         THE COURT:  Thank you, ma'am.

25         JUROR NO. 8:  I am Juror No. 8.  I am 33 years old.

1 I live in McDonald, Allegheny County.  I have lived there for
2 approximately 25 years.  I rent now.  I am licensed to drive an
3 automobile.  I have two college degrees, one in IT, one in
4 journalism.  My employer is Continuum Management Services.  My
5 job title is service desk technician.  I am not married.  I do
6 not have any children and I do not have an attorney.

7           THE COURT:  Thank you, sir.

8           JUROR NO. 27:  I am Juror No. 27.  I am 67 years
9 old.  I live in Portersville, Butler County.  I have lived
10 there approximately 20 years.  I own my home.  I am licensed to
11 drive an automobile.  My educational background is about three
12 and a half years of college which includes a two-year
13 associate's degree in court reporting.  My employer is Butler
14 County courts.  My job title is official court reporter.  I am
15 not married.  I do not have any children.  And the only
16 attorney I have, Will & Price, is for preparing my will.

17           THE COURT:  Thank you, ma'am.

18           JUROR NO. 20:  I am Juror No. 20.  I am 72 years
19 old.  I live in Murrysville in Westmoreland County.  I have
20 lived there approximately 30 years.  I own my own home.  I am
21 licensed to drive a car.  My educational background is some
22 college, studying engineering, business and adult education.
23 My employer was since I'm retired Westinghouse Electric
24 Corporation.  My job title, last one was instructor.  I am
25 married.  My spouse's employer is Samson Mars Realty.  My

1 spouse's job title is clerk/receptionist.  I have three

2 children; 38-year-old daughter, union electrician; a

3 40-year-old son works for 84 Lumber; and a 43-year-old son that

4 works for the Hartford Insurance Company.  I do not have an

5 attorney at this time.

6          THE COURT:  Thank you, sir.

7          JUROR NO. 56:  I am Juror No. 56.  I am 28 years

8 old.  I live in Monroeville in Allegheny County.  I have lived

9 there for approximately 13 years.  I rent my home.  I am

10 licensed to drive an automobile.  I went to college for art

11 education.  My employer is Medcare Equipment Company.  I

12 deliver medical equipment.  I am not married.  I do not have

13 any children.  I currently do not have an attorney.

14          THE COURT:  Thank you, sir.

15          JUROR NO. 13:  I'm Juror No. 13.  43 years old.  I

16 live in Chicora, Pennsylvania, which is in Butler County.  I

17 have lived there all my life.  I own my home.  I am a licensed

18 driver.  My educational background is high school.  My employer

19 is Allegheny Technologies, Inc.  My job title is senior

20 maintenance supervisor.  I am married.  My spouse is a

21 homemaker.  I have three children; a 16-year-old, a 15-year-old

22 stepdaughter, and a nine-year-old.  I do not have an attorney

23 at this time.

24          THE COURT:  Thank you, sir.

25          JUROR NO. 52:  I am Juror No. 52.  I am 66 years

1 old.  I live in Regent Square in Allegheny County.  I have

2 lived there approximately 25 years.  I rent my home.  I am

3 licensed to drive an automobile.  I hold a Bachelor's degree in

4 French and a Master's degree in theology.  I am self-employed

5 as a consultant for Second Chance Incorporated.  My job title

6 is SWAN consultant and SWAN refers to the Statewide Adoption

7 Network.  I am not married, I do not have children.  I do not

8 have an attorney.

9          THE COURT:  Thank you, ma'am.

10          JUROR NO. 53:  I am Juror No. 53.  My age is 57.  I

11 live in Ruffs Dale in Westmoreland County.  I have lived there

12 for approximately 25 years.  I rent my home.  I am licensed to

13 drive an automobile.  My educational background is high school.

14 My employer is currently on disability.  I was weigh master

15 dispatcher for the company before that.  I am married.  My

16 spouse's employer is CVS Caremark.  Her job title is -- she's

17 pharmacist technician.  I do not have children.  I do not have

18 an attorney.

19          THE COURT:  Thank you very much, sir.

20          JUROR NO. 21:  I'm Juror No. 21.  I'm 52 years old.

21 I live in Pittsburgh in Allegheny County.  I've lived there 30

22 years.  I own my own home.  I am licensed to drive.  I have a

23 BA from college.  My major was art history.  My employer is

24 Innovation Works.  My job title is director of communications.

25 I am married.  My husband is self-employed as an architect.  I

1 have three children; a 23-year-old in college, a 20-year-old in

2 college and a 17-year-old in high school.  I do not have an

3 attorney.

4              JUROR NO. 41:  I am juror 41.  I am 66 years old.  I

5 live in New Castle, Lawrence County.  I have lived there 66

6 years.  I own my own home.  I am licensed to drive an

7 automobile.  I have a Bachelor's degree in education.  I am a

8 retired schoolteacher from New Castle Area School District.  My

9 husband is also retired.  He was Assistant Superintendent of

10 the New Castle Area School District.  We have three children; a

11 daughter 38, she is currently CFO of the City of New Castle; I

12 have a son 30, he's a web designer at Cyber here in Pittsburgh;

13 I have a daughter 27, she's a CPA at Ernst Young.  I do not

14 have an attorney.

15              JUROR NO. 10:  I am Juror No. 10.  I am 34 years

16 old.  I live in Pittsburgh, Allegheny County.  I have lived

17 there approximately 28 years.  I rent my home.  I am not a

18 licensed driver.  I have a high school diploma.  My employer is

19 BNY Mellon.  My job title is a data entry operator.  I am not

20 married.  I do not have kids.  I currently do not have an

21 attorney.

22              THE COURT:  Thank you, ma'am.

23              JUROR NO. 48:  I'm Juror No. 48.  I'm 60 years old.

24 I live in Bethel Park, Allegheny County.  I lived there 25

25 years.  I own my own home.  I am licensed to drive.  My

1  educational background is high school.  My employer is American

2  Industrial Contracting.  My job title is president.  I am

3  married.  My spouse is a homemaker.  I have four children; 35,

4  31, that's twins, and a 25-year-old, and they're all in

5  construction.  I don't have an attorney.

6              THE COURT:  Thank you, sir.

7              JUROR NO. 54:  I'm Juror No. 54.  I'm 62 years old.

8  I live in Forest Hills Borough, Allegheny County.  I have lived

9  there for 35 years.  I own my home.  I am a licensed driver.  I

10 have an associate's degree in technology and I'm employed by

11 Bank of New York Mellon as a software specialist.  I am

12 married.  My wife's employer is Woodland Hills School District.

13 She's a paraprofessional.  I have one daughter that is 29 years

14 old.  She's a pharmacist for the United States Public Health

15 Service at Victorville Federal Prison.  I do not have an

16 attorney.

17             THE COURT:  Thank you, sir.

18             JUROR NO. 50:  I'm Juror No. 50.  I am 43 years old.

19 I live in the City of Greensburg in Westmoreland County.  I

20 have lived there approximately 18 years.  I own my home.  I am

21 a licensed driver.  My educational background is college.  My

22 major area of study was accounting.  My employer is Elliott

23 Company Accounting.  My job title is regional manager of

24 General Ledgers and Controls for the Americas.  I am married.

25 My spouse's employer is Dormont Manufacturing of Watts Water

1  Technology Company.  My spouse's job title is product

2  liability, health and environmental manager.  I have three

3  children ages 16, 12 and 8.  They are students.  I do not have

4  an attorney.

5          THE COURT:  Thank you, ma'am.

6          JUROR NO. 66:  I am Juror No. 66.  I am 66 years

7  old.  I live in Eldersville, Washington County.  I have lived

8  there 13 years.  I own my home.  I am a licensed driver.  My

9  educational background is two years of college in engineering.

10 I'm a retiree from Allegheny Ludlum Steel and I work part time

11 at Eden's Garden Center and Maintenance Company.  I am married.

12 My wife works as an EMT in Bridgeville as a call operator.  I

13 have five kids; 42, son that is 42, teacher down in Florida;

14 another son that is 38, works for the State of Ohio in computer

15 programming; a 37-year-old daughter who is a homemaker; a

16 35-year-old son who is a vice president of some company up in

17 Akron, and I do have a 16-year-old high school student in

18 Burgettstown.  I do have an attorney.  His name is Tom Steel of

19 Keller & Peacock.  It's because of a lawsuit.

20         THE COURT:  Thank you, sir.

21         JUROR NO. 15:  I am juror 15.  I'm 50 years old.  I

22 live in Patterson Township, Beaver County.  I have lived there

23 for approximately 26 years.  I own my home.  I am a licensed

24 driver.  My educational background is college.  My major is IT,

25 human resources.  My employer is Eaton Corporation.  My job

title is project manager.  I am married.  My spouse's employer

is Blackhawk School District.  My spouse's job title is

cafeteria monitor.  I have two children, a daughter 24, special

educational teacher at New Horizon and a son 23 who works in

sales at USA Pan.  I do not have an attorney.

JUROR NO. 29:  Juror No. 29.  I am 26 years old.  I

live in Pittsburgh of Allegheny County for 25 years.  I rent my

home.  I am licensed to drive an automobile.  My educational

background is high school.  My employer is Texas Roadhouse.  My

job title is waitress.  I am not married.  I do not have

children.  I do not have an attorney.

THE COURT:  Thank you, ma'am.

JUROR NO. 19:  I am Juror No. 19.  I am 66 years

old.  I live in Neville Island, Allegheny County.  I have lived

there approximately 22 years.  I own my own home.  I am

licensed to drive.  My education background is high school.  My

employer is the Willows Senior Living as a housekeeper.  I am

married.  My spouse's employer is Venango, Incorporated.  He is

a car operator.  I have two children, one 39, that's a manager

for apartment complex, and a daughter that works at Fairfield

Hotel.  I do not have an attorney.

THE COURT:  Thank you, ma'am.

JUROR NO. 64:  I am Juror No. 64, I'm 55 years old.

I live in Carnegie, Allegheny County.  I have been there

approximately 25 years.  I rent my home.  I am licensed to

1  drive.  My educational background is college.  My majors were

2  speech communications and film production.  I freelance in film

3  production, so I have multiple employers throughout the course

4  of the year.  My title is either assistant director or

5  production manager.  I am not married.  I do not have children.

6  I do not have an attorney.

7           THE COURT:  Thank you, ma'am.

8           JUROR NO. 40:  I'm Juror No. 40.  I'm 68 years old.

9  I live in Allegheny County in Pittsburgh, North Hills area.  I

10 have lived there approximately 65 years.  I own my home.  I am

11 licensed to drive an automobile.  My educational background is

12 some college and medical billing and coding.  My employer is

13 Children's Hospital of Pittsburgh of UPMC.  My job title is

14 supervisor of the Welcome Center.  I am not married.  I have

15 one daughter, 44, who is a medical assistant and also works for

16 UPMC.  I do not have an attorney at this time.

17          THE COURT:  Thank you, ma'am.

18          JUROR NO. 62:  Good morning.  I am juror 62.  My age

19 is 54.  I live in Westmoreland County, North Huntington

20 Township.  I have lived there approximately 48 years.  I own my

21 own home.  I am licensed to operate a motor vehicle.  My

22 educational background is some college, major was nursing.  My

23 employer is UPMC Jefferson Home Health.  My job title is a

24 traveling nurse.  I am married.  My spouse's employer is Curtis

25 Wright.  Her job title is a certified purchasing manager.  I do

1  have two children, 28 and 23, a special needs assistant and

2  full time student.  I do not have an attorney at this time.

3            THE COURT:  Thank you, sir.

4            JUROR NO. 58:  I am Juror No. 58.  I am 42 years

5  old.  I live in Hopewell Township in Beaver County.  I have

6  lived there for the last ten years and I was raised there as

7  well.  I currently own my home.  I am licensed to drive an

8  automobile.  I attended college.  I have a bachelor's in

9  psychology and a master's in child development.  My employer

10  the The Alliance for Infants and Toddlers.  I am a service

11  coordinator.  I am not married.  I do not have children.  I do

12  not have a lawyer.

13            THE COURT:  Thank you, ma'am.

14            JUROR NO. 25:  I am Juror No. 25.  I am 65 years

15  old.  I live in Harmony in Butler County.  I own my own home.

16  I am licensed to drive an automobile.  My educational

17  background is some college.  My study was liberal arts.  My

18  employer is Market Space Communications and I am an

19  administrative assistant.  I am married.  My husband is retired

20  and working part time for Enterprise as a driver.  I have two

21  children, one daughter is 34 and she's an administrative

22  assistant.  My other daughter is 36 and she's an investigative

23  insurance agent.  I have no attorney.

24            THE COURT:  Thank you, ma'am.

25            Juror 63.

JUROR NO. 63:  I'm Juror No. 63.  I am 52 years old. I live in Mt. Lebanon, Allegheny County.  I have lived in Mt. Lebanon approximately 26 years.  My wife and I own our home.  I am licensed to drive.  I hold a doctorate in computer science.  My employer is Google.  I am a software engineer.  I am married.  My wife is the CEO of Carnegie Speech, LLC.  I have two children, ages 11 and 13, unemployed.  I do not have an attorney.

JUROR NO. 43:  I am Juror No. 43.  I am 56 years old.  I live in Gibsonia, Allegheny County.  I have lived there approximately 20 years.  I own my home.  I am a licensed driver.  My educational background is high school.  My employer is McCameson, Incorporated.  My job title is steamfitter foreman.  I am married.  My spouse's employer is Passavant Memorial Homes.  Her job title is pharmacist.  I have two children, ages 23 and 22.  They're both in college.  I do not have an attorney.

THE COURT:  Thank you, sir.

JUROR NO. 227:  I am Juror 227, 48 years old.  I live in Waynesburg, Greene County.  I have lived there for four years.  Own a home.  Am licensed to drive.  Education is some college.  My employer is PA Department of Corrections at SCI Green.  I'm a sergeant.  Wife is teacher's aide at Carmichael School District.  We have two boys, 7 and 18, both students.  I do not have an attorney.

1              THE COURT:  Thank you, sir.

2              JUROR NO. 51:  I am Juror 51.  I am 33 years old.  I

3   live in North Huntington, Westmoreland County.  I have lived

4   there for about six years.  I do own my home.  I am licensed to

5   drive.  My educational background is college.  I have a HR

6   degree, human resource degree.  My employer is Bobby Rahal

7   Automotive.  I am the HR manager.  I am married.  My spouse's

8   employer is Asset Works.  My spouse's job title is VP of

9   assets.  I do have two children.  I have a two-year-old and a

10  5-week-old.  I do not have an attorney.

11             THE COURT:  Thank you, ma'am.

12             JUROR NO. 67:  I am Juror No. 67.  I am 38 years

13  old.  I live in Canonsburg, Washington County.  I have lived

14  there for approximately six years.  I own my own home.  I am

15  licensed to drive a vehicle.  My educational background is

16  college.  I have an associate's degree in electronics.  My

17  employer is Universal Hospital Services.  My job title is

18  biomedical equipment technician.  I am married.  My spouse's

19  employer is Range Resources.  My spouse's job title is

20  purchasing assistant.  I have one child that is two years old

21  and I do not have an attorney.

22             THE COURT:  Thank you, sir.

23             JUROR NO. 42:  I am Juror No. 42.  I am 41 years

24  old.  I live in the City of Clairton in Allegheny County.  I

25  have lived there for three years.  I own my own home.  I am

licensed to drive an automobile.  My educational background is
some college.  I majored in communication education.  My
employer, I am self-employed.  My job title is novelist.  I am
currently separated.  My spouse's employer is File Inventory
Control System.  Her title is manager.  I have three children,
ages 19, 17 and 15, and they are all in school.  I do not have
an attorney.

          THE COURT:  Thank you, sir.

          JUROR NO. 11:  I am Juror No. 11.  I am 33 years
old.  I live in Green Tree, Allegheny County.  I have lived
there for approximately six years.  I own my own home.  I am
licensed to drive an automobile.  My educational background is
law school.  My employer is the Law Offices of Robert L. Lampl.
My job title is associate attorney.  I am married.  My spouse's
employer is Friday and Cox, LLC.  My spouse's job title is
associate attorney.  I have two children ages two and four.  I
do not have an attorney.

          JUROR NO. 14:  I am juror 14.  I am 62 years old.  I
live in McKees Rocks, Allegheny County.  I have lived there for
five years.  I rent my home.  I am licensed to drive an
automobile.  My education is high school.  I am disabled, I am
getting disability.  I worked at BP as a cashier.  I am not
married.  I have three children.  My son is 42, he works in
logistics at the VA Hospital in Oakland; I have a 40-year-old
daughter, she has a housekeeping business; and I have a

1  27-year-old daughter who is a homemaker.  I don't have an

2  attorney.

3          THE COURT:  Thank you, ma'am.

4          JUROR NO. 46:  I am Juror No. 46.  I am 54 years

5  old.  I live in Pittsburgh, Allegheny County.  I have lived

6  there approximately three years, but I did live in Allegheny

7  County for 37 years total.  I do own my own home.  I am

8  licensed to drive an automobile.  My educational background is

9  a Master's of Science in nursing.  My employer is EDMC.  My job

10 title is RN adjunct faculty.  I am married.  My spouse's

11 employer is ALCOA Defense.  My spouse's job title is in

12 security.  We have two children, 28 and 25.  My 28-year-old

13 works also for EDMC and my 25-year-old works for Home City Ice.

14 I do not have an attorney.

15         THE COURT:  Thank you, ma'am.

16         JUROR NO. 4:  I am Juror No. 4.  I am 47 years old.

17 I live in North Washington Township, Westmoreland County.  I

18 have lived there approximately 24 years.  I own my home.  I am

19 licensed to drive an automobile.  My educational background is

20 college.  I have associate's degree in paralegal studies and a

21 degree in legal secretarial studies.  My employer is Carmeuse

22 Lime and Stone.  My job title is accounts receivable

23 administrator.  I am married.  My spouse's employer is Duress

24 Equipment.  My spouse's job title is collection manager.  I

25 don't have any children.  I do not have an attorney.

1           THE COURT:  Could you restate the name of your
2 employer.

3           JUROR NO. 4:  Carmeuse Lime and Stone.

4           JUROR NO. 55:  I am Juror No. 55.  I am 35 years
5 old.  I live in Carmichael, which is in Greene County.  I have
6 lived there approximately five years.  I rent my home.  I am
7 licensed to drive an automobile.  My educational background is
8 a BS in business.  My employer is Target.  My job title is
9 executive team lead.  I am not married.  I have one child.  He
10 is 15 and in high school.  I do not have an attorney.

11           THE COURT:  Thank you, sir.

12           JUROR NO. 60:  I am Juror No. 60.  I am 63 years
13 old.  I live in Pittsburgh, Allegheny County.  I have lived
14 there approximately 42 years.  I rent.  I am licensed to drive
15 an automobile.  My educational background is Bachelor's degree
16 in education.  My employer was Gateway School District.  My job
17 title was high school teacher.  I'm retired.  I am not married.
18 I have no children.  And I do not have an attorney.

19           THE COURT:  Thank you, ma'am.

20           JUROR NO. 75:  I am Juror No. 75.  I am age 35.  I
21 live in West Deer township, Allegheny County.  We have lived
22 there for approximately one year.  I own my home.  I have a
23 license to drive.  My education is in plumbing and mechanical.
24 My employer is Roto-Rooter Services.  Job title is excavation
25 plumber.  My spouse is a home schooler to our three children,

1 9, 5 and 4.  And I do not have an attorney.

2          THE COURT:  Thank you, sir.

3          JUROR NO. 2:  I am Juror No. 2.  My age is 33 years

4 old.  I live in Brentwood Borough, Allegheny County.  I have

5 lived there approximately two years.  I own my home.  I am a

6 licensed driver.  My educational background is trade school

7 cosmetology.  My employer is Lins Asian Fusion.  My job title

8 is a server.  I am married.  My spouse's employer is

9 boilermaker Local 154.  My spouse's job title is journeyman

10 welder.  I have a child.  He is five.  I do not have an

11 attorney at this time.

12          THE COURT:  Thank you, ma'am.

13          JUROR NO. 72:  I am Juror No. 72.  I am 25 years

14 old.  I live in Claridge, Westmoreland County.  I have lived

15 there for approximately 23 years.  I do not own or rent my

16 home.  I am licensed to drive an automobile.  My educational

17 background is high school.  My employer is LRG Corporation.  My

18 job title is journeyman machinist.  I am not married.  I do not

19 have any children.  And I do not have an attorney.

20          THE COURT:  Thank you, sir.

21          JUROR NO. 30:  I'm Juror No. 30.  I am age 52 years

22 old.  I live until Braddock Hills in Allegheny County.  I have

23 lived there approximately six years.  I rent my home.  I am a

24 licensed to drive an automobile.  My educational background is

25 high school.  My employer is Ducommon LaBarge Technologies.  My

1 job title is print circuit board assembly.  I am not married.

2 I have three children; 34, 30, and 28.  I do not have an

3 attorney.

4          THE COURT:  Could you tell us what each of your

5 children do.

6          JUROR NO. 30:  Yes, my 34-year-old daughter is a

7 high school schoolteacher.  My 30-year-old daughter is a

8 licensed therapist, and my son is studying for his CDL license

9 to drive truck.

10          THE COURT:  Your middle child, what type of

11 therapist?

12          JUROR NO. 30:  She's a counselor.  She has her

13 master's in counseling, so she just became a licensed

14 therapist.

15          THE COURT:  Thank you, ma'am.

16          JUROR NO. 31:  Good morning.  I'm Juror No. 31.  I

17 am 39 years old.  I live in the Borough of Dormont, Allegheny

18 County.  I have lived there approximately six years.  I own my

19 home.  I am licensed to drive an automobile.  My educational

20 background is college.  I have a Bachelor's degree in public

21 speaking and marketing.  My employer is Special Olympics,

22 Pennsylvania.  I'm in fund-raising and special event

23 management.  I am married.  My spouse's employer is the

24 Allegheny County Airport Authority and he is a firefighter.  We

25 have two children, 11 and 14.  They do not work.  I do not have

1 an attorney.

2          THE COURT:  Thank you, ma'am.

3          JUROR NO. 26:  I'm Juror No. 26.  I am 64 years old.

4 I live in Edgewood, Allegheny County.  I have lived there

5 approximately 35 years.  I own my home.  I am licensed to drive

6 an automobile.  My educational background is in education,

7 special education and psychology.  My doctoral degree is in

8 counseling.  My employer is Community Day School.  My job title

9 is director of learning services.  I am married.  My spouse is

10 a self-employed psychologist.  We have a 24-year-old son who is

11 a videographer.  I don't have an attorney at this time.

12          THE COURT:  Thank you, ma'am.

13          JUROR NO. 33:  I am Juror No. 33.  I am 31 years

14 old.  I currently live in Greensburg, Westmoreland County.  I

15 rent my home.  I am a licensed driver.  My education is high

16 school.  My employer is Life Steps, Incorporated, and my job

17 title is a supervisor.  I am currently separated, going through

18 a divorce.  I do not have any kids.  And I do have an attorney

19 because of my divorce.

20          THE COURT:  Thank you very much, ma'am.

21          Thank you, Mr. Zimmerman.

22          Ladies and gentlemen, and all trial participants,

23 let me begin our next phase by first apologizing for clearing

24 my throat.  I was fighting a little bit of a cold over the

25 weekend.  And I'll do my best not to be distracting to you or

1 the proceedings.

2        What is going to happen now is I'm going to pose a

3 number of questions to you as a group.  If your answer to the

4 question is no, simply remain seated and say nothing.  So, when

5 you hear my question, if your answer would be no, you need not

6 do anything except remain seated and say nothing.

7        If on the other hand your answer to any of my

8 questions is a yes, please stand and when I acknowledge you,

9 simply state your juror number only.  At this time, we're not

10 asking you to provide and you should not provide any further

11 information about your yes answer.

12        So, if the answer to the question is a no, remain

13 seated, say nothing.

14        If the answer is yes, please stand and when I

15 acknowledge you, please state your juror number only.  Once

16 you've done that, you can be seated.

17

18        Question No. 1.  Recalling the summary of the

19 indictment which I read to you a few moments ago, do any of you

20 know anything about this case or have you read, seen, or heard

21 anything about it, or has anyone spoken with you about it?

22        There are no yes answers to No. 1.

23        No. 2.  I will now ask the defendant,

24 Mr. Atiba Warren, to stand.

25        Mr. Warren.

1              Do any of you know or know anything about

2  Mr. Atiba Warren?

3              Let the record reflect there are no yes answers to

4  No. 2.

5              You may be seated, Mr. Warren.

6              No. 3.  I'll now ask Mr. Warren's counsel, Mr. Mark

7  Sindler, to stand.

8              Do any of you know Mr. Sindler?

9              Has he ever represented you or any members of your

10 immediate family or been involved with you or them in any way?

11             Ladies and gentlemen, I will tell you for purposes

12 of all of my questions today, immediate family means husband,

13 or wife, children, brothers, sisters, mother, father,

14 grandparents, or domestic partner.

15             Thank you, Mr. Sindler.

16             There are no yes answers to No. 3.

17             No. 4.  I will now ask the prosecutors, Assistant

18 U.S. Attorneys Katherine King and Jonathan Ortiz to stand.

19             Do any of you know Ms. King or Mr. Ortiz

20             There are no yes answers to No. 4.

21             You may be seated Ms. King and Mr. Ortiz.

22             Also seated at counsel table is law enforcement

23 officer Steven Scuilli.

24             Please stand, Mr. Scuilli.

25             MR. ORTIZ:  It's Christian Scuilli.

1              THE COURT:  C-H-R-I-S-T-I-A-N?

2              MR. ORTIZ:  Yes, Your Honor.

3              THE COURT:  Officer Christian Scuilli, does anyone

4 know Christian Scuilli?

5              There are no yes answers as to Mr. Scuilli,

6 Mr. Ortiz or Ms. King.

7              No. 5.  Do any of you know anybody else on the jury

8 panel, me, the Judge, or any member of the Court's staff who

9 were introduced earlier today?

10             JUROR NO. 11:  No. 11.

11             THE COURT:  Juror No. 11 answered yes to question 5.

12             JUROR NO. 57:  57.

13             Anybody else know anyone else on the jury panel, me,

14 the Judge or any member of the Court's staff?

15             JUROR NO. 50:  Juror 50.

16             THE COURT:  Any other yes answers to question 5?

17             No. 6.  This case is being prosecuted by the federal

18 government following an investigation by the City of Pittsburgh

19 Police and it involves also the Federal Bureau of Alcohol,

20 Tobacco, Firearms and Exclusives and the Allegheny County

21 Medical Examiner's Office.

22             Do you have such strong personal feelings about any

23 of these agencies or any other government agency that would

24 affect your ability to render a fair and impartial verdict in

25 this case?

1              There are no yes answers to No. 6.

2              No. 7.  Similarly, potential witnesses in this case

3 are employed by the Bureau of Alcohol, Tobacco, Firearms and

4 Explosives, also known has the ATF and E, the Allegheny County

5 Medical Examiner and the Pittsburgh police.

6              Have you or any member of your immediate family ever

7 had any difficult or unpleasant experiences with any of those

8 agencies, or any other federal, state or local agency or

9 office, or do you have strong personal feelings for or against

10 those agencies for whatever reason?

11             There are no yes answers to No. 7.

12             No. 8.  Do you believe that law enforcement

13 testimony is more or less likely to be believable or reliable

14 than testimony by another witness?

15             There are no yes answers to No. 8.

16             No. 9.  The following witnesses may testify in this

17 trial:

18             Steven Sywyj, spelled S-Y-W-Y-I.

19             Lance Hoyson, spelled H-O-Y-S-O-N.

20             William Best, spelled B-E-S-T.

21             Kevin Kaufman, K-A-U-F-M-A-N.

22             Estelle Hayes, H-A-Y-E-S.

23             Travis Johnson, J-O-H-N-S-O-N.

24             Duwane Hayes, H-A-Y-E-S.

25             Carol Janssen, J-A-N-S-S-E-N.

1           Steve Wright, W-R-I-G-H-T.

2           Do you know any of those witnesses?

3           There are no yes answers to No. 9.

4           No. 10.  This trial is estimated to take several

5    days to present the witness testimony, evidence, and arguments

6    of counsel.  However, this is realistically just our best

7    estimate of trial time and the trial may turn out to be

8    somewhat shorter or somewhat longer.  Also our jury

9    deliberation room is up one flight of stairs from this

10   courtroom, which must be traversed several times each day.

11          Knowing what I've told you, is there any legitimate,

12   justifiable hardship reason, personal, professional, business,

13   medical condition or impairment or otherwise why you could not

14   serve as a juror for the duration of this trial?

15          Before you answer, I must advise you that a claimed

16   hardship must be real and not imagined, perceived or hoped for

17   and that such claims of hardship will be carefully considered

18   by the Court.

