```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     UNITED STATES OF AMERICA,

4        vs.
                                    Criminal No. 13-270
5     ATIBA WARREN,
                     Defendant.
6

7

           Transcript of Jury Trial Proceedings on Tuesday, October
8  27, 2015, United States District Court, Pittsburgh,
   Pennsylvania, before Mark R. Hornak, District Judge.
9

10
   APPEARANCES:
11
      For the Government:          Katherine A. King, Esq.
12                                 Jonathan B. Ortiz, Esq.
                                   Assistant U.S. Attorney
13                                 400 US Courthouse
                                   700 Grant Street
14                                 Pittsburgh, PA 15219

15
      For the Defendant:          Mark A. Sindler, Esq.
16                                 310 Grant Street
                                   Suite 2330 Grant Building
17                                 Pittsburgh, PA  15219

18

19

20
   Court Reporter:               Juliann A. Kienzle, RMR, CRR
21                                5300 U.S. Courthouse
                                  700 Grant Street
22                                Pittsburgh, PA 15219
                                  (412) 261-6122
23

24
           Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.
```

1  (Proceedings held in open court; Tuesday, October 27, 2015.)

2          THE COURT:  We're here in case of the United States

3  of America versus Atiba Warren, pending on the docket at

4  13-CR-270.

5          Present in chambers for the continuation of

6  individual voir dire and jury selection are Mr. Warren, his

7  lawyer, Mr. Sindler; Ms. King and Mr. Ortiz for the United

8  States; my law clerk, Mr. Greer; my courtroom deputy Mr. Babik;

9  and two representatives of the United States Marshal Service.

10          I advised counsel that this morning we received two

11 phone calls from jurors and we have one attendance note to

12 make.

13          First, Juror No. 21 has not yet appeared this

14 morning.

15          MR. BABIK:  That's correct, Your Honor.

16          THE COURT:  We'll keep an eye out, keep you posted.

17          Secondly, Juror No. 14 called to indicate that she

18 fell this morning at home or on the way in.  Would not be able

19 to make it today.

20          Is that correct?

21          MR. BABIK:  That is correct, Judge.

22          THE COURT:  You may recall No. 14 was a woman who

23 sat on the aisle in the last row on the right-hand side who

24 appeared to use a silver cane to assist in walking.

25          We then also received a phone call, Ms. Dressler

1  took it from Juror No. 57 who indicated she had made

2  arrangements for child care for her 11-year-old and would be

3  here today.

4          Is that correct, Mr. Babik?

5          MR. BABIK:  That's correct.  She was out there when

6  I took role.

7          THE COURT:  First, we'll keep an eye out for Juror

8  No. 21 who made it into the pool yesterday.

9          We'll keep going until we get 32, irrespective of

10  Juror 57 as to which there's a pending cause challenge that the

11  Court has taken under advisement.

12          If No. 21 is here when we get to 32 without the

13  necessity of No. 57, then we'll know we have 32 in the pool.

14  If 21 is not here, then we'll keep going until we get 32 in the

15  pool.

16          Then I'll bring 57 back and ask her to put on the

17  record whatever arrangements she's made relative to her child

18  care since that was at least part of the cause challenge.

19          So, at that point, Mr. Sindler, you'll have an

20  opportunity outside the presence of Juror 57 to either stick by

21  your cause challenge, and I'll rule on it if you do, or you may

22  be satisfied that you don't want to make the cause challenge in

23  which case we would lop off the last person who would have

24  otherwise become Juror No. 33.

25          If we do it that way, is that okay with you,

1  Mr. Sindler?

2           MR. SINDLER:  Sure.

3           THE COURT:  Is that okay with you, Ms. King and

4  Mr. Ortiz?

5           MS. KING:  Yes.

6           THE COURT:  So the next person it would appear we

7  would be bringing back would be Juror 29.

8           MS. KING:  Your Honor, before we bring anybody back,

9  I was doing a little Googling last night of the jurors and

10  found two issues that I'd like to bring to everyone's

11  attention.

12           In Question No. 17, the Court had asked the

13  prospective jurors if they had ever been convicted of a crime

14  or charged with a crime or arrested.

15           THE COURT:  Or anybody in their immediate family.

16           MS. KING:  Or anybody in their immediate family.

17           With respect to two of the jurors, on the Allegheny

18  County, I will call it the Court of Common Pleas website, but

19  it's for the entire State of Pennsylvania, you can just search

20  people by name.  I found two, what I believe two of the

21  prospective jurors who did not answer yes to any questions

22  were, in fact, arrested.  One of them I believe the charges

23  were withdrawn, and the other one I think, I believe was

24  sentenced to a period of 60 days of probation.  Both for

25  possession of marijuana-type offences, which are criminal

1  offenses.  So I wanted to bring that to everyone's attention.

2  I don't know what the Court would like to do about that, but I

3  printed off the copies of the Court of Common Pleas docket

4  sheets with respect to those two individuals.

5          THE COURT:  Well, let's take it one step at a time.

6  What does the United States think the Court should do about it,

7  if anything?  Then we'll ask Mr. Sindler the same question.

8          MS. KING:  Well, I do think that by not answering

9  yes, both of those jurors did not answer truthfully that

10  question.  So I think that the Court and the parties should be

11  able to question them about that.

12          I think that's really it for now.

13          THE COURT:  Mr. Sindler, what do you think?

14          MR. SINDLER:  In part, I'm not surprised.  As I

15  brought up to the Court's attention yesterday with respect to

16  Question 8, I think some of these questions have left the

17  jurors less than open about standing up because some of these

18  questions can lead to some embarrassing situations, at least in

19  their own minds.  I don't know, though, which of the people --

20  if these two people have already been questioned or if they're

21  about to be.

22          MS. KING:  They have not been questioned because

23  they did not answer yes to any questions.

24          THE COURT:  Were they ones we put in the pool

25  yesterday without bringing back because they had not answered

1  yes to any question?

2          MS. KING:  That's correct.  So, they are Juror No.

3  5, who is the fourth person, the Vanessa Smith, and Juror No.

4  8, who is the Brandon Pelesky.

5          MR. SINDLER:  We have not gotten to those people.

6          THE COURT:  They were people yesterday that we would

7  have gotten to, but they had no yes answers so we didn't bring

8  them back.  So I simply said to counsel and Mr. Warren

9  yesterday, do you nonetheless have any cause issues that we

10 should bring them back to explore, or was there anything about

11 what they said in the courtroom that you would like to explore

12 back here further?

13         MR. SINDLER:  The next question I would have, or

14 just observation, rather, is given that at least one of the

15 names is rather common, I don't want to say it on the record,

16 how do we know that it's the same person or persons about whom

17 Ms. King is talking?

18         MS. KING:  I did go back and look at my notes for

19 both of those people.  As you probably know, the docket sheets

20 for magistrate in Common Pleas court provide the date of birth

21 for the person, and so for both of these individuals, the age

22 is correct, and for both of them, they both said that they

23 lived, one in McDonald and the other in Sewickley, and those

24 addresses line up with what is on these sheets.  So beyond

25 that, I do not have proof that this is the same person.

 1              MR. ORTIZ:  To take it even further for Mr. Pelesky,

 2  according to the roster that is provided by the Court, it's

 3  Brandon J. Pelesky and the printout for that particular person

 4  from the magistrate court is Brandon John Pelesky.  With the

 5  residence, town, the age, and the name all matching up, it

 6  seems --

 7              THE COURT:  So there is indicia of congruence, not

 8  certainty, but indicia of congruence.

 9              MS. KING:  Yes.

10              MR. SINDLER:  There is enough here to ask both

11  people about this issue.  But it also causes me concern with

12  respect to the more sensitive question, one of which I brought

13  up yesterday.  I don't have a solution, by the way, as to that

14  because I get the sense that this panel in some respects has

15  not been entirely forthright, not that they're lying, not that

16  they're being deceptive but because certain questions raise

17  potentially in their minds embarrassing consequences, they

18  stand down.  So I'm not surprised that this has come up.

19              THE COURT:  On that question, one of the reasons I

20  combine it with not only you but also members of your immediate

21  family is that you have a cover if you stand up.

22              MR. SINDLER:  You feel more comfortable standing

23  when someone stands before you or stands as you do.

24              THE COURT:  That may be true.

25              MS. KING:  I will note --

 1              THE COURT:  Also to the pool, it's not to the other

 2    folks sitting in the courtroom when you stand to that question,

 3    it's not clear, are you standing because of yourself or

 4    standing because of a family member?

 5              MS. KING:  Numerous people did stand for this

 6    question.  I think if you'll recall, this was part of your

 7    concern, two people stood and then several other people stood.

 8              THE COURT:  I will say that the question Mr. Sindler

 9    asked that we re-ask yesterday and that I asked in conjunction

10    with two other questions, my recollection was there were at

11    least two individuals who stood the second time around.

12              MR. SINDLER:  Yes, 72 and 75.

13              THE COURT:  Seated on my left-hand side your

14    right-hand side, which made it logical to re-ask the question.

15              I think actually as to at least one of the other

16    what I'll call cover questions that I selected, I think there

17    were one or two people that stood that hadn't stood the

18    previous time, even though they were rather -- I tried to

19    select rather innocuous, run-of-the-mill questions as to those.

20              So, why don't we do this.  Let's keep on going.  I

21    think in some ways, given that we are going to bring 57 back

22    and she was back here yesterday, anyway, then we can bring

23    those folks back as part of that process at the end.  And then

24    both counsel will have an opportunity to explore that, and that

25    will give me time to think about what it is I want to ask them

1  and clear those questions with each of you before I do that,

2  along with hearing from you, Mr. Sindler, and Ms. King and

3  Mr. Ortiz, if there are further follow-up questions as to those

4  people you would like me to ask.

5             If we do it that way, does that work for the United

6  States?

7             MS. KING:  Yes, Your Honor.

8             THE COURT:  If we do it that way, does that work for

9  you, Mr. Sindler?

10            MR. SINDLER:  Sure.

11            THE COURT:  Anything else we should bring up before

12 we bring Juror 29 back?

13            MS. KING:  No, Your Honor.

14            THE COURT:  Mr. Sindler, anything else you'd like to

15 take up on Mr. Warren's behalf before we bring Juror No. 29

16 back.

17            MR. SINDLER:  No.

18         (Juror No. 29 enters chambers.)

19            THE COURT:  Counsel, we have Juror 29 with us.  When

20 we were together yesterday, she answered yes to Questions 10,

21 15, 18, 21, 32, and 38.

22            So we've asked her to come back for some follow-up.

23            Question No. 10, stated as follows:  This trial is

24 estimated to take several days to present the witness

25 testimony, evidence, and arguments of counsel.  However, this

1  is realistically just our best estimate of the trial time.

2  Also, the jury deliberation room is up one flight of stairs

3  from the courtroom which must be traveled several times a day.

4  And I asked if there was any legitimate, justifiable hardship,

5  reason, personal, professional business that would provide that

6  the juror could not serve for the duration of the trial.

7           You answered yes, ma'am.

8           JUROR NO. 29:  Well, No. 1, I have asthma, so I

9  really can't be running up and down stairs.  I was wondering if

10 I could take an elevator if that was possible.

11          Two, I am just a waitress, so I don't have like a

12 paycheck coming or anything.  If I'm out of work for that long,

13 I'm not going to be able to pay my bills.  And I take care of

14 my sister, too, so I'm responsible for her.

15          THE COURT:  When you say take care of your sister?

16          JUROR NO. 29:  She's disabled.  She has spina

17 bifida.  She's 21.  She lives with me, but she can't get around

18 on her own.  She can't work, so I have to take care of her as

19 far as food and everything like that.

20          THE COURT:  Is it just the two of you that live

21 together?

22          JUROR NO. 29:  Yes.

23          THE COURT:  When you say take care of her with food,

24 and those things, does that mean buy it, prepare it?

25          JUROR NO. 29:  She can get around in our house and

1  cook for herself, but I have to do the shopping, make sure the

2  water bill is paid, stuff like that.

3           THE COURT:  Whether you're at work or whether you're

4  here, is your sister home by herself?

5           JUROR NO. 29:  Yes.

6           THE COURT:  Any other reasons you answered yes to

7  Question No. 10?

8           JUROR NO. 29:  That's all.

9           THE COURT:  The next one you answered yes to was

10 No. 15.  It was whether you or anyone in your immediate family

11 had ever been employed or sought to be employed by the federal

12 government, other than the military or any state, local, county

13 or federal law enforcement agency or court as a paid or

14 volunteer person.

15          JUROR NO. 29:  I wasn't really sure if I answered

16 this correctly, but my aunt does work for city council.

17          THE COURT:  Here in Pittsburgh?

18          JUROR NO. 29:  Yes.

19          THE COURT:  Do you know what she does?

20          JUROR NO. 29:  She's the chief of staff for Theresa

21 Smith.

22          THE COURT:  Then you answered yes to Question 18,

23 which asked whether you or anyone in your immediate family had

24 ever been the victim of a crime.

25          JUROR NO. 29:  Yes.

1            THE COURT:  Your answer was.

2            JUROR NO. 29:  About five years ago I -- my

3  boyfriend physically assaulted me.  I had to go to court for

4  that.

5            THE COURT:  Were the police involved in that

6  situation?

7            JUROR NO. 29:  Yes.

8            THE COURT:  Did you call them?

9            JUROR NO. 29:  Yes.

10            THE COURT:  Was your boyfriend placed under arrest?

11            JUROR NO. 29:  Yes.

12            THE COURT:  In custody?

13            JUROR NO. 29:  Yes.

14            THE COURT:  Did you get a PFA.

15            JUROR NO. 29:  I tried and the judge declined it.

16            THE COURT:  So what happened when you went to court?

17            JUROR NO. 29:  It was at Dennis Joyce's office.  I

18  dropped the charge because he initially stole my car and

19  then --

20            THE COURT:  Your boyfriend?

21            JUROR NO. 29:  Yes, then he came back and we got

22  into an altercation and the cops got called and he got

23  arrested, then a couple months later I said, I just want you to

24  leave me alone, I'll drop the charges, leave me alone, since

25  they wouldn't give me a PFA, that's it.

1          THE COURT:  Did he leave you alone?

2          JUROR NO. 29:  Yes.

3          THE COURT:  Was there anything at all about that

4   whole episode and process that caused you to have a point of

5   view, of any type, toward the legal system, the court system,

6   lawyers, defense lawyers, prosecution lawyers, police officers,

7   judges, bailiffs, anything about that?

8          JUROR NO. 29:  Yes.  I was a little upset with the

9   police officers because he was a drug addict and they kind of

10  treated me kind of crappy because I was dating a drug addict.

11  You can't help who you love, but they were not very nice to me.

12  The judge made it kind of cold for me, made me feel bad about

13  my situation, so I was a little bent out of shape about that,

14  but that's it.

15         THE COURT:  Let me ask you this.  Is there anything

16  about all you've explained just now and in answer to the

17  question that you think would impact in any way, shape or form

18  your ability if you were picked as a juror to judge this case

19  as a juror based only on the evidence you hear in this

20  courtroom, in this trial, and the instructions that I give you?

21         JUROR NO. 29:  I don't think that would really make

22  an effect on my judgment.  That's my personal feelings, but I

23  don't think I would -- every situation is different.

24         THE COURT:  So you believe in this case, you could

25  base a decision only on the evidence in this trial and the

1  instructions I give?

2          JUROR NO. 29:  Yes.

3          THE COURT:  Then we had Question No. 21, which asked

4  if you or anybody in your immediate family had ever been

5  employed as a firefighter or affiliated with any fire

6  department?

7          JUROR NO. 29:  It's actually my stepbrother, my step

8  dad's son, he's a volunteer firefighter for Crafton.

9          THE COURT:  Crafton Borough?

10          JUROR NO. 29:  Yes.

11          THE COURT:  Do you know about how long he has done

12  that?

13          JUROR NO. 29:  He started when he was 18, so maybe

14  like ten years now.

15          THE COURT:  Then you answered yes to Question 32.

16  Question 32 asked if you were representing the government or

17  the defendant in this case, is there any reason you would not

18  be content to have the case decided by you or somebody in your

19  frame of mind.

20          Why is that?

21          JUROR NO. 29:  Well, I'm not very educated and I

22  feel like if I was in trouble, I'd want someone with a good

23  education to be judging my future.  I'm also -- I'm really

24  don't have a lot of worldly experience, so I don't have a lot

25  of opinions to bring to the table.  I'm just a waitress, and

1  I'm kind of like really just concerned with getting to work and

2  making money, so I don't feel like I'm 100 percent -- I would

3  be 100 percent great candidate to judge myself.  I would be

4  upset if somebody like me was on my jury.

5             THE COURT:  Why would that be?

6             JUROR NO. 29:  Just because I feel like I'm -- maybe

7  I'm not that young, but I feel like I'm young and I'm kind of

8  like, okay, I need to work, I got to pay bills, and I got to

9  put myself through school.

10             THE COURT:  Are you going to school?

11             JUROR NO. 29:  I'm trying to get in school right now

12  because I had a little bit of college.

13             THE COURT:  Did you graduate high school?

14             JUROR NO. 29:  Yes.  I have my diploma.

15             THE COURT:  Where did you go to high school?

16             JUROR NO. 29:  Montour.

17             THE COURT:  You said you had a little bit of

18  college.  Tell me a little bit about that.

19             JUROR NO. 29:  I went to CCAC for a little bit, just

20  like liberal arts courses.

21             THE COURT:  Did you do okay?

22             JUROR NO. 29:  Yes.

23             THE COURT:  How much schooling did you get at CCAC?

24             JUROR NO. 29:  About a year, not even an

25  associate's, just a year.

1            THE COURT:  Is that the education you want to get

2 back into?

3            JUROR NO. 29:  Yes.

4            THE COURT:  Then you also answered yes to question

5 38, which asked whether you or anybody in your family owns or

6 possesses a firearm or ammunition, if so, what kind and for

7 what purpose.

8            JUROR NO. 29:  My dad is a sergeant major in the

9 Marines, so he has a lot of big guns, but usually we just -- he

10 has like his hunting rifles, that's what he has at the house is

11 his hunting rifles.  I don't know what kind they are, but

12 that's all he has.

13            THE COURT:  Have you ever used a firearm?

14            JUROR NO. 29:  Yes, a hunting rifle.  He also has a

15 .9 millimeter handgun that I have shot before and a .22

16 hand-rifle, but that's it, handguns.

17            THE COURT:  Is your stepfather currently active as a

18 sergeant major.

19            JUROR NO. 29:  He just retired.

20            THE COURT:  He did that for a considerable period of

21 time?

22            JUROR NO. 29:  Oh, yes, 40 years.

23            THE COURT:  Do you live with your stepfather?

24            JUROR NO. 29:  Yes.  He's like -- because my step

25 dad and my mom are not together anymore, so he's kind of like

1  in and out, but he's still my dad.

2           THE COURT:  How recently did you shoot one of his

3  hunting rifles or the .9 millimeter?

4           JUROR NO. 29:  It has been a while, maybe four

5  years.

6           THE COURT:  Do you have a concealed carry permit?

7           JUROR NO. 29:  No.

8           THE COURT:  Do you know whether your stepfather

9  does?

10          JUROR NO. 29:  I'm pretty sure he does.

11          THE COURT:  Do you know whether your stepfather has

12 ever used a firearm other than for hunting or target practice?

13          JUROR NO. 29:  No.

14          THE COURT:  Mr. Sindler, do you have any follow-up

15 questions?

16          MR. SINDLER:  If you would learn that there was not

17 an elevator available to traverse the steps, would that be a

18 problem for you?

19          JUROR NO. 29:  I could make it work, I would just

20 have to take my time.  It's physically induced asthma, if I'm

21 running or fast walking, then I have to stop and use my inhaler

22 and take a break, but I could make it work.

23          MR. SINDLER:  There's a possibility that during

24 deliberations, the majority of the other jurors or perhaps all

25 the other jurors might be of a different point of view or

1  mindset than yours.  Would the concerns you brought to the

2  table today impact whether you would stick to your principles

3  or stick to your decision or be swayed by the others?

4          JUROR NO. 29:  That's a hard question because part

5  of me says, yeah, I just really need to get to work so I would

6  be, like, go with it, but part of me have would be like, you

7  have to do the right thing, you have to stick to your guns.  I

8  think I would probably just stick to what I believe in if I

9  really believed that, go with it.

10          MR. SINDLER:  I'm just reading your body language,

11  it seems like you're not sure.  I don't want to put words in

12  your mouth.  Are you certain of that?  Or you're somewhat

13  certain?

14          JUROR NO. 29:  I'm somewhat certain about that.

15          MR. SINDLER:  During the course of the trial, which

16  will take for purposes of testimony and looking at exhibits

17  maybe just a couple of days, would your attention be divided or

18  would it be focused upon the work at hand, which is, of

19  course --

20          JUROR NO. 29:  I'm pretty good at focusing, I would

21  be focused and attentive and pay attention because I want to

22  make sure I do it right and it gets done, so I think I would

23  be -- a couple of days, that's nothing.

24          MR. SINDLER:  That's all I have.

25          THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

1          MS. KING:  You work at Texas Roadhouse, when you go

2   to work, like if you were to work today, what would your hours

3   be?

4          JUROR NO. 29:  Usually I work lunch.  I'm only a

5   lunch sever, so I would be at work now until four or five.

6          MS. KING:  What time would you start normally?

7          JUROR NO. 29:  Like nine we open up the store.

8          MS. KING:  Nothing further.

9          THE COURT:  Thank you very much.

10      (Juror No. 29 exits chambers.)

11         THE COURT:  Mr.  Greer has passed me a note Juror 21

12  has arrived.

13         Any issues on Juror 29?

14         MR. SINDLER:  I move to strike her.

15         THE COURT:  The basis?

16         MR. SINDLER:  She seems uncertain about how she can

17  continue if deliberations reached a point where the task at

18  hand would then be competing with issues that she has, either

19  employment-wise or domestically with respect to taking care of

20  her own needs as well as that of her sister.

21         THE COURT:  Mr. Ortiz and Ms. King, any matters

22  regarding cause?

23         MS. KING:  We have no objection to that.

24         THE COURT:  I'll take that one under advisement.

25         Juror 19 is next.  Juror 19 responded yes to two

1 questions, 17 and 38.

2        (Juror No. 19 enters chambers.)

3            MR. BABIK:  Juror No. 19.

4            THE COURT:  Counsel, we have juror 19 with us.  She

5 responded yes to two questions, No. 17 and No. 38.

6            Just as a reminder, 17 asked whether you or any

7 member of your immediate family had ever been arrested, charged

8 with or convicted of a criminal offense.

9            JUROR NO. 19:  I said yes.

10            THE COURT:  You did.

11            JUROR NO. 19:  Yes.

12            THE COURT:  Can you tell us why.

13            JUROR NO. 19:  My daughter years ago, she got in

14 trouble for credit card fraud.  She was in her early 20s.

15 She's 44 now.  She didn't serve any time or anything, but she

16 had to make restitution and that was it.

17            THE COURT:  Do you know if she had to go to court

18 over all that?

19            JUROR NO. 19:  Yes, she did.

20            THE COURT:  Did you go to any of the court sessions

21 or proceedings?

22            JUROR NO. 19:  No, I didn't.

23            THE COURT:  Do you know if she had a lawyer at that

24 time?

25            JUROR NO. 19:  She had a lawyer, yes, she did.

1          THE COURT:  Did you have anything to do with

2 assisting her in finding the lawyer, compensating the lawyer?

3          JUROR NO. 19:  No, I didn't.

4          THE COURT:  Other than that, is there any other

5 reason you answered yes to No. 17?

6          JUROR NO. 19:  No, that was it.

7          THE COURT:  Does your daughter still live in the

8 Pittsburgh area?

9          JUROR NO. 19:  Yes, she does.

10          THE COURT:  Let me ask you this.  Is there anything

11 about that situation, anything at all that affected how you

12 view the legal system, the jury system, court system, lawyers,

13 whether they be prosecuting lawyers, defense lawyers, law

14 enforcement, judges, court personnel, anything at all about

15 that whole situation that you believe affects or colors your

16 view of our legal system and everybody that's in it?

17          JUROR NO. 19:  No, not at all.

18          THE COURT:  Is there anything at all about that

19 situation with your daughter that you think would in any way at

20 all get in the way of your ability to decide this case, if

21 you're selected, based only on the evidence that is presented

22 in this courtroom in this trial and the instructions that I

23 give you?

24          JUROR NO. 19:  No.

25          THE COURT:  Then Question 38, ma'am, asked whether

1  you or anybody in your family owned or possessed a firearm or

2  ammunition and if so, what kind and for what purpose?

3              JUROR NO. 19:  My husband has hunting guns.  He

4  hunts every year.  He has about four or five.  He got it from

5  his father when he passed away.

6              THE COURT:  Are these long guns with a long barrel

7  or handguns?

8              JUROR NO. 19:  They're long guns.  He does have a

9  handgun, though, but he has a permit for it.

10             THE COURT:  So he has a concealed carry permit.

11             JUROR NO. 19:  Yes.

12             THE COURT:  Let me ask you this.  Have you ever used

13  any of those firearms?

14             JUROR NO. 19:  No.

15             THE COURT:  Is your husband at all involved with or

16  affiliated with law enforcement in any way?

17             JUROR NO. 19:  No, he's not.

18             THE COURT:  Do you know whether your husband has

19  ever used any of those firearms for any purpose other than

20  hunting or target practice?

21             JUROR NO. 19:  No, he hasn't.

22             THE COURT:  Mr. Ortiz and Ms. King, do you have any

23  follow-up questions?

24             MR. ORTIZ:  Ma'am, do you remember what courthouse

25  your daughter was going to?

1             JUROR NO. 19:  No.  That was about 20 some years

2 ago, I'm not sure.

3             MR. ORTIZ:  Do you know if it was in or near

4 Pittsburgh?

5             JUROR NO. 19:  It was in Pittsburgh.

6             THE COURT:  Have you ever been to this courthouse

7 before?

8             JUROR NO. 19:  No, I haven't.

9             MR. ORTIZ:  But you did go to your daughter's case?

10             JUROR NO. 19:  No, I was sick at time.  I didn't go.

11             THE COURT:  Thank you.

12             Ms. King?

13             MS. KING:  No, Your Honor.

14             THE COURT:  Mr. Sindler?

15             JUROR NO. 19:  I had a death in my family yesterday.

16 It's my brother-in-law.  He'll be buried Thursday and Friday,

17 laid out here in Thursday and buried Friday.

18             THE COURT:  Is that here in the Pittsburgh area?

19             JUROR NO. 19:  Yes.

20             THE COURT:  Let me ask you this.  What would happen

21 if you were selected for this jury in that situation?

22             JUROR NO. 19:  I guess I would have to come.

23             THE COURT:  How would you feel about that?

24             JUROR NO. 19:  It's going to be rough because I

25 would like to be there for my sister.

1          THE COURT:  So it's the husband of your sister?

2          JUROR NO. 19:  Yes.

3          THE COURT:  Mr. Sindler, any follow-up to that

4 additional information?

5          Thank you for telling us.  We're sorry for your

6 loss.

7          MR. SINDLER:  Where is the viewing?

8          JUROR NO. 19:  The viewing is going to be at Szal's

9 in the bottoms, McKees Rocks.

10          MR. SINDLER:  The burial?

11          JUROR NO. 19:  McKees Rocks, too.

12          MR. SINDLER:  Were you close with your

13 brother-in-law during the time he was married to your sister?

14          JUROR NO. 19:  Yes.

15          MR. SINDLER:  What period of time was that?

16          JUROR NO. 19:  They have been married 28 or 29 years

17 now.  That's the second marriage, my sister's second marriage.

18          MR. SINDLER:  That's all I have.

19          THE COURT:  Ma'am, do you anticipate that the

20 funeral service will be sometime during the day on Friday?

21          JUROR NO. 19:  It's going to be -- he'll be laid out

22 Thursday and then buried early Friday, church services and

23 then --

24          THE COURT:  The viewing will be Thursday afternoon

25 and evening and then the services Friday morning?

1              JUROR NO. 19:  Yes.

2              THE COURT:  Mr. Sindler, any follow-up to the

3    Court's questions?

4              MR. SINDLER:  Will you be expected to help your

5    sister at all or the family in the preparation of these events

6    later in the week?

7              JUROR NO. 19:  Well, no, I don't think so.  I think

8    she has everything planned.  Her and his brother have

9    everything planned out.

10             MR. SINDLER:  I guess the better question would be,

11   do you want to be helping her, despite the fact that you have a

12   competing interest?

13             JUROR NO. 19:  I would like to, yes.  I would like

14   to.

15             THE COURT:  Mr. Ortiz and Ms. King, any follow-up

16   questions for this juror?

17             MS. KING:  No.

18             THE COURT:  Thank you very much.

19        (Juror No. 19 exits chambers.)

20             THE COURT:  Mr. Ortiz and Ms. King, any cause

21   issues?

22             MS. KING:  We do think she should be excused.  The

23   viewing is on Thursday, I do believe that this will go into

24   Thursday, she's going to miss that.

25             THE COURT:  Mr. Sindler?

1             MR. SINDLER:  I agree.

2             THE COURT:  I think it's going to be tough for

3    anyone to have both feet firmly planted in this trial, so we'll

4    excuse No. 19.

5             The next juror would be No. 64, who answered yes to

6    two questions, No. 12 and No. 38.

7             MR. SINDLER:  Before the person comes in, would it

8    be worthwhile to consider whether -- I know it's probably not

9    going to be answered yes for the rest of the people who we are

10   going to be voir diring, there might be some event or something

11   that has come up where a person may have not realized she

12   should have answered yes.  No one else I don't think passed

13   away overnight that was related --

14            THE COURT:  But it is a reminder there could have

15   been intervening things.

16            MR. SINDLER:  We wouldn't have known about it had

17   this lady not brought it up.  We would be imposing upon her in

18   the worst kind of way had she not brought it up.  I don't know

19   what your thoughts are about that.

20            THE COURT:  You mean a question like, sir, or ma'am,

21   after we go through the questions to which there was a yes

22   answer, something like, sir, ma'am, having had an opportunity

23   to reflect on yesterday and we're here today, is there anything

24   else you think you should bring to our attention today?

25            MR. SINDLER:  Yes.

1            THE COURT:  Any objection to that type of question

2 Mr. Ortiz and Ms. King?

3            MS. KING:  No.

4            THE COURT:  I think it makes sense.  We'll ask that

5 question.

6            I thought Juror 19 was kind of remarkably together.

7 I don't mean that as criticism, she wants to do her duty, but

8 she had an obvious family issue.

9            MR. BABIK:  Juror No. 64.

10       (Juror No. 64 enters chambers.)

11            THE COURT:  Counsel, we have Juror No. 64 with us.

12 There were two yes responses, Question No. 12 and Question No.

13 38.

14            Just as a reminder, Question 12 is have you ever

15 served as a juror in a criminal or civil case or as part of a

16 grand jury in any federal, state or county court.

17            You answered yes.

18            JUROR NO. 64:  I have served twice.  Once on a civil

19 and once on a criminal natural.

20            THE COURT:  Let's take them one at a time.  Tell us

21 about the civil case.

22            JUROR NO. 64:  That was the first one, they settled.

23 We spent about a week and they settled right before we were

24 going to go into deliberation.

25            THE COURT:  So you were actually picked for that

1 jury?

2          JUROR NO. 64:  Yes.

3          THE COURT:  Do you know which court that was?

4          JUROR NO. 64:  It was in the county building.

5          THE COURT:  Here in Pittsburgh?

6          JUROR NO. 64:  Yes.  It was probably 20 years ago.

7          THE COURT:  20 some years ago?

8          JUROR NO. 64:  20-ish.

9          THE COURT:  Do you recall generally what the case

10 was about?

11          JUROR NO. 64:  It was a contractor being sued for a

12 restaurant in Market Square actually, it leaked.

13          THE COURT:  Do you recall any of the lawyers or the

14 judge in that case?

15          JUROR NO. 64:  No.

16          THE COURT:  Tell us about the other time you served.

17          JUROR NO. 64:  The other one, I was an alternate on

18 a criminal case.  It was a drug dealer, and it was probably

19 three or four days of testimony.  Then I was released and they

20 went into deliberation.  I never found out, it wasn't in the

21 paper, I don't know how it turned out.

22          THE COURT:  You sat through the trial and the

23 testimony but because they did not need you to serve as an

24 alternate, you never got into the deliberations?

25          JUROR NO. 64:  Correct.

1                    THE COURT:  Any other service as a juror?

2                    JUROR NO. 64:  I was called in another time, but by

3    the end of the day nobody was seated.

4                    THE COURT:  Was that in this courthouse or

5    different?

6                    JUROR NO. 64:  Again, it was the county.

7                    THE COURT:  Here in Pittsburgh?

8                    JUROR NO. 64:  Yes.

9                    THE COURT:  Let me ask you this, ma'am.  Is there

10   anything at all about those experiences that has affected your

11   views in any way about court system, the legal system, the jury

12   system, lawyers, participants in those trials, whether they be

13   law enforcement, defendants, judges, bailiffs, anything at all

14   about any of that experience that you believe has influenced or

15   affected your views in any way about our system and those parts

16   of our system?

17                   JUROR NO. 64:  No.  It was fascinating.  I enjoyed

18   seeing it and learning what people did.  Just kind of a neat

19   other world.

20                   THE COURT:  Anything about any of that that in any

21   way, shape or form left a bad taste in your mouth?

22                   JUROR NO. 64:  No.

23                   THE COURT:  If you were selected to serve in this

24   case, do you believe there's anything about that service that

25   would affect your ability to decide this case based only on the

1  evidence you hear in this courtroom and the instructions I give

2  you?

3            JUROR NO. 64:  No.

4            THE COURT:  Then you also answered yes to Question

5  38 which asks whether you or anyone in your family owns or

6  possesses a firearm or ammunition and, if so, what kind and for

7  what purpose?

8            JUROR NO. 64:  I do not.  I have a brother and

9  sister, they're in different cities, I don't know -- they're

10 handguns, that's the extent of what I know.

11           THE COURT:  So each of them are in different cities

12 and those cities are other than Pittsburgh?

13           JUROR NO. 64:  Correct.

14           THE COURT:  How is it you know they each possess --

15           JUROR NO. 64:  My sister goes to the target range

16 quite a bit.  She loves it and she brags about how much better

17 she's getting.  My brother, it's the gun that my father had

18 that was just when my parents moved to the North Hills -- when

19 they first built, it was to protect them, and it now protects

20 my brother's family.

