1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   UNITED STATES OF AMERICA,

4      vs.
                                    Criminal No. 13-270
5   ATIBA WARREN,
                  Defendant.
6

7

        Transcript of Jury Trial Proceedings on Wednesday, October
8  28, 2015, United States District Court, Pittsburgh,
   Pennsylvania, before Mark R. Hornak, District Judge.
9

10

   APPEARANCES:
11

      For the Government:          Katherine A. King, Esq.
12                                 Jonathan B. Ortiz, Esq.
                                   Assistant U.S. Attorney
13                                 400 US Courthouse
                                   700 Grant Street
14                                 Pittsburgh, PA 15219

15

      For the Defendant:           Mark A. Sindler, Esq.
16                                 310 Grant Street
                                   Suite 2330 Grant Building
17                                 Pittsburgh, PA  15219

18

19

20
   Court Reporter:                 Juliann A. Kienzle, RMR, CRR
21                                 5300 U.S. Courthouse
                                   700 Grant Street
22                                 Pittsburgh, PA 15219
                                   (412) 261-6122
23

24

        Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.

1  (Proceedings held in open court; Wednesday, October 28, 2015.)

2          THE COURT:  We're here this morning in the case of

3  the United States of America versus Atiba Warren, pending on

4  the docket of the Court at 13-270.

5          Will counsel for the United States please enter

6  their appearances.

7          MS. KING:  Good morning, Your Honor, Katherine King

8  for the United States.

9          THE COURT:  Good morning, Ms. King.

10          MR. ORTIZ:  Jonathan Ortiz.

11          THE COURT:  You have Mr. Christian Sciulli seated

12  with you?

13          MS. KING:  Yes.

14          THE COURT:  Will counsel for Mr. Warren enter his

15  appearance.

16          MR. SINDLER:  It's Mark Sindler.

17          THE COURT:  Mr. Warren is seated with you at counsel

18  table; is that correct, sir?

19          MR. SINDLER:  Yes.

20          THE COURT:  We have seated and sworn the jurors and

21  alternate jurors yesterday.  In a few minutes we'll begin with

22  opening statements from Mr. Ortiz after the Court goes through

23  its preliminary jury instructions.

24          Ms. King, just to confirm for the record, does the

25  United States have any objections or corrections to the

1  preliminary jury instructions which the Court posted at ECF No.

2  119?

3          MS. KING:  No, Your Honor.

4          THE COURT:  Mr. Sindler, does Mr. Warren have any

5  objections or corrections to the preliminary jury instructions

6  which the Court posted at ECF 119?

7          MR. SINDLER:  No.

8          THE COURT:  We are set up in the courtroom with all

9  the displays for the use of the exhibits.

10          I will remind counsel that once you place anything

11 up on your screen, it goes up on all the screens, mine,

12 opposing counsel's, and the jury, so we need to make sure

13 before something goes up on the screen if there are any

14 questions regarding authenticity or admissibility or being

15 published to the jury, we iron those out.  So, the best time to

16 do that is when the jury is not here so that we don't have to

17 do it at sidebar.

18          Mr. Ortiz, will you be using anything on the screens

19 during your opening?

20          MR. ORTIZ:  No, Your Honor.

21          THE COURT:  Mr. Sindler, will you be using anything

22 on the screens during your opening?

23          MR. SINDLER:  No.

24          THE COURT:  Mr. Ortiz, during your witnesses,

25 assuming we get to witnesses this morning, I'm sure we will, do

1 you anticipate using things on the screen or, Ms. King, maybe

2 the question is more appropriately addressed to you.

3            MS. KING:  I will be directing the witnesses, Your

4 Honor.  I will, but I'll make sure it's admitted prior to the

5 time I publish them.

6            THE COURT:  That will be terrific.

7            Ms. King and Mr. Ortiz, are there any matters we

8 should take up or review prior to the jury being brought to the

9 courtroom?

10            MS. KING:  No, Your Honor.  Thank you.

11            THE COURT:  Mr. Sindler, same question of you, sir?

12            MR. SINDLER:  No.

13            THE COURT:  Mr. Greer, as far as you know, we're

14 ready to go.

15            Mr. Babik, please bring the jury to the courtroom.

16         (Whereupon, the jury enters the courtroom.)

17            THE COURT:  If you would note, all members of the

18 jury and all alternates are present.

19            All counsel are present.

20            Mr. Warren is present.

21            Good morning, ladies and gentlemen of the jury.

22            We're going to begin today's court session by my

23 going over, as I promised you at the end of the day yesterday,

24 some preliminary instructions regarding the process we're going

25 to use for our trial.  There will be more detailed instructions

1 that will come your way when all of the trial proceedings have

2 come to a conclusion and the matter would be sent off to you

3 for your deliberations.  So these will be preliminary

4 instructions this morning.

5          As I noted yesterday, if at any time either when I'm

6 speaking or any of our other trial participants are engaged in

7 the courtroom, if you cannot see or hear something that you

8 need to see or hear, simply raise your hand, I'll note that and

9 we'll do our best to correct the situation.

10          Ladies and gentlemen of the jury, you have now been

11 sworn as the jury to sit in determination of this case.  I want

12 to take a few minutes to give you some preliminary instructions

13 about your duties as jurors.  At the end of the trial, I'll

14 give you more detailed instructions regarding the law and your

15 decision-making responsibilities.

16          I previously introduced my courtroom staff to you.

17 Please do not ask the court staff any questions about the

18 substance of the case during the trial, except you may ask them

19 about personal matters relating directly to your service as a

20 juror, such as transportation problems or the need for supplies

21 in the jury room, or similar things.

22          Your role as jurors is to find the facts.  Under our

23 system of justice, you are the sole judges of the facts.  You

24 will have to decide what happened.  You must decide the facts

25 only from the evidence presented to you in this trial.

1          You will hear testimony and evidence, decide what
2 the facts are, and then apply to those facts the law that I
3 will give to you in my final instructions.  That is how you
4 will reach your verdict.

5          I play no part in finding facts.  You should not
6 take anything that I may say or do during the trial as
7 indicating what I think of the evidence or about what your
8 verdict should be.  My role is to make whatever legal decisions
9 have to be made during the course of the trial and to explain
10 to you the legal principles that must guide you in your
11 decisions.  You must not substitute or follow your own notion
12 or opinion about what the law is or ought to be.  You must
13 follow the law that I give to you, whether you agree with it or
14 not.

15          You must follow my instructions carefully.  Each of
16 the instructions is important and you must follow all of them.
17 Perform your duties fairly and impartially.  Do not allow
18 sympathy, prejudice, fear, bias or public opinion to influence
19 you.  You should also not be influenced by any person's race,
20 color, religion, national ancestry, gender, profession or
21 occupation.

22          As stated earlier, this case has been brought by the
23 United States government against the defendant, Atiba Warren.

24          The indictment charges defendant at Count One as
25 follows.

1          That the defendant, Atiba Warren, was knowingly in

2  possession of a firearm in or affecting interstate commerce on

3  or about October 23, 2012, in the Western District of

4  Pennsylvania, after having been convicted of a crime punishable

5  by imprisonment for a term exceeding one year.

6          As to Count One, in order for the crime of

7  possession of a firearm by a convicted felon, in violation of

8  Title 18, United States Code, Section 922(g)(1) to be

9  established, the government must prove each and all of the

10 following essential elements beyond a reasonable doubt.

11         One, that the defendant has been convicted of a

12 crime punishable by imprisonment for a term exceeding one year;

13         Two, that after such conviction, the defendant

14 knowingly possessed the firearm identified in the indictment,

15 namely, a Taurus model Judge .45LC/.410 pistol;

16         And three, that the defendant's possession was in or

17 affecting interstate or foreign commerce.

18         As previously stated, the charge against the

19 defendant is set forth in an indictment, which is simply the

20 description of the charge made by the government against the

21 defendant.  But the indictment is not evidence that the

22 defendant committed a crime.  The defendant has pled not guilty

23 to the charge.

24         A defendant is presumed to be innocent and may not

25 be found guilty by you unless all twelve of you unanimously

1  find that the government has proved the defendant's guilt

2  beyond a reasonable doubt as to such charge.

3              This is anticipated to be a trial lasting several

4  days.  We will endeavor to start each trial day at

5  approximately 9:00 a.m. and will take a lunch recess beginning

6  sometime between noon and twelve-thirty and resuming about an

7  hour and ten minutes later.  We will take a 10 to 15-minute

8  recess break in the morning and again in the afternoon and we

9  will adjourn for the day at approximately four-thirty.

10              It is important, ladies and gentlemen of the jury

11  that each of you arrive no later than 8:45 a.m. so we may begin

12  our trial promptly.  We can't begin until everyone is here

13  because all jurors must hear all of the evidence in the case.

14  If anyone is late, the other jurors, parties, the lawyers, the

15  witnesses, and the Court would be required to wait until all

16  jurors are here.  Therefore, you are required to be here on

17  time for each morning and afternoon session.

18              The first step in a trial will be the attorney's

19  opening statements.  The government in its opening statement

20  will tell you about the evidence which it intends to present to

21  you so that you will have an idea what the government's case is

22  going to be.  Just as the indictment itself is not evidence,

23  neither is an opening statement evidence.  Its purpose is only

24  to help you understand what the evidence will be and what the

25  government will attempt to prove.

1                     Next, the attorney for the defendant will make an

2     opening statement.

3                     Next, the government will offer witnesses and

4     exhibits as evidence that it contends will prove the charge

5     against the defendant.  The government's evidence may consist

6     of the testimony of witnesses, as well as documents, reports,

7     photographs, and other things introduced for your consideration

8     as exhibits.

9                     Ladies and gentlemen, some of you may have heard the

10    terms direct evidence and circumstantial evidence.  Direct

11    evidence is direct proof of a fact, such as testimony by a

12    witness about what the witness actually knows, said or heard or

13    saw or did.  Circumstantial evidence, or indirect evidence is

14    simply proof of one or more facts from which you could find

15    another fact.  For example, although you can hardly see outside

16    from this room, if one or more people walked in with a wet

17    trench coat or a dripping umbrella, it would be reasonable and

18    logical to conclude from that indirect or circumstantial

19    evidence that it had been raining outside.  You are to consider

20    all the direct and circumstantial evidence presented in this

21    trial and give such evidence the weight you think it deserves.

22                    After the government has presented all of its

23    evidence, the attorney for the defendant may present evidence

24    or testimony or other evidence on the defendant's behalf, but

25    the defendant is not required to do so.  You must know that the

defendant at all times is presumed to be innocent and that the
government must prove the guilt of a defendant beyond a
reasonable doubt.  A defendant does not have to prove his
innocence and has no legal obligation to testify or to present
any other testimony or evidence whatsoever.  In fact, under the
law, no inference or suggestion of guilt can be drawn by you
from the fact that a defendant did not testify or present any
evidence whatsoever.  If the defendant does decide to present
evidence, the government may introduce rebuttal evidence.

        The direct examination of each witness is conducted
by the lawyer who called the witness to the witness stand.
Each witness may be then questioned or cross-examined by
opposing counsel.  I may, from time to time, ask questions of
the witness in order to obtain information or bring out some
facts not fully developed by the testimony.  However, you will
not be permitted to ask questions of witnesses.

        You may also hear from one or more witnesses who
will give opinions about matters requiring some special
knowledge or skill.  You should judge this testimony in the
same way that you judge the testimony of any other witness.
The fact that such person has given an opinion does not mean
that you are required to accept it.  Give the testimony
whatever weight you think it deserves, considering the reasons
given for the opinion, the witness' qualifications and all of
the other evidence in the case.

1            The evidence in this case will consist not only of
2   testimony from witnesses and documents which will be shown to
3   you, but evidence also includes such fair and reasonable
4   inferences as may properly flow from facts which are not
5   disputed or which you believe to be true.  You should consider
6   both kinds of evidence.  The law makes no distinction between
7   the weight to be given to either direct or circumstantial
8   evidence.

9            You are to decide how much weight to give to any
10  evidence, in other words, you, ladies and gentlemen of the
11  jury, may draw upon your own experiences in life and your own
12  common sense in interpreting the facts which will be presented
13  to you by the parties in this case.

14           After all the witness testimony and evidence has
15  been presented, the attorneys will make their closing arguments
16  to you.  In these arguments, the attorneys will give you their
17  views of that which the evidence proves on the questions that
18  you have to decide.  These arguments should be given due
19  consideration, but the arguments themselves, again, are not
20  evidence.  Only testimony and evidence which has been admitted
21  through the witness chair during the trial can be considered by
22  you in determining the facts of the matter.

23           In the final phase of the trial, I will instruct you
24  about the rules of law which you are to apply in reaching your
25  verdict.  After hearing my instructions and the closing

arguments of counsel, you will leave the courtroom together,
proceed to the jury deliberation room to make your decision.
Your deliberations will be secret.  You will never have to
explain your verdict to anyone.

During the trial, ladies and gentlemen, I will
decide which rules of law apply to the case.  These decisions
will be in response to issues raised by the lawyers as we go
along and also in the final instructions given to you after the
evidence and arguments are completed.  I may also give you
certain instructions during the course of the trial itself.

The admission of evidence in court is governed by
rules of law.  During the trial, the lawyers may find it
necessary to make objections to certain testimony or evidence
and it then becomes my duty to rule on those objections and to
decide whether certain testimony or other evidence may be
permitted for your consideration.  You must not concern
yourself with the objections or the reasons for my rulings.
You must not consider testimony or exhibits to which I have
sustained an objection or which I have ordered stricken from
the record.  None of my rulings should be regarded as any
indication of my opinion as to what your findings or verdict
should be.

You are also not to consider the fact that a lawyer
objects to certain evidence as being any attempt by that lawyer
or his client to withhold any evidence from you which you might

1  need to properly determine the case.  The only way I can rule

2  on the legal effect of certain evidence is if the lawyer raises

3  an objection.  If the lawyer does not raise an objection at the

4  appropriate time, the lawyer is not fulfilling his or her duty

5  to the client or to the Court, therefore, you should not hold

6  it against any lawyer or lawyer's client if objections to

7  evidence are being made.

8           From time to time there may be conferences at what

9  we call sidebar, either requested by one of the lawyers or by

10 the Court.  At sidebar the lawyers and I will meet at the far

11 end of the bench to discuss legal points which may be involved

12 in the evidence again.  This is not an attempt to withhold

13 information from you which you should have, but rather it's a

14 means of ensuring that you hear only legally admissible

15 evidence upon which you are to base your decision.  I may not

16 always grant a lawyer's request for a sidebar conference or

17 grant it at a particular time, please do not consider my

18 granting or denying or deferring for a moment a request for

19 such a conference as any indication of my opinion of the case

20 or what your verdict should be.

21          When we are at sidebar, you can feel free to stand

22 up in the jury box and stretch for a moment.  And I will alert

23 you that during sidebars, there will be a white noise device

24 that is activated in the courtroom.

25          Mr. Babik, could you give an example of that, sir.

1  (Example played.)

2            THE COURT:  It will be your job as jurors to find

3  and determine the facts of this matter.  If at any time I

4  should make any comment regarding the facts, you're at liberty

5  to disregard it.  Moreover, you should not take any questions

6  that I may ask witnesses as any indication of my opinion as to

7  how you should determine the issues of fact in this case.

8            Any opinion which you think I may have as to the

9  facts would not be at all important because you and you alone

10 as the jury are the sole judges of the facts.

11           The evidence from which you are to find the facts

12 consists of the following.

13           One, the testimony of witnesses;

14           Two, documents and other things received as

15 exhibits;

16           Three, any facts that are stipulated, that is,

17 formally agreed to by the parties;

18           And, four, any facts which are judicially noticed,

19 that is, facts that I specifically say you must accept as true,

20 even without other evidence.

21           The following things are not evidence.

22           A, statements, arguments and questions of the

23 lawyers for the parties in this case.

24           B, objections by the lawyers.

25           C, any testimony which I tell you to disregard or I

strike from the record.

And D, anything you may see or hear about this case or its participants or issues outside of this courtroom.

Ladies and gentlemen, you must make your decision based only on the evidence that you see and hear in court.  Do not let rumors, suspicion or anything else that you may see or hear outside of court influence your decision in any way.

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

Also, certain testimony or other evidence may be ordered stricken from the record and you will be instructed by me to disregard such evidence.  Do not consider any testimony or other evidence that gets stricken or excluded.  Please, do not speculate about what a witness might have said or what an exhibit might have shown.

Ladies and gentlemen, it will be your job as jurors to find and determine the facts diligently and conscientiously, for ordinarily, there is no means of correcting an erroneous determination of the facts by a jury.

You as the jury will have to decide what testimony you believe and what testimony you don't believe.  That's known

as credibility or believability.  You should decide whether you

believe what each witness has to say and how important that

testimony is.  In making that decision, I suggest that you ask

yourself a few questions.  Did the witness impress you as

honest?  Did the witness have any particular reason not to tell

the truth?  Did the witness have a personal interest in the

outcome of the case?  Did the witness seem to have a good

memory?  Did the witness have the opportunity and ability to

observe accurately the things the witness testified about?  Did

the witness appear to understand the questions clearly and

answer them directly?  Did the witness' testimony differ from

the testimony of other witnesses?  These are but a few of the

considerations that may help you in determining the accuracy of

what each witness will say.

Also, ladies and gentlemen, you don't have to

believe something is true simply because more witnesses said it

is true than said it is not true.  You may find that the

testimony of a smaller number of witnesses about an event is

more believable than the testimony of a larger number of

witnesses.

Ladies and gentlemen, during the trial, you may told

that the parties agree or stipulate to what a witness'

testimony will be if the witness were called at trial.  You

will consider that stipulation to be the testimony of that

witness as if the witness were testifying.  Likewise, you may

be told that the parties agree or stipulate to a certain fact.
You should accept that fact as true, even though nothing more
is said about it.  However, you as the judges of the facts are
not duty-bound to accept a stipulation since you and you alone
are the sole determiners of the facts of this case.

         No transcript of witness testimony in court will be
furnished to you at the time you begin your deliberations.  You
are required to remember the evidence as you heard it from the
witnesses.  You can see, therefore, that it is important that
you hear and listen to all of the evidence.  If any witness
does not speak loudly enough or clearly enough to be heard by
you, or you do not hear the question of counsel or see an
exhibit, please let me know immediately by raising your hand
and we'll see to it that the witness or lawyer repeats the
material which you did not hear.

         Ladies and gentlemen, you may take notes during the
trial.  The Court has provided you with notebooks for your use.
Of course, if you prefer not to take notes, you don't have to
take any notes.  The decision about whether or not to take
notes is a matter for each of you individually to decide.  If
you do decide to take notes, please be careful not to get so
involved in note-taking that you become distracted from the
ongoing proceedings.  Additionally, I caution you that there
may be a tendency to attach undue importance to matters that
one has written down.  Testimony that is considered unimportant

1  at the time presented and, thus, not written down, may take on

2  greater importance later in the trial in light of all the

3  evidence presented.  Therefore, you are instructed that your

4  notes are only a tool to aid your own individual memory and you

5  should not compare your notes with other jurors' notes in

6  determining the content of any testimony or in evaluating the

7  importance of any evidence.

8           Ladies and gentlemen, your notes are not evidence

9  and will by no means be a complete outline of the proceedings

10 or a comprehensive list of the highlights of the trial.  Above

11 all, your memory should be your greatest asset when it comes

12 time to deliberate and render a decision in this case.  You may

13 not take your notes beyond the courtroom and the jury room

14 vicinity before you leave these areas for any reason, your

15 notes must be left in the jury room.  When you leave at night,

16 your notes will be collected by Mr. Babik and locked up

17 securely.  They will not be read by anyone.  At the end of the

18 trial, your notes will be collected and destroyed.  No one, not

19 the lawyers, my staff, newspaper reporters or me will be

20 permitted to read your notes.  They are and will remain

21 private.

22          Finally, there are three basic rules about a

23 criminal trial which you must keep in mind.

24          First, the defendant is presumed to be innocent.

25 The indictment brought by the government against the defendant

1  is only an accusation, nothing more.  It is not proof of guilt

2  or anything else.  The defendant, therefore, starts out with a

3  clean slate which you must recognize.

4            Second, the burden of proof is on the government

5  from the very beginning to the very end of the trial.  The

6  defendant has no burden or requirement to prove his innocence

7  or to present any evidence or to testify.  Since the defendant

8  has the Constitutional right to remain silent, in arriving at

9  your verdict, the law prohibits you from giving any

10 consideration to the fact that a defendant may not have

11 testified.

12           Third, the government must prove the guilt of a

13 defendant beyond a reasonable doubt.  I will give you further

14 instructions on this point later, but bear in mind that in this

15 regard, a criminal case is much different from a civil case.

16           Ladies and gentlemen, I caution you to use these

17 preliminary instructions only for the purpose of understanding

18 the evidence and not to make a determination of the outcome of

19 the case before all of the evidence is presented.  The

20 instructions given to you at the end of the presentation of all

21 of the evidence and the arguments of counsel will further

22 detail the law and clarify how you should apply the law to the

23 facts in this case.

24           As I previously told you, you're to decide this case

25 only upon the consideration of the testimony and evidence that

1   you receive in this courtroom during this trial.  For that

2   reason, you must not read about the case in the newspapers or

3   watch or listen to television or radio reports of what is

4   happening here in court.  You're not to visit any scene or

5   conduct any independent research in the library on the Internet

6   or in any other way.  You are to decide and are required to

7   decide the case only upon the evidence presented here in court

8   in this trial.

9            In other words, you should not and may not consult

10  dictionaries, reference materials, search the Internet,

11  website, blogs or use any other electronic or technological

12  tools to obtain information about the case, the participants,

13  or the issues, or to help you in any way to decide the case.

14           Please, do not try to find out information from any

15  source outside of the confines of this courtroom, no Googling,

16  no Yahoo, no Twitter, no Facebook, no any of those things.

17           Information that you receive from outside of the

18  courtroom would be improper to consider in deliberating on this

19  case and attempts by the parties to influence your decision

20  outside of the courtroom would be a violation of the law.

21           I know that many of you, like many of the rest of

22  us, use cell phones, iPads, iPhones, Blackberries, the Internet

23  and other tools of technology.  You must also not talk to

24  anyone at any time about this case, including amongst

25  yourselves until deliberations begin.  You may not use any of

1  these tools of technology to communicate electronically with

2  anyone about the case, its participants or its issues.  This

3  includes your family and friends.  You may not communicate with

4  anyone about the case, its participants or its issues on your

5  cell phone, Smartphone, through e-mail, Blackberry, iPhone,

6  iPad, text messages, Twitter, blogs, websites, Facebook,

7  Google, plus, MySpace, LinkedIn or YouTube.  You may not use

8  any similar technology of social media even if it hasn't been

9  invented or I have not specifically mentioned it here.  I

10  expect you will inform me as soon as you become aware of your

11  or another juror's violation of these instructions, even if it

12  is completely inadvertent.

13          You're not to concern yourself with the sentence the

14  defendant could receive should you find him guilty.  Your

15  function is solely to decide whether the government has

16  sustained or carried its burden proving the charges to you

17  beyond a reasonable doubt.  If, and only if you find the

18  defendant guilty of the charge will it become the duty of the

19  Court, me, the judge, to pronounce sentence at a later date.

20          Ladies and gentlemen, the attorneys in the case and

21  the other trial participants are not permitted to discuss the

22  case or its issues with you other than in the courtroom in the

23  course of trial.  They're not even permitted to be sociable

24  with you outside of the courtroom.  So, if you see them or

25  members of my staff or me in the corridors or elevators and

1  they don't speak to you, please don't think anyone is trying to

2  slight you or snub you.  They are each simply observing the

3  rules and the restrictions which the Court and the law places

4  on all of those people to not discuss or to talk with you at

5  all unless it is in the courtroom during the trial.

6          Ladies and gentlemen, please do not discuss this

7  case with anyone.  Please do not discuss this case amongst

8  yourselves until such time as you have heard all of the

9  evidence, the closing arguments of counsel, and the final

10 instructions on the law as I will give them to you at the

11 conclusion of the case.

12         Ladies and gentlemen, I previously introduced our

13 courtroom staff to you.  Please do not ask any member of the

14 court staff any questions about the substance of the case, the

15 issues or the parties during the trial, except you may ask a

16 staff member about personal matters relating to your service as

17 a juror.  As I noted, it could be a transportation or

18 scheduling issue or supplies for the jury room or similar

19 things.  I believe Mr. Babik has provided you with contact

20 information to use if you have an emergency or some unforeseen

21 event and for you to use to obtain information in the event of

22 bad weather or some other difficulty in proceeding in the

23 courthouse.  We also have your contact information in the event

24 we need to contact the jury after hours due to a change in

25 schedule or some unforeseen circumstance.  As I noted, you'll

1  be provided with water and coffee and tea in the jury room.

2  You may bring any soft drink into the courtroom so long as it

3  has a mechanical lid.  Please, no disposable cups and lids.

4          Finally, as I noted yesterday, there is a question

5  that would be on my mind if I were a juror, that is, what I

6  have a need for an immediate break?  As I said yesterday, no

7  problem.  Please simply make the break sign and I will call a

8  break as soon as possible.  If it's a matter of greater

9  urgency, please just raise your hand, and this applies to all

10 trial participants.  Please also do so if at any time you

11 cannot see or hear what is going on in court.  If any of these

12 things happen or there's an urgent need for break, please don't

13 be self-conscious, we've all been there.

14          In a moment, we'll hear the opening statement from

15 Mr. Ortiz on behalf of the government.

16          Before we do that, Ms. King, are there any other

17 matters by way of preliminary instructions that the Court

18 should address at this time?

19          MS. KING:  No, Your Honor.

20          THE COURT:  Mr. Sindler, the same question to you,

21 sir?

22          MR. SINDLER:  No.

23          THE COURT:  Mr. Ortiz, you're invited to give an

24 opening statement on behalf of the government.

25          Ladies and gentlemen, please listen carefully to all

1  of the opening statements today.  I would ask counsel to please

2  keep their voice up.

3             MR. ORTIZ:  I got my gun when I heard my cousin was

4  stabbed.  I bought it on the streets.  The serial numbers were

5  already filed off when I bought it.

6             Those statements were made by the defendant,

7  Atiba Warren, to Pittsburgh Police Officer Lance Hoyson on

8  October 23, 2012.  Those statements and the events that led up

9  to them, what was seen and heard by the various witnesses are

10  what brings us all here to court today.  It is why the

11  defendant is here.

12             In this trial, you will hear from at least two

13  Pittsburgh police officers, Lance Hoyson and Steven Sywyj.

14  Both of them were working on October 23, 2012 for the

15  Pittsburgh Police Department.  They both were assigned to a

16  unit called Zone 5, which is a regional breakdown of a variety

17  of different neighborhoods in the Pittsburgh area.  They were

18  colleagues, they worked together, but on this particular day,

19  they weren't partners, they were working separately, but they

20  both had essentially the same job, which was to perform routine

21  patrol, which means they were both in their respective

22  uniforms, driving around in a marked police car, trying to be a

23  physical, observable presence in the Pittsburgh community,

24  sticking to the confines of Zone 5.

25             They did what police officers were supposed to do.

1  If they saw someone run a red light, they should give a ticket.

2  If someone was lost, they would help them find their way.   If

3  someone needed help or assistance or a crime occurred, they

4  would provide whatever aid was needed.

5          Both of them, at around 10:00 p.m. received a call

6  to go to 520 Lincoln Avenue, which is within Zone 5.  It's

7  actually close to the border of Homewood and Larimer.   Their

8  call told them to go there immediately.

9          It just so happened that Officer Sywyj arrived

10  first.  When he pulled up in his marked police car, he parked

11  it and he got out and he looked at 520.  He could see that it

12  was a stand alone, single family residence with two stories,

13  had a front yard and a back, had a large porch that covered the

14  full width of the front of the home.  And it had a front door

15  that was on the left of the porch.  Coming from the porch was a

16  walkway that went all the way out to the street.

17          Officer Sywyj got out of his car and he went up to

18  the porch of 520.  When he got to it, he saw that there was a

19  man who was laying down and this man who was laying down was

20  barely conscious because he was bleeding heavily from his body

21  from deep cuts.

22          He saw another man who was rendering aid to this

23  person, applying pressure to the wounds, trying to stop the

24  blood flow.  The man who was on the ground, the injured man,

25  his name was Mr. Hayes.  The man who was rendering aid was

1   Mr. Weathers.  Officer Sywyj saw this, he surveyed the

2   situation and a few moments later more police officers arrived.

3              And then an ambulance arrived and medics were there

4   and they provided treatment to Mr. Hayes.  And as soon as he

5   was ready and able, he was taken away from 520 to be treated

6   for his injuries.  But Officer Sywyj stayed, and so did

7   Mr. Weathers because Officer Sywyj still had a job to do.  He

8   needed to investigate.  He needed to know what happened.  Was

9   it an accident?  Was it a crime?  Can someone tell me what

10  happened?