19          Any yes answers to that question No. 10?

20          JUROR NO. 13:  13.

21          JUROR NO. 29:  29.

22          JUROR NO. 75:  75.

23          JUROR NO. 26:  26.

24          JUROR NO. 14:  14.

25          JUROR NO. 51:  51.

```
 1                  THE COURT:  Thank you.

 2                  No. 11.  Is there any matter pending in your life

 3  about which you're concerned that would prevent you from

 4  devoting your full, undivided attention to this trial?

 5                  JUROR NO. 10:  10.

 6                  JUROR NO. 13:  13.

 7                  JUROR NO. 50:  50.

 8                  JUROR NO. 42:  42.

 9                  THE COURT:  Thank you.

10                  No. 12.  Have you ever served as a juror in a

11  criminal or civil case, or as a member of a grand jury in any

12  federal, state or county court?

13                  JUROR NO. 54:  54.

14                  JUROR NO. 47:  47.

15                  JUROR NO. 66:  66.

16                  JUROR NO. 41:  41.

17                  JUROR NO. 64:  64.

18                  JUROR NO. 21:  21.

19                  JUROR NO. 15:  15.

20                  THE COURT:  Question 13.

21                  Is there anything about jury service, whether it

22  involves lawyers, judges, the accused, the evidence, your jury

23  deliberations or your views of jury service more generally that

24  makes you feel you would have trouble being fair and impartial

25  or that you believe would make it difficult for you to serve
```

1  fairly as a juror in this case?

2          There are no yes answers to No. 13.

3          No. 14.  Have you formed any opinions about either

4  the prosecutors or defense lawyers, those in this case or

5  otherwise, the federal government, the criminal justice system,

6  the court system, or the prosecution or defense of criminal

7  cases which would affect you in deciding this case?

8          There are no yes answers to No. 14.

9          No. 15.  Have you or any member of your immediate

10  family ever been employed or sought to be employed by the

11  federal government, other than military service, or by any

12  state, local, county or federal law enforcement agency or court

13  in a paid or volunteer capacity?

14          JUROR NO. 31:  31.

15          JUROR NO. 75:  75.

16          JUROR NO. 66:  66.

17          JUROR NO. 16:  16.

18          JUROR NO. 13:  13.

19          JUROR NO. 56:  56.

20          JUROR NO. 54:  54.

21          JUROR NO. 50:  50.

22          JUROR NO. 27:  27.

23          JUROR NO. 29:  29.

24          JUROR NO. 43:  43.

25          JUROR NO. 58:  58.

1                   JUROR NO. 42:  42.

2                   JUROR NO. 14:  14.

3                   THE COURT:  No. 16.  Have you or any member of your

4    immediate family ever been a witness or defendant in a criminal

5    case other than a minor traffic violation?

6                   JUROR NO. 227:  227.

7                   JUROR NO. 67:  67.

8                   JUROR NO. 13:  13.

9                   No. 17.  Have you or any member of your immediate

10   family ever been arrested, charged with or convicted of a

11   criminal offense?

12                  JUROR NO. 48:  48.

13                  JUROR NO. 2:  2.

14                  No. 18.  Have you or a member of your immediate

15   family ever been a victim --

16                  MR. SINDLER:  A lady stood up.

17                  JUROR NO. 4:  No. 4.

18                  THE COURT:  And you were answering Question 17,

19   which is have you or any member of your immediate family ever

20   been arrested, charged with or convicted of a criminal offense?

21                  Your number again?

22                  JUROR NO. 4:  4.

23                  JUROR NO. 13:  13.

24                  JUROR NO. 19:  19.

25                  JUROR NO. 43:  43.

```
 1              JUROR NO. 14:  14.

 2              THE COURT:  No. 18.  Have you or a member of your

 3  immediate family ever been a victim of a crime?

 4              JUROR NO. 2:  2.

 5              JUROR NO. 4:  4.

 6              JUROR NO. 52:  52.

 7              JUROR NO. 54:  54.

 8              JUROR NO. 10:  10.

 9              JUROR NO. 16:  16.

10              JUROR NO. 40:  40.

11              JUROR NO. 42:  42.

12              JUROR NO. 57:  57.

13              JUROR NO. 53:  53.

14              JUROR NO. 21:  21.

15              JUROR NO. 29:  29.

16              JUROR NO. 63:  63.

17              THE COURT:  No. 19.  Do any of you now or have you

18  within the past five years belonged to or participated in any

19  crime prevention groups such as neighborhood watch

20  organizations or any other crime prevention groups?

21              There are no yes answers to No. 19.

22              No. 20.  Mr. Warren is a black male.  Do you have

23  any opinions or beliefs regarding black males that may affect

24  your ability to render a fair and impartial verdict in this

25  case?
```

```
 1                   There are no yes answers to No. 20.

 2                   No. 21.  Have you or a member of your immediate

 3  family ever been employed as a firefighter or affiliated with

 4  any fire department?

 5                   JUROR NO. 31:  31.

 6                   JUROR NO. 72:  72.

 7                   JUROR NO. 34:  34.

 8                   JUROR NO. 7:  7.

 9                   JUROR NO. 13:  13.

10                   JUROR NO. 56:  56.

11                   JUROR NO. 38:  38.

12                   JUROR NO. 53:  53.

13                   JUROR NO. 10:  10.

14                   JUROR NO. 54:  54.

15                   JUROR NO. 29:  29.

16                   JUROR NO. 42:  42.

17                   THE COURT:  Question No. 22.  Have you ever studied

18  law?

19                   JUROR NO. 28:  28.

20                   JUROR NO. 11:  11.

21                   JUROR NO. 4:  4.

22                   THE COURT:  No. 23.  Do you believe that black males

23  or black persons are more likely than others to commit a crime?

24                   There are no yes answers to No. 23.

25                   No. 24.  The jury in this case will be instructed
```

1  that a defendant in a criminal case is presumed to be innocent

2  and that presumption of innocence remains with him throughout

3  the entire trial.

4          Do you have any doubts or reservations about your

5  ability to follow this instruction?

6          There are no yes answers to No. 24.

7          No. 25.  Do you believe that Mr. Warren is obligated

8  to prove that he is innocent of these charges?

9          There are no yes answers to 25.

10          26.  Do you think that because Mr. Warren has been

11  charged with a crime, that he is probably guilty of that crime

12  or some other crime?

13          There are no yes answers to 26.

14          27.  I will also instruct the jury that the

15  defendant in a criminal case does not have to testify or

16  present any evidence on his own behalf and that his decision to

17  do so is not to be considered evidence against him of guilt.

18          Do you have any doubt or reservation about being

19  able to follow this instruction?

20          There are no yes answers to 27.

21          28.  Do you believe that Mr. Warren is required to

22  testify in this case or provide his version of what occurred?

23          JUROR NO. 43:  43.

24          JUROR NO. 72:  72.

25          THE COURT:  No. 29.  Do you believe that if

1  Mr. Warren does not testify in this case, that the absence of

2  that testimony is evidence of his guilt?

3              There are no yes answers to 29.

4              No. 30.  If Mr. Warren were to testify, would it be

5  difficult for you to fairly consider his testimony for any

6  reason?

7              There are no yes answers to No. 30.

8              No. 31.  I will instruct the jury that the

9  government has the burden of proving the defendant's guilt

10 beyond a reasonable doubt.  Do you have any doubt or

11 reservation about your ability to follow this instruction or

12 any other instruction that I would give you?

13             There are no yes answers to No. 31.

14             No. 32.  If you were representing the government or

15 the defendant in this case, is there any reason why you would

16 not be content to have this case decided by you or someone in

17 your frame of mind?

18             JUROR NO. 2:  No. 2.

19             JUROR NO. 16:  16.

20             JUROR NO. 29:  29.

21             THE COURT:  Question No. 33.  To admit to having

22 some sympathy for or personal feelings for or against either

23 the defendant or the government in this case is nothing to be

24 ashamed of and does not reflect badly upon you as a person.

25 However, both the government and the defendant are entitled to

have this case heard by a fair and impartial jury that will

decide the case solely according to the evidence admitted in

this court and according to the Court's instructions on the

law.  The law provides that the jury may not be governed by

sympathy, prejudice or public opinion.

         With this in mind, do you have any reason why you

would not be able to give either the government or the

defendant a fair trial based solely upon the evidence admitted

at trial and the instructions given by the Court, even if you

disagreed with those instructions?

         There are no yes answers to No. 33.

         No. 34.  Is there anything about the nature of this

case or the people or issues involved in it which you think

would make it difficult for you to try the issues fairly and

impartially without any prejudice or bias?

         There are no yes answers to 34.

         35.  Do you now have any opinion as to Mr. Warren's

guilt or innocence?

         There are no yes answers to 35.

         36.  During deliberations, if you have formed an

opinion, would it be difficult for you to keep an open mind and

to consider the opinion of others?

         There are no yes answers to 36.

         No. 37.  Do you have any strong feelings for or

against or relating to the private ownership of firearms or

1   laws regulating their possession or firearms themselves, such

2   that you would be unable to render a fair and impartial verdict

3   in this case based solely on the evidence presented and the

4   legal instructions of the Court?

5          JUROR NO. 26:  No. 26.

6          JUROR NO. 52:  52.

7          JUROR NO. 50:  50.

8          THE COURT:  Question 38.  Do you or any member of

9   your immediate family own or possess any type of firearm or

10  ammunition?

11         JUROR NO. 4:  4.

12         JUROR NO. 55:  55.

13         JUROR NO. 75:  75.

14         JUROR NO. 2:  2.

15         JUROR NO. 72:  72.

16         JUROR NO. 30:  30.

17         JUROR NO. 31:  31.

18         JUROR NO. 47:  47.

19         JUROR NO. 34:  34.

20         JUROR NO. 28:  28.

21         JUROR NO. 7:  7.

22         JUROR NO. 38:  38.

23         JUROR NO. 57:  57.

24         JUROR NO. 27:  27.

25         JUROR NO. 20:  20.

```
 1              JUROR NO. 56:   56.

 2              JUROR NO. 13:   13.

 3              JUROR NO. 52:   52.

 4              JUROR NO. 66:   66.

 5              JUROR NO. 50:   50.

 6              JUROR NO. 54:   54.

 7              JUROR NO. 10:   10.

 8              JUROR NO. 53:   53.

 9              JUROR NO. 29:   29.

10              JUROR NO. 19:   19.

11              JUROR NO. 64:   64.

12              JUROR NO. 40:   40.

13              JUROR NO. 62:   62.

14              JUROR NO. 25:   25.

15              JUROR NO. 14:   14.

16              JUROR NO. 11:   11.

17              JUROR NO. 42:   42.

18              JUROR NO. 67:   67.

19              JUROR NO. 51:   51.

20              JUROR NO. 227:   227.

21              JUROR NO. 43:   43.

22              THE COURT:  Question 39.  Having now heard the

23  questions of the Court, do you know of any reason why you could

24  not sit on this jury and render a fair and impartial verdict

25  based solely on the evidence presented in this case and the law
```

1 as I will instruct you?

2             There are no yes answers to No. 39.

3             Could I see counsel and the trial participants at

4 sidebar for a moment.

5     (Whereupon, there was a discussion at sidebar.)

6             THE COURT:  We're at sidebar so I can go over a few

7 procedural issues with counsel.

8             Present are Mr. Warren and Mr. Sindler, Ms. King and

9 Mr. Ortiz.

10             Mr. Sindler, based on the Court's conduct of voir

11 dire, are there any additional voir dire questions that you

12 believe should be propounded to the group as a whole?

13             MR. SINDLER:  There are no more.  My concern,

14 though, given how Question 17 was answered.

15             THE COURT:  Just to reflect, Question No. 17:  Have

16 you or any member of your immediate family ever been arrested,

17 charged with or convicted of a criminal offense.

18             Mr. Sindler.

19             MR. SINDLER:  The manner in which those answers were

20 answered affirmatively by some of the people, it seemed like

21 there were more people who once one or two had risen that

22 answered than would have had the first one or two not.  I bring

23 that up because a question or two before that concerning -- can

24 I go to my list.

25             THE COURT:  You may, Mr. Sindler.

```
1              Mr. Sindler has returned.

2              MR. SINDLER:  Question 8 concerned the testimony of

3    law enforcement and whether one would be inclined, more

4    inclined simply because of employment in law enforcement to

5    believe that testimony.

6              I have just found in the course of my trial career

7    that people tend to -- there are some people who affirmatively

8    answer that, and I think that sometimes unless -- using

9    Question 17 as an example, unless there's one or two people who

10   in a touchy area such as that, and I wonder if there's a way to

11   just cover that one question again because I find it hard to

12   believe that amongst the 50 or so people in the room nobody has

13   that inclination or belief about a person employed by law

14   enforcement and whether or not they would believe that

15   testimony more so than say a civilian.  That's all.

16             THE COURT:  Anything else about voir dire or any

17   additional follow-up that you'd request, sir?

18             MR. SINDLER:  No.

19             THE COURT:  Of the group of a whole.

20             The second question is going to be, it would seem to

21   the Court that it would be logical before we began the

22   individual follow-up to give everyone their lunch break rather

23   than get it started with one or two people at five minutes to

24   twelve.

25             MR. SINDLER:  I would agree.
```

 1            THE COURT:  Ms. King and Mr. Ortiz, is there

 2 anything about the voir dire as conducted or in terms of

 3 additional general voir dire that the United States would like

 4 to bring up or would like the Court to address?

 5            MS. KING:  No, Your Honor.

 6            MR. ORTIZ:  No, Your Honor.

 7            THE COURT:  Do you concur that this might be a good

 8 time to let them take their lunch break?

 9            MS. KING:  Yes.

10            THE COURT:  It's my intention that we'll do two

11 things when we do that.  I am going to give the group

12 essentially the same admonition I would give them as if they

13 were sworn jurors about not talking about this case or

14 discussing this case with themselves or anybody else, or any

15 matter related to it.  And once we will get all the jurors out

16 of the courtroom before we move anyone around in the courtroom,

17 we'll have them out and the doors closed before we do that,

18 I'll invite them if they want to leave their things here or

19 take it with them, that's entirely up to them.

20            It would be my intention, Mr. Sindler, what I will

21 do is I will re-ask Question 8, but I will not ask it alone.  I

22 will select several other questions so it's one of three that I

23 re-ask to confirm the Court's notes.

24            Is that agreeable with you?

25            MR. SINDLER:  That's fine.

```
 1              THE COURT:  Any objection, Ms. King or Mr. Ortiz?
 2              MS. KING:  No, Your Honor.
 3              THE COURT:  Anything about the process we're going
 4  to take now you would like to weigh in on?
 5              MS. KING:  No, Your Honor.
 6              THE COURT:  My thought would be one hour and fifteen
 7  minutes.  We have a considerable number of people who appear to
 8  not come into Downtown Pittsburgh.  If I gave them an hour,
 9  they might be a little nervous about being back here, so we're
10  going to give them an hour and fifteen minutes so they're
11  comfortable.  That will give counsel time to check your notes
12  and be ready to go this afternoon.
13              Ms. King and Mr. Ortiz, anything we should take care
14  of at sidebar?
15              MS. KING:  No.
16              THE COURT:  Mr. Sindler?
17              MR. SINDLER:  No.
18         (Whereupon, the discussion at sidebar ended.)
19              THE COURT:  We're back on the record in open court.
20              Mr. Warren is present as are his lawyer,
21  Mr. Sindler, Ms. King and Mr. Ortiz for the United States.
22              Ladies and gentlemen, there are a couple questions
23  I'm going to ask again just to make sure our collective notes
24  are correct.
25              What we're then going to do is we're going to take
```

1 our midday break so you have time to go and get something to

2 eat and then we'll tell you a time that we're going to be back

3 here, maybe you can beat the rush a little bit.

4          I will also tell you in our courtroom, we do permit

5 soft drinks, so long as they are in a container with a

6 mechanical lid, something that screws on like this, no sort of

7 flimsy takeout cups.  So if you happen to have your commuter

8 cup or a soft drink in a sealed bottle, you're welcome to bring

9 that back so you can have something to drink.

10          Bear with me one second, ladies and gentlemen.  I'm

11 going to re-ask Question 13.

12          Is there anything about jury service, whether it

13 involves lawyers, judges, the accused, the evidence, jury

14 deliberations or your views of jury service more generally that

15 makes you feel that you would have trouble being fair or

16 impartial or you believe would make it difficult for you to

17 serve fairly as a juror in this case?

18          That's Question 13 once again.

19          There are no yes answers to Question No. 13.

20          One moment, ladies and gentlemen.

21          Question No. 5.  Do you know anybody else on the

22 jury panel, me, the judge, or any member of the court staff?

23          If you stood before, we need you to stand again.

24          JUROR NO. 57:  57.

25          JUROR NO. 27:  27, sort of.

1          JUROR NO. 50:  50.

2          JUROR NO. 11:  11.

3          THE COURT:  That was Question No. 5.

4          Lastly, Question No. 8.

5          Do you believe that law enforcement testimony is

6   more or less likely to be believable or reliable than testimony

7   by another witness?  That's Question No. 8.

8          JUROR NO. 72:  72.

9          JUROR NO. 75:  75.

10          THE COURT:  Thank you very much.

11          Ladies and gentlemen, it's now one minute after

12   noon.  We are going to take our lunch break at this time.

13   We're going to resume in court at one-fifteen.  So I would ask

14   you to be back here -- we're going to lock the doors while

15   you're out -- we're going to ask you to be back here by about

16   ten minutes after one.

17          Here comes the special part.  When you come back,

18   sit in exactly the same place you're seated now.  So look to

19   your left, look to your right, look in front of you and behind

20   you, whatever you need to get your bearings, so when you come

21   back, you need to sit in the same place.

22          Before we get started this afternoon Mr. Babik,

23   Mr. Greer and Mr. Zimmerman will assist you.

24          As I mentioned, we're going to lock the doors.

25   You're welcome to leave things here, but you may find it more

1 comfortable to take them with you or to the jury room.

2          You're welcome to go wherever you want to go, just

3 so you would be back here and seated by ten minutes after one.

4          I can advise you we do have a small cafeteria down

5 on the first floor at the other end of the hallway, and there

6 are other places around town.

7          Ladies and gentlemen, I am going to give you the

8 following instruction.

9          While you are away from the courtroom, you should

10 not discuss this case, anything about it, anything about the

11 instructions I have given you, anything about your answers or

12 the answers of anyone else to any of the questions that have

13 been asked here today.  You should not do anything that would

14 be any type of research into anything having to do with this

15 case or the issues involved in it.  That means no Googling, no

16 TV, radio, even Encyclopedia Britannica, looking things up on

17 the Internet, Facebook, Twitter, no tools of technology.  You

18 should take no steps to do any research about the case, any of

19 the participants, or any of the issues that are involved in it.

20          You should not discuss the case or any of the

21 participants or any of the issues that appear to be involved in

22 it with anyone else, including amongst yourselves.

23          I will advise you that the lawyers and all of the

24 other trial participants have been told they're not to greet

25 you, not to converse with you, so it's not that they're not

1  being sociable, it's that they have been instructed to not have

2  any contact or discussion with you.

3          Should during your break anybody talk with you or

4  attempt to talk with you about this case, any of the issues

5  that might be involved in it or any of the participants, please

6  let my deputy, Mr. Babik, or Mr. Greer or Mr. Zimmerman know

7  that as soon as you return.

8          Mr. Babik, is there anything else we should say to

9  the jury panel at this time?

10         MR. BABIK:  Nothing else, Judge.

11         THE COURT:  Ladies and gentlemen, we'll have all the

12 trial participants, including me, we'll keep our seats while

13 you collect your things up, take one last look at who is seated

14 next to you, in front of you and behind you.  We'll send you on

15 your way.  If you could be back here at ten after one, that

16 would be terrific.

17         Please note that the jury panel is excused for the

18 midday break.

19     (Jury panel is dismissed from the courtroom.)

20         THE COURT:  All of the prospective jurors have left

21 the courtroom.

22         Ms. King, Mr. Ortiz, any other matters we should

23 take up at this time?

24         MS. KING:  No, Your Honor.  Thank you.

25         THE COURT:  Mr. Sindler, same question?

1             MR. SINDLER:  No.

2             THE COURT:  Close the main doors to the courtroom,

3 sir.

4             Mr. Babik, if you would recess court.

5             If counsel could be back at ten after one, we'll

6 have the paperwork ready to go and then we'll get started with

7 the follow-up questions on yes answers.

8             Marshals can assist Mr. Warren.

9             And Mr. Sindler, any reason we can't recess?

10             MR. SINDLER:  No, Your Honor.

11             THE COURT:  Ms. King and Mr. Ortiz?

12             MS. KING:  No, Your Honor.

13         (Whereupon, there was a brief recess in the proceedings.)

14       (Proceedings held in-chambers.)

15             THE COURT:  We're in chambers.

16             Present are counsel, Ms. King and Mr. Ortiz, for the

17 United States.

18             Mr. Sindler is here for Mr. Warren.

19             Mr. Warren is not in here yet.  He will be shortly.

20             I have two representatives of the marshal service.

21             Mr. Babik and Mr. Greer.

22             It's my intention to send Mr. Babik out.

23             Mr. Babik, have all of the prospective jurors

24 reported back to the courtroom and are they properly seated?

25             MR. BABIK:  They are.

1                    THE COURT:  You have personally observed it?

2                    MR. BABIK:  I personally observed it.

3                    THE COURT:  My thought would be to have Mr. Warren

4  come back here.  Then we'll begin with Juror No. 38 would be

5  the first one that we would bring back.

6                    What I will do is, as I explained the other day at

7  the pretrial conference, specifically remind them of the

8  questions that my notes showed an affirmative answer to, and

9  ask some follow-up.  I'll then give counsel an opportunity to

10  ask follow-up.  As long as everyone minds their manners, we'll

11  continue that during the course of the voir dire.

12                    Mr. Sindler, any reason we can't bring Mr. Warren

13  back?

14                    MR. SINDLER:  No, Your Honor.

15                    THE COURT:  Mr. Ortiz, Ms. King?

16                    MS. KING:  No, Your Honor.

17                    Will you let the parties know which questions you

18  believe the juror affirmatively responded to before they come

19  in?

20                    THE COURT:  Yes.

21                    MR. SINDLER:  Which question do you plan to start

22  with?

23                    THE COURT:  Question 21 is the first one he answered

24  a yes to.

25                    Mr. Warren, if you need a water, just help yourself.

1          Mr. Sindler, can we start bringing the jurors in who

2    have answered affirmatively to any question?  I'm going to go

3    in order.  If we get to a juror that did not answer

4    affirmatively to any question, including -- I know Juror No. 5

5    who you believe you had difficulty hearing the employer.

6          Does anyone need me to bring her back or him back

7    just to confirm who Juror No. 5's employer was?

8          MS. KING:  No.

9          THE COURT:  If we get to a juror as we're going down

10   the list that did not have an affirmative answer to any

11   question, I'll ask you if based on the answers you heard in the

12   courtroom you have any challenges for cause.  If need be, then

13   we would bring the juror back, but otherwise, they would be in

14   the pool and we'd move to the next one.  I'll ask each juror

15   that had at least one affirmative answer follow-ups to the

16   questions and I'll do them in the numerical order in which the

17   affirmative answer occurred.

18          Does that help you out?

19          MR. SINDLER:  Yes.

20          THE COURT:  Any reason we can't bring Juror No. 8

21   back who would be the first one we would be speaking with?

22          MR. SINDLER:  No.

23          THE COURT:  Mr. Ortiz and Ms. King?

24          MS. KING:  No.

25          THE COURT:  Juror 38 responded yes to Questions 21

1 and 38.

2        (Juror No. 38 enters chambers.)

3            THE COURT:  We're back here with Juror No. 38.

4            Sir, you gave a yes answer to two questions, No. 21,

5 and No. 38.

6            No. 21 was:  Have you or a member of your immediate

7 family ever been employed as a firefighter or affiliated with

8 any fire department?

9            What caused you to answer yes to that one?

10            JUROR NO. 38:  I have a nephew that was with the

11 West View Volunteer Fire Department.  Numerous cousins that was

12 involved with the Perrysville Volunteer Fire Department.  They

13 weren't employed but they were volunteers.

14            THE COURT:  They participated?

15            JUROR NO. 38:  Correct.

16            THE COURT:  Do you know if those family members that

17 were with West View and/or Perrysville Fire Department are

18 still affiliated with them as volunteer firefighters still

19 involved?

20            JUROR NO. 38:  No.

21            THE COURT:  Do you know of any of them ever having a

22 particularly good or not so good experience with that service?

23            JUROR NO. 38:  No, I think the rapport was all good.

24            THE COURT:  Then Question 38 was whether you or any

25 member of your family own or possess any type of firearm or

1 ammunition?

2          Can you tell us a little bit about what that is and

3 for what purpose.

4          JUROR NO. 38:  I am a hunter.  I have a lot of

5 hunting rifles and shotguns.  I do own a couple of pistols.  My

6 wife -- recently we purchased her a pistol.  I don't know why

7 either, for protection, I guess, but just for home security

8 purposes.

9          THE COURT:  Do either of you have a concealed carry

10 permit or anything like that?

11          JUROR NO. 38:  No.

12          THE COURT:  Ms. King or Mr. Ortiz, any follow-up to

13 Juror No. 38?

14          MR. ORTIZ:  Do you know exactly how many guns you

15 own?

16          JUROR NO. 38:  Mainly hunting guns, probably two,

17 three shotguns, three rifles, two pistols.  My wife has a

18 pistol, three.  And a German Luger that is my father's as a

19 keepsake, but nine or ten.

20          THE COURT:  Any other follow-up, Ms. King or

21 Mr. Ortiz?

22          MS. KING:  No, Your Honor.

23          THE COURT:  Mr. Sindler, any follow-up?

24          MR. SINDLER:  No, Your Honor.

25          THE COURT:  Thank you, sir.

1          (Juror No. 38 exits chambers.)

2               THE COURT:  Any issues for cause relative to 38?

3               Mr. Sindler?

4               MR. SINDLER:  No.

5               THE COURT:  Ms. King or Mr. Ortiz?

6               MS. KING:  No, Your Honor.

7               THE COURT:  38 is in the pool.

8               MR. SINDLER:  Can I speak to my client for a moment

9  while we are bringing the juror back?

10               THE COURT:  Can we have Mr. Warren --

11               THE MARSHALL:  I can escort him back.

12               MR. SINDLER:  Is that all right, just for a moment.

13               THE COURT:  Absolutely.

14          (Defendant exits chambers with Mr. Sindler.)

15               THE COURT:  Ms. Kienzle, if you'd note that

16  Mr. Sindler and Mr. Warren had left chambers momentarily for a

17  private consultation.

18               While they were gone, there were no proceedings, no

19  conversation, no anything other than allowing Mr. Ortiz to

20  stand up.

21               Do you concur, Ms. King?

22               MS. KING:  I do.

23               THE COURT:  Do you concur, Mr. Ortiz?

24               MR. ORITZ:  I do.

25               THE COURT:  Do you concur, Mr. Greer?

1                MR. GREER:  Yes.

2                THE COURT:  We will bring in Juror 7 who answered

3  yes to the same two questions, 21 and 28.

4         (Juror No. 7 enters chambers.)

5                THE COURT:  We have present Juror No. 7 who

6  responded yes to two questions, No. 21 and No. 38.

7                Sir, Question 21 was:  Have you or a member of your

8  immediate family ever been employed as a firefighter or

9  affiliated with any fire department?

10               Can you tell us what you had in mind that led to a

11  yes answer?

12               JUROR NO. 7:  I was a volunteer firefighter for

13  eight years near Ithaca, New York.

14               THE COURT:  How long ago did that service end?

15               Juror No. 7:  When I was 24 so, about four years.

16               THE COURT:  Did it end satisfactorily to you and the

17  fire department?

18               Juror No. 7:  Yes.

19               THE COURT:  Then you answered yes to Question 38

20  which was whether you or any member of your family owned or

21  possessed any type of firearm or ammunition and if so what kind

22  and for what purpose?

23               JUROR NO. 7:  I have two handguns, a .9 millimeter

24  and .22 caliber.  I was in the Army for 20 years, so I did buy

25  a Beretta.

1          THE COURT:  That's the .9 millimeter.

2          JUROR NO. 7:  Yes.  The other one is for target

3 practice.  And then I have a .22 caliber rifle, a Ruger.

4          THE COURT:  Do you use that for hunting or target

5 practice?

6          JUROR NO. 7:  Barely anything at this point.

7          THE COURT:  Do you have a concealed carry permit?

8          JUROR NO. 7:  I do not.

9          THE COURT:  If you generally describe for what

10 purpose you had the firearms.

11          JUROR NO. 7:  Target practice, familiarity.

12          THE COURT:  Mr. Sindler, any follow-up for Juror No.

13 7?

14          MR. SINDLER:  No.

15          THE COURT:  Mr. Ortiz or Ms. King?

16          MS. KING:  No.

17          JUROR NO. 7:  The last one, I tend to forget this,

18 I'm involved in a malpractice.  I'm a defendant.

19          THE COURT:  Is that in court somewhere?

20          JUROR NO. 7:  It's still in discovery.

21          THE COURT:  An actual lawsuit was filed.

22          JUROR NO. 7:  Yes.

23          THE COURT:  What court?

24          JUROR NO. 7:  Fayette County.

25          THE COURT:  Common Pleas Court?

1          JUROR NO. 7:  County court, I believe.

2          THE COURT:  Do you know who your lawyer is?

3          JUROR NO. 7:  Jason Logue.

4          THE COURT:  Do you know who the lawyer is that's on

5   the other side of the case?

6          JUROR NO. 7:  At least one of them, there are two

7   Davis brothers, I can't remember which one it is in Fayette

8   County.

9          THE COURT:  They are down in the Uniontown area?

10         JUROR NO. 7:  Yes.

11         THE COURT:  Without going into explicit detail, can

12  you generally say what the case is about?

13         JUROR NO. 7:  It was a delay in diagnosis.

14         THE COURT:  That's the claim against you?

15         JUROR NO. 7:  Yes.

16         THE COURT:  Are there other people who have been

17  sued in that lawsuit?