21           THE COURT:  Do you know whether your sister or

22 brother are in any way involved with any type of law

23 enforcement, do they have these firearms for any law

24 enforcement type purposes?

25           JUROR NO. 64:  No.

 1            THE COURT:  Do you know whether either of them have

 2   a concealed carry permit?

 3            JUROR NO. 64:  Neither do.  If they do, they have

 4   certainly not shared that with me.

 5            THE COURT:  Do you know if either of them have ever

 6   used their firearms for any purpose other than hunting or

 7   target practice?

 8            JUROR NO. 64:  I don't believe.

 9            THE COURT:  Now, we're here on the second day today,

10   is there anything that has come to mind since you were here

11   yesterday that you think we ought to know about because of the

12   questions I asked in the courtroom or that you want to bring to

13   our attention.

14            JUROR NO. 64:  There is actually one.  I didn't

15   stand because I don't consider it a hardship.  You asked the

16   question about the flight of stairs.  I wear a brace on my leg.

17   I can certainly take steps, but I'm probably slower than the

18   average bear, so it's a hardship to the Court if I was slower

19   either up or down.

20            THE COURT:  You can do the stairs, but you're more

21   methodical?

22            JUROR NO. 64:  Yes.

23            THE COURT:  Anything else you would like to tell us

24   thinking about things from yesterday?

25            JUROR NO. 64:  Just the stairs.

1            THE COURT:  Mr. Sindler, any follow-up?

2            MR. SINDLER:  How long ago was your service where

3  you were an alternate?

4            JUROR NO. 64:  15-ish.

5            MR. SINDLER:  So about five years after the service

6  in the civil case.

7            JUROR NO. 64:  Correct.

8            MR. SINDLER:  The movements of what appear to be

9  your left leg, when you're done with a flight of stairs, does

10 that cause any kind of pain?

11           JUROR NO. 64:  No, I truly am methodical is a good

12 term, I go one step at a time.

13           MR. SINDLER:  So once you would arrive at the

14 deliberations room, whether it's the beginning of the day or

15 perhaps during deliberations, there wouldn't be any issue with

16 the joint in terms of affecting your attention?

17           JUROR NO. 64:  No, not unless -- not unless

18 something untoward happened.

19           MR. SINDLER:  Very well.

20           That's all I have.

21           THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

22           MR. ORTIZ:  Not from me.

23           MS. KING:  When you served as an alternate, was that

24 also in Allegheny County?

25           JUROR NO. 64:  Yes.

1            MS. KING:  Nothing further.

2            THE COURT:  Thank you very much, ma'am.

3       (Juror No. 64 exits chambers.)

4            THE COURT:  Any cause issues with 64?

5            MR. SINDLER:  No.

6            THE COURT:  Mr. Ortiz and Ms. King?

7            MS. KING:  No.

8            THE COURT:  64 is in as No. 22.

9            That brings us to 40 who had two yes answers, No. 18

10 and 38.

11            MS. KING:  I might have missed something.  She's

12 number 22, but I thought only three people were struck.

13            THE COURT:  After we get 40 in, we'll do a recount.

14            I have also not counted the two people as to who

15 there are pending causing challenges.  These are 22 that were

16 not stricken, nor is there a cause challenge on the table.

17            MR. BABIK:  Juror No. 40.

18       (Juror No. 40 enters chambers.)

19            THE COURT:  Counsel, we have Juror No. 40 with us.

20 She responded yes to two questions, No. 18 and No. 38.

21            No. 18 asked whether you or any member of your

22 immediate family had ever been the victim of a crime.

23            You answered yes.

24            JUROR NO. 40:  Yes, that's correct.

25            THE COURT:  Why did you answer yes?

1          JUROR NO. 40:  I was -- No. 1, my car was stolen.

2          THE COURT:  How long ago was that?

3          JUROR NO. 40:  Probably about 30 years.

4          THE COURT:  Did you get it back?

5          JUROR NO. 40:  I got it back, but I wasn't happy.

6 They asked me, the state police asked me could they hold it

7 for -- they said they think it was involved in another crime

8 and they wanted to hold it and check it for prints and

9 everything.  So they impounded it at a lot and I had to pay 300

10 some dollars.  They told me it would be reimbursed and it

11 wasn't, so I was upset about that.

12          THE COURT:  What part of the town or state?

13          JUROR NO. 40:  I lived in Mt. Washington and the car

14 was found in Evans City.

15          THE COURT:  Did the state police tell you what type

16 of other crime they thought it might be involved in?

17          JUROR NO. 40:  They believed it was involved in a

18 robbery in Dormont.

19          THE COURT:  Did it turn out that that was the case?

20          JUROR NO. 40:  There was -- apparently whoever stole

21 the car had wiped it clean.  They found no evidence in the car

22 as to who stole it or -- they couldn't connect it to the crime,

23 so I was responsible for paying almost $400 in fees to get it

24 out of the towing where it was towed to.

25          THE COURT:  You were not reimbursed for that?

1          JUROR NO. 40:  No.

2          THE COURT:  Either by the police or your insurance

3 or anybody else?

4          JUROR NO. 40:  No, but I wrote a very nice letter to

5 the Evans City Council and let them know how he felt about it.

6          THE COURT:  You felt negatively about it?

7          JUROR NO. 40:  I did.  When the state police told me

8 could they hold it, retain it, I said, absolutely, if you think

9 it would help.  What is this going to cost me?  I asked

10 specifically how much it would cost me.  Nothing, it will all

11 be covered by restitution.

12          THE COURT:  Let me ask you this, ma'am.  You

13 mentioned the state police and you had conversations with the

14 state police about this, but you also said you wrote a letter

15 to the folks on Evans City Council.  Can you help us have a

16 better understanding of how each of those were involved in this

17 situation?

18          JUROR NO. 40:  Just because I felt that they have --

19 I guess they felt that they had arrangements, state police had

20 arrangements with certain garages where they were -- where they

21 towed the vehicles to whenever they found them, and I felt that

22 there was a little bit of something going on there.

23          THE COURT:  So, you complained to Evans City Council

24 because you thought they had some decision making in all of

25 this?

1          JUROR NO. 40:  I did.

2          THE COURT:  Now, was that the only reason you

3 answered yes to this question?

4          JUROR NO. 40:  No.  I was self-employed.  My husband

5 and I owned, had an owner-operated deli in the West End and we

6 were broken into.  It was an overnight, we were never there

7 when we were robbed, but we were broken into about four times.

8          THE COURT:  When was, ballpark, the first time and

9 the last time that that happened?

10          JUROR NO. 40:  We sold the business in 2001, so it

11 had to be between 1983 and 2001.

12          THE COURT:  On any of those occasions, did the

13 police launch any type of investigation?

14          JUROR NO. 40:  Not really.  I launched my own.  I

15 offered a $50 reward and the girl turned in her boyfriend.

16          THE COURT:  What happened as a result of that?

17          JUROR NO. 40:  We had to go to a hearing with

18 juvenile court, but the young man in question -- it was a

19 family-type neighborhood and I actually did go -- I had a

20 conversation with his grandmother.  So it was -- his

21 grandmother assumed responsibility for him and I let it go at

22 that because I knew her and I respected her.

23          THE COURT:  In the case of any of those four

24 break-ins at your deli, did you suffer a financial loss or were

25 they reimbursed by insurance or other means?

 1            JUROR NO. 40:  It was usually -- no, it wasn't

 2  enough to be paid back by the insurance company.  It was more

 3  of having to go down in the middle of the night and board up a

 4  windows or having the police waiting there with the lights

 5  shining and everything while you go down.  Actually, the -- I

 6  have to say that the police were quite helpful, they actually

 7  assisted my husband in helping to board up the windows or

 8  anything.  I have never had any problem with police support at

 9  all.

10            THE COURT:  Let me ask you this, ma'am.  Other than

11  the one situation you described where you went to juvenile

12  court, did any of these other situations, the break-ins or the

13  car thing, did any of them cause you to go to any type of court

14  or formal legal proceeding?

15            JUROR NO. 40:  No.

16            THE COURT:  Now, is there anything about any of

17  those matters, either taken separately or in combination, that

18  you believe affects or influences your views one way or the

19  other about court systems, courts, jury trials, juries,

20  lawyers, be they prosecuting lawyers, defense lawyers, police

21  officers, defendants, victims, judges, bailiffs, anybody in the

22  system, is there anything about any of the matters you've

23  described in any way, shape or form that you believe has

24  affected or does affect your views of that process or system in

25  any way?

1                JUROR NO. 40:  I do not.

2                THE COURT:  Let me ask you this, ma'am.  If you're

3  selected for the jury, like every other person on the jury, you

4  would be administered an oath.  By that oath, you would be

5  declaring in open court that you will decide the case as a

6  juror based solely on the evidence presented in this courtroom,

7  in this trial and the instructions that I provide.

8                Do you have any reason to believe you would not or

9  could not or would have any difficult in abiding by that oath?

10               JUROR NO. 40:  I do have one concern.  In this case,

11 was the defendant indicted in 2012?  Is that the original date

12 of this case?

13               THE COURT:  I can answer this -- I'll give you these

14 two answers, ma'am.  As I stated in open court yesterday, the

15 docket number on this case is 13-CR-270.  And the indictment

16 charges events occurring on or about October 23, 2012.

17               Mr. Sindler, do you believe those are accurate

18 reflections of what the Court stated in open court today?

19               MR. SINDLER:  It's more than a belief, it's

20 accurate.

21               THE COURT:  Mr. Ortiz and Ms. King, is that accurate

22 as to what the Court stated yesterday?

23               MS. KING:  Yes, Your Honor.

24               THE COURT:  I can tell you those two things.

25               JUROR NO. 40:  My concern is, I know evidence is

1   evidence and it's logged and everything is documented, but I

2   have trouble, like, with witness testimony, how accurate is

3   witness testimony after three years?

4           THE COURT:  Help me, help all of us understand what

5   causes you to ask that question?

6           JUROR NO. 40:  I think normal folks can't remember

7   three years ago what they did on a certain day, and this is an

8   important case and I'm just concerned that memory might not be

9   accurate.

10          THE COURT:  Anything else, ma'am?

11          JUROR NO. 40:  Huh-uh.

12          THE COURT:  Now, the other question you answered yes

13  to was No. 38.  That question asked whether you or anybody in

14  your family owns or possesses a firearm or ammunition and if

15  so, what kind and for what purpose?

16          JUROR NO. 40:  I have a shotgun that was my

17  husband's and it's underneath the sofa, but I don't know where

18  the shells are.  They're in a Band-Aid box somewhere in the

19  house.

20          THE COURT:  Can I take it from the way you've made

21  that statement that your husband is no longer with you?

22          JUROR NO. 40:  Right, he passed away in March.

23          THE COURT:  March of this year?

24          JUROR NO. 40:  Uh-huh.

25          THE COURT:  Did you ever fire that shotgun?

1          JUROR NO. 40:  No, not that one.  We have just been

2  kind of looking at it and we just kind of move it from house to

3  house.  That's why I don't know where the can is, but somewhere

4  in that house there are two shells in a Band-Aid can.

5          THE COURT:  Have you ever fired any firearm?

6          JUROR NO. 40:  I have.

7          THE COURT:  Tell us about that.

8          JUROR NO. 40:  I used to shoot skeet at one time.

9          THE COURT:  Do you have a concealed carry permit?

10          JUROR NO. 40:  I do not.

11          THE COURT:  Have you or did your husband ever use

12  any of those shotguns for anything other than hunting or target

13  practice, skeet shooting?

14          JUROR NO. 40:  We have not.

15          THE COURT:  Mr. Ortiz and Ms. King, any follow-up

16  questions for this juror?

17          MR. ORTIZ:  Ma'am, you kind of talked about a couple

18  of different things, but when you were asking questions about

19  the date of this particular case and kind of what is going to

20  be coming before you, you said a couple things I just want to

21  ask you about.

22          Is it fair to say that you have doubts about dated

23  information from other people?  Is that what you're trying to

24  say?

25          JUROR NO. 40:  I would say not under -- like

documented evidence, I wouldn't have a problem with it.  It's
just witness testimony that I would have a little bit of a
problem with.

MR. ORTIZ:  If the person tells you -- for instance,
if I said to you three years ago today I went to Starbucks and
I ordered this or that, are you saying you wouldn't believe me
because that's just a random thing that happens?

JUROR NO. 40:  I'm not saying I wouldn't believe
you.  I would just have it in the back of my mind why would you
know that three years ago you went to Starbucks and had a
coffee that day?

MR. ORTIZ:  What if I told you something was
significant.

JUROR NO. 40:  If something significant happened on
that particular day, I could understand it.  I went to
Starbucks and I bought a coffee and I had this and that and
somebody gave me a 50 dollar bill, I would remember that.

MR. ORTIZ:  Let me ask you, when you're talking to
people and they're telling you a story about something that
happened years before, when you're listening to them and
they're talking to you about what happened to them, how do you
judge those people to see whether or not you believe them?
What is your thought process?

THE COURT:  Let me rephrase that question Mr. Ortiz.

If someone is telling you a story about something

1  that happened in a past period of time, do you nonetheless

2  listen to them and pay attention to it?

3            JUROR NO. 40:  Absolutely.

4            THE COURT:  Do you then give it such weight as you

5  think is appropriate?

6            JUROR NO. 40:  Absolutely.

7            THE COURT:  Mr. Ortiz.

8            MR. ORTIZ:  Nothing further.

9            THE COURT:  Mr. Sindler, any follow-up questions?

10           MR. SINDLER:  No.

11           THE COURT:  Ma'am, we are here on our second day

12  today.  So you have had an opportunity to go home and sleep on

13  things.  Is there anything that we either talked about in the

14  courtroom yesterday or anything else that you would like to

15  bring to our attention or think we should know about your

16  potential service as a juror?

17           JUROR NO. 40:  No, I don't.

18           THE COURT:  Thank you so much, ma'am.

19       (Juror No. 40 exits chambers.)

20           THE COURT:  Mr. Sindler, any cause issues?

21           MR. SINDLER:  No.

22           THE COURT:  Mr. Ortiz and Ms. King?

23           MR. ORTIZ:  Judge, I think her statements went a

24  little back and forth as to her ability to appropriately judge

25  evidence that may come before her, and certain statements that

1 she made lead me to believe that she wouldn't be able to

2 properly evaluate a witness and she would have trouble being

3 fair and impartial in evaluating witness testimony,

4 particularly in a case that comes from 2012.

5          THE COURT:  I'm going to overrule that objection.  I

6 don't think she -- I don't come to the same conclusion.  I

7 asked her, and Mr. Ortiz, I wasn't being disrespectful, I

8 wanted to make sure that you didn't inadvertently go into an

9 area that would really go to the deliberative process as

10 opposed to her ability to fairly and neutrally engage in the

11 deliberative process.

12          I think she said she takes things that are said as

13 they're presented to her.  I think if she or any other juror

14 chooses to give certain weight to matters because of when they

15 did or didn't occur, it strikes the Court she would be doing

16 her job as a juror.

17          I'm going to be instructing all of them in the

18 opening instructions with a nonexclusive list for things that a

19 juror would take into account in determining who to credit as

20 the sole finders and triers of the fact, and certainly the time

21 when something occurred or didn't occur, whether it was paired

22 with significant events or not, the Court anticipates based on

23 its experience, those issues will likely be parts of argument

24 from one or both counsel in this case and part of the Court's

25 standard instructions.  So, it sounded to the Court that what

1  she said was one of the things that could affect her assessment

2  of credibility is how long something had occurred in the past,

3  and I think the law recognizes that that is something that a

4  finder of fact can consider in assessing credibility.

5          So, I'll deny -- I take that as a motion to strike

6  for cause.  I'll deny the motion.

7          Is there any other basis for a cause point of view

8  on the government's part?

9          MR. ORTIZ:  No.

10         THE COURT:  No. 40 is in.

11         Let's do a little recount here because I list her as

12  No. 23.

13         I have in the pool the status of all the jurors as

14  follows:  38 in; 7 in; 28 in; 5 in; 34 in; 16 in; 47 in; 24 in.

15         57 pending cause challenge from the defendant.

16         No. 8 in; 27 in; 20 in; 56 in.

17         13 stricken.

18         52 in; 53 in; 21 in; 41 in.

19         10 stricken.

20         48 in; 54 in; 50 in; 66 in; 15 in.

21         29 pending cause challenge.

22         19 stricken.

23         64 in; 40 in, for a total of 23 jurors who have

24  neither been stricken or as to which there is pending cause

25  charge.

1            MR. SINDLER:  The cause challenge that has been

2  deferred that you say was 19 I have as 38.

3            THE COURT:  38 was the very first person we saw.

4            29 there's a cause challenge.  She's the first

5  person we saw today.

6            And 57 was a cause challenge from yesterday, both of

7  which are under advisement.

8            Mr. Greer, does that comport with your listing?

9            MR. GREER:  Yes.

10            THE COURT:  Mr. Sindler, is that helpful to you,

11 sir?

12            MR. SINDLER:  Yes.

13            THE COURT:  Ms. King and Mr. Ortiz?

14            MS. KING:  Yes.

15            THE COURT:  That would show our next juror, Juror

16 62, as who answered yes to only question 38.

17       (Juror No. 62 enters chambers.)

18            THE COURT:  Counsel, we have Juror No. 62 with us.

19 Yesterday he answered yes to one question, which is No. 38.

20            That asked, sir, whether you or anybody in your

21 family owned or possessed a firearm or ammunition, if so, what

22 kind and for what purpose?

23            JUROR NO. 62:  It is mine.  I have a Smith & Wesson

24 Model 19 4 1/8 inch 357.

25            THE COURT:  Is that a revolver?

1          JUROR NO. 62:  It is.

2          Back in the '80s, I was involved in security for

3  Pittsburgh Plate Glass at their factory in Greensburg, and at

4  that time, they were building a facility -- I was very young

5  and they were building a facility in Chillicothe, Ohio.  I was

6  looking to try to get certified in security.  I was working

7  part time in hopes of being able to get hired full time in

8  Chillicothe.  That never transpired.  They took very few people

9  from Greensburg to Ohio.

10         THE COURT:  Did you acquire that firearm in

11 anticipation or for that effort to get on the security force in

12 Chillicothe?

13         JUROR NO. 62:  Yes.

14         THE COURT:  You still possess it?

15         JUROR NO. 62:  I do.

16         THE COURT:  Do you have a concealed carry permit?

17         JUROR NO. 62:  I do not.

18         THE COURT:  Have you ever used it for any purpose

19 other than hunting or target practice or qualifying for this

20 security job?

21         JUROR NO. 62:  No.  I like to go target shooting

22 occasionally.

23         THE COURT:  Mr. Ortiz and Ms. King, any follow-up

24 questions?

25         MS. KING:  No.

```
 1              THE COURT:  Mr. Sindler, sir, any follow-up
 2 questions. >
 3              MR. SINDLER:  No.
 4              THE COURT:  We're here on day two of jury selection.
 5 I was curious if there is anything that might have come to mind
 6 since we've had another day that you'd like to or think you
 7 should bring to all of our attention either based on the
 8 questions asked in the courtroom yesterday or any other matters
 9 that you think we should be aware of in determining the jury in
10 this case?
11              JUROR NO. 62:  None that I'm aware of.
12              THE COURT:  Thank you very much.
13        (Juror No. 62 exits chambers.)
14              THE COURT:  Mr. Sindler, any cause issues with 62?
15              MR. SINDLER:  No.
16              THE COURT:  Mr. Ortiz and Ms. King?
17              MS. KING:  No.
18              MR. ORTIZ:  No.
19              THE COURT:  Juror 62 becomes the 24th person in the
20 pool.
21              That brings us to 58 who responded yes to a single
22 question and that was question 15.
23              Mr. Greer.
24        (Juror No. 58 enters chambers.)
25              THE COURT:  Counsel, we have Juror No. 58 with us.
```

1  Yesterday, she answered yes to one question, which was No. 15.

2          Ma'am, that asked whether you or anybody in your

3  immediate family had ever been employed or sought employment by

4  the federal government, other than the military, or any state,

5  local, county or federal law enforcement agency or court in a

6  paid or volunteer way?

7          JUROR NO. 58:  Yes.

8          THE COURT:  Why did you answer yes?

9          JUROR NO. 58:  My father was an attorney in Beaver

10 County.  He was an Assistant DA for about 15 years.

11         THE COURT:  Do you know when he ended that service?

12         JUROR NO. 58:  I do, approximately 11 years ago.

13         THE COURT:  Let me ask you this.  When he was an

14 Assistant DA over in Beaver County, were you living with him?

15         JUROR NO. 58:  Yes.  It started when I was in high

16 school, but, yes, so when I was in high school for a short

17 period of time, but then during the time I was in college, and

18 then I was not living there for a period of time after that.

19         THE COURT:  Let me ask you this.  If you know, when

20 he was an Assistant DA, was that his only job as an attorney,

21 did he do that and also practice law privately in addition to

22 that?

23         JUROR NO. 58:  Not at the same time.  He practiced

24 privately when I was younger, then when he moved into the DA's

25 office, that's all he did.

1                THE COURT:  Do you know how his time as an Assistant

2 DA came to an end, did he retire?

3                JUROR NO. 58:  Yes, he got ill, he retired, yes.

4                THE COURT:  Is your father still living?

5                JUROR NO. 58:  No.

6                THE COURT:  About how long after he ended his time

7 as an Assistant DA did he pass away?

8                JUROR NO. 58:  About three to four months.

9                THE COURT:  So he became ill while he was an

10 Assistant DA.

11                JUROR NO. 58:  Yes.

12                THE COURT:  Sitting here today, do you have any

13 recollection of any of the matter, him talking with you about

14 any of the matters he worked on as an Assistant DA?

15                JUROR NO. 58:  No.

16                THE COURT:  Let me ask you this, ma'am, is there

17 anything about your dad's time as an Assistant DA over in

18 Beaver County that you think would in any way, shape or form

19 influence how you would judge this case if selected as a juror,

20 in any direction?

21                JUROR NO. 58:  I don't think so.

22                THE COURT:  Do you have any doubts?

23                JUROR NO. 58:  No.

24                THE COURT:  Let me ask you this, ma'am.  Every juror

25 in this case that is selected will take an oath to decide this

1  case based only on the evidence they hear in this case, in this

2  courtroom, and the instructions given by me as the judge.

3          Do you have any hesitation or doubt as to your

4  ability to follow those?

5          JUROR NO. 58:  No.

6          THE COURT:  Mr. Sindler, do you have any follow-up

7  questions, sir?

8          MR. SINDLER:  What period of time did he serve as an

9  Assistant DA?

10          JUROR NO. 58:  What years?

11          MR. SINDLER:  Was it a number of years that you

12  know?  How many years was he an Assistant DA?

13          JUROR NO. 58:  He started out there part-time, then

14  it was full time.  It was about 15 years from start to end, but

15  I don't have a good memory of how long he was there part-time

16  and then when he went to full time.  I was in college.

17          MR. SINDLER:  So the 15 years was a continuous

18  stretch?

19          JUROR NO. 58:  Yes.

20          MR. SINDLER:  Even though he didn't discuss anything

21  he did with you, was there anything that you learned of his

22  work from third parties, such as, the media, or talk on the

23  street or from other sources?

24          JUROR NO. 58:  You mean in terms of cases he was on

25  or things like that?

1               MR. SINDLER:  Things he did or things he was

2   involved in?

3               JUROR NO. 58:  Not really.  Not that I can think of,

4   no.

5               MR. SINDLER:  So there was a wall between what he

6   did and what you knew about what he did?

7               JUROR NO. 58:  I'm not sure I understand exactly --

8   I knew what he did, but, of course, he never discussed

9   specifics of cases.

10              MR. SINDLER:  That's all I meant.  The particular

11  matters upon which he worked was never anything with which you

12  were familiar?

13              JUROR NO. 58:  Right.  I know he was a criminal

14  attorney, but we never discussed it.

15              MR. SINDLER:  You didn't know anything about what he

16  did from other sources such as media or talk of other people?

17              JUROR NO. 58:  I don't think any of the cases he had

18  were --

19              MR. SINDLER:  Published.

20              JUROR NO. 58:  He wasn't on the news, it wasn't

21  anything like that.

22              MR. SINDLER:  That's all I have.

23              THE COURT:  Mr. Ortiz and Ms. King?

24              MR. ORTIZ:  Not from me.

25              THE COURT:  We're here on day two on jury selection.

```
 1  I'm just curious if there was anything that might have come to
 2  mind from yesterday either relative to the questions we asked
 3  in court or anything else that you think we ought to be aware
 4  of in setting the jury in this case?
 5              JUROR NO. 58:  No.
 6              THE COURT:  Thank you so much, ma'am.
 7          (Juror No. 58 exits chambers.)
 8              THE COURT:  Mr. Ortiz and Ms. King, anything
 9  relative to cause on Juror 58.
10              MS. KING:  No.
11              THE COURT:  Mr. Sindler?
12              MR. SINDLER:  No.
13              THE COURT:  Juror 58 is in the pool as No. 25.
14              That brings us to 25, who answered yes to only
15  Question No. 38.
16          (Juror No. 25 enters chambers.)
17              MR. BABIK:  Juror No. 25.
18              THE COURT:  Counsel, we have Juror No. 25 with us.
19  Yesterday she responded yes to one question, which is No. 38.
20              Ma'am, just to recall, that question asked whether
21  you or anybody in your family owned or possessed a firearm or
22  ammunition and, if so, what kind and for what purpose?
23              JUROR NO. 25:  We have a 20-gauge shotgun and we had
24  an animal -- one of our pets killed by another animal one time
25  so we got that, and also for our protectional home.
```

```
 1                    THE COURT:  When you say "we," who is we?

 2                    JUROR NO. 25:  My husband and myself.

 3                    THE COURT:  Have you ever fired that shotgun?

 4                    JUROR NO. 25:  No.

 5                    THE COURT:  Do you know whether your husband has

 6  ever fired it?

 7                    JUROR NO. 35:  He hasn't.

 8                    THE COURT:  So since you obtained that shotgun, it's

 9  not been fired?

10                    JUROR NO. 25:  No.

11                    THE COURT:  Do you have ammunition for it at your

12  home?

13                    JUROR NO. 25:  Yes.

14                    THE COURT:  Let me ask you this we're here on day

15  two on jury selection, as you slept on things or overnight, is

16  there anything based either on the questions I asked in the

17  courtroom yesterday or anything else that you think you should

18  bring to our attention about your possible service as a juror?

19                    JUROR NO. 25:  Other than the fact that if it would

20  go longer than the two weeks, I do have a medical procedure

21  scheduled in November 12th, so that's my only concern at this

22  point.

23                    THE COURT:  That's not next week, it's the week

24  after next week?

25                    Okay.  Anything else you think we ought to be aware
```

1  of.

2  JUROR NO. 25:  I don't think so.

3  THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

4  MS. KING:  No.

5  THE COURT:  Mr. Sindler?

6  MR. SINDLER:  No.

7  THE COURT:  Thank you for coming in.  We appreciate

8  it.

9  (Juror No. 25 exits chambers.)

10  THE COURT:  Mr. Sindler, any cause issues with 25?

11  MR. SINDLER:  No.

12  THE COURT:  Mr. Ortiz and Ms. King?

13  MS. KING:  No.

14  THE COURT:  She's in the pool.  That is No. 26.

15  That brings us to Juror 63 who responded yes to

16  question 18.

17  (Juror No. 63 enters chambers.)

18  THE COURT:  Sir, when you were in court yesterday,

19  you answered yes to a single question and that was No. 18.  It

20  asked have you or a member of your immediate family ever been

21  the victim of that crime?

22  JUROR NO. 63:  Before I leave, I should advise you,

23  I may have incorrectly answered another question.

24  THE COURT:  Fill us in, please.

25  JUROR NO. 63:  You asked whether any of my immediate

1 family have been employed by government.

2           My parents are teachers in Maryland and unlike

3 Pennsylvania, the teachers there are, in fact, employed by the

4 county.  Baltimore County.

5           THE COURT:  As opposed to local city or town, it's

6 the whole county.

7           JUROR NO. 63:  The schools in Maryland are owned by

8 the county, so they were technically county employees.

9           THE COURT:  That would be your mom and dad?

10           JUROR NO. 63:  That's correct.

11           THE COURT:  Anything else?

12           JUROR NO. 63:  That's all.

13           THE COURT:  So, Question 18 asks whether somebody,

14 you or somebody in your immediate family had ever been the

15 victim of a crime?

16           JUROR NO. 63:  Yes.  About 30 years ago, the

17 apartment I was living in, renting, was burglarized.  Someone

18 broke in one of the windows.  I came home, saw the broken

19 window, thought I heard someone in the house, called the

20 police.  The police arrived very promptly and looked through

21 the house.  There was no one there at the time.  I think they

22 went out the back.  There was a downstairs exit out of the

23 house.

24           About 10 or 15 years ago my car was burglarized in a

25 parking lot downtown.

1          THE COURT:  Let's start with the situation about 30

2  years ago.

3          Was that here in the Western Pennsylvania area or

4  somewhere else?

5          JUROR NO. 63:  Yes, in Squirrel Hill.

6          THE COURT:  You said the police did come?

7          JUROR NO. 63:  Yes.

8          THE COURT:  Did they or anybody else ever identify

9  who had broken into your home?

10          JUROR NO. 63:  No.

11          THE COURT:  Did you suffer any loss as a result of

12  that.

13          JUROR NO. 63:  We had a few items taken.  They were

14  covered mostly by insurance.

15          THE COURT:  You said "we," who is we?

16          JUROR NO. 63:  I had at that house three housemates.

17          THE COURT:  The situation with your car, your car

18  was broken into?

19          JUROR NO. 63:  Yes.

20          THE COURT:  Was there damage to the car?

21          JUROR NO. 63:  There was damage to the window.  They

22  broke a window and took a gym bag that was in the back seat.

23          THE COURT:  Was the repair of the car and loss of

24  gym bag covered by any type of insurance?

25          JUROR NO. 63:  I don't know that the gym bag had

1  enough to be worth reporting, and I believe the insurance

2  covered the window repair.

3            THE COURT:  In regard to either case, did you have

4  to go to court or get involved with court system in any way?

5            JUROR NO. 63:  No.

6            THE COURT:  With the car situation, were the police

7  involved in any way?

8            JUROR NO. 63:  No.

9            THE COURT:  Let me ask you this, sir.  Is there

10 anything about either of those situations, either separately or

11 together, that you believe has affected your view, one way or

12 the other, of a legal system, the court system, courts, police,

13 victims, witnesses, defendants, lawyers, bailiffs, anything at

14 all, is there anything about either of those episodes

15 separately or something that you think has affected your point

16 of view or perspective in any way, shape or form about this

17 case?

18            JUROR NO. 63:  No.

19            THE COURT:  Let me ask you this, sir.  Once the jury

20 is selected in this case, they'll take an oath to do their duty

21 and to decide this case based only on the evidence presented in

22 this trial, in this court, and the instructions I give.  If

23 you're selected for the jury, do you have any hesitation or

24 doubts of your ability to abide by that oath?

25            JUROR NO. 63:  No.

1            THE COURT:  Sir, let me ask you this.  We're here on

2  day two of jury selection, is there anything that has come to

3  mind that you think you should fill us in on either related to

4  the questions we asked yesterday, just as you did with your

5  parents' service as a teacher, or anything else about your

6  potential jury service that you should make us aware of?

7            JUROR NO. 63:  No.

8            THE COURT:  Ms. King and Mr. Ortiz, any follow-up

9  questions?

10           MS. KING:  No.

11           MR. ORTIZ:  No.

12           THE COURT:  Mr. Sindler, sir?

13           MR. SINDLER:  No.

14           THE COURT:  Thank you for coming back.

15       (Juror No. 63 exits chambers.)

16           THE COURT:  Mr. Ortiz and Ms. King, any cause issues

17 with 63?

18           MS. KING:  No.

19           THE COURT:  Mr. Sindler?

20           MR. SINDLER:  No.

21           THE COURT:  63 is in, number 27 in the pool.

22           That brings us to juror 43, who responded yes to

23 Questions 15, 17, 28 and 38.

24       (Juror No. 43 enters chambers.)

25           THE COURT:  Counsel, we have Juror No. 43 with us.

1  Yesterday he responded yes to four questions, No. 15, 17, 28

2  and 38.

3              Sir, just to remind us, Question 15 asked whether

4  you or anybody in your immediate family had ever been employed

5  or sought to be employed by the federal government, other than

6  the military, or any state, local, county or federal law

7  enforcement agency or court, any paid or volunteer way?

8              JUROR NO. 43:  Yes.  I applied for the post office,

9  I think it was 1982.

10              THE COURT:  What happened to that application?

11              JUROR NO. 43:  Never heard.

12              THE COURT:  What job did you apply for, if you

13  recall?

14              JUROR NO. 43:  Actually, when I came to apply for

15  it, I think it was for a postal worker.

16              THE COURT:  Any other reason you answered yes to

17  that question?

18              JUROR NO. 43:  Huh-uh.

19              THE COURT:  The next one you answered yes to was 17

20  and it asked whether you or anybody in your immediate family

21  had ever been arrested, charged with or convicted of a criminal

22  offense?

23              JUROR NO. 43:  Yes.

24              THE COURT:  What led to that yes?

25              JUROR NO. 43:  I've had some brothers who have

1 gotten themselves into different kind of trouble.

2       THE COURT:  Could you tell us a little bit more

3 about that.

4       JUROR NO. 43:  I really can't.  I was pretty young

5 at the time.  I think most of it was bar fighting.  I don't

6 know, different things like that.  I just remember them

7 spending some time, not any time away, just being arrested and

8 my dad had any go bail them out.  Most of it happened when I

9 was pretty young.

10       THE COURT:  When you say "pretty young," do you

11 remember the range of age?

12       JUROR NO. 43:  Probably eight to twelve.

13       THE COURT:  Were your brothers somewhat older than

14 you, sir?

15       JUROR NO. 43:  Yes.

16       THE COURT:  Would they have been in their 20s at

17 that time.

18       JUROR NO. 43:  19 and 20s.

19       THE COURT:  You mentioned your dad had to go bail

20 them out.  Does that mean they might have spent several hours

21 or an overnight in local jail?

22       JUROR NO. 43:  Uh-huh.

23       THE COURT:  Do you know if any of them ever had to

24 go to court?

25       JUROR NO. 43:  I don't know.

1            THE COURT:  Do you know if any of those situations

2  with your brothers involved any physical harm to anyone,

3  damaged property, any type of weapons?