11             So he turned to Mr. Weathers trying to get

12  information and Mr. Weathers said, I'll talk to you, but I just

13  want to go inside and talk to my family first.

14             So Officer Sywyj let him go into 520.  But because

15  Officer Sywyj wanted to make sure that he could talk to

16  Mr. Weathers, he followed him.  He walked over with him to the

17  front door of 520 on the left-hand side of the porch.  He

18  watched Mr. Weathers as he went into the home, talking to some

19  individuals.

20             You'll hear that 520 has a layout that starts from

21  that front door.  The layout of the home goes to the right and

22  back.  As you enter into the front door, you enter into a

23  foyer, a small entryway.  That entryway connects to the rest of

24  the house.

25             The entryway connects to the rest of the home, first

1  to the living room.  The entry from there to the living room is

2  through a large, open, arched entryway that is a door, it's

3  open.

4           Once you pass through that arch into the living

5  room, you can get into the dining room.  Behind that, the

6  kitchen.  And coming off the dining room are a set of stairs

7  that go up to the second floor.

8           As you stand in the living room to go into the

9  dining room, you have two different entryways that you can

10  pass.  On the left, is another large, arched, open entryway.

11  Continuing along in the living room is a wall that divides the

12  two rooms.  On that wall is a fireplace.  Then on the other

13  side of the fireplace is another large, arched, open entryway.

14  So, through either entry you can get into the dining room.

15           Officer Sywyj stood just outside the foyer.  He

16  stood on the porch and he looked through and he saw

17  Mr. Weathers talking to some people in the living room.  But he

18  was only able to watch him for a moment because his attention

19  was taken elsewhere.  As he was walking into the living room,

20  he saw through the first large, arched, open entryway a person

21  appear.  And that person caught his attention and he stopped

22  looking at Mr. Weathers and he looked at that person and that

23  person was the defendant, Atiba Warren.  The reason that he

24  looked at him was because as he walked by, he walked like this,

25  with a black gun in his hand.  Seeing that, Officer Sywyj

yelled out "gun" to his colleagues outside.  And he pulled out his pistol, went into the home and tried to get everyone out and tried to find that gun.

As he yelled that, Mr. Warren looked at him and continued across the dining room, going behind the fireplace wall and coming out into the living room without the gun in his hand.

Officer Sywyj went over to him, saw that he didn't have the gun, and he went into the dining room and he looked around.  He saw a table in the dining room and on the table was a magazine and sticking out from it was the barrel of the black gun.

So he picked it up and he looked at it.  He could see that the serial numbers had been scratched off.  They had been removed.  So he called out to his colleagues and Mr. Warren was taken into custody.  That's what you will hear from Officer Sywyj, what he saw and what he did.

You will hear that because this trial is really about three elements.  For two of those elements, we agree on the facts supporting them.  The first is that Mr. Warren before October 23, 2012, had been convicted of a crime that is punishable by more than one year in prison.

The second is that this gun prior to October 23, 2012 had traveled in and affected interstate and foreign commerce.

1          So the trial is really about the contested third

2    element, whether or not Mr. Warren possessed that gun.

3          So Officer Sywyj will come in and testify about what

4    he saw, that he saw Mr. Warren possessing that gun.  And myself

5    and Ms. King, with the help of Detective Sciulli, will present

6    that evidence to you, what was seen.

7          You won't hear about fingerprints and you won't hear

8    about DNA.  But you will hear about, in addition to what was

9    seen, what was heard because after Mr. Warren was taken into

10   custody, he was removed and placed into the back of a marked

11   police car that was outside of the house.  Officer Hoyson

12   approached that car, he got in and sat down in the front.  He

13   turned around and looked at Mr. Warren and he said that he

14   wanted to speak with him.  Mr. Warren said, I got my gun when I

15   heard that my cousin was stabbed.  Officer Hoyson asked a few

16   follow-up questions.  Mr. Warren said, I bought it on the

17   streets.  The serial numbers were already filed off when I

18   bought it.

19         That's what this case is about.  That's all that

20   it's about, all that it needs to be about.  What was seen and

21   what was heard.

22         And after these witnesses come and testify to you

23   about what they saw and what they heard, Ms. King will come up

24   and appear before you and she will say, ladies and gentlemen,

25   you've now heard the evidence and based on what you saw and you

1    heard, the defendant should be found guilty.

2             Thank you.

3             THE COURT:  Thank you, Mr. Ortiz.

4             Mr. Sindler, sir, you're invited to give an opening

5    statement.

6             Ladies and gentlemen, give close and careful

7    attention to all of the opening statements.

8             Mr. Sindler.

9             MR. SINDLER:  Having heard the government's version

10   of events, three years ago, I'm reminded of a story from the

11   annals of Major League Baseball.  It concerns a legend in the

12   professional sport.  Rogers Hornsby.  Mr. Hornsby is no longer

13   with us, but he still holds the second highest batting average

14   in major league history.  Only Ty Cobb had a higher batting

15   average.  He was facing a rookie pitcher one day.  The pitcher

16   was throwing to him ball 1, ball 2.  Ball 3 was being called by

17   the umpire behind the plate.  The pitcher at that point was

18   fuming, livid that the umpire was calling three balls.  The

19   umpire removed his mask, took a few steps to the pitcher's

20   mound and said, son, if any of those pitches or that last

21   pitch, like the two that came before it were a strike, Rogers

22   Hornsby would have told you so.

23             I'm reminded of that story because expectations

24   matter.  Expectations make a difference and you'll see, given

25   the version that the government has given you just now, the

1 expectations are quite different when you look at and when you

2 view the evidence that is going to come in in this case.

3 Expectations matter and expectations can very much differ from

4 one side to the other.

5           Is my client a model citizen?  It doesn't matter.

6 It doesn't matter because we're not here today or tomorrow or

7 for the rest of this week to decide whether that's the case.

8 What does matter is the quality of the government's evidence.

9 You're going to see, like all of us in the work we do, no

10 matter what kind of work that it is, is the work that you do

11 good?  Is it mostly good?  Is it barely passable?  And down the

12 road.

13           Here, there's one man, Mr. Sywyj, who claims to have

14 seen my client with a gun.  Wasn't disarming him right away.

15 Mr. Warren left the home when Mr. Sywyj says he saw him with a

16 gun and then he was arrested later on.

17           Later on, Mr. Hoyson, the other police officer,

18 rolls over to the police car in which Mr. Warren was placed and

19 says that he, speaking to him alone, not recording anything,

20 claims to have taken a statement off of Mr. Warren with respect

21 to that same firearm.

22           The police then wrap up the subplot of that night,

23 the subplot being this firearm investigation, as quickly as it

24 started.  The major or the big main event was actually the

25 stabbing in which Mr. Warren played no part whatsoever.  You'll

1  see that is the case.  He had no part whatsoever to play with

2  respect to the stabbing that occurred earlier that night.

3          So we have Mr. Sywyj saying that my client possessed

4  a firearm, later on a different officer acting or working alone

5  taking a statement from him and here we are.

6          Here we are where questions continue to remain with

7  respect to the manner of this investigation.  What if the

8  initial reporting by the police is much less true or the

9  account that they gave then than what is the case now?  What if

10 your sense of the investigation and how it was carried out

11 differs from the manner in which it's being prosecuted here in

12 this courtroom?  What if the manner of identifying Mr. Warren

13 does not square with how he claimed that he had this weapon and

14 not the least of which what if there is an alternative theory

15 to the government's steadfast belief that Mr. Warren possessed

16 a firearm that night because you're going to see that from the

17 outset of Mr. Sywyj having seen Mr. Warren, supposedly with

18 this firearm, it was his story, he was sticking to it, and he

19 will not be budging from it.

20          Judge Hornak has explained a couple of different

21 times now the importance, the bedrock principle in our system

22 of justice, the presumption of innocence.  I'm not going to go

23 over that with you again, but I do want to conclude here this

24 morning with one thought with regard to the burden of proof

25 beyond a reasonable doubt.

1          I imagine, even though I wasn't with any of you this

2  morning, that in getting here today, you must have crossed some

3  street and in doing so, you came to the curb of whatever street

4  you were going to crossing and in order to get to the other

5  side, you didn't just walk into the path of some car, truck or

6  other moving vehicle.  You didn't do that because you stood a

7  chance, I imagine, of getting hit.  None of us want to be in

8  that situation.  You instead look both ways, you made sure the

9  path was clear, the path that you were going to take to get to

10 the other side.  You did so because you wanted to get over

11 there safely, intact, and without being injured.

12          The government is going to ask you to cross that

13 street.  I'm here to tell you right now that when that time

14 comes, it will not be safe to cross the street to get to the

15 other side because you're going to be entertaining one or more

16 reasonable doubts at that moment, where they're asking you to

17 cross in order to get across there to the other side.

18          THE COURT:  Thank you, Mr. Sindler.

19          Is the government prepared to call its first

20 witness?

21          MS. KING:  Yes, Your Honor.  The government calls

22 Steven Sywyj.

23          THE COURT:  Will Steven Sywyj step forward to be

24 sworn.

25     STEVEN SYWYJ, a witness having been duly sworn, testified

as follows:

          THE CLERK:  Please state your name for the record.

          THE WITNESS:  Steven Sywyj.

          THE COURT:  I ask you to adjust the microphone so it is comfortable to you.  I ask you to keep your voice up so we can all hear what you have to say.

DIRECT EXAMINATION

BY MS. KING:

Q.  Mr. Sywyj, can you please introduce yourself to the jury?

A.  Steven Sywyj.

Q.  How are you employed?

A.  Allegheny County police.

Q.  What is your job title?

A.  Police officer.

Q.  How long have you been with the Allegheny County police?

A.  It will be two years in January.

Q.  Prior to your employment with the Allegheny County police, where were you employed?

A.  Pittsburgh Bureau of Police.

Q.  How long were you employed with the Pittsburgh Bureau of Police?

A.  Approximately six and a half years.

Q.  What was your job title?

A.  I was a police officer there as well.

Q.  Prior to the time that you were a police officer, what did

1  you do?

2  A.  I managed an auto change from about a year out of college.

3  Prior to that, I went to college, got a Bachelor's degree from

4  the University of Rochester.

5  Q.  What was your major?

6  A.  Double majored in history and political science.

7  Q.  When exactly did you start working as a police officer

8  with the Pittsburgh Bureau of Police?

9  A.  July 2007.

10  Q.  Did you receive any training in your capacity as a police

11  officer?

12  A.  Yes.  I went to the police academy, so I received the Act

13  120 certification, which essentially you go through the police

14  academy, crimes code, vehicle code, criminal procedures,

15  firearms, things of that nature.

16  Q.  Did you receive any training in addition or other than the

17  police academy?

18  A.  Yearly updates, things of that nature.

19  Q.  Directing your attention to October 2012, were you working

20  as a police officer with the Pittsburgh Bureau of Police that

21  month?

22  A.  I was, yes.

23  Q.  Did you work in any particular part of the city?

24  A.  Zone 5.

25  Q.  Can you please describe what Zone 5 encompasses?

A.   Homewood, East Liberty, Lincoln-Lemington, Larimer,
Bloomfield, Garfield, Highland Park, Morningside, Stanton
Heights, so, the east end of the city.

Q.   Is all of Zone 5 located within the Western District of
Pennsylvania?

A.   It is, yes.

Q.   Can you please describe what your typical duties were when
you were working as a police officer for the City of Pittsburgh
police?

A.   To enforce the statutes of the Commonwealth, answer calls
for service, proactively patrol neighborhoods.

Q.   Were you typically in a vehicle or did you have some other
mode of transportation?

A.   Yes, I was most often in a vehicle.

Q.   You named several neighbors that encompassed Zone 5.  Were
you ever assigned to one particular neighborhood?

A.   I answered call throughout the zone.

Q.   Directing your attention to October 23, 2012 specifically,
were you working that day?

A.   I was.

Q.   If you recall, what was your shift that day?

A.   It was 1500 to 2300, 3:00 p.m. to 11:00 p.m.

Q.   Were you working alone that day?

A.   No, I had a partner.  I was partnered up the day with
Kevin Swimkosky.

1    Q.   Were you in a vehicle?

2    A.   Yes.

3    Q.   Were you in uniform?

4    A.   I was.

5    Q.   At some point on that day, October 23rd, were you directed

6    to go to 520 Lincoln Avenue?

7    A.   Yes.  We were sent to a call for male stabbed multiple

8    times there.

9    Q.   What part of the neighborhood is Zone 5 is 520 Lincoln

10   Avenue?

11   A.   It would be Larimer.

12   Q.   Larimer?

13   A.   Correct.

14   Q.   Can you describe generally how a call comes to you while

15   you're on patrol in a vehicle?

16   A.   Well, the call goes to 911 and from there, they dispatch

17   us over the radio.

18   Q.   So it is something you hear over the radio in your car?

19   A.   Correct.

20   Q.   When you respond to a scene, typically, what type of steps

21   do you take?

22   A.   Proceed to the location.  In that particular case,

23   immediately.

24   Q.   So you did respond to 520 Lincoln Avenue?

25   A.   Yes.

1  Q.  If you recall, how far away from 520 Lincoln Avenue were
2  you when you received the call?
3  A.  We were just a couple streets away.  We were there very
4  quickly.
5  Q.  When you arrived on the scene, what did you find when you
6  got there?
7  A.  On the front porch, one gentleman was rendering aid to
8  another who had been stabbed in the torso I think twice.
9  Q.  Were any other police officers or medics there when you
10 arrived?
11 A.  No, we were first on scene.
12 Q.  If you remember, what did the house look like when you
13 arrived, what did you see?
14 A.  Just typical for the neighborhood, two-story house, small
15 front yard.  It was on Lincoln Avenue.
16 Q.  Were you able to determine the name of the victim?
17 A.  Eventually, yes, Duwane Hayes.
18 Q.  Were you ever able to determine the name of the person who
19 was assisting at Mr. Hayes?
20 A.  DeShawn Weathers.
21 Q.  Do you recall what your assessment was of the victim?
22 A.  He looked to be gravely injured.  I believe he would have
23 most likely succumbed to his wounds had not medical attention
24 come to him very shortly.
25 Q.  If you recall, how long did it take the medics to arrive

1 after you arrived?

2 A.  It was only a few minutes.

3 Q.  You said that you were the first officer on the scene.

4 Did you remain the only officer on the scene?

5 A.  No, Smolinski and Warner showed up just after us.  And

6 then most of the other responding units from the zone arrived

7 after that.

8 Q.  When you arrived, did you go up on to the porch?

9 A.  Yes, I moved to -- they were to the right of the front

10 door, Mr. Hayes was slouched on the couch with Mr. Whethers

11 attempting to render aid and apply pressure to his wounds.  I

12 moved to the right of them and began to try and interview

13 Mr. Weathers for a better active description.  We hadn't

14 actually determined where the stabbing occurred.  Just more

15 details.

16 Q.  Did you have any details at the time you actually arrived

17 at the house?

18 A.  It was fairly cursory description that came over the

19 radio.  I believe it was black male, gray vest, like I said,

20 they didn't -- I don't think that there was an actual location

21 of the stabbing, where that had occurred.

22 Q.  Were you able to speak to Mr. Weathers as he was rendering

23 aid?

24 A.  Yes.

25 Q.  Were you able to obtain any information from him?

A.   Sure.  I began to -- he was certainly preoccupied with
trying to assist Mr. Hayes.

Q.   Once the medics arrived, what happened?

A.   They took over treatment and I began to try and interview
Mr. Weathers in more depth.  He had -- was preoccupied with
what had happened and was obviously emotionally affected and
desired to go inside and speak to family.

I decided that rather than argue with him about
whether or not he could speak with his family, that it would
just be more efficient to let him do that and then I would get
the information that I needed.

Q.   What happened?

A.   I agreed that he could go inside and speak to family.  I
went to the front door where I could visually monitor him as he
spoke to the family.  He went inside and spoke with some --
several people, who I'm assuming were the family inside on the
right.  That's when Mr. Warren appeared from behind him.

Q.   As you were standing at the doorway, what could you see
inside the residence?

A.   I could see the living room and I could see through an
archway on the left deeper into the residence.

Q.   You said that you saw Mr. Warren.  Can you describe that
more fully, please?

A.   Yes.  I was standing in the door, like I said, trying to
keep a visual on Mr. Weathers when Mr. Warren appeared in the

1 archway with a very large firearm at chest level in his right

2 hand like this.  I saw it.  I shouted "gun" to the officers

3 behind me and I drew my pistol.  At that point, Mr. Warren made

4 eye contact with me and disappeared behind the wall in the

5 house.

6           He -- I started to begin to order everybody out of

7 the house, my gun drawn, and he reappeared a couple of seconds

8 later from another archway in the right of the living room.

9 Q.  What did you do next?

10 A.  I ordered him out of the house.  I asked him where the gun

11 was?  He said, it's just a toy.  I ordered him out of the

12 house.  There were several other officers outside to keep them

13 from going anywhere and myself and Officer Hoyson made entry

14 into the house.

15 Q.  What did you do?

16 A.  I went to the location where I saw him disappear with the

17 gun.  I saw it protruding from under a magazine on the small

18 table.  I recovered the firearm and I noticed that the serial

19 number was obliterated.  I radioed to the supervisor to have

20 Mr. Warren placed under arrest.

21 Q.  Officer Sywyj, sitting here today, do you see the person

22 that you have identified as Mr. Warren?

23 A.  Yes.  He's sitting over there to the right in the black or

24 gray shirt.

25           MS. KING:  Your Honor, may the record reflect that

1 the witness has identified the defendant.

2          THE COURT:  It may.

3 BY MS. KING:

4  Q.  Officer Sywyj, you'll see underneath the table there you

5 have a binder in front of you.  There are a series of

6 photographs in that binder.  If you could flip to what has been

7 premarked as Government's Exhibit 2.

8  A.  I'm there.

9  Q.  Do you recognize this photo?

10  A.  I do.

11  Q.  What is it?

12  A.  520 Lincoln Avenue.

13  Q.  Is what you see in the photograph a fair and accurate

14 depiction of the outside of 520 Lincoln Avenue?

15  A.  It is, yes.

16          MS. KING:  Your Honor, the government moves for the

17 admission of Government Exhibit 2.

18          THE COURT:  Mr. Sindler?

19          MR. SINDLER:  No objection.

20          THE COURT:  Without objection, Government Exhibit 2

21 is admitted into the record.

22          MS. KING:  Your Honor, may I publish that photograph

23 to the jury?

24          THE COURT:  You may, Ms. King.

25          MS. KING:  Mr. Babik, may I please have the screen.

1

2 BY MS. KING:

3   Q.   On the screen in front of you, Officer Sywyj, is what has

4 just been admitted as Government Exhibit 2.

5           Looking at the photograph, are there any differences

6 between when you arrived on the night of October 23, 2012, and

7 what you see in this picture?

8   A.   It was later in the day, but it looks very similar.

9   Q.   If you can flip in your binder to what has been marked as

10 Government Exhibit 3.

11   A.   I'm there.

12   Q.   What is that?

13   A.   That is a closer view of the same house.

14   Q.   Is that a fair and accurate depiction of a closer view of

15 520 Lincoln Avenue?

16   A.   It is.

17           MS. KING:  Your Honor, the government moves for

18 admission of Government Exhibit 3.

19           THE COURT:  Mr. Sindler?

20           MR. SINDLER:  No objection.

21           THE COURT:  Without objection, Government Exhibit 3

22 is admitted to the record.

23           MS. KING:  May I publish to the jury?

24           THE COURT:  You may, Ms. King.

25 BY MS. KING:

Q.   Officer Sywyj, looking at Government Exhibit 3, can you
indicate on this photograph where the two men were located on
the porch when you arrived that evening?

A.   Mr. Hayes was slouched against the couch on the left at
about the approximate location of the center column, the cement
column behind it, and Mr. Weathers was above him attempting to
render aid.

Q.   Where did you go when you arrived?

A.   I moved to the right of them.

Q.   When Mr. Weathers indicated to you that he would like to
go inside, can you just indicate on this photograph where
exactly it was that he entered the house?

A.   It would have been the front door on the left, at the left
of the building.

Q.   If you could flip to what has been premarked as
Government's Exhibit 4 that is there in your binder.

A.   I'm there.

Q.   Are you familiar with that photograph?

A.   Yes, that's the front door of the same house.

Q.   Is that a fair and accurate depiction of the front door of
that residence?

A.   It is.

           MS. KING:  Your Honor, we move for admission of
Government Exhibit 4.

           THE COURT:  Mr. Sindler?

1          MR. SINDLER:  No objection.

2          THE COURT:  Without objection, Government Exhibit 4

3 is admitted into the record.

4          MS. KING:  May I publish to the jury?

5          THE COURT:  You may.

6 BY MS. KING:

7 Q.  Officer Sywyj, can you indicate where it was that you

8 stood after Mr. Weathers entered the residence.

9 A.  I would have been in front of the door, right at the front

10 door, at the floor mat.

11 Q.  If you can flip to your binder to Government Exhibit 5.

12          Are you familiar with that photograph?

13 A.  I am.

14 Q.  What is it?

15 A.  It's a view from approximately the front door of 520

16 Lincoln Avenue.

17 Q.  Is that a fair and accurate depiction of your -- of a view

18 into the residence from the night of October 23, 2012?

19 A.  Yes.

20          MS. KING:  Move for the admission of Government

21 Exhibit a.

22          THE COURT:  Mr. Sindler?

23          MR. SINDLER:  No objection.

24          THE COURT:  Without objection, Government Exhibit 5

25 is admitted into the record.

1                MS. KING:  May I publish Exhibit 5 to the jury?

2                THE COURT:  You may.

3   BY MS. KING:

4   Q.  Officer Sywyj, can you describe for the jury what this

5   picture depicts, please.

6   A.  It depicts -- that's the -- it's a viewpoint from

7   approximately the front door of 520 Lincoln Avenue.

8   Mr. Weathers and the other members of the family while I was

9   monitoring him would have been in the room to the right,

10  off-screen and the archway you can see toward the right of the

11  photo is where Mr. Warren appeared.

12  Q.  If you can flip to what has been premarked as Government

13  Exhibit 6 in your binder.

14                Are you familiar with that photograph?

15  A.  Yes.  It was where everybody was standing initially when

16  Mr. Weathers went into the house.  The archway on the right is

17  where Warren reappeared after he ditched the gun.

18                MS. KING:  Your Honor, the government moves for

19  admission of Government Exhibit 6.

20                THE COURT:  Mr. Sindler?

21                MR. SINDLER:  No objection.

22                THE COURT:  Without objection, Government Exhibit 6

23  is admitted into the record.

24                MS. KING:  May I publish to the jury?

25                THE COURT:  You may.

1  BY MS. KING:

2  Q.  You have just given a description of where the family was

3  standing.  Can you please -- you can actually touch the screen

4  in front of you and indicate on the screen, if you like.

5  A.  It would have been kind of in this area here.

6  Q.  You're indicating in front of the fireplace area of the

7  what I'll refer to as the living room?

8  A.  Correct.  Mr. Weathers would have been in front of the

9  female he was speaking to.

10  Q.  Can you please point out on Government Exhibit 6 where you

11  first saw Mr. Warren.

12  A.  He appeared right in here.

13  Q.  That is the left-hand archway from the living room into

14  the dining room; is that correct?

15  A.  It is.

16  Q.  You said he disappeared and then reappeared again.  Can

17  you indicate on the screen where he reappeared here?

18  A.  Here.

19  Q.  You're indicating the right-hand archway from the living

20  room into the dining room; is that correct?

21  A.  I am.

22  Q.  If you know, approximately how long was the defendant out

23  of your sight?

24  A.  It was just a couple seconds.

25  Q.  If you can take and flip to what has been premarked as

1  Government Exhibit 7.

2           Are you familiar with that photograph?

3  A.  Yes.  It's approximately the same view.

4           MS. KING:  Your Honor, the government moves for

5  admission of Government Exhibit 7.

6           THE COURT:  Mr. Sindler?

7           MR. SINDLER:  No objection.

8           THE COURT:  Without objection, Government Exhibit 7

9  is admitted into the record.

10          MS. KING:  May I publish to the jury?

11          THE COURT:  You may, Ms. King.

12  BY MS. KING:

13  Q.  To recap, you said this is an additional view of that

14  living room into the dining room area?

15  A.  Correct.

16  Q.  Taking a step back, you stated you went in to recover the

17  firearm.  Can you indicate which path --

18          Mr. Babik, could you please clear the screen.

19          Can you indicate which path you took when you

20  entered the residence to obtain the firearm.

21  A.  After I ordered Mr. Warren to exit from the right, I went

22  in the way that I saw him disappear with the gun and I went in

23  here.

24  Q.  You're indicating that you entered through the left-hand

25  doorway --

1    A.   I am, yes.

2    Q.   Archway.

3              If you can take a look at what has been premarked as

4    Government Exhibit 8 in your binder.

5              Are you familiar with that?

6    A.   Yes.

7    Q.   What is it?

8    A.   It is a view farther through the archway deeper into the

9    house.

10             MS. KING:   The government moves for admission of

11   Government Exhibit 8.

12             THE COURT:   Mr. Sindler?

13             MR. SINDLER:   No objection.

14             THE COURT:   Without objection, Government Exhibit 8

15   is admitted into the record.

16             MS. KING:   May I publish?

17             THE COURT:   You may, Ms. King.

18   BY MS. KING:

19   Q.   You said this is a farther view into the dining room from

20   the living room?

21   A.   Correct.

22   Q.   Do you know which archway this photograph was taken?

23   A.   Would have been the left.

24   Q.   If you can take a look at Government Exhibit 9 in your

25   binder.

1              Are you familiar with that photo?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's a view of the dining room.

5   Q.   The dining room of 520 Lincoln Avenue?

6   A.   Correct.

7              MS. KING:  Your Honor, the government moves for

8   admission of Government Exhibit 9.

9              THE COURT:  Mr. Sindler?

10             MR. SINDLER:  No objection.

11             THE COURT:  Without objection, Government Exhibit 9

12  is admitted into the record.

13             MS. KING:  May I publish to the jury, Your Honor?

14             THE COURT:  You may, Ms. King.

15             MS. KING:  Thank you.

16  BY MS. KING:

17  Q.   Officer Sywyj, is this an accurate representation of how

18  the dining room looked on the night that you were there?

19  A.   Yes.  It looks fairly close.

20  Q.   There's a table that you can see in the middle of the

21  room.  To your recollection, was that the location of the table

22  within the room on the night that you were there?

23  A.   It's similar.  Might have been moved a few feet closer to

24  the wall, but it's close.  Closer to the wall opposite the

25  fireplace.

1  Q.  Thank you.

2            I'm showing you what has been marked as Government

3  Exhibit 1.

4            Are you familiar with that object?

5  A.  Yes, it's the firearm that I recovered that I observed

6  Mr. Warren with.  It's a black Taurus Judge.

7  Q.  How do you recognize that firearm as the same firearm you

8  recovered?

9  A.  It's the same make and model, has the serial number

10 obliterated and one of the things that stuck out to me when I

11 saw him with it is how obnoxiously long the cylinder is.

12            MR. SINDLER:  Judge, I would object and ask to have

13 stricken that reference to the firearm.

14            THE COURT:  Which reference to the firearm?

15            MR. SINDLER:  The obnoxiousness of it.

16            THE COURT:  Ms. King?

17            MS. KING:  No objection, Your Honor.

18            THE COURT:  Without objection, Your Honor, the word

19 obnoxious will be stricken from the record.  You should give

20 it, as I instructed in my preliminary instructions, anything I

21 direct stricken from the record should be given no

22 consideration by you.  The word "obnoxious" is stricken from

23 the record.

24            MS. KING:  Your Honor, the government moves for

25 admission of Government Exhibit 1 into evidence.

 1              THE COURT:  Mr. Sindler?

 2              MR. SINDLER:  No objection.

 3              THE COURT:  Without objection, Government Exhibit 1

 4 is admitted into the record.

 5 BY MS. KING:

 6 Q.  Officer Sywyj, could you please hold up the firearm just a

 7 bit so the jury can see it.

 8              Thank you.

 9              If you can flip back to your binder, please.

10              The first page you'll see what has been premarked

11 has Government Exhibit 1-A?

12 A.  Yes.

13 Q.  Do you recognize that photograph?

14 A.  Yes, it's the same firearm.

15 Q.  It's the firearm -- a photograph of the firearm that you

16 recovered?

17 A.  Correct.

18              MS. KING:  Your Honor, the government moves for

19 admission of 1-A into evidence.

20              THE COURT:  Mr. Sindler?

21              MR. SINDLER:  No objection.

22              THE COURT:  Without objection, Government Exhibit

23 1-A is admitted into the record.

24              MS. KING:  Mr. Babik and Your Honor, may I please

25 public to the jury?