18         JUROR NO. 7:  The corporation which employs me, yes.

19         THE COURT:  Any hospitals or other providers?

20         JUROR NO. 7:  I honestly don't know at this point

21  whether they have also been named.  I think they retained

22  separate counsel.

23         THE COURT:  Ms. King or Mr. Ortiz, any follow-up to

24  that?

25         MS. KING:  No, Your Honor.

1           MR. SINDLER:  Do you have any views of the legal

2   profession as a result of being involved and is it different

3   from before you were involved in this case?

4           JUROR NO. 7:  It's not the first time I have been

5   involved in a malpractice suit, so it doesn't changes anything.

6   There are certain lawyers that look for that type of work.  But

7   I have been doing this for a long time, I know these things

8   happen and I feel patients have a right to redress as well.

9           THE COURT:  Is there anything about the current

10  lawsuit or your experience in it or any other experiences

11  you've had with the legal system that you think would get in

12  your way of rendering a verdict in this case based only on the

13  evidence you hear in the courtroom and in the instructions as I

14  give them.

15          JUROR NO. 7:  I don't think so.

16          THE COURT:  You'd be able to do that?

17          JUROR NO. 7:  Yes.

18          THE COURT:  Mr. Sindler, any follow-up.

19          MR. SINDLER:  No.

20          THE COURT:  Mr. Ortiz?

21          MR. ORTIZ:  Did any of your prior suits actually get

22  submitted to a jury?

23          JUROR NO. 7:  No, they either settled or were

24  dropped.

25          THE COURT:  Any other follow-up for Juror No. 7?

 1              MS. KING:  No, Your Honor.

 2              THE COURT:  Thank you very much for coming in.

 3         (Juror No. 7 exits chambers.)

 4              THE COURT:  Ms. King or Mr. Ortiz, any issues for

 5  cause?

 6              MR. ORTIZ:  No, Your Honor.

 7              THE COURT:  Mr. Sindler?

 8              MR. SINDLER:  No.

 9              THE COURT:  Juror 28, who responded yes to two

10  questions, No. 22 and No. 38.

11         (Juror No. 28 enters chambers.)

12              MR. BABIK:  Juror No. 28.

13              THE COURT:  Counsel, we have Juror No. 28 with us.

14              Juror 28 is here because he gave two yes answers to

15  Questions 22 and 38.

16              Question 22, sir, was:  Have you ever studied law?

17              You said yes.  Can you tell us about that.

18              JUROR NO. 28:  It goes back to high school and a

19  little bit of college.  We had a pretty good law program at

20  Latrobe and I participated in a few moot courts in Harrisburg.

21              THE COURT:  While you were in high school?

22              JUROR NO. 28:  Yes.

23              THE COURT:  Did you enjoy that?

24              JUROR NO. 28:  Yes, I did.

25              THE COURT:  About how long ago was that, sir?

1          JUROR NO. 38:  35 plus years ago.

2          THE COURT:  Tell me about college.  You said you had

3   a little experience in college.

4          JUROR NO. 28:  Just intro to law when I started

5   college, and then I left college.

6          THE COURT:  What courses of study were you pursuing?

7          Juror No. 28:  Food service management.

8          THE COURT:  Where was that, sir?

9          JUROR NO. 28:  That was Westmoreland County

10  Community College.

11         THE COURT:  Then Question 38, sir, was whether you

12  or any member of your family owned or possessed any type of

13  firearm or ammunition, and, if so, what kind and for what

14  purpose?

15         Can you tell us about that.

16         JUROR NO. 28:  I'm a hunter.  I own firearms for

17  hunting.  I own firearms for personal defense.  I do have a

18  concealed carry permit for the State of Pennsylvania.

19         THE COURT:  Can you briefly describe what types of

20  firearms you own.

21         JUROR NO. 28:  I have shotguns, revolvers, rifles,

22  semi-automatic handguns.

23         THE COURT:  If you had to estimate, how many long

24  guns and how many handguns?

25         JUROR NO. 28:  Probably a dozen handguns and

1 probably eight long guns.

2          THE COURT:  Have you ever been in a position where

3 you had to use any of them other than for sporting or target

4 purposes?

5          JUROR NO. 28:  No, sir.

6          THE COURT:  Mr. Sindler, any follow-up for Juror No.

7 28?

8          MR. SINDLER:  No.

9          THE COURT:  Mr. Ortiz and Ms.  King?

10          MS. KING:  No.

11      (Juror No. 28 exits chambers.)

12          THE COURT:  Mr. Sindler, any cause issues with Juror

13 No. 28?

14          MR. SINDLER:  No.

15          THE COURT:  Ms. King and Mr. Ortiz?

16          MS. KING:  No.

17          THE COURT:  No. 28 is in the pool.

18          The next one we would have that had no yes answers

19 is No. 5.  Are there any cause issues based on the answers to

20 the general questions or anything further that anyone wants

21 explored with No. 5?

22          MS. KING:  No, Your Honor.

23          MR. SINDLER:  I don't have the piece of paper that

24 is out at the table, can I take a moment to go, I apologize, I

25 thought I brought it in.

1           THE COURT:  You may, that's fine

2       (Mr. Sindler leaves chambers.)

3       (Mr. Sindler enters chambers.)

4           THE COURT:  The record will note that Mr. Sindler

5  has returned to the room after briefly retrieving something

6  from counsel table.

7           Mr. Warren, can you confirm there was no

8  conversation whatsoever while your lawyer was out of the room?

9           THE DEFENDANT:  No conversation.

10          THE COURT:  Mr. Ortiz and Ms. King, do you agree?

11          MS. KING:  Yes.

12          THE COURT:  Mr. Greer?

13          MR. GREER:  Yes, Judge.

14          THE COURT:  Does anyone need Juror No. 5 that had no

15  positive responses brought back for any follow-up questions of

16  any type?

17          Ms. King or Mr. Ortiz?

18          MS. KING:  No, Your Honor.

19          THE COURT:  Mr. Sindler?

20          MR. SINDLER:  I can confirm, no.

21          THE COURT:  So no objections for cause, Juror No. 5

22  is in the pool.

23          Mr. Greer, if Juror No. 34 can come back who

24  responded yes to 21 and 38.

25      (Juror No. 34 enters chambers.)

1            THE COURT:  Counsel, we have Juror 34 with us.  She

2 said yes in response to two questions, No. 21, and No. 38.

3            Ma'am, No. 21 was whether you or a member of your

4 immediate family has ever been employed as a firefighter or

5 affiliated with any fire department.

6            What led to your yes answer?

7            JUROR NO. 34:  My father was a charter member of the

8 fire company in south Franklin.

9            THE COURT:  South Franklin Township.

10            JUROR NO. 34:  Which is in Washington County.

11            THE COURT:  Is he still living?

12            JUROR NO. 34:  No.

13            THE COURT:  Do you know about how long he was in

14 that fire company?

15            JUROR NO. 34:  I can't remember when they

16 established it.  It was basically until he was dead, until he

17 was deceased.

18            THE COURT:  How long ago did he pass away?

19            JUROR NO. 34:  In 2002.

20            THE COURT:  As far as you know, did he have a

21 particularly good or bad experience there, everything go okay?

22            JUROR NO. 34:  Yes.  It's volunteer, yes.

23            THE COURT:  Then No. 38, was whether you or anyone

24 in your family owned any firearms or ammunition and, if so,

25 what kind and for what purpose?

1          JUROR NO. 34:  We have a couple shotguns.

2          THE COURT:  When you say "we."

3          JUROR NO. 34:  My husband.  I have shot a pistol

4 before, a handgun, but I don't touch them.

5          THE COURT:  Tell us about your husband.

6          JUROR NO. 34:  He has hunting rifles because he used

7 to go hunting.  He doesn't really hunt that much anymore.

8 Couple shotguns, he has a couple handguns.  We live in the

9 country, so basically some of the guns are used for some of the

10 animals, we have raccoons, coyotes out our way.  He hasn't gone

11 hunting for a period of time, but he does have guns.  My son

12 does, too.

13         THE COURT:  Does he live with you or somewhere else?

14         JUROR NO. 34:  He lives across the road from us.

15         THE COURT:  What kind of weapons does he have, if

16 you know?

17         JUROR NO. 34:  He has a shotgun.  I think he has a

18 hunting rifle, too.  I'm not sure.

19         THE COURT:  Does he hunt, your son?

20         JUROR NO. 34:  Some.

21         THE COURT:  How old is your son?

22         JUROR NO. 34:  29.

23         THE COURT:  How old is your husband?

24         JUROR NO. 34:  63.

25         THE COURT:  Do you your son or your husband have a

1  concealed carry permit.

2           JUROR NO. 34:  My husband does.  I don't know if my

3  son does or not.

4           THE COURT:  Do you know if any of you, your husband

5  or your son, have ever used any of the firearms for anything

6  other than hunting or target practice?

7           JUROR NO. 34:  No, they haven't.

8           THE COURT:  Mr. Ortiz, Ms. King any follow-up to

9  those questions?

10          MR. ORTIZ:  I guess I wasn't sure that I understood.

11 Your son lives across the road from you?

12          JUROR NO. 34:  He lives -- my mother-in-law died a

13 couple years ago, so he and his wife live in her house right

14 now.

15          MR. ORTIZ:  Separate house?

16          JUROR NO. 34:  He's married, they have a kid,

17 totally separate.

18          MR. ORTIZ:  Thank you.

19          THE COURT:  Any other follow-up, Ms. King or

20 Mr. Ortiz?

21          MS. KING:  No.

22          THE COURT:  Any follow-up, Mr. Sindler?

23          MR. SINDLER:  No.

24          THE COURT:  Thank you very much, Juror No. 34.

25      (Juror No. 34 exits chambers.)

1          THE COURT:  Mr. Sindler, any cause issues with Juror

2 No. 34?

3          MR. SINDLER:  No.

4          THE COURT:  Mr. Ortiz or Ms. King?

5          MS. KING:  No.

6          THE COURT:  Juror No. 34 is in.

7          That brings us to 16 who responded yes to 15, 18 and

8 32.

9     (Juror No. 16 enters chambers.)

10          MR. BABIK:  I have Juror No. 16.

11          THE COURT:  Counsel, we have Juror No. 16 here.  He

12 responded yes to three questions, No. 15, No. 18 and No. 32.

13          Sir, No. 15 was whether you or any member of your

14 immediate family has ever been employed or sought to be

15 employed by the federal government, other than the military, or

16 any state, local, county or federal law enforcement agency or

17 court in a paid or volunteer capacity.

18          You answered yes.  Tell us about that.

19          JUROR NO. 16:  I work at the county jail.  I have

20 been asked several times if I want to become a CO.

21          THE COURT:  CO stands for?

22          JUROR NO. 16:  Correctional officer.  I have never

23 followed through, but I have been asked.

24          THE COURT:  How recently were you asked?

25          JUROR NO. 16:  Maybe until the last year.  It was by

1 a CO.

2           THE COURT:  By another CO?

3           JUROR NO. 16:  Yes.

4           THE COURT:  Was it somebody in management or

5 supervision?

6           JUROR NO. 16:  No, sir.

7           THE COURT:  Has anybody in management or

8 supervision?

9           JUROR NO. 16:  They have not.

10           THE COURT:  This is the Allegheny County Jail?

11           JUROR NO. 16:  Yes, sir.

12           THE COURT:  As I recall from your answers in the

13 courtroom, you're an employee of the Allegheny Intermediate

14 Unit.

15           JUROR NO. 16:  I'm an educator of the Allegheny

16 Intermediate Unit.  At the Allegheny County Jail I have several

17 classes there where I have direct contact with the inmates.

18           THE COURT:  You work five days a week, twelve hours

19 a day, it's an eight hours a day.

20           Juror No. 16:  Seven to three.

21           THE COURT:  Question 18 was have you or a member of

22 your immediate family ever been a victim of a crime.

23           What led to your yes?

24           JUROR NO. 16:  Yes, my mother.  Domestic abuse.  My

25 father, my late father.  Domestic and family abuse, and my

1 older brother has been robbed.

2           THE COURT:  Let's start with the situation with your

3 mother.  Did any of that ever lead to --

4           JUROR NO. 16:  Incarceration?

5           THE COURT:  Or just charges, formal, criminal, legal

6 proceedings?

7           JUROR NO. 16:  Yes, but I didn't feel that was

8 necessary to bring it up because he's a late father and it

9 doesn't affect my situation at all.

10           THE COURT:  How long ago the did your father pass

11 away?

12           JUROR NO. 16:  September 10, 2015.

13           THE COURT:  Was he ever incarcerated as a result of

14 that?

15           JUROR NO. 16:  I believe he has time on the books in

16 the Allegheny County Jail, yes, for public drunkenness, I

17 believe.

18           THE COURT:  When he was there, was that because he

19 had been convicted of a criminal offense or he was being held

20 pending a trial?

21           JUROR NO. 16:  I'm not certain.

22           THE COURT:  Approximately how old was your father

23 when he passed away?

24           JUROR NO. 16:  My father would have been 56 -- 59.

25           THE COURT:  At the time your father passed away --

1 let me ask you this, is your mother still living?

2              JUROR NO. 16:  Yes, sir.

3              THE COURT:  Does she live in the Pittsburgh area?

4              JUROR NO. 16:  Yes, sir.  I live and rent from her.

5              THE COURT:  In the same home?

6              JUROR NO. 16:  Yes.

7              THE COURT:  About how long have you done that?

8              JUROR NO. 16:  Since graduating college.

9              THE COURT:  How long is that?

10             JUROR NO. 16:  2009.

11             THE COURT:  About six years?

12             JUROR NO. 16:  Yes, sir.

13             THE COURT:  Did any of the domestic violence that

14 you described, did any of that ever occur in your presence?

15             JUROR NO. 16:  Yes, sir.

16             THE COURT:  Were you physically involved in any way

17 while that was going on?

18             JUROR NO. 16:  Yes, sir.

19             THE COURT:  Could you briefly tell us in your own

20 words.

21             JUROR NO. 16:  My father was an alcoholic and

22 teenage angst, I felt it necessary to defend my mother's honor.

23 At times, I placed myself in situations I should not have.  I

24 have been struck.  I have seen her struck.  Or to take care of

25 that other siblings and I got together and told our mother we

1  were not going to deal with this.  She made a decision to get a

2  PFA, removed him from the home, and they proceeded getting a

3  divorce.

4           THE COURT:  After that PFA was obtained, were there

5  any allegations that it was violent in any way?

6           JUROR NO. 16:  Not that I know of.

7           THE COURT:  Generally, how would you describe your

8  relationship with your mother?

9           JUROR NO. 16:  Very close.

10          THE COURT:  Generally, how would you describe your

11 relationship with your late father in say the last three or

12 four years of your life?

13          JUROR NO. 16:  We were disconnected, but I learned a

14 lot of his mistakes, that's why I chose to work at county jail.

15          THE COURT:  Why is that?

16          JUROR NO. 16:  People get a chance to better

17 themselves.  I believe in our justice system.  I've seen the

18 ability to grow from people's mistakes.  A lot of my students

19 come in being -- having committed or not committed a crime,

20 they're able to better themselves and go back into life as

21 recidivized individuals and learn from it.  I saw my father's

22 ability to do that and so that urged me to want to do it

23 yourself.

24          THE COURT:  When you say you saw your father's

25 ability to do it, what do you mean?

1              JUROR NO. 16:  He took classes, he went to the

2  classes I teach, and at that point he started his own business,

3  and then fell back into his bad habits later on, but I've seen

4  the ability for rehabilitation that happened.

5              THE COURT:  What classes do you teach?

6              JUROR NO. 16:  I teach pre-apprenticeship

7  mathematics, pre-GED for females and I teach computer literacy

8  and work readiness.

9              THE COURT:  Work readiness?

10             JUROR NO. 16:  Yes, sir.

11             THE COURT:  Question 32 was if you were representing

12  the government or the defendant in this case, is there any

13  reason why you would not be content to have the case decided by

14  you or someone in your frame of mind, and you said yes.

15             JUROR NO. 16:  My concern would be from the fact I

16  worked at the county jail, I would be afraid that he wouldn't

17  get any educational services being we had a close encounter.

18             THE COURT:  Who is he?

19             JUROR NO. 16:  Any person, any defendant who has

20  been incarcerated at any time.

21             THE COURT:  Help me understand that a little better.

22             JUROR NO. 16:  I felt like if anyone in the

23  situation that the defendant is in, were --

24             THE COURT:  Meaning Mr. Warren?

25             JUROR NO. 16:  Yes, Mr. Warren.  I would want to

1  make sure he would get an education.  I would be afraid if I

2  were to serve on his jury, that I would not be able to serve

3  him in the capacity he's meant to get while incarcerated.

4            THE COURT:  So you would concern if he was otherwise

5  going to become one of your students, the fact you were on the

6  jury would prevent him from taking the class?

7            JUROR NO. 16:  Yes, sir.

8            THE COURT:  Are there others that teach your

9  classes?

10           JUROR NO. 16:  My two pre-apprenticeship classes,

11 there are not.

12           THE COURT:  You teach only at the Allegheny County

13 Jail?

14           JUROR NO. 16:  Yes, sir.

15           THE COURT:  Now let me ask you this, sir.  Is there

16 anything about what you've heard about the case or your answers

17 to any of the Court's questions today or your follow-up here

18 that you think would get in the way of you rendering a fair and

19 impartial verdict based only on the evidence you hear in the

20 courtroom and the instructions that I gave you?

21           JUROR NO. 16:  No, sir.

22           THE COURT:  You could follow all of those?

23           JUROR NO. 16:  Yes, sir.

24           THE COURT:  You could put everything else aside?

25           JUROR NO. 16:  Yes, sir.

1                THE COURT:  Mr. Sindler, any follow-up questions?

2                MR. SINDLER:  I don't remember what you had said, if

3  you had said it.  How long have you been working at the

4  Allegheny Intermediate Unit.

5                JUROR NO. 16:  I will be working there two years

6  come December 16th.

7                MR. SINDLER:  Has it been continuous?

8                JUROR NO. 16:  Yes.

9                THE COURT:  Have you been doing the same thing that

10  you just described during those two years?

11               JUROR NO. 16:  I also do pod runs where I get

12  information off the inmates so they can further their

13  education.

14               MR. SINDLER:  I don't have any other questions.

15               THE COURT:  When you say "pod runs," what is that

16  shorthand for?

17               JUROR NO. 16:  I go up to the pods where inmates are

18  being kept and I get information off them so they can further

19  their education.  I ask them questions or I drop off diplomas

20  and certifications.

21               THE COURT:  You will recall when all the jurors and

22  we were all in the courtroom, there were some other questions I

23  asked you, I'd like to follow-up on some of those.

24               I'm going to instruct the jury, whoever is on the

25  jury, that any defendant, including Mr. Warren, is presumed to

1   be innocent.

2              JUROR NO. 16:  Correct.

3              THE COURT:  They can be found guilty of a crime

4   charged if and only if the government proves each and every

5   element of the crime beyond a reasonable doubt and the jury

6   verdict has to be unanimous.  That's an instruction I'm going

7   to give.

8              Do you believe you'd have any hesitation whatsoever

9   in following that instruction?

10             JUROR NO. 16:  I would have no hesitation

11  whatsoever.

12             THE COURT:  I will instruct the jury, just as I've

13  said in the courtroom now, that whether any defendant in any

14  criminal case chooses to testify or not, or present any

15  evidence or not, is solely up to them.  No defendant is

16  required to testify or present any evidence, they don't even

17  have to present a case and that cannot in any way, shape or

18  form be held against them in a jury rendering its verdict.

19             Do you have any hesitation whatsoever in being able

20  to follow that instruction?

21             JUROR NO. 16:  I do not have any hesitation

22  following that instruction.

23             THE COURT:  Ms. King or Mr. Ortiz, any follow-up?

24             MR. ORTIZ:  You spoke a little bit about the

25  rehabilitation that you see with some of the inmates.  Is your

1  interaction with them primarily about the goals that they want

2  to achieve, or do you have discussions about their underlying

3  offenses, why they're incarcerated.

4          JUROR NO. 16:  My strict rule, I don't care who you

5  are, where you're from, what you may or may not have, all I

6  care about once you cross that threshold, you are not by

7  yourself.  If you accept that goal with me, I'm there through

8  and through to help you learn and grow as an individual.

9  That's it.

10          MR. ORTIZ:  So discussion about the cases --

11          Juror No. 16:  We have strict rules with AIU and

12  Allegheny County Jail that we do not discuss cases or anything

13  about cases inside or outside of our classrooms.  That way we

14  don't develop biases or any of those types of things.

15          THE COURT:  Mr. Sindler, any further follow-up?

16          MR. SINDLER:  No.

17          THE COURT:  Let me ask you about the folks you

18  teach.  Are they all men, all women, or some of each.

19          JUROR NO. 16:  I teach two classes of all gentlemen.

20  And then I teach in the afternoons, I teach a class of all

21  females.  Evenings I teach a class of all females.

22          THE COURT:  The people in your classes, are they a

23  mix of people that are charged and awaiting trial and others

24  who may have already had their trial, or is it just one or the

25  other?

1           JUROR NO. 16:  It is a mix.  It goes through max

2  security all the way down to people just waiting on detainers.

3           THE COURT:  Mr. Sindler, any follow-up to the

4  Court's questions?

5           MR. SINDLER:  No.

6           THE COURT:  Mr. Ortiz or Ms. King?

7           MS. KING:  Do you know the status of the different

8  people that you're working with, whether they are just on a

9  detainer, whether they are convicted?

10          JUROR NO. 16:  The only time I find that out is if

11  they're getting to be in the red, which means they're about to

12  be released, so I know if I can have time to test them or I can

13  further their education or get a certificate.

14          MS. KING:  Do you have access to their file that

15  says what they did, why they're there?

16          JUROR NO. 16:  I do not have access to the file.  If

17  it needs to be brought to my attention, it will be brought to

18  my attention, but I have never had a situation where it has

19  been brought to my attention.  The only thing we do is we give

20  them a basic intake form where they fill out their basic

21  general information, so if upon release we need to get them a

22  certificate or something, we have a contact place to mail it to

23  or a place to make sure they get it at some time.

24          THE COURT:  Sir, let me ask you this.  In the whole

25  time you have been assigned by the intermediate unit over to

1  the Allegheny County Jail, have you ever found yourself in any

2  situations that you found that you believed were uncomfortable

3  or unsafe to you?

4           JUROR NO. 16:  No, sir.  I've been in a situation

5  where I felt that a comment was made toward a colleague of mine

6  that I felt could have been detrimental to her which I did

7  report and write up, but I have never felt uncomfortable or

8  unsafe in my situation where I work.

9           THE COURT:  By title or office, who did you write

10 that up to?

11          JUROR NO. 16:  To my boss.  I also gave a copy of it

12 to the investigation services in the jail.

13          THE COURT:  Is your boss somebody that works for the

14 intermediate unit?

15          JUROR NO. 16:  Works for the intermediate unit.

16          THE COURT:  Then you gave a copy to somebody who

17 works for the jail?

18          JUROR NO. 16:  Yes, sir.

19          THE COURT:  Mr. Ortiz or Ms. King, any follow-up to

20 the Court's questions?

21          MS. KING:  No, Your Honor.

22          THE COURT:  Mr. Sindler?

23          MR. SINDLER:  Something that was a moment ago before

24 we got to the next stage, Judge.

25          Is it the same people who are asking you to become a

1 CO or is it different individuals who are continually

2 approaching you?

3            JUROR NO. 16:  Usually the same person.  It's more

4 jovial, I feel like, but there are times where he's just like

5 you can do this job a lot better than some of my peers.

6            MR. SINDLER:  Do you like what you're doing?

7            JUROR NO. 16:  I love teaching.  Like I said, I have

8 a degree in elementary education.  When you see any individual,

9 a child or adult understand something and they know how to use

10 it to better their lives, it's remarkable.

11            MR. SINDLER:  That's all I have.

12            THE COURT:  Any other follow-up?

13            MS. KING:  In the general questions you said you

14 don't have a driver's license, is there a reason for that?

15            JUROR NO. 16:  Yes.  When I was younger, I was in a

16 very bad accident where I ended up breaking my back and ended

17 up losing offers for scholarships.  Ever since, I've had

18 permits and I left them lapse.  I have developed a fear of

19 driving in the evening with my permit.  I always felt public

20 transportation was my best bet.  Yes, I mean to fix that.

21            THE COURT:  What kind of scholarships do you feel

22 you were in the running for?

23            JUROR NO. 16:  I ran track and played football.

24            THE COURT:  Where did you attend high school?

25            JUROR NO. 16:  Chartiers Valley.

```
 1              THE COURT:  Any questions, Mr. Sindler?

 2              MR. SINDLER:  No.

 3              THE COURT:  Ms. King or Mr. Ortiz?

 4              MS. KING:  No, Your Honor.

 5              THE COURT:  Mr. Ortiz and Ms. King, any issues of

 6  cause for Juror No. 16?

 7              MS. KING:  No, Your Honor.

 8              THE COURT:  Mr. Sindler?

 9              MR. SINDLER:  We don't.

10              THE COURT:  16 is in.

11         Mr. Greer, please bring in No. 47 who responded yes

12  to No. 12 and No. 38.

13         (Juror No. 47 enters chambers.)

14              THE COURT:  Counsel, we have Juror 47 with us.  She

15  answered yes to two questions, No. 12 and No. 38.

16              Ma'am, No. 12 was:  Have you ever served as a juror

17  in a criminal or civil case or as part of a grand jury in

18  federal, state or county court.

19              Tell us about that.

20              JUROR NO. 47:  I was a juror for Fayette County for

21  an assault case between a correction officer and an inmate.

22              THE COURT:  Were you actually picked to be on the

23  jury?

24              JUROR NO. 47:  I was.

25              THE COURT:  Did the case go to trial?
```

1          JUROR NO. 47:  Yes, it did.

2          THE COURT:  Did it go all the way until the jury

3 deliberated and rendered a verdict?

4          JUROR NO. 47:  Yes.

5          THE COURT:  It was a unanimous verdict?

6          JUROR NO. 47:  Yes, it was.

7          THE COURT:  Do you recall whether it was conviction

8 or acquittal?

9          JUROR NO. 47:  It was an conviction.

10          THE COURT:  About how long ago was this?

11          JUROR NO. 47:  This was probably three years ago.

12          THE COURT:  Was there anything about, anything at

13 all about your experience as a juror that you found troublesome

14 or troubling or concerning?

15          JUROR NO. 47:  No.

16          THE COURT:  Anything you found unsatisfactory,

17 unpleasant about it?

18          JUROR NO. 47:  No.

19          THE COURT:  Looking back, any second thoughts about

20 your time and service as a juror?

21          JUROR NO. 47:  No.

22          THE COURT:  You were treated okay by the court

23 system down there?

24          JUROR NO. 47:  Yes.

25          THE COURT:  By the lawyers?

1              JUROR NO. 47:  Yes.

2              THE COURT:  By everyone else involved?

3              JUROR NO. 47:  Yes.

4              THE COURT:  You served as a juror one time?

5              JUROR NO. 47:  Just one time.

6              THE COURT:  Question 38 was whether you or anybody

7   in your family owned any type of firearm and, if so, what kind

8   or ammunition?

9              JUROR NO. 47:  My husband actually has a deer rifle.

10  That's the only gun we have in the house, but my brother owns a

11  couple different firearms.  I'm not 100 percent sure what type

12  they are, but they don't live that far from me, and my dad owns

13  a handgun.

14             THE COURT:  Let's start with your husband.  He is an

15  active hunter.  Does he go out most years?

16             JUROR NO. 47:  Yes.

17             THE COURT:  Have you ever fired a firearm?

18             JUROR NO. 47:  I have.  I have fired my brother's

19  Glock.

20             THE COURT:  A Glock.  That's a handgun?

21             JUROR NO. 47:  Yes.

22             THE COURT:  Do you or any of your people you have

23  talked about have a concealed carry permit?

24             JUROR NO. 47:  My brother dad, my dad does.

25             THE COURT:  Let's talk about your dad.  You said he

1 has both long guns and a handgun?

2         JUROR NO. 47:  He just has a handgun.

3         THE COURT:  Do you know for what purpose?

4         JUROR NO. 47:  He has it for protection in the

5 house.

6         THE COURT:  Then your brother, tell us about that.

7         JUROR NO. 47:  My brother, he likes guns.  He

8 started -- I don't know, I think he has four or five different

9 types of guns.  He just enjoys shooting, so he actually belongs

10 to a shooting range that he goes to.  He's actually the one

11 that actually taught me how to shoot.

12        THE COURT:  Does he have both handguns and long

13 guns?

14        JUROR NO. 47:  He has handguns.

15        THE COURT:  Do you know whether your husband, father

16 or brother have ever had to use a firearm for any purpose other

17 than hunting or target practice?

18        JUROR NO. 47:  They have not.

19        THE COURT:  Ms. King and Mr. Ortiz, any question

20 follow-up questions?

21        MR. ORTIZ:  No, Your Honor.

22        MS. KING:  No.

23        MR. SINDLER:  Did you serve as the foreperson on

24 that jury.

25        JUROR NO. 47:  I did not.

1            MR. SINDLER:  I know that you answered Judge

2    Hornak's questions about nothing standing out about that

3    exercise of serving on a jury.  The deliberations part did not

4    stand out in any way for you either?

5            JUROR NO. 47:  It was just a long process.  We were

6    there for a very long time.  The only reason it sticks out to

7    me is because we didn't dismiss on a normal time, my mother

8    actually was supposed to be somewhere and I knew my kids were

9    handled and she actually had my husband come down to the

10   courthouse to see if my car was still in the parking garage

11   because we ended up deliberating and the case wasn't done until

12   about nine o'clock at night.