4            JUROR NO. 43:  What was the first one?

5            THE COURT:  Any type of physical harm to anyone,

6  damage to property.

7            JUROR NO. 43:  Physical harm to others.

8            THE COURT:  That would be the bar fight type

9  situation.

10            JUROR NO. 43:  Uh-huh.

11            THE COURT:  Any other reasons you answered yes to

12  that question, sir?

13            JUROR NO. 43:  No.

14            THE COURT:  The next question you answered yes to

15  was No. 28.  That asks, sir, do you believe that Mr. Warren is

16  required to testify in this case or provide his version of what

17  occurred.

18            You answered yes to that.  Fill us in on that, sir.

19            JUROR NO. 43:  I just feel you have to hear all

20  sides of the story to make an accurate decision.

21            THE COURT:  Let me ask you this, sir.  As I

22  mentioned yesterday in court, I will be instructing the jury

23  that in this case, like every other case where there are

24  criminal charges in our country, a defendant has no obligation

25  whatsoever to offer any evidence, any testimony, or to testify

1   and that if a defendant chooses not to do any of those things,

2   that cannot in any way, shape or form be considered by the jury

3   in making their determination because a defendant has an

4   absolute right to do or not do any or all of those things.

5            Do you have any hesitation in your ability to follow

6   that instruction based on what you said?

7            JUROR NO. 43:  No.  I just feel it's unfair of him

8   if he doesn't give his side of the story.

9            THE COURT:  Then lastly, sir, the question you

10  answered yes to, the last one was No. 38 and that asked whether

11  you or anybody in your family owned or possessed a firearm or

12  ammunition and, if so, what kind and for what purpose?

13           JUROR NO. 43:  Yes.  Myself and all my brothers, we

14  have rifles, shotguns, pistols, for hunting and for protection.

15           THE COURT:  Let me ask you this, sir.  Do you have a

16  concealed carry permit for any of your firearms?

17           JUROR NO. 43:  No.

18           THE COURT:  Do you have both long guns and handguns?

19           JUROR NO. 43:  Yes.

20           THE COURT:  To your knowledge, have you or has

21  anybody in your family ever used any of them for any purpose,

22  other than hunting or target practice?

23           JUROR NO. 43:  No.

24           THE COURT:  Mr. Sindler, any follow-up?

25           MR. SINDLER:  If Mr. Warren had the chance to

1 testify but chose not to, would you hold it against him in this

2 case?

3           JUROR NO. 43:  No.

4           MR. SINDLER:  Would it affect your ability to serve

5 or to consider the evidence that is put before you in this

6 case, in reaching a verdict or in reaching a decision as to the

7 verdict?

8           JUROR NO. 43:  No.

9           MR. SINDLER:  It just seemed that earlier you were

10 adamant about wanting to hear both sides.

11           JUROR NO. 43:  I just think he's being unfair to

12 himself if he doesn't give his own side of the story.

13           MR. SINDLER:  Unfair in what way?

14           JUROR NO. 43:  Anything that happens, everybody has

15 their opinion of what happens, everybody has their own story of

16 what happens, just this conversation right now, we all have a

17 different feeling what went on, what was said, and not giving

18 your own side, you're kind of being unfair to yourself.

19           MR. SINDLER:  If he didn't give his version, if you

20 will, in your mind, would he be unfair to himself?  In this

21 case would he be unfair to himself?

22           JUROR NO. 43:  I think in any case you're being

23 unfair to yourself not giving your side of the story.

24           MR. SINDLER:  We're here on this case, the same

25 answer you just gave would apply in this case, right?

1          JUROR NO. 43:  Yes.

2          MR. SINDLER:  That's all I have.

3          THE COURT:  Ms. King and Mr. Ortiz?

4          MS. KING:  Yes.

5          Sir, as the judge said, he's going to instruct you

6  that what you consider is the evidence that you've heard and

7  that you can't make any negative inference from the fact that

8  the defendant does testify or doesn't testify.  He's going to

9  instruct you that you have to follow, the judge is going to

10 instruct you that you have to follow those instructions.

11         Are you going to have a problem following those

12 instructions?

13         JUROR NO. 43:  No.

14         THE COURT:  Mr. Ortiz?

15         MR. ORTIZ:  Nothing.

16         THE COURT:  This is our second day of jury

17 selection, just to check since you've all had a chance to go

18 home, reflect on yesterday.  Is there anything else you think

19 you should bring to our attention either related to the

20 questions I asked in court yesterday or anything else that you

21 think might affect your ability to serve as a juror?

22         JUROR NO. 43:  No.

23         THE COURT:  One last follow-up, sir.  If Mr. Warren

24 chose not to testify, would you be disappointed if you were a

25 juror?

1                     JUROR NO. 43:  Yes.

2                     THE COURT:  Thank you, sir.

3                     Any further follow-up, Mr. Ortiz or Ms. King?

4                     MR. ORTIZ:  If you don't mind, Your Honor.

5                     When you're saying that you're disappointed, could

6      you explain what you mean by disappointed?

7                     JUROR NO. 43:  Just as I said all along, I like to

8      hear all sides of the story.  It's his choice to not -- if it's

9      his choice not to say anything, that's his choice.  I'm just

10     hearing everybody else's story, I'm not hearing his.  If that's

11     the way the judge wants it to be ruled, that's fine.

12                    MR. ORTIZ:  Is it fair to say that your

13     disappointment comes from you're curious to see what he may or

14     may not have to say, but you still would nonetheless follow the

15     Judge's instructions?

16                    JUROR NO. 43:  I think that would be correct.

17                    MR. ORTIZ:  So despite your curiosity that you may

18     or may not have, if the judge tells you what you can and can't

19     consider, you would follow the Judge's instructions.

20                    JUROR NO. 43:  Yes.

21                    THE COURT:  Mr. Sindler, any follow-up?

22                    MR. SINDLER:  No.

23                    THE COURT:  Sir, thank you very much for coming

24     back.

25          (Juror No. 43 exits chambers.)

1              THE COURT:  Mr. Sindler, any matters for cause with

2  Juror 43?

3              MR. SINDLER:  Yes.  We ask people to use their

4  common experiences and their common sense and his experiences

5  have been that he wants to hear in any situation in which he's

6  been presented with both sides of the story.  I understand

7  Mr. Ortiz efforts to rehabilitate, but I also recognize the

8  pregnant pause following Ms. King's question moments before

9  that where looking to the sky, as if for Divine intervention,

10 he grudgingly, if you will, from his body language, came to the

11 answer he did.  This is not somebody -- this is a challenge for

12 cause.  This is not somebody who can sit impartially and do his

13 duty or do his service because he wants to hear from

14 Mr. Warren.  I think that your instruction will be important,

15 it is important, it is important in any case, but it's like

16 trying to put a square peg into a round hole, Judge.  With this

17 man, it's not working.

18             THE COURT:  Mr. Ortiz and Ms. King?

19             MS. KING:  Yes, Your Honor.

20             First of all, with respect to the pause, I think he

21 was carefully considering how he was going to answer and he did

22 answer that he would have no problem listening to the Court's

23 instruction.  That was his repeated answer.  While he did

24 honestly say that he personally liked to hear all sides, he

25 clearly said he could put that aside and listen to the Court's

1  instruction as to both only considering the evidence that was

2  put before him and not considering negatively whether the

3  defendant did or did not testify.  So, I think he's fine for

4  the jury.

5        THE COURT:  I'm going to grant the motion to strike

6  him for cause.  The Fifth Amendment right to avoid

7  self-incrimination is not saying other rights aren't important,

8  but that's a hallmark, it's one of the key parts of the jury

9  selection process in the jury deliberation process.

10        I don't doubt that Juror No. 43, if chosen and

11  sworn, would endeavor to follow that instruction because a

12  federal judge had directed him to follow that instruction.  I

13  also think, and this is not meant to say the Court's follow-up

14  question is any better than any asked by counsel, but when he

15  said he would be disappointed if Mr. Warren did not testify, I

16  thought that was a candid and telling answer on his part.  I

17  think, at best, it would be a struggle for Juror 43 to abide by

18  the Fifth Amendment instruction.  So I will grant the motion

19  and strike Juror 43 for cause.

20        That brings us to Juror 227.  That juror answered

21  yes to questions 16 and 38.

22     (Juror No. 227 enters chambers.)

23        THE COURT:  Counsel, we have Juror 227 with us

24  today.  He responded yes yesterday to two questions, No. 16 and

25  No. 38.

1           Question 16 asked:  Have you or any member of your

2   immediate family ever been a witness or a defendant in a

3   criminal case, other than a minor traffic violation?

4           And you answered yes, sir.  Could you help us

5   understand that.

6           JUROR NO. 227:  From my job, I had to go to court

7   two or three times to provide testimony for when inmates

8   attacked staff.

9           THE COURT:  When is the last time that happened,

10  sir?

11          JUROR NO. 227:  Five years ago.

12          THE COURT:  Was that to criminal court here in

13  Allegheny County?

14          JUROR NO. 227:  Greene County.

15          THE COURT:  When did it happen prior to that?

16          JUROR NO. 227:  A year or two before that.

17          THE COURT:  Same county court?

18          JUROR NO. 227:  Yes.

19          THE COURT:  Same type of situation?

20          JUROR NO. 227:  Yes.

21          THE COURT:  Do you recall whether it happened any

22  time before that?

23          JUROR NO. 227:  I don't recall.

24          THE COURT:  Do you know about how long before that

25  any other time occurred?

1           JUROR NO. 227:  No.

2           THE COURT:  In each of the cases you've identified,

3  you actually were sworn and testified as a witness?

4           JUROR NO. 227:  One case I was called, didn't

5  testify, the second case I was called and testified.

6           THE COURT:  So it's in the more recent case you

7  testified?

8           JUROR NO. 227:  Yes.

9           THE COURT:  Do you recall what the outcome of that

10 case was?

11          JUROR NO. 227:  Not guilty.

12          THE COURT:  Did you view that verdict as being

13 consistent or inconsistent with your testimony?

14          JUROR NO. 227:  --

15          THE COURT:  You said the outcome was not guilty.

16 Did you view that not guilty verdict as being consistent or

17 inconsistent with your testimony?

18          JUROR NO. 227:  Absolutely inconsistent.

19          THE COURT:  Let me ask you this, sir.  As a result

20 of those experiences or anything else, have your views of the

21 court system, the jury trial system, juries, service on juries,

22 lawyers, be they defense lawyers, prosecution lawyers, victims,

23 witnesses, defendants, court personnel, law enforcement been

24 influenced in any way?

25          JUROR NO. 227:  I would assume.

1                    THE COURT:  Why would you say you would assume?

2                    JUROR NO. 227:  I don't think -- my opinions aren't

3 bad, I'm sure I have been influenced by my years of service.

4                    THE COURT:  When you say "service," what service are

5 you referring to.

6                    JUROR NO. 227:  I have been a corrections officer

7 for going on 22 years now.

8                    THE COURT:  That's with the Pennsylvania Department

9 of Corrections?

10                   JUROR NO. 227:  Yes, sir.

11                   THE COURT:  What locations have you done that in,

12 sir?

13                   JUROR NO. 227:  Greene County or SCI Greene, start

14 to finish.

15                   THE COURT:  You reside in Greene County now?

16                   JUROR NO. 227:  Yes, sir.

17                   THE COURT:  What position do you hold as a

18 corrections officer?

19                   JUROR NO. 227:  Block sergeant.

20                   THE COURT:  How long have you been a block sergeant?

21                   JUROR NO. 227:  15 years.

22                   THE COURT:  Now, the other question you answered yes

23 to was No. 38.  That asked whether you or anybody in your

24 family owned or possessed a firearm or ammunition, if so, what

25 kind and for what purpose?

1              JUROR NO. 227:  .9 millimeter, .38, self-defense.

2              THE COURT:  That's you or you possess that?

3              JUROR NO. 227:  Yes, sir.

4              THE COURT:  About how long have you had that

5  handgun?

6              JUROR NO. 227:  25 years.

7              THE COURT:  Do you have a concealed carry permit,

8  sir?

9              JUROR NO. 227:  No.

10             THE COURT:  Have you ever used that firearm or any

11 other firearm for any purpose other than hunting or target

12 shooting?

13             JUROR NO. 227:  The .9 millimeter, it was my service

14 weapon when I was a police officer before I became a jail

15 guard.

16             THE COURT:  How long were you a police officer?

17             JUROR NO. 227:  A year, year and a half.

18             THE COURT:  Where was that, sir?

19             JUROR NO. 227:  Southmont Borough.

20             THE COURT:  That's in Greene County also?

21             JUROR NO. 227:  No, that's in Cambria County.

22             THE COURT:  Did your service as a Southmont Borough

23 Police Officer come to an end because you got the correction

24 officers job?

25             JUROR NO. 227:  Yes, sir.

1          THE COURT:  So you applied for the corrections job

2  while you were a borough police officer; is that correct, sir?

3          JUROR NO. 227:  Yes, sir.

4          THE COURT:  Sir, this is the second day of jury

5  selection so I'm just curious, is there anything that has come

6  to mind that you'd like to fill us in on or think you should

7  fill us in on either related to the questions we heard in the

8  courtroom or anything else that could affect your service as a

9  juror?

10          JUROR NO. 227:  No.

11          THE COURT:  Thank you.

12          Ms. King and Mr. Ortiz, any follow-up questions for

13  this juror?

14          MR. ORTIZ:  You had mentioned that or I think your

15  answer was that your prior experiences might have affected you

16  in some sort of way.

17          Do you believe that what you went through either as

18  testifying as a witness or through your duty as a police

19  officer or as a corrections officer makes it so you can't be

20  fair and impartial if you're seated on this jury?

21          JUROR NO. 227:  I don't think so.

22          THE COURT:  So you could be fair and impartial?

23          JUROR NO. 227:  Sure.

24          THE COURT:  Mr. Sindler, any follow-up questions?

25          MR. SINDLER:  Did you monitor the proceedings of the

1 case either before or after you testified, of the case in which

2 you testified?  Were you present at all in the courtroom?

3            JUROR NO. 227:  Yes.

4            MR. SINDLER:  Do you know if the defendant testified

5 in that case?

6            JUROR NO. 227:  Yes, he did.

7            MR. SINDLER:  That's all I have.

8            THE COURT:  Let me ask you this, sir, just as

9 follow-up.  So you were present for the testimony of the other

10 witnesses in that case where you testified?

11            JUROR NO. 227:  Yes.

12            THE COURT:  You said you heard the testimony of the

13 defendant?

14            JUROR NO. 227:  Yes.

15            THE COURT:  Did you believe the testimony of the

16 defendant?

17            JUROR NO. 227:  No.

18            THE COURT:  Was the defendant's testimony consistent

19 or inconsistent with the jury verdict?

20            JUROR NO. 227:  His testimony was consistent with

21 the jury verdict, yes.

22            THE COURT:  Were you a witness to the episode that

23 led to whatever the charges were in that case?

24            JUROR NO. 227:  Yes.

25            THE COURT:  The defendant was a witness to the

1  episode of what was charged in that case?

2              JUROR NO. 227:  Yes.

3              THE COURT:  Having heard that testimony and having

4  seen the outcome of that case, do you believe in any way, shape

5  or form that would affect your ability to fairly judge the

6  evidence in this case in this trial and follow my instructions

7  in this case?

8              JUROR NO. 227:  I don't think so.

9              THE COURT:  Any follow-up to the Court's questions,

10 Mr. Sindler?

11             MR. SINDLER:  No.

12             THE COURT:  Mr. Ortiz and Ms. King?

13             MS. KING:  No.

14             MR. ORTIZ:  No, Your Honor.

15             THE COURT:  Thank you for coming back, sir.

16 Appreciate it.

17     (Juror No. 227 exits chambers.)

18             THE COURT:  Mr. Ortiz and Ms. King, any questions as

19 to cause or points for cause relative to 227?

20             MS. KING:  No.

21             MR. ORTIZ:  No.

22             THE COURT:  Mr. Sindler?

23             MR. SINDLER:  I'd like to defer my answer to that

24 because he did not answer earlier yesterday whether he was

25 employed or applied for some position in law enforcement.  When

1  you work for the Department of Corrections you're definitely in

2  law enforcement and that was a question he didn't answer

3  yesterday.

4          THE COURT:  Okay.

5          MR. SINDLER:  I'd like to know why he didn't answer

6  yes to that.  I just realized it when he came in.  I didn't

7  know this sooner.  I did know yesterday or actually I've known

8  since last week that we would have -- actually potentially

9  several corrections officers.  He's the only one in the pool,

10 but that concerns me because I wonder then what other questions

11 besides that one he should have answered yes to.  I know he

12 answered a couple because we covered them here this morning but

13 he's most certainly in law enforcement.  He didn't answer yes

14 to that question, that bothers me as to his candor.

15         THE COURT:  I thought where you were going -- I'm

16 not ruling on the point you just made, I would have thought the

17 fact that he was a Southmont Borough Police Officer would have

18 driven a yes to that Question No. 15.  It could be -- I'm not

19 saying it was or wasn't -- when he stated openly that he was a

20 correction officer, that he may have addressed that, but he

21 also did not stand in response to Question 15, and the way 15

22 is worded, the fact that he had been a Southmont Borough police

23 officer should have elicited a yes answer to question 15.  We

24 will mark that as a cause challenge, ruling deferred.

25         So that brings us to Juror 51 who answered yes to

1  two questions, No. 10 and 38.

2          We'll deal with 227 the same way that we will deal

3  with the two other jurors that Ms. King identified.

4      (Juror No. 51 enters chambers.)

5          THE COURT:  Counsel, we have Juror No. 51 with us.

6          Ma'am, when you were here yesterday, you answered

7  yes to two questions, No. 10 and No. 38.

8          We'll start with No. 10.  That said:  The trial is

9  estimated to take several days to get all the material in,

10  that's our best estimate, it could be a little longer, a little

11  shorter.  We also reported that the jury deliberation room is

12  up a flight of stairs, and that would have to be traveled a

13  couple times a day.  And then we asked everyone if there was

14  any legitimate, justifiable, important hardship that would

15  impact your ability to serve as a juror.

16          You answered yes.

17          JUROR NO. 51:  Yes.  As I stated earlier, I have a

18  five-week old at home who is breastfed baby, so right now I'm

19  pumping, but he's not taking to a bottle very well and I'm

20  going day-by-day with childcare for my two children at home.

21          THE COURT:  If you could remind us how old is your

22  other child is.

23          JUROR NO. 51:  Two years old.

24          THE COURT:  When you're not down here at the federal

25  courthouse for jury duty, how do you normally handle childcare

1  situations.

2           JUROR NO. 51:  Right now I'm on leave, maternity

3  leave, so I've had some time last week, I have been calling

4  daycare because prior to I had childcare for my one child, but

5  now that I have two, it brings a whole new mix to the group, so

6  I have to look at childcare.

7           THE COURT:  If I may ask, how are you handling

8  childcare yesterday and today?

9           JUROR NO. 51:  Yesterday I had my mother who was

10  able to spend the night for me, but then it switched into

11  finding another sitter who came over at ten o'clock today to

12  relieve my mother.

13           THE COURT:  Let me ask you this, ma'am.  If this

14  jury duty call had not come up, how long were you anticipating

15  being on leave from your outside job?

16           JUROR NO. 51:  Eight to twelve weeks, depending.

17           THE COURT:  You're five weeks into that period?

18           JUROR NO. 51:  Yes.

19           THE COURT:  If you could remind us, what part of the

20  area you live in generally.

21           JUROR NO. 51:  I live in North Huntingdon,

22  Westmoreland County.

23           THE COURT:  Then the other question you answered yes

24  to was No. 38.  It had asked whether you or anybody in your

25  family owned or possessed a firearm or ammunition, if so, what

1  kind and for what purpose.

2          JUROR NO. 51:  I grew up in a house of two avid

3  hunters, so my father and my brother had firearms in the house

4  growing up used for hunting.

5          THE COURT:  Do you think they still do?

6          JUROR NO. 51:  Yes.

7          THE COURT:  Are they rifles, long guns, handguns?

8          JUROR NO. 51:  They have several rifles for hunting

9  then I know my father owns a handgun.

10          THE COURT:  Do you know whether any of them have a

11  concealed carry permit?

12          JUROR NO. 51:  My father does for his handgun.

13          THE COURT:  Do you know if he's been involved in any

14  type of security or law enforcement work?

15          JUROR NO. 51:  No.

16          THE COURT:  Do you know whether your father or

17  brothers have ever used any of those firearms for any purpose

18  other than hunting or target practice or qualification?

19          JUROR NO. 51:  No.

20          THE COURT:  Let me ask you this, ma'am.  If as we

21  said in open court yesterday, the trial takes several days, and

22  that's our best interest, could be a little shorter, could be a

23  little longer, could go to the end of the week, can't rule out

24  the possibility folks might have to come back on Monday, how

25  would that schedule impact you and how would you address that

1  impact?

2              JUROR NO. 51:  I'm not sure yet.  Like I said, I'm

3  going day-by-day trying to find child care.  My husband is out

4  of town.

5              THE COURT:  Does your husband normally travel?

6              JUROR NO. 51:  He does travel for work, yes.

7              THE COURT:  Do you anticipate he'll be out of town

8  the balance of this week?

9              JUROR NO. 51:  Right, he comes home on the weekends.

10             THE COURT:  So every week he's out of town during

11 the business week?

12             JUROR NO. 51:  He leaves Sunday night, comes back --

13 Monday mornings, returns Friday evenings.

14             THE COURT:  Other than your two-year-old and

15 five-week-old, does anybody else reside in the home with you?

16             JUROR NO. 51:  No.

17             THE COURT:  Remind us what line of work are you in.

18             JUROR NO. 51:  Human resources.

19             THE COURT:  Let me ask you this, ma'am.  Today is

20 the second day of jury selection, so we're asking folks, is

21 there anything that has come to mind either related to the

22 questions we asked in the courtroom or anything else you think

23 should come to our attention that might affect your attention

24 as a juror?

25             JUROR NO. 51:  I pointed out to them downstairs and

1  up here, I do have to pump every two to three hours.

2          THE COURT:  You need a private location

3  approximately every two to three hours to do that?

4          JUROR NO. 51:  Yes.

5          THE COURT:  Mr. Ortiz and Ms. King, any follow-up

6  questions for this juror?

7          MS. KING:  Have you had any issues with pumping

8  since you have been here yesterday and today?

9          JUROR NO. 51:  No.  I mean they were accommodating

10  downstairs in the waiting room.  Today they -- security asked

11  me about my bag and said it looked very dangerous, what was it,

12  which I kind of chuckled about, but aside from that I have had

13  no problems.

14          MS. KING:  Are you having any issues storing your

15  expressed milk?

16          JUROR NO. 51:  I have a little baggie cooler.

17          MS. KING:  You said your son is having a hard time?

18          JUROR NO. 51:  Taking to a bottle.

19          MS. KING:  Did he take any bottle yesterday?

20          JUROR NO. 51:  He did a little bit, but according to

21  my mom, he just had difficulty latching to it.

22          MS. KING:  Is this the first time you have been away

23  from him since he has been born?

24          JUROR NO. 51:  It is.

25          MR. ORTIZ:  Is it fair to say this is kind of

1 weighing on your mind?

2          JUROR NO. 51:  I mean -- it's stressful to have my

3 baby crying and have someone else watch them, but it's going to

4 have to happen sooner or later.

5          THE COURT:  Is someone coming to the house to watch

6 them?

7          JUROR NO. 51:  They are coming to the house, yes.

8          THE COURT:  Mr. Sindler, any follow up, sir?

9          MR. SINDLER:  But you're hoping that you get

10 coverage as the days go by because it sounds like you're not

11 planning beyond the day on which we're talking.

12          JUROR NO. 51:  Absolutely.  I'm just going -- I

13 don't know what is to come tomorrow or I wasn't sure of what

14 was to come today.

15          MR. SINDLER:  Thank you.

16          THE COURT:  Ma'am, let me ask you this.  If you

17 learned later today you were selected for the jury, do you

18 believe you would be able to make arrangements for the days you

19 would be here on jury duty?

20          JUROR NO. 51:  I'm sure that I could make that work.

21          THE COURT:  Let me ask you this, ma'am.  I note

22 that -- I don't know what time you left the house in North

23 Huntingdon, if you followed the Court's instructions and you

24 were in the courtroom by 8:45, you have been up in this area of

25 our building for about two hours.  Do you need a private space

1  now?

2          JUROR NO. 51:  I've already found a private space

3  around 9:30.

4          THE COURT:  If you need assistance, please let

5  Mr. Babik know and we'll arrange for a private space for you.

6          JUROR NO. 51:  Okay.

7          THE COURT:  Any further follow-up, Mr. Sindler?

8          MR. SINDLER:  No.

9          THE COURT:  Mr. Ortiz and Ms. King?

10         MS. KING:  No.

11         THE COURT:  Thank you, ma'am.

12      (Juror No. 51 exits chambers.)

13         THE COURT:  Mr. Sindler, any cause matters as to 51?

14         MR. SINDLER:  It's two-pronged.  One, I think her

15  attention is going to be divided, even if you disagree or the

16  government objects to that reason, there is a fairly good

17  prospect that for the couple days that we have ahead of us,

18  there is the chance of a delay because she's having trouble

19  finding coverage, even though she does have an optimistic

20  outlook about that.

21         THE COURT:  A delay in starting for the day?

22         MR. SINDLER:  I am sorry, a delay starting for the

23  day.  Once she's here, she's here.  It's about the opening of a

24  new day and I just get out of sorts.  This is a selfish reason

25  from where I'm sitting because something has happened with the

1  prisoner, it was my client, and I don't want to put my selfish

2  reasons upfront here, but it's a very good chance of a delay

3  where even though despite her optimistic outlook, she doesn't

4  have right now coverage for the remaining days of the week.

5          THE COURT:  Appreciate that, Mr. Sindler.

6          Mr. Ortiz and Ms. King?

7          MS. KING:  We do not object to her being stricken.

8  I would just say that having a five-week-old baby, I do think

9  that she would have divided attention.  And I also think that

10  having a solely breastfed baby who is not taking a bottle would

11  be on her mind during the time of the trial.  I think she

12  should be relieved.

13          THE COURT:  I will release her.

14          51 is excused.

15          That brings us to No. 67 who answered yes to

16  Question 16 and 38.

17          Does anyone back here need a break?  We will take a

18  brief recess.

19      (Whereupon, there was a brief recess in the proceedings.)

20          THE COURT:  We're back on the record in chambers.

21          The defendant, Mr. Warren, is present represented by

22  his lawyer, Mr. Sindler.

23          Mr. Ortiz and Ms. King for the United States ar

24  present as well as court staff.

25          The last action taken was to release Juror 51.

1          That brings us to Juror 67 who responded yes to 16

2 and 38.

3      (Juror No. 67 enters chambers.)

4          THE COURT:  Counsel, we have Juror 67 here.

5 Yesterday he responded yes to two questions, the first of which

6 was No. 16.

7          It asks if you or any member of your immediate

8 family has ever been a witness or a defendant in a criminal

9 case other than a minor traffic violation.

10          JUROR NO. 67:  Actually, I was a witness in a more

11 of after civil suit, though.

12          THE COURT:  What kind of case was it, sir?  If you

13 can describe it in your own words.

14          JUROR NO. 67:  Basically, my neighbor that was

15 living in the same apartment building we were in apparently

16 somehow fell in the yard while it was icy, broke his shoulder

17 pretty good, and he ended up suing the landlord.

18          THE COURT:  Did you actually go to court, sir?

19          JUROR NO. 67:  Yes.

20          THE COURT:  You testified as a witness?

21          JUROR NO. 67:  Correct.

22          THE COURT:  Do you recall about how long ago that

23 was?

24          JUROR NO. 67:  I would say maybe about two years

25 ago, something like that.

1            THE COURT:  Do you know what town or city that

2  courthouse was in?

3            JUROR NO. 67:  Washington, Pennsylvania.

4            THE COURT:  Do you remember who any of the lawyers

5  were in that case?

6            JUROR NO. 67:  I think the one just retired.  I

7  probably couldn't -- I know faces more than names, sorry.

8            THE COURT:  Fair enough.  Is that the only reason

9  you answered yes to that question, sir?

10            JUROR NO. 67:  Yes.

11            THE COURT:  Was there anything about your experience

12  as a witness or coming to court and testifying in the case that

13  you've just described that has affected, you believe, has

14  affected your views in any way about the court system, jury

15  system, jury trial system, lawyers, witnesses, defendants,

16  police, court officials, judges, bailiffs, anything at all that

17  you believe affected you from that system?

18            JUROR NO. 67:  It seemed as though actually being a

19  witness on a trial just seemed like it was -- it was very

20  lengthy, they drug it out for five years.  I really kind of got

21  grilled up on the stand, too.  It just seemed like it really

22  wasn't worth it, and they still awarded awarding him $30,000

23  for insurance.  The only thing he could have gotten was more

24  than that, you know.  At least he was getting $30,000.  We

25  weren't told that until afterwards.  It was like, wow, okay,

1 honestly, what was the point other than just maybe it wasn't

2 quite as much.

3          THE COURT:  Were you called as a witness on behalf

4 of the gentleman that fell?

5          JUROR NO. 67:  No, actually I was called on behalf

6 of the landlord.

7          THE COURT:  Do you believe you were in any way

8 treated improperly or unfairly as a witness?

9          JUROR NO. 67:  I wouldn't say improperly, but the

10 lawyer for the gentleman that fell certainly did grill me

11 pretty good.

12          THE COURT:  Let me ask you this, sir.  Every juror

13 that is seated in this case is going to take an oath and by

14 that oath, they're going to commit to rendering a fair and just

15 verdict based only on the evidence presented in this courtroom,

16 in this trial, along with the instructions I give as the judge.

17          If you were selected, sir, do you believe you'd have

18 any hesitation or difficulty in abiding by that oath?

19          JUROR NO. 67:  No.

20          THE COURT:  You were very thoughtful or you took

21 some time to think about that.  Can you help me understand

22 that.

23          JUROR NO. 67:  I'm just -- I have a lot going on in

24 my life and stuff like that.  It's like I almost kind of feel

25 like -- I almost kind of feel like I am a shoe-in for being a

1 juror, but I just -- there's just so much going on in my life,

2 it just seems like it makes it awfully difficult.

3          THE COURT:  What kind of things are that?

4          JUROR NO. 67:  We just got a puppy about a week ago,

5 an eight-week old puppy.  I have been having to stay up nights

6 with it just to basically make sure that she doesn't use the

7 bathroom, until we can potty train her and stuff like that.  We

8 have a 2-year-old.  My job requires me to basically bend over

9 backwards it seems like all the time at work.  I almost have to

10 tear myself away to go home.

11          THE COURT:  What line of work are you in, sir?

12          JUROR NO. 67:  I work for Universal Hospital

13 Services.  I don't know if I said that the first time around.

14 I work on medical equipment.  So they require me to go here and

15 go there, even Cleveland, Columbus, it just depends upon the

16 day.  They could say tomorrow you're going to Cleveland and

17 just having to do it just to keep things running in the

18 hospitals.  So, my job requires more than 100 percent it seems

19 like.

20          THE COURT:  When you're on your job, are you

21 compensated on a salary basis?

22          JUROR NO. 67:  No.

23          THE COURT:  How are you compensated?

24          JUROR NO. 67:  Just hourly.

25          THE COURT:  So, what happens to your compensation

1  while you're on -- if you would be selected for jury duty?

2  JUROR NO. 67:  I believe they would actually pay for

3  it, but I'm not quite sure.  I believe there is a selection in

4  their timekeeping computer part of it that actually -- you can

5  select jury duty.

6  THE COURT:  So you believe you would be covered in

7  that regard while you're here?

8  JUROR NO. 67:  Probably, so it would actually kind

9  of be a little bit more of a vacation, honestly.

10  THE COURT:  Six of one, half dozen of another?

11  JUROR NO. 67:  Yes.

12  THE COURT:  The other question you answered yes to

13  was 38.  38 asked everyone whether they or someone in their

14  family possessed or owned a firearm or ammunition, if they did,

15  what kind and for what purpose.  You answered yes.

16  JUROR NO. 67:  Mine is for protection, probably for

17  my wife.  She was actually raped when she was 11 years old

18  and -- I guess if nothing else, every once in a while we

19  wonder -- she maybe keeps a little bit of tabs on him since he

20  is in the system to make sure he stays far enough away from us.

21  I guess he's been around several areas we have lived in before

22  and stuff like that, not too far away.  Just basically for our

23  protection.

24  THE COURT:  You said this happened when your wife

25  was 11.  About how many years ago would that have been?

1          JUROR NO. 67:  She's 37 now, so about 26 years ago.

2          THE COURT:  Do you know, did that case go to court?

3          JUROR NO. 67:  Yes.  Yes, he was actually in prison

4 for I believe 18 years.

5          THE COURT:  This person, do you believe they still

6 reside or travel around in the area you live in?

7          JUROR NO. 67:  I haven't really asked her in a long

8 time.  He's been kind of bouncing between Uniontown,

9 Pennsylvania, where we lived there for a little bit, and then

10 down to West Virginia, in and out of the state it seemed like

11 where his family has more of that.

12          THE COURT:  What county do you live in?

13          JUROR NO. 67:  Washington County.

14          THE COURT:  What type of firearm is this that you

15 have?

16          JUROR NO. 67:  .9 millimeter Ruger.

17          THE COURT:  Pistol?

18          JUROR NO. 67:  Yes.

19          THE COURT:  Do either you or your wife have a

20 concealed carry permit for that?

21          JUROR NO. 67:  No. It's locked up in the house all

22 the time.

23          THE COURT:  Have you or your wife ever used it for

24 any purpose other than hunting or target shooting?

25          JUROR NO. 67:  No.

1          THE COURT:  One of the other things we went over in

2   court yesterday -- we're here on day two today, sir, I was

3   curious, we're asking everyone, whether there is anything about

4   any of the topics we talked about in questions in court

5   yesterday or anything else that you wanted to bring to our

6   attention about either any of those matters or anything else

7   that would affect your possible service as a juror?

8          JUROR NO. 67:  Well, I'm not quite sure of the

9   specifics on trial itself, but my cousin is a -- used to be a

10  state policeman -- I don't know, if that's even close enough

11  for immediate family or not since I don't talk to him.

12         THE COURT:  It wasn't in our definition, but I

13  appreciate you bringing it up.

14         JUROR NO. 67:  In Virginia.

15         THE COURT:  In Virginia.

16         JUROR NO. 67:  I believe he works for the federal

17  government now.