1                    THE COURT:  You may, Ms. King.

2  BY MS. KING:

3  Q.  This is a photograph of the firearm; is that correct?

4  A.  Yes.

5  Q.  If you just look at 1-B, can you identify that, please.

6  A.  Yes, this is the opposite side of the same firearm.

7                    MS. KING:  Your Honor, the government moves for

8  admission of Government Exhibit 1-B.

9                    THE COURT:  Mr. Sindler?

10                    MR. SINDLER:  No objection.

11                    THE COURT:  Without objection, Exhibit 1-B is

12  admitted into the record.

13                    MS. KING:  Thank you.  May I publish to the jury?

14                    THE COURT:  You may, Ms. King.

15  BY MS. KING:

16  Q.  This is a photograph of the other side of that firearm; is

17  that correct?

18  A.  Yes.

19  Q.  You testified that Mr. Warren told you that what you had

20  seen was just a toy.  Did you recover any toy gun that evening?

21  A.  I did not.

22  Q.  Officer Sywyj, after you see the firearm, what do you

23  typically do with a firearm?

24  A.  Typically, it's made clear, make sure it's unloaded so

25  it's no longer dangerous.  And then to, you know, keep it

1 within my custody until it's packaged for evidence.

2  Q.  After you recovered this firearm in this case, what did

3 you do with it?

4  A.  I retained it with me until I later took it to the station

5 and packaged it for evidence.

6  Q.  When you say "packaged" it for evidence, what does that

7 mean?

8  A.  Seal it in an envelope with documentation and send it to

9 the crime lab.

10  Q.  Did you, in fact, send this firearm to the crime lab?

11  A.  Yes.

12  Q.  For what purpose?

13  A.  For trace history, for operability, and, obviously, to try

14 and have the serial number recovered.

15  Q.  Are there any other tests that you could have submitted

16 the gun for?

17  A.  No.

18  Q.  Do you ever submit a gun for fingerprints?

19  A.  Yes, I could have -- I'm sorry, I was confused.  I didn't

20 know if you meant mechanically.

21          Yes, I could have.  I didn't.

22  Q.  Why did you not submit this gun for fingerprints?

23  A.  Because I saw him possess it in his hand.

24          MS. KING:  Just one moment, Your Honor.

25          I have no further questions, Your Honor.

1          THE COURT:  Thank you, Ms. King.

2          Mr. Sindler you may cross-examine, sir.

3                    CROSS-EXAMINATION

4  BY MR. SINDLER:

5  Q.   The photos that were shown to you this morning, they were

6  not prepared by the government, were they?

7  A.   I'm sorry.

8  Q.   The photos shown to you were not prepared by the

9  Pittsburgh Police Department, were they?

10  A.   Not to my knowledge.

11  Q.   Were they prepared by the ATF?

12  A.   I suppose.

13  Q.   So you don't know who prepared them?

14  A.   Correct.

15  Q.   You don't know if I told you that the defense prepared

16  those exhibits and were given to the government?

17  A.   I'm not sure.

18  Q.   Do you know if any photographs were taken that night or

19  the next morning by the city police?

20  A.   I don't believe so.

21  Q.   Was there any, besides your seizing evidence and

22  Mr. Hoyson supposedly taking a statement, was any work done by

23  what is known has the mobile crime unit at that address?

24  A.   It was not.

25  Q.   Now, the focal point of the night is 520 Lincoln Avenue,

1  correct?

2  A.   Yes.

3  Q.   You had never been to this residence before October 23,

4  2012; is that right?

5  A.   Not to my knowledge.

6  Q.   Well, you had been working at Zone 5 for six and a half

7  some years with the city police, correct?

8  A.   Yes.

9  Q.   Do you recall the period of time that you were in Zone 5

10 while employed by the city?

11 A.   Yes.

12 Q.   Was it the entire time?

13 A.   No.   My first year I started in the west end, Zone 6.

14 Q.   So is it fair to say that for the next five and a half

15 years you were assigned to Zone 5?

16 A.   Yes, approximately five years.

17 Q.   Can we agree that Lincoln Avenue is a major point of

18 egress or ingress through the Larimer neighborhood?

19 A.   It is.

20 Q.   To your knowledge, you're not previously familiar either

21 with the occupants who you encountered that night; is that

22 right?

23 A.   That's correct.

24 Q.   And if not familiar with 520 Lincoln Avenue, you were also

25 not familiar with the interior of the home; is that right?

1   A.   That's correct.

2   Q.   And as you had said, your arrival that night was with

3   Kevin Swimkosky; is that right?

4   A.   That's right.

5   Q.   Another patrol officer?

6   A.   Correct.

7   Q.   It seems in looking at the review of that night, the two

8   of you were -- the two of you were amongst 11 total officers

9   who appeared at the home that night; is that right?

10   A.   Yes.

11   Q.   Some arrived two to a vehicle; is that right?

12   A.   Yes.

13   Q.   Two of those people would have been you and Swimkosky?

14   A.   Yes.

15   Q.   I suppose some would have arrived solo as well?

16   A.   It is likely.

17   Q.   The vehicles probably were, for the most part, would have

18   parked or stationed themselves in front of the home, correct?

19   A.   Correct.

20   Q.   You guys came with lights and audio or siren?

21   A.   Lights and sirens, yes.

22   Q.   The other vehicles probably had at least their rooftop

23   lights going?

24   A.   Yes.

25   Q.   In your approach to the front porch, your attention is

1  immediately drawn to a man who is bleeding out on the floor of

2  that front porch?

3  A.  That's correct.

4  Q.  The person providing aid is Mr. Weathers, correct?

5  A.  Correct.

6  Q.  At that point, he could have been, but later learned not

7  to be a suspect in that stabbing; is that correct?

8  A.  Correct.

9  Q.  Mr. Warren was never a suspect in that stabbing, was he?

10  A.  I had no idea who the actor was.

11  Q.  So that would be a yes to my question?

12  A.  Yes.

13  Q.  Your sense at the time, though, was that armed people

14  could still be on scene; is that right?

15  A.  Yes.

16  Q.  Mr. Weathers initially begins to answer the questions that

17  you're putting to him; is that right?

18  A.  Correct.

19  Q.  Then eventually he moves away from the stabbing victim, I

20  suppose, primarily because the medics have arrived?

21  A.  That's correct.

22  Q.  Weathers does not go toward the street, does he?

23  A.  No.

24  Q.  He doesn't try to go along the side path to the backyard?

25  A.  No.

1  Q.  His intentions are to go inside, which is what you

2  eventually let him do?

3  A.  Correct.

4  Q.  You indicated today a reluctance to let him leave your

5  sight; is that right?

6  A.  Yes.

7  Q.  That's primarily because he may have material information

8  with regard to the stabbing?

9  A.  Correct.

10  Q.  And you positioned yourself at the front door?

11  A.  That's correct.

12  Q.  And I think you said this a couple times today, once

13  inside, Weathers is conversing with various people who you

14  suspect or believe, rather, to be family members?

15  A.  Correct.

16  Q.  Several people are inside; is that right?

17  A.  Yes.

18  Q.  In the course of that evening, though, your report never

19  does document the identities or the names of the people inside

20  of the house?

21  A.  It wasn't relevant to him having a firearm.

22  Q.  Let's ask the question again.

23          In your report, you never documented the names of

24  the people inside of the house, yes or no?

25  A.  Correct.

1   Q.  Can we agree, too, that the inside of the home, at least

2   as of the point that you see a firearm is an active crime

3   scene?

4   A.  Yes.

5   Q.  Because the crime that you eventually learned has

6   supposedly occurred is Mr. Warren possessing a firearm with a

7   defiled serial number, correct?

8   A.  Yes.

9   Q.  I did notice, though, that in reviewing your report, the

10  names of the other officers who showed up were documented; is

11  that right?

12  A.  Yes.

13  Q.  So, of the 11 people who were police that night you had

14  documented in your report their first names, correct?

15  A.  Not in the narrative very likely.  In the drop down menu,

16  yes.

17  Q.  I'm sorry?

18  A.  Not in the narrative portion I don't believe.

19  Q.  Well, there was a first page to your report, I'm sure --

20  A.  They likely would have been there.

21  Q.  I'd like to please finish asking my question.

22          In the course of getting ready for this trial, you

23  reviewed your report, yes or no?

24  A.  Yes.

25  Q.  On the first page of your report is a listing toward the

1  bottom of the other police officers who appeared that night,

2  yes?

3  A.  Yes.

4  Q.  Do you list their first names?

5  A.  Yes.

6  Q.  Do you list their last names?

7  A.  Yes.

8  Q.  Do you list their badge numbers?

9  A.  Yes.

10  Q.  I see that you also listed the vehicles by number in which

11  they arrived?

12  A.  Correct.

13  Q.  Yes.

14        You would not disagree with me that there were at

15  least seven vehicles, police vehicles that showed up that night

16  in response to this call?

17  A.  Yes.

18  Q.  You agree?

19  A.  Yes.

20  Q.  And in the course of what becomes an active crime scene,

21  which is the first floor of this home, you supposedly see my

22  client with a firearm, and I'm trying to depict what you were

23  doing earlier, that is at chest level, correct?

24  A.  Yes.

25  Q.  My right forearm is diagonal across my chest.

```
 1              Is that an accurate depiction?
 2  A.  An angle might be slightly different, but yes.
 3  Q.  Is it about 45 degrees?
 4  A.  Yes.
 5  Q.  And the hand is supposedly holding the firearm, correct?
 6  A.  Yes.
 7  Q.  And can we assume then that the firearm was pointed
 8  somewhere toward a ceiling or the area where the ceiling would
 9  meet a wall inside of the home?
10  A.  Yes.
11  Q.  The gun when you said you saw it, was not down by his
12  side, by his leg, was it?
13  A.  No.
14  Q.  It was not concealed partially or fully behind his back,
15  was it?
16  A.  No.
17  Q.  And your recollection is that he was holding it in his
18  right hand?
19  A.  Correct.
20  Q.  And at some point, you said that it was difficult to see
21  him or it because he was behind other people with the firearm;
22  is that right?
23  A.  I never said it was difficult.
24  Q.  Well, was your view or observation of him be clouded if
25  there were other people, as you say, that were in front of him
```

1 or near him?

2  A.  They were in front of the fireplace to the right.  I

3 clearly saw him with the firearm.

4            MR. SINDLER:  I need a moment, Judge.

5            THE COURT:  No problem, Mr. Sindler.

6            MR. SINDLER:  Judge, I am showing, if I may approach

7 Mr. Sywyj, a document or a binder containing some prior

8 testimony that we have marked for at least identification sake

9 Defense O.

10           THE COURT:  O as in Oscar?

11           MR. SINDLER:  Yes.

12           May I approach?

13           THE COURT:  Any objection, Ms. King?

14           MS. KING:  No.

15           THE COURT:  You may approach, Mr. Sindler.

16 BY MR. SINDLER:

17  Q.  Review Page 25.  When you have finished reviewing it,

18 please let me know that you're done.

19  A.  Yes.

20  Q.  Have you reviewed Page 25 of defense O?

21  A.  Yes.

22  Q.  Do you recall being in this building several months ago

23 testifying about similar matters?

24  A.  Yes.

25  Q.  Do you recall it being around March 3rd, 2015?

1  A.  Yes.

2  Q.  Do you recall testifying from a witness stand, perhaps

3  where you're seated now?

4  A.  Yes.

5  Q.  Do you recall being under oath at the time?

6  A.  Yes.

7  Q.  To answer truthfully to questions being put to you at the

8  time?

9  A.  I do, yes.

10  Q.  Do you recall being asked at the time, this is toward the

11  bottom of Page 25 of Defense O.

12          "And what happened then?"

13          Do you see that?

14  A.  Yes.

15  Q.  When you say "he," referring to Mr. Warren, going to the

16  right and to the living area --

17          MS. KING:  Objection, Your Honor.

18          THE COURT:  Basis?

19          MS. KING:  This is not inconsistent.  This is not

20  proper impeachment.  The statement that Mr. Sindler is

21  attempting to put into evidence is not inconsistent with what

22  the witness just testified to.

23          THE COURT:  That may result in a limiting

24  instruction, but I'll overrule the objection.  He's allowed to

25  engage the witness regarding prior testimony.

1          You can ask a direct question about the content of

2 the prior testimony.  The evidence of the prior testimony may

3 be resolved in a limiting instruction.

4          We have to first determine if it comes within Rule

5 16(b).

6          MR. SINDLER:  I understand.

7 BY MR. SINDLER:

8  Q.  Do you recall answering the question:  At that point what

9 happened then?

10  A.  Yes.

11  Q.  Do you recall that part of your answer toward the bottom

12 of Page 25 of Defense O, "at that point, I saw Mr. Warren

13 behind everybody."

14          Yes?

15  A.  Yes, he was deeper with inside the house.

16  Q.  Where everybody was?

17  A.  Yes.

18  Q.  Supposedly with a firearm, correct?

19  A.  Yes.

20          MR. SINDLER:  I'll take O back, please.

21          THE COURT:  Ms. King, do you want a limiting

22 instruction?

23          MS. KING:  Yes, Your Honor.

24          THE COURT:  Ladies and gentlemen, from time to time

25 during the course of any trial, including this trial, one or

more lawyers may present to any witness the content of a prior

statement or prior testimony of that witness.  Unless I rule

and tell you otherwise, you may only consider that prior

testimony or prior statement of the witness to determine the

credibility by you making a determination as to whether that

prior statement is consistent or inconsistent with the

testimony that is being given here in court.

So, I'm instructing you that you may consider the

prior testimony, which has been presented as part of Defense

Exhibit O, only in determining whether you believe it or not to

be inconsistent or consistent with this witness' testimony here

in court, and then you may consider that and give it such

weight as you believe appropriate in determining whether you

find the witness to be credible or believable.

Any further request or correction regarding the

limiting instruction?

MS. KING:  No, Your Honor.

THE COURT:  Mr. Sindler, do you believe the Court

has appropriately given a limiting instruction under the rules?

MR. SINDLER:  Yes.

THE COURT:  Thank you.

You may proceed, Mr. Sindler.

BY MR. SINDLER:

Q.  I imagine that you're informed that a professional report

writing is important to what you do as a police officer; is

 1  that right?

 2  A.   Yes.

 3  Q.   You may have indicated already, at least during my

 4  questioning, that part of the form, at least the one you did in

 5  this case, includes a provision for a narrative, correct?

 6  A.   Correct.

 7  Q.   After filling it in and checking out boxes or blocks, you

 8  eventually submit it to be filed as part of that case file,

 9  correct?

10  A.   Correct.

11  Q.   In this case, there was a file developed upon the seizure

12  of this firearm, correct?

13  A.   Correct.

14  Q.   The writing down of things on a report like this ensures

15  accuracy; is that right?

16  A.   Yes.

17  Q.   It helps you recall important details of an event?

18  A.   Yes.

19  Q.   Correct?

20          There is also some accountability in your

21  profession, so the form serves to help with the accountability;

22  is that right?

23  A.   Yes.

24  Q.   And then recording what you see and perhaps overhear also

25  ensures credible testimony if you need to, as is the case here,

1  later on; is that right?

2  A.  Yes.

3  Q.  And then recording what you hear is important for the same

4  reason on these forms that you have to use, correct?

5  A.  Yes.

6  Q.  As a general patrol officer -- I don't know that Ms. King

7  had covered it -- in your time with Zone 5 and including the

8  time from October 2012 until you left the force, you had been

9  involved in a number of different kinds of incidents, correct?

10  A.  Yes.

11  Q.  Burglaries are the things you would have investigated,

12  other assaults, yes?

13  A.  Yes.

14  Q.  Perhaps drug activity, yes?

15  A.  Things of that nature, yes.

16  Q.  Traffic offenses, yes?

17  A.  Correct.

18  Q.  And in these incidents, as you go from shift-to-shift and

19  day-to-day, you don't know what you're going to encounter

20  because you're out there to investigate and make sure that

21  people try to remain safe, correct?

22  A.  That's correct.

23  Q.  In some of those instances, you're the primary

24  investigator, correct?

25  A.  Yes.

1  Q.  And in some other cases, you're secondary or in an assist

2  role, correct?

3  A.  Correct.

4  Q.  Would you say in this chase that your role was more

5  primary than secondary?

6  A.  Yes.

7  Q.  And that's because you were perhaps the first to arrive?

8  A.  Yes.

9  Q.  Some of these incidents result in arrests, correct?

10  A.  Correct.

11  Q.  People being taken into custody?

12  A.  That's correct.

13  Q.  Some of these incidents may also involve your work with

14  what are called search warrants, correct?

15  A.  Correct.

16  Q.  That's where you get judicial or the authority from a

17  judge to search a place ahead of time?

18  A.  Yes.

19  Q.  Now, when you said you saw Mr. Warren, your testimony

20  today is that he had appeared, disappeared, and then

21  reappeared, correct?

22  A.  Correct.

23  Q.  It happened in that sequence; is that right?

24  A.  Yes.

25  Q.  And this would be an important part of what happened that

1  night, correct?

2  A.  Yes.

3  Q.  You testified to this back in March, do you recall that?

4  A.  Yes.

5  Q.  And, of course, you testified to it this morning during

6  direct examination, right?

7  A.  Yes.

8  Q.  And we can agree, though, as well that this sequence of

9  events, the appearing, disappearing, and reappearing appears

10  nowhere in your written narrative done the night of or right

11  after October 23, 2012?

12  A.  Correct.

13  Q.  And you also don't even describe supposedly the two

14  different doorways in which he was appearing or disappearing or

15  reappearing, do you?

16  A.  Correct.

17  Q.  So it seems then that upon testifying several months ago,

18  this appearing and disappearing comes up for the first time

19  some two and a half years after the event happened, yes?

20  A.  Yes.

21  Q.  And I can or we can agree rather that the report to which

22  I'm referring is only one.  You didn't do more than one report

23  in this case, did you?

24  A.  That's correct.

25  Q.  Yes?

1  A.  That's correct.

2  Q.  You also testified today to a statement that Mr. Warren

3  supposedly made while he's inside of the house.

4        This is at a time where you're obviously talking to

5  him; is that right?

6  A.  Yes.

7  Q.  You weren't talking to Weathers at the time, were you?

8  A.  No.  I was ordering everyone out of the house.

9  Q.  You weren't talking to any of the other people you say you

10  saw in the house that night, were you?

11  A.  No.

12  Q.  You were talking to Mr. Warren?

13  A.  Correct.

14  Q.  I think the question was that night or at that moment,

15  where is the gun?

16        Do you recall that?

17  A.  Yes.

18  Q.  Supposedly Mr. Warren's response was, oh, it's just a toy.

19        Right?

20  A.  Yes.

21  Q.  So, this is also something to which you testified back in

22  March of this year.

23        Do you recall that?

24  A.  Yes.

25  Q.  And, of course, you testified to it this morning because

 1  now we're talking about it on cross-examination.

 2          There's no reference to that conversation, though,

 3  in the report that you did on the night of or shortly after

 4  October 23, 2012, right?

 5  A.  That's correct.

 6  Q.  We would agree, you and I, that the dialogue to which

 7  you're referring to today and to which you referred several

 8  months ago would be an important part of this investigation,

 9  correct?

10  A.  Yes.

11          MR. SINDLER:  That's all we have.

12          Ms. King, do you have any redirect?

13          MS. KING:  Yes.  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Sindler.

15                  REDIRECT EXAMINATION

16  BY MS. KING:

17  Q.  Officer Sywyj, Mr. Sindler was referring to a police

18  report in this case.

19          Did you author a police report in this case?

20  A.  I did.

21  Q.  You have reviewed that report?

22  A.  I have.

23  Q.  Can you describe what the purpose of a police report is

24  for the jury?

25  A.  To document events and detail the elements of the crime.

1    Q.   Do you document in every report every person that is

2    present at a scene?

3    A.   No.

4    Q.   Why not?

5    A.   Some of them are irrelevant.

6    Q.   In the narrative section of your report when you're

7    recounting events that occurred during an incident, do you

8    document every single thing that happened?

9    A.   No.

10   Q.   Why would you not do that?

11   A.   It's not as efficient.

12   Q.   When you showed up this night to respond to a person being

13   stabbed, and then you now have a new arrest on your hands for a

14   firearm, Mr. Sindler asked you if the mobile crime unit

15   responded for that and you replied they did not.

16            Is there a reason for that?

17   A.   I believe that they later --

18            MR. SINDLER:  Judge, I want --

19            THE COURT:  One at a time.

20            MR. SINDLER:  I believe we're getting into

21   speculation when he says "I believe."

22            THE COURT:  Okay, we'll find out.

23            Ms. King, you may rephrase and re-ask the question.

24   BY MS. KING:

25   Q.   Did the mobile crime unit respond to 520 Lincoln Avenue,

1  if you know?

2  A.  Yes.

3  Q.  What was the purpose of them responding there?

4  A.  The stabbing.

5  Q.  Were they responding at all for the firearm?

6  A.  No.

7  Q.  Why not?

8  A.  Because I had already seized it and made the arrest.

9  Q.  There was no reference in your report to Mr. Warren making

10 a statement to you that it was just a toy.

11          Can you explain why.

12 A.  I saw him possess the firearm.  He was Mirandized and

13 admitted to buying and possessing the firearm.

14 Q.  Why would you not include "it's just a toy" in your

15 report?

16 A.  Perhaps I should have.

17 Q.  You said that there were several people in the front room.

18 Did those people in any way block your view of Mr. Warren?

19 A.  He was farther to the left in the archway.  They were to

20 the right of the room.  When I saw him with the firearm, I saw

21 him with the firearm in front of him at chest level.

22 Q.  Did you have a clear view of Mr. Warren?

23 A.  I did.

24          MS. KING:  We have no further questions.

25          THE COURT:  Thank you, Ms. King.

1              Mr. Sindler, recross limited to Ms. King's redirect.

2                        RECROSS-EXAMINATION

3 BY MR. SINDLER:

4 Q.  During our earlier examination, you would agree that

5 Mr. Warren was behind everybody, whoever everybody was, when

6 you saw him with the firearm.  Are you retracting what you said

7 several months ago?

8 A.  I meant to articulate that he was deeper within the

9 building.

10 Q.  You meant to articulate that today or was that several

11 months ago?

12 A.  I'm not understanding your question, sir.

13 Q.  Are you retracting what you said several months ago when

14 you said under oath that Mr. Warren was standing behind

15 everybody, and I don't know who everybody was?

16 A.  I meant to communicate that he was standing deeper within

17 the structure than the rest of the people.

18 Q.  So you're standing by your prior testimony, or you're

19 retracting it?

20 A.  I meant the same thing both times, sir.

21 Q.  You did?

22 A.  Yes.

23              MR. SINDLER:  That's all we have.

24              THE COURT:  Ms. King, any redirect?

25              MS. KING:  No, Your Honor.

1            THE COURT:  Officer Sywyj, you may step down from

2 the stand, sir.  You're not excused from the court proceedings

3 and area until I direct that to be the case.

4            THE WITNESS:  Should I leave this here?

5            THE COURT:  Ms. King, would you retrieve Government

6 Exhibit 1 and secure that.

7            MS. KING:  Yes, Your Honor.

8            THE COURT:  Thank you, Mr. Sywyj.

9            Mr. Sywyj, remain waiting outside the courtroom.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Thank you, Mr. Sywyj.

12           Ms. King and Mr. Sindler, I note it's one minute

13 after 11, would now be an appropriate time for midmorning

14 break?

15           MS. KING:  Yes, Your Honor.

16           THE COURT:  Mr. Sindler, do you concur?

17           MR. SINDLER:  Sure.

18           THE COURT:  Ladies and gentlemen, we're going to

19 take our midmorning break.  We'll resume approximately 11:15 to

20 11:20.  You'll know we're resuming because Mr. Babik will come

21 up to retrieve you.

22           Ladies and gentlemen, for the first of what I

23 suspect will be a number of times, I give you the following

24 instruction while you're away from the courtroom.  Do not

25 discuss the case, it's participants or any issues involved in

1  it with anyone, even amongst yourselves.  Do not seek out or

2  receive any information from any source, human, printed,

3  written, broadcast, technology, in any way, shape or form

4  relating to this case, its participants or the issues involved

5  in it.  Should anybody attempt to discuss any of those items or

6  matters with you, please advise Mr. Babik of that right away,

7  even if it is completely inadvertent.

8           Mr. Babik, if you would assist the jury to the jury

9  room for our midmorning break.

10       (Jury is dismissed from the courtroom.)

11          THE COURT:  I would note for the convenience of

12  counsel, the Court had a second podium made and you're welcome

13  to move that one around, but you're also free to leave one in

14  each of the places you each like to use.  Both of them have a

15  piece of Velcro so the wireless mic can be moved and counsel

16  can feel free to do that or tip the microphones as might be

17  helpful to you.

18          Ms. King and Mr. Ortiz, any matters we need to take

19  up before the break?

20          MS. KING:  No.

21          THE COURT:  Mr. Sindler, same question, sir?

22          MR. SINDLER:  No.

23          THE COURT:  Ms. King, advise Mr. Sindler who your

24  next witness will be.

25          Mr. Greer, you can recess the court.

1          (Whereupon, there was a brief recess in the proceedings.)

2          THE COURT:  Mr. Sindler, anything we should take up

3 before we bring the jury back in?

4          MR. SINDLER:  I'm not sure if now is the right time.

5 We may have had some earlier misunderstanding.  We don't need

6 to go through the process with each exhibit, do we want to

7 admit it, Mr. Sindler?  Do you object?  What is your position?

8 There are some exhibits that have not been referred to at this

9 trial.  If now is the appropriate time or when the jury comes

10 out, we can put on the record that the remaining exhibits --

11          THE COURT:  We can do it right now outside the

12 presence of the jury and then whoever uses one of those

13 exhibits, if it has been admitted, can simply state this has

14 been admitted into the record.

15          MR. SINDLER:  I plan on doing the same thing this

16 afternoon, so what is good for the goose is good for the

17 gander.  The government knows what they are.  With exception of

18 Exhibit J, which we'll get to perhaps this morning, but that's

19 what I wanted to put on the record.

20          THE COURT:  I'm fine, if we want to go through them

21 one by one and confirm that they're admitted, we can do it

22 right now.

23          Ms. King, is that all right with you?

24          My notes reflect that currently in the record are

25 Government Exhibits 1 through 9, inclusive then Government

1  Exhibits 1A as in Adam and one B as in boy.

2           Those have all been offered and admitted.

3           MS. KING:  The government would also of Exhibit 1C,

4  1D and 1E and 1F into evidence.

5           THE COURT:  Any objection to the offer of Exhibits

6  1C, D, E, and F into the record?

7           MR. SINDLER:  We do, but we covered this on Monday,

8  and then you had said earlier today -- my recall is not as good

9  as yours -- that you had already made a determination.

10          THE COURT:  I believe I denied the motion in limine,

11  but your objection is preserved.

12          These are the four photographs that were to be used

13  in conjunction with Mr. Best's testimony, Ms. King?

14          MS. KING:  Yes.

15          THE COURT:  They are two what we'll call

16  photographs, that is, of areas on government exhibit where a

17  serial number appears to have been obscured or scratched off,

18  and then the after, if you will, photograph of each of those

19  areas where it has been represented that a serial number

20  becomes visible due to some sort of acid restoration.

21          Is that correct, Ms. King?

22          MS. KING:  Yes, Your Honor.

23          THE COURT:  Mr. Sindler, I know of your objections

24  that are contained in your motion in limine.  You're free to

25  state any additional ones that time.

1          MR. SINDLER:  Nothing additional at the expense and

2   risk of being overly repetitive.  If we're going to go with the

3   four, I ask at least reconsider, not based upon something new,

4   but if we're going to go with the before and after theories

5   that the government is pursuing in this slice of the trial, I'm

6   not sure why we have two of the before and two of the after.

7   One of the before and one of the after, in our way of thinking,

8   serves the purpose.

9          MS. KING:  There are two serial numbers, Your Honor.

10         THE COURT:  I understand one is on the frame and one

11  is on the barrel.

12         I understand that objection, Mr. Sindler, as being,

13  among other things, a cumulativeness objection under Rule 403?

14         MR. SINDLER:  Yes.

15         THE COURT:  I'm going to overrule the objection.

16         Ms. King, don't beat it into the ground.

17         MS. KING:  Yes, Your Honor.

18         THE COURT:  I'm not saying you were going to, but I

19  don't think it is cumulative to the degree that it is

20  prejudicial at all, or that the prejudicial value substantially

21  outweighs the probative value, so I will overrule that

22  objection, including on 403 grounds, and admit Government

23  Exhibits 1C, 1D, 1E, and 1F into the record.

24         Mr. Sindler, as far as this Court is concerned, you

25  have made and preserved your objection.

1          Any further exhibits?

2          MS. KING:  No further exhibits.

3          We did come to an agreement that after the testimony

4  of Mr. Hoyson, the government will read into evidence these two

5  stipulations.