13           MR. SINDLER:  Did you guys get a verdict on the same

14   day in which you were given deliberations?

15           JUROR NO. 47:  I believe it was three days.

16           MR. SINDLER:  Of deliberations.

17           Juror No. 47:  It did.

18           MR. SINDLER:  I know you live in Lemont Furnace

19   area.

20           JUROR NO. 47:  I do.

21           MR. SINDLER:  That does not propose any

22   transportation or logistic issue if you are chosen to serve on

23   this jury?

24           JUROR NO. 47:  It does not.

25           THE COURT:  Mr. Ortiz or Ms. King?

1          MS. KING:  No, Your Honor.

2          THE COURT:  Thank you very much.

3      (Juror No. 47 exits chambers.)

4          THE COURT:  Mr. Sindler, any issues for cause with

5  No. 47?

6          MR. SINDLER:  No.

7          THE COURT:  Mr. Ortiz or Ms King?

8          MS. KING:  No, Your Honor.

9          THE COURT:  No. 47 is in the pool as No. 7 in the

10 pool.

11          24 has no yes or no answers.  Does anyone need 24

12 brought back for any follow-up or any cause issues?

13          MS. KING:  No.

14          THE COURT:  Mr. Sindler?

15          MR. SINDLER:  Let me speak to my client for a

16 moment.

17          THE COURT:  Okay.  That's fine.

18          We'll give Mr. Sindler and Mr. Warren an opportunity

19 to speak.  We'll be off the record while they are outside of

20 the Court's office.

21      (Whereupon, there was a brief pause in the proceedings.)

22      (Defendant exits chambers with Mr. Sindler.)

23          THE COURT:  Mr. Sindler and Mr. Warren have

24 returned.

25          Mr. Greer, can you confirm for the record that in

1 their absence, the only conversation was the Court's brief

2 discussion with you about the nature of your water bottle.

3 　　　　　　MR. GREER:  Yes, Your Honor.

4 　　　　　　THE COURT:  Do you concur, Mr. Ortiz and Ms. King?

5 　　　　　　MS. KING:  Yes, Judge.

6 　　　　　　THE COURT:  Mr. Sindler, should we bring Juror No.

7 24 for any follow-up or cause issues?

8 　　　　　　MR. SINDLER:  No.

9 　　　　　　THE COURT:  Do you concur there are no cause issues

10 for Juror No. 24?

11 　　　　　　MR. SINDLER:  I do.

12 　　　　　　THE COURT:  Mr. Ortiz and Ms. King?

13 　　　　　　MS. KING:  Yes.

14 　　　　　　THE COURT:  Juror 24 is in the pool of No. 8.

15 　　　　　　That would bring us to No. 57, Mr. Greer, who

16 answered yes to 5, 18, and 38.

17 　　　(Juror No. 57 enters chambers.)

18 　　　　　　THE COURT:  Counsel, we have Juror 57 with us.  She

19 responded yes to several questions, three to be exact.

20 　　　　　　The first was No. 5.  It asked if she knew anybody

21 else on the jury panel, me, the Judge, or any member of the

22 court staff?

23 　　　　　　What led you to a yes?

24 　　　　　　JUROR NO. 57:  I know one of the jurors, No. 50.

25 　　　　　　THE COURT:  How do you know Juror 50.

1           JUROR NO. 57:  We went to college together and

2   worked at a restaurant together for three years.

3           THE COURT:  About how long ago were you in college?

4           JUROR NO. 57:  20 years.  She lives -- we have

5   mutual friends.  She attends the church I work at sometimes,

6   so, but it was a surprise to see her.

7           THE COURT:  What college did the two of you attend

8   together?

9           JUROR NO. 57:  IUP.

10          THE COURT:  When you were at IUP at the same time,

11  were you in clubs, classes, see each other socially?

12          JUROR NO. 57:  We just worked together, and

13  sometimes socially because we worked together.

14          THE COURT:  So people would go out after work or

15  something like that?

16          JUROR NO. 57:  Sometimes, not often.

17          THE COURT:  Where did you work?

18          JUROR NO. 57:  Denny's Restaurant.

19          THE COURT:  Were you a server?

20          JUROR NO. 57:  Uh-huh.

21          THE COURT:  Was Juror No. 50 a server?

22          JUROR NO. 57:  She was.  She married a cook.

23          THE COURT:  From Denny's?

24          JUROR NO. 57:  Yes.

25          THE COURT:  How long was it after you left IUP that

1 you next crossed paths with her?

2          JUROR NO. 57:  It has only been a few years ago.

3          THE COURT:  You work at a church now?

4          JUROR NO. 57:  Yes.

5          THE COURT:  Which church do you work at?

6          JUROR NO. 57:  Otterbein United Methodist Church,

7 which is right down from the courthouse in Greensburg, which

8 would have been much more convenient.

9          THE COURT:  You know that she occasionally attends

10 services at that church?

11          JUROR NO. 57:  I do.

12          THE COURT:  Since you have left college and left

13 work at Denny's, have you socialized with each other, families?

14          JUROR NO. 57:  No.

15          THE COURT:  Is there anything particularly positive

16 or negative about your interactions or relationship with that

17 other juror?

18          JUROR NO. 57: Not negative.  We were friends.

19          THE COURT:  If both of you, if it turned out both

20 were selected to the serve on the jury -- we'll start with

21 this, would you be able to base your verdict solely on the

22 evidence you saw in the courtroom and the instructions I give

23 as the judge?

24          JUROR NO. 57:  Yes.

25          THE COURT:  If you had a particular point of view on

1 a matter before the jury or the verdict, and Juror 50 had a

2 different point of view, either on a matter or on the ultimate

3 verdict, how would you feel about that?

4             JUROR NO. 57:  I wouldn't care.  I would be fine.  I

5 would hope we would work it out quickly.

6             THE COURT:  Why would you hope that would happen?

7             JUROR NO. 57:  Just because I watch TV, I would just

8 hope it would work out, we could get to a common ground

9 quickly.

10             THE COURT:  What is it about watching TV?

11             JUROR NO. 57:  Doesn't it take a long time to get

12 through the system, the longer they take -- did you see Twelve

13 Angry Men, did you see the show, an old, old --

14             THE COURT:  One of the ways this works is I get to

15 ask the questions.

16             JUROR NO. 57:  Twelve Angry Men took a long time

17 because they couldn't agree.  So that's what I think about when

18 I'm sitting here.

19             THE COURT:  Do you recall in that film whether at

20 the end they did all agree?

21             JUROR NO. 57:  Yes.

22             THE COURT:  If this took a longer or moderate or a

23 shorter period of time, would that make any difference in your

24 life?

25             JUROR NO. 57:  Yes, it would.  The only

1  difference -- yes, it would because I have an 11-year-old who

2  is an elementary school who I have to put on the bus in the

3  morning and get off the bus in the evening, and it's not close

4  to our house, we have to drive to it and my husband has to --

5  he had to go into work three hours late today for me to get

6  here, and I don't -- we're not quite sure after school just

7  yet.  If it was longer, it would be an issue for us.

8             THE COURT:  Do you live in the Westmoreland County

9  area?

10            JUROR NO. 57:  I live in Latrobe.

11            THE COURT:  I was going to ask you how you made

12 arrangements today.  If this trial took several days this week,

13 would you be able to make other arrangements to assist your

14 11-year-old?

15            JUROR NO. 57:  I don't know what we would do.

16            THE COURT:  Family in the area?

17            JUROR NO. 57:  Everybody works.

18            THE COURT:  Close neighbors?  Parents of other

19 school children?

20            JUROR NO. 57:  Not close.  Everybody works.  That's

21 my problem.  Even the neighbors, everybody works.  So, like I

22 said, he went to work three hours late today because of it.  I

23 don't know what we would do.

24            THE COURT:  What line of occupation does your

25 husband do?

1                    JUROR NO. 57:  He works for a 3D printing company.

2                    THE COURT:  In the Westmoreland County area?

3                    JUROR NO. 57:  Yes, in Irwin.

4                    THE COURT:  What work does he do for them?

5                    JUROR NO. 57:  He's in the production area in the

6    back.

7                    THE COURT:  Do you know ballpark how many folks they

8    have working out there?

9                    JUROR NO. 57:  Not that many.  I don't know, though

10   for sure.

11                   THE COURT:  Dozen?  Couple dozen?

12                   JUROR NO. 57:  Couple dozen I would guess.

13                   THE COURT:  Your husband, is he one of the folks

14   that operates the machines, or is he a supervisor, some of

15   each?

16                   JUROR NO. 57:  He operates the machines.  He's one

17   of a couple, just two or three that I know of that operate the

18   machines.

19                   THE COURT:  Are there ever occasions during the year

20   that your family is away from Greensburg, maybe go on a

21   vacation or some family or other things like that?

22                   JUROR NO. 57:  Not every year.  We go on a vacation

23   every other year.

24                   THE COURT:  Was this year one of those years?

25                   JUROR NO. 57:  No.

1            THE COURT:  Was last year one of those years?

2            JUROR NO. 57:  Last year.

3            THE COURT:  How did your husband handle it at work,

4   how did they handle it without him?

5            JUROR NO. 57:  He took vacation.

6            THE COURT:  Then they covered his work?

7            JUROR NO. 57:  He scheduled it ahead of time.

8            THE COURT:  You said your husband went in later

9   today.  Does that mean he'll work later because of that?

10           JUROR NO. 57:  Yes.

11           THE COURT:  Does he get paid on an hourly basis?

12           JUROR NO. 57:  Yes.

13           THE COURT:  About how long has he worked there?

14           JUROR NO. 57:  He has been there for it will be two

15  years in December.

16           THE COURT:  Now, the next question that you answered

17  yes to was No. 18.  That was whether you or a member of your

18  immediate family had ever been the victim of a crime.

19           What was on your mind for that?

20           JUROR NO. 57:  We owned a business and --

21           THE COURT:  Who is "we"?

22           JUROR NO. 57:  My husband and I owned a business and

23  it was burglarized.  That means we weren't there, versus

24  robbed.  We weren't there when it happened, but we came to work

25  and our windows were smashed out and money was stolen from our

 1 business.

 2              THE COURT:  About how long ago was that?

 3              JUROR NO. 57:  That was a long time ago, that was in

 4 2000.

 5              THE COURT:  What kind of business was it?

 6              JUROR NO. 57:  A car lot.

 7              THE COURT:  Used car lot?

 8              JUROR NO. 57:  Yes.

 9              THE COURT:  In the Greensburg area?

10              JUROR NO. 57:  Blairsville.

11              THE COURT:  Was that burglary ever solved?

12              JUROR NO. 57:  No.  Whoever did it hit a bunch of

13 the businesses on 22, little businesses on 22.

14              THE COURT:  Approximately what was your loss?

15              JUROR NO. 57:  A couple hundred dollars and some

16 damage from breaking windows and doors.

17              THE COURT:  Was any of that covered by insurance?

18              JUROR NO. 57:  Yes.  I think it would have been, but

19 we didn't submit it to our insurance just because it was such a

20 low amount of actual money and deductibles and stuff.

21              THE COURT:  Was there anyone that you or law

22 enforcement or others thought might be a suspect in that crime

23 but were never charged?

24              JUROR NO. 57:  Huh-uh.

25              THE COURT:  Is that a no?

1           JUROR NO. 57:  No.

2           THE COURT:  Is there anything about that experience

3 that you think would get in the way of you deciding this case

4 based only on the evidence you heard in court and my

5 instructions?

6           JUROR NO. 57:  No.

7           THE COURT:  You'd be able to do that?

8           JUROR NO. 57:  Yes.

9           THE COURT:  Anything else that caused you to respond

10 yes to whether you or family member had ever been a victim to a

11 crime?

12          JUROR NO. 57:  No.

13          THE COURT:  The next one you answered yes to is

14 No. 38, which is whether you or anyone in your family owns a

15 firearm or ammunition and, if so, what kind and for what

16 purpose?

17          JUROR NO. 57:  My husband owns some kind of a gun,

18 but I don't think it's at our house even.  We keep it at his

19 parents' house because of our daughter.  I don't actually know

20 the purpose.  I think his dad had given it to him.  In the --

21 he used to hunt a little bit, too, but he hasn't since we have

22 been together.  Then my brother is a hunter, too, and he has

23 several guns.  That's it.

24          THE COURT:  Starting with your husband, is it a long

25 gun like a rifle or shotgun or handgun?

1          JUROR NO. 57:  I think it's a long gun, a rifle.

2          THE COURT:  Do you know whether your husband has a

3    concealed to carry permit?

4          JUROR NO. 57:  He does not.

5          THE COURT:  Has your husband ever used his rifle for

6    anything other than hunting or target practice?

7          JUROR NO. 57:  No.

8          THE COURT:  Your brother, what kind of firearms does

9    he have?

10         JUROR NO. 57:  I don't know.

11         THE COURT:  Do you know if he has a concealed carry

12   permit?

13         JUROR NO. 57:  I don't believe he does.

14         THE COURT:  Do you know whether your brother has

15   ever used his gun for something other than hunting or target

16   practice?

17         JUROR NO. 57:  I'm sure he has not.

18         THE COURT:  Mr. Sindler, do you have any follow-up

19   for Juror 57?

20         MR. SINDLER:  No.

21         THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

22         MR. ORTIZ:  No.

23         MS. KING:  I do.  You kind of indicated that you

24   were concerned about the length of time that you would

25   deliberate if you were picked to be on the jury.  If you had

1 one position about that the defendant was innocent or guilty

2 and the rest of the jury had a different position, would you

3 change your mind just to get it over with?

4          JUROR NO. 57:  I don't know.

5          THE COURT:  Is it possible you might?

6          JUROR NO. 57:  I don't know.  I honestly have no

7 idea.  To me, right is right and wrong is wrong.  But I don't

8 know.

9          THE COURT:  When you say right is right and wrong is

10 wrong in these circumstances, what are you referring to?

11          JUROR NO. 57:  Well, if something is presented in my

12 mind as I see it, if it's right, if there's an injustice, to me

13 it's right is right, so it would have to be like -- it would

14 just have to be discussed and discussed.  I don't know.  I want

15 to be fair, whatever that is, whatever direction, I just don't

16 know.

17          THE COURT:  Let me ask you this.  As you heard in

18 the courtroom, I will be instructing the jury that any

19 defendant in any criminal case is presumed to be innocent.

20          JUROR NO. 57:  Correct.

21          THE COURT:  They may only be found guilty in the

22 government proves each element of the offense beyond a

23 reasonable doubt and the jury is unanimous in that regard.

24          Do you think you'd have any difficulty whatsoever in

25 following that instruction?

1            JUROR NO. 57:  I don't think so.  I don't know.  I

2  don't mean to sound aloof either.  I don't know.  I don't know.

3  I would think I could get to an answer.

4            THE COURT:  In getting to the answer, one of the

5  hallmarks, one of the rules of the road, if you will, for all

6  the jurors, all twelve jurors that are deliberating is that

7  from the very beginning of the trial until the very end of the

8  trial, the defendant, any defendant is always presumed to be

9  innocent.  They can only be found guilty of a crime if the

10 government has proven the crime beyond a reasonable doubt and

11 all twelve members deliberating agree.  That will be my

12 instruction.  It's a hallmark of our legal system.

13            Do you think you'd have any difficulty at all in

14 following that instruction wherever it led?

15            JUROR NO. 57:  No.  But I don't think -- no.  I

16 don't think I understand your question based on her question.

17 Should I just forget what she asked.

18            THE COURT:  We take them one at a time.

19            We'll let Ms. King ask her question again.

20            MS. KING:  I think my question was essentially if

21 you thought that the evidence said one thing and other jurors

22 thought that the evidence said something else, would you change

23 your position just to be done?

24            JUROR NO. 57:  No, I don't think I would.  If I

25 really believed it, I don't think I would be able to do that.

1          THE COURT:  You don't think you'd be able to do

2   that?

3          JUROR NO. 57:  I don't think I'd be able to change

4   my position if I really believed what I believed.

5          THE COURT:  Then my question, which is separate, is

6   I will be instructing the jury, as I mentioned in the

7   courtroom, that in any criminal proceeding, a defendant is

8   presumed to be innocent and they could only be found guilty if

9   the government proves their case beyond a reasonable doubt, and

10  the jury has to be unanimous.

11         Do you think you'd have any difficulty at all in

12  abiding by that instruction?

13         JUROR NO. 57:  I wouldn't, no.

14         THE COURT:  You would have no difficulty?

15         JUROR NO. 57:  No.

16         THE COURT:  That includes if you and Juror No. 50

17  had different views.

18         JUROR NO. 57:  That wouldn't affect things.

19         THE COURT:  That wouldn't affect things.

20         JUROR NO. 57:  No.

21         THE COURT:  Mr. Sindler, any follow-up to these

22  questions?

23         MR. SINDLER:  I appreciate your candor, but there is

24  the concern about your child, the child's care, and, of course,

25  the impositions that are being placed upon your husband's

1 employment.

2          JUROR NO. 57:  I know.

3          THE COURT:  Have those been going through your mind

4 in answering these most recent questions?

5          JUROR NO. 57:  Uh-huh.

6          MR. SINDLER:  You're still holding to your answers?

7          JUROR NO. 57:  I'm hoping that -- this is where I'm

8 at right now and if this is five days later and the situation

9 has changed, I would hope that I would be able to stand by what

10 I'm saying.  This is complicated.

11          MR. SINDLER:  I don't have any other questions.

12          THE COURT:  Mr. Ortiz and Ms. King?

13          MR. ORTIZ:  Ma'am, at one point you said in

14 answering some of the different questions something to the

15 effect of I want to be fair.  Do you have any reservation as

16 you're discussing this now about whether or not you can be

17 fair?

18          JUROR NO. 57:  Gosh, I don't know.  No, I can be

19 fair.  I can be fair.

20          MR. ORTIZ:  Do the concerns about your daughter?

21          JUROR NO. 57:  Yes.  It's a big concern.  I can't

22 even pretend it's not.  I have to be able to live with myself,

23 too.  So I feel like I would do what is right.

24          MR. ORTIZ:  The concerns you have about your

25 daughter and your husband and the work, do you have any belief

1  that that is going to impact how you view the evidence, how you

2  deliberate, how much time you spend, whether or not you can be

3  fair and impartial as a juror?

4          JUROR NO. 57:  Do I have any concerns about it?

5          MR. ORTIZ:  Yes.

6          JUROR NO. 57:  No, I will be fair.  I will be fair

7  and impartial.  I just won't be happy.  I can't pretend that it

8  will be easy.  I do -- I have to live with myself.  I'm not

9  going to just lie, I'm not going to lie about it just to make

10 it better for myself.

11         THE COURT:  Ma'am, once the jury has been selected,

12 before they begin their work, in court, Mr. Babik, who you saw

13 this morning, will have all twelve seated members of the jury

14 and the two alternates stand and he'll administer an oath to

15 them.  That oath is going to say that the jurors will truly and

16 fairly do their duty and will deliver a true verdict based

17 solely on the evidence in the courtroom and the instructions of

18 the Court.

19         Do you have any reason to believe you would not or

20 could not follow that oath?

21         JUROR NO. 57:  I have no reason to believe that.

22         THE COURT:  And you would follow that oath?

23         JUROR NO. 57:  I would follow that oath.

24         THE COURT:  Mr. Ortiz and Ms. King, any follow-up

25 questions?

1          MS. KING:  No, Your Honor.

2          THE COURT:  Mr. Sindler?

3          MR. SINDLER:  No, Your Honor.

4          THE COURT:  Thank you for coming back.

5     (Juror No. 57 exits chambers.)

6          THE COURT:  Mr. Ortiz, Ms. King, any issues for

7  cause?

8          MR. ORTIZ:  I don't.

9          MS. KING:  No.

10          MR. SINDLER:  I move to strike her, Judge.  My

11  concerns are her personal issues -- not personal issues but the

12  matters of her personal life regarding her child and the

13  secondary impact upon her husband's employment.  I thought that

14  there were some times here, no reflection upon anyone else here

15  that she was being grilled and there were moments when she was

16  looking to the sky for divine intervention it seemed.  There

17  may have been some times here when she was giving answers,

18  depending upon the question, that the person wanted to hear,

19  and I'm concerned that there are larger issues that are going

20  to be competing for not only her interest but her service as a

21  juror in this case.

22          THE COURT:  When you say "larger issues," what do

23  you think those could be?  What drives your question?

24          MR. SINDLER:  The child, child care issue.  But in a

25  more secondary issue, the employment issue that impacts her

1   husband because I guess at least today he was late or later a

2   significant amount of time, three hours, in order to take care

3   of the child or make sure the child is taken care of.

4              THE COURT:  Okay.

5              I'm going to take that one under advisement.  So

6   there's a cause challenge for Juror No. 57.

7              Juror No. 8 had no yes answers.

8              Mr. Sindler, do you want Juror No. 8 brought back

9   for any follow-up or any cause concerns based on what was

10  stated in the courtroom?

11             MR. SINDLER:  No concerns.

12             THE COURT:  Mr. Ortiz and Ms. King?

13             MR. ORTIZ:  No, Your Honor.

14             MS. KING:  No.

15             THE COURT:  Juror No. 8 is in the pool.

16             That would take us to Juror 27 who responded yes to

17  questions 5, 15 and 38.

18             Mr. Greer, keep 57 out there.  Keep her in the pool

19  for now, subject to a cause challenge by the defense.

20             And that will bring us to Juror No. 27.

21             If counsel or Mr. Warren needs a break, let me know.

22        (Juror No. 27 enters chambers.)

23             THE COURT:  We have Juror No. 27 with us.  She

24  responded yes to three questions.  The first of which was

25  No. 5.  No. 5 reads:  Do you know anybody else on the jury

1  panel, me, the Judge, or any member of the Court staff.

2          What led to a yes.

3          JUROR NO. 27:  The attorney with Lampl's office, I

4  recognize his face.  As an official court reporter in Butler

5  County, I believe he has appeared on a case there.  I don't

6  know him.  I can't remember his name, but he stood up and said

7  he knew somebody else on the panel and I thought he is talking

8  about me and recognized me.

9          THE COURT:  Do you recall any particular proceeding

10 he might have been involved in while you were doing your work

11 in Butler County?

12         JUROR NO. 27:  No, but it seems like it was within

13 the last two years.

14         THE COURT:  Anything about that interaction that has

15 left you with a particularly positive or negative feeling

16 toward that other juror?

17         JUROR NO. 27:  No, just a nice young man.

18         THE COURT:  If it turned out that both of you were

19 selected for service on the jury and it turned out that you and

20 he had a different point of view on some issue in the case or

21 on the ultimate verdict, do you believe the fact that you've

22 seen him in court or are familiar with him would in any way

23 affect your decisions as a juror?

24         JUROR NO. 27:  Not at all.  He was second seat,

25 hardly opened his mouth.

1                THE COURT:  Did you come away with any impression of

2  his professional abilities as a attorney?

3                JUROR NO. 27:  Competent, not so far in either

4  direction that I would say anything, but just the general norm.

5                THE COURT:  Do you recall generally what type of

6  proceeding it was?

7                JUROR NO. 27:  It was a trial.  It was a several-day

8  trial.

9                THE COURT:  With a jury?

10                JUROR NO. 27:  Yes.  But I don't remember anymore

11  than that.

12                THE COURT:  When you do your official court reporter

13  work up in Butler County, do you do them on all sorts of cases

14  that are in the Common Pleas court.

15                JUROR NO. 27:  Until about seven years ago we did

16  all criminal and civil, everything, and about seven years ago

17  we went exclusively civil, but I also go out to district

18  justices' offices and report criminal, and if somebody is on

19  vacation I report criminal.

20                THE COURT:  Day to day you are on the civil side of

21  court in Butler County?

22                JUROR NO. 27:  Yes.

23                THE COURT:  When you go out to the district

24  magistrate cases, is that freelancing or is that with the court

25  system?

1                JUROR NO. 27:  We do it as a service to the court

2    system.  The public defenders will ask us to go rather than pay

3    somebody and if we aren't -- if our courtroom doesn't have

4    anything going that day, we can volunteer to go out for them.

5                THE COURT:  You've said when others are on vacation,

6    you might go over to one of the other divisions of the court?

7                JUROR NO. 27:  Yes.

8                THE COURT:  About how often does that happen?

9                JUROR NO. 27:  The volunteering for someone else,

10   probably, or filling in for them probably happens four or five

11   days a week.  District justice happens maybe once every three

12   or four weeks.

13               THE COURT:  You live in the Butler County area?

14               JUROR NO. 27:  I do.

15               THE COURT:  The next question you said yes to was

16   No 15.

17               JUROR NO. 27:  It may be part of that.  I have been

18   an official in federal court for four years and I've worked

19   here on the grand jury also.

20               THE COURT:  When is the last time you did any of

21   that?

22               JUROR NO. 27:  I'm looking at employers, '96, '97.

23   They had the contract, so I just did an occasional day.

24               THE COURT:  You came in to fill in or to supplement

25   the court reporting staff in the building.

1          JUROR NO. 27:  Grand jury is on contract and the

2  company I was with had contract for it.

3          THE COURT:  You said it was '96 and '97 when you

4  last did that?

5          JUROR NO. 27:  Yes.

6          THE COURT:  Appreciate that.

7          Then No. 15 was whether you or anyone in your

8  immediate family has been employed or sought to be employed by

9  the federal government, other than military, or any state,

10  local or county or federal law enforcement agency or court in a

11  paid or volunteer capacity.

12          JUROR NO. 27:  I did four years as an official in

13  Federal District Court in San Diego, Southern District of

14  California.

15          THE COURT:  You were a formally appointed official

16  federal court reporter there?

17          JUROR NO. 27:  I was.

18          THE COURT:  When did that happen?

19          JUROR NO. 27:  '84 to '88 and that was all criminal.

20          THE COURT:  Anything about that experience that you

21  found particularly pleasant or unpleasant?

22          JUROR NO. 27:  We worked 60 to 70 hours a week to

23  keep up with the load, so I quit, but nothing else about it was

24  unpleasant.

25          THE COURT:  If you were selected for the jury here,

 1 is there anything about your current service as a court

 2 reporter or past service as a court reporter in any capacity

 3 that you think would get in the way of you rendering a verdict

 4 based solely on the evidence in court here and the Court's

 5 instructions.

 6          JUROR NO. 27:  No.

 7          THE COURT:  You'd be able to follow those

 8 instructions?

 9          JUROR NO. 27:  I would.

10          THE COURT:  Then lastly, Question 38 was a yes.

11 That's whether you or anybody in your family owns a firearm or

12 ammunition.  If so, what type and for what purpose.

13          JUROR NO. 27:  I know my brother occasionally hunts

14 once every five years or so, so he must have a rifle or

15 something.

16          THE COURT:  Does he live here in the Western

17 Pennsylvania area?

18          JUROR NO. 27:  Yes.

19          THE COURT:  Have you ever used that or any other

20 firearm?

21          JUROR NO. 27:  I have never used that firearm, but

22 when I was a teenager, 20s, my father let me shoot a gun he had

23 once or twice out behind our home in the country.

24          THE COURT:  Was that a long gun or handgun?

25          JUROR NO. 27:  Long gun.

1              THE COURT:  Do you know whether your brother has a

2  concealed carry permit?

3              JUROR NO. 27:  I know he does not.

4              THE COURT:  Do you know whether your brother has

5  ever used his gun for something other than target practice?

6              JUROR NO. 27:  He has not.

7              I have handled a pistol now that I think about it,

8  but it was for continuing education, I took a class with the

9  local police department to be a ride along because it gave the

10 continuing ed points and they took us to a pistol range and had

11 us try to shoot.

12             THE COURT:  About how long ago was that?

13             JUROR NO. 27:  Early '90s.

14             THE COURT:  Who provided the handgun that you used

15 for that exercise.

16             JUROR NO. 27:  The police department.  My hand is

17 too small and I cannot pull the trigger and put my finger

18 around the top so I was not able to do.

19             THE COURT:  Mr. Sindler, any follow-up?

20             MR. SINDLER:  Do you recall your work with any

21 federal prosecutors back in '96 or '97 when you were here doing

22 grand jury work?

23             JUROR NO. 27:  No.

24             MR. SINDLER:  But you must have done so ten years

25 before that when you were in the Southern District of

1  California.

2              JUROR NO. 27:  In the Southern District of

3  California I remember one public defender.  You see her on the

4  national news.  She goes around for death penalty cases, Judy,

5  four or five letter word.  Clark, Judy Clark.  She's gotten

6  such notoriety that I see her on TV going all over the United

7  States.

8              THE COURT:  Aside from just saying you spent five

9  years on a contract basis doing federal grand jury work, does

10 anything about that time stand out right now?

11             JUROR NO. 27:  Not really, except I do remember one

12 of the very notorious cases -- how should I put it?  It was a

13 large gang activity that went on for 18 months of reporting it,

14 but again, I did maybe three days of testimony for the whole

15 thing.

16             MR. SINDLER:  That was the duration?

17             JUROR NO. 27:  The duration and the like 50

18 defendants involved in that.  I don't know why that sticks out

19 but it does.  It was a conspiracy more than anything else.

20             MR. SINDLER:  Okay.

21             That's all I have.

22             THE COURT:  Mr. Ortiz and Ms. King?

23             MR. ORTIZ:  Nothing, Your Honor.

24             MS. KING:  Nothing, Your Honor.

25             THE COURT:  Thank you for coming in, Juror 27.

 1          (Juror No. 27 exits chambers.)