18         THE COURT:  In the Virginia area?

19         JUROR NO. 67:  Yes.

20         THE COURT:  In some type of law enforcement for the

21  federal government?

22         JUROR NO. 67:  Yes.  He really didn't give me much

23  of a description of what he does, but he says it's very

24  important.

25         THE COURT:  Let me ask you this, sir.  I'm just

1  double checking my notes, that's why we all take notes when

2  we're out in the courtroom.

3          One of the other questions we talked about in court

4  was whether anybody in our jury panel themselves or any member

5  of their immediate family had ever been the victim of a crime.

6  I think that was Question 11.  I didn't have a note down for

7  that one with you.  I was just curious why that maybe didn't

8  come up yesterday, or if my notes are incorrect?

9          JUROR NO. 67:  Well, basically, my uncle was shot

10  and killed up in Akron, Ohio.  He was shot four times.  The guy

11  only ended up getting like 15 years.  So, it was a little bit

12  of a dado, even though I really wasn't close with him, but we

13  did go up for the funeral and this, that, and the next, and

14  stuff like that.  For some reason, he almost kind of separated

15  himself from the rest of the family a little bit.  I'm not sure

16  why.

17          THE COURT:  This was an uncle?

18          JUROR NO. 67:  Yes.

19          THE COURT:  I didn't ask about uncles yesterday so I

20  can understand that.

21          About how long did that thing in Akron happen, about

22  how long ago?

23          JUROR NO. 67:  I'd say early '90s, something like

24  that.  It's been a long while.

25          THE COURT:  There was a court proceeding with that

1 and it led to somebody being convicted of that crime?

2             JUROR NO. 67:  Correct.

3             THE COURT:  Was there any reason the situation with

4 your wife when she was 11 didn't come up in court yesterday?

5             JUROR NO. 67:  Well --

6             THE COURT:  Maybe I just have bad notes.

7             JUROR NO. 67:  No.  I don't know.  Maybe I wasn't

8 sure on how to answer that correctly.

9             THE COURT:  You filled us in today.

10            JUROR NO. 67:  That was more of I guess before I was

11 with her or met her or anything like that.  So, maybe I didn't

12 feel as though it was important.

13            THE COURT:  Or part of the question.

14            JUROR NO. 67:  Yes.

15            THE COURT:  So you didn't know your wife -- it's not

16 like you knew each other when you were 11 or 12.

17            JUROR NO. 67:  Yes.

18            THE COURT:  Fair enough.

19            Mr. Ortiz and Ms. King, any follow up for this

20 juror?

21            MR. ORTIZ:  No, I don't believe so.

22            THE COURT:  Mr. Sindler, same question.

23            MR. SINDLER:  Why do you believe you're a shoe-in to

24 be a juror on this case, or did I misunderstand you?

25            JUROR NO. 67:  I don't know.  I guess because I

1 don't really follow the news.  I try to stay out of trouble, do

2 the best I can on whatever I do, and stuff like that.  So, I

3 don't know, it's more of just I guess -- I don't know.  It

4 seems like that's the way things go.  I don't know.

5            MR. SINDLER:  I understand that the event that --

6 the tragic event involving your wife happened well before you

7 were married, but it is still with both of you because I guess

8 you're able to track or you think they may be in your midst?

9            JUROR NO. 67:  Yes.  Basically she can get online

10 and find out where he's residing at as long as I guess he

11 reports in to whoever he has to report in to.

12            MR. SINDLER:  Do you know when this happened, did

13 she know her attacker at the time?

14            JUROR NO. 67:  Oh, yes.  Basically, family friend

15 and was actually dating her sister at the time.

16            MR. SINDLER:  Then with respect to your uncle who

17 was shot and killed in Akron, did you say that you were

18 disappointed by the punishment he had gotten, the defendant,

19 not the uncle, obviously?

20            JUROR NO. 67:  I honestly thought that he should

21 have gotten more for that.

22            MR. SINDLER:  Why did you feel that way?

23            JUROR NO. 67:  Well, I thought the standard for

24 life -- a murder trial or something like that would be at least

25 20 years, but maybe I was mistaken.  I think he actually maybe

1   served 18 years or something like that because it was an

2   unregistered handgun, too, so they gave him three for that, but

3   it was like -- I don't know, that's kind of piddly to me.

4              MR. SINDLER:  Did you attend the proceedings?

5              JUROR NO. 67:  No.  We did go to the courthouse

6   after the funeral, but that was it.

7              MR. SINDLER:  That's all I have.

8              THE COURT:  Sir, let me ask you one question as a

9   follow-up, then as I always do, we'll give the lawyers a chance

10  to follow-up from my question.

11             In every trial in this court where somebody is

12  charged with a crime, one of the instructions I give to the

13  jury, every federal judge gives to every jury is the jurors, as

14  the judges of the facts, are to consider the evidence presented

15  in this courtroom and the instructions that I give them in

16  reaching their verdict.  One of the things every federal judge

17  tells every jury is that they are not to concern themselves in

18  any way, shape or form with what sentence or punishment should

19  occur if in any criminal case a defendant were to be found

20  guilty.  Like all of the instructions that every federal judge

21  gives, it's very important that everyone abide by those

22  instructions.

23             Given the situation with your uncle and this

24  situation with your wife, do you believe you'd have any

25  hesitation or difficulty in following that instruction?

1             JUROR NO. 67:  I don't believe so.

2             THE COURT:  Do you think you could follow and would

3 follow that instruction?

4             JUROR NO. 67:  I think so, yes.

5             THE COURT:  Mr. Sindler, any follow-up to the

6 Court's questions?

7             MR. SINDLER:  No.

8             THE COURT:  Mr. Ortiz and Ms. King?

9             MR. ORTIZ:  Actually, I do.

10             When Mr. Sindler was asking you questions about the

11 crime that was committed against your uncle, you were talking

12 about I guess your displeasure with the sentence that the

13 defendant had received there.  Toward the end you mentioned you

14 felt that the firearm offense was piddly I think was the word

15 you used?

16             JUROR NO. 67:  Yes.  Obviously, it didn't make it a

17 lengthier term, but I felt it was -- I don't know, kind of

18 silly to me that they're able to tack on more -- more of the --

19 we're getting away from what actually was the issue and the

20 crime and now we're worried about, well, it wasn't registered.

21 Well, to me, I just kind of felt like it was, I guess -- I

22 don't know.

23             MR. ORTIZ:  Do you recall yesterday the judge

24 explained what the charge was in this case that is alleged to

25 have happened?

1              JUROR NO. 67:  No, I don't really recall.

2              MR. ORTIZ:  Do you mind if we tell him the charge?

3              JUROR NO. 67:  I think I might vaguely remember.  I

4    wasn't quite sure.

5              THE COURT:  I'll re-read exactly what I said in

6    court yesterday.

7              JUROR NO. 67:  Sorry.

8              THE COURT:  No problem.  No problem at all, sir,

9    that's why we all keep our notes and I keep my notes.

10             Among the things that I said yesterday was that,

11   what I said was:  The government is pursuing this case by an

12   indictment, which is a formal document used solely for the

13   purpose of charging a defendant with having committed a crime

14   and informing the defendant of the nature of the pending

15   charges.  It is merely a statement of charges.  It is not

16   evidence or proof of criminal conduct.

17             Under the law, a defendant is presumed to be

18   innocent, the government has the burden of proof of proving the

19   charge set north in the indictment through witness testimony

20   and evidence beyond a reasonable doubt.

21             I also told the jury panel the mere fact that

22   Mr. Warren has been charged with criminal conduct and is

23   present in this courtroom is not evidence or proof that he is

24   guilty of anything.  You should have no opinion as to his guilt

25   at this moment in time.  As a matter of fact, if you were

1  called upon to render your verdict at this moment, under the

2  law you would have to find Mr. Warren not guilty.  Why?

3  Because by law, he's presumed to be innocent unless proven

4  guilty beyond a reasonable doubt, and at this time, there's

5  been no witness testimony or evidence whatsoever presented to

6  establish guilt.

7           I then said the grand jury has returned a one-count

8  indictment against the defendant.  Count One charges Mr. Warren

9  with knowingly possessing a firearm, in or affecting interstate

10 commerce on or about October 23, 2012, in the Western District

11 of Pennsylvania, after having been convicted of a crime

12 punishable by imprisonment for a term exceeding one year.  As

13 previously stated, the charge against the defendant is set

14 forth in an indictment which is simply the description of the

15 charge made by the government against the defendant, but the

16 indictment is not evidence that the defendant committed a crime

17 or crimes.

18           The defendant has pled not guilty to the charges.

19           Those are the matters I stated in open court

20 yesterday exactly as I stated them yesterday.

21           MR. ORTIZ:  Sir, having re- read that instruction

22 about what this case is generally about, do you have any

23 feelings about the merits of a charge such as that or a case

24 such as that?

25           JUROR NO. 67:  No, no, I guess -- I kind of felt --

1  I guess as far as going back to my uncle's thing is that the --
2  I guess looking at the bigger issue as far as my uncle was
3  killed and murdered by this gentleman, to me, I guess the gun,
4  unregistered is just really minute, really just not important
5  to me, anyway.  But, of course, I think I'm just -- I think it
6  was just because it's my uncle and the brutality of it.  He was
7  actually shot four times, one square in the chest, loaded into
8  the back of the guy's pickup and drove around for an hour and a
9  half before he dropped him off at the hospital to make sure he
10 was dead.  I just think, to me, that just seemed like it was
11 really kind of small potatoes compared to what actually
12 happened.
13          MR. ORTIZ:  Kind of lost sight what the case was
14 about?
15          JUROR NO. 67:  Right.  I guess I can see in this
16 case that, yes, that would probably be important.  That's what
17 it is mainly about.  I just think in my uncle's case, it really
18 wasn't that concerning, even though it did help put him away a
19 little bit longer.
20          THE COURT:  Mr. Ortiz and Ms. King, any further
21 follow-up?
22          MS. KING:  No.
23          MR. ORTIZ:  No.
24          THE COURT:  Mr. Sindler, any follow-up?
25          MR. SINDLER:  No.

1          THE COURT:  This is the second day that we're here.

2 Is there anything about other matters that came up in regard to

3 any of the questions we asked in the courtroom yesterday or

4 anything else you think we ought to be aware of relative to

5 your potential jury service?

6          JUROR NO. 67:  No.

7          THE COURT:  Thank you very much.

8      (Juror No. 67 exits chambers.)

9          THE COURT:  Ms. King or Mr. Ortiz, any cause matters

10 as to Juror 67?

11          MS. KING:  No.

12          THE COURT:  Mr. Sindler?

13          MR. SINDLER:  I'm concerned about his candor.  It

14 goes back to something I said earlier today, a question is

15 asked and it's pretty straightforward, only because he's here

16 now did we learn about the things that he did not answer yes to

17 yesterday with respect to whether people in his family were

18 victims of a crime.  The uncle may not have counted.  I can

19 understand where he's coming from with respect to his wife,

20 that horrible incident happened many years before they were

21 married, but it's still very much a part of their lives.

22          THE COURT:  And therefore?

23          MR. SINDLER:  Therefore, I'm concerned about the

24 lack of candor.  He's bringing it up now, but I wonder then

25 what else he could have answered yes to that he didn't.  Having

1  not done so yesterday with respect to whether or not somebody

2  like a wife had been a victim of a crime.

3           THE COURT:  Therefore, do you move to strike for

4  cause.

5           MR. SINDLER:  I move to strike for cause.

6           THE COURT:  No problem.  I just wanted to make sure

7  we have a clear record.

8           Ms. King and Mr. Ortiz, any position on that motion?

9           MS. KING:  Your Honor, I think he was candid, very

10 candid when he came in today just now to speak with us.  He did

11 answer yes to a question regarding possessing the firearm, and

12 today himself brought up why they possess that firearm.  I

13 think that he explained that this happened to his wife when she

14 was 11 years old, before he ever knew her.  It wasn't something

15 on his mind as being current in his life right now with respect

16 to when the crime occurred, which I believe is how he read that

17 question.  He did provide many answers today.  I think he was

18 very forthcoming with us today.  He said that he could fairly

19 and accurately follow the Court's instructions and that he

20 could be a fair and impartial juror.

21          THE COURT:  I'm going to deny the motion.  I think

22 the situation with the uncle would have not -- I don't believe

23 the questions asked yesterday would have required him to

24 provide that.

25          I find his explanation regarding why the situation

1  with his wife was not answered yesterday regarding Question No.

2  11 to be satisfactory.  So I'll deny the motion to strike for

3  cause.

4                    As to Juror 36, he would be in as panel member 28.

5                    Which brings us to No. 42, who had five yes answers;

6  No. 11, No. 15, No. 18, No. 21, and No. 38.

7             (Juror No. 42 enters chambers.)

8                    THE COURT:  Counsel, we have Juror 42 with us

9  yesterday.  He responded yes to several questions yesterday and

10  we'll go over those, sir.

11                   Before we do that, we're asking everyone since it is

12  the second day of jury selection, is there anything that has

13  come to mind relative to the questions we asked in the

14  courtroom yesterday or anything else regarding your potential

15  service as a juror that you think we ought to know or should be

16  brought to our attention?

17                   JUROR NO. 42:  Yes, yesterday I was asked if you had

18  made study of the law.  I have not, I have never attended a law

19  class in my life.  I worked in a gun store for about 15 years,

20  so I -- while I never actually sat down and studied law in a

21  structured manner, I did have to know various gun laws to be

22  able to function in my job.  I worked very closely with ATF

23  agents and whatnot as they came in and did their audits and so

24  forth.

25                   THE COURT:  The gun store was a licensed federal

1 firearms dealer?

2          JUROR NO. 42:  Absolutely.

3          THE COURT:  Two stores.

4          JUROR NO. 42:  Two different ones, one in Ohio and

5 one here in Pennsylvania.

6          THE COURT:  When did you last have that kind of job?

7          JUROR NO. 42:  Two years ago I was laid off.

8          THE COURT:  That was from the store here in Western

9 Pennsylvania?

10          JUROR NO. 42:  Yes.

11          THE COURT:  Did you ever have any, with yourself

12 personally, any issues where you were not in compliance with

13 the applicable firearms laws?

14          JUROR NO. 42:  That is a really sticky question

15 because a lot of times, you will have to actually ask an ATF

16 agent for a written -- basically, a written opinion on what the

17 law means because it is so archaic and convoluted.  There are

18 sometimes at which you'll ask one agent, does this computer

19 program meet your standards for recordkeeping, and one will say

20 yes and one will say no.  There was actually the last audit I

21 was at, there was an ATF agent that was quoted as saying, if

22 the book doesn't say you can do it, you can't.  The problem

23 with that is there's a lot the book doesn't cover, the actual

24 manual of laws that we are given as a gun store.  So what is

25 not in there is massive.  I understand where she was coming

 1  from.  But yes, there are several times at which we were not in

 2  compliance, but not while I was in charge of the inventory I

 3  guess is the best answer I can give you.

 4        THE COURT:  No one in any position of authority ever

 5  cited you or gave you any written notice of violation as to

 6  your conduct?

 7        JUROR NO. 42:  No.

 8        THE COURT:  Anything else that has come to mind?

 9  We'll go over the questions you answered yes to, but anything

10  else as to the questions yesterday?

11        JUROR NO. 42:  That was it, a matter of the phrasing

12  of having studied the law as opposed to it was kind of

13  practical osmosis.  I had to pick it up in order to do my job.

14        THE COURT:  Now, the first question you answered yes

15  to yesterday was No. 11.  No. 11 asks:  Is there any matter

16  pending in your life about which you're concerned that would

17  prevent you from devoting your full, undivided attention to

18  this trial?

19        JUROR NO. 42:  Yes.  My wife walked in six weeks ago

20  and said she didn't love me anymore, and so we decided we were

21  going to try to work it out.  Three weeks later I kind of said,

22  I haven't kind of seen you in three weeks, what are we working

23  out here?  She said nothing.  So, we've kind of been trying to

24  divvy things up very slowly.  We're trying to work our way

25  through to the point at which we fill out paperwork for

1 divorce.

2        I went out of town for a book signing over the
3 weekend and I came back in and she's moved half of her stuff
4 out.  So, over the course of like yesterday and today, it has
5 continued.  She no longer lives at the house and I was not
6 really informed.  So they're kind of picking through my life
7 while I'm not there.  That has taken up a great amount of my --
8 every time I'm not thinking about anything else, that's what
9 I'm thinking about, it's very distracting.

10        THE COURT:  You're saying these things happened
11 while you were here yesterday for jury duty?

12        JUROR NO. 42:  She works at like three o'clock in
13 the morning until around ten or eleven, so she'll get home at
14 noon or one, and that's her evening.  Then she goes to bed
15 early at six or seven.  So she's actually probably getting off
16 of work and heading back to the house now.

17        THE COURT:  How is that preventing you from devoting
18 your full, undivided attention to these matters?

19        JUROR NO. 42:  It was just the words "undivided
20 attention."  I'm very distracted at the moment.

21        THE COURT:  Do you believe if that process that
22 you've described generally is continuing during the course of
23 this trial, would that impair your ability to give your full
24 attention to the issues in this case?

25        JUROR NO. 42:  I really hope not, but it was a

1  matter of erring on the side of caution.  Overall, I really

2  love my wife and I trust her, but she's moving out with her

3  brother and I don't know what she's going through.

4        THE COURT:  The next question you answered yes to

5  was 15.  15 asked:  Have you or any member of your immediate

6  family been employed or sought to be employed by the federal

7  government, other than the military, or any state, local,

8  county or federal law enforcement agency or court in any paid

9  or volunteer capacity.

10       JUROR NO. 42:  The woman I am separating from now

11 worked for the TSA for I think it was ten years, which was

12 employed by the federal government.

13       THE COURT:  Did she work at the airport?

14       JUROR NO. 42:  She did.  She actually worked at

15 Cincinnati but only here, but only for six to eight months.

16       THE COURT:  As one of the TSA people when you get on

17 the airplane and go through security?

18       JUROR NO. 42:  That's correct.

19       THE COURT:  Any other reason you answered 15?

20       JUROR NO. 42:  I did seek employment -- I talked

21 when ATF agents would come in, I would spend an awful lot of

22 time with them because eventually I became in charge of the

23 inventory.  Our process worked very well together and at a

24 certain point I started talking to the agents that would come

25 into the store about getting employment with the ATF as an

1 auditor since it was well paid position.

2          THE COURT:  Did anything ever come of that?

3          JUROR NO. 42:  No.  We talked a couple of times,

4 they sent me some websites and links, but I didn't go in for an

5 actual interview specifically because of the degrees that are

6 required.

7          THE COURT:  Any other reason you gave a yes to

8 No. 15?

9          JUROR NO. 42:  No.

10          THE COURT:  The next question you answered yes to

11 was 18.  That asked whether you or a member of your immediate

12 family had ever been the victim of a crime.

13          JUROR NO. 42:  Yes, I had my car broken into.  My

14 younger daughter was groped by a friend of my ex-wife's and

15 that went to court.  My wife was raped by her brother when she

16 was preteen.

17          THE COURT:  Let's start with the break into your

18 car.  When did that happen?

19          JUROR NO. 42:  That was four years ago.

20          THE COURT:  Were the police involved in any way?

21          JUROR NO. 42:  No, it was probably kids, they broke

22 in, grabbed the change out of the change drawer, a set of brand

23 new winter gloves and that's about it.

24          THE COURT:  Then the situation with your younger

25 daughter, about how long ago did that happen?

1            JUROR NO. 42:  I want to say that was about six

2 years ago.

3            THE COURT:  Did that end up involving law

4 enforcement and going to court?

5            JUROR NO. 42:  Yes, it did.

6            THE COURT:  Did you go to court?

7            JUROR NO. 42:  I did not.  They actually avoided

8 telling me anything about it until it was over, which was kind

9 of like my ex.

10            THE COURT:  Just so I can put the pieces in place in

11 my own mind, was this younger daughter residing with you?

12            JUROR, NO. 42:  She was with -- my children live

13 with my first ex.  They had met a guy at a local pool and he

14 seemed very nice, and bad things happened.  They went to trial.

15 They went to the police, the police arrested the man, and he

16 went to trial.  He's on probation.

17            THE COURT:  Was there actually a trial or was it

18 resolved in some other way?

19            JUROR NO. 42:  I don't know whether it was a plea

20 bargain or trial -- if one of my kids breaks their arm, I will

21 be told after it's like set kind of deal.  That is --

22            THE COURT:  Do your children reside some distance

23 from you?

24            JUROR NO. 42:  They live in Cleveland, so about 200

25 miles.

1          THE COURT:  Then lastly, the situation with your

2  wife when she was younger.

3          JUROR NO. 42:  This is something --

4          THE COURT:  This is your current wife?

5          JUROR NO. 42:  This is my current wife.  It was

6  something that she told me when we first started dating is that

7  apparently she and her brother -- and he's four or five years

8  older than she is, so I guess she was around 12 and he was

9  around 16 or 17.  And this, of course, being 30 years ago now

10 was in an age before they immediately hit all kinds of alarm

11 bells and police automatically got involved.  There was a lot

12 of therapy and things of that nature, but eventually he left

13 and went to the Navy.

14         THE COURT:  "He" being her brother?

15         JUROR NO. 42:  That's correct.

16         THE COURT:  Did that go to any type of court or

17 legal proceeding?

18         JUROR NO. 42:  I have no idea but I really doubt it.

19         THE COURT:  Is there anything about those three

20 situations that you've described or how they were handled, not

21 handled, how the legal system was involved that has affected

22 your thinking in any way about the court system, the jury

23 system, the legal system or anybody that participates?

24         JUROR NO. 42:  I think the situation with my

25 daughter is the one that bothers me the most, but not knowing

1 enough of what actually happened moment to moment, I can't

2 really form much of an opinion.  I know it went to court.  I

3 know he spent some time in jail.  I know he's not in jail and

4 he should be.

5          THE COURT:  How has that affected you, sir?  You

6 said that was the one that affected you the most.

7          JUROR NO. 42:  It has given me some doubts as to the

8 effectiveness of the legal system, but I suppose anybody would.

9          THE COURT:  Let me ask you this, sir.  One of the

10 things that will happen in this case, as it happens in every

11 case, is when the jury is selected, they will all take an oath

12 to render a fair and impartial verdict based only on the

13 evidence that they hear in this trial, in this court, in this

14 case, and the instructions I give as the judge.  Is there

15 anything about any of those experiences or any of your other

16 life experiences that would give you any hesitation in your

17 able to abide by that oath?

18          JUROR NO. 42:  I do not believe so.  The only thing

19 that worries me a little bit is the fact that I did work with

20 firearms for years and have more than just a healthy respect

21 for what they do and how you must act when you have them, when

22 you own them.

23          THE COURT:  Why does that give you pause?

24          JUROR NO. 42:  If you go out on to a gun range and

25 you act unsafely, the guy who comes out every once in a while

1   is not the guy who is going to actually tear your head off.  It

2   isn't even the range officer, he won't get a chance.  It's the

3   guy right next to you who is actually out there shooting every

4   day because that's his big hobby.  We take our responsibilities

5   very seriously.  We take dealing with firearms very seriously.

6   We are our own worst critics, no matter what you might see in

7   the press.  So, I have preconceived notions about how you

8   handle firearms and how they get stored, whatnot.

9           THE COURT:  When you say preconceived notions about

10  those things, can you generally describe those?

11          JUROR NO. 42:  I think it can actually be described

12  best as they have what is called a negligent discharge, when

13  your gun goes off and you didn't expect it to.  Unless your gun

14  was made in the 1920s, that means the trigger was pulled.  So,

15  inside of the industry, we don't talk about negligent or

16  accidental discharges, we talk about negligent discharges.  You

17  pulled the trigger, it was your fault, and there is nothing you

18  can get around to say well, I dropped the gun, it went off.

19  That doesn't happen, it can't happen anymore.  There are only a

20  half a dozen brands made that will do that.  The rest are

21  tested to be lawyer proof is the expression.

22          THE COURT:  You know these things from your life

23  experience and the work you've done?

24          JUROR NO. 42:  Yes.

25          THE COURT:  Now, the next question you answered yes

1  to was, was there anybody else, either yourself or another

2  family member, that has been a victim of a crime?

3              JUROR NO. 42:  That was the --

4              THE COURT:  The three things we talked about?

5              JUROR NO. 42:  That is correct, no one else.

6              THE COURT:  Then No. 21 asked if you or anyone in

7  your immediate family has been employed as a firefighter or

8  affiliated with any fire department?

9              JUROR NO. 42:  My father was the Assistant Fire

10 Chief of Cincinnati.

11             THE COURT:  The City of Cincinnati, Ohio?

12             JUROR NO. 42:  That's correct.

13             Actually, my job when I came to Pennsylvania, I

14 was -- I worked for Anthony Arms.  The job was outside sales.

15 Really, what I did was I went to fire departments and baseball

16 clubs and whatnot and I provided them with the guns that you do

17 gun bashes with.  We provide them at a very low rate in

18 exchange for the fact that we got exposure for bringing the

19 guns to the gun fair and raffling them off and then doing the

20 paperwork to sell them.

21             THE COURT:  These would be fund-raising sales by

22 these organizations?

23             JUROR NO. 42:  That's correct.  Between growing up

24 with my father and seeing a lot and meeting a lot of the guys,

25 I learned to walk very humbly around firefighters, I have a

1   healthy respect.

2               THE COURT:  Then you answered yes to 38, which asks

3   if you or any member of your family owned or possessed a

4   firearm, if so, what kind and for what purpose?

5               JUROR NO. 42:  We are going to be here a while.  The

6   guns I have are going to be self-defense and for sport.

7               THE COURT:  Long guns?  Handguns?

8               JUROR NO. 42:  Yes.  I have guns manufactured back

9   in the 1930s from Russia.  I have AKs and ARs and shotguns,

10  semi-automatic magazine-fed 12-gauge Barishnakoff.

11              THE COURT:  Are you personally a federal firearms

12  dealer?

13              JUROR NO. 42:  No.

14              THE COURT:  Have you ever used any of the firearms

15  you've mentioned for any purpose other than hunting or target

16  practice?

17              JUROR NO. 42:  Self-defense, I have concealed carry

18  license from both Pennsylvania and Florida.  I carry most

19  places that it is legal to do so.

20              THE COURT:  You mentioned a variety of what I'll

21  call long guns in your listing there a moment ago.  Do you have

22  any handguns?

23              JUROR NO. 42:  Quite a few, revolvers,

24  semi-automatics, a variety of calibers, .357, .45 .9 millimeter

25  Smith & Wesson.

1          THE COURT:  Thank you very much, sir.

2          Do we have any follow-up?

3          Mr. Sindler, any follow-up?

4          MR. SINDLER:  Are you concerned any of your weapons

5   might be taken by your current wife or her brother?

6          JUROR NO. 42:  At this point, no, my wife is very

7   serious about firearm safety as well.  The brother doesn't have

8   access to the safe.  She's could give him access to the safe,

9   but I don't -- I think the guy is the kind of person that would

10  pick up something if he thought it was interesting and walk out

11  with it.  I might wind up missing a few books or CDs, but I

12  don't think I'm going to miss a TV or a Ruger.

13         MR. SINDLER:  Do you want to be a police officer or

14  work for law enforcement?

15         JUROR NO. 42:  Overall, no.  I'm really hoping that

16  I can get my novelist career to take off.  It would be

17  interesting, but we're talking about several years.  I'm 42,

18  going back to college for several years for a law enforcement

19  degree to enter into government service, probably wouldn't be

20  as efficient as I'd like.

21         MR. SINDLER:  When you talked about negligent

22  discharge on the range and whether or not a person is holding a

23  certain weapon from many decades ago, I'm trying to understand

24  or reconcile that with the charge that my client is facing,

25  that is that if you're a felon in this country, you can't hold

1  a firearm, if you have a certain background, so to speak.  Is

2  what you answered with respect to that question earlier today,

3  does that have any factor or effect with respect to sitting in

4  judgment on Mr. Warren?

5           JUROR NO. 42:  I am just used to the idea that there

6  is zero tolerance involved with firearms, their possession,

7  their location, there are a lot of people who have gotten into

8  trouble because they go into the bathroom, they take off their

9  gun, they use the restroom and then they leave and the gun is

10 left behind.  I personally don't see any kind -- there but for

11 the grace of God go I, but I don't see any reason for that to

12 ever happen other than the fact that you forgot that's a deadly

13 weapon.  Deadly weapons don't just appear somewhere.  They were

14 placed somewhere, they were held somewhere.

15          THE COURT:  So if the government would introduce as

16 part of this case a firearm, do you find that you could sit as

17 a juror in this case where the charge is that my client is

18 allegedly a felon in possession?

19          JUROR NO. 42:  I believe so.  I just -- it's very

20 hard to describe.  The idea that a gun shows up somewhere, I

21 have a lot of preconceived notions about who picks up a gun,

22 why they have it, whatnot.

23          MR. SINDLER:  I understand.  That's all I have.

24          THE COURT:  Mr. Ortiz and Ms. King, any questions?

25          MR. ORTIZ:  Obviously, you have something that we

1  would characterize as a lengthy backgrounds with firearms from

2  your employment, your personal ownership and possession.  If

3  you were seated in the trial, the Judge would give you

4  instructions about what makes up a potential crime, what things

5  are appropriately considered, or not, in the course of the

6  time.  Would you be able to follow his instructions as it

7  related to this case which does involve firearms?

8            JUROR NO. 42:  With lengthy instruction, I believe

9  so.

10            MR. ORTIZ:  So if the Judge were to say, this is

11  what it is, you would follow his instruction?

12            JUROR NO. 42:  Yes.

13            MR. ORTIZ:  Do you think that despite your

14  background, your employment, people that you've worked with,

15  your own possession, that you can be fair and impartial as

16  you're judging the evidence as it is coming at trial.

17            JUROR NO. 42:  Yes.

18            THE COURT:  Ms. King and Mr. Ortiz, did you have any

19  other follow-up?

20            MS. KING:  No.

21            THE COURT:  One of the things that will happen when

22  the jury is seated in this case, as happens in every case, is

23  they will take an oath to render a fair and impartial verdict

24  based only on the evidence that is given in the courtroom, in

25  this case, in this trial, and to follow the Court's

instructions as delivered by the Judge.  And as I believe I

noted yesterday, and would note in the instructions to the

jurors, that obligation of the jury to render a fair and

impartial verdict based only on the evidence and the Court's

instruction is intended to make sure that all parties to a

proceeding like this get a full and fair trial, the government,

who brings the charge, and a defendant who is resisting the

charge.  Do you have any doubts or hesitation as to your

ability to follow such an oath if you were taking that oath?

JUROR NO. 42:  I do not have any doubt.

THE COURT:  Any hesitation?

JUROR NO. 42:  Slight hesitation, but I have never

done this before.

THE COURT:  So is the hesitation because you have

never done this before?

JUROR NO. 42:  I think so.

THE COURT:  Is there anything that would limit your

efforts to make sure you followed that oath?

JUROR NO. 42:  No.

THE COURT:  Mr. Ortiz and Ms. King, any follow-up to

the Court's questions?

MS. KING:  No.

THE COURT:  Mr. Sindler, any follow-up to the

Court's questions?

MR. SINDLER:  No.

```
 1              THE COURT:  Sir, thank you very much for coming
 2  back.
 3         (Juror No. 42 exits chambers.)
 4              THE COURT:  This is an odd numbered juror so we
 5  start with Mr. Sindler, 37 on my listing.
 6              So, Mr. Sindler, I'm asking you first on the odd
 7  ones and the government on the even ones, this is the 37th
 8  juror we've brought back.
 9              MR. SINDLER:  I have two reasons to strike him for
10  cause.  The fact that he's very distracted during a tumultuous
11  time in his life, despite the fact he won't miss his television
12  set, his attention has been divided by what may not be there
13  when he comes home on a given day.
14              Secondly, it's disingenuous to say, as Mr. Ortiz
15  tried to insinuate that despite your background --
16              THE COURT:  I didn't hear you or Mr. Ortiz insinuate
17  anything.
18              MR. SINDLER:  To say that despite his background,
19  can you still listen to the judge's instructions about how to
20  view firearms?  This man has a heavy -- is heavily influenced
21  by his work with firearms.  And the sense that I get, it's more
22  than a sense, it's a feeling that I get that Mr. Warren was
23  around a firearm under circumstances where he knew he should
24  not have been, and this man is going to hold it against him.  I
25  think his background does not make him somebody who could be
```

1  fair and impartial in this case, for that second reason.

2              THE COURT:  Okay.

3              Ms. King and Mr. Ortiz?

4              MR. ORTIZ:  Judge, first of all, I don't think

5  there's anything about my statements or my questions that I

6  think are pretty matter of fact and straightforward.  The

7  answers that they elicited is he could be fair and impartial,

8  he could follow your instruction and take your guidance as to

9  how he should view the evidence.  I think that he was pretty

10 consistent about that the entire time he was here so for cause

11 on that basis, I just don't think it's there.

12             Regarding the distraction he may have, he's

13 certainly going through a personal experience, but he didn't

14 come out and say, I can't consider anything else.  He said, if

15 I'm not thinking about other things, I think about this.  But

16 if I am focused on something else, that's what I'm focused

17 upon.  So I don't think that that's somehow inhibiting him from

18 being able to appropriately evaluate the evidence in this

19 trial.

20             THE COURT:  Okay.

21             I'm going to deny the motion to strike for cause.  I

22 think as to Question 11, the distraction question, I think he

23 explained himself.  I think he's candid that it's an issue on

24 his mind.  I also think he explained himself that he can handle

25 it.

1              I think in terms of the questions regarding

2  firearms, I think he has an -- he believes he has an awareness

3  of the laws in regard to his time working for a firearms

4  dealer, but I think he was also quite clear that he will follow

5  the Court's instructions.

6              And his only hesitation in his ability to do that is

7  he hasn't done it before, based on the limitations on his

8  efforts to do that.

9              So, I don't think he is a juror that would be

10 stricken for cause, so I'll deny that motion.

11             He'll be in the pool as our 29th juror.

12             I will also observe by way of observation that I

13 think all counsel -- one thing I know for sure and one thing is

14 my evaluation.  The thing I know for sure is I have given all

15 counsel in this case far more latitude than I have given in any

16 other case during voir dire, not for any particular reason

17 other than we have highly experienced counsel on both sides of

18 the case who, in the Court's estimation, have been asking

19 completely appropriate follow-up questions.