6          THE COURT:  I understand these are not stipulations

7  of testimony, they're stipulations of fact.

8          Is that correct?

9          MS. KING:  There is one of each, Your Honor.  They

10 were filed on the docket.  They're still under seal.

11         THE COURT:  That would, therefore, implicate Third

12 Circuit Pattern Jury Instructions 4.01, regarding stipulated

13 testimony, and 4.02 regarding stipulation of fact.

14         Do you agree, Mr. Sindler?

15         MR. SINDLER:  I disagree.

16         THE COURT:  Okay.

17         MR. SINDLER:  4.01 is in play.  I don't disagree

18 with that.

19         Ms. King and I have had discussions, and maybe it

20 was Mr. Ortiz as well, I don't mean to leave him out of it, but

21 I honestly, Judge, don't understand 4.02.  It comes from

22 learned people, it's a Third Circuit Model Jury Instruction.  I

23 have it in front of me.  When it says that the government and

24 the defendant have agreed that certain facts are true, to then

25 say:  You, the juror/jury should, therefore, treat this as

 1 having been proved.  Followed by:  You're not required to do

 2 so, however, since you are the sole judges of the facts.

 3            I honestly don't understand that.  If I don't

 4 understand that, I don't know how I can explain to my client or

 5 others what it means.

 6            THE COURT:  Let me ask you this, Mr. Sindler.  Is

 7 your concern with the use of the word "should" in the second

 8 sentence as opposed to "may"?

 9            MR. SINDLER:  It's a distinction without a

10 difference.

11            THE COURT:  Really, I would think "may" is a pretty

12 big distinction.

13            I'm prepared to give the instruction with the word

14 "may" substituted for the word "should" to bring it in closer

15 consistency with the final sentence.

16            MR. SINDLER:  Your recommendation, if I understand,

17 is under the second sentence of the proposed jury instruction,

18 "you may, therefore, treat the stipulated fact or facts as

19 having been proved."

20            THE COURT:  Correct.

21            MR. SINDLER:  Can I have a second?

22            THE COURT:  You may.

23        (Whereupon, there was a brief pause in the proceedings.)

24            MR. SINDLER:  What you have proposed is satisfactory

25 to us.

1          THE COURT:  Ms. King, it would appear to me after

2   reviewing the comment and viewing the general instructions the

3   Court would give to the jury and the provisions of the final

4   sentence of pattern jury instruction 4.02 in a criminal case,

5   for the cautionary reasons that are contained in the third

6   paragraph of the comments that the second sentence of 4.02

7   should read:  You may, therefore, treat it as having been

8   proved.

9          MS. KING:  Your Honor, if I could briefly, 4.02 is

10  the final instruction.  If we look at 2.03, that's an

11  instruction to give during the course of trial.

12          THE COURT:  Okay.

13          MS. KING:  It does say:  You should, therefore,

14  treat this fact as having been proved.  I have it here.

15          THE COURT:  Ms. King, I think you are quite correct.

16  2.03 is the statement of stipulation of fact to be used during

17  trial.  It does appear in every respect to be identical to

18  4.02.

19          MS. KING:  Yes, Your Honor.

20          THE COURT:  I think, I note the provisions of the

21  comment at Paragraph 3, which reads in the comment:  In cases

22  where stipulation may amount to an admission to an element of

23  the offense, the judge may wish to exercise caution.  The Third

24  Circuit has yet to address the question, but judges may wish to

25  ascertain that the defendant understands the content of the

1  stipulation and agrees to it.

2              I believe I have ascertained that.

3              I believe given the cautionary note in Comment 3 and

4  my overriding repeated instructions to the jury that they and

5  they alone are to, as judges of the facts, determine what the

6  facts are.  And given that this is short of judicial notice

7  under Evidence Rule 201, I'll give it and state that the second

8  sentence -- I would give it stating that the second sentence

9  reads:  You may, therefore, treat it as having been proved.

10 You, however, are not required to do so since you are the sole

11 judges of the facts.

12             MS. KING:  That's fine, Your Honor.

13             THE COURT:  That's how we'll do it.  The word

14 "should" will not be used in regard to the stipulation of fact.

15             As to 4.01, stipulated testimony, I believe that it

16 is consistent to say you should consider that testimony in the

17 same way as if it had been given here in court by a witness.

18 The jury will be nonetheless given that instruction.

19             Do you concur, Mr. Sindler?

20             MR. SINDLER:  Yes, I think I said that earlier, but,

21 yes, again.

22             THE COURT:  That's how we'll do that.

23             Ms. King and Mr. Sindler, I'm happy to hear from

24 you.

25             It would be my thought, Ms. King, you would notify

1  the Court in the presence of the jury that you intend to read

2  certain stipulations.  I would then give the instructions and

3  then you would read the stipulations verbatim.

4              Is that agreeable to you?

5              MS. KING:  Yes, Your Honor.

6              THE COURT:  Mr. Sindler, is that process agreeable

7  to you, sir?

8              MR. SINDLER:  Yes.

9              THE COURT:  Ms. King, any further matters to take up

10 before we bring the jury back?

11             MS. KING:  No, Your Honor.

12             THE COURT:  Mr. Sindler, same question of you?

13             MR. SINDLER:  No.

14             THE COURT:  Mr. Babik, would you please retrieve the

15 jury.

16             MR. BABIK:  Yes, Your Honor.

17        (Jury enters the courtroom.)

18             THE COURT:  Welcome back, ladies and gentlemen of

19 the jury.

20             Note for the record that all members of the jury and

21 the alternates have returned to the courtroom.

22             Mr. Warren is present represented by Mr. Sindler.

23             Ms. King and Mr. Ortiz are here on behalf of the

24 United States.

25             THE COURT:  Ms. King, you may call your witness.

1              MS. KING:  Yes, Your Honor.  The government calls

2  Lance Hoyson.

3              THE COURT:  Mr. Hoyson, if you'd please step forward

4  to the front of the bench.

5        LANCE HOYSON,  a witness having been duly sworn, testified

6  as follows:

7              MR. BABIK:  State your name for the record.

8              THE WITNESS:  Lance Hoyson.

9              THE COURT:  Mr. Hoyson, if you'd have a seat in the

10 witness stand and adjust the microphone so it's comfortable for

11 you, and please keep your voice up so we can all hear your

12 testimony.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Ms. King.

15                   DIRECT EXAMINATION

16 BY MS. KING:

17 Q.  Please introduce yourself to the jury.

18 A.  I'm Lance Hoyson.  I am a sergeant with the Pittsburgh

19 Bureau of Police currently assigned to Zone 2 station.

20 Q.  How long have you been employed with the Pittsburgh Bureau

21 of Police?

22 A.  I have been employed for over eight years.

23 Q.  When did you start?

24 A.  July of 2007.

25 Q.  What position did you start in with the Pittsburgh Bureau

1  of Police?

2   A.  Upon completion of the academy, I was assigned to Zone 5

3  station for seven years.  I worked as a uniform patrol officer,

4  a field training officer, a plainclothes detective where we

5  handled narcotics complaints and non-fatal shootings.

6   Q.  When did you receive a promotion to sergeant?

7   A.  July of 2015.

8   Q.  Prior to the time that you were police officer, what did

9  you do?

10   A.  Prior to my time as a police officer, I graduated from

11  Grove City College with a Bachelor's degree with a double major

12  in sociology, political science.  And during that time, in the

13  first years of my employment here, I served with the United

14  States Marine Corps Reserve, including a tour in Afghanistan

15  2010.

16   Q.  You indicated that you attended the police academy; is

17  that right?

18   A.  That's correct.

19   Q.  Can you describe what type of training you received at the

20  police academy?

21   A.  The police academy, it's over seven months now, I believe,

22  of classroom and scenario based training, covering all

23  different types of topics you may come across, whether it's

24  crimes code, vehicle code, rules of criminal procedure, and

25  basic procedural matters, how to respond to different types of

1 calls and handle arrests.

2 Q.  Directing your attention to October of 2012, were you

3 working as a police officer with the City of Pittsburgh Bureau

4 of Police?

5 A.  Yes, I was.

6 Q.  Were you a patrol officer at that time?

7 A.  Yes.

8 Q.  Did you have any specific area of the city where you

9 worked?

10 A.  At that time, I worked in Zone 5 station covering the

11 entire zone.

12 Q.  Can you describe which areas of the city Zone 5 covers?

13 A.  Zone 5 covers neighbors from the east coming in, East

14 Hills, Homewood, Lincoln, Lincoln-Lemington, Larimer, East

15 Liberty, Bloomfield, Garfield, Highland Park, Stanton Heights

16 and Morningside.

17 Q.  Can you describe what some of your general duties were

18 when you were a police officer?

19 A.  At that time, we responded to 911 calls in uniform in a

20 marked car, responded to 911 calls.  In between our calls, we

21 would just be visible in the community and proactive looking

22 for anything that may be a crime.

23 Q.  Directing your attention to October 23, 2012,

24 specifically, were you working that day?

25 A.  Yes, I was.

1  Q.  If you recall, what shift were you working that day?

2  A.  That day I was working 4:00 p.m. until midnight.

3  Q.  Did you have a partner or were you working alone?

4  A.  At that time I was working with Officer Dan Stoddard.

5  Q.  In what capacity were you working with him?

6  A.  I was field training him that evening.

7  Q.  What did your duties entail on that day, October 23, 2012,

8  if you recall?

9  A.  The usual patrol duties, answering 911 calls, and making a

10 presence in the neighborhood, being visible and proactive.

11 Q.  At some point in that day, were you directed to go to 520

12 Lincoln Avenue?

13 A.  Yes, I was.

14 Q.  What part of the city is that?

15 A.  Lincoln Avenue is Larimer.  It's basically the border,

16 that street is the border between the Larimer and Homewood

17 neighborhoods.

18 Q.  How did it come about that you were directed to go to 520

19 Lincoln Avenue?

20 A.  Officers were dispatched for a call of a man stabbed and

21 we responded as backup.

22 Q.  When you received that call, what did you do?

23 A.  We activated -- I can't recall if I was driving or not,

24 but responded with our lights and siren activated.

25 Q.  Did you end up going to 520 Lincoln Avenue?

1  A.  Yes, I did.

2  Q.  Were you the first person to respond?

3  A.  No, I was not the first on scene.

4  Q.  When you arrived at 520 Lincoln Avenue, what did you

5  observe?

6  A.  On scene, I observed officers and other civilians tending

7  to a victim on the porch of the house.  We observed he had been

8  stabbed.  He was in very bad condition and we -- the medics

9  arrived fairly quickly.  We assisted in getting him into the

10  ambulance so he could get treatment.

11  Q.  You personally assisted with that?

12  A.  Yes.  We assisted the paramedics in getting him onto the

13  stretcher and getting the stretcher into their ambulance.

14  Q.  Where was the ambulance located?

15  A.  They parked on the street.  I think we left room for them

16  to get basically right in front of the house on the street.

17  Q.  After you assisted with getting the stabbing victim into

18  the ambulance, what did you do next?

19  A.  At that point, we returned to the area of what we knew to

20  be the crime scene for the stabbing, which was immediately

21  around the victim.  We basically attempt to identify any

22  witnesses, preserve any evidence.  If anybody who is not

23  essential to the investigation, we moved them away from the

24  immediate area where we observed the victim.

25  Q.  When you're talking about the immediate area, are you

1  still there at 520 Lincoln Avenue?

2  A.   Yes.

3  Q.   Would that be -- where were you -- I'm sorry, when you say

4  the immediate area, what are you talking about?

5  A.   The porch, basically trying to identify any evidence on

6  the porch.  Obviously, we fanned out a little bit farther from

7  that to do a thorough check of the area for any evidence.

8  Q.   What happened next?

9  A.   Well, while I was doing that, I heard Officer Sywyj alert

10 the other -- all of us on scene that there was a person with a

11 gun inside the house.

12 Q.   What did you do?

13 A.   As the occupants were ordered out, I entered the house

14 with Officer Sywyj.  I observed him retrieve the firearm.  He

15 showed me the firearm, and at that time, I could hear -- we

16 were still on the first floor of the house, I could hear voices

17 coming from the second floor, and fearing there may be another

18 armed individual on the second floor, we called out to them.

19 No one answered.  So I went up with Sergeant Palermo and

20 cleared the second floor and found the noise was coming from a

21 television.

22 Q.   There was no other person on the second floor?

23 A.   There was no one else.

24 Q.   Can you describe the layout of the house as you remember

25 it as you entered?

1   A.   We went into the front door, there was a living room area

2   that you basically enter into.  In the back of that living room

3   area, there was a wall, I think it was around the fireplace

4   with a walkway on both sides of that looking back into the

5   dining room and toward the kitchen area of the house.

6   Q.   Do you recall what type of view you had as you entered the

7   house?

8   A.   From the front door, you could see through into that --

9   you can see the entire -- standing in the doorway, you could

10  see the entire living room area.  You could see through both

11  the walkways on either side of the fireplace.  There were no

12  doors, it was just an open doorway.  You could see through into

13  that dining room area.

14  Q.   After you checked the second floor, what did you do next?

15  A.   Next I left the house and I went out to speak with

16  Mr. Warren, the individual who had been detained about the

17  firearm.

18  Q.   Where was he located?

19  A.   He was in a marked police car.  He was detained and

20  handcuffed in a marked police car.

21  Q.   What part of the police car was he in?

22  A.   He was in the back seat of the police car.

23  Q.   What did you do?

24  A.   I got into the police car with him and as I was obtaining

25  his -- basically his identification information, all that and

1 confirming it, I advised him of his Miranda rights and asked

2 him if he understood.  He said he did.  And I began to question

3 him about the incident, about the firearm.  He told me that

4 when he heard his cousin had been stabbed, he just got his gun.

5 I pressed a little bit more about the condition of the gun.  He

6 said that he bought it on the streets and that the serial

7 numbers were filed when he purchased the gun.

8 Q.  You said that you entered the car with him.  Were you

9 sitting in the back or the front?

10 A.  I was sitting in the front.

11 Q.  Can you describe the layout of the car?

12 A.  As we get in the car, obviously, driver and passenger seat

13 in the front.  In between them, there is a custom built center

14 console which houses things like our police radio, our patrols

15 for lights and sirens and our in-car computers, which is what I

16 would have been using to verify his identification and all

17 that.

18          Directly behind me is a partition, basically a

19 plastic or Plexiglass partition.  It's metal on the bottom and

20 separates the front seats from the back seats.  In the center

21 of that partition, it slides in a manner similar to a back

22 window on a pickup truck so that I can open that window and

23 communicate back and forth with the person in the back.

24          The back seat is usually plastic or some different

25 material with -- it's formed in a way that someone who is

1 handcuffed can sit comfortably in there.

2 Q. You said that you advised Mr. Warren of his rights. How

3 exactly did you do that?

4 A. Just verbally. I went through the rights and when I was

5 complete, when it was complete, I asked him if he understood.

6 Q. How did he respond?

7 A. He indicated that he did understand -- he indicated

8 verbally, yes, yeah.

9 Q. Do you see the person that you interviewed on October 23,

10 2012 here in the courtroom today?

11 A. I do. He's sitting on the desk to my right in the black

12 button down shirt.

13          MS. KING: Your Honor, if the record may reflect the

14 witness has identified the defendant, Atiba Warren.

15          THE COURT: It may.

16 BY MS. KING:

17 Q. Officer Hoyson, do you ever provide a written waiver of

18 rights form to someone that you interview?

19 A. Yes, we do.

20 Q. Did you do that in this case?

21 A. No, we did not.

22 Q. Why did you not do that?

23 A. The waiver form is typically issued -- is typically used

24 in an interview room in the police station. It requires

25 several initials and a signature from the individual that is

1  being interviewed, as well as a second officer to witness the

2  advisement of the rights.  And the reason that's done in an

3  interview room is because we have the means to utilize other

4  restraints, such as, leg shackles to the ring that is in the

5  floor so that we can remove the handcuffs safely off of

6  someone.

7           This evening, obviously, we were called to the scene

8  for a stabbing.  Our primary purpose there was to investigate a

9  stabbing.  I just said we didn't have the resource to take

10 someone back to the station and conduct an interview when the

11 priority was what we believed may have been a homicide with a

12 stabbing victim.

13 Q.  Are you required to provide a written waiver form of

14 rights?

15 A.  No.

16 Q.  Did you record your interview with Mr. Warren?

17 A.  I believe -- if the car camera was not -- all the car

18 cameras should have been running as they activate when the

19 emergency lights are fully activated on the vehicles.  I

20 haven't reviewed the recording to determine if it was clear or

21 not.

22 Q.  You said that you were there when the gun was recovered;

23 is that right?

24 A.  When Officer Sywyj shouted, I was in the house when he

25 displayed it to me in the house.  I didn't actually see him

1 pick it up.

2 Q.  Do you know what room he cover recovered it from?

3 A.  He recovered --

4          MR. SINDLER:  I object to that.  That's going to be

5 hearsay.  I object on that basis.

6          THE COURT:  That question is capable of a yes or no

7 answer.  We'll see what the follow-up question is.

8          Ms. King, would you restate your question?

9 BY MS. KING:

10 Q.  Do you know which room the firearm was recovered from?

11 A.  Yes, I do.

12 Q.  How do you know that?

13          MR. SINDLER:  Is it personal knowledge, Judge?

14 That's the question.

15          THE COURT:  I don't know yet.

16          I understand your objection.

17          Restate your question, Ms. King.

18 BY MS. KING:

19 Q.  Officer Hoyson, did you enter the house with Mr. Sywyj?

20 A.  Yes.

21 Q.  Did you see where he went as you entered the house?

22 A.  Yes.

23 Q.  Do you know where the gun was recovered based on what you

24 saw?

25 A.  Well, it was in the dining room.  I know the room where it

1   was recovered, behind -- the room behind the wall that the

2   fireplace was contained in in the dining room.

3   Q.   In the dining room area you're referring to?

4   A.   Yes.

5            MS. KING:   No further questions, Your Honor.

6            THE COURT:   Thank you, Ms. King.

7            Mr. Sindler, you may cross-examine.

8            MR. SINDLER:   I need a moment.

9                    CROSS-EXAMINATION

10  BY MR. SINDLER:

11  Q.   In the course of events that night, you overheard a radio

12  report about a gun, prompting you to go further toward the

13  front door or inside of the house; is that right?

14  A.   I actually heard -- I actually heard Officer Sywyj

15  personally verbalize it.

16  Q.   He supposedly said that loudly, correct?

17  A.   Yes.

18  Q.   At the time that you entered, were all the occupants

19  outside of the house?

20  A.   I believe -- at the time I entered, I believe this all

21  occurred right in the doorway.  And when I was in the house,

22  when we began to clear the house for occupants, I didn't

23  encounter anyone else.  I encountered them as they were coming

24  out the door.

25  Q.   That's fine.

1          Before you went inside the house, the occupants were

2    evacuated or cleared from the home, yes?

3    A.  Yes, I would say so.

4    Q.  It's your testimony that there were several people who

5    left the house that night, correct?

6    A.  Yes, that's accurate.

7    Q.  But you don't know their identities.  That was not

8    documented by you or others that night; is that correct?

9    A.  Not by me it was not.

10   Q.  You don't know how many females left the home, do you?

11   A.  I don't recall.

12   Q.  You don't recall how many males left the home at that

13   time?

14   A.  No.

15   Q.  You, obviously, don't know the total number of people who

16   would have been cleared from the home as you were entering it;

17   is that correct?

18   A.  That's correct.

19   Q.  Now, you did this interrogation or this interview with

20   Mr. Warren while both of you were seated inside of a car; is

21   that correct?

22   A.  Yes, that's correct.

23   Q.  Your version is that he was seated in the back seat,

24   correct?

25   A.  That's correct.

1  Q.  And he would have been directly behind the driver's seat;

2  is that right?

3  A.  I would say he could have been behind the passenger seat.

4  What I recall is that Mr. Warren and I were diagonal, so if I

5  was in the driver's seat, he would be behind the passenger

6  seat.

7  Q.  So you entered the car from the driver's side of the

8  vehicle, yes?

9  A.  Yes.

10  Q.  And the driver's side of the vehicle was curbside?  On the

11  sidewalk closest to the home?  Or curbside across the street?

12  A.  As I recall, the car was facing -- the vehicle that

13  Mr. Warren and I were in was facing north on Lincoln Avenue, so

14  the passenger side would have been curbside, the driver's side

15  would have been in the lane of travel.

16  Q.  In the lane of travel, it would be facing, if you will,

17  the correct direction for that lane?

18  A.  Yes.

19  Q.  It wasn't facing the opposite way?

20  A.  That's my recollection, correct.

21  Q.  So did you have to go around the car to enter the vehicle

22  from the driver's side?

23  A.  Yes.

24  Q.  I assume then that upon being placed in the car, it was

25  done by somebody other than you?

1  A.  That's correct.

2  Q.  And that upon being placed in there, Mr. Warren didn't

3  reposition himself, he stayed in the seat that would have been

4  directly behind or on the passenger side?

5  A.  I'm not certain.  I don't know who placed him in there.

6  Q.  I know that, but he was on the passenger side of the

7  vehicle?

8  A.  It's possible to move from side to side.

9  Q.  He's handcuffed from behind his back; is that right?

10  A.  Yes.

11  Q.  Before you supposedly get into this conversation with him,

12  you indicate that he's not required to speak with you, correct?

13  A.  Yes.

14  Q.  He can remain silent in response to your questions, yes?

15  A.  Yes, that's correct.

16  Q.  And that he can instead agree to speak to you if he wants,

17  right?

18  A.  That's correct.

19  Q.  And in the course of making this decision, you had

20  indicated as well that if he wanted, he could have the

21  assistance of a lawyer, correct?

22  A.  That's correct.

23  Q.  Because those are the basics of what we know to be the

24  Miranda warnings to a suspect who the police want to

25  interrogate while he's in custody, correct?

1   A.   That's correct.

2   Q.   Apparently, it was not practical for you to have a rights

3   waiver form handy for him to sign, correct?

4   A.   I wouldn't say not practical to have it handy, but to go

5   through all the entire process and get all the required

6   signatures and initials was not practical that night.

7   Q.   Well, you did testify about this earlier this year.

8              Do you recall that?

9   A.   Yes.

10   Q.   And do you recall answering in response to my questions or

11   that of somebody else that it wasn't practical to have the

12   rights waiver form that night, right?

13   A.   To carry them everywhere we go is what I said, that is

14   correct.

15   Q.   The rights waiver form is one or more than one page?

16   A.   It is one page.

17   Q.   A single sheet of paper?

18   A.   A single sheet of paper.

19   Q.   Is it printed on one side?

20   A.   It is.

21   Q.   You didn't have any on you that night, correct?

22   A.   I didn't personally, someone on scene may have, I didn't.

23   I didn't even look for it.

24   Q.   I'm only asking about you.  You did not have one on you

25   that night?

1    A.   No.

2    Q.   There wasn't one in the car, like in the glove box, was

3    there?

4    A.   I can't recall.  I didn't check.

5    Q.   And then you indicate that the rights that you and I have

6    just reviewed were all waived, that Mr. Warren eventually

7    agreed to speak with you, correct?

8    A.   Yes, that's correct.

9    Q.   That's the understanding you got verbally, not

10   memorialized in any way; is that right?

11   A.   Verbally, yes, that's correct.

12   Q.   Now, would it be safe to say that you were one of about

13   eleven police officers, not about, but one of eleven police

14   officers who showed that night, correct?

15   A.   That's probably accurate, yes.

16   Q.   Well, you didn't do a report in this case; is that right?

17   A.   As it relates to the arrest of Mr. Warren, we didn't.  My

18   partner and I authored a report for the stabbing.

19   Q.   Mr. Sywyj did and your information appears in that, but

20   you didn't separately do a report; is that right?

21   A.   Not under the specific incident number as it relates to

22   the arrest.

23   Q.   That's fine.

24            In that report, do you know or not that there are 11

25   different police officers, including yourself, who are listed

1  as having responded to this incident?

2  A.  I didn't count but that sounds accurate.

3  Q.  It's your position here today that it would not be

4  feasible to take him somewhere else, perhaps to headquarters or

5  a different station to have Mr. Warren interrogated as you had

6  just referred to during direct examination?

7  A.  That's correct.

8  Q.  There was some reference made that there was some camera

9  or recording equipment or both that would have been in this

10 car, but you're not sure if that information or material would

11 have been available in the course of this case, right?

12 A.  I would say it's available, but I would not think -- based

13 on more recent experience, I would say it would be of no value.

14 Q.  Well, that's your opinion, sir, right?

15 A.  Well, I've reviewed videos and the issue we've had that we

16 have tried to overcome recently is the police radio blocks out

17 everything else that is recorded on those microphones.

18 Q.  Your recent experience, though, is different from

19 something that happened three years ago because this did happen

20 three years ago, correct?

21 A.  It's the same -- yes, that's correct.

22 Q.  Now, you had said that you and Mr. Sywyj had authored a

23 report; is that correct?

24 A.  Separate reports.

25 Q.  I'm sorry?

A.   Officer Sywyj authored a report for the shooting, and my
partner and I authored a separate report under a separate
incident number for the stabbing for which we had initially
responded.

Q.   What shooting are you referring to?

A.   I'm sorry, not the shooting, the arrest, the gun arrest.
And Officer Stoddard and I saw authorized a report for the
stabbing.

Q.   Not looking at the stabbing investigation because that is
separate from the gun event, correct?

A.   Correct.

Q.   Mr. Warren was never a suspect in the stabbing; is that
correct?

A.   Not to my knowledge.  I didn't conduct the follow-up on
that.

Q.   In the course of the gun event, you didn't do a separate
report; is that right?

A.   As it relates to the gun, I did not.

Q.   Mr. Sywyj did the report; is that correct?

A.   That's correct.

Q.   And it appears that --

        MR. SINDLER:  I'm sorry, Judge.

BY MR. SINDLER:

Q.   The statement that you supposedly took from Mr. Warren is
important enough in this case because you're separately

1 testifying about it, correct?  It's important with regard to

2 this prosecution, yes?

3  A.  It is important.  I believe it was documented in

4 quotations in Officer Sywyj's report.

5  Q.  Officer Sywyj -- but Mr. Sywyj wasn't present during the

6 interrogation of Mr. Warren, correct?

7  A.  Correct.

8  Q.  Daniel Stoddard wasn't present during the interview with

9 Mr. Warren?

10  A.  That's correct.

11  Q.  And none of the other seven or so police officers that

12 were there that night were present during the interrogation of

13 Mr. Warren, right?

14  A.  That's correct.

15  Q.  It was just you and him when this statement was supposedly

16 taken; is that correct?

17  A.  Yes.

18  Q.  Now, you're in a profession that I imagine is form driven,

19 correct?

20  A.  Yes, absolutely.

21  Q.  You would agree particularly now that you're in a

22 supervisory role that there are such things as accountability;

23 is that right?

24  A.  Yes.

25  Q.  There are things like liability that are of concern,

1  correct?

2  A.   Correct.

3  Q.   In no order of importance, there are things like testimony

4  as well where when one has to testify to things that occurred,

5  a report is vital to recall what happened, yes?

6  A.   Yes.

7  Q.   And I imagine that back in the day, when you were a patrol

8  officer, you no longer are, you were facing a variety of

9  different incidents from shift-to-shift and day-to-day,

10  correct?

11  A.   That's correct.

12  Q.   Property offenses, yes?

13  A.   Yes.

14  Q.   Assaults, yes?

15  A.   Yes.

16  Q.   Traffic offenses, yes?

17  A.   Yes.

18  Q.   Drug offenses?

19  A.   Yes.

20  Q.   Pretty much the entire gamut; is that correct?

21  A.   That's correct.

22  Q.   The things that you're referring to today about statements

23  were not reduced to a certain report by you but were just

24  conveyed to Mr. Sywyj; is that right?

25  A.   That's correct.

1            MR. SINDLER:  That's all, Judge.

2            THE COURT:  Thank you, Mr. Sindler.

3            Ms. King, any redirect?

4            MS. KING:  Just a moment, Your Honor.

5            THE COURT:  Sure.

6                    REDIRECT EXAMINATION

7  BY MS. KING:

8   Q.  Officer Hoyson, you were asked a lot of different

9  questions about the fact that approximately 11 different

10 officers were there that night.  Were those officers there to

11 respond to a stabbing of someone who was perhaps going to die?

12  A.  Yes.

13  Q.  You were not there initially to respond to a call for a

14 person with a gun; is that correct?

15  A.  That's correct.

16            MS. KING:  No further questions.

17            THE COURT:  Thank you, Ms. King.

18            Mr. Hoyson, you may step down, sir.  You're not

19 excused from the trial or courthouse area until you have been

20 informed that that's the case, but you may step down from the

21 witness stand, sir.