 2              THE COURT:  Ms. King, Mr. Ortiz, any issues for

 3  cause?

 4              MR. ORTIZ:  No.

 5              THE COURT:  Mr. Sindler?

 6              MR. SINDLER:  No.

 7              THE COURT:  Juror 27 is in.

 8              Juror 20 had yes to one question,

 9  No. 38.

10          (Juror No. 20 enters chambers.)

11              THE COURT:  Counsel, we have Juror No. 20 with us.

12  My notes reflect he answered yes to one question.  That was

13  whether he or anyone in his family owned or possessed a firearm

14  or ammunition and, if so, what kind and for what purpose?

15              JUROR NO. 20:  Well, I have a single shot 16-gauge

16  shotgun.  I bought back in the late '60s when I was first

17  getting married.  Since I was in the Navy at the time and was

18  going to be gone a lot, I figured my wife could have something.

19  She didn't like it.  She didn't like having it.  So, since

20  then, I removed the firing pin so it's -- I don't know if you

21  really call it a firearm anymore but the firing pin is

22  someplace in the house.  I don't know where.

23              THE COURT:  Did you ever actually shoot the shotgun?

24              JUROR NO. 20:  Yes.

25              THE COURT:  Did your wife ever shoot it?

1          JUROR NO. 20:  No.

2          THE COURT:  Do you or your wife have a concealed

3 carry permit?

4          JUROR NO. 20:  No.

5          THE COURT:  Do you know if that firearm was ever

6 used for any purpose other than target shooting or hunting?

7          JUROR NO. 20:  It was not because I bought it new.

8          THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

9          MS. KING:  No, Your Honor.

10          MR. ORTIZ:  No.

11          THE COURT:  Mr. Sindler?

12          MR. SINDLER:  No.

13          THE COURT:  Thank you for coming in.

14      (Juror No. 20 exits chambers.)

15          THE COURT:  Mr. Sindler, any issues for cause with

16 Juror 20?

17          MR. SINDLER:  No.

18          THE COURT:  Ms. King and Mr. Ortiz?

19          MS. KING:  No, Your Honor.

20          THE COURT:  Juror 20 is in the pool.

21          Next we have 56 who answered yes to 15, 21, and 38.

22      (Juror No. 56 enters chambers.)

23          THE COURT:  Sir, my notes indicate you said yes to

24 three questions, 15, 21 and 38.

25          15 asked whether you or anybody in your immediate

1  family has been employed or sought to be employed by the

2  federal government outside of the military or state, local and

3  county or federal law enforcement or a court in a paid or

4  volunteer capacity.

5          JUROR NO. 56:  Yes, my stepfather is a PA state

6  constable in Monroeville.

7          THE COURT:  Is he the constable?

8          JUROR NO. 56:  Yes.

9          THE COURT:  Is he elected?

10         JUROR NO. 56:  He's the constable.

11         THE COURT:  He's your father-in-law?

12         JUROR NO. 56:  Stepfather.

13         THE COURT:  Do you live in the Monroeville area?

14         JUROR NO. 56:  I do.

15         THE COURT:  How often do you see your stepfather?

16         JUROR NO. 56:  Daily.

17         THE COURT:  Do you live with him?

18         JUROR NO. 56:  No, he's my neighbor.

19         THE COURT:  How long has he been constable?

20         JUROR NO. 56:  Going on eight years, ten years

21  maybe.

22         THE COURT:  Somewhere in that area?

23         JUROR NO. 56:  Yes.

24         THE COURT:  Has he ever held any other law

25  enforcement position?

1          JUROR NO. 56:  He was a county sheriff before that.

2          THE COURT:  Here in Allegheny County.

3          JUROR NO. 56:  Yes.

4          THE COURT:  Did he retire from that job?

5          JUROR NO. 56:  I honestly don't know.

6          THE COURT:  Do you know how his service came to an

7  end?

8          JUROR NO. 56:  No.

9          THE COURT:  Ballpark, how old is your stepfather?

10          JUROR NO. 56:  Mid 50s.

11          THE COURT:  Do you know how long he was a deputy

12  sheriff?

13          JUROR NO. 56:  No.

14          THE COURT:  How long has he been your stepfather?

15          JUROR NO. 56:  Probably about 14 years.

16          THE COURT:  Anybody else that you had in mind when

17  we asked question 15.

18          JUROR NO. 56:  That was the main one.  I have an

19  uncle that was a cop in Wilkinsburg.

20          THE COURT:  Is he still a policeman in Wilkinsburg?

21          JUROR NO. 56:  No.

22          THE COURT:  Is he still living?

23          JUROR NO. 56:  Yes.

24          THE COURT:  How did his work come to an end?

25          JUROR NO. 56:  I'm not totally sure about that.

1           THE COURT:  About how often do you see that uncle?

2           JUROR NO. 56:  I work with him, daily.

3           THE COURT:  What line of work do you do?

4           JUROR NO. 56:  I'm a delivery tech.  He's manager of

5    the maintenance group.

6           THE COURT:  Is there anything about your uncle's

7    prior service on the Wilkinsburg police or your stepfather's

8    current service as constable or his past service as a deputy

9    sheriff, that you think would in any way, shape or form get in

10   the way of your ability to render a verdict in this case based

11   solely on the evidence you heard in the courtroom and my

12   instructions the jury?

13          JUROR NO. 56:  No.

14          THE COURT:  You'd be able to follow those right down

15   the line?

16          JUROR NO. 56:  Absolutely.

17          THE COURT:  The next question you answered yes to

18   was whether you or anybody in your family has been currently or

19   in the past affiliated with any fire department or firefighter?

20          JUROR NO. 56:  My step dad as well.  He's assistant

21   chief at Monroeville No. 3.

22          THE COURT:  How long has he been involved with the

23   fire service?

24          JUROR NO. 56:  Ever since I have known him, probably

25   a little longer than that.

1          THE COURT:  Have you ever been involved in the fire

2    service?

3          JUROR NO. 56:  No.

4          THE COURT:  Has he ever sought to get you involved

5    in the fire service?

6          JUROR NO. 56:  No.

7          THE COURT:  Has there anything noteworthy in your

8    stepfather's service that sticks out in your mind one way or

9    the other?

10          JUROR NO. 56:  No.

11          THE COURT:  Lastly, question 38 asked whether you or

12    anybody in your family owned or possessed a firearm or

13    ammunition, if so, what purpose and what kind?

14          JUROR NO. 56:  I own a variety of firearms.  I'm an

15    addict -- well, I wouldn't call myself a collector but I guess

16    that would be a good word.  I also do security work so I carry

17    a gun for that.

18          THE COURT:  Did you go through whatever state

19    certification is required to carry a firearm as a security

20    worker?

21          JUROR NO. 56:  Yes.

22          THE COURT:  Did you have any difficulty in acquiring

23    that certification?

24          JUROR NO. 56:  No.

25          THE COURT:  Could you describe for us the types of

1 firearms you have.

2            JUROR NO. 56:  I have a Smith & Wesson M&P40.

3            THE COURT:  That's a handgun.

4            JUROR NO. 56:  Yes.

5            THE COURT:  That's a pistol?

6            JUROR NO. 56:  Yes.  I also own a Taurus 605 .357

7 Snub Nose.

8            THE COURT:  That's a revolver?

9            JUROR NO. 56:  Yes.  I have a Heritage Arms .22

10 single-action revolver.  I have a Bersa Thunder 380.  That's a

11 pistol.  A Mosin Nagant, which is old time Russian rifle.  I

12 also built my own AR-15.  I have a Mossberg 500.

13            THE COURT:  It's operable, your AR-15 is operable?

14            JUROR NO. 56:  Yes.  A Mossberg 500.  I think that's

15 it.

16            THE COURT:  Do you have a concealed carry permit?

17            JUROR NO. 56:  I do.

18            THE COURT:  Have you ever used any of those firearms

19 for anything other than hunting or target practice?

20            JUROR NO. 56:  No.

21            THE COURT:  Other than the ones you work when you

22 work security; is that correct?

23            JUROR NO. 56:  Yes.

24            THE COURT:  Are you affiliated with any security

25 company or agency or are you on your own?

1           JUROR NO. 56:  My uncle being a constable, he does

2 do side work as security.  Mostly at the Monroeville Convention

3 Center.

4           THE COURT:  It might be a special detail for an

5 event that is being held at the Convention Center.

6           JUROR NO. 56:  Most of the events, the gun shows

7 that are there, they do a lot of comedy shows there, we do the

8 security, weddings, if they require it, stuff like that.

9           THE COURT:  Have you ever had to use or begin to use

10 a firearm in conjunction with your security work as part of

11 your duties, other than carrying it?

12           JUROR NO. 56:  No.

13           THE COURT:  Mr. Sindler, any follow-up?

14           MR. SINDLER:  What conversations have you had with

15 your stepfather with regard to his work as a constable?

16           JUROR NO. 56:  Conversations?

17           MR. SINDLER:  Yes.

18           JUROR NO. 56:  All kinds.  He's my stepfather.  In

19 regard to his job?

20           MR. SINDLER:  I can clarify that.  With regard to

21 what he does as a constable.

22           JUROR NO. 56:  Some.

23           MR. SINDLER:  Does he talk about any events where

24 he's involved with various police departments in the

25 Monroeville area?

1          JUROR NO. 56:  Yes.  He does a lot of work with

2  Monroeville PD, Pitcairn Police Department as well.

3          MR. SINDLER:  Has he talked with you about that work

4  from time to time?

5          JUROR NO. 56:  Oh, yes.

6          THE COURT:  In your work at the Convention Center,

7  have you been working with uniformed police officers during

8  those times where you're working at the Convention Center?

9          JUROR NO. 56:  Only when there's an incident.  We

10  fill out a police report.  We do that kind of stuff, but that's

11  pretty much it.

12          MR. SINDLER:  Is it a Convention Center report or

13  are you filling out a report that is given to you by a police

14  department?

15          JUROR NO. 56:  We fill out a report for our records,

16  depending on the issue.  And then the police department in the

17  area would show up, which would be Monroeville.  Then it gets

18  handed off to them.  Just for like for recordkeeping.

19          MR. SINDLER:  That's all I have.

20          THE COURT:  Mr. Ortiz and Ms. King?

21          MS. KING:  No.

22          MR. ORTIZ:  No.

23          THE COURT:  Sir, is there anything about your work

24  on security matters as you've described or any interactions

25  you've had with your stepfather or your uncle that you believe

1 would influence or affect your ability to render a verdict

2 based solely on the evidence in the courtroom and my

3 instructions?

4             JUROR NO. 56:  No.

5             THE COURT:  You'd be able to base your verdict,

6 whatever that verdict was based only on the evidence you hear

7 in court and the instructions I give you as the judge?

8             JUROR NO. 56:  Yes, sir.

9             THE COURT:  Ms. King and Mr. Ortiz, any follow-up to

10 the Court's questions?

11            MS. KING:  No, Your Honor.

12            MR. ORTIZ:  No.

13            THE COURT:  Mr. Sindler?

14            MR. SINDLER:  No, Your Honor.

15            THE COURT:  Thank you very much for coming in.

16       (Juror No. 56 exits chambers.)

17            THE COURT:  Mr. Sindler, any cause issues with 56?

18            MR. SINDLER:  No.

19            THE COURT:  Mr. Ortiz and Ms. King?

20            MS. KING:  No, Your Honor.

21            MR. ORTIZ:  No, Your Honor.

22            THE COURT:  56 is in the pool.

23            No. 13 has seven yes answers, and I received a

24 letter or the jury room received a letter asking that he go on

25 jury duty for a different session.  He works twelve hours a

1  day, six to seven days a week because there's a labor dispute

2  where he's employed.  Attached to that was a letter from some

3  folks at ATI Flat Rolled Products saying:  Please move this

4  juror to a later date in 2016.  We're in the midst of a lockout

5  and our salaried employees, including this juror, are six days

6  a week, twelve hours a day.  Having him out for jury duty will

7  put us in a very difficult situation.

8            I'm happy to bring him back and go through all the

9  questions.  I'm happy to rule on what we have in front of us.

10 It is totally up to counsel.

11            MR. SINDLER:  I move to strike him.

12            MS. KING:  That's fine with us.

13            THE COURT:  So, he will be removed from the pool.

14            We will excuse No. 13, Mr. Greer, with directions to

15 the jury office to cycle him into a further down-the-road jury

16 pool.

17            So 13 is removed.

18            That brings us to 52 who had questions responded yes

19 to No. 18, 37 and 38.

20            Matt, make sure 52 is our next one.

21      (Juror No. 52 enters chambers.)

22            THE COURT:  We have Juror 52 with us.  She answered

23 yes to three questions, No. 18, No. 37, and No. 38.

24            Question 18, just to jog our memory, is whether you

25 or a member of your immediate family has ever been a victim of

1 a crime.

2          JUROR NO. 52:  Yes.  My home was broken into twice.

3 Both were really bizarre circumstances.  Both I think ended up

4 being about kids breaking in.  Nothing of great value was taken

5 either time, except my Social Security.

6          THE COURT:  Let's look at the most recent time that

7 happened.  How long ago was that?

8          JUROR NO. 52:  About four years ago.

9          THE COURT:  Did the police come and investigate?

10          JUROR NO. 52:  They did.

11          THE COURT:  Was that situation ever resolved?  Have

12 you ever determined who did it?

13          JUROR NO. 52:  They did not.

14          THE COURT:  Did you or the police have one or more

15 suspects but they just weren't charged?

16          JUROR NO. 52:  They had no idea.  They did dust for

17 prints, but they didn't find any match with anyone in their

18 pool.

19          THE COURT:  Was it the local police or the county

20 police or state police that came out?

21          JUROR NO. 52:  It was the local police in Swissvale.

22          THE COURT:  Did you have insurance that covered any

23 loss?

24          JUROR NO. 52:  The losses were so insignificant I

25 didn't even do that.  They took my favorite costume jewelry

1 that was probably worth a total of $40 and a few quarters from

2 my desk.

3          THE COURT:  Was anyone in the home when that

4 break-in occurred?

5          JUROR NO. 52:  I was out at a meeting.

6          THE COURT:  When was the first episode?

7          JUROR NO. 52:  The first episode was in a different

8 home when I lived in Wilkinsburg.  That would have been about

9 25 years ago.

10          THE COURT:  Was that investigated by any police?

11          JUROR NO. 52:  It was not.  It wasn't fully

12 investigated.  The police came to the home and to the best of

13 my knowledge, they did not even dust for prints, they just came

14 and saw that bizarre things had been taken and the things that

15 had been taken were food from my refrigerator, blankets,

16 pillows and towels and wash clothes.  They didn't pursue it any

17 further.

18          THE COURT:  Did you or the police have any suspects

19 in mind even though nobody was charged?

20          JUROR NO. 52:  Yes.

21          THE COURT:  Was that you or the police?

22          JUROR NO. 52:  It was I.

23          THE COURT:  Who were the suspects, by description?

24          JUROR NO. 52:  A neighbor's teenage daughter who, as

25 it turned out, and I had a suspicion of this, was harboring a

1  runaway.  It was never proven and she denied it, but that's as

2  far as anything went.

3          THE COURT:  Was there any type of insurance claim

4  with any of that?

5          JUROR NO. 52:  None of that, no.

6          THE COURT:  Was there anything else that led you to

7  answer yes to that question?

8          JUROR NO. 52:  No, sir.

9          THE COURT:  Is there anything about those situations

10 either separately or together that you believe would get in the

11 way of your ability to render a verdict if you were a juror

12 based only on the evidence in court here and the instructions I

13 give you as the judge?

14         JUROR NO. 52:  No, I don't believe so.

15         THE COURT:  You'd follow that down the line?

16         JUROR NO. 52:  I would.

17         THE COURT:  Now, the next question you answered yes

18 to was No. 37.  No. 37 asked:  Do you have any strong feelings

19 for or against or relating to the private ownership of firearms

20 or laws regulating their possession or firearms themselves,

21 such that you would not be able to render a fair and impartial

22 verdict in this case based solely on the evidence presented in

23 the legal instructions of the Court?

24         JUROR NO. 52:  I'm really kind of conflicted about

25 the two parts of that question because I do have strong

feelings about private ownership of guns, which I believe

should not be permitted.  I have concerns about our country's

gun laws and the lack of action that has dogged us as we try to

deal with many school shootings and the dangers that have been

escalating in our communities.  So I do have a lot of concerns

about that.  I'm very agitated about that issue.  Whether I

would be able to put it aside and hear fully only the evidence

presented, I'm really kind of struggling with that.

THE COURT:  Can you describe that struggle for us.

JUROR NO. 52:  I do believe, I fully believe that

anybody, gun owner or non-gun owner has a right to a fair

trial.  I do believe it is my responsibility to do that.  But

the involvement of a firearm in this particular case as it has

been described by you does bring up those feelings of concern,

and my belief that this country really should look at that

issue much more strongly and actually take action on it.  So I

am struggling with those two realities, my responsibility and

then my strong feeling about that.

THE COURT:  Let me ask you this, ma'am.  You've

heard this as part of my statement to the entire panel this

morning and I would be restating it to the people selected for

the jury, that in our system, at all times, any defendant is

presumed to be innocent.  No defendant could be found guilty of

any crime unless the government proves every element of the

crime beyond a reasonable doubt, and the jury has to be

1  unanimous.

2          If I give that instruction, I will give that

3  instruction, if you were on the jury, do you think you'd have

4  any hesitation at all in following that instruction?

5          JUROR NO. 52:  I do not.

6          THE COURT:  Once we get our twelve jurors and our

7  two alternates selected and they're seated in the jury box, one

8  of the very first things that will happen is Mr. Babik, who you

9  met this morning will ask everyone in the jury box to rise.

10  He'll administer an oath.  By that oath everyone that is

11  selected will under oath say, swear and affirm that they will

12  do their duty, they will follow the law, they will render a

13  fair and impartial verdict based only on the evidence presented

14  in court and based on the Court's instructions.

15          Do you have any hesitation in believing you'd be

16  able to follow that oath?

17          JUROR NO. 52:  I do not.

18          THE COURT:  I will be instructing the jury,

19  everybody that is seated for the jury, that in any criminal

20  proceeding, the government has the obligation to prove their

21  case beyond a reasonable doubt.

22          Do you have any doubt that you'd be able to follow

23  that instruction?

24          JUROR NO. 52:  No, sir.

25          THE COURT:  Now, the Question 38 was on a similar

1    topic.  It asked whether you or any member of your family owned

2    or possessed any type of firearm or ammunition, if so, what

3    kind and for what purpose.  And you answered yes.

4              JUROR NO. 52:  I did.  I'm the only member of my

5    family who holds the believes I discussed with you.  My sister

6    and her husband are both avid hunters and are members of the

7    NRA and are really quite, may I say, rabid about that issue.

8              THE COURT:  Do they own long guns or handguns or

9    both?

10             JUROR NO. 52:  Both.

11             THE COURT:  Do you know whether either of them have

12   what is known as a concealed carry permit?

13             JUROR NO. 52:  Not to the best of my knowledge.

14             THE COURT:  Do they live here in the Allegheny

15   County area?

16             JUROR NO. 52:  They do not.  They live in Warren

17   County.

18             THE COURT:  That's up near the New York border?

19             JUROR NO. 52:  It is.

20             THE COURT:  Do you know whether your brother and

21   sister, whether they have ever used their firearms for any

22   reason other than hunting or target shooting, target practice?

23             JUROR NO. 52:  No, not to my knowledge.  I know they

24   don't have any such intent.

25             THE COURT:  Do you have any personal experience with

1  firearms in any way, shape or form?

2            JUROR NO. 52:  I do not.

3            THE COURT:  Appreciate that, ma'am.

4            Mr. Ortiz and Ms. King, any follow-up questions, for

5  Juror No. 52?

6            MR. ORTIZ:  Ma'am, the way the two burglaries were

7  investigated by the police, was that something that you were

8  satisfied with, dissatisfied with?  How did you view how they

9  effectuated their job?

10           JUROR NO. 52:  Well, I felt that the Wilkinsburg

11 police who investigated the issue 25 years ago pretty much

12 tossed it off.  That didn't make any real happy, but the

13 circumstances were such that I can see that they might have

14 thought of it as trivial.

15           The Swissvale police who followed up on the more

16 recent event did a very good job.

17           MR. ORTIZ:  Did your displeasure from the first

18 incident, has that carried through in any way with how you view

19 the police, what they do, evaluate their actions?

20           JUROR NO. 52:  No, not at all.  It did cause me to

21 leave Wilkinsburg and choose another home.

22           THE COURT:  Aside from that?

23           JUROR NO. 52:  No.

24           THE COURT:  Mr. Sindler, sir?

25           MR. SINDLER:  No.

```
 1              THE COURT:  Ma'am, thank you very much for coming in
 2  today.
 3          (Juror No. 52 exits chambers.)
 4              THE COURT:  Mr. Sindler, any issues with cause?
 5              MR. SINDLER:  I move to strike her.  She's very
 6  agitated about the gun violence in our country.  Those are her
 7  words.  I don't doubt that her answers to your questions about
 8  the burden of proof, keeping your deliberations to just the
 9  evidence heard or seen in the courtroom, and she's able to do
10  that.  She's able to also recognize my client's presumption of
11  innocence and if or when that may change during deliberations,
12  but you factor in this gun thing or this firearm thing with
13  respect to her views on it and I think that it's going to be
14  very difficult for her to put that aside in serving in this
15  case.  That's why we'd like to have her removed for cause.
16              THE COURT:  Mr. Ortiz and Ms. King?
17              MR. ORTIZ:  Judge, I think she clearly has strong
18  feelings about gun ownership and the status of the laws, but
19  she said repeatedly throughout all the questions from everyone
20  she could be fair and impartial.  She understood the role she
21  had to fill, that she could follow the instructions.  We're
22  talking about a for cause challenge, there's nothing there that
23  says that she's unduly biassed or prejudiced or has a set view
24  in any kind of way that is going to prevent her from being a
25  fair and impartial verdict.
```

1           MR. SINDLER:  We ask people like her to come in and

2    not set aside their common experiences and their routines in

3    coming to a decision about whether somebody is guilty or not.

4    This is something for which she has very strong views.  I think

5    despite your efforts to rehabilitate her --

6           THE COURT:  I made no efforts to rehabilitate her.

7    I made multiple efforts to make sure she would follow my

8    instructions and her oath.

9           MR. SINDLER:  I didn't mean to mischaracterize -- I

10   don't want to restate or repeat myself.

11          THE COURT:  I'm going to deny the motion for cause.

12   You can use one of the peremptory challenges if you think

13   that's appropriate.  I think she can render a fair and

14   impartial verdict.  She impressed the Court as someone that

15   would take her responsibilities as a juror not only seriously,

16   but it appeared to the Court based on its observation of her

17   demeanor solemnly.  So, that will be an issue for counsel to

18   assess when they use their peremptory strikes.

19          52 is in.

20          The next one will be 53, who answered yes to 18, 21,

21   and 38.

22       (Juror No. 53 enters chambers.)

23          THE COURT:  Counsel we have Juror 53 with us.  He

24   responded yes to three questions, 18, 21 and No. 38.

25          Sir, Question 18, just to remind you, asked whether

1 you or a member of your immediate family had ever been the

2 victim of a crime and that caused a yes answer.

3         What was on your mind?

4         JUROR NO. 53:  We had some items stolen out of our

5 yard.

6         THE COURT:  When you say "we"?

7         JUROR NO. 53:  My father-in-law, I live with my

8 father-in-law at his residence.  I rent off of him.  We came

9 out one morning, it was more or less scrap, he collects scrap

10 things like radiators, he seen a piece of scrap laying in the

11 yard and he wondered why it was there and he went down to where

12 he stored everything and it was gone.

13         THE COURT:  Everything was gone or the piece of

14 scrap he saw in the yard?

15         JUROR NO. 53:  Everything that he had stocked.

16 That's what caught his attention was the piece he stocked

17 laying in the middle of the yard.

18         THE COURT:  Did it appear someone was taking all

19 that scrap and dropped that piece on the way out?

20         JUROR NO. 53:  That's exactly what it looked like.

21         THE COURT:  Is that the kind of scrap that someone

22 might take to a scrap yard and get money?

23         JUROR NO. 53:  Yes.

24         THE COURT:  About how long ago was that?

25         JUROR NO. 53:  I'd say two years.

1          THE COURT:  Was there a police investigation?

2          JUROR NO. 53:  Yes.  He called the state police and

3 they came out and did a report.  That was the end of it, we

4 never found out where it was.

5          THE COURT:  Even though that was the end of it, was

6 there any one people or persons that you or your father-in-law

7 or others thought might have been suspects, they just were

8 never charged or never brought into the legal system?

9          JUROR NO. 53:  No.  He just wanted to make sure he

10 had the police report filed in case something else would

11 happen, which never did.

12          THE COURT:  Do you have any sense of what the

13 approximate value of that scrap was?

14          JUROR NO. 53:  Couple hundred dollars.

15          THE COURT:  Any type of insurance claim or anything?

16          JUROR NO. 53:  No.

17          THE COURT:  Anything else that caused you to answer

18 yes to that question?

19          JUROR NO. 53:  No, sir.

20          THE COURT:  Was there anything about that episode

21 that you just described that you think could get in the way of

22 you rendering a verdict, if chosen for the jury, based only on

23 the evidence in our courtroom and the instructions I give?

24          JUROR NO. 53:  Definitely not.

25          THE COURT:  You'd be able to render such a verdict?

1          JUROR NO. 53:  Yes.

2          THE COURT:  Now, the next question you answered yes

3   to was 21.  It asked if you or anybody in your immediate family

4   has been employed as a firefighter or has been affiliated with

5   any fire department.

6          Tell us about that.

7          JUROR NO. 53:  I was a volunteer.

8          THE COURT:  Really.  Where?

9          JUROR NO. 53:  Connellsville Township in Fayette

10  County.  Right outside of Connellsville for approximately 12

11  years, 12 to 13 years.

12         THE COURT:  When did that come to an end?

13         JUROR NO. 53:  When I moved to East Huntington.  I

14  moved there, I got married and moved to East Huntington and

15  just moving into another township, it wouldn't be like fighting

16  fire with the guys that I fought fires with for twelve years.

17  Besides that, I was married, so I had to --

18         THE COURT:  About how long ago did that all come to

19  an end?

20         JUROR NO. 53:  25 years ago.

21         THE COURT:  Did you and the fire company part ways

22  on good terms with one another?

23         JUROR NO. 53:  Yes, we did.

24         THE COURT:  Then the last question you answered yes

25  to was 38.  It asked whether you or anybody in your family

1 owned or possessed a firearm or ammunition and, if so, what

2 kind and for what purpose?

3              JUROR NO. 53:  Well, I was working a security detail

4 plainclothes retail and I used to have to escort the manager of

5 the store to the bank.  So I originally purchased a gun permit

6 to carry a gun for that reason.  My father-in-law, he is an

7 avid marksman.  He belongs to a gun club.  He shoots

8 recreationally every weekend.  That's the only reason.  Now I

9 just have the gun for protection.

10             THE COURT:  What kind of firearm do you have?

11             JUROR NO. 53:  A 380 pistol.  380 semi-automatic

12 pistol.

13             THE COURT:  Do you still have your gun permit?

14             JUROR NO. 53:  Yes, I do.

15             THE COURT:  Have you ever had to use the gun or

16 elect to use the gun for anything other than hunting or target

17 practice?

18             JUROR NO. 53:  No.

19             THE COURT:  Did you ever unholster it as part of

20 your security activities?

21             JUROR NO. 53:  No.

22             THE COURT:  For what period of time did you do this

23 security work?

24             JUROR NO. 53:  What period of time?  I would say it

25 went on for about five years probably 25 years ago.  All my

activities sort of took place right before I got married or

shortly thereafter.  Then I just decided to lay low and behave

myself.

THE COURT:  When is the last time you fired that

pistol, ballpark?

JUROR NO. 53:  Two, three months ago.

THE COURT:  Do you go to a range or sportsman's

club?

JUROR NO. 53:  I go with my father-in-law.  They do

an indoor range and they also have an outdoor range, so we just

go recreationally.

THE COURT:  What kind of firearms does your

father-in-law have?

JUROR NO. 53:  Too numerous to mention probably.  He

has long guns, pistols, 22s.

THE COURT:  Do you know if he has a concealed carry

permit?

JUROR NO. 53:  Yes, he does.

THE COURT:  Do you know if he's used his firearms

for anything other than hunting or target practice?

JUROR NO. 53:  No, he has not.

THE COURT:  Mr. Sindler, any follow-up yeses, sir?

MR. SINDLER:  No, I don't.

THE COURT:  Mr. Ortiz and Ms. King?

MR. ORTIZ:  The incident where stuff was stolen from

1  your father-in-law's property, the investigation that occurred,

2  were you at all unhappy with the job the police did?

3              JUROR NO. 53:  No, not at all.  They come out, it

4  was scrap, we pretty much just said, hey, it's lost scrap.

5  They did report and then we never heard anything back.  The

6  officer told us right then, he goes, these things are hard to

7  follow-up on because it could have went any number of places.

8  So, we didn't -- really worry too concerned about it.

9              MR. ORTIZ:  Thank you.

10             THE COURT:  Mr. Sindler, any follow-up to that?

11             MR. SINDLER:  No, Your Honor.

12             THE COURT:  Juror 53, thanks for coming back.

13         (Juror No. 53 exits chambers.)

14             THE COURT:  Mr. Ortiz and Ms. King, any cause issues

15  with 53?