20             I think the Court has been asking some probing

21 follow-up questions, and I endeavor to ask the ones that might

22 be the most probing in my anticipation because I think they are

23 better coming from the Court than from one advocate or the

24 other.  I say that not by way of limitation on anything I've

25 seen Mr. Sindler do or I've seen Mr. Ortiz and Ms. King do.  So

1    I know for sure you have ended up having far more latitude than

2    I have seen in other jury selection processes that I've

3    conducted, so I know that.  What I believe is everyone has been

4    completely appropriate in how they have done that.

5              I do sense that we are on the verge of getting a

6    little edgy with each other.  Since it is my hand and my hand

7    alone that is on the lever of allowing counsel to ask follow-up

8    questions at all, just be aware the hand is on the lever and

9    it's my impression that we may be on the cusp of getting a

10   little edgy with each other and with me.  I can handle me, but

11   I'm obligated to make sure that you don't get edgy with each

12   other.

13             So let's just keep it right down between the orange

14   cones.  I intend on continuing to let you have the same

15   latitude you've all had because I think it has been valuable

16   and it has brought things out that should come out during the

17   jury selection process.

18             One thing I would correct for the record as to Juror

19   No. 67, I made a reference to a response to Question 11 as

20   relating to victim of a crime, a victim of a crime, either

21   themselves or a family member.  That was really a different

22   question.  Apparently, when I made that reference, I was

23   focused on the fact that that juror mentioned that his wife was

24   a victim when she was 11 years old, so it was not in response

25   to Question 11.  So I correct the record in that regard.

1          Our next juror up is No. 11, who answered yes to

2  Questions 5, 22 and 38.

3          MR. SINDLER:  On that juror, though, Judge, I had

4  put down it as 38, but it is 67 who is the last one seated

5  before 42.

6          THE COURT:  Correct.  The last one seated was

7  No. 67.  Then we just -- in the pool is 67.  42 is in the pool.

8  When I made a reference to No. 37, I keep a list of the

9  numerical number of people that have come back here and for my

10 own notes, I allow you to ask the first follow-up questions and

11 make cause motions on the odd number and come back with the

12 even number for the government.

13         MR. SINDLER:  I think he was the 38th juror, that's

14 where I got mixed up.

15         THE COURT:  No. 62 is the --

16         MR. SINDLER:  67.

17         THE COURT:  No. 67 I have as the 36th juror that

18 came back here and 42 was the 37th juror we have considered.

19 So the last two in the pool are 67 and 42.

20         The next one for consideration is No. 11.

21     (Juror No. 11 enters chambers.)

22         THE COURT:  We have with us, counsel, Juror No. 11

23 who responded yes to three questions and we'll go over those in

24 a moment.

25         One of the things I've noted is today is the second

1  day we have been here for jury selection.  Are there any

2  matters that have come to mind since yesterday either relative

3  to questions we asked out in the courtroom or anything else

4  that might affect your ability or your service as a juror that

5  you want to bring to our attention before we go through your

6  specific yes answers.

7            JUROR NO. 11:  Two questions I think were asked, one

8  was do you know anybody else on the panel?  One of the panel

9  members I didn't recognize, but we ended up walking in the same

10 time day I went to high school with.

11           THE COURT:  About how long was that?

12           JUROR NO. 11:  1996 to 2000.

13           THE COURT:  What high school was that?

14           JUROR NO. 11:  Brentwood.

15           THE COURT:  Do you happen to know that other juror's

16 number.

17           JUROR NO. 11:  I do not.

18           THE COURT:  Did you recognize them prior to walking

19 in together today?

20           JUROR NO. 11:  No.

21           THE COURT:  Then you said there was a second thing.

22           JUROR NO. 11:  My brother, I think one of the other

23 ones was, do you have a family member that ever was arrested.

24 I had a brother who had a criminal charge.

25           THE COURT:  Is that a younger, older brother?

1                    JUROR NO. 11:  Older brother.

2                    THE COURT:  About how long ago was that?

3                    JUROR NO. 11:  Probably about a year.

4                    THE COURT:  How old was he at the time?

5                    JUROR NO. 11:  37.

6                    THE COURT:  Do you know how that charge was

7    resolved?

8                    JUROR NO. 11:  It was pled out at the magistrate

9    level.

10                   THE COURT:  Do you recall what the nature of the

11   charge was?

12                   JUROR NO. 11:  I think it was false plates on a

13   vehicle.

14                   THE COURT:  License plates?

15                   JUROR NO. 11:  Yes.

16                   THE COURT:  Do you know what the consequences, if

17   any, were for your brother as a result of that?

18                   JUROR NO. 11:  I think it was a fine or something

19   like that.

20                   THE COURT:  Anything else that has come to mind

21   since yesterday?

22                   JUROR NO. 11:  No.

23                   THE COURT:  Now, the first question you answered yes

24   to yesterday was No. 5.  Question 5 asked:  Do you know anybody

25   else on the jury panel, me, the judge, or any member of our

1   court staff?

2              JUROR NO. 11:  Yes, I've had cases in front of Your

3   Honor.

4              THE COURT:  You have?

5              JUROR NO. 11:  I have one pending now.  It's a new

6   one.

7              THE COURT:  Have we had any proceedings in that

8   case?

9              JUROR NO. 11:  Not on that case yet, no.  It's new.

10             THE COURT:  Can you tell us what the case is?

11             JUROR NO. 11:  It's an IRS action, United States of

12  America versus individuals for fraudulent conveyances coming

13  out of a tax.

14             THE COURT:  Have just the papers been filed in that

15  case?

16             JUROR NO. 11:  The complaint has been filed, no

17  answer is due yet.

18             THE COURT:  What side of the case are you going to

19  be on?

20             JUROR NO. 11:  Defense.

21             THE COURT:  What other cases have you had in this

22  court?

23             JUROR NO. 11:  We've had a few bankruptcy appeals

24  because we do bankruptcy work, I know Your Honor, I think we've

25  had a few of those and a few civil cases, contractors, unions,

1 things of that nature.

2          THE COURT:  Have you physically appeared in any

3 proceeding where I have been the judge?

4          JUROR NO. 11:  I believe I have.

5          THE COURT:  Were those, that physical appearance was

6 it in the courtroom or was it a matter in the conference room

7 or telephone conference?

8          JUROR NO. 11:  I think it would have been the Rule

9 26 conferences.  I think that's as far as I have gotten.

10          THE COURT:  These were all civil case?

11          JUROR NO. 11:  Yes.

12          THE COURT:  Was there any other reason you gave a

13 yes answer to No. 5?

14          JUROR NO. 11:  I may have had some calls with your

15 law clerks, but nothing I can really recall, but no.

16          THE COURT:  Do you know whether or not there are any

17 proceedings scheduled in the civil case you've just described

18 to occur within the next several weeks?

19          JUROR NO. 11:  I don't believe so.

20          THE COURT:  Will you be personally involved in those

21 cases?

22          JUROR NO. 11:  I will be on some level, yes.

23          THE COURT:  Do you believe any of that past

24 experience in this court or your anticipated future experience

25 in this court affects your ability to serve as a juror in any

1 way?

2 　　　　　JUROR NO. 11:  I don't believe so.

3 　　　　　THE COURT:  Then the next one you answered yes to

4 was No. 22.  That question is have you ever studied law?

5 　　　　　JUROR NO. 11:  Yes.  I went to law school.  I have

6 been a lawyer for eight years.

7 　　　　　THE COURT:  Where did you go to law school?

8 　　　　　JUROR NO. 11:  Duquesne.

9 　　　　　THE COURT:  Then lastly, 38 asked whether you or

10 anybody in your family owns or possesses a firearm or

11 ammunition, if yes, what kind and for what purpose?

12 　　　　　JUROR NO. 11:  We own just a shotgun.  My wife likes

13 to have it in the house for defense purposes.  That's the only

14 one we have.

15 　　　　　THE COURT:  Have you ever fired it?

16 　　　　　JUROR NO. 11:  I have not.

17 　　　　　THE COURT:  Has your wife?

18 　　　　　JUROR NO. 11:  I'm sure she has.  She grew up in

19 central Pennsylvania, it's part of her family's way of life.

20 　　　　　THE COURT:  Did she bring that shotgun to the

21 marriage, if you will?

22 　　　　　JUROR NO. 11:  Pretty much.

23 　　　　　THE COURT:  It wasn't one that you purchased after

24 you were married?

25 　　　　　JUROR NO. 11:  It was not.

1          THE COURT:  Do you know if your wife has ever used

2  that shotgun for any purpose other than hunting or target

3  shooting?

4          JUROR NO. 11:  She has not.

5          THE COURT:  Mr. Babik, could you ask Juror No. 11,

6  take him into the hallway for a moment so I can go over some

7  follow-up with counsel, then we will be bringing him back in.

8          Hold him in the hallway, sir.

9      (Juror No. 11 exits chambers.)

10         THE COURT:  Since his answers to Question 5 involved

11  me, or he believes they involved me, I wanted to give you an

12  opportunity to run through any follow-up, if any, you'd want on

13  that question outside of his presence, then we'll do any

14  follow-up in his presence.

15         Mr. Sindler?

16         MR. SINDLER:  It sounds from just reading your body

17  language, Judge, that you did not recognize him or recognize,

18  more importantly, that there are any cases pending right now or

19  had been pending, but I could have been reading that body

20  language incorrectly.

21         THE COURT:  I know, I believe he said yesterday he

22  works for the law firm of Robert O. Lampl.

23         MR. SINDLER:  That's what he said.

24         THE COURT:  When I was in practice I had cases

25  involving Robert O. Lampl personally, and I'm aware that

Robert O. Lampl law firm has had cases here.  With all due

respect to Juror No. 11, I don't recall ever seeing him or

talking with him or knowing him.  I can't tell you his name

now.  I don't mean any offense to him as a lawyer, but you were

reading that correctly.

          MR. SINDLER:  That's all I have.

          THE COURT:  Mr. Ortiz and Ms. King?

          MS. KING:  No.

          THE COURT:  We'll bring him back in for some more

follow-up.

          MR. ORTIZ:  I can't think of any follow-up.

          THE COURT:  We'll bring him back in.  I just thought

in fairness you should have an opportunity outside of his

presence.

    (Juror No. 11 enters chambers.)

          THE COURT:  Juror No. 11 has come back into the

room.

          Mr. Ortiz and Ms. King, any follow-up for Juror No.

11?

          MS. KING:  Yes.

          So it seems from your answers that you work

primarily on civil cases, bankruptcy type cases.  Do you ever

do any criminal cases?

          JUROR NO. 11:  I do.

          THE COURT:  Can you describe those.

1           JUROR NO. 11:  Usually they're in state court.  I
2  have done aggravated assaults, things of that nature.  We do
3  have some white collar crime.  We're usually ancillary, they
4  arise out of a bankruptcy case, bankruptcy fraud or financial
5  fraud of some nature, so there's usually a bankruptcy case
6  going on with a criminal case that we're consulting with
7  criminal counsel and handling some of those aspects as they
8  interrelate to the criminal cases.  It's either small crimes on
9  the state level or white collar crimes, which usually end up in
10 this courtroom.
11          MS. KING:  The criminal cases that you have worked
12 on, am I right, you're a defense counsel?
13          JUROR NO. 11:  Yes.
14          MR. ORTIZ:  Has any of the work of your firm or you
15 specifically in these white collar criminal defense cases, have
16 they involved prosecutions by the U.S. Attorney's office?
17          JUROR NO. 11:  Yes.
18          MR. ORTIZ:  Anything that is currently pending?
19          JUROR NO. 11:  I have two currently pending, yes.
20          MR. ORTIZ:  Two current prosecutions you're defense
21 attorney on?
22          JUROR NO. 11:  They're interrelated with each other,
23 it's a husband and wife.
24          MR. ORTIZ:  In relation to any of the referrals that
25 are associated with your defense work, have you or your firm,

1  has Mr. Sindler or his firm at all been involved with any of

2  your cases?

3            JUROR NO. 11:  Not that I'm aware of, no.

4            THE COURT:  I'll ask a follow-up before we turn it

5  over to Mr. Sindler.

6            On the two cases you mentioned involving husband and

7  wife, have you entered your appearance on the docket of the

8  court?

9            JUROR NO. 11:  We have not, no.  We referred him --

10 I'll leave it there.

11           THE COURT:  You're referred it to somebody else.

12           JUROR NO. 11:  He has been referred to somebody else

13 because of our involvement in the bankruptcy case.

14           THE COURT:  Your appearance and your firm's

15 appearance haven't been entered in that case?

16           JUROR NO. 11:  Correct.

17           THE COURT:  Have you or others in your firm had

18 occasion to meet with either an Assistant United States

19 Attorney or others in the United States Attorney's office or

20 federal law enforcement treasury agents, anything like that,

21 postal inspectors, tax agents?

22           JUROR NO. 11:  Yes.

23           THE COURT:  Let me split that question in part.

24 Have you or others in your firm met with one or more Assistant

25 United States Attorneys relative to that case?

1            JUROR NO. 11:  No face-to-face meetings on that

2   case.

3            THE COURT:  Is that you?

4            JUROR NO. 11:  Me and Robert Lampl.

5            THE COURT:  That's a pending case.

6            JUROR NO. 11:  Correct.

7            THE COURT:  Are any of the United States Attorneys

8   you've spoken with either Mr. Ortiz and Ms. King?

9            JUROR NO. 11:  They are not.

10            THE COURT:  Mr. Sindler, any follow-up, sir?

11            MR. SINDLER:  You have been working with Mr. Lampl's

12   office for how long?

13            JUROR NO. 11:  Four and a half years or so.

14            MR. SINDLER:  Has it been continuous?

15            JUROR NO. 11:  Yes.

16            MR. SINDLER:  Did you work in any prosecutor's

17   office before that time?

18            JUROR NO. 11:  I have not.

19            MR. SINDLER:  Do you recall your career before that

20   time where you were working?

21            JUROR NO. 11:  Yes.  When I started my legal career,

22   I had two document review jobs, one at Babst Calland and one at

23   Robert Pierce & Associates.  I clerked for a year and a half or

24   two years for a criminal judge in Washington County, Judge

25   DiSalle, he had criminal and family docket.  I was in-house

1 counsel at Anthony Crane, which is a large crane company in the

2 region, and from that I ended up moving into my position with

3 Robert Lampl.

4          MR. SINDLER:  The criminal cases on which you worked

5 as a defense lawyer, are they primarily situated in a certain

6 county?

7          JUROR NO. 11:  They tend to be Allegheny County.

8          MR. SINDLER:  Here in Pittsburgh.

9          JUROR NO. 11:  Yes.

10          MR. SINDLER:  That's all I have.

11          THE COURT:  One follow-up question.  When you worked

12 for Judge DiSalle, was that a paid position?

13          JUROR NO. 11:  It was.

14          THE COURT:  Were you his only law clerk?

15          JUROR NO. 11:  There were two law clerks.

16          THE COURT:  When you worked with Judge DiSalle, did

17 you work on any particular kind of cases or not work on any

18 particular kind of cases?

19          JUROR NO. 11:  It was primarily he had -- the way

20 they did the docket down there was criminal and family.  The

21 other law clerk tended to like family and I tended to like the

22 criminal side, so that's kind of how we divvied it up.

23          THE COURT:  Did Judge DiSalle have any civil cases

24 on his docket?

25          JUROR NO. 11:  He did.  They were kind of randomly

1  assigned based on when he was sitting motions judge.  That's

2  the way they organized their caseload down there.  When you're

3  civil motions and you hear a motion on the case, then you keep

4  it, at least through disposition of say a motion for summary

5  judgment.

6           THE COURT:  One of the other questions that we went

7  over in court yesterday was whether any member of your family

8  or you had ever been employed by the federal government outside

9  of the military.

10          Have you ever been employed by the federal

11  government outside of the military?

12          JUROR NO. 11:  I have not.

13          THE COURT:  Then we also asked as part of that

14  question if you were employed by or sought to be employed by

15  any state, local, county or federal law enforcement agency or

16  court and in a paid or volunteer capacity.

17          I don't recall the Judge DiSalle thing coming up

18  then.

19          JUROR NO. 11:  No, I must have misheard, I thought

20  it was in a law enforcement capacity, so that's my fault.

21          THE COURT:  The court part didn't register?

22          JUROR NO. 11:  It must not have registered.

23          THE COURT:  Any follow-up to my questions,

24  Mr. Sindler?

25          MR. SINDLER:  No.

1                    THE COURT:  Mr. Ortiz and Ms. King?

2                    MR. ORTIZ:  One brief follow-up to Mr. Sindler's

3   question.

4                    You mentioned you did in-house counsel work for

5   Anthony Crane.

6                    JUROR NO. 11:  Yes.

7                    THE COURT:  Did you do any other representation for

8   the business associated with Mr. Anthony or Anthony Crane?

9                    JUROR NO. 11:  Yes.

10                   MR. ORTIZ:  What would that have been?

11                   JUROR NO. 11:  General in-house counsel, anything

12  that came up for him.  He had a lot of entities, so I dealt

13  with anything that came up, contract negotiations, litigation.

14                   MR. ORTIZ:  Did you do any work in relation to

15  Anthony Arms?

16                   JUROR NO. 11:  A little bit.  There was a -- right

17  before I got there, there was an investigation by the -- it

18  before I was there.  It's the NTF, right -- ATF.  Basically I

19  think they took their license for a while.  That was before I

20  got there.  It was just kind of like overseeing, making sure we

21  were on the right path with our inventory.  It was an inventory

22  issue.

23                   MR. ORTIZ:  So it doesn't sound like you had much

24  dealing with federal firearms laws or what is at issue in a

25  case like this?

1              JUROR NO. 11:  No.

2              THE COURT:  Sir, let me ask you this, then we'll see

3  if Mr. Sindler has any follow-up.

4              Have you ever been a lawyer in a jury trial?

5              JUROR NO. 11:  No.

6              THE COURT:  Have you ever attended a jury trial?

7              JUROR NO. 11:  Yes.

8              THE COURT:  So then it may not come as a surprise to

9  you that one of the things that is going to happen in the

10 trial, as it does in every jury trial in this courthouse, is

11 once the jury has been selected, they'll be administered an

12 oath, by that oath, they will be swearing or affirming that

13 they will render a fair and just verdict based solely on the

14 evidence presented in this trial, in this court, in this

15 courtroom, in this case, and that they will do so in conformity

16 with the instructions that I will provide.

17             Is there anything about your experiences or anything

18 else that gives you any doubts or hesitation as to your ability

19 to follow that oath?

20             JUROR NO. 11:  No.

21             THE COURT:  Mr. Sindler, any follow-up, sir?

22             MR. SINDLER:  No.

23             THE COURT:  Thank you, Juror No. 11, appreciate you

24 coming back.

25         (Juror No. 11 exits chambers.)

1              THE COURT:  Mr. Ortiz and Ms. King, any matters

2    regarding cause?

3              MR. ORTIZ:  No.

4              MS. KING:  No.

5              THE COURT:  Mr. Sindler?

6              MR. SINDLER:  No.

7              THE COURT:  No. 11 is in as our 30th juror.

8              I have ten minutes after twelve.  I'm happy to keep

9    going.  I'm also happy to hear from counsel on that.

10             MR. SINDLER:  I think that in deference to the

11   people in your courtroom -- I can keep going but I think we

12   should give them a break.

13             THE COURT:  Mr. Ortiz and Ms. King?

14             MS. KING:  We agree, yes.

15             THE COURT:  If we let them take a break and ask them

16   to be back in the courtroom by an hour from now, knowing that

17   we may get a straggler or two and we end up starting about 1:15

18   or 1:20.

19             Does that work for you, Mr. Sindler?

20             MR. SINDLER:  Yes.

21             THE COURT:  Does that work Mr. Ortiz and Ms. King?

22             MR. ORTIZ:  Yes.

23             THE COURT:  We'll do that.

24             Mr. Babik, we are going to take a break.  We are

25   going to ask the jury to be back here for 1:15.

1          Then once you take role, we'll get started again

2     back here with counsel.

3          Mr. Ortiz and Ms. King, anything else that we should

4     take care of while we're here at this moment?

5          MS. KING:  No.

6          MR. ORTIZ:  No.

7          THE COURT:  Mr. Sindler, same question of you, sir?

8          MR. SINDLER:  In terms of logistics and people

9     movement, is my sense correct that when having openings today,

10    that by the end of the day, we'll be in the midst of or no

11    further along than the close of the government's case because

12    I'd rather not have people here today who may be testifying for

13    the defense and would like to get a sense as to whether I can

14    wait to call them or to be here physically until tomorrow

15    morning.

16         THE COURT:  Well, that's a great question.  I think

17    it's an appropriate question.  Here's my sense of what I know

18    has to happen today or the order in which things will occur.

19         We will bring back Jurors 5, 34, 24, and 57 based on

20    the two items Ms. King raised early this morning and 57's

21    report to us.

22         We're at 30 in the pool right now.  We'll get two

23    more in the pool so that we have 32, irrespective of the open

24    cause challenges and those three jurors.  We'll then

25    interrogate them.  They may or may not remain in or come into

1  the pool.

2          We'll then take -- once those things are resolved,

3  we'll take the first 32, beginning with Juror No. 38 from

4  yesterday, we'll go down to 32 in the pool and then we'll cut

5  that off.

6          You then, Mr. Sindler, you'll have to have some time

7  to consult with Mr. Warren as you identify the mechanisms by

8  which you're going to exercise your peremptory challenges.

9          We'll make sure at the same time Mr. Ortiz and

10 Ms. King have time to speak with each other.

11         Let's assume that experience teaches that that could

12 be 20 minutes, might be less, might be a little more, but

13 experience teaches that it's often that.

14         Then we'll have the mechanical process of counsel

15 exercising the peremptory strikes for the 12 seated jurors and

16 the two alternates.

17         Mr. Babik will then confirm with counsel that his

18 list and their lists match.

19         I'll then go over that list with Mr. Babik.

20         We'll then seat the 12 seated jurors, Alternate 1

21 and Alternate 2.

22         I'll confirm with counsel that those are the twelve

23 and the two that should remain in the box.

24         Then and only then will we allow the other people

25 that had been brought up to leave.  In fact, we'll do that

1 after I administer the oath to the jurors.

2          Either at that moment, or if the time is

3 appropriate, we would give them a brief break and then I would

4 give my preliminary instructions.

5          That consists of 30 pages.  In my experience, I read

6 at a rate of about 50 seconds a page, so that will take 25, 20

7 to 25 minutes for me to do that.

8          Then we'll have either a break at that point, if we

9 didn't take one earlier, or we'll go right to openings.

10          Mr. Ortiz, without holding it to precision, if you

11 had to estimate how long would your opening will occur, how

12 long would that be?

13          MR. ORTIZ:  About 15 minutes.

14          THE COURT:  Mr. Sindler, without holding you to it

15 to the minute of ballpark, how long do you think you'll be

16 about?

17          MR. SINDLER:  About six or seven minutes.

18          THE COURT:  So we have 20, 25 minutes of openings.

19          20 or 25 minutes of me reading.

20          If we get started back here at one-twenty, we're

21 probably, if that all moves with expedition at about three

22 o'clock when those activities are done.

23          So, Mr. Ortiz and Ms. King, you'll be prepared to

24 begin presenting the government's case today?

25          MS. KING:  Yes.

1              THE COURT:  Based on what you know and what you

2    anticipate to be the cross-examination, do you believe the case

3    of the government will conclude at or about four-thirty today,

4    or before?

5              MR. ORTIZ:  I would think it would have carry past

6    four-thirty by a little bit.

7              THE COURT:  If we start at three, do you think

8    you're going to be done with the government's case earlier than

9    four-fifteen?

10             MS. KING:  No.

11             THE COURT:  Mr. Sindler, I think it is safe to say,

12   and I will not require you to have people here on red alert, we

13   will -- either today's day will end in the middle of the

14   government's case, or not all the way concluded with it, or at

15   the conclusion of the government's case in chief.  If you would

16   prefer to start -- if that happens, if the second thing occurs

17   and you would like to start with whatever you elect to do, if

18   anything, in your case tomorrow morning, then that's when that

19   will start.  You are not going to be on red alert for today.

20             If we're done at four o'clock with the government's

21   case and you want to proceed, you'll be permitted to, but

22   unless you tell me you are, we'll break for the day.

23             Does that answer your question?

24             MR. SINDLER:  Yes, it does.

25             If we go that way, Mr. Ortiz and Ms. King, is that

1  procedurally okay with you?

2         MS. KING:  Yes.

3         THE COURT:  Procedurally is that okay with you,

4  Mr. Sindler?

5         MR. SINDLER:  It is.

6         THE COURT:  Anything else we should take up at this

7  moment?

8         MR. SINDLER:  No, sir.

9         THE COURT:  Mr. Greer, anything else you believe we

10 should take up?

11        MR. GREER:  Nothing else.

12        THE COURT:  Make sure the doorways to the courtroom

13 are otherwise secured so this courtroom is secured and there is

14 no possibility of jurors being back there.

15        Let us know when you have done that.

16        MR. GREER:  All set.

17        THE COURT:  Marshals, you may escort Mr. Warren.

18     (Whereupon, there was a brief recess in the proceedings.)

19        THE COURT:  We're back on the record in chambers for

20 the jury selection in criminal together No. 13-270, the United

21 States of America versus Mr. Atiba Warren.

22        Present is Mr. Warren, his lawyer Mr. Sindler.

23        And we have Ms. King and Mr. Ortiz for the United

24 States.

25        When we were last together before our midday break,

we had one-on-one interviews with Juror No. 11.  He is the 30th juror in the pool.

      The next one on the list was Juror 14.  She was reported absent this morning.  She did call in.  She had a fall at home.

      Mr. Babik is Juror 14 still absent?

      MR. BABIK:  Still absent, Your Honor.

      THE COURT:  Mr. Sindler, any objection if I strike Juror 14 from the jury pool?

      MR. SINDLER:  No.

      THE COURT:  Mr. Ortiz and Ms. King?

      MS. KING:  No.

      MR. ORTIZ:  No, Your Honor.

      THE COURT:  Juror 14 is stricken from the pool.

      The next juror listed would be Juror 46, who had no yes answers to any questions.

      Nonetheless, I'll ask counsel beginning with Mr. Ortiz and Ms. King, do you want Juror 46 brought back for any questioning in chambers, and/or do you have any cause issues with Juror No. 46?

      MS. KING:  No.

      THE COURT:  Mr. Sindler, same questions for you, sir?

      MR. SINDLER:  No.

      THE COURT:  So Juror 46 will be in the pool.

1            Is that agreeable with you, Mr. Sindler?

2            MR. SINDLER:  Yes.

3            THE COURT:  Is that agreeable with you, Ms. King?

4            MS. KING:  Yes.

5            THE COURT:  That is the 31st juror in the pool.

6            That brings us to Juror No. 4 who had four yes

7 answers to Questions 17, 18, 21 and 38.

8            Mr. Babik, before you bring Juror No. 4 back, Mr.

9 Ortiz and Ms. King, are there any matters we should take up

10 before we bring the next juror back here?

11           MR. ORTIZ:  No, I don't think so.

12           THE COURT:  Same question of you, Mr. Sindler?

13           MR. SINDLER:  No.

14           THE COURT:  Mr. Babik, if you'd bring Juror No. 4

15 back.

16           Counsel, I can advise you, I hope to give you at the

17 end of the day today, posted as case participants only, the

18 proposed final instructions based on what you all submitted,

19 along with the proposed verdict form for your consideration,

20 and then we'll have the charge conference whenever it makes

21 sense to have the charge conference.

22      (Juror No. 4 enters chambers.)

23           THE COURT:  Juror No. 4, ma'am.

24           Yesterday when we were together, you answered yes to

25 several questions and we're going to go over those here in a

1 minute.

2          Before I do that, it is the second day that we have

3 been in the jury selection process and I just wanted to ask if

4 since we were together yesterday, if there is anything you want

5 to bring to our attention relative to the questions we asked of

6 everybody in open court yesterday, or any matter that has

7 either arisen or may come to mind relative to your service as a

8 potential service as a juror.

9          Juror No. 4:  Nothing.

10          THE COURT:  Thank you.

11          The first question you gave a yes answer to was

12 No. 17.  It asked:  Have you or any member of your immediate

13 family ever been arrested, charged with, or convicted of a

14 criminal offense.

15          You answered yes.

16          Juror No. 4:  Not myself.  My husband when he was

17 very young, he had a DUI.

18          THE COURT:  When you say very young, what age range

19 are you talking?

20          Juror No. 4:  Probably mid 20s.

21          THE COURT:  What age range is your husband in now?

22          Juror No. 4:  Mid 50s.

23          THE COURT:  So it would be almost 30 years ago?

24          Juror No. 4:  Yes.

25          THE COURT:  Do you know how that resolved?  How that

1  charge resolved?

2          Juror No. 4:  It was expunged.

3          THE COURT:  Expunged from the record.

4          Juror No. 4:  Yes.

5          THE COURT:  Was there anything else that caused you

6  to answer yes to that question?

7          Juror No. 4:  Just that.

8          THE COURT:  Did you know your husband at that time?

9          Juror No. 4:  No.

10         THE COURT:  It was before you two had met?

11         Juror No. 4:  Yes.

12         THE COURT:  The next question you answered yes to

13 was No. 18.  It asked whether you or any member of your

14 immediate family had ever been the victim of a crime.

15         Juror No. 4:  Yes.  Myself and my husband.

16         THE COURT:  Why don't we start with you.

17         Juror No. 4:  Together, our house was broken into.

18         THE COURT:  Okay.

19         Juror No. 4:  Some electronics were stolen.  We

20 weren't home at the time.

21         THE COURT:  About how long ago did that happen?

22         Juror No. 4:  That was probably about 15 years.

23         THE COURT:  Were any of the things taken ever

24 recovered?

25         Juror No. 4:  No.

1          THE COURT:  Were those losses covered by any

2   insurance policy?

3          Juror No. 4:  No.  It wasn't a lot though.

4          THE COURT:  Do you know about how much the value of

5   the loss was?

6          Juror No. 4:  It's weird, they took the VCR and just

7   a little personal device that you would keep way before Kindles

8   and things, little personal device for addresses and things.

9          THE COURT:  Was a police report filed or did law

10  enforcement get involved?

11         Juror No. 4:  They came to the house.  I guess we

12  filed the report there, but that was it.

13         THE COURT:  Was it ever determined who did that

14  break-in?

15         Juror No. 4:  No.  But they had said there was a

16  rash of the same thing happening in the neighborhood.

17         THE COURT:  Even though the police never determined

18  who did that, did you or your husband have a belief as to who a

19  suspect or suspects were?

20         Juror No. 4:  No.

21         THE COURT:  Anything else in response to that

22  question?

23         Juror No. 4:  No, that was it.

24         THE COURT:  Let me ask you this.  In regard to your

25  yes answers to both 17 and 18, your husband's DUI about 30

1  years ago and this situation that you have just described with

2  your home, is there anything about either of those episodes,

3  either separately or together, that affect how you view in any

4  way the court system, the jury system, the jury trial system,

5  people that are involved in it be they lawyers, victims,

6  defendants, investigators, court personnel or anything?

7           Juror No. 4:  No.

8           THE COURT:  When the jury in this case, as is done

9  with every jury, the jury is instructed that they're to render

10 a fair and just verdict based only on the evidence presented at

11 this trial, in this courtroom, and in this case, and the

12 Court's instructions, do you have any doubts or hesitations

13 about your able to follow that instruction?

14          Juror No. 4:  No.

15          THE COURT:  Now, the next question you answered yes

16 to was No. 22, and asked have you ever studied law.

17          Juror No. 4:  Yes.

18          THE COURT:  Tell us about that.

19          Juror No. 4:  Briefly.  I was in the paralegal

20 program at college.

21          THE COURT:  Which college was that?

22          Juror No. 4:  Mount Aloysius.

23          THE COURT:  That's up in the Altoona area?

24          Juror No. 4:  Yes.

25          THE COURT:  Did you complete that program at that

1 time?

2          Juror No. 4:  It was a junior college at the time,

3 but yes, I did complete that.  Then I came out here to Wilma

4 Boyd and took legal secretarial studies.

5          THE COURT:  Did you ever gain employment in either

6 or both of those fields?

7          Juror No. 4:  I did.

8          THE COURT:  Tell us about that.

9          Juror No. 4:  I worked for Hilton & Hilton for a

10 brief period of time, probably maybe six months to a year, but

11 that was it.

12          THE COURT:  What did you do when you were at Hilton

13 & Hilton?

14          Juror No. 4:  Legal secretary.

15          THE COURT:  Did you have any compensated employment

16 after that?

17          Juror No. 4:  No.

18          THE COURT:  Then you answered yes to Question No.

19 38, which asked whether you or anybody in your family owned or

20 possessed a firearm or ammunition and, if so, what kind and for

21 what purpose.

22          Juror No. 4:  My father-in-law has two guns.  I

23 don't know what they are.  They're small handguns.  And my

24 sister has a very small handgun.

25          THE COURT:  Have either your sister or your

1  father-in-law ever been involved in any type of security or law

2  enforcement work?

3               Juror No. 4:  No.

4               THE COURT:  Do you know --

5               Juror No. 4:  My sister was a nurse at the prison in

6  Crescent.

7               THE COURT:  Near Loretto?

8               Juror No. 4:  Yes.

9               THE COURT:  Is she still involved in that work?

10              Juror No. 4:  No.

11              THE COURT:  Do you know about when she ended doing

12 that work?

13              Juror No. 4:  Gee, maybe in 15, 20 years, I'm not

14 sure.

15              THE COURT:  15 or 20 years ago?

16              Juror No. 4:  Yes.

17              THE COURT:  Do you know about how long she did that

18 work?

19              Juror No. 4:  A few years, I think.

20              THE COURT:  Did her service in that job end on

21 mutually favorable terms, everyone was okay with each other?

22              Juror No. 4:  Yes.

23              THE COURT:  Your father-in-law or sister, do either

24 of them have what is known as a concealed carry permit?

25              Juror No. 4:  I don't know about my father-in-law,

1  but I'm pretty sure my sister does.  I don't know about my

2  father-in-law.

3           THE COURT:  Do you know whether your sister or your

4  father-in-law ever used a firearm other than for hunting or

5  target practice?

6           Juror No. 4:  I don't know.  I don't know.

7           THE COURT:  Mr. Sindler, sir, do you have any

8  follow-up for Juror No. 4?

9           MR. SINDLER:  No.

10          THE COURT:  Mr. Ortiz and Ms. King?

11          MS. KING:  No.

12          THE COURT:  Thank you very much for coming back in.

13      (Juror No.  4 exits the room.)