22            Ms. King, do you have a further matter?

23            MS. KING:  We do have one more witness, Your Honor.

24 We also would like to read some stipulations into the record,

25 which we could do now or at a later time.

1          THE COURT:  Let me ask you this, Ms. King.

2 Approximately how long do you think the direct examination of

3 that further witness will take.

4          MS. KING:  It's Mr. Ortiz's witness.  Let me consult

5 with him.

6          THE COURT:  Sure.

7      (Whereupon, there was a brief pause in the proceedings.)

8          MS. KING:  Your Honor, it may run up to the 12:30

9 time period, if not, slightly past.

10          THE COURT:  Do you have any objection if after you

11 handle the stipulations we take our lunchtime break for the

12 jury?

13          MS. KING:  Not at all.

14          THE COURT:  Mr. Sindler, does that work for you?

15          MR. SINDLER:  That's fine.

16          THE COURT:  It's my understanding you have two

17 stipulations you'll be reading to the jury at this time.

18          MS. KING:  Yes, Your Honor.

19          THE COURT:  Ladies and gentlemen of the jury, in a

20 moment Ms. King is going to read two stipulations.  I advise

21 you as follows.  The parties have agreed that certain

22 testimony, the parties have agreed what certain testimony would

23 be if presented by a witness.  You should consider that

24 testimony in the same way as if it had been given here in court

25 by a witness.

1          Further, the government and the defendant have also

2   agreed that certain facts are true.  You may, therefore, treat

3   such facts as having been proved.  You are not required to do

4   so, however, since you and you alone are the sole judges of the

5   facts.

6          Ms. King.

7          MS. KING:  Thank you, Your Honor.

8          The first stipulation is that the United States and

9   Atiba Warren stipulate and agree that Atiba Warren was

10  convicted of a crime in state court; that that crime is

11  punishable by imprisonment for a term exceeding one year; and

12  that this prior conviction occurred before October 23, 2012,

13  the date that Atiba Warren is alleged to have possessed the

14  firearm charged in the indictment.

15         The second stipulation is that the United States and

16  Atiba Warren stipulate and agree that if called as a witness,

17  Special Agent Kevin Kaufman from the Bureau of Alcohol,

18  Tobacco, Firearms and Explosives would testify that Government

19  Exhibit 1, which is a Taurus .45LC/.410 caliber pistol, model

20  The Judge, bearing serial number CT 834363 was manufactured

21  before 2012 outside of the United States in the country of

22  Brazil and then traveled in and affecting foreign and

23  interstate commerce before October 23, 2012.

24         THE COURT:  Thank you, Ms. King.

25         THE COURT:  Ms. King and Mr. Sindler, is it

1  appropriate now for the Court to give its recess admonition to

2  the jury and allow the jury to take our midday lunch break.

3          MS. KING:  Yes.

4          THE COURT:  Mr. Sindler?

5          MR. SINDLER:  That's fine.

6          THE COURT:  Ladies and gentlemen of the jury, in a

7  moment we're going to release you to Mr. Babik's care and to go

8  up to the jury room and then to have our midday break for

9  lunch.  I note it's five minutes after twelve.  If you could be

10 back in the jury room by one-fifteen so that would be an hour

11 and ten minutes from now.

12          Ladies and gentlemen, as is the case with every time

13 you're outside of the courtroom until the Court releases you

14 from duty, do not seek out or receive any information in any

15 way, shape or form having anything to do with this case, its

16 participants or the issues involved in it from any source,

17 human, printed, broadcast, transmitted, Internet or otherwise.

18          Do not discuss the case, its participants or any

19 matters or issues involved in it with anyone, including amongst

20 yourselves.  Please advise the Court immediately upon your

21 return should you, inadvertently or otherwise, gather any

22 information regarding the case, its participants or issues, or

23 if anyone seeks to speak with you about the case, its

24 participants or the issues involved in it.

25          I wish you a good lunch break.

1            Mr. Babik, you may assist the jury.

2        (Jury is dismissed from the courtroom.)

3            THE COURT:  You may be seated, everyone.

4            The Court would note that the jury has left the

5    courtroom.  All the other participants remain present.

6            Ms. King, can you give us a little preview of what

7    you anticipate happening from the government this afternoon

8    when we return.

9            MS. KING:  Yes, Your Honor.

10           The government will call William Best from the crime

11   lab and then the government will rest.

12           THE COURT:  Thank you, Ms. King.

13           Mr. Ortiz, as I understand it, you estimate the

14   direct examination of Mr. Best would be approximately 25 to 30

15   minutes.

16           MR. ORTIZ:  I think that's appropriate.

17           THE COURT:  Then, Mr. Sindler, you're certainly not

18   required to at this point, but if you have a sense of what you

19   would want to take up after the government rests, if anything.

20           MR. SINDLER:  We'd like to have the Rule 104

21   hearing.  We'd like you to take into account as to Exhibit J,

22   sorry, we'd like you to take into account the testimony of

23   Mr. Johnson from March --

24           THE COURT:  Which I've read.

25           MR. SINDLER:  -- for foundational purposes.  I

1  think -- I know that the record needs to be supplemented for

2  the sake of that exhibit through additional testimony from

3  Estelle Hayes, who is here.  So, we might get into it and we

4  might hear that it's duplicative, I'm not sure, but I do want

5  to get that exhibit admitted and it may be best to do it when

6  the government -- or after the government rests.

7           THE COURT:  Do you anticipate, and I know you won't

8  know it until you hear it, but based on what you know now,

9  approximately how long do you think your cross-examination of

10 Mr. Best might take?

11          MR. SINDLER:  It won't be that long.  I would

12 suspect it will be brief.  Momentary, probably.

13          THE COURT:  It will probably be too early then to

14 have the break to then have the 104 hearing after the break.

15          Would it be disruptive or prejudicial, Mr. Sindler,

16 if we had the 104 hearing on Exhibit J prior to resuming with

17 Mr. Best this afternoon so that we can just leave the jury in

18 the jury room while we take care of that, make whatever record

19 needs to be made, get a ruling, whatever the ruling is going to

20 be, then we bring the jury back down and proceed in a

21 continuation with the government's case with Mr. Best.

22          MR. SINDLER:  That's fine.

23          THE COURT:  So, let me ask you this, Mr. Sindler.

24 Would you be prepared to proceed with the 104 hearing at

25 approximately one-fifteen?

1          MR. SINDLER:  Yes.

2          THE COURT:  Is that agreeable to you, Ms. King?

3          MS. KING:  Yes, Your Honor.

4          THE COURT:  We'll let the jury come back exactly as

5    instructed, but I would probably be sending you up to tell the

6    jury there are some procedural matters that the Judge needs to

7    handle and we won't bring them down until we get that squared

8    away.

9          Ms. King, anything else we should talk about or take

10   up while we're on the break?

11         MS. KING:  No, Your Honor.

12         THE COURT:  Same question of you, Mr. Sindler?

13         MR. SINDLER:  No.

14         THE COURT:  Mr. Greer, please go to the back of the

15   courtroom and secure the swinging door area while we recess

16   here and the marshals assist Mr. Warren.

17         With that, Mr. Babik, you can recess the court for

18   the lunch break.

19       (Whereupon, there was a brief recess in the proceedings.)

20         THE COURT:  We're back in session.  The jury is in

21   the jury room upstairs.

22         Mr. Warren is present, represented by counsel.

23         Counsel for the United States is present.

24         I have asked Mr. Babik to advise the jury, and he

25   has done so, that the Judge, I was going to need a little time

1 to handle some procedural matters with counsel, so they have

2 been informed.

3          Mr. Sindler?

4          MR. SINDLER:  I'll be right back.

5     ESTELLE HAYES, a witness having been duly sworn, testified

6 as follows:

7          MR. BABIK:  Please state your name for the record.

8          THE WITNESS:  Estelle Hayes.

9          THE COURT:  Ms. Hayes, take the witness stand.  Make

10 yourself comfortable.  Adjust the mic so it works for you.

11          Am I right, consistent with the discussion the Court

12 held with counsel immediately before the noon lunch break, that

13 this is the 104 hearing, Federal Rule of Evidence 104 hearing

14 you've requested regarding the admissibility of proposed

15 Defendant's Exhibit J as to which the United States has filed a

16 motion in limine, which the Court conditionally granted for the

17 reasons stated in its order, subject to honoring the request,

18 which you've made, for a Rule 104 hearing for the Court to make

19 a preliminary determination of admissibility of Exhibit J.

20          Is that the proceeding we're in now, sir?

21          MR. SINDLER:  Yes.

22          THE COURT:  You may proceed, Mr. Sindler.

23                    DIRECT EXAMINATION

24 BY MR. SINDLER:

25  Q.  Tell us who you are.

1  A.  Estelle Hayes.

2  Q.  You reside where?

3  A.  520 Lincoln Avenue.

4  Q.  Do you recall testifying in this room or thereabouts

5  several months ago?

6  A.  Yes, I do.

7  Q.  Do you recall testifying about matters concerning your

8  home?

9  A.  Yes.

10  Q.  Did they concern October 23, 2012?

11  A.  Yes, it did.

12  Q.  I'm going to show you an animation, Ms. Hayes, and ask,

13  running it for 30 seconds or so if you recognize it, then we'll

14  go over pieces of it, parts of it.

15          THE COURT:  Ms. Hayes, if you have any difficulty

16  seeing it, just raise your hand.

17  BY MR. SINDLER:

18  Q.  Ms. Hayes, look at the screen in front of you as I hit

19  play here, please.

20      (Video was played.)

21          MR. SINDLER:  I've stopped it.  It played for

22  approximately 30 seconds.

23  BY MR. SINDLER:

24  Q.  Do you recognize generally what was in front of you on

25  that screen?

```
 1   A.   Yes.

 2   Q.   What do you recognize that to be?

 3   A.   My house.

 4   Q.   How do you so recognize that to be your house?

 5   A.   The color.

 6   Q.   Let me take you through portions of it.

 7   A.   Okay.

 8   Q.   I have since re-adjusted it to the beginning of the

 9   animation.

10            Do you recognize what is in front of you right now?

11   A.   Yes.

12   Q.   What do you recognize that to be?

13   A.   The outside of my home.

14   Q.   You have lived at this house for what period of time, as

15   of now?

16   A.   About five years.

17   Q.   Has it been continuous?

18   A.   Yes.

19   Q.   Do you recall that some individuals were in your home last

20   December of 2014?

21   A.   Yes.

22   Q.   Do you know for what purpose they were there?

23   A.   Ask me that again.

24   Q.   Do you recall the reason why those individuals were in

25   your home back in December of last year?
```

1  A.  Are you talking about the police?

2  Q.  Not the police, I'm talking about some other individuals

3  who were there with me.

4  A.  Oh, yes.  I recall the guys that came out to do the

5  filming of the home, yes.

6  Q.  To do the what?

7  A.  They were taking pictures.

8  Q.  Do you recall for how long they were there?

9  A.  No.

10  Q.  Do you recall what time of the day they were there?

11  A.  Morning.

12  Q.  They were there for the balance of the morning or part of

13  the morning?

14  A.  Balance of the morning.

15  Q.  Now, you were shown this animation before you came into

16  court today, correct?

17  A.  Yes.

18  Q.  Now, you were living in the house on October 23, 2012; is

19  that right?

20  A.  Yes.

21  Q.  Looking at what is in front of you right now, is there

22  anything different in what you see versus what the state of the

23  house may have been back in October of 2012?

24  A.  The furniture is not on the porch.

25  Q.  Is the front door in the same or different place, given

1  this animation, than on October 23, 2012?

2  A.  The same.

3  Q.  How about the pathway from the sidewalk to the front of

4  the house?

5  A.  The same.

6  Q.  How about the front porch in the front of that house?

7  A.  Same.

8  Q.  How about the number of stories that are shown in this

9  picture that is in front of you?

10  A.  It's the same.

11  Q.  There is a covering above this porch.  Was that there back

12  in October of 2012?

13  A.  Yes, it was.

14  Q.  Looking at the current animation, to the left side appears

15  to be that door.

16        Is that correct?

17  A.  Yes.

18  Q.  Do you recall back in October of 2012 how that door that

19  extends open, whether that was there or not?

20  A.  Yes.

21  Q.  Was it there?

22  A.  Yes, it was there.

23  Q.  Is that the way in which it opened back in October of

24  2012?

25  A.  Yes, it is.

1   Q.   Is that the security door to the front of this house?

2   A.   Yes, it is.

3   Q.   Well, let me ask you this.  Is there a second door for

4   this entryway?

5   A.   Yes, there is.

6   Q.   Can you see it in this picture that you have in front of

7   you?

8   A.   Yes, I can.

9   Q.   Does that open in or out?

10  A.   In.

11  Q.   Was it opening in or closing in or closing toward the

12  frame that way back in October of 2012?

13  A.   Yes.

14  Q.   I'm taking this animation, Ms. Hayes, to the foyer, what

15  appears to be the foyer of the home.

16           Is that the foyer?

17  A.   Yes, it is.

18  Q.   Now, looking straight ahead, is that a wall that we're

19  seeing?

20  A.   Yes.

21  Q.   Is that wall or was that wall there in October 2012?

22  A.   Yes.

23  Q.   Can you describe what is in front of you right now, now

24  that I've advanced this animation a bit?

25  A.   The foyer and you can see part of the living room.

1  Q.  The living room is to the left or to the right?

2  A.  To the right.

3  Q.  What is beyond the living room, please?

4  A.  The dining room.

5  Q.  Is there a way between the living room and the dining room

6  that you can reach the dining room?

7  A.  Yes.

8  Q.  What is in that picture in front of you?

9  A.  What did you say?

10  Q.  Do you recall that area of the screen?

11  A.  Yes.

12  Q.  What is that?

13  A.  The entrance to the kitchen.

14  Q.  Is that in the center of the picture?

15  A.  Yes, it is.

16  Q.  Is the kitchen located in the back of the home?

17  A.  Yes.

18  Q.  Was that the place in which the kitchen was located back

19  in October of 2012?

20  A.  Yes.

21  Q.  The walls that you can see in this portion of the

22  animation, did they change or move at all relative to what was

23  the case in October of 2012?

24  A.  No.

25  Q.  Would this be, this picture I'm showing you now, a bigger

1  version of the living room that you just referred to?

2  A.   Yes.

3  Q.   The area that I'm circling for you right now, what is

4  that, please?

5  A.   That's another entrance to the dining room.

6  Q.   Does that make two from the living room to the dining

7  room?

8  A.   Yes.

9  Q.   I'm circling for you a portion in the dining room.  Can

10  you identify that, please?

11  A.   Those are the stairs that lead to the upstairs.

12  Q.   To the second floor?

13  A.   Yes.

14  Q.   Is that the only way up or down to the second floor?

15  A.   Yes, it is.

16  Q.   Perhaps at the expense of repetition, what is this area

17  right here, ma'am?

18  A.   The kitchen, the hallway -- I mean the doorway to the

19  kitchen.

20  Q.   As you just explained before?

21  A.   Yes.

22  Q.   Any of the walls or any of the passageways that have been

23  referred to or that look to be in this frame, were those

24  present in October of 2012?

25  A.   Yes.

1          MR. SINDLER:  That's all I have, Judge.

2          THE COURT:  Okay.

3          Ms. King or Mr. Ortiz, do you have any questions for

4  Ms. Hayes?

5          MS. KING:  No, Your Honor.

6          THE COURT:  Thank you, Ms. King.

7          May Ms. Hayes step down from the witness stand?

8          MR. SINDLER:  She may.  May I speak with her just

9  outside the doors?

10          THE COURT:  Is her testimony and this hearing

11  concluded?

12          MR. SINDLER:  It is in the 104 hearing.

13          THE COURT:  Yes, you may.

14          MR. SINDLER:  Can we have a moment?

15          THE COURT:  We'll pause.  We'll recess right in

16  place.

17          MR. SINDLER:  Judge, she's going to get her coat and

18  exit the courtroom in a moment.

19          THE COURT:  That's fine, Mr. Sindler.

20          Thank you for coming to court, Ms. Hayes.

21          Ms. Kienzle, if the record will reflect Ms. Hayes

22  has left the courtroom.

23      (Ms. Estelle Hayes has exited the courtroom.)

24      (Whereupon, there was a brief pause in the proceedings.)

25          THE COURT:  Mr. Sindler, sir.

1          MR. SINDLER:  I don't have any other testimony to

2    present in the brief hearing.  I tried to cut right to the

3    chase.  You know my arguments, Judge.  You say you have read

4    the various documents.  You've reviewed the animation I think

5    you said several times.  We have established that the material

6    that is in Exhibit J is in the same condition for the sake of

7    what we want to make argument of it in terms of the structure,

8    the floor plan, the perspective is no different in December of

9    2014 when it was done when compared to how it was looking or

10   the shape it was in on October 23, 2012.

11         Sometimes lawyers are paid by the word, I tend to

12   think I'm not one of them.  That's our argument.  We didn't

13   have Ms. Hayes testify back in March with respect to this, so

14   that's why it was important for us to put this on, but in all

15   other respects, I believe we've made the foundation that would

16   be necessary, more than sufficient under Rule 104 in order to

17   let us use it, at least in a demonstrable way in the course of

18   this trial.

19         THE COURT:  Thank you, Mr. Sindler.

20         We'll hear from Ms. King or Mr. Ortiz on the point.

21         Ms. King.

22         MS. KING:  Thank you, Your Honor.

23         As I think is clear from the government's papers on

24   this particular issue, our contention has never been that this

25   animation does not accurately reflect where the walls are

1 located, if there's a ceiling on the porch, if the door opens

2 in or out.  The issue is, aside from Travis Johnson, who will

3 presumably put this piece of evidence in either as a

4 demonstrative or as actual evidence for the defendant, who will

5 testify as to the relevance of this exhibit?

6           Mr. Sindler has indicated in his papers that the

7 point of this is to show Officer Sywyj's perspective, Officer

8 Sywyj's perspective, which he says is best shown at the

9 17-second juncture of this animation.  Mr. Sindler has already

10 indicated previously that he would not be questioning Officer

11 Sywyj about this animation, and he has not done so.  There's

12 no --

13           THE COURT:  At least not yet.

14           MS. KING:  At least not yet.  But he did indicate,

15 unless I misheard him, that he did not intend to present this

16 to him at all.  And so, if he does not do so, I do not see how,

17 even if it's only in closing arguments, how the defense can

18 argue that this is Officer Sywyj's perspective.  There has been

19 no -- there's no evidence of that at all.  So, that is really

20 our issue as to, first of all, know as the Court requested the

21 defendant to provide, what is the purpose this animation and

22 what arguments will come from it?  And as I read the filings in

23 this case, the purpose is to argue what Officer Sywyj's

24 perspective is.  I don't think that is proper, given the basis

25 that we have.  Fine, it reflects where the walls are in the

1  house, but --

2          THE COURT:  Wouldn't it show, Ms. King, the

3  perspective of anyone that walks up the sidewalk, makes a left

4  turn, crosses the sidewalk, walks up and walks through the

5  front door into the foyer, living room and then into the dining

6  room, whether it's Officer Sywyj or Ms. Hayes or Mr. Johnson or

7  anybody else?

8          MS. KING:  Not necessarily.  Officer Sywyj was there

9  with a specific purpose of keeping an eye on what was going on

10 in that room.  So, first of all, this --

11         THE COURT:  It doesn't necessarily show what he in

12 fact did see or didn't see.

13         MS. KING:  Exactly.  And if that is going to be the

14 argument of the defendant that this is what he saw --

15         THE COURT:  How is this any different than what we

16 saw as Government Exhibit 2, 3, 4, 5, 6, 7, 8, and 9?  It's an

17 imperfect analogy, but I remember back as a much younger person

18 getting these things that had a series of pictures and you

19 flipped through them, it made it looked like it moved.  Didn't

20 you walk through a series, appropriately, or at least

21 admissibly GX-2 through 3 just a series of still shots doing

22 this and isn't this simply a moving depiction of someone

23 walking through all of those still photos.

24         MS. KING:  Someone, but not Officer Sywyj.  That's

25 our point.  Officer Sywyj has never testified that that's the

1  path he took.

2           THE COURT:  Didn't he testify this morning that he

3  went up -- if Mr. Sindler started the demonstrative at the base

4  of the front steps, presumably based on Officer Sywyj's

5  testimony, he walked up the front steps.  Now whether he walked

6  across the grass or went up the steps and neatly followed the

7  sidewalk, may or may not be contested, but it doesn't strike

8  the Court as being particularly relevant.  We know, I think,

9  from his testimony today, that he got onto the porch by going

10 up the steps to the porch.  He did some things with the

11 gentleman who had been stabbed, and then he proceeded at

12 various stages into the home through the front door.

13          MS. KING:  Yes, and I'm not saying this is not an

14 accurate representation of what someone did, but on the night

15 in question, Officer Sywyj was standing at the door, he sees

16 Mr. Warren with the gun, according to his testimony, steps

17 inside, orders everybody out, and then goes and retrieves the

18 firearm.  I just think that this animation tends to, I guess

19 depending on how it's used, but it tends to indicate that that

20 is exactly what happened, and that is not exactly what

21 happened.  He stopped as he went --

22          THE COURT:  Can't you call Officer Sywyj, if you

23 want on, redirect and say something akin to, take that look at

24 this.  Is this how it was for you on the night in question?

25 He'll say yes, no, somewhere in between.

1          Isn't Mr. Sindler, and I'm not being critical when I

2    say this, Mr. Sindler, I'm being -- I'm observing, if

3    Mr. Sindler does not know what Officer Sywyj is going to say

4    about this before Mr. Sindler uses it, then he is making an

5    informed legal judgment as to what he will do, depending on

6    what Officer Sywyj would say about it, I think.

7          Is that correct, Mr. Sindler?

8          MR. SINDLER:  Yes.

9          MS. KING:  Your Honor, we could do that, yes, but as

10   it stands right now, the only purpose, the only purpose that

11   the defendant has said that this is coming in for is for

12   Officer Sywyj's perspective.  I do not think that that is

13   appropriate.  If the defendant or the defense can tell us what

14   is the relevance?  I mean the Court asked for that, that is

15   what was said in the papers.  So if that's why it's coming in,

16   if that's why it's being offered, I think that that is not

17   appropriate.

18         THE COURT:  Mr. Sindler, why is it being offered?

19         MR. SINDLER:  You're standing at the doorway, you're

20   standing in the doorway, you're not standing in the house.  I'm

21   going to back this up a little bit from the 16-second point.

22   Wherever you are, you're standing on the front porch about to

23   enter the front door of this home.  I'm taking this, as I said

24   in my papers, to the 16- or 17-second point, which is where he

25   had to have been standing because, as he said particularly in

1  March, he may have said it today, he did not enter the home

2  upon trying to track the movements of Mr. Weathers.  If he says

3  he saw -- at least initially, Mr. Warren standing in the

4  passageway that is in the center of this picture, I'll just

5  circle it, Judge, so we're all on the same page, that being the

6  passageway, it doesn't really matter how tall you are, doesn't

7  really matter where, how you stand in that doorway, as you go

8  further in, you can then see where this corner -- I was trying

9  to refer to that in my paperwork, Judge.  I forget which filing

10 it was.  This is the corner to which I was referring right

11 here, narrows the passageway that Mr. Sywyj, at least today,

12 was trying to indicate was quite wide and was quite expansive

13 through which he could see Mr. Warren.  That is the horizontal

14 line to which I'm referring.

15         Mr. Johnson will testify that that line is only

16 3 1/2 feet across on a scale of measurement, making, due to

17 that corner that I had just recently given a vertical line to

18 on the screen, making the perspective much more narrow for

19 anybody, it doesn't matter whether it's Mr. Sywyj or not, by

20 which he can see or says he can view Mr. Warren.  That's

21 demonstrative evidence to indicate the perspective under which

22 he was operating.

23         THE COURT:  Ms. King, having heard that from

24 Mr. Sindler, what are your thoughts?

25         MS. KING:  I'm glad to know that that's the extent

1  of it.  It remains our position that it is not admissible, but

2  that's, obviously, the Court's decision.

3              THE COURT:  Understood.  Understood.

4              I'm going to allow it.  I'm going to vacate my prior

5  ruling conditionally granting the motion in limine.  I'm going

6  to do that for several reasons.

7              The Court previously made reference to the decision

8  of our Court of Appeals in Altman versus Bobcat.  It says that

9  for demonstrative evidence closely resembling the actual

10 accident -- in that case it was an accident case -- the courts

11 generally require the proponents, in this case, Mr. Warren, to

12 establish that the demonstration shares substantial similarity

13 with accident conditions.  The references there are to the

14 conditions.

15             I find based on Ms. Hayes' testimony, the Court's

16 repeated examination of it, frankly, its comparison to the

17 still photos that have been offered into evidence today, I find

18 that, at minimum, if not more than that, it sufficiently

19 establishes substantial similarity with the conditions at 520

20 Lincoln Avenue in terms of the layout.

21             In looking at ECF No. 121, which is a filing on

22 Mr. Warren's behalf in direct response to the Court's order,

23 and it's entitled Defense Notice of Use of Exhibit A at Trial,

24 I note in particular the reference to notes in it that say,

25 among other things:  Line-of-sight should not be mistaken for

1  undersigned counsel's backdoor attempt to use Exhibit J

2  material as a referendum on what Mr. Sywyj could or could not

3  see while outside.  Rather, line-of-sight refers here to the

4  unobstructed distance between him as the spectator and the

5  objects of his eventual interest.

6          I note that in the final paragraph:  At this

7  juncture, the ground-level perspective of the passageway

8  through which Mr. Sywyj supposedly observed Mr. Warren is

9  narrowed by the presence of a 90-degree corner present where

10 the foyer merges with the front room of 520 Lincoln Avenue.

11 Presence of this corner narrows the line-of-sight of anyone,

12 let alone Mr. Sywyj standing at the threshold of the front

13 entryway.

14         Exhibit E -- which is a still rendition -- does not

15 provide that perspective nor it is properly depicted in

16 Exhibits K through N.  I find that it bears a substantial

17 similarity to the physical layout at 520 Lincoln Avenue, which

18 is relevant to the case.  It displays the various architectural

19 features of the home in a moving fashion.  It displays the

20 perspectives in line-of-sight of anyone that would be traveling

21 those lines.  I think consistent with the decision in Altman,

22 certainly robust examination and cross-examination and redirect

23 examination on this point would be permitted.  The fact that I

24 have concluded that the requisite foundational showing has been

25 made by Ms. Hayes is not a finding by this Court that it, in

1  fact, is what was on the scene at 520 Lincoln Avenue, just

2  simply that it bears the requisite substantial similarity.  The

3  jury starts the trial and ends the trial as the ultimate judge

4  of the facts of what is and what was and what happened and at

5  the end of the day after the Court instructs them on what that

6  all means in the context of the case.

7          So, counsel will be permitted to argue as they will.

8          Mr. Sindler, I think at this point, the foundation

9  would not permit you to argue, or Ms. King to argue, that this

10 is necessarily what Officer Sywyj, or what any person, other

11 than Ms. Hayes, would actually observe walking through the

12 door.  But I think there is a foundational basis for a generic

13 contention by each side, what it is that anyone would observe

14 or not observe as they came through the door at 520 Lincoln

15 Avenue.  Subsequent testimony, one way or the other, may affect

16 what people can argue from this going forward.

17         Mr. Sindler, here's the question.  Exhibit J, are

18 you offering it as an exhibit or are you offering it to be used

19 as a demonstrative aid during trial?

20         MR. SINDLER:  I am offering it as an exhibit.  I

21 have already labeled it.

22         THE COURT:  I didn't know if it was labeled simply

23 for identification or because you were going to offer it.

24         MR. SINDLER:  I'll offer it eventually.  I can offer

25 it now, but at some point I'm going to offer it, so whether

1  it's now or later.

2          THE COURT:  If you do offer it now into the record

3  as an exhibit, Ms. King, what is the government's position on

4  that.

5          MS. KING:  Objection to that.  Relevance.  If the

6  purpose of this and the allowance is to testify about what a

7  general person saw as they walk in, that's not relevant to what

8  Steven Sywyj saw on that night.

9          THE COURT:  I don't mean this to sound

10  smart-alecky -- it may come out that way -- but Officer Sywyj

11  is a person.  So, if the test for relevance is a fact or

12  something that makes a fact of consequence more or less likely

13  to be true, it may make it more or less likely to be true that

14  this is what Officer Sywyj saw.

15          MS. KING:  If he was standing in the exact position

16  of this animation.  If he's standing a foot to the left, it

17  would completely change his perspective of the room.  We don't

18  have that version of this animation.  So, that is really the

19  government's issue here.

20          THE COURT:  Couldn't the same be said for all of the

21  still photographs?

22          MS. KING:  The purpose of the still photographs was

23  to indicate where in the doorway.  I don't think that the

24  testimony came in any other way but where exactly Mr. Warren

25  was seen and to give the jurors just an understanding of what

1  the layout of the house is.