16             MS. KING:  No, Your Honor.

17             THE COURT:  Mr. Sindler?

18             MR. SINDLER:  I don't.

19             THE COURT:  No. 53 is in.

20             Next one up is 21.  Two yes answers, Questions 12

21  and 18.

22         (Juror No. 21 enters chambers.)

23             THE COURT:  Counsel, we have juror 21 with us.  She

24  answered yes to two questions, No. 12 and No. 18.

25             No. 12 asked, ma'am, if you have ever served as a

1 juror in criminal or civil case or as part of grand jury or any

2 court?

3            JUROR NO. 21:  It was a civil case.  It was 20 years

4 ago, probably.

5            THE COURT:  Was it in county court or federal court?

6            JUROR NO. 21:  It must county court.

7            THE COURT:  What town was it?

8            JUROR NO. 21:  In Pittsburgh.

9            THE COURT:  Right here in town?

10            JUROR NO. 21:  Yes.

11            THE COURT:  Were you actually selected to be on the

12 jury?

13            JUROR NO. 21:  I was.  I was the foreperson.

14            THE COURT:  Did it go to trial?

15            JUROR NO. 21:  It did.

16            THE COURT:  Did it go all the way to a verdict where

17 the jury had to make a decision?

18            JUROR NO. 21:  We did.

19            THE COURT:  It was a civil case?

20            JUROR NO. 21:  Yes.

21            THE COURT:  Can you generally describe what kind of

22 case it was?

23            JUROR NO. 21:  It was -- we were trying to decide

24 damages.  I think it was an insurance case.  I can't remember.

25 I can't remember the details of it.  I just remember we had to

1 put a value on some misdeed.

2          THE COURT:  A money value?

3          JUROR NO. 21:  Yes.

4          THE COURT:  Was there anything about that service in

5 any way, shape or form that left you with a bad taste in your

6 mouth about jury service or jury system, the court system,

7 lawyers, judges, bailiffs?

8          JUROR NO. 21:  No.

9          THE COURT:  No negatives?

10          JUROR NO. 21:  No, it was not negative at all, not a

11 negative experience at all.

12          THE COURT:  And then you answered yes to No. 18,

13 which asked whether you or anybody in your immediate family had

14 ever been the victim of a crime?

15          JUROR NO. 21:  Yes, I was.  I was -- our house was

16 robbed when I was in our home when I was 16.  I was held at

17 gunpoint and robbed.

18          THE COURT:  Was that here in the Western

19 Pennsylvania area?

20          JUROR NO. 21:  No, it was in Akron, Ohio.

21          THE COURT:  Did the police come out and investigate

22 that?

23          JUROR NO. 21:  They did.

24          THE COURT:  Did the police or the authorities in the

25 Akron area institute a prosecution over that crime?

1           JUROR NO. 21:  No one was ever charged with the

2  crime.

3           THE COURT:  Were you able to identify to law

4  enforcement or the prosecuting authorities anybody you thought

5  was a suspect in that crime?

6           JUROR NO. 21:  I described -- I only saw the person

7  very, very briefly.  I described him, we went through a sketch

8  artist and I looked at photographs in a book.  There was very

9  little action that happened after that.  I filed the case or

10 whatever, took a statement.  I believe the police probably came

11 out after that, but there was no real progression.  I don't

12 think they ever found anything.

13          THE COURT:  Did anything about that either go to any

14 kind of court?

15          JUROR NO. 21:  No.

16          THE COURT:  Even the police and enforcement issues

17 didn't charge anyone, did you have a belief as to who the

18 person was that committed that crime?

19          JUROR NO. 21:  No.

20          THE COURT:  Were you alone in the home when that

21 happened?

22          JUROR NO. 21:  I was.

23          THE COURT:  About how long in time duration would

24 you say that episode was?  How long --

25          JUROR NO. 21:  It's hard to say.  It felt like it

1  took forever.  10, 15 minutes maybe.

2            THE COURT:  During that episode, in addition to the

3  action that was happening in front of you, was there anything

4  said to you by that perpetrator?

5            JUROR NO. 21:  Yes.

6            THE COURT:  Can you tell us what that was, as best

7  you recall?

8            JUROR NO. 21:  Yes, I can.  I recall it very well.

9  I was in bed at the time.  He woke me up.  I saw he had a gun.

10 He made me stand in front of him, asked me for a bag or pillow

11 case to put things in.  We went through our home as he put

12 things in the pillow case.  He told me to get -- he told me

13 that he was robbing the house because he didn't have anything.

14 We were wealthy.  And had me get back into bed and pull the

15 sheet up over my head.  I can tell you more.  Do I need to tell

16 you more?

17            It was emotional.

18            THE COURT:  It appears you have a clear memory of it

19 to today.

20            JUROR NO. 21:  Yes.

21            THE COURT:  Without verbatim, is there anything that

22 was said that you viewed as a threat to your safety?

23            JUROR NO. 21:  Yes.  I thought he was going to rape

24 me.

25            THE COURT:  Were there any other episodes or

1 incidents that caused you to answer yes to No. 18, or was this

2 what was on your mind that caused you to answer?

3          JUROR NO. 21:  I have not been a victim of any other

4 crime.

5          THE COURT:  Nor has anybody in your immediate

6 family?

7          JUROR NO. 21:  No.

8          THE COURT:  Now, looking at that -- I don't -- I'm

9 always very cautious when I ask people to disclose things about

10 might disclose their age, but about how long ago the that

11 happen?

12          JUROR NO. 21:  I was 16.  I'm 52 now.

13          THE COURT:  It would have been 36 years ago?

14          JUROR NO. 21:  Indicates yes.

15          THE COURT:  Once the jury is selected in this case,

16 the 12 people that will be seated on the jury and the two

17 alternates, once they're seated in the jury box, Mr. Babik is

18 going to administer an oath to them.  By that oath, all those

19 jurors are going to swear or affirm in open court that they're

20 going to render a verdict based only on the evidence that they

21 hear in our courtroom in this case and the instructions I give

22 as the judge.

23          Do you have any reason to believe at all, for any

24 reason, that you're not going to be able to follow that oath if

25 you're selected?

1              JUROR NO. 21:  I don't think I'll have any trouble

2 with that.

3              THE COURT:  You said you wouldn't think.  I know

4 people are very careful with their language.

5              JUROR NO. 21:  I would not have any trouble with

6 that.

7              THE COURT:  Are you going to be -- you heard this

8 morning when we talked, I talked to all the juror, everybody

9 that was in the courtroom that one of the things that was very

10 important in this case, like it would be in any criminal case,

11 is that the government and any defendant, this defendant, has

12 every right to have their case decided based only on the

13 evidence in the courtroom and the instructions I give.

14              Is there anything about that episode in Akron or

15 anything else in your life or anything else that you think that

16 would get in your way of delivering to all the parties to this

17 case a fair and just verdict based only on the evidence and the

18 instructions I give.

19              JUROR NO. 21:  No, there wouldn't be anything that

20 would prevent me from listening to the evidence and responding

21 to it.  That's not exactly your wording, I don't remember

22 exactly how you put it, but I would not have any trouble with.

23              THE COURT:  If you were selected to the jury and it

24 came time to deliberate, you would base your verdict based only

25 on the evidence you hear in this case and the instructions I

1 give?

2 　　　　　JUROR NO. 21:  That's correct.

3 　　　　　THE COURT:  Mr. Ortiz and Ms. King, any follow-up

4 for this juror?

5 　　　　　MR. ORTIZ:  I do not.

6 　　　　　MS. KING:  I have one question.  You said your

7 husband is an architect?

8 　　　　　JUROR NO. 21:  Yes.

9 　　　　　THE COURT:  Can you describe a little bit of the

10 type of work he does?

11 　　　　　JUROR NO. 21:  He does mostly residential and mostly

12 historic houses that are being renovated.

13 　　　　　THE COURT:  Does he talk to you a lot about the kind

14 of work that he does, do you have any understanding about how

15 he goes about doing his job?

16 　　　　　JUROR NO. 21:  I do.

17 　　　　　MS. KING:  Nothing else.

18 　　　　　THE COURT:  Have you ever worked with your husband

19 in his architectural practice, or helped him out, even if it

20 wasn't official?

21 　　　　　JUROR NO. 21:  Only to give him my opinion of what I

22 thought of a situation if he was having trouble with a client

23 or a contractor or something like that.

24 　　　　　THE COURT:  Did you ever go with him to see any of

25 the work sites, the engagements he was going to be working on,

1  or someone might be thinking of hiring him about?

2            JUROR NO. 21:  Yes.

3            THE COURT:  Do you look around when he looks around?

4            JUROR NO. 21:  Yes.

5            THE COURT:  When he asked for your opinion on

6  things, is that because he in conversations describes things to

7  you or does he show you things that clients have given him or

8  that he's going to give to a client?

9            JUROR NO. 21:  Yes.

10           THE COURT:  Both of those?

11           JUROR NO. 21:  Yes.  I see his work as it's

12 progressing.  I see what kinds of things his clients show him

13 that they like or don't like.

14           THE COURT:  Do you know whether as part of his

15 business he uses vendors for the various services he might need

16 help with?

17           JUROR NO. 21:  Contractors, definitely.

18           THE COURT:  Is he in a, for want of a better term, a

19 sole practice, or does he have other professionals --

20           JUROR NO. 21:  Sole practitioner.

21           THE COURT:  Does he work out of your home?

22           JUROR NO. 21:  He hasn't for many, many years.

23           THE COURT:  He has an office?

24           JUROR NO. 21:  Yes.

25           THE COURT:  Mr. Sindler, any follow-up?

1              MR. SINDLER:  Looking back 36 years ago, do you know

2  the race of the individual who was in the home in which you

3  were sleeping?

4              JUROR NO. 21:  Yes.  He was African-American.

5              MR. SINDLER:  That's all I have.

6              THE COURT:  Thank you, Mr. Sindler.

7              Any follow-up, Mr. Ortiz and Ms. King?

8              MS. KING:  No, Your Honor.

9              THE COURT:  Anything else, Mr. Sindler?

10             MR. SINDLER:  Not at this moment.

11             THE COURT:  Thank you, ma'am, for coming in.

12        (Juror No. 21 exits chambers.)

13             THE COURT:  Mr. Sindler.

14             MR. SINDLER:  I kind of wanted to ask but I didn't

15 want to start going over boundaries here.  Maybe we should ask

16 her if she knows about this firm that we've used, Cadnetics.

17             THE COURT:  That was not -- when I read

18 Mr. Johnson's name, I did not say the name of his firm.  I

19 think that's a fair inquiry.

20             MR. SINDLER:  You can do it, I can do it.

21             THE COURT:  No, no, I'll be happy to ask it.

22             Any objection if I ask that, Ms. King and Mr. Ortiz?

23             MS. KING:  No, Your Honor.

24             THE COURT:  Mr. Greer, would you ask her to come

25 back, Juror 21 for further follow-up.

1            THE COURT:  Does anyone have an objection if I

2    describe the type of work they generally do and ask if husband

3    uses them.  If she hasn't heard of Cadnetics, if they use a

4    vendor of a similar type?

5            MS. KING:  No.

6            THE COURT:  Is that okay with you, Mr. Sindler?

7            MR. SINDLER:  That's fine.

8        (Juror No. 21 enters chambers.)

9            THE COURT:  I had a follow-up question I needed to

10   clear with counsel.  It relates to your husband's architectural

11   firm.

12           One of the witnesses in this case is affiliated with

13   an organization called Cadnetics.  Have you ever heard of that?

14           JUROR NO. 21:  No.

15           THE COURT:  They do surveying and measurements of

16   buildings.  They use traditional mechanisms.  They also use

17   laser surveying equipment, that sort of stuff.  Have you ever

18   heard of that outfit?

19           JUROR NO. 21:  I know what the equipment is.  I have

20   never heard of that particular firm.

21           THE COURT:  Does your husband's architectural

22   practice engage folks, consultants, contractors that do that

23   type of work?

24           JUROR NO. 21:  No.

25           THE COURT:  How are you familiar with that

1  equipment?

2             JUROR NO. 21:  He had to learn how to use --

3             THE COURT:  He being your husband?

4             JUROR NO. 21:  Yes.  Which was -- a concern as we

5  were getting older, having to learn new software and it was

6  just something he was going to have to learn in order to be

7  able to send drawings to clients in the city, things like that.

8  He does it himself.  He has not used an outside consultant that

9  I know of and I have never heard of.

10             THE COURT:  Do you do any of it?

11             JUROR NO. 21:  No, I don't.

12             THE COURT:  Has your husband ever shared with you

13  the product of his efforts in suing CAD, which I believe stands

14  for computer assisted design or computer assisted drawing.

15             JUROR NO. 21:  I've seen it on the computer.  My son

16  knows also how to use the CAD system, but I've never seen the

17  output.

18             THE COURT:  Has your son ever showed you how it

19  works or your husband ever showed you how it works or operates?

20             JUROR NO. 21:  Yes.

21             THE COURT:  Do you have an understanding of what it

22  does or what it is intended to do?

23             JUROR NO. 21:  Yes, I do.

24             THE COURT:  Could you give us your understanding.

25             JUROR NO. 21:  What a CAD drawing does?

1              THE COURT:  Sure.

2              JUROR NO. 21:  So a three-dimensional rendering of a

3    two-dimensional -- what would you have drawn as a blueprint in

4    two dimensions on a drawing board, you do in three dimensions

5    in CAD software.  It gives you a digital file, which means you

6    can e-mail it, save it to a PDF, output it to a hard copy, if

7    that's how your clients wants to see it.  You can manipulate to

8    see it in different views.  That's what I know about it.

9              THE COURT:  Have you ever used it yourself?

10             JUROR NO. 21:  No.

11             THE COURT:  Have you ever taken a lesson, even if it

12   was from your husband or your son, formal lesson of any type?

13             JUROR NO. 21:  No.

14             THE COURT:  Mr. Sindler, any follow-up?

15             MR. SINDLER:  No.

16             THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

17             MR. ORTIZ:  Ma'am, just briefly.  Clearly you've had

18   a number of conversations with your husband and your son about

19   these similar programs.  If a witness were to come and testify

20   at court about something similar, would you still feel as

21   though you could evaluate the witness' testimony for what it is

22   as it is coming to you as a juror.

23             JUROR NO. 21:  You mean without sort of a

24   preconceived understanding?

25             MR. ORTIZ:  Yes.

1              JUROR NO. 21:  Yes, I think so.

2              MR. ORTIZ:  So whatever you were told from your

3    husband, you could essentially put that aside and view it in

4    the context of the trial or from an instruction from the Court

5    or something to that effect?

6              JUROR NO. 21:  Yes, I think so.

7              THE COURT:  Ma'am, I'm the Judge, I'll be telling

8    the jury over and over again from the moment they're sworn in

9    until the trial is over, when they're not in the courtroom,

10   they are not allowed to talk about the case, anybody that

11   involved with in it, they can't talk to the jurors, can't talk

12   to themselves, they can't do any research, just like I said

13   this morning, they can't learn about anything from the books or

14   newspapers and they can't talk to anyone away from the

15   courthouse.  Given that your husband is an architect, if

16   there's discussion of CAD in the courtroom, are you going to be

17   able to follow that instruction?

18             JUROR NO. 21:  Yes, I'll be able to follow that

19   instruction.

20             THE COURT:  You wouldn't talk to anybody until after

21   the trial is over and I tell the jury they're allowed to talk

22   to other people.

23             JUROR NO. 21:  Correct.

24             THE COURT:  Mr. Sindler, any follow-up?

25             MR. SINDLER:  No.

```
 1              THE COURT:  Ms. King and Mr. Ortiz?

 2              MS. KING:  No.

 3         (Juror No. 21 exits chambers.)

 4              THE COURT:  Mr. Sindler, anything on cause with 21?

 5              MR. SINDLER:  No.

 6              THE COURT:  Mr. Ortiz and Ms. King?

 7              MS. KING:  No.

 8              THE COURT:  21 is in the pool.

 9              Mr. Warren, do you need a drink?

10              THE DEFENDANT:  No, sir, no, Your Honor.

11              THE COURT:  Next one up is 41.  That juror had a yes

12 answer and that was No. 12.

13         (Juror No. 41 enters chambers.)

14              THE COURT:  Counsel, we have Juror 41 with us.  She

15 had a yes answer to one question, which was No. 12.  That was

16 have you ever served as a juror in a criminal or civil case or

17 as part of a grand jury in federal, state or county court.

18              Tell us about that.

19              JUROR NO. 41:  County court.

20              THE COURT:  Here in Pittsburgh?

21              JUROR NO. 41:  No, Lawrence County.  Does that count

22 for a yes?

23              THE COURT:  Yes.  That's New Castle.

24              JUROR NO. 41:  Yes.  It was assault with a deadly

25 weapon.  We went five days for the trial and deliberations.
```

1                    THE COURT:  So you were actually selected for the

2  jury.

3                    JUROR NO. 41:  Yes.

4                    THE COURT:  The case proceeded.  Did the jury

5  deliberate and render a verdict?

6                    JUROR NO. 41:  Yes.

7                    THE COURT:  Were you the foreperson of the jury?

8                    JUROR NO. 41:  No.

9                    THE COURT:  About how long ago was this?

10                   JUROR NO. 41:  I have been called three times;

11  probably about six years ago.

12                   THE COURT:  How long did the trial part in the

13  courtroom take and about how long did the deliberations take?

14                   JUROR NO. 41:  Trial three days, deliberations one

15  whole day.

16                   THE COURT:  Did the deliberations begin and end on

17  the same day?

18                   JUROR NO. 41:  Yes.

19                   THE COURT:  Or did it carry over from one day to the

20  other?

21                   JUROR NO. 41:  No, we came back early in the

22  morning, they finished and we were in there all day until five

23  or six o'clock.  It was a Friday.

24                   THE COURT:  Now let me ask you this.  Was there

25  anything at all about that, any jury service you've had, that

1  jury service you have said you were -- is that the only time
2  you were selected?

3            JUROR NO. 41:  Only time I was selected.

4            THE COURT:  Is there anything at all about that
5  experience that you found unfavorable, unpleasant relative to
6  you being on the jury or jury system as a whole or legal
7  system, lawyers, judges, bailiffs, anything negative at all
8  about it?

9            JUROR NO. 41:  No.

10            THE COURT:  Is there anything about that service
11  that you think would influence or affect your deliberation or
12  verdict in this case, if you were selected?

13            JUROR NO. 41:  No.  I don't think so.

14            THE COURT:  When I instruct the jury as seated that
15  they're going to have to render their verdict solely on the
16  evidence in our courtroom in this case and on the instructions
17  I give, is there anything you think is going to get in the way
18  of you following that instruction?

19            JUROR NO. 41:  No, sir.

20            THE COURT:  You'd be able to do that?

21            JUROR NO. 41:  Uh-huh.

22            THE COURT:  Mr. Ortiz and Ms. King, any follow-up
23  for this juror?

24            MS. KING:  You said you reached a verdict in that
25  case, what was the verdict?

1          JUROR NO. 41:  Guilty.

2          MS. KING:  Nothing further.

3          THE COURT:  Mr. Sindler, any follow-up?

4          MR. SINDLER:  Did the deliberations stand out during

5    the day you folks were doing it, anything about that stand out?

6          JUROR NO. 41:  They asked to see some evidence

7    again.  I don't recall what it was, but we did call and they

8    asked for something, they came, but once we decided to vote, it

9    was unanimous.  There was talk before the voting.

10          MR. SINDLER:  During that day?

11          JUROR NO. 41:  Yes, in the room.

12          MR. SINDLER:  There were no deliberations before

13   that day?

14          JUROR NO. 41:  No.  We had to come back Friday

15   morning and finish the trial and within an hour we were sent to

16   deliberate.

17          MR. SINDLER:  That's all I have.

18          THE COURT:  Ms. King, Mr. Ortiz, any follow-up to

19   those questions?

20          MS. KING:  No.

21          MR. ORTIZ:  No.

22          (Juror No. 41 exits chambers.)

23          THE COURT:  Mr. Ortiz, Ms. King, any cause issues

24   with Juror 41?

25          MS. KING:  No.

1          MR. ORTIZ:  No.

2          THE COURT:  Mr. Sindler?

3          MR. SINDLER:  No.

4          THE COURT:  41 is in.

5          That brings us to No. 10.  She had four yes answers

6 11, 18, 21 and 38.

7     (Juror No. 10 enters chambers.)

8          THE COURT:  Counsel, we have Juror No. 10 with us.

9 She answered yes to four questions.

10         The first of those is No. 11.  It says:  Is there

11 any matter pending in your life about which you're concerned

12 that would prevent you from devoting your full, undivided

13 attention to this trial.  You have answered yes.

14         What was on your mind, ma'am?

15         JUROR NO. 10:  On Friday, my mom had half of her

16 lung removed.

17         THE COURT:  This past Friday?

18         JUROR NO. 10:  Yes, cancer.  Everything is good so

19 far, but I'm expecting FMLA papers in the mail in case

20 something with her condition changes or whatever, so that's

21 basically it.  I just figured I might as well let you guys know

22 that in case something happens.

23         THE COURT:  Is she still in the hospital?

24         JUROR NO. 10:  Yes, she's at AGH.

25         THE COURT:  Do you have any sense, rough idea of

1 when they expect to let her out of the hospital?

2                JUROR NO. 10:  Not yet.  I'm going to see her after

3 I leave here today.  So, hopefully, I'll find out some

4 information.

5                THE COURT:  Let me ask you this, when she does get

6 out of the hospital, where is she going to go?

7                JUROR NO. 10:  She's going to be staying with me.

8                THE COURT:  With you.

9                JUROR NO. 10:  Yes.

10                THE COURT:  Does anybody else live with you?

11                JUROR NO. 10:  My father.  But he also has a

12 business to run, too, so that's why I'm getting the FMLA papers

13 sent in the mail just in case, if someone can't be there with

14 her and she needs someone there, I'm not sure yet, but I will

15 find out today.  She might be getting chemo just to make sure

16 that it's all gone, but I'm not 100 percent sure about that

17 yet.  She just got out of ICU yesterday and they moved her to

18 the fifth floor.

19                THE COURT:  Do you think if she does get chemo, that

20 would cause her to be in the hospital longer?

21                JUROR NO. 10:  I don't know.

22                THE COURT:  Let me ask you this.  Before your mom

23 went into the hospital, did you, your dad and your mom, do you

24 all live in the same house?

25                JUROR NO. 10:  Yes.

1           THE COURT:  What line of work is your dad in?

2           JUROR NO. 10:  He's a business owner.

3           THE COURT:  What kind of business?

4           JUROR NO. 10:  He owns a tavern.

5           THE COURT:  So he works there himself at the tavern?

6           JUROR NO. 10:  Well, he runs it, he don't bartend,

7    per se, but dealing with like inventory, running here, running

8    there gets tough.

9           THE COURT:  He goes and works at the tavern and he

10   has other folks that work there, too, to help him out?

11          JUROR NO. 10:  Yes.

12          THE COURT:  I'm not minimizing that, ma'am.  Was

13   there anything else that was on your mind when you answered yes

14   to this question?

15          JUROR NO. 10:  No.

16          THE COURT:  Now, let me ask you this.  If you hadn't

17   been called for jury duty, what was the plan of how you would

18   be involved with your mom when she got out of the hospital?

19          JUROR NO. 10:

20          THE COURT:  What was going to be happening?

21          JUROR NO. 10:  Just be there for her when I can, in

22   case she need me.

23          THE COURT:  Were you going to be taking time off

24   work?

25          JUROR NO. 10:  That's why I'm waiting for the FMLA

1 papers to come through the mail in case I need to, you know

2 what I mean.

3          THE COURT:  So if you turn those in, are you

4 thinking that would lead to you getting time off work?  That

5 would be your plan?

6          JUROR NO. 10:  Possibly, but I'm not saying it's

7 going to be like months, it might be like a day here, a day

8 there.

9          THE COURT:  As needed.

10          JUROR NO. 10:  Yes.  Right.

11          THE COURT:  Could you remind me what line of work

12 you're in?

13          JUROR NO. 10:  I work up at the BNY client center

14 right up on Ross.  I'm a data entry operator.

15          THE COURT:  Do you work a standard shift?

16          JUROR NO. 10:  I work twilight.

17          THE COURT:  What does that mean?

18          JUROR NO. 10:  Two to ten.  It's really three to

19 eleven but I'm two to ten.

20          THE COURT:  Two in the afternoon until ten in the

21 evening?

22          JUROR NO. 10:  Yes.

23          THE COURT:  Thank you.

24          Now the next question you answered yes to was

25 No. 18.  It says:  Have you or a member of your immediate

1  family ever been a victim of a crime?  You answered yes.

2          What was that about?

3          JUROR NO. 10:  I was jumped when I was younger.

4          THE COURT:  About how old were you?

5          JUROR NO. 10:  15.

6          THE COURT:  Was it near your home?

7          JUROR NO. 10:  Yeah, a couple blocks.

8          THE COURT:  Was there any police involvement in

9  looking into that?

10         JUROR NO. 10:  Yes.

11         THE COURT:  You called the police or somebody called

12 them for you?

13         JUROR NO. 10:  Yes, somebody else did.

14         THE COURT:  Did they ever apprehend anybody or take

15 anybody into the police system?

16         JUROR NO. 10:  I am 34, I can't remember that far.

17         THE COURT:  Do you know if there was anything

18 involved in any court system with any of that episode?

19         JUROR NO. 10:  No, I don't think so.

20         THE COURT:  Were you injured?

21         JUROR NO. 10:  I called my uncle and let him know

22 after the fact that it happened because it happened in the

23 middle of the night.  No, not badly, just banged up and bruised

24 up.  I consider that a crime.

25         THE COURT:  Sure.  Now, was there one person

1  involved in this situation besides you, one person that jumped

2  you, to use your term?

3  　　　　　JUROR NO. 10:  Multiple people.

4  　　　　　THE COURT:  Multiple people.

5  　　　　　JUROR NO. 10:  Yes, that's what jump is, when it is

6  more than one person.

7  　　　　　THE COURT:  Do you remember about how many?

8  　　　　　JUROR NO. 10:  Three.

9  　　　　　THE COURT:  Were there any weapons involved.

10  　　　　　JUROR NO. 10:  Huh-uh.

11  　　　　　THE COURT:  You even though the police didn't catch

12  anybody, did you have anybody you suspected might have been

13  involved in jumping you?  Any idea who it might have been?

14  　　　　　JUROR NO. 10:  Yeah, I know who it was.

15  　　　　　THE COURT:  Did you tell the police who you thought

16  it was?

17  　　　　　JUROR NO. 10:  I gave my uncle some names and he

18  checked into it.  But it was so long ago.

19  　　　　　I'm going on like three hours of sleep, so you're

20  going to have to excuse me.  I worked last night.

21  　　　　　THE COURT:  Do you call your uncle because you were

22  particularly close to him or did he have something to do with

23  law enforcement?

24  　　　　　JUROR NO. 10:  He's a cop.

25  　　　　　THE COURT:  What town was he a policeman in?

1           JUROR NO. 10:  He lived in Green Tree, but I want to

2 say Allegheny County.

3           THE COURT:  Is he still do that?

4           JUROR NO. 10:  Uh-huh.

5           THE COURT:  So he's currently a policeman?

6           JUROR NO. 10:  Yes.  But I think he's -- he just got

7 promoted to where he's going to be in the court just like a

8 court officer or whatever.  I don't know what it's called but

9 I'm not sure where.

10           THE COURT:  You gave the names of the people that

11 you thought were involved in this situation to your uncle.

12           Did I understand that right?

13           JUROR NO. 10:  Yeah.

14           THE COURT:  Did that lead to anybody being

15 questioned or brought in to talk to the police?

16           JUROR NO. 10:  Huh-uh.

17           THE COURT:  How did you feel about that?

18           JUROR NO. 10:  I was young.  I don't know.

19           THE COURT:  Are these people you had known before

20 this situation?

21           JUROR NO. 10:  To see around the neighborhood, but

22 not like friends or anything.

23           THE COURT:  What neighborhood did this happen in?

24           JUROR NO. 10:  Spring Garden on the North Side.

25           THE COURT:  On the North Side?

1                JUROR NO. 10:  Yeah.

2                THE COURT:  Now, the next question you answered yes

3    to was No. 21.  I asked you if you or anybody in your immediate

4    family had ever been a firefighter or affiliated with any fire

5    department or yes.

6                JUROR NO. 10:  My grandfather.  He's deceased now

7    but he was a chief firefighter at the Spring Garden Fire

8    Station.

9                THE COURT:  In the city fire department?

10                JUROR NO. 10:  Yes.

11                THE COURT:  That's the neighborhood you grew up in?

12                JUROR NO. 10:  I grew up in Spring Hill, but it's a

13    neighborhood over, yes.

14                THE COURT:  About how long ago did your grandfather

15    pass away?

16                JUROR NO. 10:  At the time I lived in South

17    Carolina, we moved back two weeks after 9/11, so, the year

18    before 9/11.

19                THE COURT:  How long was he a firefighter?

20                JUROR NO. 10:  I don't know because he retired when

21    I was young.

22                THE COURT:  Lastly, you answered yes to No. 38 which

23    asked if anybody in your family owns or possesses a firearm or

24    ammunition.

25                JUROR NO. 10:  My brother for hunting.

1                    THE COURT:  Does your brother live with you?

2                    JUROR NO. 10:  No.

3                    THE COURT:  Does he live around here?

4                    JUROR NO. 10:  Saxonburg, PA.

5                    THE COURT:  Is it a rifle or handgun?

6                    JUROR NO. 10:  I'm not sure.  I just know he hunts.

7                    THE COURT:  Do you know if he has concealed carry

8  permit of any type?