14          THE COURT:  Mr. Sindler, any cause matters as to

15 Juror No. 4?

16          MR. SINDLER:  No.

17          THE COURT:  Mr. Ortiz and Ms. King?

18          MS. KING:  No.

19          THE COURT:  By my count, that would mean that there

20 are now 32 jurors in the pool.  There are pending unresolved

21 cause challenges who are not counted in that pool.  The

22 pending ones are to 57 and 227.

23          Then, Ms. King, you raised certain matters as to

24 No. 5 and No. 8.

25          We can go and get two more, interview 55.  60 had no

1  yes answers.  Or we can bring 57 back.  One of the reasons for

2  Mr. Sindler's cause challenge yesterday were her stated matters

3  regarding childcare, that it appears she advised chambers staff

4  may have been resolved.  We can bring her back and ask her

5  about that.  Then we would have 5 and 8 to do follow-up on.

6              Mr. Sindler, any thoughts, sir?

7              MR. SINDLER:  I would rather keep going.  That's

8  just my preference.

9              THE COURT:  Why don't we get two more.  Then it may

10 mean that the last two that are left end up, even if they're

11 not the pool, not being in the pool, but that way we will have

12 guaranteed that if 5 -- if, for instance, 5 and 8 are counted

13 in the pool, if either of them would end up being excluded

14 based on any follow-up questioning, then we would have had

15 other people in place.

16             Is that your thinking?

17             MR. SINDLER:  Right.  We don't want to have 34,

18 correct?

19             THE COURT:  Not at the end.  There will be only 32

20 that we pick from.

21             MR. SINDLER:  So if we pick a 33rd and 34th, is it

22 your -- I'm just trying to read your mind here, will we be

23 bringing back 5 and 8 for further questioning?

24             THE COURT:  Yes, either way, 5, 8, 57 are coming

25 back.

1          MR. SINDLER:  I'd like to still go on.

2          MS. KING:  I think we're a little confused about how

3  we're counting the potential jurors.

4          In the pool of 32 that we have, you are not

5  including 227 and 57?

6          THE COURT:  Correct.

7          MS. KING:  But you are including 5 and 8?

8          THE COURT:  Correct.  5 and 8 there were no cause

9  challenges made, so right now they're in the pool.

10          57 and 227 are not in the pool.  There are

11  unresolved cause challenges to them.

12          If, for instance, 57 were in the pool because the

13  cause challenge has been resolved -- I'm not saying it will or

14  won't be -- but one of the reasons was child care?  Let's say

15  that turns out to be resolved.  Then we would have 33 right

16  now.  And then we would talk to No. 5 and No. 8.  If they

17  stayed in the pool, then our 33rd person, the last person we

18  saw would drop off of the pool.  If 5 and 8 both left, then we

19  would need to keep interviewing.

20          MR. GREER:  I have a cause challenge to 29 as well.

21          THE COURT:  Correct, and I have not counted them in

22  the pool.  I apologize.

23          Anyone that there's a pending unresolved cause

24  challenge on, I've not counted toward the 32.

25          Why don't we start by bringing 57 back and seeing if

1  that resolves or doesn't resolve.

2          Any objection to that, Ms. King?

3          MS. KING:  No.

4          THE COURT:  Any objection, Mr. Sindler?

5          MR. SINDLER:  I don't.  I was just expressing my

6  preference earlier, so if that's now the way to go.

7          THE COURT:  Let's do this one step at a time and

8  we'll do that one first.

9          Mr. Greer, if you would arrange for Juror No. 57 to

10  come back.

11      (Juror No. 57 enters chambers.)

12          THE COURT:  Thank you so much for coming back in.

13          We have Juror No. 57 here.

14          I reported to the lawyers that this morning you

15  contacted chambers and, as I understand it, and if I misstate

16  any of this, you feel free to correct me, that yesterday when

17  you were back and were being interviewed, you shared with us

18  the status of your childcare arrangements for, as I recall, an

19  11-year-old.

20          Juror No. 57:  Yes.

21          THE COURT:  My understanding is you conveyed a

22  message to chamber, the office, today that it appears that to

23  whatever degree that has been resolved.

24          Juror No. 57:  Yes.  I actually called last night

25  and left a message.  My daughter figured something out.  So,

1  it's not a concern anymore.  I felt just like it was fair to

2  share that.

3             THE COURT:  If you were selected for the jury, those

4  childcare matters you shared with us yesterday would no longer

5  be an issue?

6             Juror No. 57:  Correct.

7             THE COURT:  Mr. Sindler, any follow-up for Juror 57.

8             MR. SINDLER:  Just because I have been interviewing

9  a lot of people the last day or so, or been involved in the

10 interviews rather, excuse me, looking down the week here to the

11 next day or two, the next couple days, you are satisfied,

12 unlike yesterday, that your child will be taken care of in your

13 absence?

14            Juror No. 57:  Yes.

15            MR. SINDLER:  Okay.

16            THE COURT:  Mr. Ortiz and Ms. King, any follow-up?

17            MS. KING:  No, Your Honor.

18       (Juror No. 57 exits chambers.)

19            THE COURT:  Mr. Sindler, the status of your cause

20 challenge?

21            MR. SINDLER:  It would be a good idea -- I don't

22 mean to prolong things -- I need to speak to Mr. Warren.

23            THE COURT:  Absolutely.  I will say this for the

24 record, nobody has done anything to prolong anything here.

25            MR. SINDLER:  This is just taking a while.  I just

1 wanted to speak with him.

2           THE COURT:  We'll take a brief recess and allow

3 Mr. Sindler and Mr. Warren to speak in a private setting.

4      (Defendant and Mr. Sindler exit chambers.)

5      (Whereupon, there was a brief recess in the proceedings.)

6           THE COURT:  Mr. Warren is present represented by his

7 counsel, Mr. Sindler.

8           Ms. King and Mr. Ortiz are here on behalf of the

9 United States.

10           The Court is present.

11           While Mr. Warren and Mr. Sindler were out of the

12 room, the only discussion was a discussion between the Court

13 and Mr. Ortiz and Ms. King regarding the various computer

14 products that Apple computer makes.

15           Do you concur?

16           MS. KING:  Yes, Your Honor.

17           THE COURT:  Mr. Ortiz?

18           MR. ORTIZ:  Yes.

19           THE COURT:  Mr. Sindler?

20           MR. SINDLER:  We'll withdraw the challenge.

21           57 is now in the pool.

22           Now, Ms. King, the two folks that you believe needed

23 some follow-up interviewing were Juror No. 5.

24           MS. KING:  Yes.

25           THE COURT:  And Juror No. 8.

1          MS. KING:  Yes.

2          THE COURT:  Juror No. 5 happened to be the

3 numerically the fourth person we talked with yesterday?

4          MS. KING:  We didn't talk with her.

5          THE COURT:  We did not talk to her, that's correct.

6          And Juror No. 8 was the --

7          MS. KING:  We did not talk to Juror No. 8.

8          THE COURT:  Didn't talk with him either.

9          Specifically, which question did you have a concern

10 about, which numbered question?

11          MR. ORTIZ:  The question dealing with prior arrest

12 or conviction.

13          THE COURT:  That would be 17.  Have you or any

14 member of your immediate family ever been arrested, charged

15 with or convicted with a criminal offense?

16          MS. KING:  Yes.

17          THE COURT:  Here's my thought.  Let me ask counsel

18 about this and get your point of view and any suggestions you

19 have.

20          We did not interview them back here yesterday.  We

21 would bring each of them back in that order, No. 5 first and

22 then No. 8 second.

23          I would note to each of them that we did not have an

24 occasion to speak with them yesterday because they had not,

25 while we were all together in the courtroom, given a yes answer

1  to any question, but as we've asked everyone we have

2  interviewed today, we've noted it's the second day of jury

3  selection and we ask everyone if there were any matters that

4  they wanted to bring to the Court's and counsels' attention

5  relating to any of the questions that were asked yesterday in

6  the courtroom or any other matters that relate to their

7  possible jury service, having had the evening to reflect on

8  things.  And then we'll see what they say.

9           Obviously, if it comes up as response to that

10  question, then we'll follow-up in the ordinary course.  If

11  either or both of them would say something like no, my thought

12  would be -- we'll ask the government first since you wanted

13  this to happen, what would you suggest I do, then we'll hear

14  from Mr. Sindler.

15           It gets easier if they say yes, Judge, I thought

16  about it, now here are one or two or three questions that I

17  want to give you some more information on, then it is pretty

18  simple.

19           MS. KING:  I don't have an easy answer to that

20  question.

21           This was on my mind because a trial that I

22  participated in the Southern District had a juror who failed to

23  tell the truth and it resulted in a series of events after the

24  fact, overturning verdicts and everything else.  I just wanted

25  the Court to know what I knew, and also Mr. Sindler to know

1   what I knew.

2           I think with Juror No. -- I don't know, I have their

3   docket sheets here.  I don't know if the Court would want to

4   show it to them or just re-ask that specific question.

5           THE COURT:  I'd like to make that the last resort,

6   if I even did it at all.

7           MS. KING:  Maybe ask that specific question.

8           THE COURT:  Maybe several specific questions?

9           MS. KING:  Particularly this question was one where

10  two people stood up, and then it seemed as though the Court was

11  going on to the next question when a third person stood up, and

12  then like four more people stood up.  So this could be one of

13  those ones where we didn't get a complete answer yesterday

14  perhaps.  I don't have any other suggestions.

15          MR. ORTIZ:  The only other suggestion I'd add is I

16  think it's reasonable to believe that if asked a pointed

17  question as to whether or not they failed to tell the truth or

18  have a criminal conviction they didn't admit to, somebody would

19  probably take offense to that and may, to a certain extent,

20  hold that against the person that called them out on it,

21  perhaps.  But in order to have it presented truthfully but

22  fairly to the parties, if that's the case, I would suggest

23  something along the lines that if the Court were to say

24  something like, the reason that the Court produces a roster

25  like this and produces the questions that are asked to the

1  jurors is partly to allow for questions, but also for the
2  parties to do or the Court to do research into who the jurors
3  may be.  During the course of that process in this case, a
4  question arose as to whether or not you are this person.  So it
5  is not directed as to the government or the defendant as being
6  responsible for calling them out on potentially lying.  I think
7  that's truthful to the juror and to the process because that is
8  what occurred and would kind of preserve some sense of play.

9          THE COURT:  I want to hear from Mr. Sindler in a
10 minute.  One of the goals here, I think we ought to have at
11 least the following two goals.  One, that all of us, the Court,
12 counsel, Mr. Warren, have accurate information about the people
13 that may be sitting on this jury.  And secondly, that if either
14 or both sides of this case, the United States and/or
15 Mr. Warren, believed that Juror No. 5 or Juror No. 8 is
16 somebody that they otherwise would want on the jury or would
17 not object to being on the jury, that there's nothing that I
18 do, we do as part of this phase of things that, if you will,
19 pollutes their ability to serve on the jury.

20         Now, both sides will have a number of peremptory
21 strikes that you can use.  You may decide to use or not use one
22 or more of those strikes with Jurors 5 or 8.  That will be your
23 business, as it would be in the ordinary course.  But I want to
24 make sure that whatever we do here serves those twin goals of
25 getting all of the trial participants' accurate information,

1 and in the mechanism of doing that, we don't cause either or

2 both of Jurors 5 or 8 to no longer be appropriate to serve on a

3 jury when either the United States and/or Mr. Warren would have

4 otherwise thought they would be perfectly appropriate to be on

5 the jury.

6          Mr. Sindler, your thoughts, sir?

7          MR. SINDLER:  Judge, the Court doesn't do research.

8 You don't do research when it comes to these things.

9          THE COURT:  I don't.

10          MR. SINDLER:  So that part may not be entirely

11 accurate.

12          I've always been taught that if you have a problem,

13 try to come up with a solution.  I don't have a solution here.

14 This is a unique situation for me.  But it is brought up at the

15 behest of the government here.

16          I just feel uneasy in ways that I can't describe

17 that it should be put in your lap to make it seem like it's

18 benign as to either side.

19          THE COURT:  I think it helps that neither of these

20 folks came back yesterday because this will be the first

21 time -- it's not like we're recalling them to double check

22 something and they otherwise would be in the pool.  I don't

23 think bringing them back as such makes it sort of sticking out

24 like a sore thumb.  I'm not saying you were inferring that.

25          MR. SINDLER:  I wasn't.  Bringing the them back, I'm

1  fine with bringing them back.  What we're going to do and how

2  it's going to transpire once they're here is something I don't

3  have a lot to add right now, just that having you do it so that

4  it seems like it's not clear who it came from, I'm uneasy about

5  that.  I'm not going to BS anybody.  I'm having a hard time

6  explaining why.  It just doesn't seem right to me that it

7  should be you doing that.  That's all.

8           THE COURT:  Well, do you have any disagreement with

9  what the Court has stated it believes the two goals of this

10  should be?

11          MR. SINDLER:  Can you state your first goal?

12          THE COURT:  First goal is all the participants in

13  the trial, the Court, lawyers for the United States,

14  Mr. Warren, and you have accurate information about the people

15  from whom which you'll be selecting the jury.

16          MR. SINDLER:  Sure.  I have been talking about that

17  since hour one yesterday, so, yes.

18          THE COURT:  Goal No. 2 is there is nothing I do or

19  anybody does in this next phase of the process that would in

20  the mind of any party or in the mind of the potential juror

21  themselves taint them or pollute them from serving as a juror,

22  if any party wanted them to serve as a juror.

23          MR. SINDLER:  I do agree with that.  It's just that

24  I was okay with 5 and 8 because I didn't have a reason to in

25  the first place and now I may be or my client may be backed

1   into a position as to one or both of them because of some

2   information the government has come across in the interim.

3            THE COURT:  Let me ask you this, Ms. King and

4   Mr. Ortiz, if we did nothing further based on what you know

5   right now, what would be your position with the Court as to

6   either or both of Jurors No. 5 and 8?

7            MS. KING:  One position that I do have is we are

8   asking all of the jurors that come back here if anything new

9   has come up and just because we're not talking to someone for

10  any other reason doesn't mean that something hasn't come up.

11  So I think if you were to call them back and ask if anything

12  has come up, or even the one that we just passed over they

13  didn't have any yes answers, because that question isn't based

14  on them answering yes to anything, yes or no to anything

15  yesterday, so if the Court wanted to call them back and ask

16  them that question alone, then maybe we would get a chance to

17  see if they would say, you know what, I did forget to say that,

18  I'm sorry.  If they didn't, I don't have any proof that it's

19  these people, so we would just have to make our decision about

20  what we do.

21           THE COURT:  Mr. Ortiz?

22           MR. ORTIZ:  No.

23           THE COURT:  So right now in the pool are three

24  people who as a consequence of giving no yes answers yesterday,

25  they gave no answers that were a yes; No. 5, No. 8, and No. 46.

1          MR. GREER:  Also No. 24, Judge.

2          THE COURT:  No. 24 had no yes answers.

3          Why don't we do this.  Let's do this to start.

4  We'll bring each of them back, 5, 24, 8, and 46, and I will ask

5  them that question.

6          MR. SINDLER:  That sounds fine to the defense.  I

7  didn't know if we were going to discuss a Plan B before we

8  start that exercise.

9          THE COURT:  Do you have any thoughts in that regard,

10 Mr. Sindler?  I'm happy to hear you now or later.

11         MR. SINDLER:  I'd like to be heard later.  I don't

12 have a thought right now.

13         THE COURT:  Let's play it as it lies.  Everyone has

14 reserved their position.

15         Mr. Greer, why don't we start by bringing

16 Juror No. 5.

17         I would ask there be no follow-up from counsel on

18 this topic without clearing it with me first on either side.

19      (Juror No. 5 enters chambers.)

20         THE COURT:  Yesterday when we were in court and you

21 had the microphone, you were saying where you worked, the

22 microphone ended up crackling a little bit.  Could tell us for

23 the record where you work.

24         Juror No. 5:  Verland CLA.

25         THE COURT:  Verland, tell us a little bit about it.

1             Juror No. 5:  I take care of mentally challenged

2    individuals in their home settings.

3             THE COURT:  What is it you do there?

4             Juror No. 5:  Direct support professional.

5             THE COURT:  This is the second day of jury

6    selection, so everyone has come back for a second day and we

7    have been asking the folks that came back today whether there's

8    anything that as they -- everyone has had a day to sleep on it,

9    is there anything about any of the topics or the questions we

10   covered in court yesterday or anything else about your

11   potential jury service that you want to fill us in on?

12            Juror No. 5:  No.

13            THE COURT:  Any follow-up in those regards, Ms. King

14   or Mr. Ortiz?

15            MR. ORTIZ:  No.

16            THE COURT:  Mr. Sindler?

17            MR. SINDLER:  No.

18        (Juror No. 5 exits chambers.)

19        (Juror No. 8 enters chambers.)

20            THE COURT:  Sir, we didn't have occasion to bring

21   you back yesterday because you didn't have any yes answers that

22   you advised us of in court yesterday, but we're checking with

23   folks that came back today.  Based on everyone having had a

24   night to sleep on it, is there anything regarding any of the

25   topics we covered on the questions that we asked in court of

1  everyone yesterday or anything else that has come up in your

2  life or has occurred to you that we ought to know or need to

3  know regarding your potential service as a juror any of the

4  matters we talked about in court?

5          Juror No. 8:  Nothing I can think of.

6          THE COURT:  Mr. Sindler, any follow-up?

7          MR. SINDLER:  No.

8          THE COURT:  Ms. King or Mr. Ortiz?

9          MR. ORTIZ:  No, sir.

10         THE COURT:  Thank you.

11      (Juror No. 8 exits chambers.)

12      (Juror No. 24 enters chambers.)

13         THE COURT:  Ma'am, we didn't have occasion to have

14  you come back yesterday because you had no yes answers to any

15  questions when we were in court yesterday.  We just wanted to

16  check in, all of us have now had a night to sleep on it because

17  it's our second day together today, anything regarding any of

18  the topics we talked about in the questions in court yesterday

19  that you want to fill us in on additionally or differently and

20  anything that otherwise has come to mind or come up regarding

21  your potential service as a juror?

22         Juror No. 24:  No, not at all.

23         THE COURT:  Mr. Ortiz any follow-up?

24         MR. ORTIZ:  No.

25         THE COURT:  Ms. King?

1          MS. KING:  No.

2          THE COURT:  Mr. Sindler?

3          MR. SINDLER:  No.

4          THE COURT:  Thank you for coming back.

5     (Juror No. 24 exits chambers.)

6     (Juror No. 46 enters chambers.)

7          THE COURT:  Counsel, we have Juror No. 46 with us.

8  Yesterday when we asked all the questions in open court, Juror

9  No. 46 had no yes answers to any questions.

10         So, ma'am, this is day two, we've all had a chance

11 to sleep on it.  Checking in, is there anything about any of

12 the topics we talked about or brought up in the questions we

13 did in open court yesterday or anything else that may have come

14 to your mind that you think we ought to know regarding your

15 potential service as a juror in this case?

16         Juror No. 46:  No.  The only thing that I don't want

17 to perjure myself on is you asked if I had any legal background

18 and I don't, so I answered it as correctly as possible, but I

19 do teach a class, it's a nursing class called legal and ethical

20 issues.  It has nothing to do with law that you guys do.  It

21 has to do with nursing practice acts and we just look at them

22 and interpret the nurse practice acts.

23         THE COURT:  So what services nurses are permitted

24 lawfully to do?

25         Juror No. 46:  Correct.

1          THE COURT:  Did you take any courses of study or

2   training or education to prepare you to teach that class?

3          Juror No. 46:  I did not.

4          THE COURT:  Other than studying the course

5   materials?

6          Juror No. 46:  I have a master's of science in

7   nursing with the ability to teach nursing and so that is what

8   prepared me.

9          THE COURT:  Anything else, ma'am?

10          Juror No. 46:  No.

11          THE COURT:  Mr. Sindler, any follow-up?

12          MR. SINDLER:  No.

13          THE COURT:  Ms. King or Mr. Ortiz?

14          MR. ORTIZ:  As to?

15          THE COURT:  Anything at all.

16          MR. ORTIZ:  I don't know that we really have

17   anything.

18          MS. KING:  I guess we still have the two pending.

19          MR. ORTIZ:  227 and 29.

20          THE COURT:  So why don't we go through the list and

21   we'll confirm who is in and confirm anything I might need to

22   rule on.

23          Juror No. 38 I have as in, no pending challenges.

24          Any disagreements?

25          MS. KING:  No.

1           MR. ORTIZ:  No.

2           THE COURT:  Juror No. 7 is in, no pending

3 challenges.

4           MS. KING:  Right.

5           THE COURT:  Mr. Sindler, I'll take it from your

6 silence that there's to pending challenge.

7           MR. SINDLER:  You're right, no mystery here, no

8 pending challenge.

9           THE COURT:  28 in with no challenges.

10          MS. KING:  Yes.

11          THE COURT:  No objections.

12          5 in with no pending challenges.

13          MS. KING:  I guess we don't have a basis to

14 challenge right now.

15          THE COURT:  Now is the time, or not.

16          MS. KING:  I think we're on the record.  It's our

17 position that she should be asked that question, but it's not

18 going to be asked.

19          THE COURT:  We have to decide what we are going to

20 do or not do.  I have to decide what we're going to do or not

21 do, each party through counsel needs to decide what they want

22 to contend that I should do or not do.

23          MR. ORTIZ:  Your Honor, I believe that our

24 contention is that she should be asked specifically about the

25 information in a way that you are comfortable with that is fair

1  and appropriate, and I think that we had said that before.  I

2  think there is a legitimate basis there to be concerned as to

3  whether or not she was truthful with the Court during her

4  responses to the questions.  That could seriously call into

5  question whether or not she could actually be a suitable juror

6  in a for cause setting.

7           THE COURT:  Appreciate that, Mr. Ortiz.

8           Let's do a couple other things.

9           But for that, does the United States have any

10 challenge for cause as to Juror No. 5?

11          MR. ORTIZ:  Not as the record stands right now.

12          THE COURT:  Mr. Sindler, does Mr. Warren have any

13 challenge for cause as to No. 5?

14          MR. SINDLER:  No.

15          THE COURT:  Now, what is the good faith basis -- I

16 know you've talked about this and by phrasing the question this

17 way, counsel, I'm not impugning this, I want to make the

18 record.

19          What is the good faith basis that counsel for the

20 United States has to believe that Juror No. 5 did not respond

21 truthfully to Question No. 17 during voir dire?

22          MS. KING:  Last evening I logged onto the

23 Pennsylvania Unified Court System website and input each of the

24 50 jurors names into that website, each one and searched --

25          THE COURT:  Is that a publicly available website?

1          MS. KING:  Yes, anyone can do that, I logged on just

2    from my work computer and did that, anyone can do that.  In

3    that database, it often contains the defendant's name, so I put

4    in their first and last name.  Then I searched for criminal

5    cases in all counties.

6          With respect to Juror No. 5, and I'm going to say

7    her name, Vanessa Smith, it provided a date of birth which

8    would have made and she said she was 27 years old.  So her date

9    of birth that was on the Pennsylvania Unified Court System had

10   her date of birth of 1988, which in my math last night was 27

11   years old.

12         It also -- she also said yesterday in open court she

13   lived in Sewickley, Pennsylvania and she owns her own home.  On

14   the Pennsylvania website it said that the person posted bail

15   herself on August 5, 2008, and the surety name was Vanessa

16   Smith, who is the defendant, at 315 Chadwick Street, Sewickley,

17   Pennsylvania 15143, which is public information.  So the fact

18   that the name is the same, the date of birth gives her the same

19   age as the Juror No. 5 said yesterday in court, and that the

20   bond was posted in Sewickley, Pennsylvania, and the arrest

21   appears to have happened in Sewickley Borough in 2008.  She

22   said that she has lived there for 27 years, so that occurred in

23   a place where she said that she lived, she's the same age as

24   this person, and lives in Sewickley.  It seems to me that it

25   very well could be the same person and that's the reasonable

1 basis that I have.

2          THE COURT:  What offense does the material show?

3 What was the disposition of the offense?

4          MS. KING:  It says the offense date of June 29, 2008

5 was for possession of marijuana and use -- possession of drug

6 paraphernalia.  Then an offense date of August 5, 2008, which

7 was disorderly conduct, which was moved to non-traffic.  The

8 two marijuana or possessions were withdrawn.  And the other was

9 moved to non-traffic.  I'm assuming that was also withdrawn.

10 But the question that Your Honor asked was:  Has anyone been

11 arrested or charged with a criminal offense?

12          THE COURT:  The specific Question 17 is:  Have you

13 or any member of your immediate family ever been arrested,

14 charged with, or convicted of a criminal offense?

15          Let me ask you this, Ms. King.  What is the position

16 of the United States if we bring Juror No. 5 back and I ask her

17 a very direct question as to -- restate Question 17 to her.

18 And she says some form of yes, I should have answered yes to

19 that question, or the true answer to that question is yes.

20 What would you propose happens next?

21          MR. ORTIZ:  Judge, I would suggest, and I don't want

22 to speak for Ms. King, but I would suggest you treat it like

23 the other jurors who came back and later volunteered the

24 information, and clarify, why didn't you ask this before?  Do

25 you have a reason as to why not?  Do you view marijuana not as

1  a criminal offense, whatever it is, but kind of flush it out

2  the way you do for all the other jurors that have not been

3  fully clear with their immediate answers to questions, which

4  has happened a number of times so far.

5          THE COURT:  What would the position of the United

6  States be if she -- if Juror No. 5 says, my answer yesterday

7  was no and my answer today is no?

8          MS. KING:  It is what it is.

9          MR. ORTIZ:  Then I think we stand on that record,

10 and if we try to make the argument we do, if we don't, we

11 don't.

12         THE COURT:  What argument would you anticipate you

13 would make if her answer is no?

14         MR. ORTIZ:  Well, I think if her answer is no, then

15 it's the same as we are right now on the record as it stands.

16 We're not prepared to make a for cause challenge and it is what

17 it is.

18         THE COURT:  If her answer is yes, for whatever

19 reason, I didn't understand that question, or I wasn't thinking

20 about that, or yes, now that I think about it, there was this

21 thing I had with the Sewickley police, and she gives an

22 explanation, would the United States be making a for cause

23 challenge?

24         MR. ORTIZ:  I think it would depend on her answer.

25 For all we know, she could come back and say --

1          THE COURT:  You have said if her answer was no, I

2   answered that question correctly yesterday and today, there

3   with not be a for cause challenge show.  If the answer is yes,

4   you're saying there could be a for cause challenge?

5          MR. ORTIZ:  There could be.  I think it depends how

6   the answer plays out.  Again, I'm assuming that you would

7   inquire as to why didn't you answer yes the first time?  For

8   all we know, she could come back and say I didn't want to admit

9   to it so I didn't care you asked me, then we're going to have a

10  for cause challenge.  Or she may say something like, I got a

11  ticket, I thought it was just a noncriminal offense so I didn't

12  say anything.  It depends on what her answer is.

13         THE COURT:  What would be the basis -- what would be

14  your reason for cause?  What would be the cause to exclude her?

15         MR. ORTIZ:  I think it depends on what her answer

16  is.

17         THE COURT:  If her answer is yeah, I knew about

18  that, I didn't want to bring it up in open court.  The

19  situation, one of the examples you posited, if that's her

20  answer, what would be your cause?  How would that lead to

21  cause?

22         MR. ORTIZ:  Judge, until I hear her words, I really

23  don't want to speculate on what my argument will be.  I don't

24  know that I will have an argument or that Ms. King will.

25         Our position is that if we have this information, we

1  should find out what the answer is and clarify it and take it

2  from there.

3         THE COURT:  I'm not disagreeing with that.  If it

4  would make a difference.  So we know if she comes back, and I

5  presume it would be the same with No. 8, they say no, my answer

6  yesterday was accurate then and it's accurate now, you're

7  saying that as to neither 5 or 8 would you make any cause

8  challenge?  You have the information you have, but if either or

9  both of them sit here and say, no, I totally gave a correct

10  answer yesterday and that's my answer today, you would not have

11  a cause challenge.

12         Am I understanding that?

13         MS. KING:  Yes.

14         THE COURT:  But they could give some form of an

15  affirmative answer that could lead to a cause challenge.  What

16  I want to make sure of is before -- if I would determine we

17  should do something else, whatever that something else is, I

18  want to make sure it actually would make a difference.

19         So, you have the results, and, Ms. King, why don't

20  you put on the record right now it is you believe you've

21  learned as to Juror No. 8.

22         MS. KING:  Juror No. 8's name is Brandon J. Pelesky.

23  He stated yesterday that he lives in McDonald, Pennsylvania,

24  and he's 33 years old.  I found that in 2009 a

25  Brandon J. Pelesky was arrested in Findlay Township who has a

birth date of July 28, 1982, which would make him 33 and that

he is from McDonald, Pennsylvania.  He was charged with

possession of marijuana, use and possession of drug

paraphernalia, driving at safe speed -- I don't know what that

is -- and disorderly conduct.  And the first two marijuana and

use and possession were withdrawn, and the others were moved to

non-traffic court.  So there was no resolution on the Court of

Common Pleas page for that, so I assume those charges were

withdrawn.

THE COURT:  You believe those charges may relate to

Juror No. 8 because of the geographic proximity and his age?

MS. KING:  Well, his date of birth and name,

Brandon J. Pelesky, Brandon John Pelesky, and the fact that he

lives in McDonald, PA.

Then there was an arrest in 2012 of a Brandon John

Pelesky with same date of birth, 7-28-82, who is from McDonald,

Pennsylvania, for possession of marijuana, use and possession

of drug paraphernalia and speeding.  That case resulted in a

guilty plea in October of 2012 for the possession of personal

use marijuana and probation of 30 days.  And the use and

possession of drug paraphernalia resulted in a guilty plea and

also probation without verdict and probation for six months in

that one.  Then the other one was nolle prossed, the speeding.

He was also ordered to participate in drug and alcohol

treatment.  So based on again, the date of birth, the location

where the defendant lived in those cases, McDonald,

Pennsylvania, and the information that was provided by this

juror yesterday in open court, that is what leads me to believe

that may be the same person.

THE COURT:  Would the view be the same as to No. 8,

if I bring No. 8 back here and ask him specifically about

Question 17, and he says my answer yesterday was accurate,

would you have a motion to strike for cause?

MS. KING:  No.

THE COURT:  By phrasing the question this way,

counsel, I'm not saying the matters you've raised are not

important, I'm not saying that it's not appropriate for counsel

to consider them to be important, but my question is, how will

it make a difference?  It appears to the Court that what the

position of the United States is, it has reason to believe that

yesterday Jurors 5 and 8 were, at minimum, incomplete, and at

maximum, untruthful in responding to 17 when they did not

say -- did not stand, meaning they had a yes answer.  And you

have a good faith basis to contend and believe that because

you've identified docket -- state court docket information

publicly accessible that bears multiple indicia of it being the

same people; name, age, geographic location, their

self-identification and the printed identification on the jury

sheet counsel has been provided of their abode.  If each of

them came in and said that their answer yesterday was truthful,

1   the United States is saying it would not have a basis to strike

2   them for cause.  I'm not saying you're correct or incorrect,

3   I'm just saying that would be your position.  At that moment,

4   you would have had, everyone, all of us, the Court, counsel,

5   would have had them reaffirming what the United States believes

6   to be at minimum and complete or beyond that, affirmatively

7   untruthful, or somewhere in between.

8           By the same token, the United States is saying if

9   they come in and say you know what, I was charged and here's

10  what I was charged with, and they offer some explanation

11  ranging from yesterday when I answered the question, I knew I

12  was charged and decided not to say it, to I forgot all about

13  that or some version of I forgot all about that.  You might

14  have a for cause challenge.

15          I guess I'm trying to understand sort of logically

16  how this makes a difference.

17          The reason I'm being cautious about this is

18  otherwise, either or both the United States and the defendant

19  may want these people in the pool to possibly be remaining in

20  the seated jury as jurors or alternates, so I want to be very

21  cautious about the possibility of removing them.  But if the

22  United States has doubts about their veracity and they come in

23  and by their no answer reaffirm those doubts, but there would

24  be no cause challenge, I guess I'm wondering what is the point

25  of bringing them in to possibly explain why they didn't give

1  that information yesterday.  How would that lead to a cause

2  challenge whereas a reaffirmation believed in completeness or

3  untruthfulness would not lead to a cause challenge?

4          MS. KING:  I think as Mr. Ortiz said, without

5  hearing their answers it is hard to say.  But I can envision

6  someone coming in and saying something to the effect of I did

7  forget about it.  That was a long time ago.  That did happen.

8  This is what happened.  This is what happened to me.  This was

9  my experience, whatever.  But you can also envision someone

10 coming in, as Mr. Ortiz said, and saying, yeah, I did not want

11 to answer that question yesterday, which when the Court is

12 asking the entire veneer, these are the questions, you say to

13 them, there is nothing more important than jury service outside

14 of service in our military.  I am paraphrasing, obviously, it

15 is important that the parties can ask these questions to learn

16 more about you and pick an appropriate jury for this case.

17 Both parties have that right.  I think it is clear to them and

18 several questions were asked multiple times, Mr. Sindler asked

19 several questions or one question to be asked again because his

20 impression was that some jurors were not being fully

21 forthcoming --

22          THE COURT:  Which turned out to be accurate, for

23 whatever reason.

24          MS. KING:  I do think after all of that it is

25 apparent to all of the jurors that it is important for them to

answer these questions truthfully.  So if someone is willfully

not answering those questions truthfully, I think that it goes

to their ability to then take an oath that they're going to

abide by the Court's instructions and faithfully fulfill their

duty as a juror.  I think that it's something that we should at

least be able to inquire into a little bit further.

THE COURT:  Before I ask Mr. Sindler's point of

view, Mr. Babik, I want to ask you a question.

Is the jury panel either currently arranged or

arrangeable to be seated where they were sitting yesterday?

MR. BABIK:  It could be done.  Some of them are

still in their assigned seats, others are standing around the

courtroom, but we can get them assigned.

THE COURT:  One possibility -- I'm not saying I

would do this or should do this or not do this -- one

possibility that has occurred to me, and I do want to hear from

Mr. Sindler, so I'm putting it out there, Mr. Sindler, so you

have the benefit of hearing it before you weigh in on Mr.

Warren's behalf.  We could reassemble the panel, other than

No. 14, who is off because she fell this morning,

unfortunately -- I don't mean to make light of it -- and I can

say to them, ladies and gentlemen, there are several questions

that I need to pose to you again as a group so that we all, I,

my team all make sure that we have the most accurate

information in our notes.