2         THE COURT:  Ms. King, doesn't light travels in a

3  straight line, unless it's bent by refraction or by gravity.

4  So, what is at one end of the line-of-sight means there's

5  something at the other end.  So if Officer Sywyj, as I think I

6  listened and watched him do on the stand, describe where he saw

7  Mr. Warren.  Presumably, he was standing somewhere to see

8  Mr. Warren at that point.  The jury would be permitted either

9  on their own or as a consequence of argument to draw an

10  inference working backwards from where Officer Sywyj was, if he

11  said he saw Mr. Warren at a certain location.  So I think

12  that's in the record, at least inferentially.

13         MS. KING:  Another thing that Officer Sywyj

14  testified was that he was able to see into the living room area

15  of the residence.  And from this viewpoint, from this

16  animation, I don't believe that it shows that.  Not that I'm

17  saying Mr. Sindler is going to argue that, but if the jury is

18  back in the jury room and looking at this and saying, oh, well,

19  look at this, you can't see from this animation into the living

20  room without having a different perspective a foot over to the

21  left where he very well could have been standing.  After seeing

22  into the living room, they might conclude on that basis alone

23  that he was not truthful about that point, which I don't

24  think -- I think that they're going to look at this as this is

25  a recreation of what he saw.  I think there was a hybrid of an

1  element.

2          THE COURT:  Well, I think they clearly will look at

3  it as a recreation of the scene and that's why we went through

4  the ultimate thing.

5          Mr. Sindler, are you going to argue that this is a

6  recreation of what Officer Sywyj saw?

7          MR. SINDLER:  I can't.  I said already that I

8  wouldn't be doing that.  But to Ms. King's point, if he was

9  looking into the living room, if you would credit his testimony

10 from today at least, then he would have to be farther to the

11 left of the threshold so he could position himself, at least

12 his head, to look into that space, which would limit even more

13 his ability to see, due to the presence of that corner, who was

14 or wasn't standing close to or inside of that passageway on the

15 left side.

16         THE COURT:  Please run the animation again,

17 Mr. Sindler.

18         MR. SINDLER:  Do you want it run from a certain

19 point?

20         THE COURT:  Run it back from walking up the front.

21 You may as well start it from the beginning.  It's not that

22 long, Mr. Sindler.  Thank you.

23         MR. SINDLER:  I can slow it if you want.

24         THE COURT:  Let's watch it at the speed it will be

25 shown to the jury.

1        (Video was played.)

2        THE COURT:  Thank you, Mr. Sindler.

3        Ms. King, I think at the beginning, it shows someone

4   moving through the front door into the foyer door.  It doesn't

5   show anybody stopped in a particular location and unless

6   there's an argument that it does not fairly represent what

7   anyone would see traversing in that manner, it certainly does

8   not purport to represent, I don't think, what someone would see

9   stopped, standing in a particular location.

10        Mr. Sindler, do you anticipate using it as an

11  animation or stopping it at various junctures?

12        MR. SINDLER:  I'm going to stop it at the 16- or

13  17-second point, otherwise, I plan on using it as an animation,

14  so both.

15        THE COURT:  Queue it up to 16 or 17 where you would

16  be stopping it, if you would, sir.

17        MR. SINDLER:  It's right there.

18        THE COURT:  I'm looking at the document from the

19  prior hearing record, which at that time had been marked as

20  Exhibit A5.  It was a defense exhibit.  I think a similar one

21  was offered by the United States this morning.  It's a still

22  photo.

23        Does someone have a set of the exhibits from this

24  morning that I could take a peek at?

25        Thank you, Ms. King, I appreciate it.

1          Looking at what has been admitted into the record as

2    Government Exhibit 5, other than the gray chair with the

3    newspapers, unread newspapers on it with the TV off to the

4    left, it's similar layout.  It appears that the lens

5    perspective in Government Exhibit 5 is a bit more to the right,

6    looking through the hallway door, than to the left.

7          But isn't that a matter for argument or

8    cross-examination, Ms. King, given that Government Exhibit 5 is

9    in through Officer Sywyj.  Certainly, the inference, an

10   inference that could be drawn by the jury from Government

11   Exhibit 5, since Officer Sywyj, as I recall, testified, he

12   pointed to the area where he said he saw Mr. Warren through the

13   archway between the living room and dining room, that is where

14   Officer Sywyj was standing.

15         Doesn't the animation at 16, 17 show what the

16   perspective would be if Officer Sywyj was standing somewhere

17   else?

18         So then the issue becomes for the jury to determine,

19   where was he standing?

20         I don't know what the answer to that is.  But isn't

21   that why the jury is here, among other things?  And that

22   counsel can cross-examine and argue -- I mean if there had been

23   a still photo showing exactly what is on the screen now, which

24   is the cell, if you will, at second 16-17 of the animation, if

25   that was a still photo, somebody's Exhibit 5A, would there be

1 an objection to the still photo?

2          MS. KING:  No, if it was a photograph, no.

3          THE COURT:  So what then would be the objection to

4 the animation?

5          MS. KING:  I think we've already -- I've already

6 laid out all of my objections.

7          THE COURT:  Mr. Sindler, I'm going to allow you to

8 use Mr. Johnson, or unless there's a stipulation that

9 Mr. Johnson's testimony in such regard is not necessary, I'm

10 going to allow you to inquire of Mr. Johnson as to how he made

11 Defense Exhibit J.

12          I'm not saying because I have any doubts that you

13 and Ms. King, Mr. Ortiz will follow the rules because you have

14 followed all of them so far, but I would proceed with caution

15 as to what you ask Mr. Johnson to say this represents.

16          I'll defer the rulings on the objection of the

17 United States as to whether this will be permitted to be used

18 as a demonstrative aid during the course of the trial or

19 whether it will be admitted as an exhibit into the evidentiary

20 record until I hear the rest of the testimony, if any, that

21 comes in regarding Exhibit J.  It may come from any number of

22 people beyond Mr. Johnson.  Then outside the presence of the

23 jury, I'll make a ruling on that.

24          Mr. Sindler, your notation that you're moving it as

25 an exhibit into the evidentiary record has been made and is

1  preserved.  You need not renew it in the presence of the jury.

2          You need not, Ms. King, renew your objection in the

3  presence of the jury, you've preserved it, as far as this Court

4  is concerned, and I will rule on it after we hear the balance

5  of the record.

6          I intend to allow appropriately wide ranging

7  cross-examination and then, if necessary, redirect examination

8  about Exhibit J as it is used.

9          And then, at such time as we make a ruling, I make a

10 ruling on whether Exhibit J will be admitted into the record,

11 whether it is or is not, if either side believes an

12 explanatory/limiting instruction to the jury at some subsequent

13 time as to what they may or may not do with Exhibit J, I

14 certainly will take that under advisement.  It may be that both

15 sides have some instruction or advisement that they want me to

16 give the jury in that regard.

17         Mr. Sindler, is there anything further you believe

18 the Court needs to rule on or place on the record at this time

19 regarding Exhibit J?

20         MR. SINDLER:  No.

21         THE COURT:  Ms. King and Mr. Ortiz, same question of

22 you?

23         MS. KING:  No.

24         THE COURT:  Mr. Babik, I'll return this exhibit

25 binder for wherever Ms. King was using it.

1          I note that it is nine minutes after two.  The Court

2  would like an approximately six-minute recess.  I'll anticipate

3  being back on the bench at two-fifteen.

4          If counsel needs a recess, go ahead and take it.

5          Ms. King and Mr. Ortiz, is there anything else we

6  should take up before we resume and bring the jury down?

7          MS. KING:  No.

8          THE COURT:  Mr. Sindler, same question?

9          MR. SINDLER:  No.

10     (Whereupon, there was a brief recess in the proceedings.)

11          THE COURT:  Please note that Mr. Warren is present,

12  represented by counsel.

13          Ms. King and Mr. Ortiz are here for the United

14  States.

15          Before I ask Mr. Babik to bring the jury down, I do

16  make a specific 403 ruling and finding on the record that at

17  least for purposes of presenting it and using it in conjunction

18  with the testimony, and at a minimum a demonstrative device

19  prior to making a ruling on its admissibility as an exhibit

20  into the evidentiary record as to Defendant's Exhibit J, I find

21  based on the entire context of the evidentiary record that has

22  been developed so far, the Court does not believe that Exhibit

23  J as a demonstrative is prejudicial at all, let alone that any

24  prejudicial impact substantially outweighs its probative value.

25  It's not inconsistent with the probative value of the still

1  photographs which have been offered and admitted into the

2  record today.  I find that there is not any substantial risk or

3  even risk at all at the moment of jury confusion based upon the

4  standards outlined by our Court of Appeals in Altman versus

5  Bobcat Company, based on the foundational testimony that was

6  offered during the Rule 104 hearing as to the substantial or

7  even more than substantial similarity between the architectural

8  depiction contained in Defendant's Exhibit J and the actual

9  conditions of the residence at 520 Lincoln Avenue.

10          So, to the extent it's appropriate or required that

11  I make a more explanatory Rule 403 ruling and finding, that's

12  my ruling and finding to this point.

13          Mr. Sindler, any reason we can't bring the jury down

14  and resume?

15          MR. SINDLER:  No.

16          THE COURT:  Ms. King and Mr. Ortiz?

17          MS. KING:  No.

18          THE COURT:  Mr. Babik, please bring the jury down.

19      (Jury enters the courtroom.)

20          THE COURT:  Ms. Kienzle, if you'll note that all

21  twelve seated members of the jury and our two alternates have

22  returned to the courtroom.

23          Mr. Warren is present and represented by

24  Mr. Sindler.

25          Ms. King and Mr. Ortiz are present for the United

1  States.

2         Ladies and gentlemen of the jury, thank you for

3  bearing with the Court as we got a little bit of a late start

4  to our afternoon session.  I would explain that, A, I am the

5  cause of the that delay, and B, the reason I was the cause is

6  that I had several procedural matters I needed to go over with

7  counsel for the parties, so that's why we had a little bit

8  later start.

9         My thought is since it's now 2:25, we may dispense

10 with our formal afternoon break.  We will take an appropriate

11 moment to at least stretch partway through, but I would repeat

12 what I said this morning, if anyone does need a break, no

13 problem at all.  At the next available time, do the break sign,

14 if it's right now, raise your hand and we would make sure that

15 we take a break.

16         Ms. King and Mr. Ortiz, do you have another witness?

17         MR. ORTIZ:  We do, Your Honor.

18         The government calls Mr. William Best.

19         THE COURT:  Mr. William Best.

20         Mr. Best, if you'd please come to the well of the

21 courtroom to be sworn.

22     WILLIAM BEST, a witness having been duly sworn, testified

23 as follows:

24         MR. BABIK:  Please state your name for the record.

25         THE WITNESS:  William Best.

1          THE COURT:  Mr. Best, if you could take the witness

2  stand right over here, sir.

3          Make yourself comfortable, sir.  Adjust the

4  microphone so it works for you.  There is water if you need

5  refreshment during your testimony.  Keep your voice up so we

6  can all hear you.

7          Mr. Ortiz, you may examine.

8                    DIRECT EXAMINATION

9  BY MR. ORTIZ:

10  Q.  Good afternoon.

11          Sir, are you currently employed?

12  A.  Yes.

13  Q.  By whom?

14  A.  I am employed by the Allegheny County Medical Examiner's

15  Office, Forensic Laboratory Division.

16  Q.  Do you have a specific title?

17  A.  Yes.  I am a scientist assigned full time to the Firearms

18  and Toolmarks Section of the lab.

19  Q.  How long have you been employed there?

20  A.  A little over seven years now.

21  Q.  Can you walk the jury through your progression of various

22  positions over the course of those seven years?

23  A.  Yes.  I was hired by the laboratory in 2008 and was

24  assigned to the Firearms and Toolmarks Section of the

25  laboratory.

1   Q.   Before that, did you work as an intern at the same lab?

2   A.   No, I did not, not at the lab.

3   Q.   Where is the lab actually physically located?

4   A.   The laboratory is located at 1520 Penn Avenue in

5   Pittsburgh, Pennsylvania.

6   Q.   Is that here in the Strip District?

7   A.   Yes, it is.

8   Q.   Before you got employment with the lab, what was your

9   educational background?

10   A.   I obtained a Bachelor's degree in biology from Duquesne

11   University in 2007.

12            In 2008, I obtained a Master's degree in forensic

13   science and law, also from Duquesne University.

14   Q.   Could you briefly explain the main areas of focus as your

15   job as a scientist for the lab.

16   A.   Within the Firearms and Toolmarks Section?

17   Q.   Yes.

18   A.   There are a range of duties assigned to the Firearms and

19   Toolmarks Section.

20            We compare discharge components, that being spent

21   cartridge cases and projectiles to each other.

22            We perform operability and barrel length

23   examinations on firearms.

24            We perform serial number restoration examinations.

25            We also perform NIBIN or BRASSTRAX data entry and

1  review.

2          We also perform muzzle-to-target distance

3  determinations.

4  Q.  Can you explain what NIBIN and BRASSTRAX review means.

5  A.  Yes.  NIBIN stands for the National Integrated Ballistic

6  Information Network.  It's a system that we use, which is the

7  BRASSTRAX system.  It's a system that we use to link different

8  shooting cases or incidents to each other or a number of

9  shooting incidents to a particular firearm.

10 Q.  Is it fair to say that for the firearms and toolmarks

11 analysis work that you do, the majority of it concerns the

12 analysis and operability of firearms as well as examination of

13 various tools?

14 A.  Yes, it does.

15 Q.  In addition to doing that for the lab, do you also work

16 for the Mobile Crime Unit?

17 A.  Yes.  I also voluntarily serve as part of the laboratory

18 of the Mobile Crime Unit.

19 Q.  Generally, what is it the Mobile Crime Unit does?

20 A.  The Mobile Crime Unit is responsibile for responding to

21 crime scene assistance details that can be requested by any

22 agency within the Allegheny County area.  So we will respond to

23 that crime scene as requested by the agency that the crime

24 happens in.

25 Q.  If you were to respond to a particular crime scene, what

1 sort of roles would you fill as a scientist in the Mobile Crime

2 Unit?

3  A.  There are a number of roles associated with that.  General

4 crime scene processing would include photographs, notes,

5 sketches, the collection of various types of evidence,

6 processing of items of evidence on scene.  I can process items

7 for latent print examinations on scene.  I can also do

8 trajectory determination, blood spatter analysis, as I said it

9 is a lot of collecting various types, pieces of evidence.

10 Q.  In order to perform that role, did you have to take any

11 special classes, courses or training?

12 A.  Yes, there was an entire training program while employed

13 at the laboratory specifically for the Mobile Crime Unit

14 Division of that lab.

15 Q.  Does the Mobile Crime Unit actually get called out for

16 every crime scene or how is your use made?

17 A.  If an agency within Allegheny County requests our

18 assistance to come out and assist them with the processing of a

19 scene, then we will respond.

20 Q.  But if you are not requested?

21 A.  Then we wouldn't.

22 Q.  You mentioned that through your work with the mobile crime

23 lab, part of your role is to recover and document various forms

24 of evidence?

25 A.  Yes.

1   Q.   Is there any particular type of evidence that the Mobile

2   Crime Unit is called for?  Do you do any special -- have any

3   difficulty in collecting that evidence?

4   A.   There may be -- many times we are called to assist with

5   investigations involving burglaries, robberies, home invasions

6   where the special education and training by the scientists on

7   the Mobile Crime Unit may better assist the agency in

8   processing that scene.

9   Q.   What in that circumstance would you be assisting in

10  processing?

11  A.   Oftentimes that would be latent prints.

12  Q.   In your experience, are latent prints easy or difficult to

13  recover?

14  A.   They can be very difficult.

15  Q.   Why is that?

16  A.   There are a number of factors that can be associated with

17  making that difficult, environmental factors.  So, for example,

18  rain, humidity, heat, the condition that the item that you're

19  trying to collect that latent print evidence from.  Also latent

20  print evidence is very fragile, it can be easily destroyed or

21  damaged if not handled and taking special precautions when

22  packaging.  So, the collection, documentation is very difficult

23  for that particular piece of evidence.

24  Q.   You mentioned that you took special training in order to

25  work for the Mobile Crime Unit.  In addition to that, have you

1   had other training to move through your progression of

2   positions with the lab?

3   A.   Yes.   I have attended numerous, within the laboratory and

4   outside the laboratory, training opportunities.

5   Q.   Did you specifically take a course in serial number

6   restorations?

7   A.   Yes, I did.   That was a course that was presented by the

8   ATF and it was held at the ATF National Laboratory located in

9   Washington, D.C.

10  Q.   By ATF, is that the Bureau of Alcohol, Tobacco, Firearms

11  and Explosives?

12  A.   Yes.

13  Q.   In relation to your job with firearms and toolmarks

14  analysis, have you also gone out to tour firearms facilities?

15  A.   Yes.   I have toured the Smith & Wesson factory located in

16  Springfield, Massachusetts, as well as E.R. Shaw, they are a

17  barrel manufacturing facility located in Bridgeville,

18  Pennsylvania.

19  Q.   Have you also toured other forensics laboratories?

20  A.   Yes, I have, numerous.

21  Q.   Can you name some of the laboratories you have toured?

22  A.   I have toured the ATF National Laboratory in Washington,

23  D.C.; the ATF National Laboratory located in Atlanta, Georgia;

24  the Canton Stark County Laboratory located in Canton, Ohio; the

25  Pennsylvania State Police Laboratory located in Greensburg,

1  Pennsylvania; and also the Connecticut State Crime Laboratory

2  located in Marion, Connecticut.

3  Q.  By way of your position with the laboratory, do you also

4  participate in any scientific studies?

5  A.  Yes, I do.

6  Q.  Have you been published in any recognized scientific

7  journal?

8  A.  Yes, I have.

9  Q.  What journal would that be?

10  A.  NIST Journal, National Institute of Science and

11  Technology.

12  Q.  Have you also by way of your position been a presenter or

13  a lecturer to any group of bodied people?

14  A.  Yes, I have.

15  Q.  Where have you lectured?

16  A.  I have lectured for the Montour High School, I did a

17  presentation on DNA evidence that deals with our positions

18  within the laboratory.  I have also lectured, guest lectured

19  numerous times for the University of Pittsburgh Law School.

20  Q.  Have you also lectured for Duquesne University Forensic

21  Science and Law Fraternity?

22  A.  Yes, I have.

23  Q.  By way of your work with the lab, when you perform an

24  exam, do you also have to prepare a report in relation to the

25  analysis that you do?

1  A.   Yes.

2  Q.   Are those reports peer reviewed for accuracy?

3  A.   Yes, they are.

4  Q.   Through your role with the firearms and toolmarks

5  analysis section, do you perform what are known as operability

6  exams of seized firearms?

7  A.   Yes.

8  Q.   Can you explain generally to the jury what an operability

9  exam is?

10  A.   When asked to perform an operability examination on a

11  firearm that is submitted to the laboratory, basically what I

12  am doing is I'm making sure that that firearm is operable or

13  capable of discharging a projectile.

14          I'm also checking to see if that firearm has been

15  altered or changed in any way.

16          I'm also checking to make sure all of the equipped

17  safety mechanisms associated with that firearm are functioning

18  properly.

19  Q.   Is it fair to say that your exam is to see if the firearm

20  works as a firearm should?

21  A.   Correct, yes.

22  Q.   Can you explain to the jury what a projectile is or what

23  you mean specifically by projectile?

24  A.   A projectile is also referred to as a bullet.

25  Q.   Now, can you explain to the jury how specifically a

1  revolver mechanically operates?

2   A.   Yes.  A revolver is a type of firearm, typically a

3  handgun, where it has a cylinder associated with the frame of

4  the revolver, it's integral to the frame of the revolver.  In

5  order to operate or load that type of firearm, you're going to

6  have to open the action or the cylinder somehow and then insert

7  the cartridges or ammunition into that cylinder.  You would

8  then place that cylinder into the battery position in order for

9  that firearm to be able to discharge.

10  Q.   Have you performed operability exams on revolvers before?

11  A.   Yes, numerous.

12  Q.   Could you approximate how many?

13  A.   A few thousand.

14  Q.   How about semi-automatic handguns, have you performed

15  operability exams on them?

16  A.   Yes, also a few thousand.

17  Q.   Where are those operability exams conducted?

18  A.   They're conducted within the laboratory.

19  Q.   Can you explain to the jury what your area for testing the

20  operability of a firearm looks like?

21  A.   Yes.  We have a room specifically for the test firing of

22  firearms.  Within that room, we have a shooting tank, that's a

23  large stainless steel tank of water where we're able to safely

24  discharge the firearm into that tank of water.  Also, we're

25  able to recover the undamaged, pristine projectiles.  However,

1 if the firearm is excessively large or excessively powerful, we

2 cannot discharge that firearm into the water tank, we also have

3 an indoor shooting range that can hold up to that .50 BMG

4 firearm.

5 Q.  Again, those sort of exams are done here at the lab in the

6 Strip District?

7 A.  That's correct.

8 Q.  Do you also perform examinations for the presence of

9 serial numbers on firearms?

10 A.  Yes.  I'm going to examine the firearm to make sure if it

11 has a serial number, that that serial number is recorded

12 correctly and is not altered or obliterated in any way.

13 Q.  Based upon your training and experience, are you aware of

14 why firearms have serial numbers on them?

15 A.  Yes, it's for tracking for ownership, record of sales, so,

16 to be able to track through that firearm who should own that

17 firearm.

18 Q.  Are you familiar with the term obliterated in reference to

19 firearm serial numbers?

20 A.  Yes.

21 Q.  What does that term mean to you?

22 A.  Obliterated would mean that the serial number has been

23 altered to the point where it is no longer legible or readable

24 by myself.

25 Q.  Now, the exam for serial numbers, you've done that before?

1  A.  Yes, numerous times.

2  Q.  Have you ever been asked to resurrect an obliterated

3  serial number?

4  A.  Yes, numerous times.

5  Q.  Can you explain generally that process.

6  A.  First, I'm going to examine the firearm and find where the

7  serial number should be and if that serial number has been

8  altered or obliterated.  If it has been obliterated, I'm going

9  to examine the type of obliteration to see what my first method

10 of restoring that obliterated serial number is going to be.

11 Typically, the first method is going to be a grinding or

12 polishing method in order to take out all of the rough

13 imperfections left by many of the obliteration, the common

14 obliteration techniques.  Once that surface is smooth and as

15 smooth as possible, then I will apply different acids that

16 acidly etch away the metal in order to restore that serial

17 number.

18 Q.  Can you explain specifically how the acid will allow, for

19 lack of a better term, the resurrection of the previously

20 obliterated serial number?

21 A.  Yes.  When a serial number is stamped or however it is

22 applied to the firearm, the crystalline structure of the metal

23 in the area where that serial number is applied changes.  So,

24 the acids that we apply to that firearm react quicker to the

25 changed or altered area where the serial number was stamped

1 rather than the area surrounding that serial number.

2 Q.  By way of applying the acid, that would reveal the number;

3 is that correct?

4 A.  Yes.

5 Q.  Have you ever been called upon to testify in any court of

6 law in relation to your employment with the lab?

7 A.  Yes.

8 Q.  What sort of courts have you testified in?

9 A.  I have testified in the Allegheny County Court of Common

10 Pleas, the Beaver County Court of Common Pleas, and the U.S.

11 District Court Western Pennsylvania District.

12 Q.  Do you recall which judges you've testified before in the

13 Western District of Pennsylvania?

14 A.  Yes.  The Honorable Judge Conti and the Honorable

15 Judge McVerry.

16 Q.  Were all of those forms of testimony in relation to

17 criminal cases?

18 A.  Yes, they were.

19 Q.  Were you testifying as a government witness or as a

20 defense witness?

21 A.  I have testified as both.

22 Q.  Approximately how many times have you testified as a

23 defense witness?

24 A.  Only once.

25 Q.  During the course of those testimonies that you have

1  given, have you ever been deemed an expert in any particular

2  field?

3  A.  Yes.

4  Q.  Approximately how many times have you been deemed an

5  expert?

6  A.  All of them.  So, I've testified a little over 50 times.

7  Q.  So you have been deemed an expert approximately 50 times?

8  A.  Yes.

9  Q.  Were you deemed an expert in the area of toolmarks

10  analysis?

11  A.  Yes.

12  Q.  How about in the operability of firearms?

13  A.  Yes.

14  Q.  How about in the restoration official serial numbers?

15  A.  Yes.

16         MR. ORTIZ:  At this time, I offer Mr. Best as an

17  expert in the fields of firearms operability, toolmarks

18  analysis, and serial number restoration.

19         THE COURT:  Is it your intention to request that he

20  be permitted to testify in the form authorized by the Federal

21  Rule of Evidence 702?

22         MR. ORTIZ:  Yes.

23         THE COURT:  Mr. Sindler, do you have any voir dire

24  on qualifications, background, experience, or the other matters

25  contemplated by Rule 702?

1          MR. SINDLER:  No.

2          THE COURT:  Do you have any objection to the tender

3  made by Mr. Ortiz as to the basis or status of Mr. Best as a

4  witness?

5          MR. SINDLER:  No.

6          THE COURT:  I do find that by virtue of his

7  education, skills, experience and training, that Mr. Best is

8  qualified to offer testimony in the form of an opinion on the

9  areas that you've denominated, Mr. Ortiz.

10          You may proceed.

11          Mr. Ortiz, if you would pause for one moment.

12      (Whereupon, there was a brief pause in the proceedings.)

13          THE COURT:  You may proceed.

14          MR. ORTIZ:  Thank you, Your Honor.

15          May I approach?

16          THE COURT:  You may.

17  BY MR. ORTIZ:

18  Q.  Mr. Best, I'm handing you what is in evidence as

19  Government Exhibit No. 1.

20          Do you recognize that item?

21  A.  Yes, I do.

22  Q.  How do you recognize it?

23  A.  There is a tag that has been applied to the trigger guard

24  of that firearm that has my initials and the date that I

25  applied that tag to the firearm.

1    Q.   Why was that tag placed upon that firearm?

2    A.   This is the firearm that I examined, submitted under

3    laboratory case No. 12LAB10174.

4    Q.   Now, before we talk about the exams you performed on

5    Government Exhibit No. 1, can you explain to the jury how it is

6    you came into possession of Government Exhibit No. 1.

7    A.   Yes, typically for operability examinations, we will

8    receive a request from either the U.S. Attorney's office or the

9    Court of Common Pleas requesting that a particular firearm be

10   examined for a specific court date for operability

11   examinations.

12            So at that point, once the request is put on my

13   desk, I will then send a request to the evidence custodian

14   personnel for them to retrieve that piece of evidence from our

15   evidence vault and then transfer that piece of evidence to my

16   custody.

17   Q.   Once it is in your custody, then you perform the exams?

18   A.   Yes.

19   Q.   Now, you described earlier how a revolver operates

20   mechanically?

21   A.   Yes.

22   Q.   Can you please hold up and display to the jury Government

23   Exhibit No. 1 and point out the various pieces of Government

24   Exhibit No. 1 that cause the firearm to function.

25   A.   Yes.   One of the pieces that I talked about previously was

1   the cylinder of the revolver.  That would be this large

2   circular part right here.  The ammunition or cartridges would

3   be inserted into the rear of the cylinder.  That cylinder then

4   would be swung into the frame and placed into the battery

5   position.

6           At that point, either the firearm can be discharged

7   single or double action since it has the presence of a hammer.

8   So, either for a single action discharge you would manually

9   cock the hammer and then pull the trigger, the bullet, the

10  projectile would travel down and out the muzzle of the firearm.

11  If you want to discharge the firearm double action, you would

12  not have to manually cock the hammer, you would -- simply

13  pulling the trigger would cock the hammer and at a certain

14  point, that hammer would be released and strike the primer of

15  the cartridge causing that cartridge to discharge.

16  Q.   That firearm, Government Exhibit No. 1, is a Taurus Judge

17  firearm; is that correct?

18  A.   Correct.

19  Q.   Are you familiar with that type of firearm?

20  A.   Yes.

21  Q.   Is it designed to shoot a particular type of ammunition?

22  A.   It's actually designed to shoot two different types of

23  ammunition.

24  Q.   What two types would that be?

25  A.   The first type would be a center fire cartridge, which is

1 common to many different firearms, but it's also designed to

2 discharge a specific caliber of shot shell, a .410 gauge shot

3 shell.  So it's capable of discharging a center fire cartridge

4 and also capable of discharging a shot shell.

5 Q.  In your experience on examining firearms, is it common to

6 see a firearm that is specifically designed to shoot two

7 different types of caliber of ammunition?

8             MR. SINDLER:  I would object.  That's irrelevant.

9             THE COURT:  Sustained.

10 BY MR. ORTIZ:

11 Q.  You said that you eventually performed an operability exam

12 on Government Exhibit No. 1; is that right?