9                    JUROR NO. 10:  I'm sure he does.  I don't know.  I

10 just know he has deer head all over his game room.

11                   THE COURT:  It's your brother, did your brother ever

12 use his hunting gun for anything other than hunting or for

13 target practice?

14                   JUROR NO. 10:  Huh-uh.

15                   THE COURT:  Mr. Sindler, any follow-up?

16                   MR. SINDLER:  You work at twilight shift, can I ask,

17 are your sleep patterns different from the person, like myself,

18 who is up during the day?

19                   JUROR NO. 10:  It was very hard for me to get up

20 today.  I didn't get home from work until like almost midnight

21 last night and then I can't come home and go straight to sleep,

22 I'm on like the opposite schedule.

23                   MR. SINDLER:  How might that affect your work if you

24 have to be in court at nine o'clock for a few days in a row as

25 you had to be here today?

1          JUROR NO. 10:  They said as long as you guys give me

2     the -- they don't have a problem with me having off for jury

3     duty, if that's what you're asking.

4          MR. SINDLER:  How do you feel about having to be

5     here at nine o'clock for a few days in a row, will you be able

6     to pay attention and focus?

7          JUROR NO. 10:  I can't promise that.

8          THE COURT:  Why is that?  Because you're altering

9     your sleep schedule?

10          JUROR NO. 10:  Yes.

11          MR. SINDLER:  One second.

12          THE COURT:  No problem.

13          MR. SINDLER:  The lung surgery that your mom just

14     went through, were you planning on taking time off this week

15     from work in order to visit her?

16          JUROR NO. 10:  As of right now, everything is going

17     good.  But like I said, that's why I have the FMLA papers being

18     sent to me.  I opened up a claim in case something happens,

19     then I can take time off work and it won't be held against me.

20          MR. SINDLER:  This is in the back of your mind or in

21     the forefront of your mind, what is happening with your mom?

22          JUROR NO. 10:  Yes.  She had her surgery on Friday.

23     She just got out of ICU last night.

24          MR. SINDLER:  It's occupying some of your time or a

25     lot of the time during the day, while you're awake, given her

1 condition and your wanting her to get better, right?

2          JUROR NO. 10:  Yes.

3          MR. SINDLER:  That's all I have.

4          THE COURT:  Ms. King and Mr. Ortiz?

5          MS. KING:  The judge is going to instruct you that

6 you have to listen to all the evidence and carefully consider

7 it, if you're to be selected and go back into the jury room.

8          Do you think you would have a problem doing that?

9          JUROR NO. 10:  Yes.

10          MS. KING:  Could just you explain a little bit why

11 that is.

12          JUROR NO. 10:  (Indicates no.)

13          THE COURT:  May I ask a follow-up?

14          MS. KING:  Yes.

15          THE COURT:  Ma'am, your concern that you might have

16 difficulty doing that, does that have anything to do with the

17 facts of the case as I explained them in court or any of the

18 people that are involved in the case because you recall I

19 introduced all of them to the jury in court today, does your

20 reason have anything to do with any of that?

21          JUROR NO. 10:  (Indicates no.)

22          THE COURT:  Is that a no, ma'am?

23          JUROR NO. 10:  No.

24          THE COURT:  Does it have anything to do with the

25 situation when you were 15 or 16 years old?

1          JUROR NO. 10:  No.

2          THE COURT:  Let me ask you this, ma'am.  Certainly

3  from the situation we see right now, this is something very

4  serious to you; is that correct?

5          JUROR NO. 10:  Yes.

6          THE COURT:  Ms. King, would you like any follow-up?

7          MS. KING:  No, Your Honor.

8          THE COURT:  Mr. Ortiz?

9          MR. ORTIZ:  No.

10          THE COURT:  Mr. Sindler?

11          MR. SINDLER:  We're good.

12          THE COURT:  Thank you very much.

13      (Juror No. 10 exits chambers.)

14          THE COURT:  Ms. King or Mr. Ortiz, any cause issues

15  with Juror No. 10?

16          MR. ORTIZ:  Judge, I think her answers were, at

17  least what I heard, it sounded as though she wouldn't be able

18  to accurately view or appropriately view the evidence and

19  devote her time and attention to this, so I would say yes, she

20  should be struck for cause?

21          THE COURT:  Mr. Sindler?

22          MR. SINDLER:  I agree.

23          THE COURT:  I think so, too.  I think in particular

24  her emotional reaction, which involved her welling up and

25  becoming tearful when she was asked Ms. King's question,

1  there's obviously something very deeply seeded with her that

2  appears to the Court to cause two things; one, to say to all of

3  us that she had doubts about her ability to render a fair

4  verdict based only on the evidence presented at this trial and

5  the Court's instructions, and also made her -- made it

6  impossible for her to articulate that.

7          I'm going to strike her for cause.

8          That brings us to 48 who answered yes to one

9  question which was No. 17.

10      (Juror No. 48 enters chambers.)

11         THE COURT:  Counsel, we have Juror No. 48 with us.

12  He answered yes to one question.  That was Question 17.  It

13  asked whether he or anyone in his immediate family had ever

14  been arrested, charged with or convicted of a criminal offense.

15  You said yes, sir.

16         What was on your mind?

17         JUROR NO. 48:  My one son has been troubled with

18  drugs all his life, so he's been arrested.  He's been in the

19  county for a year.

20         THE COURT:  Are you saying the county for the county

21  jail?

22         JUROR NO. 48:  Yes.  So he has like 14 months.  So I

23  have been to hearings down at the courthouse, but it's never a

24  jury hearing, it's just -- they're trying to make a plea, you

25  know, and that's what they did.

1                    THE COURT:  How recently has your son been in either

2  county jail or any jail or had some involvement with the court

3  system.

4                    JUROR NO. 48:  I think the 5th of this month we were

5  down, October 5th we were down and the hearing got postponed

6  until December 10th.

7                    THE COURT:  How old is this son?

8                    JUROR NO. 48:  35.

9                    THE COURT:  Does he live here in the Allegheny

10  County area?

11                    JUROR NO. 48:  Yes.

12                    THE COURT:  Do you know if he has a lawyer or uses a

13  lawyer.

14                    JUROR NO. 48:  He has public defender.

15                    THE COURT:  From the county public defender?

16                    JUROR NO. 48:  Right.

17                    THE COURT:  Does he live with you?

18                    JUROR NO. 48:  Occasionally, until I get home and I

19  throw him out.  So he spends time -- it's just trouble is all

20  it is.

21                    THE COURT:  Who else resides in your home with you?

22                    JUROR NO. 48:  My wife and one of my sons, one of my

23  twin boys.

24                    THE COURT:  Your twins are how old?

25                    JUROR NO. 48:  31.

1          THE COURT:  So the son you described earlier, he

2 would be your oldest child?

3          JUROR NO. 48:  Yes.

4          THE COURT:  Does he have any type of employment?

5          JUROR NO. 48:  No.  Sometimes he works for me, after

6 he gets cleaned up, it's construction and I'll put him to work

7 in construction until he screws up.

8          THE COURT:  Has any of that experience that you've

9 described here today, sir, given you any points of view in any

10 direction about our legal system, our court system, our jury

11 system, lawyers that are involved in it either for the

12 prosecution or the defense of those cases, anything about it?

13          JUROR NO. 48:  I kind of feel sorry for the courts

14 for the drug addicts that come in there because all they got is

15 excuses, it's one after another and after another.  The two

16 times he was -- one time they were too lenient, I thought, I

17 thought the courts were too lenient on him, then the other time

18 I thought they bombed him, they threw him in jail for 14

19 months.

20          THE COURT:  Is there anything about the situations

21 involving that son that it was alleged or accused that involved

22 any type of violence?

23          JUROR NO. 48:  Yes.  He robbed a drugstore -- he

24 robbed a Rite-Aid with a big fishing knife, he went and grabbed

25 pills off the shelf and ran out.

1        THE COURT:  Did he do that while other employees or

2   other customers were present in the store or after hours?

3        JUROR NO. 48:  No, it was while customers were in

4   the store.

5        THE COURT:  About how long ago the that happen?

6        JUROR NO. 48:  That was probably about six or seven

7   years ago.

8        THE COURT:  I don't mean to pry, I'm just trying to

9   get a complete picture here, sir.  I appreciate with your

10  bearing with the Court.

11       In any of these situations, did you or your family

12  provide funds for a lawyer for his defense?

13       JUROR NO. 48:  Yes.

14       THE COURT:  In any of these situations, did you or

15  your family provide any funds for treatment or therapy or

16  anything like that?

17       JUROR NO. 48:  Yes.

18       THE COURT:  What is this son's current situation?

19  Is he in jail or not in jail?

20       JUROR NO. 48:  He's not in jail, but he has this

21  hearing coming up on December 10th.  I don't know, he was on

22  the news, him and his girlfriend were scamming that doctor, I

23  don't know if you remember that, that was six months ago.

24  That's what they're waiting for now.  I'm sure they're going to

25  be going to jail.

1              THE COURT:  Is your son, to your knowledge,

2  currently, if you will, clean?

3              JUROR NO. 48:  He says he's clean, yes.

4              THE COURT:  What does he residing now with you?

5              JUROR NO. 48:  He is in Dormont.

6              THE COURT:  Mr. Ortiz and Ms. King, any follow-up

7  for Juror No. 48?

8              MS. KING:  No, Your Honor.

9              MR. ORTIZ:  No.

10             THE COURT:  Mr. Sindler?

11             MR. SINDLER:  No.

12             THE COURT:  Sir, is there anything about anything

13 you just described that you believe would in any way, shape or

14 form affect your ability if you were picked for the jury to

15 render a verdict, a just and fair verdict to all parties in

16 this case based only on the evidence you hear in our courtroom

17 here and the instructions I give?

18             JUROR NO. 48:  Yes.

19             THE COURT:  You'd be able to do that or something

20 would get in the way?

21             JUROR NO. 48:  No, I would be able to do that.

22             THE COURT:  Mr. Sindler, any follow-up?

23             MR. SINDLER:  No.

24             THE COURT:  Mr. Ortiz and Ms. King?

25             MS. KING:  No.

1              MR. ORTIZ:  No.

2              THE COURT:  Thank you very much for coming, sir.

3         (Juror No. 48 exits chambers.)

4              THE COURT:  Mr. Sindler, any issues with cause for

5    Juror 48.

6              MR. SINDLER:  No.

7              THE COURT:  Mr. Ortiz and Ms. King?

8              MS. KING:  No.

9              THE COURT:  48 is in.

10             We'll take a brief pause.

11             Mr. Greer, if you tell Mr. Babik to just hold

12   everyone for a few minutes.

13             Mr. Sindler, would you like any time with

14   Mr. Warren, any time in a private setting?

15             MR. SINDLER:  No.  But I need a cord for an outlet.

16   May I bring in my cord?

17             THE COURT:  Yes.

18        (Mr. Sindler exited chambers.)

19        (Whereupon, there was a brief pause in the proceedings.)

20             THE COURT:  Ms. Kienzle, we have taken a brief

21   break.  There have been no proceedings outside of the presence

22   of the defendant.

23             Mr. Warren is present, as is his lawyer,

24   Mr. Sindler.

25             Ms. King and Mr. Ortiz are present, as are court

1  staff and representative of the marshal service.

2         Mr. Ortiz, while we were on break, you advised the

3  Court and Mr. Sindler of something that happened, and I

4  suggested you raise it on the record for two reasons, one, so

5  that it's on the record if there is anything anyone wants the

6  Court to address, and secondly, so that it was in the presence

7  of Mr. Warren.

8         Mr. Ortiz.

9         MR. ORTIZ:  Your Honor, during the break I was in

10 the men's restroom and the deputy marshal Ray, who I apologize,

11 was in there with me.  We had a brief conversation.  I was

12 asked approximately how much longer we needed, how many more

13 jurors we needed, kind of the projected time frame we're

14 looking at.  That was basically the extent of it.  Unbeknownst

15 to me or to him there was potential juror that was in the stall

16 in the men's restroom.  So I just wanted to make everyone aware

17 of that.  There wasn't any interaction with him directly.  That

18 was Juror No. 16, the gentleman that works at the Allegheny

19 County Jail, because we saw him after he left the restroom.

20        THE COURT:  He was the gentleman who had been here

21 earlier, he works for the intermediate unit but does teaching

22 over at the county jail?

23        MR. ORTIZ:  Exactly.

24        THE COURT:  Is there anything, any action you

25 believe the Court should take or needs to take in any way,

1   shape or form relative to that, Mr. Ortiz?

2           MR. ORTIZ:  I'm making everybody aware.

3           THE COURT:  Mr. Sindler, same question of you, sir?

4           MR. SINDLER:  No.

5           THE COURT:  The Court independently doesn't conclude

6   that there is anything negative or prejudicial to the jury

7   selection process or the trial of the action from that

8   interaction.  It sounds completely benign.  It's appropriate

9   that we put it on the record and put it on the record in the

10  presence of Mr. Warren so that he has an opportunity to hear

11  it.

12          THE DEFENDANT:  Thank you, Your Honor.

13          THE COURT:  Any reason we can't proceed with our

14  jury selection process with prospective Juror No. 54?

15          I would also note it is a moment or two after four

16  o'clock.  By my count, there is one pending cause challenge to

17  Juror No. 57.  Putting that aside, there are currently 17 in

18  the pool.  We need to get to 32 to allow for the requisite

19  strikes.

20          It would appear to the Court, absent some unusual

21  turn of events, that within reasonable hours today we're not

22  going to get to 32.

23          Does anyone believe that there's some reason that we

24  should nonetheless soldier on other than if we only needed one

25  or two more jurors at the end of the day?

1              Mr. Sindler, what do you think?

2              MR. SINDLER:  We have 35 or 40 more minutes at least

3 that we should take advantage of.

4              THE COURT:  Absolutely.  We'll keep going.

5              Mr. Ortiz and Ms. King?

6              MS. KING:  Yes, we don't have anything.

7              THE COURT:  Mr. Babik, do you want to bring Juror 54

8 in.

9         (Juror No. 54 enters chambers.)

10             THE COURT:  I do have a 4:45, it's a telephonic

11 status conference.  It's not time urgent, so we can bump that,

12 if need be.  By the same token, I want to be respectful of all

13 the jurors' time.

14             MR. ORTIZ:  The numbers you have --

15             THE COURT:  Oh, yes.  No. 12, No. 15, No. 18, No.

16 21, and No. 38, five questions.

17        (Juror No. 54 enters chambers.)

18             THE COURT:  Counsel, we have Juror 54.  He has

19 answered yes to five questions.  The first is No. 12.

20             Sir, have you ever served as a juror in civil or

21 criminal case or juror in any court?

22             JUROR NO. 54:  Yes, I have.  It was a county trial.

23             THE COURT:  Here in Pittsburgh?

24             JUROR NO. 54:  Yes.  It was a criminal case.  I

25 think it was in Judge McDaniel's court.  It has been got to be

1  at least 10, 15 years.

2          THE COURT:  Were you actually selected for the jury?

3          JUROR NO. 54:  Yes.

4          THE COURT:  Did the case go to trial?

5          JUROR NO. 54:  Yes.

6          THE COURT:  Did it go to a verdict?

7          JUROR NO. 54:  Yes, it did.

8          THE COURT:  Were you the foreperson on the jury?

9          JUROR NO. 54:  No.

10          THE COURT:  Do you recall if it was a civil case or

11  criminal case?

12          JUROR NO. 54:  Criminal case.

13          THE COURT:  Do you recall generally what the charges

14  were in that case?

15          JUROR NO. 54:  The charges were aggravated assault.

16  We weren't told until after the trial that the defendant was an

17  inmate, I don't remember what the prison was, but he assaulted

18  another prisoner and charges were brought and that was the

19  reason for the case.

20          THE COURT:  That came out during the trial?

21          JUROR NO. 54:  It came out after the trial.  Well, I

22  take that back, came out during the trial.  What came out after

23  the trial was that the defendant had refused to take his

24  medication and at some point during the trial, he almost

25  assaulted his attorney and they had to take him out.

1          THE COURT:  In the courtroom?

2          JUROR NO. 54:  In the courtroom.  They weren't

3  allowed to explain anything as this was happening until after

4  the trial had completed.

5          THE COURT:  Do you recall from the trial itself,

6  were there any allegations relative to the charges that brought

7  the trial to the courthouse that there were any weapons

8  involved?

9          JUROR NO. 54:  The weapon, that was involved with a

10 shiv, a homemade knife.

11         THE COURT:  The episode that unfolded in the

12 courtroom, did that involve any weapons?

13         JUROR NO. 54:  No.

14         THE COURT:  Was there anything at all -- is that the

15 only time you served as a juror?

16         JUROR NO. 54:  Yes.

17         THE COURT:  Was there anything at all about that

18 service, that is, was that or is now noteworthy in positive or

19 negative direction, either about service as a juror, our jury

20 system or court system, judges, courts, lawyers, prosecutors,

21 defense lawyers, witnesses, defendants, anything that is

22 noteworthy to you today?

23         JUROR NO. 54:  I looked at it as a very interesting

24 experience, something I had never come across until that point.

25         THE COURT:  Is there anything about that whole thing

1 that left a bad taste in your mouth in any way?

2          JUROR NO. 54:  No.

3          THE COURT:  Do you think having now gone through

4 that, in this case, if you're picked to be on the jury, that

5 you could render a verdict in this case, this very case based

6 only on the evidence you hear in this courtroom and the

7 instructions given to you in this case?

8          JUROR NO. 54:  Absolutely.

9          THE COURT:  No doubts about that?

10          JUROR NO. 54:  No doubt at all.

11          THE COURT:  Now, you also answered yes to Question

12 15 that asked if you or anyone in your immediate family has

13 ever been employed or sought to be employed by any part of the

14 federal government other than military service, or any state,

15 local county or federal law enforcement agency or a court in

16 any paid or volunteer capacity.

17          What led to your yes?

18          JUROR NO. 54:  Initially, my daughter's position as

19 a pharmacist at a federal prison.

20          THE COURT:  Is that in California?

21          JUROR NO. 54:  Yes.  I worked as a contractor --

22          THE COURT:  She did have that job?

23          JUROR NO. 54:  She has it now.

24          THE COURT:  She works for the Federal Bureau of

25 Prisons at Victorville as a pharmacist?

1          JUROR NO. 54:  Yes.  I worked as a contractor for

2  the Department of Energy, not as a federal employee but as a

3  contractor.

4          THE COURT:  What type of contract work did you do?

5          JUROR NO. 54:  We did IT work at the site in

6  Bruceton, South Park.  My sister-in-law and brother-in-law both

7  work for -- my sister-in-law worked for the Department of Army

8  and my brother-in-law worked for the Department of Army and

9  then Department of Justice in D.C.

10          THE COURT:  So your sister-in-law, what does she do

11  for the Army?

12          JUROR NO. 54:  She's -- actually, both my sister and

13  brother-in-law worked in HR dealing with federal employees in

14  the Department of Army and the Department of Justice.

15          THE COURT:  Does your brother-in-law now work for

16  the Department of Justice?

17          JUROR NO. 54:  They're both retired.

18          THE COURT:  What did he do with DOJ?

19          JUROR NO. 54:  He was in HR, he dealt mainly with

20  hiring and HR.

21          THE COURT:  Do you know when that work came to an

22  end?

23          JUROR NO. 54:  His official date of retirement is

24  September 11, 2001.

25          THE COURT:  Now, the next question you answered yes

1  to was No. 18.  That asks if you or a member of your immediate

2  family has ever been the victim of a crime.

3            What led to that yes?

4            JUROR NO. 54:  My wife had her purse stolen in

5  August.

6            THE COURT:  Of this year?

7            JUROR NO. 54:  Yes.

8            THE COURT:  Were the police involved in that

9  situation?

10           JUROR NO. 54:  Yes.

11           THE COURT:  Did you report it or your wife reported

12 it?

13           JUROR NO. 54:  It happened at WalMart.  Reported it

14 to the security people at WalMart and they called the police in

15 North Versailles.

16           THE COURT:  Has that matter been resolved in any

17 way?

18           JUROR NO. 54:  Not that I know of.

19           THE COURT:  Do you know if anybody has had any

20 charges brought against them?

21           JUROR NO. 54:  I do not.

22           THE COURT:  What was your wife's loss in that

23 regard?

24           JUROR NO. 54:  Other than mostly aggravation, there

25 were probably maybe $100 worth of gift cards, very little cash,

1 credit cards, those were all stopped.

2          THE COURT:  Any loss that was not covered by

3 insurance?

4          JUROR NO. 54:  Just the gift cards.  We didn't even

5 file a claim.

6          THE COURT:  Were there any weapons or threats as

7 part of that episode?

8          JUROR NO. 54:  No.

9          THE COURT:  Do you or your wife have any idea who

10 committed that episode?

11          JUROR NO. 54:  I do not.  The police had video and

12 saw a woman in the video, but if they were able to track her

13 down, we were never notified.

14          THE COURT:  Now, the next question you answered yes

15 to was No. 21.  That asked if you or anybody in your immediate

16 family had been employed as a firefighter or affiliated with

17 any fire department.

18          JUROR NO. 54:  My father was a volunteer fireman for

19 the better part of 60 years.

20          THE COURT:  Where was that?

21          JUROR NO. 54:  In Latrobe.

22          THE COURT:  Latrobe, Pennsylvania.  How did that

23 service come to an end?

24          JUROR NO. 54:  When he retired.

25          THE COURT:  When he retired, was that in a situation

1 that was satisfactory to both him and the fire department?

2          JUROR NO. 54:  Well, it was a volunteer position.

3 When he retired from his job at Kennametal, he stayed on as a

4 volunteer firearm but at that point, there really wasn't a

5 whole lot he could do as 65-year-old firefighter.

6          THE COURT:  He left that activity on good terms?

7          JUROR NO. 54:  Oh, yes.

8          THE COURT:  Then you also answered yes to Question

9 38 which asks whether you or anybody in your family owns or

10 possess as firearm or ammunition, if so, what kind and for what

11 purpose?

12          JUROR NO. 54:  I had a 20-gauge single shot shotgun

13 and a 16-gauge shotgun that I used to use for small game

14 hunting.

15          THE COURT:  Still possess those?

16          JUROR NO. 54:  I do.

17          THE COURT:  Do you now or have you ever possessed

18 any type of handgun?

19          JUROR NO. 54:  No.

20          THE COURT:  Do you have a concealed carry permit?

21          JUROR NO. 54:  I do not.

22          THE COURT:  The long guns you have described, were

23 they ever used for anything other than hunting or target

24 practice?

25          JUROR NO. 54:  No.

1          THE COURT:  Mr. Sindler, any follow-up?

2          MR. SINDLER:  How long ago was the case in front of

3  Judge McDaniel in which you served as a juror?

4          JUROR NO. 54:  This would only be a guess, but I

5  would say at least 10 to 15 years.  Possibly longer because now

6  that I think about it, it was while I was still a contractor at

7  the Department of Justice or at the Department of Energy and I

8  have been away from there for 19 years, so it's probably been

9  closer to 20 years.

10          MR. SINDLER:  Were the deliberations during one day

11  or more than one day?

12          JUROR NO. 54:  Two days.  The actual trial started

13  on the afternoon that the jury was empanelled, case ran through

14  the following morning, and the deliberations lasted through the

15  end of the next day.

16          MR. SINDLER:  Was there anything outstanding or

17  something that stood out with regard to the deliberations part?

18          JUROR NO. 54:  No, not really.

19          MR. SINDLER:  Was the verdict -- what was the

20  verdict was guilty?

21          JUROR NO. 54:  It was guilty.

22          MR. SINDLER:  That's all I have.

23          THE COURT:  Mr. Ortiz and Ms. King?

24          MR. ORTIZ:  Not from me.

25          MS. KING:  No, Your Honor.

1          THE COURT:  Thank you very much for coming in.

2          (Juror No. 54 exits chambers.)

3          THE COURT:  Mr. Sindler, any cause issues with 54?

4          MR. SINDLER:  No.

5          THE COURT:  Mr. Ortiz and Ms. King?

6          MS. KING:  No, Your Honor.

7          THE COURT:  54 is in the pool.

8          That brings us to Juror 50.  She answered yes to

9  five questions; No. 5, No. 11, No. 15, No. 37, and No. 38.

10        (Juror No. 50 enters chambers.)

11         THE COURT:  Counsel, we have Juror No. 50 with us.

12  She responded yes to several questions and we will now do some

13  follow-up on that.

14         The first one was Question No. 5.  It was:  Do you

15  know anybody else on the jury panel, me, the Judge, or any

16  member of the court's staff?

17         JUROR NO. 50:  Yes, I know Jennifer, I went -- gosh,

18  I can't remember her married last name, it was Chrisman, we

19  went to college together.

20         THE COURT:  Which college was that?

21         JUROR NO. 50:  IUP.

22         THE COURT:  How is it you remember her back from

23  college days?

24         JUROR NO. 50:  We actually worked together at a

25  Denny's.

1          THE COURT:  That was while you were in college at

2  IUP?

3          JUROR NO. 50:  Yes.

4          THE COURT:  I don't mean to put you on the spot,

5  about how many years ago was that?

6          JUROR NO. 50:  I graduated in '96, I believe.

7          THE COURT:  Have you had any contact with this other

8  prospective juror since then?

9          JUROR NO. 50:  Facebook contact and just talk, just

10 a little bit of texting back and forth through Facebook, that's

11 all.

12         THE COURT:  Have you ever --

13         JUROR NO. 50:  She does work at the church that my

14 kids go to like youth group for.

15         THE COURT:  So your kids are in a youth group at a

16 church she works at?

17         JUROR NO. 50:  Yes.

18         THE COURT:  When did Facebook start up, involving

19 your Facebook contact with her?

20         JUROR NO. 50:  The last couple years.

21         THE COURT:  Is that something you initiated or she

22 initiated, if you recall?

23         JUROR NO. 50:  Well, the thing is we had a little

24 reunion for all of us who worked at Denny's.

25         THE COURT:  About how long ago was that?

1          JUROR NO. 50:  That was either last year or the year

2  before that.

3          THE COURT:  Did the Facebook get going as a result

4  of that or it had already been going?

5          JUROR NO. 50:  I really can't tell you.

6          THE COURT:  Do the best you can.  Have you ever

7  socialized since then, met, gone out, gone to events, anything

8  other than just hi, how are you?

9          JUROR NO. 50:  No.  Lunch today.

10          THE COURT:  Was it just the two of you or were there

11  others.

12          JUROR NO. 50:  Just the two of us.

13          THE COURT:  If it turned out that you and this other

14  potential juror were selected for the jury, would you be able,

15  in your mind, to view the evidence and the matters that I

16  instructed the jury on separately and independently?

17          JUROR NO. 50:  Oh, yes.

18          THE COURT:  If it turned out that on a particular

19  issue or even a verdict you and this other juror had a

20  different point of view, how would the fact that you know this

21  other juror influence you or affect you?

22          JUROR NO. 50:  Not at all.

23          THE COURT:  Why is that?  It seems like you're

24  confident about that.

25          JUROR NO. 50:  Because I make my own decisions.

1          THE COURT:  Now the next one you answered yes to was

2   No. 11.  It is is there any matter pending in your life about

3   which you're concerned that would prevent you from devoting

4   your full and undivided attention to this trial?

5          JUROR NO. 50:  I started a new job, actually with

6   the same company, but I moved into a new job in May.

7          THE COURT:  Of this year?

8          JUROR NO. 50:  Of this year.  So, I'm just settling

9   into the job.  Of course, it's a lot of things on my mind.  I

10  have auditors coming, I have closing, it's just no matter what

11  it's going to be in the back of my mind.

12          THE COURT:  Let me ask you this.  If it turned out

13  you were selected for the trial and the trial took the balance

14  of this week, what effect would that have on your thinking?

15          JUROR NO. 50:  This week would be better than next

16  week.  Next week would be really bad.

17          THE COURT:  So let me ask you this.  If you were

18  selected for the jury and the evidence had been concluded and I

19  gave my instructions and the jury was sent off to deliberate,

20  would you be able to be attentive to your duties as a juror no

21  matter how long that took because I'll instruct the jury that

22  its verdict, whatever its verdict is must be unanimous.  Would

23  you be able to be attentive during the entire period of the

24  deliberations?

25          JUROR NO. 50:  I would do my very best to, yes.

1          THE COURT:  Do you have any reason to believe that

2   no matter your intention to do your very best that you wouldn't

3   be able to do your very best?

4          JUROR NO. 50:  Not really, but sometimes -- I don't

5   have any ADHD or anything.

6          THE COURT:  You don't have any doubts you would be

7   able to do your duties?

8          JUROR NO. 50:  I should be able to do it.

9          THE COURT:  Any reason to hesitate?

10          JUROR NO. 50:  Not other than what I've told you

11  already.

12          THE COURT:  If it turned out that come Friday of

13  this week, no matter when you had started, but come Friday of

14  this week the jury was still deliberating, would you be able to

15  proceed with the deliberations focusing only on the evidence

16  presented in this trial and my instructions until the jury

17  reached a unanimous verdict?

18          JUROR NO. 50:  Yes.  I'm done on Friday.

19          THE COURT:  Unless the jury decides you're not.

20          JUROR NO. 50:  Okay.  Yes, I would be able to.

21          THE COURT:  The next question that you answered yes

22  to was No. 15.  It was:  Have you or any member of your

23  immediate family ever been employed or sought to be employed by

24  the federal government, other than the military or by any

25  state, local or county or federal law enforcement agency or

1 court in a paid or volunteer capacity?