1    I'd ask you to pay very close attention to the

2 question and even if your answer today might be different than

3 yesterday or the same as you gave yesterday, if your answer is

4 a yes, you need to stand up.

5    Then ask three questions, Question 17, and then two

6 others that I will select, one of relatively equal potential

7 personal uncomfortableness, perhaps victim of a crime,

8 something like that, and then one about other service as a

9 juror, for instance.

10    Then we note again who answers yes to those three

11 questions and we see whether 5 and 8 answer yes to those

12 questions.  I don't know that that entirely solves the problem.

13    Here's one of the things I'm concerned about.

14 Whenever somebody is brought back here for a follow-up, even

15 when I just turn them right around, they might wonder what is

16 going on.  If it turns out that 5 and/or 8 serve on the jury, I

17 want to have a system in place that is consistent with their

18 ability to abide by the oath they're going to take, which is to

19 render a fair and just verdict based only on the evidence and

20 on the law.

21    Mr. Sindler, let's hear your point of view on all

22 this.

23    MR. SINDLER:  I'm not sure I understood that last

24 point you made, but I was getting ready to think you may be

25 thinking the same thing I was.  If they both stay on the panel,

1 one of my concerns, and it may be too many much out there to

2 even be remotely considered, that it may somehow come to the

3 knowledge of others because they're going to talk about how

4 they were called out, if you will.  They won't know necessarily

5 who called them out because it looks like if you do this, it

6 won't be the government asking the question, and I understand

7 that.  I wonder then is it somehow polluting or affecting --

8            THE COURT:  That may not have been a perfect word on

9 my part, it was the quickest one I could think of.

10           MR. SINDLER:  It may be affecting others.  Yes, even

11 though I have had some concern from the outset about the candor

12 of some of these people, in following your lead, and I don't

13 mean to be repetitive here, if they stick to their guns, then

14 what more can we do?  That's the answer that we're left with.

15 I don't know how much better off we're going to be if they do

16 answer yes because they have forgotten, they didn't think it

17 was that important, they're now embarrassed to talk about it or

18 admit to it.

19           Those are my impressions.

20           THE COURT:  Ms. King and Mr. Ortiz, having had an

21 opportunity to hear Mr. Sindler's point of view and the Court's

22 observation, I do think if I pose the questions, say three

23 questions, this being one of them to the group out there and 5

24 and 8 stick with their answer, I think it's really -- I'm not

25 saying any counsel is suggesting this, I think it would be over

1  the top for me to then bring them back after having done that

2  whole thing in the courtroom.  I think I either bring them back

3  and talk with them, or I do the whole thing in the courtroom.

4  The whole thing in the courtroom occurs to the Court has the

5  advantage of giving them an opportunity in a larger setting

6  where folks are not standing alone to stand if their answer is

7  yes when they didn't stand yesterday.  So it runs less of a

8  risk of singling things out.  And then I could call a few

9  people back, including them if they stood up, just to confirm

10  any yes answers that we found different.

11            That would be the advantage of doing that.  I don't

12  think I could then, if they did not stand up, either or both of

13  them, then bring them back here without really impairing the

14  fairness of the jury process for both sides.

15            The other alternative is to bring them back here.  I

16  can bring one or two other people back also and ask a couple of

17  follow-ups, as a bit of an encapsulation of this, but then ask

18  for direct follow-ups of 17 of those two people, but I'd want

19  to write out what I'm going to ask them and have counsel

20  confirm it before I did it.

21            Ms. King and Mr. Ortiz, any thoughts?

22            MR. ORTIZ:  Judge, I think our concern coming in

23  this morning was that we thought there was a possibility there

24  was an issue with candor.  I think that we essentially have

25  said everything we can say on the point.

1          THE COURT:  If they both come back and say no,

2  you'll still have a concern about their candor, but no cause

3  challenge.

4          MR. ORTIZ:  We are at a point where the way the

5  process has kind of gone forward and where we are, there aren't

6  that many options to address.  To the extent I can think any,

7  the proposals that you have are really all that there is.

8          I don't want to speak for Ms. King, but I think that

9  whatever you think is fair and appropriate at this point in

10 time to address the issue, obviously, we defer to you.

11         THE COURT:  I appreciate that.

12         Here's what we're going to do.  We're going to take

13 a ten-minute recess so that three different people can do three

14 different things.  I want to think about it and talk with

15 Mr. Greer about it.

16         I want to give you, Mr. Sindler, an opportunity to

17 speak to Mr. Warren in a private setting about it.

18         And I want to give you, Ms. King and Mr. Ortiz, an

19 opportunity to talk about it and think about what we do next.

20         Whatever we do next or don't do next, this is our

21 only shot at it.

22         So we will take an approximately ten-minute recess.

23 If the marshals can make sure Mr. Sindler and Mr. Warren have a

24 private place to speak about these things.

25         And Ms. King and Mr. Ortiz, you're welcome to use

1   the sitting area or conference room, whatever is best for you.

2   Do you have a place Mr. Sindler and Mr. Warren can

3   speak in a private setting?

4   THE MARSHALL:  If there is going to be nobody in

5   here, we can do it in here.

6   THE COURT:  It's not that I personally have any

7   problem with it.

8   THE MARSHALL:  Or we can do it in the back room.

9   THE COURT:  Is that acceptable to the marshals?

10  Does that work for you guys?

11  Mr. Babik, if you would show Ms. King and Mr. Ortiz

12  to the sitting area or conference room.

13  (Whereupon, there was a brief recess in the proceedings.)

14  THE COURT:  Back on the record.

15  Mr. Warren is present represented by counsel,

16  Mr. Sindler.

17  Mr. Ortiz and Ms. King are present for the United

18  States.

19  Members of the Court staff and the marshal service

20  are here.

21  Mr. Ortiz and Ms. King, any further, different,

22  other thoughts on the topic?

23  MS. KING:  After discussion, I think it's our

24  preference that we would do what the Court suggested by going

25  into open court and asking all of the jurors those three

1 questions, if there was going to be follow-up.

2 　　　　　　THE COURT:  What if either 5 or 8 did not stand up?

3 　　　　　　MS. KING:  I still think we would not have a reason

4 to strike them for cause.

5 　　　　　　THE COURT:  You'd consider the matter concluded at

6 that point.

7 　　　　　　MR. ORTIZ:  I think yes.  At that point, I think

8 we've addressed the issue in many different ways.

9 　　　　　　THE COURT:  If either of them did stand up, we would

10 compare our notes and then bring them back and say, I would

11 say, I note that you stood up on this one, can you fill us in?

12 　　　　　　MR. ORTIZ:  I think that would be appropriate.  If

13 they had some sort of positive or some explanation for the

14 difference, like the other jurors, that you would follow-up

15 with appropriate questions as to their justification.

16 　　　　　　THE COURT:  At that point, everyone would do what we

17 have done with everyone else.  But if we did what I suggested

18 with open court with that question and then two others, and

19 they did not, either or both did not stand in response to

20 Question 17, the United States would view the matter as

21 concluded and there would be no cause challenge as to either 5

22 or 8, if I understand what you're saying?

23 　　　　　　MR. ORTIZ:  Yes, essentially, yes.

24 　　　　　　THE COURT:  Essentially or yes?

25 　　　　　　MR. ORTIZ:  My only hesitation is we had proffered

1  certain options or suggestions earlier in the process that

2  would have been preferred at the time.  I don't think it's

3  appropriate to go back to those now because of the resulting

4  harm that could come.  So, I think for where we are in the

5  process, it's best to go forward.

6           THE COURT:  So I can consider all the options,

7  you're saying that United States would reserve its right to

8  argue post-verdict that the Court's failure to ask follow-up

9  questions earlier was error?

10          MR. ORTIZ:  Yes.  I would say that we would preserve

11 that right.

12          THE COURT:  Appreciate that.

13          Mr. Sindler, any further, additional thoughts?

14          MR. SINDLER:  No.  We are okay with following your

15 lead.  The thought occurred to me I wouldn't mind if you would

16 add in Question 8 again, but the thought also occurred that we

17 might get answers to the other two questions from people who

18 weren't in here or who had never answered yes in these last

19 couple of days leaving us with additional work to do.

20          THE COURT:  The Court had one other possibility

21 occur to it while we were out, and we did some research.  I'll

22 be candid and share the results of our research, hear what

23 counsel think.

24          One other solution, at the moment, counting those

25 two people, given that 57 is back in, we now have 33 in the

1   pool.  32 is our magic number.

2          We have two more people that had no yes answers,

3   which would mean if you counted them, we'd have 35.  We have

4   one juror that answered yes to one question and that was

5   Question No. 38 regarding whether they or their family owned or

6   possessed a firearm or ammunition.  It's possible there's

7   something that will come out of that that would be concerning

8   to counsel or the Court, but based on our experience so far in

9   the case, it's unlikely that that one answer has driven a

10  question.

11         One other solution would be to provide additional

12  peremptory challenges to each side and then you could do what

13  you wanted to do, or not do, with 5 and 8, or anybody else, and

14  it would seem to me, we'd probably have enough jurors that I

15  could provide two additional peremptory challenges to each

16  side, or however we would do it.  The concept, we have enough

17  folks that I think we can do that.

18         Here's what our research found.  Rule 24 says that

19  in a criminal case, involving non -- not involving multiple

20  defendants where the crime is punishable by a year or more in

21  prison, the defense gets ten peremptory challenges, the United

22  States gets six.  And then where there are two alternates, you

23  get either at the Court's discretion one or two challenges as

24  to the alternates, which we do last and separately.

25         I asked Mr. Greer to research whether or not the

Court has discretion to authorize additional peremptory

challenges.  And the law -- we cannot find an appellate case

where a district court was reversed for having done that.

Is that correct, Mr. Greer?

MR. GREER:  That's right, Judge.

THE COURT:  We did find a case from the Fourth

Circuit where they said granting two peremptory challenges to

each side with the agreement of all parties and where there was

no reason to otherwise call into question the impartiality of

the jury was not reversible error.

Is that correct?

MR. GREER:  That's right, Judge.

THE COURT:  We have an Eleventh Circuit case, the

one at the bottom of the page where they said it was not

reversible error do what?

MR. GREER:  The error was harmless where the

defendants had been granted more peremptory challenges than

they were entitled to under Rule 24.

THE COURT:  So that thought occurred to the Court

also.

MR. SINDLER:  I prefer to keep it as is, ten and

six, please.

MS. KING:  We're fine with adding two for each side.

THE COURT:  Mr. Sindler, is your position the same

if, addressing the ratio that is in Rule 24(a)(1) -- is it

1  24(a)(2), Mr. Greer, 24(a)(2), I awarded a differing and higher

2  number of additional peremptory challenges to the defense than

3  I did to the government?

4         MR. SINDLER:  I have to talk to Mr. Warren about

5  that.  I have a thought, but we're working pretty well together

6  here, I don't want to start --

7         THE COURT:  Talk to Mr. Warren.

8         MR. SINDLER:  I can do it right there.

9         What would hypothetically the thought be then?

10        THE COURT:  Well, the context of the question to you

11  would be either two for the defense, two additional for the

12  defense and one additional for the government.  I know, I'm

13  confident we can do that within the number of jurors we have.

14  I don't have any additional jurors sitting downstairs or coming

15  in tomorrow because all the other jury trials settled, so we

16  have this group.  It's possible we could do three and two.  I'm

17  comfortable we could do two and one based on numbers.  I have

18  no idea what the United States's position would be on that, but

19  I would note 24(a)(2) does have a differential in the ratio.

20        (Defendant and Mr. Sindler leave chambers.)

21        THE COURT:  Mr. Ortiz, Ms. King, why don't we give

22  you the hallway or conference room so you can talk or not talk

23  about any of that.

24        (Whereupon, there was a brief recess in the proceedings.)

25        THE COURT:  We're back after a brief recess.

1          Mr. Warren is present represented by his lawyer.

2          As are counsel for the United States Ms. King and

3  Mr. Ortiz present, along with court staff and representative of

4  the marshals.

5          Mr. Sindler, sir.

6          MR. SINDLER:  We're okay with that proposed

7  differential of two and one, two additional for the defense,

8  one for the government.

9          THE COURT:  Ms. King and Mr. Ortiz, any thoughts on

10  the general topic or the specific thoughts?

11          MR. ORTIZ:  Well --

12          MS. KING:  I think the one thing that we did talk

13  about was that it's obvious that we have a question about what

14  two of these potential jurors have said and would say to

15  follow-up questions.  So, while receiving one additional strike

16  would be helpful in that respect, we don't have any additional

17  information about either one of them.  And so we --

18          MR. ORTIZ:  I guess our concern is that without

19  additional information from either of the two potential jurors

20  and only being afforded one additional strike, it doesn't

21  necessarily solve the problem of the other juror.

22          THE COURT:  Well, you still have your six peremptory

23  strikes.

24          MS. KING:  But I feel like with the remainder of the

25  jurors, we have had the opportunity to question them and we

1  don't have the same concerns about not knowing information

2  about those jurors that we have with these two.

3            THE COURT:  Let me ask counsel for the United States

4  this.

5            Do you at the moment have a good faith doubt that

6  either or both of Jurors 5 or 8 were truthful in response to

7  Question 17.

8            MR. ORTIZ:  Yes.

9            MS. KING:  Yes.

10           THE COURT:  If they each come back in, either or

11 both of them, and say, I gave a correct's to Question 17, will

12 you still have a good faith doubt?

13           MR. ORTIZ:  Yes.

14           THE COURT:  As to the truthfulness?

15           MS. KING:  Yes.

16           MR. ORTIZ:  Yes.

17           THE COURT:  But you also would not have a challenge

18 for cause.  So you then would have to use, or not use your

19 peremptory strikes.

20           So the question then becomes why would we be

21 bringing them back if they persist in what the United States

22 believes to be misrepresentation only, for want of a better

23 phrase, doubling down, and then you would use your peremptory

24 strikes.

25           My concern is I bring them back and ask them very

1 directly about Question 17.  It is quite possible they will

2 conclude any or several of the following things are true,

3 whether they're actually true or not, they will conclude any or

4 some of the following things are true.

5         One, that the Court and the Court's staff has been

6 digging around into their background.

7         So, if they're not -- and end up not being chosen by

8 the exercise of somebody's peremptory strike, they may be

9 dissatisfied citizens, but they'll go on their way as

10 dissatisfied citizens.

11        If they end up being on the jury, they may be, based

12 on that belief, inaccurate, but it's one they reasonably could

13 have, resentful of the Court or the process, and although I

14 will instruct the jurors they should not talk about the case,

15 anybody involved in it or any of the issues involved in the

16 case until their deliberations begin, unless I specifically

17 said, do not talk about how you were selected for the jury,

18 which is sort of like saying don't look at your aunt's left ear

19 and then all you do is focus on your aunt's left ear, it runs

20 the significant risk that if they harbor some resentment toward

21 the process, that they will share that with other jurors.

22        In addition or separately from that, they may come

23 to believe that one or both sets of lawyers were digging around

24 into their background and that led to the question, and then

25 depending on how they guess at what the answer to that is, they

1 may well harbor some resentment toward that set of lawyers and

2 the party they represent, both themselves and in dealing with

3 others.  That's my concern.  It seemed to me that one possible

4 solution was to, in essence, amp up the number of peremptory

5 challenges.  The drafters of the rule have decided for their

6 reasons and I'm not commenting on what those reasons are or

7 whether they're good reasons or not good reasons, to allocate a

8 different number -- a different ratio of peremptory challenges

9 between defendants and the United States.  So, if I added two

10 peremptory challenges to the defense list and one to the United

11 States' list, it would be in general keeping with the ratio

12 that is in the rule, and then the United States could decide or

13 not decide whether to exercise peremptory challenges as to

14 Jurors 5 or 8.

15          I would note, and this is not meant to justify or

16 validate if somebody, if anybody comes into court under oath

17 and does not tell the truth and the whole truth, but based on

18 the Court's familiarity with the criminal process system in the

19 Commonwealth of Pennsylvania, the types of charges that were

20 listed in the district magistrate's docket sheets, Ms. King has

21 read from are the type that are often resolved by the

22 magistrate judge with his or her own form of resolution.  The

23 Court is well aware of certain district magistrates, not

24 inconsistent with the law, in essence, having their own version

25 of probation and saying, I'm going to keep the file on my desk

1   and if I don't see you again in the next year, six months,

2   whatever, I'll dismiss the charges.  They're also the kind of

3   charges that are frequently part of what is known as ARD,

4   Alternative Rehabilitation Disposition, which ends with no

5   finding and then an expungement at the end.  If the charges

6   were expunged, then I believe under Pennsylvania law, someone

7   can truthfully say they were not charged with a crime.  It's

8   been a while since I've had to deal with that in my private

9   practice, but when charges are expunged, I believe you can

10  lawfully and truthfully say in Pennsylvania you've not been

11  convicted, nor have you been charged, it is taken off your

12  record.

13          It also does not appear that anybody served any

14  time.  Again, I'm not minimizing the obligation for people to

15  tell the whole truth.  In fact, the Court in other cases has

16  been very demonstrative from the bench about the obligation of

17  people, witnesses and others to tell the whole truth.

18          So, what about two additional peremptories for the

19  defense and one for the government?  Or not, it's your

20  position, we'll figure this out somehow, we'll get there.

21          MS. KING:  We'll accept that.  We still would like

22  the questions asked, but if the Court is not going to do that,

23  the additional challenges are fine.

24          THE COURT:  Well, if I do the additional challenges

25  as noted, does that resolve the issue, or does it simply allow

1  this trial to go forward knowing that one or both sides as a

2  consequence of that action may view that -- neither you nor

3  Mr. Sindler is going to go on strike and not show up.  I know

4  you'll come to the trial and do what you're going to do, and if

5  the Court grants the challenges, you'll use them as appropriate

6  and proceed ahead.

7          It is the position of the United States that at this

8  moment, there is what the United States believes to be error in

9  the process because if there is, then I think I have an

10  obligation under Third Circuit law in this and other settings

11  to take every reasonable step to obviate the error.

12          MR. ORTIZ:  So we're clear about the posture of the

13  question, is this assuming you are going in and asking the

14  three questions?

15          THE COURT:  No.  This is assuming that I do no more

16  follow-up other than bring the next couple people in so that we

17  get to a total of 35 in the pool and then allot the additional

18  challenges.

19          MS. KING:  I think that we have a reasonable basis

20  to believe that two of the potential jurors were not 100

21  percent truthful with the Court and that they could be

22  questioned about that and that's what should happen.

23          THE COURT:  And that if the Court does not do so,

24  that it's error.

25          MS. KING:  Yes.

1           THE COURT:  Or would it be resolved, would your

2 concerns be otherwise resolved by the Court authorizing

3 additional peremptory challenges allocated, consistent with

4 Rule 24(a), Rule 24, two to the defendant, one to the United

5 States?

6           MS. KING:  We do still think that it is an error.

7 We have not done any research into this.  We've been up here,

8 but I do think --

9           THE COURT:  You understand that if --

10           Mr. Sindler, let me ask you this.  If I bring Jurors

11 5 and 8 back either individually or with other people and ask

12 them the questions, do you believe that will be error?

13           MR. SINDLER:  I don't know if it will be error.  I

14 know that there's a grave potential for it to be held against

15 me, but more importantly held against my client in terms of

16 resentment and I don't want that.  I know he doesn't want that.

17

18           THE COURT:  Which could lead you or Mr. Warren or

19 other counsel to conclude that he did not get a fair trial?

20           MR. SINDLER:  Yes.

21           THE COURT:  If somebody in our system does not get a

22 fair trial, a lawyer often thinks that was error.

23           MR. SINDLER:  Yes.

24           THE COURT:  You're allowed to say that.  That's

25 okay.

1                Ms. King and Mr. Ortiz, something else?

2                MS. KING:  It's the government's position that this

3    is not only an issue that we are concerned about, I would

4    think, and maybe I'm missing what is going on, but I think the

5    defendant would also be concerned about this issue as to

6    whether there are potential jurors who did not fully tell the

7    truth.

8                THE COURT:  He may or may not be, but I have to

9    count and the record and Court of Appeals will count -- if

10   Mr. Sindler believes that that's a concern that the Court

11   should do something about, I have to count on him raising it.

12   If he does not, I'm allowed to count on the fact that he has

13   not concluded that it's -- if it is a matter of concern, it's a

14   concern that the Court need do anything about.

15               So, let me get this straight.  If the Court poses

16   Question 17 and one or two other cover questions, perhaps

17   Question No. 8, to the entire panel, the United States will

18   live with the answer if these two jurors don't stand up in

19   response to Question 17 and will conclude that the matter is

20   resolved.  The Court will have not -- whatever error occurred

21   will have been cleansed as a result of that?

22               MS. KING:  Yes.

23               THE COURT:  That's the position of the United

24   States?

25               MS. KING:  Yes.

1          THE COURT:  Mr. Sindler, if I go out and ask two

2   questions, Question 17 and Question 8 and ask folks to stand,

3   just as they did yesterday, and I tell them if your answer is

4   the same as yesterday and it's that yes, stand up.  If your

5   answer is different than yesterday and it's a yes, standup.  I

6   ask those two questions, their 17 and your 8, what do you think

7   of that?

8          MR. SINDLER:  I'm okay with that.  I -- the longer

9   the afternoon has gone on today, though, I'm increasingly

10  against bringing back 5 or 8.

11         THE COURT:  So if they do stand up, you're going to

12  want me to bring them back, Ms. King and Mr. Ortiz?

13         MS. KING:  Yes.

14         MR. ORTIZ:  Yes.

15         THE COURT:  I think I would be duty bound if they

16  stood up to bring them back.

17         MR. SINDLER:  I may have spoken too quickly.  We

18  have been doing follow-ups so I didn't mean to speak that fast.

19         THE COURT:  I understand.

20         MR. SINDLER:  If one or both of them does or

21  doesn't -- does or do not stand, then the matter is resolved at

22  that point as to each person?

23         THE COURT:  Anybody that doesn't stand, the United

24  States has said they're going to live with that, we're not

25  bringing anybody back.  It's only if one of them stands up,

1 having not stood yesterday that we would bring them back.

2            MR. SINDLER:  That's fine.

3            THE COURT:  Does that work?

4            MR. SINDLER:  Yes.

5            THE COURT:  We'll ask two questions, Question 17 and

6 Question 8, correct?  Question 17, just to remind us, is have

7 you or any member of your immediate family ever been arrested,

8 charged with or convicted of a criminal offense?

9            Question 8 -- that's the law enforcement testimony

10 question?

11           MR. SINDLER:  Yes.

12           THE COURT:  Question 8 is:  Do you believe law

13 enforcement testimony is more or less likely to be believable

14 or reliable than testimony by another witness?

15           Brian, can you make several clean copies of our

16 sheets so when we mark this down, we have a clean sheet to go

17 on.

18           MR. BABIK:  Yes, Your Honor.

19           THE COURT:  Thank you.

20           I'm going to have to ask you to go and assist the

21 jury -- I don't know that it's essential that they be in the

22 same spot since they're going to say their number, so I'd just

23 get them organized in a meaningful way.

24           Is that agreeable to you, Ms. King and Mr. Ortiz?

25           MS. KING:  Yes.

1              THE COURT:  Mr. Sindler?

2              MR. SINDLER:  Sure.

3              THE COURT:  We have a plan of action.

4              MR. ORTIZ:  Will we be going straight into the

5     courtroom from here?  Ms. King and I could use a few minute

6     break to use the restroom.

7              THE COURT:  Marshals, how can we appropriately have

8     Mr. Warren enter the courtroom because normally he would be out

9     there before any of the jurors came in.

10             THE MARSHALL:  Let me ask you this, Your Honor.

11    When he was brought back yesterday or whenever you started back

12    here, was the courtroom cleared or did everybody come back?

13             THE COURT:  Once Mr. Warren and counsel came back

14    here for the day, Mr. Warren has not been present back in the

15    courtroom.  We started right in here this morning.

16             THE MARSHAL:  Yesterday when these deliberations

17    started --

18             THE COURT:  They were after lunch, so everyone was

19    out, and Mr. Warren when he came back from lunch, they started

20    right back here, they never saw him in the courtroom.

21             MR. SINDLER:  This is a crazy idea, but it's an

22    idea.

23             THE COURT:  Mr. Sindler, I think we're at the point

24    that crazy is not the definition.

25             MR. SINDLER:  My wristwatch says it's 3:35.  Not --

1  we can still get more work done today, we can on this case, but

2  it might be beneficial for us to think about starting tomorrow

3  with this issue where the courtroom remains closed until a

4  certain time or we get him positioned in there with myself.

5           THE COURT:  All of us, all the participants?

6           MR. SINDLER:  I know that's not the most economical

7  use of time, but I'm not thinking of a better idea right now.

8           THE COURT:  Well, I appreciate all counsel, and

9  counsel has been very efficient with their time and with the

10 jurors' time, that's to their credit.  The No. 1 thing is we

11 want to make sure that everybody in this case has a fair trial,

12 the people of the United States as represented by Mr. Ortiz and

13 Ms. King and Mr. Warren as represented by Mr. Sindler.  My job

14 as the umpire is to make sure everyone gets a fair trial.  If

15 that means that things are somewhat less efficient than in a

16 perfect world, that takes second place.

17          Mr. Ortiz and Ms. King?

18          MR. ORTIZ:  May I ask a question of the marshals?

19          THE COURT:  You may ask whatever you want.

20          MR. ORTIZ:  From a security standpoint, is it

21 logistically impossible for everyone, except for the judge, to

22 enter the courtroom from the door to the side all in one group,

23 just in a line with Mr. Warren.

24          THE MARSHAL:  I can tell you this.  A lot of times

25 whenever we bring the defendant back for these deliberations,

1    we come in together and then we go back out together.

2              THE COURT:  Who is "we"?

3              THE MARSHAL:  All of us, the marshals, along with

4    everyone else, counsel, the judge, everybody.  Again, a lot of

5    times we will just come in and once these deliberations are

6    done, then we'll all just go back out together.  Again, he will

7    not be in handcuffs, obviously.  It's not -- that should not be

8    an issue.  He is just going to be coming in with everybody

9    else.  I don't see a problem with it.

10             THE COURT:  Including Mr. Greer of the court staff.

11             THE MARSHAL:  Your Honor, this is your court.

12             THE COURT:  As a group.

13             THE MARSHAL:  We've done this before in other

14   courtrooms that everybody comes back together and then when

15   this is done, we all re-enter the courtroom that way.

16             THE COURT:  Marshals, are you comfortable?  I'm not

17   saying there is any reason Mr. Warren should do this or not do

18   this, I want this to be appropriate going in.

19             Marshals, are you comfortable going in in a group,

20   that the group is arranged that you fellows don't appear to the

21   jurors as sort of hovering around Mr. Warren?

22             THE MARSHAL:  I was going to suggest the same thing.

23   I have done that in the past, there's no prejudice, in my

24   opinion, to him if we're all together and he's not in

25   handcuffs.  He is not going to be restrained.

1           THE COURT:  Mr. Sindler, what do you think about
2  that?  We'll throw Mr. Greer into the mix.  Mr. Babik, we will
3  throw him into the mix also.  I'll come out separately.
4           MR. SINDLER:  I didn't know earlier about security
5  protocols in the building.
6           THE COURT:  A legitimate point.
7           So it's Questions No. 8 and 17 that I'll re-ask.
8           Correct?
9           MS. KING:  Correct.
10          MR. ORTIZ:  Correct.
11          THE COURT:  If we all just go out as a group, we can
12 do this this afternoon?
13          Is that okay with you, Mr. Sindler?
14          MR. SINDLER:  Yes.
15          THE COURT:  Is that okay with you, Mr. Ortiz and Ms.
16 King?
17          MS. KING:  Yes.
18          THE COURT:  Everybody here other than me is going to
19 go as a group through this side door, including you, and then
20 I'll count 30, 25, after you folks all do that, and I'll just
21 come out and when you see me come out, just say, all rise.
22          MR. BABIK:  Everyone is seated and accounted for.
23          THE COURT:  Anything else we should put on the
24 record before we do this, Mr. Ortiz and Ms. King?
25          MR. ORTIZ:  I sincerely hope this is a quick

1  question.  It is 3:38.  We had our witnesses here all day,

2  assuming they were going to testify with proposed timeline that

3  we had in mind before thinking someone would testify today, but

4  I don't know if that seems still likely.  So, if everyone

5  agrees, we would like permission to excuse our witnesses today

6  and have them here tomorrow morning.  I don't know that it's

7  likely that we're going to have testimony today.

8          THE COURT:  I think it's certain we're not going to

9  have testimony during your case in chief today.

10          Here's the question, though.

11          If, and this goes back to a matter that arose

12  yesterday, if the defendant asked through Mr. Sindler for a 104

13  hearing -- that would come at the end of your case, it wouldn't

14  be until after your case, then there might be a

15  determination -- Mr. Sindler may say, Judge, there's plenty of

16  foundation for me to get Exhibit J in, or he may say, I want a

17  104 hearing to supplement the record from the government's case

18  in chief for me to get Exhibit J in.

19          Do you agree, Mr. Sindler, if you would have a 104

20  hearing or request one, that would be held outside the presence

21  of the jury but after we heard the testimony in the

22  government's case?

23          MR. SINDLER:  That was my sense.

24          THE COURT:  So then, Mr. Sindler, do you have any

25  objection if I advise counsel for the United States that we are

1  not going to take any testimony today and they can release

2  their witnesses.

3            MR. SINDLER:  No.

4            THE COURT:  Without objection, you may do that.

5      (OPEN COURT)

6            THE COURT:  Ladies and gentlemen of the jury, let me

7  start by reiterating the thanks of the Court on behalf of the

8  Court and all of the participants for your patience and

9  steadfastness in bearing with us.  I promise you, we're getting

10 close to the conclusion of the jury selection process.

11           What has occurred to the Court is that I need to

12 reconfirm responses to several questions from the group as a

13 whole.  So what I'm going to ask you to do, even though you

14 might be seated in a slightly different spot than yesterday is

15 there are several questions I'm going to ask.  I'd ask that you

16 listen very carefully to the questions.  If your answer is yes

17 to any of the questions I pose to the group, we'll do just as

18 we did yesterday, just simply stand up and when I point to you,

19 give your juror number only.

20           Now, because these are questions that I also asked

21 yesterday, whether your answer today is the same or different

22 than yesterday, if your answer is yes, stand up, even if you're

23 double saying what you said yesterday, don't worry about that.

24 If it occurred to you that your answer is yes for whatever

25 reason, just stand up and when I go across, give your juror

1  number.

2            The Court would note for the record the defendant is

3  present represented by counsel.

4            The United States is present represented by Ms. King

5  and Mr. Ortiz.

6            Mr. Ortiz, is that process consistent with what the

7  Court advised counsel it was going to do?

8            MR. ORTIZ:  Yes, it is.

9            THE COURT:  Mr. Sindler, is that process consistent

10 with what the Court advised counsel it was going to do?

11            MR. SINDLER:  Yes.

12            THE COURT:  I'll read the question slowly.  Listen

13 to them carefully and, again, if your answer is yes, stand up,

14 and when I point to you, simply state your number.

15            Question 8.  Do you believe that law enforcement

16 testimony is more or less likely to be believable or reliable

17 than testimony by another witness?

18            If your answer is yes, please stand.

19            Sir, number?

20            Juror No. 55:  55.

21            Juror No. 75:  75.

22            Juror No. 72:  72.

23            Juror No. 25:  25.

24            THE COURT:  Any other yeses?

25            Thank you.

1            The next question is Question 17.  Please listen

2 carefully.

3            Have you or any member of your immediate family ever

4 been arrested, charged with or convicted of a criminal offense?

5            If the answer is yes, please stand and remain

6 standing.

7            Juror No. 4:  4.

8            Juror No. 2:  2.

9            Juror No. 16:  16.

10            Juror No. 48:  48.

11            Juror No. 11:  11.

12            THE COURT:  Any other yeses?

13            Thank you very much.

14            Mr. Ortiz and Ms. King, are there any other matters

15 that the Court indicated it would take care of that haven't

16 been accomplished?

17            MS. KING:  No, Your Honor.

18            THE COURT:  Mr. Sindler, same question?

19            MR. SINDLER:  No.

20            THE COURT:  At this point, thank you, ladies and

21 gentlemen of the jury.

22            Mr. Sindler, is there any reason we cannot retire

23 for any follow-up interviews and conclude the jury selection

24 process?

25            MR. SINDLER:  No.

```
 1                    THE COURT:  Ms. King and Mr. Ortiz, same question?
 2                    MS. KING:  No, Your Honor.
 3                    THE COURT:  The Court will stand in recess in the
 4  courtroom.
 5                    Mr. Babik, if you would assist or the group can come
 6  back in the same way we came out and then we'll finish up our
 7  work.
 8          (Proceedings held in chambers.)
 9                    THE COURT:  We're back in chambers.
10                    Mr. Warren is present represented by counsel.
11                    Ms. King and Mr. Ortiz are present on behalf of the
12  United States.
13                    Court staff and marshals are present.
14                    Mr. Babik, Question 8, what yes answers did you get?
15                    MR. BABIK:  72, 25, 75, and 55.
16                    THE COURT:  25 and 55 would appear to be new.
17                    MR. ORTIZ:  55 and 25.
18                    THE COURT:  As to Question 17, who did you get an
19  affirmative answer from?
20                    MR. BABIK:  2, 4, 16.
21                    THE COURT:  That's a new one for 16.
22                    Next one.
23                    MR. BABIK:  11.
24                    THE COURT:  That's new.
25                    MR. BABIK:  48.
```

1          THE COURT:  48 is not new.

2          MR. BABIK:  2.

3          THE COURT:  Question 8, we have two new yes answers.

4          As to 17, we have two new yes answers.

5          Is that correct?

6          The Court would note it appears as to Question 8,

7   Jurors 25 and 55 responded yes today and did not respond yes

8   yesterday.

9          And as to Question 17, Jurors No. 11 and 16

10  responded yes today and did not respond yes yesterday.

11         Is that your understanding, Mr. Babik?

12         MR. BABIK:  That's what I have.

13         THE COURT:  Ms. King and Mr. Ortiz, does that

14  conform to your notes?

15         MS. KING:  Yes.

16         THE COURT:  Mr. Sindler, does that conform to your

17  notes?

18         MR. SINDLER:  It does.

19         MS. KING:  Your Honor, we'd also point out that two

20  jurors that are -- two jurors answered yes yesterday to 17 but

21  did not answer yes today.