13 A.  Correct.

14 Q.  Can you explain to the jury the specific steps that you

15 took during the course of your operability exam.

16 A.  Yes.  Once the firearm was transferred into my custody,

17 the first thing that I was going to do -- that I always do is

18 check and make sure that the firearm is unloaded and safe for

19 me to handle.

20             Once it's determined that that firearm is unloaded,

21 I will then begin checking and making sure any of the safety

22 mechanisms associated with that firearm appear to be

23 functioning.  I'm also going to measure the barrel of the

24 firearm and record the make, model, caliber, and serial number

25 of that firearm.

1          At that point, I will then take the firearm into our

2 shooting room and manually shoot the firearm in order to

3 determine if it is operable or not.

4 Q.  You performed those steps on this firearm?

5 A.  Yes, I did.

6 Q.  Do you recall the specific type of ammunition that you

7 used to test the operability of that firearm?

8 A.  Yes.  This revolver was test fired using 45 Long Colt

9 ammunition.

10 Q.  Why was that type of ammunition used?

11 A.  That was the type of ammunition that was also submitted

12 with the firearm.

13 Q.  Did you also perform a serial number recovery on

14 Government Exhibit No. 1?

15 A.  Yes.  It was observed that the serial number located on

16 the frame of the revolver was obliterated and also a duplicate

17 serial number located on the barrel was also obliterated.

18 Q.  What steps did you take initially prior to performing the

19 full restoration of the serial number?

20 A.  First, I would examine the serial numbers as submitted and

21 take photographs of those serial numbers as submitted to see if

22 there were any characters at all that could be made out prior

23 to any attempts at recovery.

24          The next part of the examinations would be

25 determining the types of metal that those serial numbers were

1  stamped on because that's important, the type of metal can

2  dictate which type of acid I'm going to use and attempt to

3  restore that serial number.

4   Q.  Did you first perform the visual examination of the

5  firearm?

6   A.  Yes, I did.

7   Q.  Based upon your visual examination, could you determine

8  what type of tool had been used to obliterate the serial

9  numbers?

10   A.  Yes.  It was likely -- the method of obliteration was

11  likely a sharp-pointed tool that was used to repeatedly scratch

12  over the area where the serial number was stamped.

13   Q.  Did you perform the grinding of the metal surrounding the

14  two serial numbers?

15   A.  Yes, I did polish both of the obliterated areas to make

16  them as smooth as possible.

17   Q.  After you did that, did you do the acid re-agent test that

18  you had described before?

19   A.  Yes, I did.

20   Q.  What did you see?

21   A.  I was able to fully restore both serial numbers, the one

22  located on the frame and the serial number located on the

23  barrel.

24   Q.  During the course of your serial number restoration

25  examination, did you take any photographs of Government Exhibit

1  No. 1 as you're moving through the process?

2  A.  Yes.  I would take photographs at each step of the

3  process.  I took photographs as the firearm and the serial

4  numbers were submitted, photographs after I was done polishing

5  the serial numbers, and the final product photographs after the

6  acid etching technique was applied.

7              MR. ORTIZ:  Your Honor, at this time, I'd like to

8  publish to the jury what has been entered into evidence as

9  Government Exhibit No. 1C.

10              THE COURT:  You may do so, Mr. Ortiz.

11  BY MR. ORTIZ:

12  Q.  Mr. Best, Government Exhibit No. 1C is a photograph?

13  A.  Yes.

14  Q.  Do you recognize that photograph?

15  A.  Yes, that's a photograph that I took.

16  Q.  Of what?

17  A.  That would be the obliterated area of the serial number

18  located on the revolver's barrel.

19  Q.  That was taken prior to performing the acid recovery exam?

20  A.  Yes.

21              MR. ORTIZ:  I ask permission to displace Government

22  Exhibit 1D?

23              THE COURT:  You may do so, Mr. Ortiz.

24  BY MR. ORTIZ:

25  Q.  Mr. Best, what is depicted in 1D?

1  A.  That would be a photograph of the restored serial number

2  located on the revolver's barrel after the acid etching.

3  Q.  Now, comparing Government Exhibit 1C to 1D, can you

4  explain to the jury the steps that you had to do to get from

5  what you saw in 1C to the result in 1D?

6  A.  Like I said, first I had to polish that serial number.  As

7  you can see in the first photograph, the surface was very rough

8  and textured, so I polished out many of those scratches,

9  however, I don't want to polish too deep because if I remove

10  too much metal during the polishing process, then the acid

11  etching process isn't going to be successful.

12          So, after it is polished to the point where it is

13  suitable to apply the acid etchings, then I would take the acid

14  etchings, using a cotton-tipped swabs and swab over the area

15  where the serial number is located.

16  Q.  Did you perform the same examination for a second serial

17  number upon Government Exhibit No. 1?

18  A.  Yes.

19  Q.  Where was that second serial number located?

20  A.  That serial number was located on the revolver's frame.

21          MR. ORTIZ:  At this time, I'd ask permission to

22  publish to the jury Government Exhibit 1E.

23          THE COURT:  You may do so, Mr. Ortiz.

24  BY MR. ORTIZ:

25  Q.  Mr. Best, do you recognize what is in 1E?

1  A.  Yes.

2  Q.  What is that?

3  A.  That is a photograph of the serial number located on the

4  revolver's frame.

5  Q.  Did you take that picture?

6  A.  Yes, I did.

7  Q.  In the time period of when you were performing your serial

8  number recovery exam, is this a pre-photo or a post-photo?

9  A.  That would be as submitted.

10  Q.  That is a picture of the obliterated number?

11  A.  Correct.

12            MR. ORTIZ:  I'd ask permission to display 1F.

13            THE COURT:  You may do so, Mr. Ortiz.

14  BY MR. ORTIZ:

15  Q.  Mr. Best, take that look at what --

16            MR. ORTIZ:  I apologize.  We have a misnumbering of

17  the exhibit.  I'll renumber it after Mr. Best's testimony.

18            THE COURT:  The exhibit that is on the screen is

19  intended to be 1F?

20            MR. ORTIZ:  Yes.

21            THE COURT:  It is consistent with the exhibits

22  reviewed earlier?

23            MR. ORTIZ:  Yes.

24  BY MR. ORTIZ:

25  Q.  Can you look at what is now marked Exhibit 1F.

1                 Can you explain what you see in that photograph?

2    A.   That would be the restored serial number located on the

3    revolver's frame, which is a photograph that I took.

4    Q.   That is after your acid recovery examination?

5    A.   Correct.

6    Q.   Mr. Best, do you still have Government Exhibit No. 1 in

7    front of you?

8    A.   Yes.

9    Q.   Could you hold that up and display it to the jury, please.

10   A.   Yes.

11   Q.   Now pointing to Government Exhibit No. 1, could you first

12   indicate where the serial number that is located on the barrel

13   is located?

14   A.   Yes.  That would have been located right in this area

15   right here.

16   Q.   Can you point to the serial number that was located on the

17   frame that was previously obliterated?

18   A.   This area right here.

19   Q.   Mr. Best, in your expert opinion, is the serial number on

20   Government Exhibit No. 1 CT 834363?

21   A.   Yes, that would be the serial number that I restored on

22   both the frame and the barrel.

23   Q.   In your expert opinion, is Government Exhibit No. 1 a

24   firearm?

25   A.   Yes.

1  Q.  In your expert opinion, is it an operable firearm?

2  A.  Yes.  It was test fired and found to be in good operating

3  condition.

4  Q.  In your expert opinion, was Government Exhibit No. 1 able

5  to discharge a projectile, that being a round of ammunition?

6  A.  Yes.

7  Q.  Was that discharged by way of an action of an explosive?

8  A.  Yes.

9            MR. ORTIZ:  One moment.

10           THE COURT:  You may, Mr. Ortiz.

11           MR. ORTIZ:  No further questions.

12           THE COURT:  Thank you, Mr. Ortiz.

13           Mr. Sindler, any cross-examination, sir?

14                    CROSS-EXAMINATION

15 BY MR. SINDLER:

16 Q.  In the course of your examinations of defiled serial

17 numbers, you make no determination, do you, about who did the

18 defilement?

19 A.  No, I don't.

20 Q.  There was no determination made in this case?

21 A.  No.

22 Q.  The submission of a weapon, a firearm for fingerprints

23 depends upon the agency or the officer for the agency who is

24 making the request, correct?

25 A.  Correct.  When items of evidence are submitted to the

1  laboratory, a laboratory submission form is associated with

2  that particular piece of evidence.  Those are filled out to

3  explain to the laboratory which examinations the submitting

4  agency is requesting to be performed on items of evidence.

5  Q.   When something is submitted for fingerprint analysis, it's

6  not at the behest of or initiated by a member of the Allegheny

7  County Medical Examiner's office, correct?

8  A.   No.

9  Q.   Now, you mentioned there is a lab number associated with

10  this.  Can you read that again, please.

11  A.   Yes.  It is laboratory case No. 12LAB10174.

12  Q.   Does the 12 have some significance in this case?

13  A.   Yes, that means that the item of evidence was submitted in

14  the year 2012.

15  Q.   Now, you had said earlier, too, and correct me if I'm

16  wrong, submissions are usually made at the request of either

17  the Court of Common Pleas or the U.S. Attorney's office?

18  A.   The request to work a particular piece of evidence out of

19  turn.

20  Q.   Out of turn?

21  A.   Yes.  The laboratory has a backlog associated with

22  different sections, so we do not work items of evidence as they

23  are submitted to the laboratory.  We work items of evidence

24  typically when they are requested for specific court dates.

25  Q.   Do you know when this item was submitted for analysis?

1  A.  I can tell you exactly when the item was submitted to the

2  laboratory.

3  Q.  When was that?

4  A.  It was submitted on October 24, 2012.

5  Q.  So at the time, it would have been submitted by a member

6  of the Pittsburgh police force?

7  A.  Yes.  It was specifically submitted by Officer T. McBride.

8  Q.  Who is with the Pittsburgh police, correct?

9  A.  Correct.

10  Q.  Now, you don't know under what conditions this firearm was

11  seized, do you?

12  A.  I do not.

13  Q.  You did mention, though, in response to one of Mr. Ortiz's

14  questions that sometimes environmental factors can affect the

15  integrity that would go into whether or not fingerprints can be

16  lifted from a firearm?

17  A.  Yes.

18  Q.  Looking at this firearm, though, without doing anything

19  more, a fingerprint or two or more that could have been lifted

20  from this gun, correct?

21  A.  Possibly.

22  Q.  Not from the grip, so to speak, right?

23  A.  Correct.

24  Q.  Because that's rubber?

25  A.  Correct.  Fingerprints are typically successfully

1  recovered from smooth, flat surfaces.

2  Q.  One of the environmental factors that may affect the

3  integrity of lifting prints may be the manner in which the item

4  is seized, correct?

5  A.  Correct.

6  Q.  Because if the person is not wearing coverings over his or

7  her hands, that can affect who may have touched it, just in

8  terms of linking a fingerprint earlier, correct?

9  A.  Yes.

10  Q.  Now, you mentioned some testimony earlier about the Mobile

11  Crime Unit.  Does the Mobile Crime Unit to which you referred

12  that is connected with Allegheny County work at all within the

13  City of Pittsburgh?

14  A.  We typically do not, but we actually have in a few

15  instances where we responded to incidents within the City of

16  Pittsburgh.

17  Q.  The City of Pittsburgh, though, has it own, if you will,

18  division or department for Mobile Crime Unit work?

19  A.  Yes, they do.

20          MR. SINDLER:  One second.

21          That's all we have.

22          THE COURT:  Thank you, Mr. Sindler.

23          Mr. Ortiz, any redirect?

24          MR. ORTIZ:  No, Your Honor.

25          THE COURT:  Mr. Ortiz, let me ask you this.  Do you

1 anticipate recalling Mr. Best to the witness stand during the

2 course of this trial?  Do you want me to excuse him or ask him

3 remain on call?

4          MR. ORTIZ:  I think he can be excused.

5          THE COURT:  Mr. Sindler, is it okay if we excuse

6 this witness to go about his business, sir?

7          MR. SINDLER:  Yes.

8          THE COURT:  Mr. Best, sir, thank you for coming to

9 federal court.  You are excused from further service as a

10 witness.  You're free to remain or go about your business.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  Mr. Best, please return Government

13 Exhibit 1 to government's counsel table, sir.

14          Ms. King and Mr. Ortiz?

15          MS. KING:  The government rests, Your Honor.

16          THE COURT:  Thank you, Ms. King.

17          May I see counsel at sidebar.

18    (Whereupon, there was a discussion at sidebar.)

19          THE COURT:  We're at sidebar at the Court's request.

20 Present is Mr. Warren, his lawyer, Mr. Sindler, Ms. King and

21 Mr. Ortiz.

22          We have only been in session for about 40 minutes so

23 I would not normally take a jury break but the government has

24 closed.

25          Mr. Sindler, is there any matter to take care of, or

1  Ms. King and Mr. Ortiz?

2              MR. SINDLER:  Not right now.

3              THE COURT:  Ms. King, same question?

4              MS. KING:  No.

5              THE COURT:  That concludes the sidebar.

6              MR. SINDLER:  I need a moment to retrieve a witness.

7              THE COURT:  We are going to keep going, we'll let

8  the jury continue to stretch.

9          (Whereupon, the discussion at sidebar ended.)

10         (Whereupon, there was a brief pause in the proceedings.)

11             MR. SINDLER:  Defense calls Estelle Hayes.

12         ESTELLE HAYES, a witness having been duly sworn, testified

13  as follows:

14             MR. BABIK:  Please state your name for the record.

15             THE WITNESS:  Estelle Hayes.

16             THE COURT:  Ms. Hayes, if you'd take a chair in the

17  witness stand.  Adjust the mic so it works for you.  I ask that

18  you keep your voice up.  If you need water, there is some

19  there.

20             We took a brief pause in place while Mr. Sindler

21  exited the courtroom and escorted Ms. Hayes back into the

22  courtroom.

23             Mr. Greer can you confirm for the record there were

24  no proceedings, discussions, conversations or any other matters

25  while Mr. Sindler was absent from the courtroom?

1           MR. GREER:  I so confirm.

2           THE COURT:  Thank you, Mr. Greer.

3           Mr. Sindler, you may proceed.

4                    DIRECT EXAMINATION

5   BY MR. SINDLER:

6   Q.  Would you tell us who you are, please.

7   A.  Estelle Hayes.

8           THE COURT:  Mr. Sindler, if you could flip that

9   toggle switch on the podium mic, that would be great.

10  BY MR. SINDLER:

11  Q.  Where do you reside?

12  A.  520 Lincoln Avenue.

13  Q.  How long have you resided there?

14  A.  Five years.

15  Q.  Has it been continuous?

16  A.  Yes.

17  Q.  Were you residing there on October 23, 2012?

18  A.  Yes.

19  Q.  For what period of time -- I'm sorry, do you own or rent

20  the home?

21  A.  I rent.

22  Q.  What kind of a home do you live in?

23  A.  Two-story single house.

24  Q.  What part of the city or where is it located within

25  Allegheny County?

1    A.   Larimer Avenue -- I mean Larimer.

2    Q.   Larimer?

3    A.   Yes.

4    Q.   Since you have been living there, have you alone resided

5    there or have other people resided there as well?

6    A.   Other people have resided there as well.

7    Q.   Now, looking back at October 23, 2012, do you recall who

8    was living there?

9    A.   Yes.

10   Q.   Who was that?

11   A.   Atiba Warren.

12   Q.   Is he at all related to you?

13   A.   No.

14   Q.   Do you see him here in the courtroom?

15   A.   Yes, I do.

16   Q.   Can you point him out?

17   A.   Over there.

18   Q.   Well, the record has to show how you recognize him.

19   A.   Do I recognize him?

20   Q.   What is he wearing?

21   A.   He's the defendant, wearing a black shirt, white

22   undershirt, glasses, bald head.

23            MR. SINDLER:  Can I ask that the record show she has

24   identified Mr. Warren?

25            THE COURT:  It does show that, Mr. Sindler.

1  BY MR. SINDLER:

2  Q.  How long have you known Mr. Warren, Ms. Hayes?

3  A.  Five years -- no, about four years.

4  Q.  Has that been continuous?

5  A.  Yes.

6  Q.  Do you recall how you met him?

7  A.  I met him through my granddaughter.

8  Q.  Your granddaughter's name is?

9  A.  Jakeera Burbank.

10  Q.  How through your granddaughter would you have met

11  Mr. Warren?

12  A.  He was staying there at her home.

13  Q.  Where does she live?

14  A.  East Hills.

15  Q.  Now, at the time you had met him, what was your marital

16  status?

17  A.  I was married.

18  Q.  Married to a man named who?

19  A.  Duwane Hayes.

20  Q.  Was he at the time living with you or not?

21  A.  Yes, he was.

22  Q.  For what period of time was he living with you at 520

23  Lincoln Avenue?

24  A.  From 2011 to 2013.

25  Q.  Was there a reason why he stopped living with you at 520

1  Lincoln Avenue?

2  A.   Yes.  He had health issues and alcohol problems.

3  Q.   Did he eventually move out?

4  A.   Yes.

5  Q.   In the course of getting to know Mr. Warren, did there

6  come a time when he began living with you?

7  A.   Yes.

8  Q.   Why was that?

9  A.   Something had happened between my granddaughter and him.

10  Q.   Regardless of what that would have been, though, why would

11  that have resulted him living with you at 520?

12  A.   He didn't have any place to go and my husband said he

13  could stay there.

14  Q.   I'm sorry?

15  A.   My husband offered him a room.

16  Q.   When did this come about?

17  A.   Around January of 2012.

18  Q.   At the time, what were the financial arrangements, if any,

19  with Mr. Warren?

20  A.   He was to pay $200 a month in rent and buy his own food.

21  Q.   Did he pay the rent?

22  A.   Yes.

23  Q.   Did he pay it on time?

24  A.   Yes.

25  Q.   How about the food?

1  A.   Yes.

2  Q.   Now, was he given his own bedroom or what were the

3  arrangements he was given upon coming to your home?

4  A.   He had his own room.

5  Q.   This is on which part of the house?

6  A.   Second floor.

7  Q.   I'm going to walk you through some exhibits and ask if you

8  can identify them with respect to 520 Lincoln Avenue.

9          Is that okay?

10  A.   Okay.

11          MR. SINDLER:   Judge, I expect to show on the screen

12  that everyone will be able to see various exhibits that we've

13  already gone over with the government that purport to show the

14  residence about which we're talking and didn't want to start

15  doing that before running that or getting that on the record.

16          THE COURT:   Okay.

17          Does Ms. King and Mr. Ortiz know exactly which

18  exhibits you're about to show and go through with Ms. Hayes?

19          MS. KING:   Yes, Your Honor, we do.

20          THE COURT:   Ms. King and Mr. Ortiz, do you have any

21  objection to Mr. Sindler showing the exhibits he's about to

22  show on the display screens in our courtroom?

23          MS. KING:   No, Your Honor.

24          THE COURT:   You may proceed, Mr. Sindler.

25          Thank you, Ms. King.

```
 1  BY MR. SINDLER:
 2  Q.  Do you see a screen in front of you?
 3  A.  Yes, I do.
 4  Q.  Do you see what has been marked as Exhibit A?
 5  A.  Yes.
 6  Q.  Do you recognize that?
 7  A.  Yes.
 8  Q.  What do you recognize it to be?
 9  A.  The outside of my home.
10  Q.  I'm sorry?
11  A.  The outside of my home.
12  Q.  Can you describe what part of this house this is?
13  A.  The front.
14  Q.  Is it the front walkway?
15  A.  Yes, it is.
16  Q.  Does it lead up to the front porch?
17  A.  Yes, it does.
18  Q.  Do you see in front of you Exhibit B?
19  A.  Yes.
20  Q.  Does that differ at all from Exhibit A in any way?
21  A.  No.
22  Q.  Is it about the same?
23  A.  Yes, it is.
24  Q.  Do you see Exhibit C in front of you?
25  A.  Yes, I do.
```

1  Q.  What does that depict, please?

2  A.  The front porch.

3  Q.  Do you know when these pictures were taken?  Were these

4  taken after October 23, 2012?

5  A.  Yes.

6  Q.  Now, the furniture you see on the porch, does that bear

7  any resemblance to what was on the porch three years ago?

8  A.  Yes.

9  Q.  How so?

10 A.  The love seat and the table, all that was there.

11 Q.  Now when you say the love seat --

12 A.  That's the couch, yes.

13 Q.  I'm sorry.  You can actually put your finger to the

14 screen.  Can you circle the love seat, please?

15 A.  I think this is the love seat right here.

16         THE COURT:  If you actually touch the screen, ma'am,

17 it will show up.

18         THE WITNESS:  If I touch the screen?

19         THE COURT:  Yes, ma'am.

20 BY MR. SINDLER:

21 Q.  Is that the love seat?

22 A.  Yes.

23 Q.  Was the other item of furniture on that front porch as

24 well --

25 A.  Yes.

1    Q.   -- back in October of 2012?

2    A.   Yes, it was.

3    Q.   I'm showing you Exhibit D.

4              Do you recognize that?

5    A.   Yes.

6    Q.   What does that depict, please?

7    A.   The front porch.

8    Q.   Of the same house?

9    A.   Of the same house, yes.

10   Q.   Do you see Exhibit E in front of you?

11   A.   Yes, I do.

12   Q.   What does that show?

13   A.   That is the entrance into the house.

14   Q.   When you say the entrance, is that the view from the area

15   that I'm circling on Exhibit D?

16   A.   Yes.

17   Q.   Same one, once you go through that front door?

18   A.   Once you go through that front door, yes, that's what

19   you'll see.

20   Q.   The area directly within view of Exhibit E, which is up in

21   front of you, what does that depict, please?  What does that

22   show?

23   A.   Say that again.

24   Q.   The area directly --

25   A.   To the right?

1  Q.  Within -- right here I'm circling for you, what does that

2  depict right here?

3  A.  That's the foyer.

4  Q.  The foyer?

5  A.  Yes.

6  Q.  What is straight ahead in the area that I'm circling, this

7  passageway?

8  A.  The dining room.

9  Q.  Is there an area beyond that?

10  A.  The kitchen.

11  Q.  I'm showing you Exhibit F.

12           Do you recognize that?

13  A.  Yes.

14  Q.  What do you recognize that to be?

15  A.  That's the living room.

16  Q.  The living room.  Is that directly in the front of the

17  house?

18  A.  Yes, it is.

19  Q.  The area that I'm circling for you right now, is that what

20  we had seen on Exhibit E?

21  A.  Yes.

22  Q.  The area I'm circling for you right now, what does that

23  depict, please?

24  A.  That's another entrance.

25  Q.  Would that be to a different room than the living room?

1   A.   No, to the same room.

2   Q.   But where is it -- to which room is that?

3   A.   It leads to the dining room.

4   Q.   Just so we're clear, is this area right here a fireplace?

5   A.   Yes, it is.

6   Q.   Do you see Exhibit G?

7   A.   Yes.

8   Q.   What does that show, please?

9   A.   The dining room.

10   Q.   The area right here, do you recognize that?

11   A.   Yes.

12   Q.   What is that?

13   A.   That's the doorway to the kitchen.

14   Q.   So it's a separate passageway?

15   A.   Yes.

16   Q.   Do you recognize Exhibit H, which is in front of you?

17   A.   Yes, I do.

18   Q.   What do you recognize that to be?

19   A.   Sidewalk leading -- the steps leading upstairs.

20   Q.   Would the steps be in this direction?

21   A.   Yes.

22   Q.   And is that the only way up or down?

23   A.   Yes, it is.

24   Q.   I'm sorry, to or from the second floor?

25   A.   Yes, it is.

1  Q.  Do you recognize Exhibit I?

2  A.  Kitchen, yes.

3  Q.  If you went to the left or right, would that be the entire

4  kitchen area through that passageway?

5  A.  Yes, it would.

6  Q.  Now, as of the time that Mr. Warren began living with you,

7  for what period of time did that arrangement, that living

8  arrangement continue?

9  A.  From January 2012 until he was arrested.

10  Q.  Do you recall went that was?

11  A.  2013.

12  Q.  I'm sorry?

13  A.  2013.

14  Q.  If I said to you October 23, 2012, would that help you

15  with your memory?

16  A.  Okay.

17  Q.  Were you present on the night that he was arrested?

18  A.  No.

19  Q.  Were you present at the house the night that he was

20  arrested?

21  A.  Yes.

22  Q.  Do you recall what time he was arrested, about?  Was it

23  daylight or was it evening?

24  A.  It was evening.

25  Q.  Given that it was evening, do you recall your routine when

1  you went down for the night?  Or were you up?

2  A.  No, I was in the bed.

3  Q.  Do you recall about what time you had gone to bed at that

4  time?

5  A.  That's about seven.

6  Q.  At the time, do you have a specific recall or was that

7  just your general routine?

8  A.  That's my general routine.

9  Q.  At the time that you were going down for the night three

10 years ago, who was residing in the house at the time?

11 A.  Atiba Warren.

12 Q.  And who else?

13 A.  My son.

14 Q.  Where was your husband?

15 A.  He was in his own apartment.

16 Q.  Had he already moved out?

17 A.  Yes.

18 Q.  Now, I imagine you have other family; is that correct?

19 A.  Yes.

20 Q.  Was there any other family living in your house at the

21 time or right before Mr. Warren was arrested?

22 A.  No.

23 Q.  Were there any grandchildren living there?

24 A.  No.

25 Q.  Do you have any sons or daughters?

1   A.   Yes.

2   Q.   Were they living there at the time?

3   A.   No.

4   Q.   When you went down for the evening, did you have a bedroom

5   on the second floor or on the first floor?

6   A.   Second floor.

7   Q.   Do you recall that night whether or not Mr. Warren was

8   home when you retired for the evening?

9   A.   Yes, he was.

10   Q.   Was he in a separate bedroom?

11   A.   Yes, he was.

12   Q.   As part of your routine at the time when you went down for

13   the evening, so to speak, what arrangements, if any, did you

14   make to secure the house?

15   A.   I made sure all the doors were locked and the porch light

16   on, the light on from the upstairs.

17   Q.   I'm sorry?

18   A.   The hallway light.

19   Q.   For the upstairs?

20   A.   Yes.

21   Q.   Were there any lights that were left on in the interior of

22   the first floor?

23   A.   The light over the stove.

24   Q.   Would that be in the kitchen?

25   A.   Kitchen, yes.

1  Q.  Did you leave any lights on in the dining room?

2  A.  No.

3  Q.  Did you leave any lights on in the living room?

4  A.  No.

5  Q.  Were any lights left on in the foyer?

6  A.  No.

7  Q.  The front entryway?

8  A.  No.

9  Q.  What would be the state of the window treatments or the

10 window blinds or curtains, if any, when you would go down for

11 the evening?

12 A.  They would be closed.

13 Q.  Would they be drawn?

14 A.  Yes, drawn.

15 Q.  When did you become aware of the events of October 23,

16 2012?

17 A.  A young man named Omar, I heard him yelling through my

18 house saying:  Mamma, Bull been stabbed.

19 Q.  Who has been stabbed?

20 A.  Duwane, my son.

21 Q.  Does Omar have a last name or is that a nickname?

22 A.  His name is DeShawn Weathers.

23 Q.  Was he inside of your house when you had heard this?

24 A.  Yes, he was.

25 Q.  Do you recall how he gained entry to your home?

1   A.   No.

2   Q.   Now, you mentioned that you secure your doors to your

3   home; is that right?

4   A.   Right.

5   Q.   Besides the front door, where would any other door be

6   located?

7   A.   The side.

8   Q.   I'm sorry?

9   A.   The side of the house.

10   Q.   Is that like an entryway, similar to the front door?

11   A.   Yes.

12   Q.   What did you learn later on, if anything, about one or

13   both of those doors?

14   A.   That he had forced his way in.

15   Q.   Now, this man named Omar, is that somebody with whom you

16   were familiar?

17   A.   Yes.

18   Q.   How so?

19   A.   He was a friend of my kids.

20   Q.   How long had you known him?

21   A.   I have known him since '97.

22   Q.   I'm sorry?

23   A.   Since 1997.

24   Q.   Would that be a continuous period of time?

25   A.   Yes.

1  Q.  Is it somebody who lived in the neighborhood?

2  A.  No.

3  Q.  Do you know where he lived, if at all, if you knew where

4  he lived?

5  A.  He lived in East Liberty.

6  Q.  Had he been to your home before?

7  A.  Yes.

8  Q.  You knew him, I suppose, fairly well?

9  A.  Yes.

10  Q.  Did you recognize his voice when you heard the statements

11  being shouted out?

12  A.  Yes, I did.

13  Q.  What did that prompt you to do?

14  A.  Get up and come down the steps.

15  Q.  Were you fully sleeping at the time?

16  A.  No.

17  Q.  Were you semi-awake?

18  A.  Yes.

19  Q.  I imagine you put on some additional clothing to come

20  downstairs?