2          JUROR NO. 50:  My brother-in-law is an attorney.  He

3 was working I believe for the Allegheny courthouse and I'm

4 pretty certain he has applied for jobs here.

5          THE COURT:  To do what, if you know?

6          JUROR NO. 50:  I don't know the specifics.

7          THE COURT:  Do you know what he does now as an

8 attorney?

9          JUROR NO. 50:  He worked at the attorney general's

10 office for a while before his last job.  I don't know

11 specifics.

12          THE COURT:  Do you know if his work then or

13 currently takes him into court?

14          JUROR NO. 50:  Yes.

15          THE COURT:  Do you know if it takes him in very

16 often?

17          JUROR NO. 50:  I know on occasion he would come out

18 to the Westmoreland County Courthouse.

19          THE COURT:  Do you know if his work was of a civil

20 nature or criminal nature?

21          JUROR NO. 50:  I really don't know.

22          THE COURT:  It's your brother-in-law?

23          JUROR NO. 50:  Yes.

24          THE COURT:  How often do you talk with him,

25 ballpark?

1             JUROR NO. 50:  Monthly to weekly.  I talked to

2  him -- texted him yesterday.

3             THE COURT:  Did you tell him you were coming for

4  jury duty?

5             JUROR NO. 50:  I actually did not tell him I was

6  coming.  My sister knows, but I told him my son has a big

7  soccer game.  I always tell him that.

8             THE COURT:  The next question you answered yes to

9  was No. 37.  That was:  Do you have any strong feelings for or

10 against or relating to the private ownership of firearms or

11 laws regulating their possession or firearms themselves, such

12 that you would be unable to render a fair and impartial verdict

13 in this case based solely on the evidence presented and the

14 legal instructions of the Court?

15            JUROR NO. 50:  I just firmly believe in the right to

16 own firearms.  So, that's my only --

17            THE COURT:  Do you believe that that belief would

18 interfere with your ability to follow the evidence as presented

19 in this court, in this trial, and my instructions as the judge?

20            JUROR NO. 50:  No.

21            THE COURT:  All the jurors that are ultimately

22 selected and empanelled before they start their duties are

23 going to be given an oath by my bailiff and in that oath, they

24 will swear or affirm that they will truly and fairly render a

25 verdict based only on the evidence in this case and the

1 instructions of the Court.

2          Do you believe for any reason, including those

3 beliefs, you would have any difficulty following that oath?

4          JUROR NO. 50:  No.

5          THE COURT:  Now, the last question you said yes to

6 was No. 38.  It asked whether you or anybody in your family

7 owned or possessed a firearm, if so what kind and for what

8 purpose.

9          JUROR NO. 50:  I personally do have a small Colt

10 380.

11          THE COURT:  Pistol?

12          JUROR NO. 50:  Pistol.  I've had it since I was in

13 college.  I used it for target shooting.

14          My husband does have different guns, but I don't

15 know what.

16          THE COURT:  Do you know --

17          JUROR NO. 50:  My father has -- I come from a family

18 of hunters.

19          THE COURT:  Are they long guns, pistols, handguns,

20 some of each?

21          JUROR NO. 50:  I'd say some of each.

22          THE COURT:  Do you have a concealed carry permit?

23          JUROR NO. 50:  I do not.

24          THE COURT:  Does your husband?

25          JUROR NO. 50:  He definitely did.  I don't know if

1  it recently expired.

2          THE COURT:  What about the other members of the

3  family you made reference to?

4          JUROR NO. 50:  Actually, I think my father and

5  mother both do.

6          THE COURT:  To your knowledge, have either you

7  personally or any of the other family members you referred to

8  ever used their firearm for any purpose other than hunting or

9  target shooting?

10         JUROR NO. 50:  No.

11         THE COURT:  Mr. Ortiz and Ms. King, do you have any

12 follow-up questions for Juror No. 50?

13         MR. ORTIZ:  Ma'am, you mentioned that you firmly

14 believe in the right to own firearms; is that right?

15         JUROR NO. 50:  Yes.

16         MR. ORTIZ:  Are you aware there are certain laws

17 that say that certain people aren't allowed to own or possess

18 firearms.

19         JUROR NO. 50:  I am now, yes.

20         MR. ORTIZ:  Do you have any belief about the

21 validity or the value of those laws concerning the fact that

22 you believe people should own or possess firearms?

23         JUROR NO. 50:  I understand that if you misuse a

24 weapon, you shouldn't have the right to have it anymore, yes.

25         MR. ORTIZ:  If the Court were to instruct you that

1 there are other reasons why someone isn't allowed to possess or

2 own a firearm, could you follow the Court's instruction and

3 apply it to this particular case?

4             JUROR NO. 50:  Yes.

5             THE COURT:  Even if it didn't involve the use of the

6 firearm, if there was some other reason why someone couldn't

7 possess a gun?

8             JUROR NO. 50:  Yes.

9             THE COURT:  Mr. Ortiz, any further follow-up?

10             MR. ORTIZ:  I don't believe so.

11             THE COURT:  Mr. Sindler?

12             MR. SINDLER:  If we were here Friday afternoon

13 deliberating, the majority or perhaps the other jurors are of a

14 position different from yours, which meant the prospect or

15 possibility of coming back on Monday, would that alone force

16 you to change your mind because of the issue that is in the

17 forefront of your mind with regard to your job and the position

18 you now have with this company you work at?

19             JUROR NO. 50:  No.

20             MR. SINDLER:  Meaning?

21             JUROR NO. 50:  It would not.  That would be unfair.

22 No.  I would make my decision based on the evidence.  I

23 wouldn't let my personal position sway my decision.

24             MR. SINDLER:  There might be other reasons to sway

25 your decision, but that would not be a or the reason to sway

1  your decision, correct?

2             JUROR NO. 50:  Correct.

3             MR. SINDLER:  That's all I have.

4             THE COURT:  Thank you very much.

5             Any follow-up to Mr. Sindler's question, Ms. King

6  and Mr. Ortiz?

7             MS. KING:  No.

8             MR. ORTIZ:  No.

9             THE COURT:  Thank you very much for coming in.  I

10 appreciate it.

11        (Juror No. 50 exits chambers.)

12            THE COURT:  Mr. Sindler, sir, your position on

13 cause?

14            MR. SINDLER:  No.

15            THE COURT:  Mr. Ortiz and Ms. King?

16            MS. KING:  No.

17            THE COURT:  Juror 50 is in.

18            That takes us to 66 who answered yes to 12, 15, and

19 38.

20            Before 66 comes in, Ms. King and Mr. Ortiz, do you

21 have any point of view on behalf of the United States about how

22 long we should go today?

23            I'm not subcontracting out my decision, but I want

24 to get the assessment of counsel.

25            MS. KING:  I'm happy to go as long as we can, but I

1 think the jurors probably think they would be done at five, so

2 I wouldn't want --

3              THE COURT:  I'm good to go however long.

4              Mr. Sindler, any thoughts or views based on your

5 experience, sir?  See where we are?

6              MR. SINDLER:  I do.  I was going to say we should

7 break after No. 66, but I think that we should not go any

8 longer.

9              I agree with Ms. King that we should try to maximize

10 the time here, but I don't know where there's a sense that the

11 jurors are going to be here until five o'clock today.  They

12 have just been sitting there for a lengthy period of time.

13 They seem to be comfortable, they're spreading out in the

14 courtroom, chatting, but they have been confined there for the

15 afternoon.  I think that we should cut it at 4:40 or 4:45.

16              MS. KING:  That's fine with the government.

17              THE COURT:  I have 4:30, so why don't we bring 66 in

18 and see where we are at the end of 66.

19              Does that work?

20              MR. SINDLER:  Yes.

21              THE COURT:  Ms. King and Mr. Ortiz?

22              MS. KING:  Yes.

23              THE COURT:  I have 12, 15, and 38.

24         (Juror No. 66 enters chambers.)

25              THE COURT:  Counsel, we have Juror 66 here.  He

1 answered yes to several questions.  The first of which is

2 No. 12.

3          Sir, that question just to refresh our memories was

4 whether you had ever served as a juror in criminal or civil

5 case or as part of a grand jury in either federal, state or

6 county court.  You answered yes.

7          JUROR NO. 66:  Yes.  Westmoreland County civil.

8 There was a gentleman got left go, got fired from his company,

9 he was 60 years old.  He had age discrimination because they

10 fired him.  Then they hired two other guys to take his spot at

11 less -- about half of what his salary was.

12          THE COURT:  Were you actually picked for the jury?

13          JUROR NO. 66:  Yes.

14          THE COURT:  Case went to trial?

15          JUROR NO. 66:  Yes.

16          THE COURT:  Did it go all the way until the jury

17 having to deliberate?

18          JUROR NO. 66:  No.

19          THE COURT:  It didn't.  It ended short?

20          JUROR NO. 66:  It ended short because the owner of

21 the company came in the one day and that was the day that one

22 of the gentlemen that they hired was explaining what he was

23 doing and he talked to the lawyers and next thing you know,

24 they disappeared, the Judge disappeared.  An hour later they

25 came out and said, we're done.  We thank you for your duty.

1          THE COURT:  Was anyone even picked as a foreperson

2 or foreman?

3          JUROR NO. 66:  No.

4          THE COURT:  Is that the only time you have been on

5 any type of jury?

6          JUROR NO. 66:  That was the only time.  The other

7 two times I went down there --

8          THE COURT:  About how long ago was this trial where

9 you were picked?

10         JUROR NO. 66:  About six, seven years.

11         THE COURT:  Was there anything at all about that

12 process, being on a jury, how you were picked, lawyers, judges,

13 courthouse people, being in court, the system as a whole,

14 anything about that that left a bad taste in your mouth?

15         JUROR NO. 66:  No.

16         THE COURT:  If you were picked for this jury, would

17 you be able to render a verdict in this case based only on the

18 evidence you heard here in this courtroom and the instructions

19 I gave in this case?

20         JUROR NO. 66:  Yes.

21         THE COURT:  Nothing from the prior time would carry

22 over?

23         JUROR NO. 66:  No.

24         THE COURT:  Now, the next question you answered yes

25 to was No. 15.  That asks whether you or anybody in your

immediate family has ever been employed or sought to be

employed by the federal government, other than the military, or

by any state, local, county or federal law enforcement agency

or court in a paid or volunteer capacity?

JUROR NO. 66:  My brother-in-law was for 32 years in

the -- between the state -- he started out in Washington Police

Department, then he came to Pennsylvania, and he ended up in

the Pennsylvania Bureau of Investigation, PBI, for his last 20

years.

THE COURT:  Is he now retired?

JUROR NO. 66:  He retired, then he had a bad

motorcycle accident and he died two years later.  It was about

five years ago.

THE COURT:  So it was about seven years ago then

that his work in that area ended?

JUROR NO. 66:  Yes.

THE COURT:  Was that situation the only reason you

answered yes to this question?

JUROR NO. 66:  Yes.

THE COURT:  Now, was there anything about his

service or the work that he did that you think would get in the

way of you judging this case based only on the evidence in our

courtroom and the instructions I give?

JUROR NO. 66:  No.  Because he was tight mouthed

about everything.  He didn't say anything, even to his wife.

1              THE COURT:  Is there anything about his service in

2 law enforcement that you think gives you a point of view, pro

3 or con, on people that are in law enforcement or people that

4 are charged with crimes?

5              JUROR NO. 66:  No.

6              THE COURT:  Now, the next question you answered yes

7 to was 38.  It asks whether you or anybody in your family owns

8 or possesses a firearm or ammunition, if so, what kind and for

9 what purpose?

10             JUROR NO. 66:  I have a British 303.  That's my deer

11 gun.  I have a 12-gauge shotgun.  I got a 22 Remington rifle,

12 and I have a BB pistol.  I live out in the country.  So, I get

13 to use it.

14             THE COURT:  What do you use the BB pistol for?

15             JUROR NO. 66:  Chipmunks.

16             THE COURT:  Do you have a concealed carry permit?

17             JUROR NO. 66:  No.

18             THE COURT:  Have you ever used any of those firearms

19 that you've described or any other firearms for any purpose

20 other than hunting or target practice?

21             JUROR NO. 66:  No.

22             THE COURT:  Was there any other ownership of

23 firearms in your family that caused you to answer yes to that

24 question?

25             JUROR NO. 66:  No.  I'm the only one out of all the

1 five kids that took up hunting.

2        THE COURT:  Mr. Sindler, any follow-up?

3        MR. SINDLER:  As you can imagine, there are going to

4 be several police officers or law enforcement types testifying

5 in this case.  Your relationship with your former or late

6 brother-in-law, you're saying will have no influence whatsoever

7 in how you view this case?

8        JUROR NO. 66:  Right.

9        MR. SINDLER:  That's all I have.

10        THE COURT:  Mr. Ortiz and Ms. King?

11        MS. KING:  No questions.

12        MR. ORTIZ:  No.

13        THE COURT:  Sir, thank you very much.

14     (Juror No. 66 exits chambers.)

15        THE COURT:  Mr. Ortiz and Ms. King, anything on

16 cause with 66?

17        MS. KING:  No, Your Honor.

18        MR. ORTIZ:  No.

19        THE COURT:  Mr. Sindler?

20        MR. SINDLER:  No.

21        THE COURT:  66 is in.  That's 20.

22        No. 15 who is the last one on my sheet, had one yes

23 to No. 12.  How about we do him?

24     (Juror No. 15 exits chambers.)

25        THE COURT:  We have Juror 15 with us.  He gave a yes

1  answer to one question.

2          That question was No. 12.  It asks, sir, have you

3  ever been a juror in a criminal case, a civil case or a grand

4  jury and state, federal or county court?

5          JUROR NO. 15:  Right.

6          THE COURT:  Tell us what you knew.

7          JUROR NO. 15:  It was approximately -- sometime ago,

8  about 20 years ago.  County, Beaver County.  The case involved

9  AN insurance company against someone for a settlement.

10         THE COURT:  Did the case actually go to trial?

11         JUROR NO. 15:  Yes.

12         THE COURT:  Were you actually picked to be on the

13  jury?

14         JUROR NO. 15:  Yes.

15         THE COURT:  Did it go all the way through so the

16  jury had to deliberate?

17         JUROR NO. 15:  Yes.

18         THE COURT:  Did it reach a verdict?

19         JUROR NO. 15:  Yes.

20         THE COURT:  Were you the foreperson on the jury?

21         JUROR NO. 15:  No.

22         THE COURT:  That's the only time you have been a

23  juror?

24         JUROR NO. 15:  Yes.

25         THE COURT:  Was there anything in any way, shape or

1  form about that experience that left a bad taste in your mouth

2  toward being on a jury, the jury system, the court system,

3  lawyers, parties to litigation, court personnel, anything at

4  all that left you with a negative sense of things?

5              JUROR NO. 15:  No, there was not.

6              THE COURT:  Anything that you found uncomfortable or

7  disquieting about that service as a juror?

8              JUROR NO. 15:  No.

9              THE COURT:  You sat through that trial as a juror.

10 If you're picked in this case to be on the jury, do you

11 believe -- was there anything that would get in the way of you

12 rendering a verdict in this case based only on the evidence

13 presented in this case and the instructions I give in this

14 case, putting aside everything that happened at that trial?

15             JUROR NO. 15:  No, there would not be.

16             THE COURT:  You would be able to do that?

17             JUROR NO. 15:  Yes.

18             THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

19             MS. KING:  No, Your Honor.

20             MR. ORTIZ:  No, Your Honor.

21             THE COURT:  Mr. Sindler?

22             MR. SINDLER:  No.

23             THE COURT:  Thank you very much for coming in.

24        (Juror No. 15 exits chambers.)

25             THE COURT:  Mr. Sindler, anything for cause on this

 1 juror?

 2            MR. SINDLER:  No.

 3            THE COURT:  Mr. Ortiz and Ms. King?

 4            MS. KING:  No.

 5            MR. ORTIZ:  No.

 6            THE COURT:  15 is in.

 7            Why don't we take a moment and recap.

 8            My notes show that the following jurors are in the

 9 pool: 38, 7, 28, 5, 34, 16, 47, 24.

10            There is a pending cause challenge on 57.

11            8, 27, 20.

12            56 has been stricken.

13            13 has been stricken.

14            52 is in.

15            53, 21, 41.

16            10 has been stricken.

17            48 is in.

18            54 is in.

19            50 is in.

20            66 is in.

21            15 is in.

22            I made a mistake, I believe 56 is in as Juror No.

23 12, so they're in.

24            The ones that are stricken -- 57 has a pending cause

25 challenge, so I'm not counting that juror in the pool at the

moment.  13 was stricken, based on the letter and the

information that was brought to the Court's and counsel's

attention.  10 has been stricken for cause.

Balance of the jurors that we've interviewed are in the pool, leaving us with 21 in the pool, 11 to go.

MS. KING:  I agree with that.  I just wanted to bring to the Court's attention, I think I recall seeing Juror No. 10 after she was stricken still here in the hallway, which is fine, but she should be just alerted she doesn't have to come back tomorrow.

MR. BABIK:  When I took her out in the hallway, she was crying pretty badly.  I let her go down to the restroom.  I didn't know she was stricken yet at that point.  When I came back in, that's when I learned she was stricken.  I went back out to check, she still wasn't back yet.  So after the break I went back out, she was finally back, so I didn't dismiss her until after our break.

THE COURT:  Has she been sent home?

MR. BABIK:  I sent her back to the jury assembly room to let them know she has been dismissed from our selection and she's in their hands at that point.

THE COURT:  Does anyone need anything further on the record about Juror No. 10?

MR. SINDLER:  No.

THE COURT:  I have 4:40.  Based on our prior

1 discussion, I think this would be an appropriate time to

2 suspend the jury selection process.

3          Do you concur, Mr. Sindler?

4          MR. SINDLER:  I do.

5          THE COURT:  Mr. Ortiz and Ms. King?

6          MS. KING:  Yes.

7          MR. ORTIZ:  Yes.

8          THE COURT:  It would be my intention to have

9 Mr. Babik return to the courtroom and have him tell the jurors

10 they're to return tomorrow and to be available.

11          Do you want to start here?

12          Marshals, what time would Mr. Warren be available?

13          THE MARSHALL:  They have requested to have him

14 brought over at 8:00 a.m.  Unfortunately, this morning, they

15 had to make two trips.  They had to bring the female

16 separately, they brought the female first and then the male

17 prisoners.  So if all goes well, we will be here by eight.

18          THE COURT:  Do you want to start at nine or

19 nine-thirty tomorrow, counsel?

20          MS. KING:  I prefer nine.

21          MR. SINDLER:  Nine is preferable.

22          THE COURT:  That's consistent with when jurors are

23 normally told to be here.

24          If we can have them in our courtroom at 8:45.

25          My thought would be we'll begin exactly as we did

1  here, Mr. Warren and counsel will come directly back here,

2  unless there's something you want to do in open court

3  beforehand or think we need to do.

4         Mr. Ortiz and Ms. King, any reason we need to

5  convene in the courtroom?

6         I want to make sure Mr. Warren is here first and we

7  don't let the jury in before that.

8         MS. KING:  We do want to resolve the stipulation

9  issues and it might be best to do that either right now after

10  the jury is dismissed or in the morning before selection

11  begins.

12         THE COURT:  Obviously, if we're doing that in the

13  courtroom --

14         MR. ORTIZ:  Judge, I think, if I may, to the extent

15  we need to make a record of anything, I think we can certainly

16  do it here, with your permission.  We brought the records that

17  we referenced in court to show Mr. Sindler, so presumably

18  things can be worked out.

19         THE COURT:  Mr. Sindler, how do you want to handle

20  the morning, resume right back in here?

21         MR. SINDLER:  Sure.

22         THE COURT:  Does anyone have any objection if the

23  Court does not retake the bench, instructs his clerk,

24  Mr. Babik, to instruct the jury that we're recessing for the

25  day and that everybody that has not been stricken is to report

1 back directly to this courtroom at 8:45 tomorrow morning with

2 the anticipation that we would start back here at 9:00 a.m.

3              Mr. Sindler, does that work for you?

4              MR. SINDLER:  That's fine.

5              Are you telling them to take the seats they were

6 taking today?  Does that matter?

7              THE COURT:  Now that we know what order we're taking

8 them in, I don't know that they specifically need -- are they

9 seated still next to each other?

10             MR. BABIK:  They're kind of standing around at this

11 point.

12             MR. SINDLER:  It doesn't matter.

13             THE COURT:  We know the order they were in.

14             Mr. Ortiz, does that plan work for you and Ms. King?

15             MR. ORTIZ:  Yes.

16             THE COURT:  We'll resume in the morning.

17             Ms. King, we're now done with jury selection for

18 today.  Ms. King and Mr. Ortiz, are there any other matters you

19 want to bring to the Court's attention?

20             MS. KING:  We did indicate earlier we had the

21 certified copy of the defendant's conviction.  I'll just point

22 out for the record that this was provided with the Rule 16

23 materials at the beginning of this case.  I have just one copy,

24 this is the only certified copy that I have.  And it's from

25 Baltimore, which is why it looks different than the records we

1 are used to here.

2          MR. SINDLER:  It may have been provided.  I just

3 wasn't here at the beginning of the case, so it was one thing

4 that may not have made it from Mr. Shoemaker because he was

5 somewhat cooperative, but I don't recall seeing this before.

6          MS. KING:  If I can be helpful, I can explain what

7 you're looking at.

8          MR. SINDLER:  I have a sense of it.

9          THE COURT:  Is this one of these things where one

10 person with the seal certifies somebody else that has a seal

11 who certifies somebody else that has a seal?

12          MS. KING:  There were three victims in this case, so

13 it was three individual case numbers, but we are treating it

14 essentially as the same case.

15          MR. SINDLER:  If I can have a moment to speak with

16 Mr. Warren, and then I don't need it right now, if I can get

17 copies because I don't have them.

18          MS. KING:  I can e-mail it to you today.

19          MR. SINDLER:  Should we do it in the anteroom?

20          THE COURT:  Whatever is fine with the marshals.

21          THE MARSHAL:  It is much easier than going anywhere

22 else.

23          THE COURT:  If it's good with all of you, it's good

24 with the Court.

25          (Defendant exits chambers with Mr. Sindler.)

1          (Whereupon, there was a brief pause in the proceedings.)

2               THE COURT:  Mr. Warren is back along with his

3   lawyer, Mr. Sindler.

4               While you were out, there was no discussion

5   regarding the case.  There were several questions from

6   Mr. Ortiz about several of the photographs in the Court's

7   office which I explained their origin.

8               Mr. Sindler.

9               MR. SINDLER:  Mr. Warren and I have discussed the

10  material concerning the stipulation with regard to the prior

11  conviction.  We're okay or we're consenting to the government's

12  stipulation, our stipulation with respect to not having to go

13  down the road of using this material that Ms. King has shown me

14  just moments ago.  So, that's where we are on the record.  I'm

15  okay with the stipulation as it was created.  I don't know if

16  you're familiar with it.

17              THE COURT:  I heard Ms. King read it in court this

18  morning.

19              MS. KING:  I have a copy.

20              MR. SINDLER:  Mine is out there on the table, so I

21  don't have it here in chambers.

22              So, Judge, what you have in front of you, although

23  it's not marked, this is the joint stipulation material that

24  Ms. King provided me earlier this month.  If your attention is

25  focused upon Paragraph No. 1, that's where we are.

1          So, we're okay with that stipulation, in addition to

2    what is No. 2.  But No. 2 was something that we talked about

3    earlier today on the record.  So we're not talking right now

4    about that.  That has been resolved, as I understand it.

5          THE COURT:  So as I understand it, at an appropriate

6    juncture in the case, the joint stipulations that is, the

7    content of Paragraph 1 and the content of Paragraph 2, not the

8    introductory paragraph, the content of No. 1 and the content of

9    No. 2 would be read to the jury as a stipulation?

10          MS. KING:  Yes, Your Honor.

11          THE COURT:  The Court would instruct the jury that a

12    stipulation means that no further evidence is required of the

13    matter set forth in the stipulation.  The jury at all times

14    remains the judge of the facts and they are -- it's their

15    responsibility and their responsibility alone to determine what

16    the facts are, even the facts that have been stipulated to.

17          MR. SINDLER:  That's fine.  But as, unfortunately, a

18    caveat, we still have to decide a jury instruction, which I

19    think follows from 4.06 of the Third Circuit Model Criminal

20    Jury Instructions that Ms. King wants to have read into the

21    record or have you read as part of that.  So, even though I'm

22    agreeing to this stipulation, and I am, there's still a jury

23    instruction out there that I also don't have in front of me

24    right now --

25          THE COURT:  That we need to resolve.

1              MR. SINDLER:  That is still pending.  That's all I'm

2  saying.

3              THE COURT:  All I ask is counsel confer with each

4  other as to the time, the juncture in the trial when the

5  stipulation would be read, and if there is an instruction you

6  would like me to give the jury at the time of the stipulation

7  is read as to what a stipulation is.  I'm happy to do that or

8  not.

9              In civil trials and I think in one criminal trial

10 when there was a stipulation read, I gave a brief definitional

11 statement to the jury that parrots what is in the opening

12 instructions that I'll be giving tomorrow.

13             Does that work for you, Mr. Sindler?

14             MR. SINDLER:  Yes.

15             THE COURT:  Counsel confers as to the juncture when

16 this will happen.

17             Ms. King and Mr. Ortiz, anything else we should take

18 care of today?

19             MR. ORTIZ:  No, Your Honor.

20             MS. KING:  No, Your Honor.

21             THE COURT:  Mr. Sindler, anything you think we

22 should take care of today?

23             MR. SINDLER:  No.

24             THE COURT:  Now, let's talk a little scheduling of

25 the day tomorrow.  Once we get the jury selected and sworn,

1  we'll see what time it is, but my thought would be once that

2  occurs, unless it's the natural time for lunch, and I'm not

3  saying it will take that long, but unless it's the time for the

4  lunch break, I would give a jury recess, I would give them the

5  admonition about not discussing and not researching, have Brian

6  take them up to the jury room, let them be familiar with where

7  it is and the set up there and the process of going up there.

8  That would also give counsel some time to get themselves

9  organized in the courtroom so we could proceed with the opening

10  statements.

11             Does that make sense to you, Mr. Ortiz and Ms. King?

12             MS. KING:  Yes.

13             THE COURT:  Does that work for you, Mr. Sindler?

14             MR. SINDLER:  Sounds good.

15             THE COURT:  Is there anything other than the oral

16  presentation of a lawyer that is going to be used during

17  anyone's opening statement?

18             MR. ORTIZ:  I would check with the marshals that are

19  in the courtroom at the time, but there's a chance I may

20  display the firearm.

21             THE COURT:  It will be cleared and wired and all

22  that stuff?

23             MR. ORTIZ:  Absolutely.

24             THE COURT:  Other than that, is there anything other

25  than your oral statements to the jury and the possibility of

1  displaying the firearm that you intend on using in your

2  opening, Mr. Ortiz?

3          MR. ORTIZ:  No.

4          THE COURT:  Mr. Sindler?

5          MR. SINDLER:  No.

6          THE COURT:  I do not place time limits on opening

7  statements or closing arguments as long as they're within

8  reason and are not duplicative and don't change the drift from

9  opening statement to closing argument or the closing argument

10 gets repetitive.  That's not an invitation to make it a

11 marathon, I don't think either of you will, but I also want you

12 to know I intend on letting you do your job in your opening

13 statement.

14          Mr. Sindler, it's your current intention to deliver

15 your opening statement immediately on conclusion of Mr. Ortiz?

16          MR. SINDLER:  Yes.

17          THE COURT:  If that changes, let Mr. Ortiz know.

18          Anything else, we should take up?

19          MR. SINDLER:  No.

20          THE COURT:  Mr. Greer, would you please go out and

21 make sure that the doorways into the courtroom and that area

22 are closed and secured and cleared and then alert the marshals

23 that has been accomplished.

24          Ms. King, if you want authority, you can file this

25 joint stipulation under seal without the need for redaction so

1   that it has an ECF number when we're referring to it.  It would

2   be unsealed once it has been read into the record, but I don't

3   know who has Pacer accounts, so that's why things like this, I

4   authorize to be sealed until they come live in open court.

5              Is that agreeable with you, Ms. King?

6              MS. KING:  Yes, Your Honor.

7              THE COURT:  Does that work for you, Mr. Sindler?

8              MR. SINDLER:  That's fine.

9              MS. KING:  I don't think that can happen today.

10             THE COURT:  I'm thinking to get an ECF number on it.

11             MR. ORTIZ:  The clerk's office might tell us we need

12  an order from you to file it under seal.

13             THE COURT:  I have given you a signed order that

14  authorizes you to file this under seal without the need for

15  redaction.  You can show that to whoever needs to see it.  Then

16  you have the order.

17             Anything else we need to put on the record,

18  Mr. Ortiz and Ms. King?

19             MS. KING:  No, Your Honor.

20             THE COURT:  Mr. Sindler?

21             MR. SINDLER:  No.

22             THE COURT:  That will conclude the proceedings for

23  today, Monday, October 26th.

24             The marshals can assist Mr. Warren.

25             Mr. Warren, we'll see you tomorrow.

1        (Court adjourned.)

2

3                              CERTIFICATE

4

5        I, Juliann A. Kienzle, certify that the foregoing is
a correct transcript from the record of proceedings in the
6  above-titled matter.

7

s/Juliann A. Kienzle, RMR, CRR
8  _____
Juliann A. Kienzle, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25