22         THE COURT:  Who were they?

23         MS. KING:  19 and 43.

24         THE COURT:  Each of those are high enough in our

25  pool that we would need to do some follow-up with that.

1          MR. BABIK:  They were dismissed.  19 and 43 were

2 dismissed.

3          THE COURT:  It would appear to the Court that we

4 need to bring back in 16 to ask about Question No. 17l.  25 to

5 ask about No. 8; 42 to ask about No. 17; and if we're going

6 to --

7          Juror No. 16 as to Question 17 is a new answer.

8          MR. GREER:  Judge, I have in my notes that both of

9 those jurors discussed those when they were back here before,

10 discussed their answers to that question, even though they

11 hadn't answered yesterday.

12          THE COURT:  So No. 16, you have that specifically in

13 your notes, Mr. Greer?

14          MR. GREER:  Yes.

15          THE COURT:  Does anyone want Juror No. 16 brought

16 back for follow-up questioning?

17          MS. KING:  No, we don't think that is necessary.

18          THE COURT:  Mr. Sindler, do you want 16 brought back

19 for follow-up questioning?

20          MR. SINDLER:  My client says no.

21          THE COURT:  So we need not do that.

22          The next one there appears to be a differential on

23 is Juror 25, gave a positive response today to No. 8.

24          Does anyone want Juror 25 brought back for follow-up

25 questions?

1          MR. SINDLER:  I would.

2          THE COURT:  Mr. Ortiz, Ms. King, any reason not to

3   do that?

4          MS. KING:  I don't believe so, Your Honor.

5          THE COURT:  Then with have Juror No. 11 who gave an

6   affirmative response to No. 17.

7          MR. GREER:  He discussed a criminal charge that his

8   brother had had when he was back here this afternoon or this

9   morning.

10         MR. ORTIZ:  False plates.

11         THE COURT:  Does anyone want Juror No. 11 brought

12  back for follow-up questioning?

13         MS. KING:  The government does not need that.

14         THE COURT:  Mr. Sindler?

15         MR. SINDLER:  No.

16         THE COURT:  So, we'll bring 25 back.  We'll do the

17  follow-up questions.  And then we'll see how many jurors we

18  have left.

19         MR. SINDLER:  Do I take it we didn't get to 55 yet?

20         MS. KING:  We have not.

21         THE COURT:  So we'll see whether 25 stays in the

22  pool or not, and then we'll count and see if we have enough at

23  that point?

24         Does that work for you, Mr. Sindler?

25         MR. SINDLER:  Yes.

1           THE COURT:  Does that work for you, Ms. King and Mr.

2  Ortiz?

3           MS. KING:  Yes.

4           THE COURT:  I'm not initially going to make a

5  reference initially to a differential in the answers.  I am

6  simply going to say, sir, you responded yes, can you tell us

7  why you responded yes.

8       (Juror No. 25 enters chambers.)

9           THE COURT:  Counsel, we have Juror No. 25 back here

10  with us.  This is as a follow-up to the questions the Court

11  just restated to the entire panel.

12           Ma'am, I note that in response to Question 8 just a

13  few moments ago which just as a reminder reads:  Do you believe

14  that law enforcement testimony is more or less likely to be

15  believable or reliable than testimony by another witness?

16           You responded yes.  Could you tell us a little bit

17  about that.

18           Juror No. 25:  I don't think I understood the

19  question the first time.

20           I think if they're called in for a reason, there

21  must be something to it.

22           THE COURT:  If who is called?

23           Juror No. 25:  If someone has been charged with

24  something that a policeman has said they have done, there is

25  probably a likelihood that something was done there.

1          THE COURT:  You believe that to be true based on

2    your life experience?

3          Juror No. 25:  Not necessarily true, no, but I would

4    have a tendency to think they would be, unless I heard

5    otherwise.

6          THE COURT:  So let me ask you this, ma'am.

7          Among the things I'll instruct the jury when they're

8    selected, there will be a number of instructions I give them,

9    but let me tell you two of them, or several of them.

10         First, it's the role of the jury and the jury alone

11   to determine the credibility, that is, the truthfulness of any

12   testimony from anybody that testifies, it's the role of the

13   jury alone.

14         Secondly, in this case and in every criminal case

15   that is in any court in the United States, no defendant is

16   required to offer any evidence, any testimony, any papers,

17   anything in defense of the charges against them.  They're not

18   obligated to testify in any case against them, and, in fact,

19   the jury will be told that it may not hold against the

20   defendant the fact that they don't present a case or they

21   choose not to testify.

22         And that it's the obligation of the government in

23   any criminal case to prove each and every element of the crime

24   charged beyond a reasonable doubt, and the jury has to be

25   unanimous in whatever its verdict is, and that from the

1 beginning of the trial until the end of the trial, every

2 defendant in a criminal case in the United States is presumed

3 to be innocent and they may only be found guilty if the

4 government has proved the case in every element beyond a

5 reasonable doubt.

6           Those will be among the instructions I give the

7 jury.

8           So, if you hear those instructions, how does that

9 play into what you have just told us?

10          Juror No. 25:  I guess it doesn't make a whole lot

11 of sense because if he can't -- if he or she can't be proved

12 guilty, then you can't say they are guilty.

13          It's just -- I guess when you worded that, I thought

14 you meant who are you more likely to believe in the beginning,

15 a witness or the policeman?

16          THE COURT:  That's part of the question.

17          Juror No. 25:  But not necessarily mean that that

18 would be the end result of your belief.  But I thought you

19 meant what would your feeling be?

20          THE COURT:  Let me sort of repeat the Question 8

21 again.  If a witness testified that was a police officer or

22 somehow affiliated with law enforcement and they were among all

23 the witnesses, would you view their testimony as being more

24 believable or more reliable because they are a police officer

25 or affiliated with law enforcement?

1          Juror No. 25:  I might.

2          THE COURT:  That's fine.  We appreciate you coming

3 back and telling us.

4          Mr. Sindler, do you have any follow-up for Juror No.

5 25?

6          MR. SINDLER:  No.

7          THE COURT:  Mr. Ortiz or Ms. King, any follow-up for

8 Juror 25?

9          MS. KING:  No.

10          MR. ORTIZ:  No.

11          THE COURT:  Ma'am, thank you so much for coming

12 back.

13      (Juror No. 25 exits the room.)

14          THE COURT:  Mr. Sindler, any position on cause?

15          MR. SINDLER:  Given this development, I now move to

16 strike her because she has a belief, an inclination toward the

17 credibility, it's enhanced because a person is a police

18 officer.

19          THE COURT:  Mr. Ortiz, Ms. King?

20          MS. KING:  We have no objection.

21          MR. ORTIZ:  No objection.

22          THE COURT:  No objection to the cause strike?

23          MS. KING:  Right.

24          THE COURT:  She will be stricken for cause.  I make

25 an independent finding that while it appears to the Court that

1  she would be sincere and earnest in following the Court's

2  instructions, she was candid in saying she does have a starting

3  point that police officers or law enforcement are more credible

4  or more believable, so she has to overcome that.  I found her

5  candid and forthright in that regard, so I will grant the

6  motion to strike Juror No. 25 for cause.

7           So let's work through the list and see who we have

8  in the pool without dealing with any of the other matters for

9  cause.

10          38 -- I would ask just so we have a clear record if

11  counsel agrees with the Court, just say agreed.

12          THE COURT:  38 in the pool?

13          MS. KING:  Agreed.

14          MR. SINDLER:  Yes.

15          THE COURT:  7 in the pool?

16          MS. KING:  Agreed.

17          MR. SINDLER:  Yes.

18          THE COURT:  28 in the pool?

19          MS. KING:  Agreed.

20          MR. SINDLER:  Yes.

21          THE COURT:  5 in the pool.

22          MS. KING:  Agreed.

23          MR. SINDLER:  Agreed.

24          THE COURT:  34 in the pool.

25          MS. KING:  Agreed.

```
1              MR. SINDLER:  Agreed.

2              THE COURT:  16 in the pool.

3              MS. KING:  Agreed.

4              MR. SINDLER:  Agreed.

5              THE COURT:  47 in the pool.

6              MS. KING:  Agreed.

7              MR. SINDLER:  Agreed.

8              THE COURT:  24 in the pool.

9              MS. KING:  Agreed.

10             MR. SINDLER:  Agreed.

11             THE COURT:  57 in the pool.

12             MS. KING:  Agreed.

13             MR. SINDLER:  Agreed.

14             THE COURT:  8 in the pool.

15             MS. KING:  Agreed.

16             MR. SINDLER:  Agreed.

17             THE COURT:  27 in the pool.

18             MS. KING:  Agreed.

19             MR. SINDLER:  Agreed.

20             THE COURT:  20 in the pool.

21             MS. KING:  Agreed.

22             MR. SINDLER:  Agreed.

23             THE COURT:  52 in the pool.

24             MR. SINDLER:  Agreed.

25             MS. KING:  Agreed.
```

1          THE COURT:  56 in the pool.

2          MS. KING:  Agreed.

3          MR. SINDLER:  Yes.

4          THE COURT:  52 in the pool agreed.

5          MS. KING:  Agreed.

6          MR. SINDLER:  Agreed.

7          THE COURT:  53 in the pool.

8          MS. KING:  Agreed.

9          MR. SINDLER:  Agreed.

10         THE COURT:  21 in the pool.

11         MS. KING:  Agreed.

12         MR. SINDLER:  Agreed.

13         THE COURT:  41 in the pool.

14         MS. KING:  Agreed.

15         MR. SINDLER:  Agreed.

16         THE COURT:  48 in the pool.

17         MS. KING:  Agreed.

18         MR. SINDLER:  Agreed.

19         THE COURT:  54 in the pool.

20         MS. KING:  Agreed.

21         MR. SINDLER:  Agreed.

22         THE COURT:  50 in the pool.

23         MS. KING:  Agreed.

24         MR. SINDLER:  Agreed.

25         THE COURT:  66 in the pool.

```
 1              MS. KING:  Agreed.

 2              MR. SINDLER:  Agreed.

 3              THE COURT:  15 in the pool.

 4              MS. KING:  Agreed.

 5              MR. SINDLER:  Agreed.

 6              THE COURT:  The count so far, I come to 21 at that

 7  point.

 8              MR. SINDLER:  Yes.

 9              THE COURT:  Ms. King and Mr. Ortiz, does that sound

10  right?

11              MS. KING:  I'm counting.

12              THE COURT:  Mr. Greer?

13              MR. GREER:  I think it's 22, Judge.

14              THE COURT:  Let me count again.

15              MS. KING:  I have 22 as well.

16              THE COURT:  I have 22 also.

17              That brings us to 64 in the pool.

18              MS. KING:  We have 29.

19              THE COURT:  There is a pending cause challenge to

20  that.

21              MS. KING:  She's the next in line.

22              THE COURT:  I was not counting people that there

23  were pending causes.

24              I just want to confirm, 64 in the pool.

25              MR. SINDLER:  Yes.
```

1          MS. KING:  Yes.

2          THE COURT:  40 in the pool.

3          MS. KING:  Yes.

4          MR. SINDLER:  Yes.

5          THE COURT:  62 in the pool.

6          MS. KING:  Yes.

7          MR. SINDLER:  Yes.

8          THE COURT:  58 in the pool.

9          MS. KING:  Yes.

10         MR. SINDLER:  Yes.

11         THE COURT:  63 in the pool.

12         MR. SINDLER:  Yes.

13         THE COURT:  43 was stricken; 227 there pending

14 challenge; 51 was stricken.

15         67 in the pool.

16         MS. KING:  Yes.

17         MR. SINDLER:  Yes.

18         THE COURT:  42 in the pool.

19         MS. KING:  Yes.

20         MR. SINDLER:  Yes.

21         THE COURT:  11 in the pool.

22         MS. KING:  Yes.

23         MR. SINDLER:  Yes.

24         THE COURT:  14 was absent.

25         46 in the pool.

```
1              MS. KING:  Yes.

2              MR. SINDLER:  Yes.

3              THE COURT:  43 in the pool.

4              MS. KING:  4.

5              THE COURT:  4, I am sorry.

6              That would take us to 32.

7              Correct?

8              MR. ORTIZ:  I believe so.

9              MR. SINDLER:  Is 4 the last one?

10             THE COURT:  4 was the last one that we saw.  4 was

11  in.

12             I have one pending cause challenge -- excuse me, two

13  pending cause challenges to 29 and 227.

14             MR. ORTIZ:  I guess I'm a little confused as to the

15  effect of 29 and 227 on the count.

16             THE COURT:  I understand.

17             MR. ORTIZ:  I was under the impression that since

18  they have not yet been struck, they are --

19             THE COURT:  Let me be more precise in the question.

20  The people I have listed and stated as in the people are people

21  that have been interviewed, including back here, and there has

22  been no sustained cause challenge for.

23             Would you agree with that?

24             MR. ORTIZ:  I would.

25             MS. KING:  Yes.
```

1          THE COURT:  Mr. Sindler, do you agree with that?

2          MR. SINDLER:  Yes.

3          THE COURT:  If I deny the cause challenge as to 29

4 and 227, they would be in the pool and the last two would drop

5 off.  If I sustain either the cause challenge as to 29 or 227,

6 then accordingly, 46 and/or 4 would be in.

7          Do you agree, Mr. Ortiz?

8          MR. ORTIZ:  Yes.

9          MS. KING:  Yes.

10          THE COURT:  Do you agree, Mr. Sindler?

11          MR. SINDLER:  Yes.

12          THE COURT:  I will sustain the cause challenges as

13 to 29 and 227.

14          So that makes the jury numbers, Mr. Babik, just to

15 confirm, the jurors are in, 38, 7, 28, 5, 34, 16, 47, 24, 57,

16 8, 27, 20, 56, 52, 53, 21, 41, 48, 54, 50, 66, 15, 64, 40, 62,

17 58, 63, 67, 42, 11, 46, 4.  For a total of 32.

18          Do you concur?

19          MR. BABIK:  I concur.

20          THE COURT:  Do you concur, Mr. Sindler?

21          MR. SINDLER:  I do.

22          THE COURT:  Do you concur, Mr. Ortiz?

23          MR. ORTIZ:  I do, if I could raise one issue.

24          THE COURT:  This is the time.

25          MR. ORTIZ:  Your Honor has been quite thorough and

1  clear on all of his rulings so far for whether or not the for

2  cause challenge has been sustained or overruled.  However, with

3  29 and 227, there hasn't been a discussion as to why, and I

4  guess I'm just bringing it up because at the top of my mind,

5  particularly 227, I recall several different times that he said

6  he could be fair and impartial and I don't recall what perhaps

7  justification is for that particular --

8            THE COURT:  I recall I found Juror No. 227, and this

9  is not meant to sound as rude as it may come out, but it's a

10  factual finding and I think it's totally appropriate, Mr.

11  Ortiz, for you to request a specific finding.  I found Juror

12  No. 227 to easily be the rudest and most belligerent

13  prospective juror that I've seen.  I have substantial doubts as

14  to his ability to follow the Court's instructions based on the

15  Court's observation of his demeanor and conduct while he was

16  present before the Court.  In particular, I note what appeared

17  to be, in the Court's estimation, at minimum disdain, more

18  likely disgust with the fact that he testified as a witness, a

19  principal witness based on his explanation in a criminal trial

20  involving his work as a correction officer and that was

21  contrary to the testimony of the defendant, who ended up being

22  found not guilty in that state court proceeding in the Court of

23  Common Pleas of Greene county.  Based on the Court's

24  observation of his demeanor and the tone and content of his

25  answers, I have substantial doubts as to his ability to follow

1 the instructions of the Court.

2         No. 29 -- not to put too fine a point on it, all of

3 that leads the Court to believe, I believe, he would, no matter

4 what his subjective good intentions would be, it appeared to

5 the Court he would have an extraordinarily difficult time

6 separating his sworn obligations as a juror here from his

7 perceived sworn obligations as a correctional officer at the

8 State Correctional Institution at Greene.  So those would be my

9 findings as to 227.

10         Mr. Greer, remind me of my notes on 29.

11         No. 29 was woman who appeared to the Court to be

12 very sincere and very earnest.  She did reflect that she had a

13 physical situation that she did not believe would be

14 insurmountable in climbing the stairs back and forth to the

15 jury room and the Court takes her at her word in that regard

16 and the Court does not view it as an obstacle or impediment to

17 the fair trial of the case if it took the jury a few minutes

18 more or longer to come up and down the stairs.  She did have

19 what appeared to be, and it was examined in several ways both

20 by the Court's questions and follow-up questions from all

21 counsel in the case, a sincerely held and it appeared to the

22 Court deeply held belief for reasons that frankly escape the

23 Court but nonetheless appear to the Court to be subjectively

24 and sincerely held by her a sense of diminished standing with

25 others an inferiority, and in her response to the Court's

questions and some of the follow-up questions of all counsel,

it appeared that one of the central bases for the cause

challenge from the defendant went to her ability or willingness

to, when instructed by the Court as part of the Court's opening

and closing instructions that jurors have to, among their

duties do two things at once, they have to come and exercise

their own judgment and bring their own conclusions and judgment

to the task of jurors, and being a member of a jury, and at the

same time have an open mind to the positions and views of

others in the jury room, and consistently through the

deliberation process do both of those things, but at the end of

the day, if those two juror responsibilities and obligations

are in tension with one another, they are to follow their own

best judgment, even if that would mean they are the only person

standing to that judgment.  And I took the basis of the cause

challenge from, the principal basis of the cause challenge from

counsel for the defendant, it was based on her answers, it

appeared that there was a material, serious, substantial,

subjective and deeply held belief on her part about how she

fits into things, if you will, that she may on her own, not as

a result of being overborne or the more fierce will of others,

but based on her own beliefs about herself be materially unable

or unwilling to follow that instruction if things got into

tension between those two responsibilities.  I found that basis

for the cause challenge to be well taken.

1            MR. ORTIZ:  Thank you for clarifying.

2            THE COURT:  No problem at all, Mr. Ortiz.  Any

3  counsel is doing their job as far as I'm concerned when they

4  ask the Court to make specific findings on the record for a

5  ruling the Court makes.

6            Anything else?

7            MS. KING:  No, Your Honor.

8            THE COURT:  Mr. Sindler, we have our 32.

9            MR. SINDLER:  I'd like to get an idea about

10 planning.

11           THE COURT:  That is the next thing.

12           Mr. Babik, would you please recite to counsel what

13 we will do next.

14           MR. BABIK:  We'll retire back to the courtroom.

15 I'll come up with a sheet that has 32 prospective jurors.  The

16 government will get the first strike, I give it to Mr. Ortiz

17 and Ms. King, they will make the first strike, I will give you

18 each a colored pen.  You pass it back and forth to make your

19 strikes.  Continue making your strikes.  Give it back to me.

20 The Judge and I will review it.  At that point I'll seat the

21 jurors.

22           THE COURT:  Mr. Babik will give you a little

23 direction sheet that shows the number of strikes you each have

24 on each round.  You'll see the first set of strikes gets us to

25 12 that are seated.  Then that should leave four left and you

1  will each get a strike and that will leave two left as the

2  alternate.  The lower numbered person will be Alternate No. 1,

3  the first one in sequence we've taken will be No. 1, the other

4  one will be Alternate No. 2.

5          Once we've concluded that, Mr. Babik will then seat

6  them in the jury box, call them up, give them the new number,

7  direct them to a specific seat.

8          Once they are seated, I will then ask counsel on the

9  record, are you satisfied with the jury as seated?

10          Once we've confirmed that that is true, I'll ask

11  counsel if there is any objection to swearing the jury?  That

12  will be done.

13          I will then have all the members of my staff be

14  sworn in as jury bailiffs so that they can work with the jury

15  during the trial.

16          It would be my intention at that point to conclude

17  for the day.  I would not give my full opening instructions.  I

18  would greet the jury.  I would confirm they are the seated

19  jury.  I would give them what I call the recess admonition of

20  don't talk about the case, don't do any research, don't do

21  anything else.  I would instruct them to be back in the jury

22  room at 8:45 tomorrow morning.

23          Assuming we're all here and Mr. Warren is here, we

24  would start at nine o'clock with my opening instructions, and

25  then we would recognize you, Mr. Ortiz, to give the opening for

1 the United States.

2          If we do that process, does that work for the

3 lawyers for the government?

4          MS. KING:  Yes.

5          THE COURT:  Does that process work for you,

6 Mr. Sindler?

7          MR. SINDLER:  Yes.

8          MR. GREER:  For Juror 57, where there was a cause

9 challenge, that was overruled?

10          THE COURT:  It has been withdrawn.

11          MR. GREER:  She is going to be slotted back in the

12 order.

13          THE COURT:  She'll go right where she always was.

14          I will say when you strike, you're not obligated to

15 strike from the top of the list.  If you want your first strike

16 to be the last person on the list, that's fine.  You don't have

17 to go all in one direction.  You pick who you strike in what

18 order.

19          Anything else we need to put on the record back

20 here?

21          Counsel for the United States?

22          MS. KING:  No, Your Honor.

23          THE COURT:  Counsel for Mr. Warren?

24          MR. SINDLER:  No.

25          (Proceedings concluded in chambers.)

1          (OPEN COURT)

2               THE COURT:  Mr. Babik, you may begin the process.

3               Let the record reflect Mr. Warren is present,

4  represented by Mr. Sindler.

5               Mr. Ortiz and Ms. King are here for the United

6  States.

7               Ms. King, has the United States completed its

8  portion of the jury selection process?

9               MS. KING:  Yes, Your Honor.

10               THE COURT:  Mr. Sindler, has counsel for Mr. Warren

11  have you completed your portion of the jury selection process?

12               MR. SINDLER:  We have.

13               THE COURT:  Mr. Babik, have you reviewed the

14  selection form as provided to you by counsel and confirmed that

15  counsel have identified the 12 jurors that will be seated as

16  the sitting jury in this case and the two jurors who will be

17  seated as the alternates?

18               MR. BABIK:  I have confirmed it.

19               THE COURT:  Mr. Babik, you may proceed with seating

20  the members of the jury and the alternate members of the jury.

21               MR. BABIK:  If your number is called, please come

22  over to the jury box and be seated, please bring any personal

23  belongings along with you.

24               THE COURT:  Juror No. 4, you are now Alternate Juror

25  No. 2.  Take the top seat there.

1          Juror No. 63, you're now Juror No. 12.

2          Juror No. 62, you are now Juror No. 11.

3          Juror No. 64, you are now Juror No. 10.

4          Juror No. 15, you are now Juror No. 9.

5          Juror No. 54, you are now Juror No. 8.

6          Juror No. 41, you're now Juror No. 7.

7          Juror No. 46, you are Alternate Juror No. 1.

8          Juror No. 53, you are now Juror No. 6.

9          Juror No. 27, you're now Juror No. 5.

10          Juror No. 24, you're now Juror No. 4.

11          Juror No. 47, you're now Juror No. 3.

12          Juror No. 28, you're now Juror No. 2.

13          Juror No. 38, you're now Juror No. 1.

14          Your Honor, the jury has been seated.

15          THE COURT:  Thank you very much, Mr. Babik.

16          Mr. Ortiz and Ms. King, are you satisfied with the

17 jury and alternate jurors as seated?

18          MS. KING:  Yes, Your Honor.

19          THE COURT:  Mr. Sindler, are you satisfied with the

20 jury and alternate jurors as seated?

21          MR. SINDLER:  We are.

22          THE COURT:  Mr. Sindler, may the jury be sworn?

23          MR. SINDLER:  Yes.

24          THE COURT:  Ms. King and Mr. Ortiz, may the jury be

25 sworn?

1          MS. KING:  Yes, Your Honor.

2          THE COURT:  Mr. Babik, please administer the oath to

3 the jurors.

4     (Administration of the oath.)

5          THE COURT:  Mr. Greer, Mr. Zimmerman, Ms. Dressler,

6 please come to the well of the Court.

7          Mr. Babik, please join them.

8          Are you prepared to receive the oath as jury

9 bailiffs?

10         MR. ZIMMERMAN:  Yes, Your Honor.

11         MR. GREER:  Yes, Your Honor.

12         MS. DRESSLER:  Yes, Your Honor.

13         MR. BABIK:  Yes, Your Honor.

14     (Administration of the oath.)

15         THE COURT:  Ladies and gentlemen of our jury, in a

16 moment, I'm going to give you a few very brief instructions for

17 this evening.

18         The reason I've asked you to bring your personal

19 belongings with you to the jury box, recognizing it may be just

20 a bit inconvenient is when we conclude for the day, which we're

21 going to do here in a few minutes, Mr. Babik, who is our

22 courtroom deputy, will escort you to show you where the jury

23 room is, how you can get there because that's where you'll be

24 reporting for duty tomorrow morning so that you have your

25 belongings with you so when Mr. Babik has concluded that, he

1 will allow you to leave directly.

2           Mr. Babik, before we do that, would you in a moment

3 take care of the rest of the folks that have been with us for

4 the last two days.

5           Ladies and gentlemen who have given of your time to

6 come as prospective jurors to sit and serve in this case, had

7 you been selected, please accept my thanks and appreciation on

8 behalf of myself, all of the participants in this case, and all

9 of my colleagues and members of our courthouse family.  We, as

10 I told you yesterday, that we understand and appreciate the

11 very fact of being called for jury duty is a substantial

12 personal and professional inconvenience, but it is one of the

13 highest duties we can all serve as citizens of our system.

14 Recognizing it's been two long days, counsel and all of the

15 participants have been working very hard to get to the point

16 that we're at now.  Please accept my apologies as the Court for

17 the length of time it has taken.  That is my responsibility and

18 accountability, but also accept the Court's appreciation on

19 behalf of the Court and all of the participants in the trial

20 for your patience and bearing with us.

21           Mr. Babik, if you would please provide directions to

22 the members of the jury panel who are not selected.

23           Ms. King and Mr. Ortiz, any objections to the Court

24 releasing the other members of the jury panel from this

25 proceeding?

1          MS. KING:  No, Your Honor.

2          THE COURT:  Mr. Sindler, same question?

3          MR. SINDLER:  No.

4          MR. BABIK:  You can report to the jury office on the

5 third floor where I brought you up from yesterday morning.  Let

6 them know you have been dismissed from this jury selection and

7 they will provide you further information at that point.

8          THE COURT:  Trial participants and jury, we'll take

9 a pause in place while the other prospective jurors gather

10 their things and proceed.

11          (Jury panel dismissed.)

12          THE COURT:  Ladies and gentlemen of the jury, you

13 have now been sworn to sit in determination of this case.  I

14 want to take just a few moments now to go over some very

15 preliminary instructions regarding your duties and

16 responsibilities as jurors.  As the trial progresses, beginning

17 tomorrow morning, I'll give you more detailed instructions and

18 then certainly more detailed instructions at the end of the

19 case.

20          We're not going to begin the trial itself today,

21 that will begin tomorrow morning.  We'd ask you to report to

22 the jury room -- Mr. Babik will show you how to get there and

23 where it is -- if you could be there no later than 8:45

24 tomorrow morning.  We hope to be able to begin our trial at or

25 about nine o'clock.

1              As you might imagine, it's important that everyone

2  be here by that time because we can't start our trial or

3  proceed with our trial unless all of the trial participants,

4  including each and every member of the jury and the alternates

5  are present.  So you can understand the importance of being

6  here.

7              Mr. Babik is also going to give you instructions on

8  how to contact us if there's some difficulty or urgency that

9  comes up in your situation so that you can alert us.  He'll

10 confirm he has contact information for you in the event we need

11 to contact you due to some change in the Court's schedule or

12 those things.

13             Just a couple big picture reminders.  We will be

14 providing water to you in the jury room, as Mr. Babik will show

15 you.  There is a refrigerator, coffee maker, microwave and

16 those sorts of things, but we will have cold water for you.  If

17 there are other soft drinks you want to have, coffee, tea, all

18 those other things, all I ask is it be in some sort of

19 mechanically closing lids, commuter cup or something like that.

20 You'll be permitted to bring your water or soft drink with you

21 to the jury box.  We will, as you'll see during the course of

22 the trial, at opportune times not only take a break away from

23 the courtroom but an opportunity for everyone to just stand and

24 stretch so that you can do that while you're in the jury box.

25             One of the common questions that we hear from jurors

1 are, and I'll just tell you this now and I'll repeat it

2 tomorrow, to allay any concerns you might have, if during the

3 proceedings you don't see or hear something that is going on,

4 all you need to do is raise your hand, I'll be keeping an eye

5 out and we'll make sure we take care of that for you.

6          If you need a break, but it can wait a few minutes

7 until the next natural opportunity, all you need to do is give

8 me this signal like you're breaking the stick, I'll see it,

9 I'll keep that in mind for the next opportunity.  If you need a

10 break with some urgency, put your hand up and we will take a

11 break right then and there.  That applies to all of our trial

12 participants.  Don't be embarrassed.  We've all been there,

13 including the Court, so, we will accommodate that for you.

14          We're going to begin tomorrow by me giving you more

15 detailed instructions about your role and responsibility as

16 jurors.  But before we dismiss you to go with Mr. Babik, there

17 are some special instructions that I'll give you now, and

18 you'll hear these during the whole course of the trial, in

19 fact, you'll hear them so often that by the end of the trial,

20 you'll be able to give this instruction.

21          Ladies and gentlemen of the jury, please do not

22 discuss this case, any of the participants in it, any of the

23 issues or matters that are involved in it with anybody else

24 until the trial has been concluded and you have been released

25 for service.  That includes no discussion of those topics

1 amongst yourselves.  That will come at the very end of the

2 trial when deliberations occur.  So, do not discuss the case,

3 the participants, the issues or the matters involved in it with

4 anyone else.

5 　　　　　Do not seek out or receive any information about

6 this case, this trial, those involved in it, the issues that

7 are or may be involved in it from any source.  No Googling is

8 the big rule.  No independent research, no looking at the TV,

9 magazines, newspapers, encyclopedias, online sources, Twitter,

10 Facebook, none of that stuff until the trial is over and you

11 have been released from duties.

12 　　　　　If you're in the presence of someone that might be

13 talking about any of those matters, please move away from that,

14 so you should not seek out or receive information about any of

15 those matters from any source whatsoever.

16 　　　　　If anyone should attempt to discuss the case with

17 you in any way, shape or form, please do not participate in

18 that, move away from that, and advise Mr. Babik if that

19 happened.  Even if it was completely accidental, even if it was

20 completely inadvertent, even if it was one of your fellow

21 jurors, please let Mr. Babik know that and we can address that

22 appropriately.

23 　　　　　You should dress comfortably.  Everyone was dressed

24 appropriately today.  You can feel to dress comfortably for the

25 weather.  You will be able to leave your coats and other things

in the jury room and we do secure the area when you're away
from it.

        We will have two breaks, one in the morning,
midmorning and one at mid afternoon lasting approximately 15
minutes.  We'll take a lunch hour at an appropriate time
midday, and that will usually go for an hour and ten minutes.
You're also free to bring your lunch or other things.  We do
have a refrigerator upstairs.  How you handle that is up to
you.

        We will do our very best, today is an exception, to
end no later than 4:30 each day.  We know people have different
transportation arrangements.  If it looks like with five more
minutes we can wrap an item up, we may do that, but I'll
generally resolve doubts in favor of ending a few minutes early
rather than ending a few minutes later so that you can handle
your transportation arrangements in that way.

        Mr. Babik, are there any other matters that we
customarily address to the jury at this time prior to the
opening instructions?

        MR. BABIK:  I think you covered everything, Judge.

        THE COURT:  Ms. King and Mr. Ortiz, are there any
other matters I should advise the jury of at this time?

        MS. KING:  No, Your Honor.

        THE COURT:  Mr. Sindler, same question?

        MR. SINDLER:  No.

 1              THE COURT:  Mr. Babik will in a moment escort you up

 2  to the jury room, show you around, give you the lay of the

 3  land.  Take your things with you because you'll depart directly

 4  from there.  If the other trial participants could remain for a

 5  few moments, we can go over some procedural matters in getting

 6  ready for tomorrow.

 7              Mr. Babik, sir.

 8              THE COURT:  In a moment, Mr. Zimmerman, would you

 9  arrange for Ms. Dressler to bring out that other paperwork.

10              Mr. Zimmerman will deliver to all counsel a copy of

11  the proposed final jury instructions.  Obviously, they're

12  subject to change and a charge conference on anything that

13  comes up along with the proposed verdict form.  We will post it

14  as a Case Participants Only document only so you have it on

15  ECF.

16              We will be removing at least one of the chairs

17  behind each side of counsel table so we can set the screen up

18  and, Ms. King, we'll give you and Mr. Ortiz room for your cart

19  behind the table there so people can move through the well of

20  the courtroom, but we'll make sure you have space behind for

21  tomorrow.

22              Any other arrangements that the United States thinks

23  need to be made in the courtroom or otherwise for tomorrow

24  morning?

25              MS. KING:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Sindler, same question for you?

2          MR. SINDLER:  No.

3          THE COURT:  Any reason that we can't adjourn for the

4 day once Mr. Zimmerman hands you these papers?

5          MR. SINDLER:  No.

6          THE COURT:  Ms. King and Mr. Ortiz?

7          MS. KING:  No, Your Honor.  Thank you.

8          We did discuss with Mr. Sindler at the Court's

9 request the stipulations that would be coming in.  So we

10 decided with his agreement it will come in after the testimony

11 of two law enforcement witnesses but prior to the testimony of

12 Mr. Best.  I'll just read them in or Mr. Ortiz will read them

13 into the record.

14          THE COURT:  Is that an agreeable time for you?

15          MR. SINDLER:  Yes, that's fine.

16          THE COURT:  We'll start with you, Ms. King and Mr.

17 Ortiz, do you want me to give an instruction at that time which

18 would be parallel to the instruction in the Court of Appeals

19 Standard Form Instruction 4.02?  Do you want me to give that

20 instruction of what a stipulation is?

21          MS. KING:  That's fine with us.

22          THE COURT:  Mr. Sindler, what do you think?

23          MR. SINDLER:  I'll have to get back to you.

24          THE COURT:  Let me know in the morning.

25          Any reason we can't adjourn, Ms. King and Mr. Ortiz?

```
 1              MS. KING:  No, Your Honor.

 2              THE COURT:  Mr. Sindler?

 3              MR. SINDLER:  No.

 4         (Court is adjourned.)

 5                        -----

 6                     CERTIFICATE

 7

 8              I, Juliann A. Kienzle, certify that the foregoing is
   a correct transcript from the record of proceedings in the
 9 above-titled matter.

10
   s/Juliann A. Kienzle, RMR, CRR
11 _____
   Juliann A. Kienzle, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```