21  A.  I had my -- no, I didn't.  I had a lounging robe on.

22  Q.  Did you descend the stairs that we were looking at or

23  referring to in Exhibit H?

24  A.  Yes, I did.

25  Q.  What did you do when you came downstairs?

1  A.  I went to the front door.

2  Q.  What did you find when you came to the front door?

3  A.  My son was laying on the couch and there was people

4  everywhere.

5  Q.  I'm going to show you Exhibit C, Ms. Hayes.

6          Do you see it in front of you?

7  A.  Yes.

8  Q.  Do you recall which piece of furniture, if they're noted

9  there on Exhibit C, on which your son may have been laying?

10  A.  Right here.

11  Q.  The furniture to the left?

12  A.  Yes.

13  Q.  Where were you standing at the time?

14  A.  In the doorway.

15  Q.  Were you peering out?

16  A.  Yes.

17  Q.  Was anybody around you in your immediate vicinity?

18  A.  The officer and paramedics.

19  Q.  So there were various first responders?

20  A.  Yes.

21  Q.  When you had left your room to come downstairs, do you

22  know where Mr. Warren would have been at the time?

23  A.  Upstairs.

24  Q.  He remained in his room?

25  A.  Yes.

1  Q.  Did you come across anybody on the way from the upstairs,

2  your bedroom, down to the first floor door?

3  A.  No.

4  Q.  Do you know where Omar or Mr. Weathers was located?

5  A.  Outside.

6  Q.  Do you know where outside?

7  A.  No.  No, I don't.  I think he was in the front.

8  Q.  Was your attention at the time focussed upon your son?

9  A.  Yes, it was.

10  Q.  Do you recall how long you were standing there watching

11  people tend to his care?

12  A.  No, I don't.

13  Q.  But you stayed there for a certain amount of time before

14  you did something next, correct?

15  A.  Correct.

16  Q.  What would have happened next?

17  A.  I heard a police officer say "gun."

18  Q.  Where was this police officer located?

19  A.  On the screen door.

20  Q.  Was he the person standing next to you?

21  A.  Yes.

22  Q.  Do you recall any other police officers around you besides

23  that one person?

24  A.  No, I don't.

25  Q.  What did you do when you heard that?

1   A.  I turned and I looked.  He ordered me out the house.

2   Q.  Did you leave the house?

3   A.  Yes.

4   Q.  Where did you go?

5   A.  On the porch.

6   Q.  Did you just stay there for the time being?

7   A.  Yes.

8            MR. SINDLER:  Judge, may I have a sidebar very

9   quickly, please.

10           THE COURT:  We'll go to sidebar.

11     (Whereupon, there was a discussion at sidebar.)

12           THE COURT:  We're at sidebar.  Present are

13   Mr. Sindler, Ms. King, and Mr. Ortiz.

14           Mr. Sindler, do you conclude that Mr.  Warren is not

15   present at sidebar and that's okay with him.

16           MR. SINDLER:  Yes and yes.

17           THE COURT:  You requested a sidebar.

18           MR. SINDLER:  I didn't mention this earlier, but I'm

19   going a little out of order with my witnesses just due to

20   availability issues and I don't need to get into that, but I'm

21   going to be going into some of the work that Mr. Johnson did,

22   even though Johnson is not going to be testifying today.  Now

23   they have already been admitted or they have been jointly

24   agreed to, K, L, M and N, for starters, and those --

25           THE COURT:  These are the four isometrics that I

1 have already ruled have been admitted into evidence.

2          MR. SINDLER:  Yes.  We're going to be also having

3 her discuss or explain Exhibit J, with the parameters that you

4 discussed, or we talked about earlier today.

5          THE COURT:  Let's cut those two into two halves.

6          Ms. King and Mr. Ortiz, do you have any objection if

7 prior to Mr. Johnson's testimony Mr. Sindler uses with

8 Ms. Hayes the isometric Exhibits J, K, L and --

9          MR. SINDLER:  K, L, M and N.

10          MS. KING:  No.

11          THE COURT:  So you can use those.

12          How do you intend on identifying the one you showed

13 us in this case?  What do you intend on saying to her they are?

14 Would you just say, please look at this.

15          MR. SINDLER:  I'm going to ask her to identify them.

16 Hopefully, she'll recognize them.  We have already gone over

17 this before.

18          THE COURT:  Is she going to say they're a

19 technologically developed thing, or is she going to say that's

20 a floor plan of my house.

21          MR. SINDLER:  That's that a floor plan of my house.

22          Now, let's go to J.

23          Any objections anyone has had to anything, as far as

24 I'm concerned, they have been made and preserved.

25          Do you have any objection if he uses J with

1 Ms. Hayes?

2             MS. KING:  No.

3             THE COURT:  How do you plan on describing that to

4 her?

5             MR. SINDLER:  Again, just a different view of the

6 floor plan.  I don't -- I'm not going to be getting into what a

7 police officer or anyone else could have seen that night.

8             THE COURT:  Do you plan on stopping it anywhere

9 other than at the approximately 16- to 17-second area where you

10 said --

11             MR. SINDLER:  I was going to show her the 30-second

12 animation.

13             THE COURT:  That's fine.

14             Anything else at sidebar?

15             MR. SINDLER:  No.

16             THE COURT:  Now, I know it's a bit unpredictable,

17 but if you do all that, how long do you think the balance of

18 her direct will be?

19             MR. SINDLER:  I think about ten or so minutes.

20             THE COURT:  We've had a request for a break, do you

21 mind if we take a break at this moment?

22             MR. SINDLER:  That's fine.

23             THE COURT:  Is that fine with you, Ms. King and

24 Mr. Ortiz?

25             MS. KING:  That is fine.

1          THE COURT:  I'll tell them we've had a request for a

2 break.  Mr. Babik will take them up and then we'll bring them

3 back down.

4          Anything else we need to conduct at sidebar?

5          MR. SINDLER:  No.

6          MS. KING:  No.

7     (Whereupon, the discussion at sidebar ended.)

8          THE COURT:  We're back on the record in open court.

9 All prior participants and the jury remain present.

10          Ladies and gentlemen, there are two announcements

11 the Court.  First, it's getting a little warm in here.  There's

12 nothing I can do about that, we have tried.

13          Second, we've had a request for a non-urgent break,

14 and in consultation with counsel, this appears to be an

15 appropriate time to take it.

16          When you return, Ms. Hayes will remain on the stand

17 for further questioning.

18          At this point, we're going to take a recess until

19 approximately 3:35.

20          As with all other recesses during the course of our

21 trial, ladies and gentlemen, do not discuss the case, its

22 participants, issues or any matters related to it with anyone

23 else, including amongst yourselves.  Do not seek out or receive

24 any information about the case, the issues involved in it or

25 the participants from any source of any nature, form, or

1 content and should anyone attempt to discuss any of those

2 matters with you while we're on break, please advise Mr. Babik

3 of that as promptly as possible.

4          Mr. Babik, you may assist the jury.

5       (Jury is dismissed from courtroom.)

6          THE COURT:  Ms. Hayes, you're welcome to step down

7 from the stand.

8          Mr. Greer, if you would recess the court, sir.

9       (Whereupon, there was a brief recess in the proceedings.)

10          THE COURT:  Ms. Kienzle, if you'd note that

11 Mr. Warren is presented, represented by his lawyer,

12 Mr. Sindler.

13          Ms. King and Mr. Ortiz are present on behalf of the

14 United States.

15          Ms. Hayes is still in the courtroom.

16          Mr. Sindler, may Ms. Hayes take the witness stand?

17          MR. SINDLER:  Yes.

18          THE COURT:  Ms. Hayes, if you step forward, I remind

19 you that you remain under oath.

20          Mr. Sindler, any issues to take care of before we

21 bring the jury back down?

22          MR. SINDLER:  No.

23          THE COURT:  Mr. Ortiz and Ms. King, same question to

24 you?

25          MS. KING:  No, Your Honor.

1           THE COURT:  Mr. Babik, you may bring the jury back

2   down.

3       (Jury enters the courtroom.)

4           THE COURT:  Please be seated, everyone.

5           If you would note that all twelve seated members of

6   the jury are present, as are the two alternates.

7           Mr. Warren is present, represented by counsel.

8           Ms. King and Mr. Ortiz are here for the government.

9           Ms. Hayes remains on the stand and under oath.

10           Mr. Sindler, you were examining, sir.

11  BY MR. SINDLER:

12  Q.  Ms. Hayes, can you look at the screen in front of you,

13  please.

14  A.  Yes.

15  Q.  Do you see Exhibit K in front of you?

16  A.  Yes.

17  Q.  Do you recognize Exhibit K?

18  A.  Yes.

19  Q.  What do you recognize that to be?

20  A.  The inside of my home.

21  Q.  Which part of that home does Exhibit K show, please?

22  A.  The living room, the dining room, the kitchen.

23  Q.  Would these things be on the first floor of your home?

24  A.  Yes.

25  Q.  Does it appear that the second floor is missing?

1    A.   Yes.

2    Q.   And the roof as well?

3    A.   Yes.

4    Q.   If you can put an X in the area where the dining room is

5    located, please, or a checkmark.

6    A.   (Witness marks exhibit.)

7    Q.   Can you put an X or a checkmark where the living room is

8    located?

9    A.   (Witness marks exhibit.)

10   Q.   And then one more please for the kitchen area.

11   A.   (Witness marks exhibit.)

12   Q.   We had showed you exhibits earlier that referred to the

13   front entryway to the home.

14           Do you see that on Exhibit K?

15   A.   Yes.

16   Q.   Can you put a spot or a check somewhere?

17   A.   You said entrance, right?

18   Q.   Yes.

19           Where is the doorway located relative to that X you

20   just placed there?

21   A.   Over here.  Right in there. (Witness marks exhibit.)

22   Q.   Now, you recall testimony earlier this afternoon where you

23   had descended the stairs to the front door.

24           Do you recall that?

25   A.   Yes, I do.

1   Q.   Can you draw a line, if you will, of the direction that

2   you had taken once reaching the first floor and going on to the

3   doorway.

4   A.   I would come down these stairs and go through here.

5        (Witness marks exhibit.)

6            MR. SINDLER:   One second, Judge.

7   BY MR. SINDLER:

8   Q.   Ms. Hayes, I'm showing you Exhibit F one more time.

9            Do you see that?

10  A.   Yes, I do.

11  Q.   Do you see the two passageways that you had referred to

12  earlier in your testimony?

13  A.   Yes, I do.

14  Q.   Can you just put an X or checkmark next to each of those

15  passageways.

16  A.   (Witness marks exhibit.)

17  Q.   I'm going to pull back up for your review Exhibit K.

18           Can you put, using the screen again as your guide,

19  note where those two passageways are located on Exhibit K,

20  please.

21  A.   Right here.   (Witness marks exhibit.)

22  Q.   The one toward the bottom of the screen is not one you had

23  passed through on going to the front door on October 23, 2012,

24  correct?

25  A.   Correct.

1   Q.   I'm going to erase what you just marked.

2            One final question on this exhibit.  Do you see or

3   note there where the front porch for the house would be

4   located?

5   A.   It would be out here. (Witness marks exhibit.)

6   Q.   Would it be that rectangle you just put an X through?

7   A.   Yes, yes, it would be.

8   Q.   Ms. Hayes, I'm pulling up for view right now on the screen

9   in front of you --

10            MR. SINDLER:  Just give me a moment, Judge.

11            THE COURT:  No problem.  In fact, if we would take a

12   pause for one moment, Mr. Sindler, as you're working on that

13   before you begin.

14            MR. SINDLER:  May I have a sidebar, please?

15            THE COURT:  One moment, Mr. Sindler, and we will.

16       (Whereupon, there was a discussion at sidebar.)

17            THE COURT:  We're at sidebar at the request of

18   Mr. Sindler.

19            Present are Mr. Sindler, Ms. King and Mr. Ortiz.

20            Mr. Sindler, Mr. Warren is not here.  Do you waive

21   his presence at the sidebar?

22            MR. SINDLER:  I do.

23            It's a little embarrassing, Judge.  I did all these

24   things ahead of time to make sure technology is working.

25            THE COURT:  You can't get the video to work?

1            MR. SINDLER:  I was using this an hour or two ago.

2  I'm not doing anything differently.  I don't want to hold

3  things up.

4            THE COURT:  What would you like to do?

5            MR. SINDLER:  I can't recall her tomorrow, she has

6  employment issues.

7            THE COURT:  Do you want to see if we can get Mr. Fox

8  up here to see if he can work on it?

9            MR. SINDLER:  Sure.

10            THE COURT:  We'll do that.

11            I'll explain to the jury that there's a little

12  difficulty with the Court's equipment, we're going to have our

13  technician come up.  We're going to have Mr. Babik take them to

14  the jury room for a few minutes while we do all that.

15            Ms. King and Mr. Ortiz, let me ask you this, is that

16  okay?

17            MR. ORTIZ:  If I could just inquire of Mr. Sindler

18  what the schedule issue is.  Looking at the time of day, it

19  looks like we're going to be running into a much later time

20  period.

21            THE COURT:  You are going to need her anyway for

22  cross?

23            MR. ORTIZ:  Exactly.  If we're talking about Friday,

24  maybe she won't get paid but --

25            THE COURT:  What is her employment situation?

1        MR. SINDLER:  Her employment is that she starts or

2   has part-time work starting in the afternoon.  So, she would be

3   available in the morning, with some resentment, but that's not

4   anyone else's issue.

5        THE COURT:  You'll have to work for her, but she

6   could be here for nine, nine-fifteen start tomorrow morning?

7        MR. SINDLER:  Yes.

8        THE COURT:  Does that help out?

9        MS. KING:  Yes.

10       THE COURT:  If we get things humming, how long do

11  you figure she'll still be on the stand for your direct?

12       MR. SINDLER:  About five or so more minutes.

13       THE COURT:  Is that helpful to know, Ms. King?

14       MS. KING:  Yes.

15       (Whereupon, the discussion at sidebar ended.)

16       THE COURT:  Ladies and gentlemen of the jury, here's

17  why we had a sidebar.  We have a little problem with the

18  Court's video equipment.  We want to show you something, so

19  we're going to call downstairs for our technician to come up

20  and square that away.  We hope that will takes a short as ten

21  minutes or so.

22       But in the meantime, so you can be comfortable, get

23  something to drink and be outside of the courtroom.

24       Mr. Babik will take you upstairs for our recess.

25       Mr. Greer, would you please ask Ms. Dressler to have

1 Mr. Fox come up to the courtroom.

2          Ladies and gentlemen, as is the case with every

3 single recess or break that we take in court proceedings, I'm

4 obligated to remind you once again -- I know it was only 20

5 minutes ago -- that during our recess, you should not seek out

6 or receive any information regarding the case, participants or

7 the issues from any source whatsoever.  You should not discuss

8 the case, the participants, or the issues with any other

9 person, including with another member of the jury, and you must

10 notify Mr. Babik immediately should anyone seek to discuss any

11 of those items with you.

12          With that, Mr. Babik, you may assist the jury.

13      (Jury is dismissed from the courtroom.)

14          THE COURT:  Ms. Hayes, you may step down.

15          The Court is going to remain here.  Everyone can go

16 about their business.

17      (Whereupon, there was a brief recess in the proceedings.)

18          THE COURT:  Please note that Mr. Warren is present,

19 represented by counsel.

20          Counsel for the United States Ms. King and Mr. Ortiz

21 are present.

22          Ms. Hayes can retake the stand.

23          Ms. King and Mr. Sindler, the Court will go any way

24 counsel wants to go.  Are we having the charge conference today

25 at the end of the day or sometime during a break tomorrow?

1                I don't know how much of what might happen.  And any

2  of that is fine with the Court.

3                MS. KING:  We don't know who all the defendant's

4  witnesses are, so it's hard for us to have it today because of

5  that.

6                THE COURT:  That seemed likely to me, but I just

7  thought I would check with you.

8                Does that work for you, Mr. Sindler?

9                MR. SINDLER:  That's fine.

10                THE COURT:  We will not have the charge conference

11  today.

12                Ms. King, any reason we can't bring the jury down?

13                MS. KING:  No, Your Honor.

14                THE COURT:  Mr. Sindler?

15                MR. SINDLER:  No.

16                THE COURT:  We're good to go.

17                MR. SINDLER:  Yes, and I don't know what happened.

18                THE COURT:  Gremlins.

19          (Jury enters to the courtroom.)

20                THE COURT:  Please be seated, everyone.

21                Ms. Kienzle, if you'd note that all members of the

22  jury and alternates are present.

23                All trial participants are present.

24                Mr. Greer, it's my understanding that our technology

25  issue has been resolved.

1              Is that correct, sir?

2              MR. GREER:  That's correct.

3              THE COURT:  I note Ms. Hayes is on the stand.  She

4  remains under oath.

5              You may continue, sir.

6  BY MR. SINDLER:

7  Q.  Do you have the screen in front of you, Ms. Hayes?

8  A.  Yes, I do.

9  Q.  I'm going to show you what has been marked Exhibit J.

10             Do you recognize what will be a short animation?

11 A.  Yes.

12 Q.  What do you recognize the screen in front of you to be?

13 A.  The front of the house.

14 Q.  Does that look like a design of the front of your house?

15 A.  Yes, it does.

16 Q.  I'm going to hit play here in a moment and ask you to

17 follow until it ends, please.  All right?

18 A.  Okay.

19     (Video was played.)

20 BY MR. SINDLER:

21 Q.  That animation having just stopped, Ms. Hayes, do you

22 generally recognize what was just played before you?

23 A.  Yes, I do.

24 Q.  Can you tell us what that is?

25 A.  That's the inside of the house.

1   Q.   Is that on the first floor?

2   A.   Yes.

3   Q.   I just want to go over a few parts of that as we rewind

4   it?

5            MR. SINDLER:  Judge, may I be seated while I examine

6   her.

7            THE COURT:  You may.

8            I would advise counsel, if it assists in your

9   preparation, any counsel may remain seated during any

10  examination.

11  BY MR. SINDLER:

12  Q.   Ms. Hayes, I have just come to the 6-second portion of

13  this animation.

14           Do you recognition this particular part of the

15  screen in front of you?

16  A.   Yes, I do.

17  Q.   What does that show?

18  A.   The front porch.

19  Q.   Taking it to the 11-second portion of the animation, what

20  do you see to the far left?

21  A.   The front door.

22  Q.   There's a window on the right side of that screen.  Where

23  does that window go into?  Which room is on the other side of

24  that window?

25  A.   I can't even think of it right now.  That's the entrance.

1  Q.  On the left side?

2  A.  Yes.

3  Q.  Do you recognize this part of the video?

4  A.  Yes.

5  Q.  What is that?

6  A.  That's the entrance.

7  Q.  Is that at the doorway to the first floor?

8  A.  Yes, it is, the foyer.

9  Q.  What is the right side of the screen shot that is in front

10 of you at the 17-second point?

11 A.  The living room.

12 Q.  Is that the front of the house?

13 A.  Yes.

14 Q.  Going through this passageway, which part of the house are

15 we now in?

16 A.  The dining room.

17 Q.  What is just beyond the dining room?

18 A.  The kitchen.

19 Q.  Through that passageway?

20 A.  The kitchen.

21 Q.  To the left and toward the bottom left corner, what do you

22 see there?

23 A.  The steps.

24 Q.  To the second floor?

25 A.  To the second floor, yes.

1         MR. SINDLER:  Judge, those are all the questions we

2 have right now.

3         THE COURT:  Thank you very much, Mr. Sindler.

4         Ms. Hayes, if you'd remain there.

5         Ms. King or Mr. Ortiz.

6         MS. KING:  Thank you, Your Honor.

7                   CROSS-EXAMINATION

8 BY MS. KING:

9 Q.  Hello, Ms. Hayes.

10         You testified on October 23, 2012, which is the

11 night that your son was stabbed, DeShawn Weathers alerted you

12 to the fact that your son had been stabbed?

13 A.  Yes.

14 Q.  And that's how you knew that that had happened?

15 A.  Yes.

16 Q.  After you heard him yelling out that Bull had been

17 stabbed -- is that your son's nickname, Bull?

18 A.  Yes, it is.

19 Q.  You came downstairs?

20 A.  Yes.

21 Q.  You went right to the front door; is that right?

22 A.  Yes, I did.

23 Q.  You testified you didn't see anybody else in your house at

24 that time; is that right?

25 A.  Correct.

1    Q.   When you got to the front door, you could see your son?

2    A.   Yes.

3    Q.   He was on the porch?

4    A.   Yes, he was on the couch.

5    Q.   You could see the paramedics working on him?

6    A.   Yes.

7    Q.   Was there a lot of blood?

8    A.   I can't remember.  There was blood, yes.

9    Q.   You saw an officer also standing there at the front door?

10   A.   I did.

11   Q.   You testified that he was actually standing right there at

12   the screen door; is that correct?

13   A.   Correct.

14   Q.   You were standing close to him?

15   A.   Yes.

16   Q.   You heard the officer yell "gun"; is that right?

17   A.   Yes.

18   Q.   Then you exited the house; is that correct?

19   A.   Yes.

20            MS. KING:  Mr. Sindler, if you could pull back up

21   Defense Exhibit J and pause it at the 16-second mark.

22            Thank you.

23   BY MS. KING:

24   Q.   Ms. Hayes, on the screen before you, would you say that

25   this is a vantage point standing at the threshold of your

1 house, standing at the doorway?

2 A.  Yes.

3 Q.  So, would the vantage point of this be from just on the

4 porch of your residence there?

5 A.  Yes.

6 Q.  In this depiction, you can see into part of the living

7 room; is that right?

8 A.  Yes.

9 Q.  You can actually see right into the dining room; is that

10 correct?

11 A.  No.  No.  Not when you come -- not if you're at the front

12 door.

13 Q.  You can see straight back through the kitchen; is that

14 correct?

15 A.  You can't see straight back through the kitchen.

16 Q.  In this picture, you can't see the kitchen?

17 A.  Now I can.

18 Q.  So standing right here from this vantage point, you can

19 see straight back through the kitchen?

20 A.  Straight back to the kitchen.

21 Q.  Straight through the dining room?

22 A.  Yes.

23          MS. KING:  I have no further questions.

24          THE COURT:  Mr. Sindler, any redirect?

25          MR. SINDLER:  No.

1            THE COURT:  Ms. Hayes, thank you for coming to

2   court.  You may step down.

3            Mr. Sindler, do you anticipate calling Ms. Hayes

4   during the trial of this matter?

5            MR. SINDLER:  I do not.

6            THE COURT:  Ms. King and Mr. Ortiz, do you

7   anticipate recalling Ms. Hayes during the trial of this matter?

8            MS. KING:  No, Your Honor.

9            THE COURT:  Is there any reason, Mr. Sindler, that I

10  cannot excuse Ms. Hayes if she would like to go about her

11  business.

12           MR. SINDLER:  No.

13           THE COURT:  Ms. King and Mr. Ortiz, may I excuse

14  Ms. Hayes if she would like to go about her business?

15           MS. KING:  Yes, Your Honor.

16           THE COURT:  Ms. Hayes, you're further excused from

17  services as a witness.  You're welcome to remain and you're

18  welcome to go about your business, ma'am.

19           Mr. Sindler, sir.

20           MR. SINDLER:  We do have another witness but it's

21  going to take us beyond the time that you had told the jury --

22           THE COURT:  It's more than a 13-minute witness?

23           MR. SINDLER:  It's going to be.

24           THE COURT:  We had discussed this with counsel,

25  ladies and gentlemen of the jury, I indicated to you yesterday

1    I would break the ties in favor of a slightly earlier stop

2    rather than keeping everyone beyond 4:30.  We're going to break

3    at this time.  We'll resume tomorrow morning, if you can be in

4    the jury room at 8:45, 8:50 in the morning, we'll endeavor to

5    start at nine or as promptly thereafter as possible.

6              I believe this will be the fourth time in the last

7    70 minutes I'm given you this instruction.  I'm duty bound by

8    my oath to give it to you again.

9              Until I release you from your service as jurors, you

10   may not discuss this case, any matter involved in it or any

11   participants with any other person, including amongst

12   yourselves, friends, family, those you might encounter.  You

13   may not seek out or receive from any source electronic,

14   publish, print, broadcast or otherwise any information about

15   the case, it's participants, or the issues that are involved in

16   it.

17             Lastly, ladies and gentlemen, should anyone attempt

18   to discuss any of those matters with you, please advise

19   Mr. Babik of that as promptly as possible.

20             We'll see you tomorrow morning.  Again, if you could

21   be in the jury room no later than ten minutes to nine.

22             At this point, Mr. Babik, if you could assist the

23   jury.

24             Have safe travels and a pleasant evening.

25             (Jury is dismissed from courtroom.)

1          THE COURT:  Before we all break for the evening,

2  Ms. King or Mr. Ortiz, are there any other matters you believe

3  we should take up?

4          MS. KING:  We would like to know who the defense

5  witnesses will be.

6          THE COURT:  Can you advise who the next witness will

7  be.

8          MR. SINDLER:  It's probably going to be Travis

9  Johnson.  And I'm couching it that way because I'm predicting

10 availability issues.  So it may be a different person, but

11 right now, due to circumstances that are way beyond my control,

12 it's likely going to be Travis Johnson.

13         THE COURT:  A different person from Cadnetics if

14 it's not Mr. Johnson?

15         MR. SINDLER:  No, there's no deceit going on here.

16         THE COURT:  No one said that.

17         MR. SINDLER:  The person from Cadnetics will be

18 Travis Johnson.

19         THE COURT:  If Mr. Johnson is not the lead-off

20 witness, who will be the backup?  It will be Johnson if he's

21 available, or?

22         MR. SINDLER:  Or it's going to be the victim in this

23 case, Duwane Hayes.

24         THE COURT:  It will either be Mr. Johnson or

25 Mr. Hayes.

1            Is that helpful, Ms. King?

2            MS. KING:  We'd like an offer of proof as to the

3  victim as the testimony here has said that he was basically

4  unconscious on the porch.

5            THE COURT:  Or at least in some form of extremis.

6            MS. KING:  Yes.

7            THE COURT:  Could you generally state what relevant

8  testimony --

9            MR. SINDLER:  It's going to let us pursue an

10 alternative theory to the government's theory as to who was

11 possessing the firearm on the night in question.

12            THE COURT:  Let me ask you this, Mr. Sindler.  It

13 would appear from the testimony that has been offered into the

14 record so far in the trial that Mr. Duwane Hayes was in some

15 form of extremis on the front porch, stabbed and bleeding

16 profusely.  Will his testimony be that he was conscious and in

17 a position to observe?

18            MR. SINDLER:  Not at that time, not at that time.

19            THE COURT:  Okay.

20            Well, Ms. King, and Mr. Sindler, and Mr. Ortiz,

21 we'll see where it goes.  That sometimes happens in trials.  If

22 there are matters to be brought to the Court's attention

23 regarding Mr. Duwane Hayes' testimony, we'll take them up as

24 they come.

25            As I noted at our pretrial conference, I do not have

1 some overwhelming negative view of sidebars, if counsel

2 believes they're necessary to address an evidentiary issue in a

3 way that does not prejudice the material rights of any party.

4          So, if this situation with Mr. Duwane Hayes requires

5 a sidebar, nobody is going to get in hot water with the Court

6 for asking for it.

7          Is that helpful in answering your question about

8 what is coming first, Ms. King?

9          MS. KING:  Yes.  Thank you, Your Honor.

10          THE COURT:  Anything else we should take up today

11 Ms. King and Mr. Ortiz?

12          MS. KING:  No, Your Honor.

13          THE COURT:  Mr. Sindler, same question?

14          MR. SINDLER:  No, Your Honor.

15          THE COURT:  Mr. Greer, take your standard post at

16 the door.

17          With that, Mr. Babik, you can adjourn the Court.

18          If everyone could be here and in place by ten

19 minutes to nine tomorrow, unless you have something to take up

20 with the Court, that will be great.  That will let us get a

21 nice early start.  If there is anything to take up with the

22 Court, I'll be here no later than 8:20 tomorrow.

23          Mr. Babik, you may adjourn the Court.

24       (Court adjourned.)

25                    -----

```
 1

 2

 3                        I-N-D-E-X

 4  WITNESS              Direct      Cross     Redirect      Recross

 5  Steven Sywyj           34         55          72           75
    Lance Hoyson           86         97         107           --
 6  Estelle Hayes         114         --          --           --
    William Best          142        165          --           --
 7  Estelle Hayes         171        205          --           --

 8

 9                        CERTIFICATE

10

11         I, Juliann A. Kienzle, certify that the foregoing is
    a correct transcript from the record of proceedings in the
12  above-titled matter.

13
    s/Juliann A. Kienzle, RMR, CRR
14  _____
    Juliann A. Kienzle, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25
```