1            IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    UNITED STATES OF AMERICA,

4        vs.
                                    Criminal No. 13-270
5    ATIBA WARREN,
                 Defendant.

6

7

         Transcript of Jury Trial Proceedings on Thursday, October
8  29, 2015, United States District Court, Pittsburgh,
   Pennsylvania, before Mark R. Hornak, District Judge.

9

10

   APPEARANCES:
11

     For the Government:          Katherine A. King, Esq.
12                                Jonathan B. Ortiz, Esq.
                                  Assistant U.S. Attorney
13                                400 US Courthouse
                                  700 Grant Street
14                                Pittsburgh, PA 15219

15

     For the Defendant:          Mark A. Sindler, Esq.
16                               310 Grant Street
                                 Suite 2330 Grant Building
17                               Pittsburgh, PA  15219

18

19

20
   Court Reporter:               Juliann A. Kienzle, RMR, CRR
21                               5300 U.S. Courthouse
                                 700 Grant Street
22                               Pittsburgh, PA 15219
                                 (412) 261-6122
23

24

         Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.

1 (Proceedings held in open court; Thursday, October 29, 2015.)

2          THE COURT:  We're back in the case of the United

3 States of America versus Atiba Warren at 13-CR-270.

4          Mr. Warren is present represented by Mr. Sindler.

5          Ms. King and Mr. Ortiz are here on behalf of the

6 United States.

7          Ms. King and Mr. Ortiz, any matters we need to take

8 care of before we resume our trial?

9          MS. KING:  No, Your Honor.

10          MR. ORTIZ:  Your Honor.

11          THE COURT:  Mr. Sindler?

12          MR. SINDLER:  No, Your Honor.

13          THE COURT:  Mr. Sindler, is it okay to bring the

14 jury back in?

15          MR. SINDLER:  Yes.

16          THE COURT:  Ms. King?

17          MS. KING:  Yes.

18          THE COURT:  Mr. Babik, if you'd bring the jury back

19 down.

20          (Jury enters the courtroom.)

21          THE COURT:  Good morning, ladies and gentlemen.

22 Welcome back to Courtroom 6A.

23          Please note on the record that all twelve members of

24 the jury and our two alternates are present.

25          All of our trial participants are present.

1            Mr. Sindler, sir.

2            MR. SINDLER:  We have a witness, Judge, Travis

3 Johnson.

4            THE COURT:  Mr. Travis Johnson please step forward

5 to be sworn.

6      TRAVIS JOHNSON, a witness having been duly sworn,

7 testified as follows:

8            MR. BABIK:  Please state your name for the record.

9            THE WITNESS:  Travis Johnson.

10            THE COURT:  Mr. Johnson, you may take the witness

11 stand right there, sir.  Adjust the mic so it works for you.

12 Please keep your voice up so that we can hear you during your

13 testimony, sir.

14            Mr. Sindler, you may examine.

15                     DIRECT EXAMINATION

16 BY MR. SINDLER:

17 Q.  Tell us who you are.

18 A.  My name is Travis Johnson.

19 Q.  Tell us about your profession.

20 A.  I work for Cadnetics.  We're a company who provides

21 measuring and drafting services for architects, engineers and

22 contractors.

23 Q.  If you can, spell the name of that company?

24 A.  C-A-D-N-E-T-I-C-S.

25 Q.  Where is it located?

A.   South Side of Pittsburgh.

Q.   What does it do on the South Side of Pittsburgh?

A.   You mean our services?

Q.   Yes.

A.   We provide measuring, drafting, services in regards to construction and architecture.

Q.   For what period of time has this gone on with the company, I mean?

A.   Approximately 20, 22 years.

Q.   Has that been continuous?

A.   It has.

Q.   What has been your affiliation with the company?  For what period of time, rather?

A.   I have been with Cadnetics for approximately seven years.

Q.   Has that been continuous?

A.   It has.

Q.   What is your current role at the company?

A.   I'm vice president.  It entails managing staff, making sure that the services are being done correctly, keeping up with technology.

Q.   How large is the staff?

A.   It varies, but roughly right about 20.

Q.   I'm sorry?

A.   Twenty.

Q.   Is it that right now?

1   A.   Roughly; one or two here and there.

2   Q.   What period of time have you been the vice president of

3   the company?

4   A.   Maybe about five years.

5   Q.   Has that been continuous?

6   A.   It has.

7   Q.   Before you began your work with Cadnetics, can you please

8   describe your educational background.

9   A.   I was educated through high school.  Then my senior year

10  of high school we had classes for CAD and drafting.  From there

11  I got a job with Desmone Associates.  All my education has been

12  on-the-job training.

13  Q.   What does CAD stand for?

14  A.   Compute-aided drafting.

15  Q.   You mentioned Desmone.  What is that?

16  A.   Architecture firm.

17  Q.   It's located where?

18  A.   In the Lawrenceville side of Pittsburgh.

19  Q.   For what period of time were you associated with Desmone

20  Associates?

21  A.   Roughly six years.

22  Q.   Was that continuous?

23  A.   It has.

24  Q.   Uninterrupted?

25  A.   Yes.

1  Q.  You indicated before that you're a vice president of

2  Cadnetics.  Can you describe your duties at the company.

3  A.  My daily duties start with usually writing proposals,

4  preparing what services are going to be provided for the

5  company or for the project.  Then it also entails doing the

6  work that we as a company provide.  Also oversee the staff and

7  the work that they do as well.

8  Q.  The company you said is located on the South Side.  Is

9  that the company's only location?

10 A.  Currently it is, yes.

11 Q.  That might change you're saying?

12 A.  Yes.

13 Q.  Is it one floor or more than one floor, the building in

14 that you occupy?

15 A.  We occupy one floor.

16 Q.  Do all the people who work for it work on that floor?

17 A.  Correct.

18 Q.  Describe the clientele who are served or that is served by

19 Cadnetics?

20 A.  We primarily serve architects, engineers and contractors.

21 Q.  In what capacity?

22 A.  Providing CAD drafting and measuring of existing

23 buildings.

24 Q.  Do you also provide drafts for new buildings?

25 A.  Yes.

1    Q.   Describe, please, what an architectural drawing is.

2    A.   An architectural drawing is a set of documents to be used

3    to construct a building.   It's typically bound by a contract

4    that needs to be followed, a set of instructions to construct a

5    building.

6    Q.   For that structure?

7    A.   Yes.

8    Q.   How does it differ from an engineering drawing?

9    A.   Engineering drawings in the sense of a building are the

10   systems within the building; the HVAC, the electrical, the

11   plumbing.

12   Q.   When you say the electrical and the plumbing, does that

13   refer to HVAC?   I'm not sure if the jury knows what that stands

14   for?

15   A.   Heating and air conditioning systems.

16   Q.   Can you then distinguish, please, amongst drafting,

17   animation and illustration.

18   A.   Drafting is typically two dimensional, sometimes it can be

19   three dimensional, but it's drawing lines, a set of

20   instructions on how to build something.

21           Illustration is adding color or an artistic look to

22   that.

23           Then an animation is a series of still frames or

24   still illustrations to make up a moving picture.

25   Q.   The work that you're doing for architects and engineers

1  and even contractors, what qualifications do you bring to do

2  that kind of work?

3   A.   Our company requires our staff to maintain a two-year

4  certificate in three pieces of software, Auto-CAD, Revit and

5  3d Max.

6   Q.   What is AutoCAD?

7   A.   AutoCAD is two-dimensional software to create CAD

8  drawings.

9   Q.   You had mentioned before you got to this point two

10  dimensional and three dimensional.  Can you explain a little

11  better the difference between the two?

12   A.   Two dimensional is typically, it's flat, so you only see

13  the drawings as if you were looking at it straight on, either

14  down or in front.

15          Three dimensional is more of what you would see in

16  the real world where it has a flat but it has also height.

17   Q.   You mentioned AutoCAD.

18          What is Revit?

19   A.   Revit is a 3D drafting software so that the things that

20  you draw are in 3D as opposed to being flat.

21   Q.   Can you describe the third type you referred to?

22   A.   The third type is 3d Max.  That's software where you can

23  take either the AutoCAD files or the Revit files and add color,

24  animation and lighting to create videos.

25   Q.   Can you explain BIM, please.

1  A.   BIM is a process that is adopted in construction to create

2  3D models for construction.

3  Q.   What purpose does it serve?

4  A.   It helps coordinate and make sure a building is being

5  built properly.

6  Q.   Because if a building is not built properly, what are some

7  of the consequences?

8  A.   Financial consequences are first.  There's a lot of money

9  involved with construction.  Other than that, there's just

10 making sure that things are correct and accurate.  If things

11 are not correct and accurate, there can also be problems with

12 the structure and it could harm or put people in danger as

13 well.

14 Q.   What is class detection?

15 A.   Class detection is the process of making sure that two

16 objects don't occupy the same space in a building before it is

17 built.

18 Q.   So you're engaged in 3D modeling; is that right?

19 A.   Correct.

20 Q.   Have you already explained or can you explain further what

21 3D modeling is, please?

22 A.   3D modeling is the process of taking either 2D information

23 or information that is gathered in the field and recreating an

24 object or a scene in the computer in three dimensions so it's

25 not just a flat picture.

1  Q.  Is it done manually or otherwise?

2  A.  It can be done a few different ways.  It could be done

3  both.

4  Q.  Do you do it manually or otherwise?

5         When I say "you," either you personally or the

6  company for which you work.

7  A.  Yes, we do it manually.  We take the information and then

8  we reconstruct that object or scene in the computer.

9  Q.  Is there any automated aspect to the work that you do?

10  A.  There is, but not in its entirety.

11  Q.  What does that mean "not in its entirety"?

12  A.  Certain parts and pieces are automated.  If you wanted to

13  create a door, you don't have to create the entire door, you

14  pick a door object.

15  Q.  Are you familiar with a 3D scanner?

16  A.  I am.

17  Q.  What is that?

18  A.  A 3D scanner is a piece of equipment that allows you to

19  measure a space from a given vantage point.

20  Q.  Are you limited to one vantage point or can it be any

21  vantage point?

22  A.  It can be anywhere that you're able to set the scanner so

23  you can move it around to gather multiple points.

24  Q.  Does Cadnetics use a 3D scanner?

25  A.  We do.

1  Q.   How many do you have?

2  A.   At the time of the process we had one, we now have two.

3  Q.   Where are these 3D scanners obtained?

4  A.   We buy them from a company called Faro.

5  Q.   How is that spelled?

6  A.   F-A-R-O.

7  Q.   Can you describe it, please.

8  A.   It's a rectangle box, approximately 1 foot by 8 inches by

9  1 foot.

10  Q.   Explain its purpose, please.

11  A.   It sends out a laser measurement in a 360-degree sphere to

12  measure points in a room or a space.

13  Q.   Is something about it then rotating in one complete cycle?

14  A.   Correct.   The machine itself rotates 360 degrees and then

15  the laser has a mirror that also rotates in the opposite 360.

16  Q.   Is this something that in terms of accuracy is better than

17  or different from a manual measurement?

18  A.   It is better than a manual measurement.

19  Q.   Why is that?

20  A.   A manual measurement, if you take it using a tape measure

21  has slack in the tape measure, so as you pull it out from one

22  point to another, there is an amount of dip in the tape

23  measure.   The laser scanner is accurate to about a millimeter

24  over 100 meters.

25  Q.   How do you know that?

1   A.   The certificates provided by the Faro Company.

2   Q.   The first of the two that you referred to, this apparatus,

3   how long is has Cadnetics been using that particular appliance?

4   A.   I believe it's about three years now.

5   Q.   Has that been continuous?

6   A.   It has.

7   Q.   During the three years it has been using that appliance,

8   how many times has it been deployed or used on an annual basis,

9   if you will?

10  A.   We probably use it maybe 50 times, give or take.

11  Q.   Are there certain people at Cadnetics who use this

12  appliance?

13  A.   Yes.

14  Q.   Are you one of them?

15  A.   Yes.

16  Q.   How does one have the ability to use the Faro appliance?

17  A.   The Faro appliance is actually a pretty simple machine to

18  use.  It has an interface very similar to a Smartphone, you

19  just set it up in a room, pick the settings that you want to

20  use and press the appropriate button.

21  Q.   When at a place at which this appliance is used, how does

22  one know where and how often to move it or place it within a

23  given part of a structure?

24  A.   That comes from the scope that is provided by the client.

25  When they specify what they want to gather, the information,

1 then the operator experience comes into play of making sure

2 that they place enough scans around the space to gather

3 everything.

4 Q.   There's a second one the company has been using and that

5 has been for what period of time?

6 A.   A couple weeks.

7 Q.   The Faro appliance, is that calibrated, recalibrated,

8 looked at, tuned up at any given time?

9 A.   Yes, it's calibrated approximately every year, but not

10 exactly every year.

11 Q.   The one that you've had for more than two weeks -- the

12 first one, rather, how often has that been calibrated, if you

13 know?

14 A.   Approximately every year.

15 Q.   Why it is once a year?

16 A.   That's just the recommendations of the manufacturer to

17 make sure that all the measurements stay within the precision

18 that they require.

19 Q.   Within the business that you work, describe, please, any

20 certifications in any specific fields or areas that you have or

21 in which you work.

22 A.   I have a certificate in BIM management.  That ensures over

23 a five-year period that we have the sufficient knowledge to

24 create and manage BIM projects.

25 Q.   Any others?

1  A.  Other than the three for the software, the AutoCAD, the

2  Revit and 3d Max.

3  Q.  BIM, again, stands for Building Information Modeling,

4  correct?

5  A.  Correct.

6  Q.  What is forensic mapping?

7  A.  Forensic mapping is a way to use a 3D scanner to map a

8  scene in 3D.

9              MR. SINDLER:  Judge, we're at a point where we'd

10 like to present Mr. Johnson as somebody who is qualified to

11 provide expert testimony on computer-aided design and

12 architectural and structuring renderings.

13             THE COURT:  And to offer testimony in a form

14 authorized by Rule 702 in the Federal Rules of Evidence?

15             MR. SINDLER:  I apologize, you are right.

16             THE COURT:  Ms. King and Mr. Ortiz, any voir dire on

17 that topic?

18             MS. KING:  No, Your Honor.

19             THE COURT:  Any objection to the Court authorizing

20 this witness to offer testimony in the form authorized by

21 Federal Rule of Evidence 702?

22             MS. KING:  No.

23             THE COURT:  That request is granted.

24             Mr. Sindler, you may proceed.

25             The Court makes the requisite finding under that

1  rule and Mr. Johnson is authorized to offer testimony in the

2  form of opinion within the parameters that you've described him

3  being offered for, Mr. Sindler.

4  BY MR. SINDLER:

5  Q.  Are you familiar with 520 Lincoln Avenue?

6  A.  I am.

7  Q.  How?

8  A.  That was the property that we laser scanned and made a 3D

9  model for.

10  Q.  Do you recall when that happened?

11  A.  That was December 19th, approximately 9:00 a.m.

12  Q.  Which year?

13  A.  2014.

14  Q.  Do you recall the circumstances by which you ended up

15  going to that residential address?

16  A.  We received a phone call from you, Mr. Sindler, to help 3D

17  map that residence.

18  Q.  Was anybody with you or who was there on that morning?

19  A.  Yes, one person from Cadnetics was with me, Justin Petino.

20  Q.  What was his role?

21  A.  He was the operator at the time for the machine.

22  Q.  What part of the house was being scanned or being mapped?

23  A.  We scanned the front yard area, the front porch, the

24  vestibule or entryway, the living room, and the dining room and

25  the kitchen.

1  Q.  Did you use the appliance to which you earlier referred?

2  A.  We did.

3  Q.  How many different settings or how many different places

4  was it set while you were there?

5  A.  Six.

6  Q.  What part of the home was scanned?

7  A.  The first floor primarily, plus exterior.

8  Q.  There was no scanning done of the second floor?

9  A.  There was not.

10 Q.  For what period of time were you and Mr. Petino present at

11 the site?

12 A.  45 minutes to an hour.

13 Q.  Was that sufficient time to do what it was that you had to

14 accomplish?

15 A.  Yes.

16 Q.  Was there any other equipment used during the course of

17 your visit?

18 A.  We used a cell phone to take a few reference photos.

19 Q.  I'm sorry?

20 A.  A cell phone for reference photos.

21 Q.  What you just described, is that the extent of the

22 activities that you and Mr. Petino engaged in on that day?

23 A.  Yes.

24 Q.  What happened after you left the premises?  Not

25 necessarily that day, but with the material that had been

1  recorded or obtained while you were at that address?

2   A.  We take the scanned data back to the office.  We put it

3  together so that all the scans are in order.  Because there are

4  individual pieces, they have to be put together to be a

5  complete, comprehensive piece.

6          After we take that scanned data, we can then 3D

7  model that space architecturally and then we can take it into

8  3D Max to create an illustration or an animation.

9   Q.  The illustration, for starters, is that an accurate

10  measurement of the space that was scanned?

11  A.  Yes.  The 3D model is an accurate to-scale model in the

12  computer.

13  Q.  At the expense of being repetitive here, how do you know

14  that?

15  A.  The laser scanner is calibrated so that the accuracy is

16  ensured by the company.

17  Q.  So for the illustration, for illustration sake, the

18  modeling that you had done was to scale; is that correct?

19  A.  Correct.

20          MR. SINDLER:  I just need a moment, Judge.

21  BY MR. SINDLER:

22  Q.  Mr. Johnson, I'm going to show you or ask you if the

23  screen in front of you, can you see what is noted as Exhibit K?

24  A.  I can.

25  Q.  Do you recognize it?

```
 1  A.  I do.

 2  Q.  What do you recognize it to be?

 3  A.  520 Lincoln Avenue.

 4  Q.  Specifically, where at 520 Lincoln Avenue?

 5  A.  This is the first floor of the 3D model that we produced.

 6  Q.  I'm going to take you here one step at a time.

 7          Do you recognize the area that I'm checking off?

 8  A.  Correct, that is the front porch.

 9  Q.  That looks to be a little shaded.  Why is that?

10  A.  It is in the shadow of the light and the roof of the porch

11  or the ceiling of the porch is still on, but it's slightly

12  transparent.

13  Q.  Do you recall whether that porch was covered or not?

14  A.  You mean with like a roof?

15  Q.  I'm sorry, a roof, yes.

16  A.  Yes, it was covered.

17  Q.  So it's a covered porch?

18  A.  Yes.

19  Q.  Do you recall the area -- I'm not sure why this is not

20  circling.

21          THE COURT:  If you need to walk over to his screen,

22  Mr. Sindler, or Ms. King also, if that becomes necessary.

23  BY MR. SINDLER:

24  Q.  I'm circling an area.

25          Do you recognize that?
```

1  A.  Yes.

2  Q.  What is that?

3  A.  That is the front door of the entryway of the house.

4  Q.  Then the area that I'm circling here, what is that?

5  A.  The living room.

6  Q.  Is that the room closest to the street or to the front

7  porch?

8  A.  Closest to the front porch, yes.

9  Q.  These two circles represent what, if you recall?

10  A.  Below the yellow part of the wall are two openings that go

11  into the dining room from the living room.

12  Q.  Can you place a note somehow as to what you mean by parlor

13  wall?

14  A.  Below this wall here is an opening.

15  Q.  So those are both openings?

16  A.  Yes.

17  Q.  Now, if you remember, where on Exhibit K did you or

18  Mr. Petino place the Faro?

19  A.  We placed it in multiple locations.  One was placed at the

20  doorway here, I think one was placed here in the dining room,

21  approximately, and one in the kitchen area.

22  Q.  When looking at Exhibit K, is there a particular name or a

23  particular way in which this is identified or characterized,

24  this particular kind of drawing?

25  A.  We would call it an isometric.

1   Q.   What does isometric mean?

2   A.   Isometric is just a way to visually show a 3D model,

3   usually looking down or at an angle of an object.

4   Q.   How is it possible, given that there's supposedly from

5   other testimony in this case a second floor and, obviously, a

6   roof to look into the structure looking at only the first

7   floor?

8   A.   The 3D program allows you to place a, like a virtual slice

9   through the building so that you can hide the parts either

10  above and below the slice.

11  Q.   Does that affect the integrity or the authenticity of the

12  model that is being produced?

13  A.   It does not, not from a measurement standpoint.

14  Q.   Why not?

15  A.   Because nothing changes from a measuring standpoint, it

16  only hides parts of the building.

17  Q.   Now, in the course of this case or in the course of

18  working with the defense, were there certain or specific

19  measurements that were taken?

20  A.   For the exhibits?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Can you describe that, please.

24  A.   We provided three measurements of just a few points within

25  the dining room from the entryway.

1  Q.  I'm going to show you and bring up on the screen what is

2  known as Exhibit L.

3             Do you see that?

4  A.  I do.

5  Q.  Do you recognize Exhibit L?

6  A.  I do.

7  Q.  What do you recognize it to be?

8  A.  It's a 3D perspective with an 18-foot measurement from the

9  entryway door to just slightly past the archway of the dining

10 room.

11 Q.  The 18 feet that is referred to on L refers to what?

12 A.  You mean the point which it's measuring?

13 Q.  Yes.

14 A.  It's just an arbitrary point past the doorway.

15 Q.  Does it take or are you using a point from the threshold

16 of the doorway to somewhere early into the dining room area?

17 A.  Yes, from the doorway into the dining room.

18 Q.  I'm going to ask you to keep your eyes on the screen,

19 please, and refer to Exhibit M.

20             Do you see that?

21 A.  I do.

22 Q.  What do you recognize Exhibit M to be?

23 A.  Exhibit M is a similar isometric with the same point of

24 the doorway, 22 feet farther.

25 Q.  Is it about 4 feet farther from the distance shown on the

1  previous exhibit?

2  A.   Yes.

3  Q.   From the doorway?

4  A.   From the doorway.

5  Q.   I'm going to show you what is referred to as Exhibit N.

6       Do you recognize that?

7  A.   Yes.

8  Q.   What do you recognize it to be?

9  A.   It is another 3D perspective showing 26 feet from the

10 doorway into the dining room, 4 feet previous to the other one,

11 8 feet previous to that.

12 Q.   I'm going to circle an area in the dining room.

13       Do you recognize that?

14 A.   Yes.

15 Q.   What do you recognize that to be?

16 A.   That is the stairs going up to the second floor.

17 Q.   Was that little stairway there present when you were at

18 the house?

19 A.   Yes.

20 Q.   How do you know that the distances to which you just

21 referred on L, M, and N are accurate?

22 A.   We rely on the software daily, so do many architects and

23 engineers and other people in construction.  There's a certain

24 assumption that you trust the technology that is being

25 provided.

1  Q.  Is the same appliance that was being used in this case the

2  one that would be used for other clients at Cadnetics?

3  A.  Yes.

4  Q.  Do you recall how many times before December 19, 2014, the

5  appliance would have been used for those clients?

6  A.  Many times, probably over 100.

7  Q.  In preparation for this case, was there also an animation

8  done?

9  A.  There was.

10 Q.  Can you explain that, please.

11 A.  The animation we created was to provide a viewpoint,

12 heading from the street up through the yard into the house and

13 into the dining room.

14 Q.  Was that done for the material that was obtained when you

15 visited the home on December 19, 2014?

16 A.  Correct.

17 Q.  Just so we're clear, the only time that you or anybody

18 from the firm had visited the home or the residence was on that

19 date?

20 A.  Correct.

21 Q.  There was no time before or afterwards?

22 A.  No.

23 Q.  I'm going to direct your attention to the screen one more

24 time, please.

25            Do you see it?

```
 1   A.   I do.

 2   Q.   Do you recognize the opening frame --

 3   A.   Yes.

 4   Q.   -- that is in front of you?

 5   A.   Yes, I do.

 6   Q.   What do you recognize it to be?

 7   A.   It's 520 Lincoln Avenue.

 8   Q.   Mr. Johnson, I'm going to run this animation and ask that

 9   you pay attention to the screen, please, until its end.

10        (Video was played.)

11   Q.   Is that the sum of what was done by you for this purposes

12   of this animation?

13   A.   Yes.

14   Q.   It was done by you, correct?

15   A.   Correct.

16   Q.   I'm going to take you back a few frames and ask you to pay

17   attention still to the screen in front of you.

18        (Video was played.)

19   Q.   Do you recognize the frame that is in front of you?

20   A.   Yes.

21   Q.   What do you recognize that to be, please?

22   A.   The front porch at 520 Lincoln Avenue.

23   Q.   Specifically, putting an X there, what is that, please?

24   A.   That is the doorway into the house.

25   Q.   You went through that doorway, right?
```

1    A.   Correct.

2    Q.   I'm showing you a frame that is at about the 19-second

3    point of this 30 or so second animation.

4              Do you recognize that?

5    A.   I do.

6    Q.   What do you recognize that to be?

7    A.   That is the view through the archway into the dining room.

8    Q.   Would that be, when you looked at Exhibit L, the archway

9    on the top of the screen or the one on the bottom of the

10   screen?

11   A.   This would be the one on the top of the screen.

12   Q.   Do you recall from your measurements and the renderings

13   that you have done in this case, the width of the passageway

14   that is in front of you?

15   A.   This one was 3 foot 6 inches.

16   Q.   3 1/2 feet?

17   A.   Yes.

18   Q.   How do you know that?

19   A.   We measured the 3D model.

20   Q.   I'm going to ask you to compare some reference points on

21   two different exhibits, please.

22             I'm circling a portion of Exhibit K which is in

23   front of you.

24             Is it in front of you?

25   A.   It is.

1  Q.  Do you see this area that I'm circling right here?

2  A.  I do.

3  Q.  Can you keep that in mind, please.

4  A.  Yes.

5  Q.  The area that I just showed you and asked you to remember

6  from Exhibit K, do you see that on the screen in front of you,

7  which is now showing Exhibit J?

8  A.  I do.

9  Q.  Can you please identify it on the screen using your

10 finger.

11 A.  That would be this wall here.

12 Q.  Do you recall what it is that you just drew a rectangle

13 around, please?

14 A.  It would be a wing wall of an opening.

15 Q.  When you say a "wing wall," is that part of the structure

16 that you encountered at the house?

17 A.  Yes, yes.

18        MR. SINDLER:  One moment, Judge.

19        That's all we have, Judge.

20        THE COURT:  Thank you, Mr. Sindler.

21        Ms. King or Mr. Ortiz, any cross-examination?

22        MS. KING:  Yes, Your Honor.

23        THE COURT:  You may proceed, Ms. King.

24        MS. KING:  Thank you.

25        Ms. King, as I noted with Mr. Sindler, if there's

 1 any reason you need to also use the witness' touch screen,

 2 you're free to do that without further ado.

 3             MS. KING:  Thank you, Your Honor.

 4                     CROSS-EXAMINATION

 5 BY MS. KING:

 6 Q.  Mr. Johnson, you were not present at 520 Lincoln Avenue on

 7 the evening of October 23, 2012, were you?

 8 A.  I was not.

 9 Q.  You have been to the residence as you testified?

10 A.  Yes.

11 Q.  You went there to take a scan of the residence with your

12 laser scanner along with Mr. Petino?

13 A.  Correct.

14 Q.  The purpose of taking that scan was to eventually create a

15 3D model of the residence, including the animation we all just

16 saw; is that right?

17 A.  Correct.

18 Q.  To create that model you, in fact, start by using the

19 laser scanner?

20 A.  Correct.

21 Q.  The scanner essentially takes millions of measurements by

22 shooting out a laser beam and touching all the points on

23 whatever surface is available for it to scan; is that right?

24 A.  Correct.

25 Q.  Your scanner, in fact, also has a photograph or a picture

1  component to it; is that correct?

2  A.  That is correct.

3  Q.  Can you describe that a little bit, what your scanner does

4  with respect to taking photographs.

5  A.  When it takes the photograph, it takes the measurement,

6  and then after the measurements, it takes the photographs and

7  overlays the color onto the measurement.

8  Q.  So, after you complete the scan, am I correct that the

9  scanner has an SD card in it?

10  A.  It does.

11  Q.  If any member of the jury is not familiar with an SD card,

12  with you explain what that is.

13  A.  It's a small microchip piece that stores data.

14  Q.  So you are finished with your scan, you take your scanner

15  back to your office, you take the SD card out of the scanner

16  and you plug it into your computer?

17  A.  Correct.

18  Q.  Then you download or upload or whatever all of that data

19  that you've just scanned into your computer?

20  A.  Correct.

21  Q.  Once you do that, then you're able to work toward creating

22  your final 3D rendering or model of the scene?

23  A.  Correct.

24  Q.  Before you get to the point of having a final version of

25  your 3D model, there's something that is involved that is

 1 | called the Point Cloud; is that correct?
 2 | A.   Correct.
 3 | Q.   Can you describe what that is, please.
 4 | A.   Point Cloud is a visual representation of those
 5 | measurements, so it appears to look like a 3D model, but it's
 6 | just a series of dots, vertices on the wall.
 7 |            THE COURT:  Ms. King, if you need the Elmo, you're
 8 | also free to use that.
 9 |            MS. KING:  Thank you, Your Honor.
10 | BY MS. KING:
11 | Q.   Mr. Johnson, I'm showing you what I have marked as
12 | Government Exhibit 10.
13 |            Are you familiar with that?
14 | A.   I am.
15 | Q.   What is that?
16 | A.   That is the Point Cloud of the front porch of the house.
17 | Q.   Am I correct that this Point Cloud is a necessary
18 | component of creating the final 3D animation that we just saw?
19 | A.   Yes.
20 | Q.   Did your scanner create this Point Cloud?
21 | A.   It did.
22 |            MS. KING:  Your Honor, I move for admission of
23 | Government Exhibit 10 into evidence.
24 |            THE COURT:  Mr. Sindler?
25 |            MR. SINDLER:  I don't have any objection.

```
 1            THE COURT:  Without objection, Government Exhibit 10
 2 is admitted into the record.
 3            MS. KING:  May I please have permission to publish
 4 to the jury, Your Honor?
 5            THE COURT:  You may, Ms. King.
 6            MS. KING:  Mr. Babik, if I could please have my
 7 screen.
 8 BY MS. KING:
 9 Q.  On the screen in front of you is Government Exhibit 10.
10 Can you please describe for the jury what they're looking at.
11 A.  This is a Point Cloud view of the front porch of 520
12 Lincoln Avenue.
13 Q.  I see that there's a lot of black areas around the actual
14 residence.
15            Can you describe why that is.
16 A.  When the scanner scans, we -- it gathers more information
17 than is required.  So, we removed those points for this
18 particular image.
19 Q.  Does this Point Cloud represent all of the various points
20 that your laser scanner took, as well as the photographic
21 overlay that you were talking about?
22 A.  This one particular scanner, you're asking if it has -- if
23 it's all of them?
24 Q.  I guess where does the color come from in this Point Cloud
25 that we're looking at?
```

1  A.  The color comes from the laser scanner's photographs.

2  Q.  I'm going to show you what I have marked as Government

3  Exhibit 11.

4           Looking at Government 11, are you familiar with

5  that?

6  A.  I am.

7  Q.  What is it?

8  A.  That is the laser scanner at the point of the door at the

9  threshold.

10 Q.  This is a representation of a scan that your laser scanner

11 took when you were at 520 Lincoln Avenue on December 19, 2014?

12 A.  Correct.

13          MS. KING:  Your Honor, I move for admission of

14 Government Exhibit 11 into evidence.

15          THE COURT:  Mr. Sindler?

16          MR. SINDLER:  No objection.

17          THE COURT:  Without objection, Government Exhibit 11

18 is admitted into the record.

19          MS. KING:  May I publish to the jury?

20          THE COURT:  You may.

21 BY MS. KING:

22 Q.  Government Exhibit 11, looking at it, it appears the laser

23 scanner was, in fact, on the porch at the time this scan was

24 taken; is that correct?

25 A.  For this particular scan.

1   Q.   This particular scan was able to capture a straight view

2   from the porch, from the doorway through the living room,

3   through the dining room and straight into the kitchen; is that

4   correct?

5   A.   Correct.

6   Q.   I'm going to go and show you what has already been shown

7   to you as Defense Exhibit J, hopefully.

8           MS. KING:  Mr. Babik, could you switch to

9   Mr. Sindler and see if it will work on his.

10          Can you put it on the 16-second mark.

11          Can you back it up just slightly, please.

12  BY MS. KING:

13  Q.   Looking at Defense Exhibit J, which is a portion of the

14  animation that you created, this is a different perspective

15  into the house from the porch; is that correct?

16  A.   Yes.

17  Q.   From this different perspective, different from Government

18  Exhibit 12 that we have just looked at, you can still see --

19          THE COURT:  Were you referencing Government Exhibit

20  12 or 11?  The last one I have in is 11.

21          MS. KING:  11.  Pardon me.

22  BY MS. KING:

23  Q.   On Government Exhibit 11, you can still see straight from

24  the porch through the living room, through the dining room and

25  into the kitchen; is that correct?

1  A.   That is correct.

2            MS. KING:  I have no further questions, Your Honor.

3            THE COURT:  Thank you, Ms. King.

4            Mr. Sindler, any redirect?

5            MR. SINDLER:  No.

6            THE COURT:  Do you anticipate the possibility of

7  recalling Mr. Travis Johnson as a witness in this case,

8  Mr. Sindler?

9            MR. SINDLER:  I don't.

10           THE COURT:  Can he be excused, from your

11 perspective?

12           MR. SINDLER:  Yes.

13           THE COURT:  Ms. King, do you anticipate recalling

14 Mr. Johnson as a witness?

15           MS. KING:  It is possible, Your Honor.  If the

16 defense is calling any additional witnesses, we may need to

17 have him testify.

18           THE COURT:  Mr. Johnson, first, thank you for coming

19 to federal court today, sir.  We are going to ask if you could

20 remain available to the Court in the hallway until you get word

21 from my deputy that you have been formally released from your

22 witness service, sir.

23           Thank you, Mr. Johnson.

24           Mr. Johnson, if those are any of the exhibits you

25 were handed, you can set them on that little table right in

1  front of the witness box.

2           Thank you for coming to court, Mr. Johnson.

3           Mr. Sindler, sir?

4           MR. SINDLER:  May I see you at sidebar?

5           THE COURT:  Sure, we'll take a sidebar for the

6  moment.

7           Ladies and gentlemen, feel free to stand up and

8  stretch.

9      (Whereupon, there was a discussion at sidebar.)

10           THE COURT:  We're at sidebar.

11           Mr. Warren is present, represented by list lawyer,

12  Mr. Sindler.

13           Ms. King and Mr. Ortiz are here for the United

14  States.

15           Mr. Sindler.

16           MR. SINDLER:  With respect to the remainder of the

17  defense, I'm going to need a moment to speak to Mr. Warren, and

18  I'm looking, I know it's not an opportune time to take a break,

19  but there's no other way to do it, I need some time.

20           THE COURT:  That's fine.  When you say "a moment,"

21  approximately what do you anticipate?

22           MR. SINDLER:  About five to seven minutes.

23           THE COURT:  Let's assume that's ten.  I'll just

24  explain to the jury we're going to take a brief recess as we

25  organize a few things in the courtroom.

1            MR. SINDLER:  Thank you.

2            THE COURT:  Anything else at sidebar?

3            MR. SINDLER:  Will we be doing it in here?

4            THE COURT:  You can meet with Mr. Warren wherever

5    you make arrangements to meet with him in a private setting.

6            Ms. King and Mr. Ortiz?

7            MS. KING:  No, Your Honor.

8            THE COURT:  That will conclude the sidebar.

9        (Whereupon, the discussion at sidebar ended.)

10           THE COURT:  The sidebar has concluded.  We're back

11   on the record in open court.

12           All trial participants and all members of the jury

13   are present.

14           Ladies and gentlemen of the jury, although the

15   timing is not precise, we're going to take approximately a

16   ten-minute recess at this point.  We need to organize a few

17   things regarding the balance of the presentation for our trial.

18           So, in a moment, Mr. Babik will assist you to go up

19   to the jury room.  I do anticipate it will be in the ten-minute

20   range.

21           Ladies and gentlemen, while you're away from the

22   courtroom, do not seek out or receive any information about the

23   case, the issues involved in it or any of the parties or people

24   involved in the case.  Do not discuss the case, the issues, the

25   folks or people involved in it with anyone else, including

 1  amongst yourselves.  And should anybody attempt to contact you

 2  or do any of those things with you, please let Mr. Babik know

 3  that right away.

 4          Mr. Babik, if you could assist the jury.

 5      (Jury is dismissed from the courtroom.)

 6          THE COURT:  Please be seated.

 7          Ms. King and Mr. Ortiz, anything we need to take

 8  care of while the jury is out of the room?

 9          MS. KING:  No, Your Honor.  Thank you.

10          THE COURT:  Mr. Sindler, same question?

11          MR. SINDLER:  Just for logistics, will we be meeting

12  in that study toward the back here?

13          THE COURT:  Yes.

14          Yesterday we permitted Mr. Sindler and Mr. Warren,

15  under appropriate guidance of your colleagues, we have a

16  library room at the front end that they're able to use.

17          Mr. Greer, if you'd go back first and clear that

18  room with the marshals, then you're free to use it.

19          We'll resume when Mr. Greer or Mr. Babik tells me

20  we're ready to resume.

21          Anything else, Mr. Sindler?

22          MR. SINDLER:  No.

23          THE COURT:  With that, Mr. Greer, you can recess the

24  Court.

25      (Whereupon, there was a brief recess in the proceedings.)

1           (Jury is not present in the courtroom.)

2           THE COURT:  If you'd note that all trial

3   participants are present in the courtroom, the jury is not.

4           Mr. Sindler.

5           MR. SINDLER:  Judge, before we rest this morning,

6   I'd like to move into admission or move into the record,

7   rather, Defense Exhibits A through N, as in Nancy.

8           THE COURT:  Ms. King?

9           MS. KING:  I just reassert my objection to J.

10          THE COURT:  Okay.

11          The Court has ruled on that and the Court will stand

12  by its ruling.

13          The objection is noted.  Defense Exhibits A, as in

14  apple, through N, as in Nancy, inclusive are admitted into the

15  record.

16          MS. KING:  I wasn't clear that the Court had ruled

17  that J was coming in as actual evidence.  I thought that was

18  still pending.

19          THE COURT:  You are correct, Ms. King.  I indicated

20  we would take that up.

21          Mr. Sindler, are you asking that it come into the

22  record as an exhibit?

23          MR. SINDLER:  Yes.

24          THE COURT:  Ms. King?

25          MS. KING:  I still object.  I don't think that it's

1 appropriate as an exhibit.  I think it was used demonstratively

2 and so -- it's been shown several times.  I just don't think it

3 should go back with the jury.

4           THE COURT:  I'm going to overrule the objection.  I

5 will allow it to come in substantively.  Arguably, the only

6 witness whose testimony it illustrated independently was

7 Ms. Hayes when it was shown to her on two different occasions,

8 yesterday, and only once in the presence of the jury.

9           I find that under the applicable case law I cited

10 yesterday, it fulfills the Third Circuit test.  I think it is,

11 particularly based on Mr. Johnson's testimony, the jury could

12 conclude -- it will be up to the jury whether it does

13 conclude -- but the jury could conclude that it is a fair and

14 accurate depiction of the residence at 520 Lincoln Avenue on

15 the date and time at issue in the case.

16           Counsel will certainly be free to argue from that

17 and all of the other material that has come in as to the weight

18 that the jury, if any, that the jury should give to it.

19           So I will admit Defense Exhibits A, as in apple,

20 through N, as in Nancy, inclusive.

21           Mr. Sindler.

22           MR. SINDLER:  Judge, I'm going to place these

23 exhibits over on the table.  I would just say so that we're all

24 clear, K through N is marked on the back, just because I would

25 be covering up something on the front of those respective

1 exhibits.  And then the only way to provide an exhibit for J is

2 a thumb drive that I have right here, which I'll put over there

3 on the table as well.

4          THE COURT:  That's fine.

5          Before any exhibits go up to the jury room, we'll

6 make sure counsel have had collectively an opportunity to go

7 through them to confirm that they are, in fact, the exhibits

8 that were used in the courtroom and that it's a complete set.

9          Mr. Sindler, in terms of the thumb drive is there,

10 so that would be the exhibit that's in the record.

11          MR. SINDLER:  It is.  There's no -- we changed it,

12 given the earlier --

13          THE COURT:  I'm not saying there is any funny

14 business.  The exhibit itself is the electronic content on that

15 thumb drive.

16          MR. SINDLER:  Yes.

17          THE COURT:  Mr. Sindler?

18          MR. SINDLER:  So at this point, the defense rests.

19          THE COURT:  I'll have you say that once we have the

20 jury back in here.

21          MR. SINDLER:  Okay.  I don't know if the government

22 has any rebuttal, but we rest.

23          THE COURT:  So, Ms. King, knowing that when the jury

24 comes back, Mr. Sindler will reiterate that the defense rests,

25 what would be the government's, if you know at this point,

1 anticipated next step?

2        MS. KING:  We do not have a rebuttal case, Your

3 Honor.

4        THE COURT:  So then the testimony and evidence will

5 have been concluded and the jury will have it.

6        Then it seems to me we need to have a charge

7 conference.

8        MS. KING:  Yes.

9        THE COURT:  So we will send the jury on an early

10 morning break.  It will be probably about 10:45 when they go

11 out?

12        MR. SINDLER:  One other thing, please.  Given how

13 this day is going to evolve, due to circumstances beyond my

14 control, a different judge in the building would like my

15 presence in her courtroom at noon.

16        THE COURT:  The Chief?

17        MR. SINDLER:  The Chief, for a hearing that will

18 take I believe a while.

19        THE COURT:  When you say "a while"?

20        MR. SINDLER:  I think it's going to be more than a

21 10 or 15 minute get together.  It's a six-year-old case, not

22 that I want to go into the details, but trial is supposed to

23 start on Monday in that case and I learned only several days

24 ago --

25        THE COURT:  This coming Monday?

1          MR. SINDLER:  November 2, 2015, that the client for

2    whom I have been standby counsel for about three continuous

3    years just within the past week decided to have me as his

4    lawyer or wants counsel appointed, which would appear to be me

5    since I have been in that role for three years.

6          THE COURT:  You're the likely candidate.

7          MR. SINDLER:  There is going to be a colloquy,

8    discussions about scheduling, and I think it's going to take on

9    the order of about 30 to 40 minutes.

10          THE COURT:  The Chief is meticulous.

11          MR. SINDLER:  She's methodical, so that's coming up

12   in about an hour and a half.

13          THE COURT:  Let me ask you this.  Let's assume that

14   we're done with what we're going to do in the courtroom with

15   the jury at quarter to 11, 10 to 11, something like that.  Do

16   we believe we can have the charge conference and get that

17   squared away before you have to go see Chief Judge Conti?

18          MR. SINDLER:  I'm fairly confident.

19          MS. KING:  I think so, yes.

20          THE COURT:  So then when we get back, when you're

21   done with Chief Judge Conti and I'll have ruled on whatever I

22   need to rule on relative to the charge, we'll get that all

23   ready, then when we resume this afternoon, we would proceed to

24   closing arguments?

25          MR. SINDLER:  Okay.  Sure.

1          THE COURT:  Does that work for you, Ms. King?

2          MS. KING:  Yes.

3          THE COURT:  Am I leaving anything out that anyone

4  can think of?

5          MS. KING:  No.

6          THE COURT:  So we may actually be able to charge the

7  jury this afternoon.

8          So, Mr. Sindler, based on what you know now, it

9  would seem to the Court that we would not plan on resuming this

10 afternoon until 1:30, to play it safe.

11         MR. SINDLER:  That's fine.  Sure.

12         THE COURT:  Does that make sense to you, Ms. King?

13         MS. KING:  Yes, Your Honor.  Thank you.

14         THE COURT:  I'll just explain to the jury that's how

15 it works without going into a lot of other detail.

16 Fortunately, it's a beautiful day outside.  They can do what

17 they want to do until approximately 1:30.

18         Mr. Sindler, anything else we ought to talk about?

19         MR. SINDLER:  No.

20         THE COURT:  Ms. King or Mr. Ortiz, and Mr. Ortiz?

21         MS. KING:  Mr. Ortiz just reminded me that if during

22 the course of reviewing the evidence the jury does want to view

23 that thumb drive, we will need a clean laptop, which we can get

24 from Mr. Fox, I believe, but we'll need to check that there's

25 nothing else on the drive.

1        THE COURT:  Funny you mention that.

2        Mr. Babik, do you have any report for counsel

3   regarding the availability of a clean laptop, if one is needed.

4        MR. BABIK:  I spoke to Shawn Fox this morning and he

5   was going to bring one up at one o'clock this afternoon.

6        THE COURT:  I will swear Mr. Fox in as an additional

7   jury bailiff.  He is an employee of the clerk's office of the

8   court so if he has to take the laptop, he will confirm for the

9   record that the laptop has nothing else on it and to the extent

10  it would become necessary for him to assist the jury

11  technologically because he would be sworn as a jury bailiff, he

12  would be in a position to do that.

13       MR. SINDLER:  In the interest of full disclosure, K

14  through N are on that thumb drive.  Perhaps he and I can work

15  to remove them, but they're identical to what I showed here in

16  court.

17       Now, I provided paper copies because your earlier

18  trial management order said you wanted paper copies.

19       THE COURT:  No problem.

20       MS. KING:  That's fine.

21       THE COURT:  That's exactly what we saw in court?

22       MR. SINDLER:  It is.

23       THE COURT:  No problem.  We'll be good then.

24       Anything else we ought to talk about before the jury

25  comes down?

1            MS. KING:  No.

2            THE COURT:  What we'll do when the jury comes back

3   down and is seated, I'll turn to you and say something like,

4   Mr. Sindler, then you'll report whatever you're going to do,

5   and then, Ms. King and Mr. Ortiz, I'll turn to you and do the

6   same thing with you.

7            If it goes as we've anticipated, I'll then explain

8   to the jury that they can have a somewhat more leisurely lunch

9   today.

10           Mr. Greer, anything else we need to take care of

11  before we bring the jury down?

12           MR. GREER:  Nothing else, Judge.

13           THE COURT:  Can I excuse Mr. Johnson, Mr. Sindler,

14  once we do all this?

15           MR. SINDLER:  That has been my position.

16           THE COURT:  I want to make sure it didn't change.

17           MS. KING:  Yes.

18           THE COURT:  Once we close everything down, then I'll

19  alert you, Mr. Greer, that you can release Mr. Johnson.

20       (Jury enters the courtroom.)

21           THE COURT:  Please be seated everyone.

22           Ms. Kienzle, if you would note that all twelve

23  seated members of the jury and our two alternate jurors have

24  returned to the courtroom.

25           All trial participants previously noted are in the

 1 | courtroom.

 2 |          Mr. Sindler, sir.

 3 |          MR. SINDLER:  Judge, we move for admission of

 4 | Defense Exhibits A through N, as in Nancy, please.

 5 |          THE COURT:  Inclusive?

 6 |          MR. SINDLER:  Inclusive.

 7 |          THE COURT:  Ms. King?

 8 |          MS. KING:  No objection with our prior --

 9 |          THE COURT:  All objections have been previously made

10 | and preserved.

11 |          All objections to Defense Exhibits A through N have

12 | been previously made, preserved and ruled on.

13 |          Defense Exhibits A through N inclusive are admitted

14 | into the record.

15 |          Mr. Sindler.

16 |          MR. SINDLER:  The defense rests.

17 |          THE COURT:  The defense rests.

18 |          Ms. King and Mr. Ortiz?

19 |          MS. KING:  The government's case has concluded.

20 |          THE COURT:  There will be no rebuttal case or

21 | additional presentation by the United States?

22 |          MS. KING:  That's correct.

23 |          THE COURT:  I did this morning direct one witness to

24 | remain around.

25 |          Is there any reason he cannot be excused at this

1  point, Mr. Sindler?

2           MR. SINDLER:  No.

3           THE COURT:  Ms. King?

4           MS. KING:  No, Your Honor.

5           THE COURT:  When we conclude our proceedings here,

6  we'll tell him he's free to go about his business.

7           It would appear then, Mr. Sindler and Ms. King, that

8  the next order of business for the Court would be, in the

9  standard practice, to convene with counsel regarding

10  confirmation of the final instructions that will be given to

11  the jury later on, and then arrange a time for us to return to

12  the courtroom for the presentation of closing arguments and the

13  Court's final instructions to the jury.

14           Do you concur, Ms. King and Mr. Ortiz?

15           MS. KING:  Yes, Your Honor.

16           THE COURT:  Mr. Sindler?

17           MR. SINDLER:  Yes.

18           THE COURT:  Ladies and gentlemen of the jury, as you

19  may have gathered, the scheduling of any trial in federal court

20  moves at different rates, so where we are now is the

21  presentation of the testimony and evidence to you has

22  concluded.  So, we're going to take a somewhat longer than

23  normal midday break so that we can get things prepared because

24  when we return to the courtroom to resume our trial, we'll have

25  the closing arguments of counsel that I alerted you to when we

1  gave our preliminary instructions yesterday, along with the

2  final instructions from the Court, and you will then be in a

3  position to begin your deliberations.

4          So, we are not going to resume here in court until

5  1:30 p.m. today.  Fortunately, it's a nice day.  It is a little

6  bit of a longer break but that will allow the Court to have

7  everything ready to go for when you return.  So we will be on

8  recess until 1:30 p.m. today.

9          Ladies and gentlemen, during that recess, as with

10 all of our other recesses, you should not seek out or receive

11 from any source, in any means, method or manner any information

12 about the case, the participants in the case, or any of the

13 issues that are involved.  That's print, media, electronic,

14 digital, computer, database, anything, no information from any

15 source, no research on the part of any of you.

16         You should not discuss the case, those that are

17 involved in it or the issues in the case with anyone, including

18 anyone else on the jury.

19         Further, should anyone attempt to discuss any of

20 those things with you, you need to let Mr. Babik know that as

21 promptly as possible, if that were to arise.

22         With that, Mr. Babik, we'll excuse the jury for

23 their midday break.

24         If you could be back in the jury room by about 25

25 minutes after one today, that's what we would ask you to do.

1            So, Mr. Babik, if you can assist the jury.

2        (Jury is dismissed from the courtroom.)

3       (Whereupon, there was a brief recess in the proceedings.)

4            Ms. Kienzle, if you would note the jury has been

5    excused and all the other trial participants are present.

6            Counsel, we delivered to you the other day at the

7    end of the day in hard copy form and we've posted on the docket

8    as Case Participant Only documents three items, a verdict form,

9    a Court two-page document consisting of court's instructions to

10   the jury before closing arguments, and our proposed final

11   instructions to the jury, all of which were dated October 27,

12   2015.

13           Why don't we take them beginning with the fewest

14   number of pages.

15           The verdict form.

16           Ms. King and Mr. Ortiz, your position regarding the

17   verdict form?

18           MS. KING:  It's fine with us.

19           THE COURT:  Mr. Sindler?

20           MR. SINDLER:  This might be stating the obvious.

21   I'm wondering because I've seen other verdict forms where the

22   reference is made to not guilty/guilty.  I'm assuming here that

23   the foreperson would know what to write on the line since it's

24   not given as a choice, amongst the two.

25           THE COURT:  I'm happy to put the choice on.  In my

past experience, maybe I was being inappropriately predictive

in this case, there have been lengthy debates about which

phrase comes first, is it left to right, top to bottom, and I

thought since we had a single question on a single count, I

would try a slightly different format which would require the

foreperson to write in the verdict.

I will be saying during the final instructions, and

you'll note I did make reference to the verdict form, and I

would anticipate saying to the jury that whatever your

unanimous verdict is, it is to be written, the word or words

are to be written on that line.

MR. SINDLER:  That's fine.

THE COURT:  Ms. King, does that work for you?

MS. KING:  Yes.

THE COURT:  Does that work for you, Mr. Sindler?

MR. SINDLER:  Yes.

THE COURT:  The verdict form will be used in that

form.

Then we have, and I took this verbatim from what

counsel submitted, the Court's instructions prior to the

closings, a two-page document.

Mr. Sindler?

MR. SINDLER:  That's fine.

THE COURT:  Ms. King?

MS. KING:  That's fine.

```
 1              THE COURT:  Just to confirm, the way the closings
 2  go, the United States goes first, Mr. Sindler goes second, then
 3  United States gets rebuttal.
 4              Is that your understanding, Ms. King?
 5              MS. KING:  Yes.
 6              THE COURT:  Mr. Sindler?
 7              MR. SINDLER:  Yes.
 8              THE COURT:  Does counsel want the instructions
 9  before or after the closings?
10              MS. KING:  I think it makes sense to come before
11  because you describe what will happen.
12              THE COURT:  Mr. Sindler?
13              MR. SINDLER:  I had the sense you were going to have
14  us close first.
15              MS. KING:  I thought you meant the closing
16  instruction.
17              THE COURT:  This will come, the two pages will come
18  before you two say anything.
19              MS. KING:  I like the instructions after.
20              THE COURT:  After the closings?
21              MR. SINDLER:  That was my understanding.
22              THE COURT:  That's what we'll do.
23              On the proposed final instructions, the way I've set
24  it up is I have numbered every paragraph.  The reason I do that
25  is so that if we're talking about a paragraph, we can talk
```

about the number of the paragraph and sometimes it accelerates
things because I start by asking the party that has the burden
of persuasion in the case what is the first numbered paragraph
with which you have a question, suggestion or objection, the
lowest number.

MS. KING:  Paragraph 36.

THE COURT:  Mr. Sindler, do you have any questions,
objections or suggestions for a paragraph lower than 36?

MR. SINDLER:  12.

THE COURT:  Let's go to 12.

Mr. Sindler.

MR. SINDLER:  On the final line of Page 7, which is
where 12 begins is the word "evidence," it's just a stylistic
request, Judge, but when you're trying to define evidence and
then you use the word evidence again.  I prefer to use the word
"exhibits" instead of the word "evidence" on the final line.

THE COURT:  Ms. King, any objection if we change
that to exhibits?

MS. KING:  As Mr. Ortiz just pointed out, testimony,
exhibits, and stipulations.

THE COURT:  Mr. Sindler?

MR. SINDLER:  That's fine.

THE COURT:  Testimony, exhibits, and stipulations.

With that revision, are counsel in concurrence on
Paragraphs 1 through 12 inclusive?

1             Ms. King?

2             MS. KING:  Yes, Your Honor.

3             THE COURT:  Mr. Sindler?

4             MR. SINDLER:  Yes.

5             THE COURT:  The next lowest number paragraph you

6  have a question or concern about, anything below 36?

7             MR. SINDLER:  No.

8             THE COURT:  So, Ms. King, with the revisions to

9  Paragraph 12, are all of paragraphs 1 through 35 otherwise

10 acceptable to the government?

11            MS. KING:  Yes, Your Honor.

12            THE COURT:  Ms. King, you drew our attention to

13 No. 36.

14            MS. KING:  Yes, Your Honor.

15            In addition to expert testimony from Travis Johnson,

16 we also heard testimony from William Best, so his name should

17 be included here.  That will apply to the next paragraph as

18 well.

19            THE COURT:  37 also?

20            MS. KING:  Yes.  So there would have to be an

21 additional sentence about Mr. Best's knowledge, skill,

22 experience, training or education in the fields of --

23            MR. ORTIZ:  It was toolmarks analysis, firearms

24 operability, and serial number restoration.

25            THE COURT:  So, why don't we say 36 would read:  The

rules of evidence ordinarily do not permit witnesses to state
their own opinions about important questions in a trial, but
there are exceptions to these rules.  In this case, you heard
testimony from William Best and Travis Johnson.

I'm just putting them in chronological order.

Mr. Ortiz, those two topics were toolmarks?

MR. ORTIZ:  There were three, toolmarks analysis,
firearms operability, and serial number restoration.

THE COURT:  So the next sentence would read:
Because of his knowledge, skill, experience, training, or
education in the fields of toolmarks analysis, firearms
operability, and serial number restoration, Mr. Best was
permitted to offer an opinion in those fields and the reasons
for those opinions.

Because of his knowledge, skill, experience,
training or education in the field of CAD drafting and 3D
modeling, Mr. Johnson was permitted to offer his opinions in
those fields and the reasons for those opinions.

MS. KING:  With respect to Mr. Best, he did offer
several opinions, so I think it would be for both witnesses
they offered opinions.

THE COURT:  Plural?

MS. KING:  Yes.

THE COURT:  The opinions will be plural.

Mr. Sindler, with those changes, would they be

1 acceptable to the defendant?

2          MR. SINDLER:  That's fine.

3          THE COURT:  Then No. 37, rather than saying the

4 "opinion" these witnesses stated, it would be the "opinions"

5 these witnesses stated.

6          MS. KING:  Yes.

7          THE COURT:  Ms. King, anything else on 36 or 37?

8          MS. KING:  No, Your Honor.

9          THE COURT:  Mr. Sindler, anything on 36 or 37?

10          MR. SINDLER:  No.

11          THE COURT:  With those revisions, are they otherwise

12 acceptable to the defense?

13          MR. SINDLER:  Yes.

14          THE COURT:  Ms. King?

15          MS. KING:  Yes.

16          THE COURT:  The next lowest number anyone has a

17 question or comment or objection on, Ms. King?

18          MS. KING:  39.

19          THE COURT:  Mr. Sindler, anything on 38?

20          MR. SINDLER:  I don't.

21          THE COURT:  Ms. King, 39.

22          MS. KING:  We brought this to the Court's attention

23 prior to trial.  I don't believe that the identity of

24 Mr. Warren is at issue in this case.  We had testimony from

25 Mr. Sywyj who said he saw Mr. Warren with a gun.  Mr. Warren

1  emerged from the second doorway, made a statement that the gun

2  was a toy, and that this same Mr. Warren was interviewed by

3  Officer Hoyson in the car and himself admitted to possessing

4  the gun, so I do not believe that the defendant's identity is

5  at issue in this case.

6          THE COURT:  Mr. Sindler?

7          MR. SINDLER:  I thought you had already ruled on

8  that because it was brought up on Monday I think during our

9  initial conference before we even got to the jury pool.  If I'm

10 mistaken about that, we rest upon the same arguments we made

11 Monday morning, primarily because the man who emerged from the

12 house having not been dispossessed of the weapon then required

13 or led to Sywyj going into the house to get the weapon and then

14 a decision made to arrest Mr. Warren.

15          What is certainly at issue as well as to the first

16 point I just made is the visibility circumstances, the

17 circumstances under which Mr. Sywyj could see Mr. Warren.  So

18 when you take into account the testimony from Ms. Hayes that

19 the lighting was not what it would be, one, given the hour of

20 the day, and secondly, because part of her routine in retiring

21 for the night was to, except for a light in the kitchen, which

22 is well away from where these circumstances evolved and

23 developed, led to a pretty dark first floor into which

24 Mr. Sywyj was peering.

25          MS. KING:  Ms. Hayes, in fact, never testified that

when she went downstairs the lights were off.  She testified
when she went to bed they were off.  She testified differently
at the suppression hearing.  But Officer Sywyj specifically
said that the defendant is the person that he saw, that he
spoke to, and Officer Hoyson said the same thing.  So both
individuals identified the same defendant.

MR. SINDLER:  Mr. Sywyj didn't say that he turned on
a light switch or that he activated a light, and, of course, he
is going to say that he could clearly see my client, but
Ms. Hayes gave a different impression.

THE COURT:  Let me ask this.

Ms. King, would that be the same objection for each
of the numbered paragraphs through 43 inclusive?

MS. KING:  Yes, that entire instruction.

THE COURT:  I'm going to give the instructions.
I'll tell you why.  It seems to me the gravamen of the offense
that is charged is that Mr. Warren, that Mr. Warren, I don't
mean to phrase it that way, Mr. Warren, but Mr. Warren seated
next to Mr. Sindler was in possession of a firearm and that he
was observed in the possession of the firearm.

You're correct, Ms. King, that Mr. Sywyj and
Mr. Hoyson in the courtroom, as did Ms. Hayes, identified
Mr. Warren as Mr. Warren, and that the two police officers said
that Mr. Warren who is in the courtroom is who they saw that
night.  But it appears to the Court that it will be up to the

1 jury to decide if that is who they saw and will, with the

2 assistance of the argument of counsel, come to whatever

3 conclusion they're going to come to, including giving weight to

4 Officer Sywyj and Officer Hoyson's testimony as the jury deems

5 appropriate.  So I'm going to give the instructions.  The

6 objection is noted.  That's the basis for my giving the

7 instructions.

8         Mr. Warren is not in the context of the case and the

9 charges preferred in this case, he's not a by-stander or

10 collateral participant, if you will, it's sort of the heart of

11 the case, so I'm going to give those instructions.  The

12 objection is to Paragraphs 39 through 43 from the United States

13 inclusive is noted, and as far as this Court is concerned, have

14 been preserved.

15         Any objections or comments or questions -- what is

16 the next lowest one you have, Mr. Sindler?

17         MR. SINDLER:  46.

18         THE COURT:  Ms. King, do you have anything on 44,

19 45?

20         MS. KING:  No.

21         THE COURT:  So Ms. King, are 44 and 45 agreeable to

22 the United States?

23         MS. KING:  Yes.

24         THE COURT:  Are they agreeable to the defense,

25 Mr. Sindler?

1              MR. SINDLER:  Yes.

2              THE COURT:  Mr. Sindler, you have a concern about

3  46.  It appears it comes out.

4              MR. SINDLER:  That's all I was going to say.

5              THE COURT:  Ms. King, it would appear that 46 comes

6  out?

7              MS. KING:  Yes.

8              THE COURT:  47, any objections on 47?

9              MR. SINDLER:  No.  Although, just so the record is

10 clear, my client and I did discuss this.  This is oftentimes a

11 matter that can go either way when the client in a criminal

12 case doesn't testify.

13             Here, the preference is that the instruction be

14 given about his not testifying, the fact that it should not be

15 held against him.

16             THE COURT:  Ms. King, any objection to giving the

17 instruction at 47?

18             MS. KING:  No.

19             THE COURT:  It will be given.

20             Ms. King, what is the next lowest one that you have

21 a question or objection on?

22             MS. KING:  54.

23             THE COURT:  Mr. Sindler, anything before 54?

24             MR. SINDLER:  No.

25             THE COURT:  So 47 through 53 inclusive are agreeable

1 | to the government, Ms. King?

2 |             MS. KING:  Yes.

3 |             THE COURT:  Mr. Sindler?

4 |             MR. SINDLER:  Yes.

5 |             THE COURT:  Ms. King, 54.

6 |             MS. KING:  Your Honor, it seems the essence of this

7 | instruction is that the government and the defendant are equal

8 | before the law, which is true, but on the second page, on 32,

9 | where it says:  No greater weight should be given to the

10 | testimony of a witness connected with the government than to a

11 | witness who is not, we would prefer that the instruction read

12 | something to the effect of:  No greater weight should be given

13 | to the testimony of any witness connected with either party,

14 | instead of saying that specifically the government's witnesses

15 | should not receive greater weight.

16 |             THE COURT:  Mr. Sindler, any objection to that

17 | revision?

18 |             MR. SINDLER:  Well, I do have an objection because

19 | we already, when we picked a jury have Question 8 that was part

20 | and center at certain times on Monday and Tuesday of this week

21 | with respect to getting the jury that we did, that is that

22 | there's a tendency for people to give greater weight because of

23 | a uniform, a badge, or working in a law enforcement capacity to

24 | somebody who comes into court with that kind of background.

25 | The instruction seems to be perfectly appropriate.

1            THE COURT:  Well, that's a possibility.  I'm not a

2 psychologist and I didn't train as a psychologist for this job,

3 but I would also note, although it was not a question requested

4 by any party in voir dire, the Court prior to having this job

5 did get around a little bit, it's also possible that there are

6 people on the jury who, for their reasons, on any jury, for

7 their reasons, they find logical to have concerns about the

8 government and, therefore, they may give greater weight to

9 people that testify or present things contrary to the

10 government.

11            So, I'm going to revise 54 to read as follows:  The

12 government and the defendant, Atiba Warren, are equal before

13 the law.  No greater or lesser weight should be given to the

14 testimony of a witness connected with either party.

15            Is that agreeable with you, Ms. King?

16            MS. KING:  Yes.  Thank you.

17            THE COURT:  Mr. Sindler, do you still have an

18 objection?

19            MR. SINDLER:  I do.  It's only because I don't know

20 that anybody testified contrary to what the government or what

21 government witnesses had said in this case.  So I'm just noting

22 the objection.

23            THE COURT:  It is noted, Mr. Sindler.

24            Mr. Sindler, what is the next lowest number you have

25 an objection, question or concern with?

```
 1              MR. SINDLER:  69.

 2              THE COURT:  Ms. King, anything below 69?

 3              MS. KING:  60.

 4              THE COURT:  Are 55 through 59 agreeable to the

 5  government, Ms. King?

 6              MS. KING:  Yes, Your Honor.

 7              THE COURT:  Mr. Sindler?

 8              MR. SINDLER:  Yes.

 9              THE COURT:  60, Ms. King.

10              MS. KING:  Your Honor, it seems to the government

11  that this is a 404(b) type instruction and there was no 404(b)

12  evidence elicited in this case.

13              There are two other occasions within these jury

14  instructions where the Court essentially says the same thing,

15  and so simply because there was no 404(b) evidence elicited, I

16  don't think that this is necessary.

17              THE COURT:  Mr. Sindler?

18              MR. SINDLER:  The problem is that in a case like

19  this, we can't bifurcate out prior conviction and felon in

20  possession prosecution --

21              THE COURT:  Because it's an element.

22              MR. SINDLER:  -- the tendency is that there is going

23  to be undue influence or weight paid by a juror or the jury to

24  the prior conviction that was, particularly in this case wasn't

25  contested but instead stipulated to.  The instruction seems
```

1 perfectly appropriate under these circumstances.

2          MS. KING:  Your Honor, it is our position that that

3 is, in fact, when the Court goes over the prior stipulation

4 about the conviction and immediately thereafter the Court says

5 the same type of thing right at that point.

6          THE COURT:  I'll take a look at that, but it's

7 likely I'll leave 60 in because this is one of the rare cases

8 where everyone knows you have to tell the jury about a prior

9 conviction without ever getting to 609 or 404.  So the jury

10 affirmatively knows that Mr. Warren has been convicted of an

11 offense in state court for which the punishment was a term in

12 prison in excess of a year -- which the punishment could be a

13 term in prison in excess of a year.

14          So I'll look it over.  If I find it to be unduly

15 cumulative or repetitive and would modify it, I would alert

16 counsel to that, but as of now I would leave it in, Ms. King.

17          MS. KING:  Thank you.

18          THE COURT:  Next lowest number you have, Ms. King?

19          MS. KING:  Your Honor, I am sorry, I missed one at

20 Paragraph 17.

21          THE COURT:  That's fine.

22          Let's all go back to 17.

23          MS. KING:  Page 11.

24          The sentence that reads:  You should not show

25 prejudice -- you should not show prejudice against an attorney

1 or his -- I think it should be his or her client.

2          THE COURT:  Okay.

3          MS. KING:  Or their client.

4          THE COURT:  Why don't we say:  You should not hold

5 it against an attorney or their client because the attorney has

6 made objections.

7          So it would read:  You should not hold it against an

8 attorney or their client because the attorney has made

9 objections.

10          MS. KING:  Yes.

11          THE COURT:  Does that resolve it, Ms. King?

12          MS. KING:  Yes.

13          THE COURT:  Is that agreeable with you, Mr. Sindler?

14          MR. SINDLER:  That's fine.

15          THE COURT:  The last one we talked about was 60.

16          Ms. King, what was your next lowest one with

17 questions, comments or objections?

18          MS. KING:  Paragraph 79.

19          THE COURT:  Mr. Sindler, do you have anything

20 between 60 and 79?

21          MR. SINDLER:  I'm sorry, I thought I said 69.

22          THE COURT:  So are Paragraphs 61 through 68

23 inclusive agreeable with you, Mr. Sindler?

24          MR. SINDLER:  They are.

25          THE COURT:  Ms. King?

1          MS. KING:  Yes.

2          THE COURT:  We're at 69, Mr. Sindler.

3          MR. SINDLER:  Judge, we reached two stipulations in

4  this case and this is a point at which unlike any other

5  evidence in a case when it comes to jury instructions where

6  evidence being reviewed as part of the jury instruction, and

7  it's particularly evidence that goes to the element of the

8  offense, it appears -- not appears, it seems to me that it

9  gives more weight than it should to this particular stipulation

10  by reviewing that evidence as part of the jury instruction.

11          THE COURT:  If we go ahead to Paragraph 81, aren't

12  we doing the same thing relative to the stipulation that it

13  traveled in interstate, and maybe Ms. King is going to tell me

14  it should be interstate or foreign commerce, and that the

15  reason we have Paragraph 70 and 71 and 72, we have follow-up

16  paragraphs to the stipulation paragraph of 69, are to look out

17  appropriately for the interests of Mr. Warren or anyone in

18  Mr. Warren's shoes.  But isn't 69 and 81, aren't they parallel?

19          MR. SINDLER:  They are.  I was actually going to

20  object to that as well this morning.  But you can still say,

21  and I don't have it spelled out on some piece of paper here

22  that there has been evidence in this case that the parties have

23  stipulated to, and then get into the paragraphs that you're

24  referring to as to how or what weight, if any, should be given

25  to those stipulations, without explaining or describing that

1  which has been stipulated to.

2          THE COURT:  So, if 69 began with:  Evidence has been

3  submitted that Atiba Warren was convicted of a crime in state

4  court and that this conviction occurred prior to the time

5  Mr. Warren or Atiba Warren is alleged to have possessed the

6  firearm in question.

7          So your objections to 69 through 72 are to the

8  extent it references a stipulation as opposed to evidence?

9          MR. SINDLER:  Instructions as to how the jury should

10 look at a stipulation is one thing, but we're explaining or

11 describing once again the evidence itself as part of these jury

12 instructions and that is to what I'm objecting.

13         THE COURT:  Let's hear from Ms. King.

14         MS. KING:  Your Honor, the model instructions

15 themselves, this is based on the model instructions from the

16 Third Circuit, and so we think it is absolutely appropriate.

17         I mean I would note that these -- the draft

18 instructions that we submitted to the Court were submitted as

19 we were working out what the actual stipulations would be, and

20 so as I'm looking at 69, I don't know that it necessarily

21 exactly tracks the stipulation that we actually entered into,

22 but when I look -- when I look in the model instructions, this

23 is exactly what the model instructions say what this

24 instruction is.  So I think it should be given.  I think it

25 should be given as it's given in the model instructions.

1          The other thing I would point out is if the
2    defendant didn't want the stipulation to come in as it did,
3    what the instruction would actually -- according to the model
4    instructions, the Court would tell the jury that the government
5    has alleged and introduced evidence that the defendant was
6    convicted of, and you name the crime, which would be in this
7    case robbery with a deadly weapon.  So you would be saying that
8    to the Court, had we not had the stipulation in, so I think
9    it's kind of an end runaround of the stipulation we entered
10   into to ask for this.

11          MR. SINDLER:  If that would have happened, I would
12   have objected to that as well, but we're not dealing with that
13   now, we're dealing with what we have here in this case.

14          THE COURT:  I'm going to take a look at it,
15   Mr. Sindler.  Your objection is noted.  It's likely that I'm
16   going to leave at least as to Paragraph 69 and the following
17   paragraphs through 72 inclusive, that I'm going to leave them
18   in because I do believe, although it was not directly addressed
19   because it was not before our Court of Appeals in Caldwell, I'm
20   coachable as a district judge, and one of the messages I
21   believe that came through loud and clear in Caldwell is that
22   district judges have an obligation to make sure the
23   instructions are clear when there is evidence admitted into the
24   record in a criminal trial of a defendant's prior convictions
25   or prior conviction that I give an appropriate limiting

1  instruction or instructions as to what use that is not to be

2  made of.

3          I believe because that evidence has come in, I'm

4  going to give the instructions in 70 through 73 because I think

5  it's important to do that, and I think they only make sense in

6  the context of something like 69.

7          So I will take a look at the verbiage while we're on

8  break in the context that you've noted.  When I come back out,

9  what I anticipate we'll do, Mr. Greer, you need to remind me of

10 this, is we'll have this document, any revisions done in two

11 forms, red line and clean.  Clean will, of course, be the one

12 I'll read from once it has been resolved and what would go to

13 the jury room, but I'll make any other revisions in red line so

14 that they can be quickly observed by counsel and then we can do

15 what we need to do on the record.

16         So, the objection is noted.  It's likely I'm going

17 to leave them in either as is or substantially as is.

18         So, other than the sort of principle objection or

19 objection based on that broad principle that you've noted,

20 Mr. Sindler to 69, does that also carry over to 70, 71 and 72,

21 sir?

22             MR. SINDLER:  It does.

23             THE COURT:  It's noted.

24         Any other objections to 69 through 72 inclusive,

25 Mr. Sindler?

 1           MR. SINDLER:  Through what, I'm sorry?

 2           THE COURT:  69 through 72 inclusive?

 3           MR. SINDLER:  No.

 4           THE COURT:  Ms. King?

 5           MS. KING:  No.

 6           THE COURT:  Any objections to 73?

 7           Or what is the next lowest one anyone has an

 8 objection on of 73 or higher.

 9           Ms. King?

10           MS. KING:  79.

11           THE COURT:  Mr. Sindler, anything before 79?

12           MR. SINDLER:  76.

13           THE COURT:  Does that mean that 73 through 75 will

14 are acceptable to you, Mr. Sindler?

15           MR. SINDLER:  They are.

16           THE COURT:  To you, Ms. King?

17           MS. KING:  Yes.

18           MR. SINDLER:  It's stylistic, the word

19 "insufficient," I prefer it to read "not sufficient."

20           THE COURT:  Ms. King, is that okay?

21           MS. KING:  Yes.

22           THE COURT:  So it becomes two words "not

23 sufficient."

24           That changes is made.

25           Next lowest number you have a question or an

1   objection to or question?

2            MS. KING:  79.

3            THE COURT:  Anything with 77 or 78, Mr. Sindler?

4            MR. SINDLER:  No.

5            THE COURT:  Those are agreed to.

6            79, Ms. King?

7            MS. KING:  As Your Honor indicated, we would like to

8   add:  In foreign and/or in interstate commerce.

9            THE COURT:  That would be at the very last line:

10  The firearm has traveled in foreign or interstate commerce.

11           MS. KING:  Yes.

12           THE COURT:  Mr. Sindler?

13           MR. SINDLER:  Okay.

14           THE COURT:  That change is made.

15           Mr. Sindler, what is the next lowest one you have a

16  question, concern or objection to?

17           MR. SINDLER:  We just raised it, it's 81, but it

18  sounds like it's pending or being addressed.

19           THE COURT:  Okay.  It is.

20           Ms. King, anything with 80 or 81?

21           MS. KING:  Same thing in the last line:  Foreign or

22  interstate commerce.

23           THE COURT:  In 81?

24           MS. KING:  Yes.

25           THE COURT:  Mr. Sindler, next lowest number after

 1  81?

 2              MR. SINDLER:  101.

 3              THE COURT:  Ms. King, anything before 101?

 4              MS. KING:  No.

 5              THE COURT:  82 through 100 are agreeable to the

 6  government; is that correct?

 7              MS. KING:  Yes.

 8              THE COURT:  82 through 100 are agreeable to the

 9  defense, Mr. Sindler?

10              MR. SINDLER:  Yes.

11              THE COURT:  101, Mr. Sindler.

12              MR. SINDLER:  There is a reference to plural

13  charges, Judge, on the fourth line.  It should read as to "the

14  one charge" as opposed to "any charges."

15              THE COURT:  So, if we changed "any charges" to "the

16  charge against Mr. Warren," that would be accurate?

17              MR. SINDLER:  Well, I was suggesting:  You cannot

18  return a verdict as to the one charge, I'm not sure that there

19  has to be a reference to Mr. Warren.

20              THE COURT:  How about:  The one charge in this case?

21              MR. SINDLER:  That's fine.

22              THE COURT:  Ms. King, is that agreeable with you?

23              MS. KING:  Yes.

24              THE COURT:  That change will be made.

25              Next lowest number you have, Ms. King?

1         MS. KING:  We have no further comments.

2         THE COURT:  Mr. Sindler?

3         MR. SINDLER:  Nor do we.

4         THE COURT:  We'll get these made.  We'll give

5  counsel copies in red line.  What we may do, Mr. Sindler, is if

6  they're made before you -- would it be possible for everyone to

7  hang around here until I give these to you because I think I

8  may give them to you by quarter to twelve or ten minutes to

9  twelve.

10        Is that agreeable?

11        MR. SINDLER:  If you will, I'm going to be camped

12  out in a Judge Conti conference room, it's only one floor down

13  directly below us, is that okay?

14        THE COURT:  That's fine.

15        Ms. King, can you or Mr. Ortiz, or we can get them

16  down to you on the fourth floor.

17        MR. ORTIZ:  I can wait for it.

18        THE COURT:  We'll get these taken care of.  We'll

19  give you clean and red line.  All the paragraph numbers I've

20  referenced to, Ms. Kienzle, are the paragraph numbers in the

21  documents that were delivered to counsel in October 27 and

22  posted as Case Participants Only Documents on those dates.

23  They will change because we're deleting one paragraph in its

24  entirety, so the number of the paragraphs coming after that

25  will be different on the forms that we give you now.  So, all

1  of the references during the charge conference, Ms. Kienzle,

2  were to the numbers on that prior ECF document.  We'll get this

3  taken care of.

4           Mr. Ortiz, thank you for hanging around.

5           Mr. Sindler, we'll get a set of copies down to you.

6           Then when we resume before we have the jury, we'll

7  do a final run through, all the objections you've made, as far

8  as I'm concerned, are deemed preserved and we'll go from there.

9           Ms. King and Mr. Ortiz, anything else we should take

10 up right now?

11          MS. KING:  No, Your Honor.  Thank you.

12          THE COURT:  Mr. Sindler, anything else?

13          MR. SINDLER:  No.

14          THE COURT:  Mr. Greer, if you'd recess the Court.

15     (Whereupon, there was a brief recess in the proceedings.)

16          THE COURT:  First, Ms. King and Mr. Ortiz, did you

17 get copies of the red line jury questions?

18          MS. KING:  Yes.

19          THE COURT:  Mr. Sindler, did you get a copy of the

20 red line jury instructions?

21          MR. SINDLER:  Yes.

22          THE COURT:  I believe Mr. Ortiz gave them to you.

23          MR. SINDLER:  Yes.

24          THE COURT:  I have two other suggested

25 modifications.  If I could draw counsel's attention to

1  Paragraph 13, it had made a reference to at subparagraph D to

2  judicially noticed facts.  There have been none in this case,

3  so my thought was to delete D to avoid any risk of confusion.

4          Ms. King, what do you think about that?

5          MS. KING:  We agree with that.

6          THE COURT:  Mr. Sindler?

7          MR. SINDLER:  Sure.

8          THE COURT:  Then at Paragraph 71, the very last line

9  of that reads:  Doubt all of the elements of this crime.

10          My thought would be to change it to:  Doubt all of

11  the elements of the crime charged in this case.

12          Avoids confusion that someone would think I'm saying

13  there was a crime as opposed to the crime charged in this case.

14          Mr. Sindler?

15          MR. SINDLER:  I was turning to that part of the

16  instructions.

17          THE COURT:  Rather than saying, "this crime," it

18  would read, "the crime charged in this case."

19          MR. SINDLER:  That's fine.

20          THE COURT:  Ms. King?

21          MS. KING:  That's fine.

22          THE COURT:  So, we'll make those two changes.

23          Ms. King and Mr. Ortiz, let me state this both as to

24  the government and the defense, all objections previously made,

25  unless they have been sustained by being adopted in the charge

1 are deemed by this Court to have been made and preserved.

2          Subject to any prior objections or requests,

3 Ms. King, any objections to the charge with the two

4 modifications I have just made, or Mr. Ortiz?

5          MR. ORTIZ:  No objections to the change you just

6 made, but I do have two additional issues I want to bring up.

7          The first is pretty straightforward in Paragraph 79.

8 I think we missed the "or foreign" in relation to the commerce.

9 It's the last sentence of Paragraph 79.

10          THE COURT:  That would read:  Had traveled in

11 foreign or interstate commerce.

12          MR. ORTIZ:  I think that would be consistent with

13 the other paragraphs we mentioned and the stipulation.

14          THE COURT:  Mr. Sindler, any objection to making

15 that modification to Paragraph 79?

16          MR. SINDLER:  No.

17          THE COURT:  Without objection, it will be made.

18          MR. ORTIZ:  Then the other is in 70, on Page 38.  I

19 know that you said you were going to review the language, take

20 it under consideration potentially modify the language and it

21 looks like the modification was to because it relates to one of

22 the elements of the crime.

23          THE COURT:  Okay.

24          MR. ORTIZ:  My suggestion would be that to the

25 extent it needs to be modified from the pattern jury

instruction, that it be modified to something to the effect of

the jury may find that it tends to establish, which would be

more consistent with the pattern as well as more consistent

with the purpose through which we -- which we had for

submitting the stipulation, it doesn't just relate to that

element.  That was our evidence for that.

THE COURT:  So let me just take a moment.

I appreciate it, Mr. Ortiz, let me take a minute to

look at it.

What if it read:  Was brought to your attention only

in regard to.

MR. ORTIZ:  Well, Your Honor, it wasn't brought in

regard to it, it was brought because it is our evidence of

that.  So I don't believe that "in regard to" or "relates to"

is appropriately reflecting the purpose that we entered into

that stipulation.  If it wasn't going to be used to establish

that, we wouldn't have stipulated to it.  We would have

actually proved it by putting in the certified conviction.  So,

to the extent that it is going to vary from what is the

accepted model instruction, I think it really only should be:

You may find that it tends to, or something to that effect

because it is a stronger use than just regards or relates.

THE COURT:  What if it was:  Was brought to your

attention by the government in order to demonstrate one of the

elements of the crime or in order to prove -- in an effort to

1  prove, was brought to your attention by the government --

2          MR. ORTIZ:  Respectfully, Your Honor, it's a joint

3  stipulation.  He agreed to it.  So it isn't just -- it isn't

4  just the government's proposition that it establishes this or

5  that it relates to it.  It was agreed upon that this occurred,

6  that this fact is submitted to the jury and should be

7  considered for --

8          THE COURT:  Doesn't Paragraph 68 give you all of

9  that with a lot of horsepower, Mr. Ortiz?

10         MR. ORTIZ:  But Paragraph 70 then walks it back.

11 That's why the model instruction has the language that it does.

12 The modification removes the true purpose of the stipulation

13 and why we entered into it.

14         THE COURT:  What if we take out everything in

15 Paragraph 70 so that it begins with:  You are not to speculate

16 as to the nature of the conviction.  You may only consider

17 it -- so that it essentially addresses the Caldwell type issues

18 and we just take off the stuff at the beginning because that's

19 covered by 68?

20         MR. ORTIZ:  If I understand you, you're proposing to

21 remove the full first two sentences?

22         THE COURT:  What if we took that out and began

23 Paragraph 70 with:  You are not to speculate.

24         The only reason the first two sentences are in are

25 really to focus on the word "only" because 68 says the parties

1  have stipulated to this and that it occurred, et cetera, et

2  cetera.  The beginning of 70 is an effort to focus the jury's

3  attention that they're to give it one use and one use only.

4         MR. ORTIZ:  Right, but those preceding paragraphs

5  don't say what the stipulation is relevant for.

6         THE COURT:  Yes, but one of you is going to give a

7  closing that is going to explain that, right?

8         MR. ORTIZ:  But this is part of their instruction,

9  they have to consider it, to the extent they have a

10 consideration or a question about what Ms. King read into the

11 record as far as the stipulation is concerned, this is their

12 guidance for that.

13        THE COURT:  Take a minute and read 67 and 68

14 together to ourselves.

15        MR. ORTIZ:  Your Honor, my read of 67 and 68 is,

16 again, stating there is a stipulation, but it isn't explaining

17 the purpose for it, as it relates to the elements that you set

18 out.  This is what the purpose of the beginning Paragraph 70

19 is.

20        THE COURT:  I think you're asking for a double dip.

21 The only reason for -- the only reason Paragraph 70 is in here

22 is in open court, everyone has said out loud, properly, without

23 the strictures of 404 or 609 that Mr. Warren is for purposes of

24 this statute a convicted felon.  Normally, we don't talk about

25 that in a criminal trial unless it comes within 404, 609.  So

1  there's caution about that.  So, that's the only reason 70 and

2  71 are in here is to give caution as to what use can and can't

3  be made of that information.  The fact that it's an element of

4  the crime is Paragraph 67 and the fact that the parties have

5  stipulated to those facts is 68, and then we talk -- and 69

6  says, you can treat that stipulation as a proven fact, but

7  you're not required to do so.

8         So, it seems to me that Mr. Sindler or anybody in

9  Mr. Sindler's shoes could say, Judge, I understand why you have

10 70 and 71 in at all, I've talked to Mr. Warren about it and we

11 don't want you to do 70 or 71.  Those two paragraphs are for

12 the benefit of the defendant, not for the benefit of the United

13 States.

14         MR. ORTIZ:  Your Honor, the instruction isn't for

15 us, it's for them and --

16         THE COURT:  I understand.  It seems to me 70 and 71

17 when I say they're for the benefit of the defendant, they're to

18 protect the interest of the defendant in assuring that evidence

19 of another crime is not used for a propensity-based purpose,

20 which is beyond 404.  Generally in our law, we do not allow

21 propensity evidence of any type to come in.  I'm to guard

22 against it.  That's why 70 and 71 are in.  It seems to me,

23 Mr. Ortiz, 67, 68 and 69 say for there to be guilt of

24 Mr. Warren, you have to find that the government proved he had

25 been convicted of a crime punishable by a term of imprisonment

of more than a year.  That's 67.  68 says the parties have
agreed he was so convicted.  And that it occurred at the right
time.  And 69 says, if you want, you can treat that as proven,
but you don't have to because you're the judge of the facts.

At that point, I think the instructions have
addressed that there was a stipulation, what the stipulation
was, and what the jury may but is not required to do with it.

The only reason 70 is in here, and I focus on the
word only in the fourth line, is as a cautionary instruction to
the jury that you can consider that fact only because that
criminal record is an element of the offense.  Otherwise, 70
and 71 wouldn't be in the instructions.

MR. ORTIZ:  Well, Your Honor, I don't want to repeat
myself too much, but I respectfully disagree.  I believe to the
extent the Court is inclined to change the pattern jury
instruction on this issue, I don't believe that this is a
proper way to change it.  If you were inclined to make a
change, it should be limited to something to the effect of:
You may find that it tends to establish.

THE COURT:  I think that's already in 69.  I go
beyond that, I say:  You may treat it as a proven fact.

I think I've covered you in 69, Mr. Ortiz.

Mr. Sindler, do you want instructions 70 and 71?

MR. SINDLER:  I do.

THE COURT:  Do you want them because you believe

1  they're necessary as non-propensity directives to the jury?

2          MR. SINDLER:  I do.

3          THE COURT:  I'm willing to change, Mr. Ortiz,

4  "brought to your attention only because it relates to one of

5  the elements of the crime," to "brought to your attention only

6  in conjunction with one of the elements of the crime," or "only

7  in regard to one of the elements of the crime."  Or I'll leave

8  it just as it is.

9          MR. ORTIZ:  Given the choices, I believe that "in

10  conjunction" would be the term that would be most consistent

11  with the pattern jury instructions.

12          THE COURT:  Mr. Sindler, do you have an objection if

13  I change it to "your attention only in conjunction with one of

14  the elements of the crime"?

15          MR. SINDLER:  That's fine.

16          THE COURT:  Mr. Ortiz or Ms. King?

17          MR. ORTIZ:  That's all.

18          THE COURT:  Mr. Sindler, recognizing the other

19  objections previously in our charge conference that were made,

20  in this Court's estimation are preserved, any other amendments,

21  corrects, objections other than those that have been noted?

22          MR. SINDLER:  No.

23          THE COURT:  What we'll do is I'll have Mrs. Dressler

24  make the revisions.  It's my intention we'll deliver -- once

25  the jury is excused after I give the instructions, we'll then

1  make the copies that go up to the room.  We're not going to

2  make them yet because you may once they're out of the room, I

3  will ask each side if you have any objections or corrections to

4  the charge as delivered to the jury outside of the presence of

5  the jury.  Then if any would have to be made, then we would

6  make them.

7         So at this point, we'll make copies for counsel and

8  Mr. Warren to have and the Court to have during its reading of

9  them.  We'll make the circulation copies that will go to the

10  jury room once they have been discharged.  We have arranged for

11  Mr. Fox to be back up here, we'll call him around three

12  o'clock.  We'll swear him in as a jury bailiff.  He has a clean

13  computer.  He will go with Mr. Babik up to the jury room and

14  show someone how to set it up if they need to have that done.

15         Mr. Greer, could you save time and ask Mrs. Dressler

16  to come out and see me.

17         MR. GREER:  Yes.

18         THE COURT:  Ms. King and Mr. Ortiz, are there any

19  other matters we ought to take up once we get these logistics

20  back and proceed to closing arguments?

21         MS. KING:  No, Your Honor.

22         THE COURT:  Mr. Sindler?

23         MR. SINDLER:  No.

24         THE COURT:  Ms. King, just for information purposes,

25  who is going to deliver the closing argument for the United

1 States?

2              MS. KING:  I will, Your Honor.

3              THE COURT:  Mr. Sindler, if you need anything moved

4 before your closing argument, if you're going to be over there

5 and need the podium moved, just feel free to move it.

6              MR. SINDLER:  I can do that.  I'm going to have to

7 make sure this is working, too, because we've had plenty of

8 instances the last couple of days that due to circumstances

9 beyond my control --

10             THE COURT:  Do you want to check her out right now?

11             MR. SINDLER:  Sure.

12             It's working now.

13             THE COURT:  You can check it again later,

14 Mr. Sindler.  No problem, better safe than sorry.

15             Ms. King and Mr. Ortiz, any reason we can't bring

16 the jury down?

17             MS. KING:  No, Your Honor.

18             THE COURT:  Mr. Sindler, may we bring the jury down?

19             MR. SINDLER:  Yes.

20             THE COURT:  Mr. Babik, bring the jury down.

21        (Jury enters the courtroom.)

22             THE COURT:  Please be seated.

23             Ms. Kienzle, if you would note that all twelve

24 members of the jury and our two alternate jurors are returned

25 to the courtroom.

1             All trial participants as previously noted are

2    present in the courtroom.

3             Thank you, ladies and gentlemen of the jury.

4             Members of the jury, you have heard and seen all of

5    the evidence in this case.  The lawyers now have the

6    opportunity to present their closing arguments.  Under the

7    rules of procedure, the government will argue first, and then

8    the defense will present its closing argument, and finally the

9    government may, if it chooses, argue in response or in rebuttal

10   to the defense's argument.

11            Closing arguments are designed to present to you the

12   parties' theories about what the evidence has shown and what

13   conclusions may be drawn from the evidence.  Remember, what is

14   said in closing arguments is not evidence.  You have already

15   heard and seen all of the evidence in this case.

16            After the lawyers present their closing arguments, I

17   will give you my final instructions concerning the law that you

18   must apply to the evidence in reaching your verdict.  Although

19   the lawyers may mention points of law in their closing

20   arguments, the law that you must follow in reaching your

21   verdict is the law that I will give you in my final

22   instructions.  If there is any difference in what the lawyers

23   say about the law and what I tell you in my final instructions,

24   you must follow my final instructions.

25            Ms. King, you're invited to give your closing

1 argument.

2 　　　　　MS. KING:  Thank you, Your Honor.

3 　　　　　Ladies and gentlemen of the jury, on October 23,
4 2012, Atiba Warren heard that his cousin had been stabbed and
5 he went and he grabbed his gun, this gun.

6 　　　　　As Judge Hornak explained to you a little bit
7 yesterday morning and as he is going to explain to you further
8 this afternoon, there are three elements that the government
9 has to prove to you in order for you to find that the defendant
10 knowingly possessed that gun on October 23, 2012, in violation
11 of federal law.

12 　　　　　As I explained to you yesterday, there are a couple
13 of stipulations in this case.  Two of these elements, they
14 aren't even in dispute.  The first one and the third one, those
15 aren't in dispute.  What you need to consider when you go back
16 to the jury room and you think about the evidence, you need to
17 focus on that second element, and that is, whether on October
18 23, 2012, the defendant knowingly possessed that gun.  I submit
19 to you that when you do go back to the jury room and you do sit
20 down and start to deliberate and discuss all of the evidence
21 that you've heard, the testimony from the witnesses, reviewing
22 all of the exhibits that are going to go up to the jury room
23 with you, you're only going to be able to reach one conclusion
24 and that is that the defendant knowingly was in possession of
25 this firearm on October 23, 2012.

1              So let's just talk about the evidence that you

2 heard.

3              You heard from three witnesses from the government.

4 You heard from two police officers that were City of Pittsburgh

5 police officers at the time this incident occurred.

6              The first one was Officer Steven Sywyj.  He came in

7 and he sat down and he told you what happened on that day.  He

8 told you how he was working in Zone 5 out in the East End of

9 Pittsburgh, driving around around ten o'clock at night when he

10 gets a call, a service call for somebody stabbed.  So, he puts

11 on his lights and sirens and drives to 520 Lincoln Avenue.

12 He's going to assist in the stabbing and to do some

13 investigations into that stabbing.  That's why he's going.

14              He arrives and he told you what he saw when he got

15 there.  He sees Mr. Duwane Hayes laying on the floor stabbed,

16 bleeding and DeShawn Weathers helping out and rendering aid to

17 the victim.  And the victim was in pretty bad condition,

18 according to Mr. Sywyj, and according to other witnesses you

19 heard from.  If the medics didn't arrive soon, who knows what

20 would have happened to him.  But the medics did arrive.  They

21 did arrive and they were able to take over from DeShawn

22 Weathers the care for Duwane Hayes.

23              At that point, understandably, DeShawn Weathers is

24 distraught, he's upset, his friend has been stabbed, and he

25 wants to go inside and he wants to tell the victim's mother

1  what happened.

2          So, Officer Sywyj says, sure, fine, you go ahead and

3  you do that.  I need to talk to you some more because you were

4  a witness to this stabbing.  You saw what happened and I need

5  to get some information from you and so I'm going to stand

6  right here at the door and watch you as you go inside.  That's

7  what he did.

8          Estelle Hayes told you that.  She told you that's

9  where he was standing, right at the door.  Officer Sywyj told

10 you that.  As he's standing there at the door, furthering this

11 investigation of the stabbing.  All of a sudden, he sees the

12 defendant, Atiba Warren, in the doorway.  He had a straight

13 view.  You saw from all of the exhibits, you saw from the

14 exhibits from the government, the photographs of the inside of

15 the house, you saw from the exhibits from the defense, the

16 rendering, from that door, you can see straight back through to

17 the kitchen.  In that left-hand archway between the living room

18 and the dining room, Officer Sywyj sees Atiba Warren holding

19 this gun at chest level, and they made eye contact.  Officer

20 Sywyj told you that.  Officer Sywyj shouts "gun" to alert

21 everybody that is behind him, all of the other 11 or so

22 officers that are there, they're investigating that stabbing,

23 oh, my gosh, there's a gun here.  We have a new situation,

24 there's a new crime that is going on.  You need to know it.

25 Then he starts sending everybody out of the house.

1            As he's making eye contact with Atiba Warren, he

2     ducks behind that partition wall that you saw there in the

3     pictures and the rendering, that fireplace wall, he ducks

4     behind there and he appears seconds later in the other doorway,

5     no gun.  As Officer Sywyj is sending them out of the house,

6     where is the gun?  He says, oh, it was just a toy.

7            So Officer Sywyj goes into the dining room

8     immediately, looks around, lo and behold on the table, that

9     gun.  There it is.  There's no toy.  He told you he searched

10    around, he didn't see a toy.  What he saw was that.  He picked

11    it up and he saw that the serial numbers were obliterated.  He

12    called for Mr. Warren to be put under arrest, and he was.

13           At that same time, Lance Hoyson is there.  You heard

14    from him.  He told you how he also received that call for

15    service for somebody stabbed.  He shows up and his role is to

16    assist the medics with getting the victim into the ambulance

17    un.  After he's done that, he's here to investigate the

18    stabbing.  He's here to investigate this violent crime that

19    occurred.  So he does that.  He starts looking around.  He

20    starts to see if he can see any evidence around.  Then he hears

21    "gun."  Just as Officer Sywyj said.  Just as Estelle Hayes said

22    she heard, "gun."  So he goes to assist his colleague.  He goes

23    inside.  He sees where Officer Sywyj goes to the dining room to

24    collect that firearm.  Then he hears what turns out to be a

25    television, he is not sure what it is, it could be somebody

1  else, so he goes upstairs to investigate and there's nobody

2  else there.   There's nobody else there.   He goes back outside.

3          Now they have two investigations.   They have the

4  stabbing and they have this firearm that has been recovered

5  with an obliterated number.

6          He goes to interview the defendant.   The defendant

7  is already in the police car.   The Officer Hoyson told you how

8  he got into the car.   He starts putting the defendant's

9  identifiers in his computer there.   He turns around and he

10  reads the defendant his Miranda warnings.   He tells him that he

11  has a right to a lawyer.   He tells him that he has a right to

12  remain silent.   He tells him that he doesn't have to talk to

13  him.   But he does talk to him.   He says, I'll talk to you and

14  I'll tell you, I heard my cousin got stabbed, and I went and I

15  got my gun.   The very same gun that you recovered, obviously,

16  because it has the serial number obliterated.   And I know that

17  it's obliterated because I bought it that way on the street.

18  That's what he says.

19          That's it.   That's what happened that night.   That's

20  what they saw and that's what they heard.

21          Then the gun has to go off for testing.   So you

22  heard from William Best, who told you a lot of interesting

23  things, but what he told you was that he shot this gun into the

24  water tank and it fired.   And that it worked.   And that it is a

25  firearm.   And he told you that he was actually able to use acid

1  to get these serial numbers up.  One here, here's one here and

2  one here.  That's what Mr. Best told you.

3          That's the government's case.  That's the

4  government's case.

5          Judge Hornak is going to tell you that when you go

6  back to the jury room and when you deliberate, one of the

7  things you need to do is use your common sense when you

8  evaluate the evidence in this case, your lifetime experience,

9  use your common sense.  I ask you, what does your common sense

10 tell you happened here?  The defendant heard that his cousin

11 was stabbed, he went and got his gun, a gun that he bought on

12 the street with the serial numbers already obliterated, and the

13 gun he is not permitted to have because he's a convicted felon.

14         So, just briefly, to go over the elements with you,

15 again, these are the three elements that the government has to

16 prove.  We have to prove each of them for you to be able to

17 find the defendant guilty beyond a reasonable doubt.

18 Judge Hornak is going to go over these elements with you and

19 he's going to send a copy of the jury instructions back with

20 you to review in the jury room.

21         The first one is the prior conviction.  I read to

22 you yesterday that there's a stipulation here.  This is not an

23 issue.  The parties agree about this.  We agree that prior to

24 October 23, 2012, the defendant was convicted of a crime in

25 state court that is punishable by more than a year in prison.

1 That means that it's a felony.  That is not in dispute.  That's

2 the proof.

3          The third element, interstate commerce.  You heard

4 me read that stipulation in yesterday, too.  That's an element

5 of this federal crime that the gun had to have at some point

6 traveled in interstate or in foreign commerce, or in both.

7 There's a stipulation here, too, as to that.  This gun was

8 manufactured in Brazil.  It's actually stamped right on the

9 gun, as you saw in the pictures.  So in order to end up here in

10 Pennsylvania on October 23, 2012, when it was recovered, that

11 gun had to travel in interstate commerce at some point.

12 There's a stipulation to that fact.  That is not in dispute.

13 This element is not in dispute.

14          The last one is knowing possession.  I just went

15 over with you all of the elements and all of the facts that go

16 to this.  But just to briefly reiterate, the fact that it's a

17 firearm, we do have to prove that it's a firearm.  William Best

18 told you this gun is a firearm.  He told you that.

19          We have to prove to you beyond a reasonable doubt

20 that the defendant was in knowing possession of this firearm.

21 The proof that I submit to you that we have offered is the

22 testimony of Steve Sywyj, Officer Sywyj, who saw the defendant

23 with this firearm in his hand and then recovered that firearm

24 seconds later after the defendant exited the home.

25          You also heard the testimony of Officer Hoyson, who

told you that the defendant admitted to possessing this gun.
Not only admitted to possessing this gun, but admitted to
knowing certain elements this about this gun.  He knew that the
numbers were obliterated from this gun.  Those are the
defendant's admissions.

So, again, once you review all the evidence, and
think about it and talk about it, and as Mr. Ortiz said that I
would, I'm going to now ask you that after you go upstairs and
review everything, that you do come back and return a verdict
of guilty to the one count of this indictment, that the
defendant was in knowing possession of that gun on October 23,
2012.  Thank you.

THE COURT:  Thank you, Ms. King.

Mr. Sindler.

MR. SINDLER:  It wasn't that long ago that I was
just talking to you about something that I'm going to bring up
once again and, hopefully, the evidence has shown that this
investigation ended as quickly as it had begun.  And that's
fine in many circumstances, but in the circumstances involving
Atiba Warren, it is anything but because of the many things
that didn't happen that perhaps should have happened.

I say that along the lines of something that I
brought to your attention and referred to during my opening
statement and that is, what kind of work do you do?  Is it good
work?  Is it mostly good work?  Is it barely passable?  It is

1  the kind of work in which you cut corners?

2            Here, I suppose it is the kind of investigation

3  conducted by both Mr. Sywyj, who is over there to your

4  collective left sitting alongside Mr. Hoyson, an investigation

5  that probably was thought never to have gone to trial, or be

6  one that is as contested as it has been this week here in this

7  federal courtroom.

8            Why?  Well, Mr. Sywyj as a police officer, showed up

9  to a much more serious event and said he saw Mr. Warren with a

10 firearm.  Didn't disarm him right away.  Unlike what Ms. King

11 had said a moment ago, I don't know that a crime was being

12 committed, so let's give him the benefit of the doubt.

13 Mr. Warren was with a gun, supposedly, there are 11 police

14 officers outside that home at that moment, or about to be 11

15 and given there is a gun in the midst of police officers, we'll

16 also concede, rightfully so, that this person should not be

17 having a gun in the presence of police officers, whether

18 lawfully possessed or not.

19           So he doesn't disarm him.  Says he saw him under

20 certain conditions, which we'll talk about in a moment, and

21 then Mr. Warren eventually comes out, makes no attempt to try

22 to leave or be evasive or be threatening or menacing to

23 anybody, and is eventually arrested.  He's arrested because

24 when the call goes out from Mr. Sywyj, he finds the gun and

25 says that this man was holding it, he should, therefore, be

arrested.  And moments later, I suppose, Mr. Warren was placed
in the back of a car handcuffed.

Along comes Mr. Hoyson, who may have already been
there at the time, and proceeds to get inside of the car and
have a conversation, also uncorroborated because he was by
himself, much like Mr. Sywyj was when looking inside of this
home to which he had never been saying that Mr. Warren was
holding a firearm.

Mr. Hoyson has a most remarkable conversation
because he gets out of the car, goes over to Mr. Sywyj and
said, you know what, it was like a hallelujah moment.  This man
just entirely and completely implicated himself in this
firearm.  He said he bought it off of the street.  He said that
he knew that when he bought it, it had an obliterated or
defiled serial number, and that's it.  We can mail this case
in.

Sywyj is going to say, I saw it, Hoyson is going to
say separately, I had a conversation with him.  Together, we're
going to make a case that is probably going to result in some
kind of a guilty plea or some kind of a concession like that
from the defendant, and we can move on to more important
things, or perhaps matters of more gravity, such as that
stabbing incident or whatever other matters come about.

Now, we're going to go over in a moment the material
differences between what Mr. Sywyj, for starters, had between

what happened three years ago and what he's testified to six
months ago as well as what he testified to this week.

A couple things to keep in mind.  I think both men
have admitted that they are, perhaps like a lot of us, were in
a form-driven profession.  They have accountability to the
people they protect.  They have accountability to their
superiors, there is liability, and in cases like this, there is
testimony.  You have to be able to recall, despite the very
many number of different incidents you investigate, matters
that come to trial or that require recall.

The second thing with regard to recall would be
this.  It is human nature that as more time goes by -- at least
it's true with me, I think it's true with other people with
whom I have talked about this -- it is more difficult to recall
something than you are able to closer in time to the event that
is under thought or under discussion.  We're going to see in a
moment that the important things that were part of Mr. Sywyj's
testimony six months ago, which would have been two and a half
years after the incident, or just this week, which is a full
three years after the incident, despite the passage of time,
remarkably was operating under the influence of an improved
memory, despite the fact that a report to which he was
referring in some points didn't contain those matters that he
felt were important enough to testify about.

When you look at Mr. Sywyj, you have two things to

consider.  You have the report that he had done, which was just
one, followed by his testimony.

The first thing that comes to our attention would be
the following.

Mr. Warren, in a house to which Mr. Sywyj had never
been, appears, disappears, and then later reappears on the
floor in which supposedly he's moving around in a furtive way,
trying, if you believe Mr. Sywyj, trying to remain outside of
his field of observation.  Nothing at all appears about that in
his report, but remarkably the testimony he gives in this case,
not only six months ago but here this week, suddenly includes
that fact.

When you move on, you see that that isn't the only
thing he was remarkably able to remember, despite the passage
of time.

Mr. Warren had yet a second discussion with a police
officer that night before apparently the one that he had with
Mr. Hoyson where he refers to the gun as a toy.  I would think
if I'm a police officer for the years that he had been serving
as a police officer at that time, that if that conversation had
actually occurred, it would be part of his police report.
Unless, of course, the kind of work that he does and the kind
of investigation that we're talking about isn't quite as good
as it should be for the kind of work that he's doing.

You move on and you see that there's one thing that

1 Mr. Sywyj did get correct, at least he was consistent about it,

2 and that concerned the number of people inside of the house.

3 He said in his report there were several people behind whom

4 Mr. Warren was supposedly standing.  He testified to it several

5 months ago, testified to it again this week.

6          The difficulty that you have to have with that when

7 you consider the number of people around whom they say

8 Mr. Warren was standing is a woman named Estelle Hayes.

9          Now, true, you have two different people here who

10 have two very different vested interest in this case.

11          The police's vested interest is quite obvious, they

12 have done an investigation.  For the fruits of their labors

13 they would nearly demand, I would say, if not compel, a verdict

14 that is guilty.

15          Estelle Hayes would have a vested interest because,

16 of course, as you heard, she was somebody who was having Mr.

17 Warren in as a boarder at 520 Lincoln Avenue.

18          So why should Ms. Hayes be somebody who is more

19 believable on this point about something that maybe as

20 insignificant as the number of people in the house when, of

21 course, in order to make Mr. Sywyj's story work, you have to

22 have several people in the house because those are the people

23 behind whom Mr. Warren was supposedly hiding or standing or

24 trying to shield himself at times where he was trying to look

25 inside of the home.

1          Well, I guess it must be police procedure, but one

2   thing that they did very, very accurately, I suppose, is list

3   the number and the names of the police officers who were there

4   that night.  There were 11, with Mr. Sywyj.

5          They also even included the vehicles by vehicle

6   number in which all of these men had arrived in a support

7   position or support role that night.

8          But if you look at Ms. Hayes' testimony, there's a

9   diametrical difference between what she says and what Mr. Sywyj

10  says and the number of people who are living there.  There is

11  DeShawn Weathers who does come into the house at some point.

12  But if Ms. Hayes, as the defense and prosecution testimony

13  tended to show, was standing at the same front door with the

14  police officer.  DeShawn Weathers is somewhere inside of the

15  house.  We're not sure if it was deep as the dining room in

16  which Mr. Sywyj says he saw Mr. Warren.  There was nobody else

17  in the house.  So why would it be something that is that

18  important to list in a report and testify about, that there

19  were several, presumably, family members present when he saw

20  Mr. Warren.

21          The point of this part of the exercise, folks, is

22  this.  If you tend to believe or find, rather, that the

23  testimony of somebody in important parts doesn't strike you as

24  believable or credible, you're entitled, you don't have to, but

25  you're entitled to not believe some or all of the testimony

1 given by that person in this courtroom.

2          So, once the home is evacuated, Mr. Warren comes

3 outside and acts in a way that is entirely contrary to somebody

4 who has just committed the offense that Mr. Sywyj claimed he

5 did.  He wasn't trying to leave, and remember he probably

6 couldn't because at this point there are probably seven police

7 cars in or near the front of 520 Lincoln Avenue responding to

8 the more serious event that night.  That is the only means of

9 escape.  So while he's standing on the front porch or the front

10 yard of the home, there is no testimony about Mr. Warren

11 resisting arrest, trying to make himself scarce, trying to

12 hide, threatening, or menacing anybody.  In fact, for all we

13 know, he peacefully surrendered upon being told to place his

14 hands behind his back and then being placed in a cruiser for

15 eventual transportation for processing.

16          But before he leaves, we then have the additional

17 phase here, which is the Hoyson interview inside the car.  Now,

18 the supposed statement was taken by a different person than

19 Mr. Hoyson or then Mr. Sywyj, and we have a similar situation

20 brewing here where it is just one person talking to him, even

21 though Mr. Hoyson did arrive with another officer.  I think

22 someone had field training upon their arrival at 520 Lincoln

23 Avenue.  Mr. Warren is already handcuffed behind his back.  I

24 think we can all agree that if we're in that position, we can't

25 do any writing of any kind.  So it's really unfair to our

1  common sense and it's unfair to our sense of judgment to think

2  that it's impractical for a police officer to have somebody

3  sign a rights form that wasn't even available in the first

4  place when it's that officer, or somebody like him, who placed

5  my client in the situation and position that he was in, which

6  was making it impossible to sign anything, let alone that

7  rights for.

8          But there is a way for Mr. Hoyson to get around that

9  he says, because he also says, you know what, I did talk to him

10 about his rights.  You don't have to talk to me if you don't

11 want to.  If you do talk to me, whatever you say, it's going to

12 be used against you.  You can remain silent.  If you need or

13 want to talk with a lawyer before you go forward with me, we

14 can try to make one available.

15         Then imagine, Mr. Hoyson says in a hallelujah

16 moment, Mr. Warren took the fall for this firearm in ways that

17 are just impossible to overcome.  He bought it on the street.

18 He bought it knowing that it had defiled serial numbers, and

19 it's the same weapon that was taken from the house.

20         He gets out of the car, walks over to where

21 Mr. Sywyj is and says, you know what, I just had the most

22 remarkable conversation with this man, he implicated himself

23 and why don't you just make it part of your report while you're

24 at it.

25         So, it was also I guess impractical for Mr. Hoyson

1    to do a report regarding what -- and Ms. King just said it,

2    it's a very important part of this case, you know what, I took

3    the statement, you, Mr. Sywyj, weren't there when it was done,

4    but you know what, just make it part of your report.  Again,

5    leading me to ask, what kind of work do you do?  Is it good

6    work?  Or is it other than good work in the profession that you

7    care to work in.

8             Now, before I had a chance to, the government

9    brought up something that might be on some of our minds.  That

10   is the fingerprints situation.  There weren't any.  I would

11   agree that if you want to believe Mr. Sywyj or at least believe

12   his story, why would someone like that under those

13   circumstances have a gun like that submitted for fingerprints

14   when all you got to do is believe me, I'm a police officer,

15   Steven Sywyj, and know that I saw him with it, and nothing more

16   needed to be done.

17            But we also know that the environmental factors that

18   Bill Best referred to were probably not present to degrade the

19   possibility of Mr. Warren's prints, if they appeared on that

20   weapon, at the place where or from the place at which the gun

21   was found.  The gun wasn't subjected to weather conditions, so

22   it wasn't like weather conditions would have degraded any

23   prints that he was holding, that he may have left on that

24   firearm.  There wasn't some dog or cat in the home that came

25   along and rubbed up against the weapon or may have licked the

1   weapon to degrade the fingerprints that were found on that

2   weapon.  But it was only up to him because Best can't request

3   evidence.  It is the investigator through whom evidence is

4   submitted for that kind of test.  Now, I would suggest that one

5   environmental degradation that occurred was Mr. Sywyj placing

6   his hand on the gun when he seized it.  I can't hear any

7   testimony about him having gloves or something of the nature by

8   which evidence of that sort would be handled because he was

9   already of the belief, you know what, this is my story, I'm,

10  sticking to it, that being I saw him with it, therefore, he had

11  it, done.  We can mail in this conviction and add on to that

12  the Hoyson statement that was supposedly taken from inside of

13  that car.

14          I had prepared through the use of others this

15  isometric drawing.  I'm showing you right now what is known as

16  Exhibit K in this case.  I did so to give you a couple of

17  different perspectives of the place at which this incident

18  occurred because the government, for reasons that are not known

19  to me, didn't do so.  It's their crime scene, but I brought

20  along somebody else to recreate it through this exhibit.  It

21  will be upstairs for you to look at and that sort of thing.

22          One thing I'd ask you to keep in mind is that in the

23  course of this case, one of the reasons, aside from the

24  inconsistencies of Mr. Sywyj's version of the events in this

25  case have to be looked at some scrutiny is the conditions under

1  which he was looking.  This home, at least the top-down version

2  of Exhibit K doesn't give you that sense because for all we

3  know, it's full daylight from what we can see there.  But in

4  the area that goes from the front door, through the foyer,

5  through the upper part of the front room and into that

6  passageway were conditions where the visibility was, at best

7  poor, visibility, at worst, was non-existent at a place to

8  which Mr. Sywyj had never been, around people he had never met

9  beforehand.  I don't need to go into what it's like when you

10 can't see through the lack of either natural or artificial

11 light, but those are the conditions under which he was

12 operating.  But he would have you believe this black weapon

13 under dark circumstances, with a man holding the gun at a 45

14 degree angle across his chest, able for probably any adult who

15 was the size of Mr. Sywyj to be able to see.  It has to work

16 that, you understand, because if the gun is down by his side,

17 no matter whether there are people there or not, harder to see,

18 if the gun is partially obstructed, behind his back, in full or

19 in part, harder, if not impossible, to see.

20         It reminds me of a magazine involving a famous actor

21 or actress, pick any Swiss watch, Swiss-made watch you want.

22 There's the wrist watch across your wrist and that's what he

23 was doing.  Mr. Warren, if you believe Mr. Sywyj, was like part

24 of an ad.  He was holding it up, making sure that whoever was

25 in that doorway would be able to see that he was holding a

1 firearm at that time.  Does your common sense tell you that

2 that was the case at that time?

3          We added three more versions of this isometric,

4 which is Exhibits L, M and N to give you a sense of distance

5 and proportion because looking at K, you don't get that.

6 Mr. Sywyj, if you believe his version, would tell you that

7 there was approximately, I'm not saying exactly, but there was

8 approximately 18 feet of darkness through which he was able to

9 see Mr. Warren supposedly holding this gun.

10          We added two more dimensions, M and N, because M,

11 would show you the middle of that room, or thereabouts, not the

12 middle of the room but the middle of the area that would have

13 been traveled from the bottom of those stairs to the passageway

14 around which Mr. Sywyj said that he saw Mr. Warren.

15          The next one, which is Exhibit N, would just show

16 you the distance for somebody standing or in the area directly

17 in front of the staircase.

18          What kind of work are you doing?  Is it good?  Or is

19 it less than good?

20          You already know I'm a baseball fan.  I'm going to

21 hit you with one more, and I promise you it's the last one.

22 Warren Spahn is the winningest pitcher in Major League Baseball

23 history.  To this day, the record books still show him with the

24 most wins in Major League history.  He was on the mound one day

25 at the old Polo Grounds in New York City facing a batter named

1  who?  Willie Mays.  At that time, Willie Mays was 0 for 12 in

2  his first dozen at bats.  Spahn is on the mound, 60 feet 6

3  inches from home plate at which Mays is standing and before you

4  know it, Willie Mays hammers his first home run of his major

5  league career.

6          Reporters gather around Warren Spahn's locker after

7  the game.  They're eager to know the answer to the following

8  question.  What kind of pitch did you throw Mays?  Spahn

9  doesn't hesitate in the answer.  One that was perfect for the

10 first 60 feet.

11          I can't tell you how important the burden of proof

12 beyond a reasonable doubt is in this case.  I always do this.

13 I have spoken in front of many other juries in my career.  I

14 say the same thing every single time.  It is a bedrock

15 principle of our system of justice, which is second to none

16 anywhere on this planet.  Some of you are going to be thinking

17 when whether or not the government in this case has met its

18 burden some of the following thoughts.  One, he didn't do it.

19 Well, that's very easy, if he didn't do it, your vote is very

20 clear, your vote is not guilty.

21          If you're thinking, well, I'm not that certain he

22 didn't do it, I'm just pretty sure he didn't do it.  He's not

23 guilty.

24          Go a little farther toward the middle there.  He

25 probably didn't do it.  He might have, but he probably didn't.

1 Your verdict is not guilty.

2          Now, we're past the middle and toward the area where

3 the government wants you to be.  I'm pretty sure that he did

4 it.  I'm pretty sure that Mr. Warren committed the offense on

5 which he stands indicted.  Worse yet, because we're getting

6 really close now if you're the government, he did it.  He

7 definitely did it, but the government didn't prove it.  If he

8 did it, but the government didn't prove it, it's not guilty.

9 Because not proven, in this case, like any other one, is not

10 guilty.

11          We're at that street corner, folks.  I figuratively

12 mentioned it to you yesterday.  You're at some intersection

13 that is controlled or not controlled by some mechanical device,

14 like a light, like a stick figure, or some crossing guard

15 perhaps, I don't know.  You're getting ready to cross the

16 street, before you do so, you look over.  You recognize some

17 people across the way on the other side.  They look familiar.

18 Name is Chris Sciulli, could be Jonathan Ortiz, could be

19 Ms. King.  You might even see with them Mr. Hoyson or

20 Mr. Sywyj.  Some or all of them are over there.  Whoever is

21 over there, they're going to be waving, waving at you saying,

22 you know what, it's all right, it's all right to come over.

23 Come over and cross the street right now and join us.

24          Before you do so, before you step off that curb,

25 you're looking both ways, you're looking one way, and whether

1  it's one way or both ways, you are expressing reasonable doubt.

2  It's the same reasonable doubt that you have as a result of

3  this less than or second-rate prosecution.  With that, your

4  verdict has to be that of not guilty.

5          THE COURT:  Thank you, Mr. Sindler.

6          Ms. King or Mr. Ortiz.

7          MS. KING:  Thank you, Your Honor.

8          Ladies and gentlemen, I'm just going to touch on two

9  main points.

10          First of all, credibility.  Mr. Sindler is

11  essentially asking you to find that those two officers are

12  lying to you.  But that's not for him to tell you and it's

13  certainly not for me to tell you, it's for you to decide.  The

14  Judge is going to instruct you on that.  You are the people

15  that get to make the decision about the credibility of the

16  witnesses, and you were able to sit here as they testified in

17  front of you.  The Judge is going to say to you that you may

18  decide whether to believe a witness based on his behavior and

19  the manner in which they testified and the explanations that

20  they gave and all of the other evidence in this case.

21          What did you think of them when they testified?  Did

22  you think they were being evasive?  Did you think they weren't

23  answering questions?  Or did you think they gave you an

24  accurate depiction of what occurred that night?  That's for you

25  to decide when you go upstairs.

1              You also have to use that same standard when you

2    evaluate Ms. Hayes' testimony.  How did she appear to you?  Did

3    she appear confused?  Did she appear that she couldn't

4    accurately remember what happened that evening?  You need to

5    think about that when you go upstairs and evaluate everyone's

6    testimony.

7              The second thing that I just briefly want to touch

8    on is vantage point.  Mr. Sindler is arguing that Officer Sywyj

9    couldn't see Atiba Warren with a gun.  Every single witness

10   that testified before you that had any knowledge about that

11   residence at all told you that from standing at the front door,

12   you could not only see into the vestibule, you could not only

13   see into the living room, you could not only see into the

14   dining room where Mr. Warren had the gun, you could see all the

15   way into the kitchen.  You could see all the way through the

16   house.

17             Ladies and gentlemen, when you go upstairs and you

18   deliberate, I ask you to return a verdict of guilty in this

19   case.

20             THE COURT:  Thank you, Ms. King.

21             Ms. King and Mr. Sindler, it would be the Court's

22   intention to allow the jury to have a brief ten-minute recess

23   in the jury room to refresh themselves, and then when they

24   return to the courtroom for the Court to provide its final

25   instructions to the jury.

1          Is that procedure acceptable to you, Ms. King?

2          MS. KING:  Yes.

3          THE COURT:  Is that acceptable to you, Mr. Sindler?

4          MR. SINDLER:  Yes.

5          THE COURT:  Ladies and gentlemen of the jury, we're

6 going to take about a ten-minute recess now and give you an

7 opportunity to refresh yourselves.

8          Then when Mr. Babik has you come back down, the

9 Court will give you, as noted, its final instructions to you,

10 the twelve seated members of the jury.  I will give some

11 further direction.  Alternates, of course, will also receive

12 the final instructions in the event they would be called upon

13 to deliberate.  When the jury returns, after my final

14 instructions, to the jury room, the alternates will remain in

15 the courtroom for a moment while I give you some direction as

16 to what will happen next relative to your service.

17          So, ladies and gentlemen, this is going to be the

18 last time that I give you exactly this instruction.

19          During this recess, you should not seek out or

20 receive any information regarding this case, those

21 participating in it or any issues or matters regarding the case

22 at all.

23          You should not discuss any matters regarding this

24 case, those involved in it or the issues involved in it with

25 any other person, including amongst yourselves.  That time will

1  come in just a few minutes.

2          And lastly, should anyone attempt to discuss any of

3  those things with you, I would ask that you bring them promptly

4  to Mr. Babik's attention.

5          With that, you can assist the jury, Mr. Babik.

6          MR. BABIK:  All rise for the jury.

7      (Jury is dismissed from the courtroom.)

8          THE COURT:  Please be seated, everyone.

9          It's my intention once the twelve-seated jurors are

10 taken upstairs to begin their deliberations, it appears one of

11 the alternates is a resident of Allegheny County, the other is

12 a resident of Westmoreland County, it's my intention to not

13 discharge them from jury duty or jury service until a verdict

14 has been rendered and received, but to also excuse them from

15 the courtroom so they're no longer present here, and to advise

16 them after today, should proceedings be continuing after today,

17 that they need not return to the courthouse.

18          Now I can, and I'm happy to have them come back to

19 the courthouse and they would have to be in the jury room

20 downstairs, we would not have them up here during whenever

21 deliberations are going on.

22          Ms. King or Mr. Ortiz, do you have any thoughts

23 regarding any of that?

24          MS. KING:  They can definitely go home, Your Honor.

25          THE COURT:  Mr. Sindler, any thoughts?

1          MR. SINDLER:  I feel like I'm the bad guy, Judge.

2          THE COURT:  There is no good guy or bad guy, we're

3  all doing our job.

4          MR. SINDLER:  I don't know.  The case may very well

5  be decided today.

6          THE COURT:  Or may not.

7          MR. SINDLER:  There was a premonition on your part,

8  it sounded like, because it sounded like you were not going to

9  give the admonition that you had been because if they are going

10  home tonight --

11          THE COURT:  Everyone gets the admonition until the

12  jury is discharged because a verdict has been rendered.

13          MR. SINDLER:  I don't have any basis to believe that

14  one of the twelve will become unavailable if this case goes

15  beyond today, but I prefer to have both back.

16          THE COURT:  I'll take it under advisement.

17          I have given you copies of the instructions.  At the

18  appropriate point in the instructions, Mr. Babik will show the

19  jury, each of the twelve members of the jury, a copy of the

20  verdict form.  He'll collect it back up before they go

21  upstairs, but that way they can each see it, hold it and look

22  at it while I'm explaining it.  He will then deliver upstairs

23  an envelope, along with the verdict form that they will use to

24  complete the verdict.

25          He also provides them with some paper and other

envelopes in case they have a question for the Court, that
gives them a mechanism to do that.

Mr. Greer, what we'll do is call down to the jury
room and make sure that there is someone down there available
if we need to send the alternates down for the balance of the
day.  Then we'll take care of getting their contact information
from them.

It would also be my intention once the jury goes up
and the alternates have left the courtroom, Mr. Fox will be up,
we'll swear him in as the jury bailiff.

Mr. Babik will confirm with all counsel the content
of the exhibits that he will then take up to the jury room,
along with Mr. Fox, along with the clean computer, which is
here.  You're welcome to examine it.  I'll make sure Mr. Fox
under oath tells us that it's a clean computer, and then he'll
go up and explain, if they do want to use the thumb drive,
where to put it in and how to use that.

Is that all agreeable with you, Ms. King?

MS. KING:  Yes, Your Honor.

THE COURT:  Is that agreeable with you, Mr. Sindler?

MR. SINDLER:  Yes.

THE COURT:  With that, Mr. Greer we'll adjourn the
Court.

MS. KING:  Detective Sciulli actually has to leave
for the day, so we do have an ATF agent who can take custody of

1  the gun, he's in plainclothes, so he will have the gun

2  available if the jurors want to look at it.

3          THE COURT:  My thought is if during the course of

4  deliberations, whenever it might be, the jury advises the Court

5  that they want to see Government Exhibit 1, we would make sure

6  counsel is notified, come back over if you want, and we would

7  have Government Exhibit 1 returned to the courtroom and then

8  two of my jury bailiffs, Mr. Babik and Mr. Greer, would deliver

9  it up to the jury room and remain outside while they examined

10 it.

11          Is that agreeable with you, Ms. King?

12          MS. KING:  Yes.

13          THE COURT:  Is that agreeable with you, Mr. Sindler,

14 if it comes up?

15          MR. SINDLER:  Yes.

16          THE COURT:  Mr. Greer.

17          MR. GREER:  All rise.

18     (Whereupon, there was a brief recess in the proceedings.)

19          THE COURT:  Ms. King and Mr. Ortiz, can we bring the

20 jury back in?

21          MS. KING:  Yes.

22          THE COURT:  Mr. Sindler?

23          MR. SINDLER:  Yes.

24          THE COURT:  Note that all trial participants are

25 present.

1            Mr. Babik, you can bring the jury down.

2        (Jury enters the courtroom.)

3            THE COURT:  Ms. Kienzle, if you'd make a note that

4  all twelve seated members of the jury and our two alternate

5  jurors have returned to the courtroom.

6            All trial participants as previously noted remain in

7  the courtroom.

8            Members of the jury, now that you've heard and seen

9  all of the testimony and evidence presented in this trial, it

10 becomes my duty as the judge to give you instructions

11 concerning the law applicable to this case.  You will be

12 provided copies of these instructions in the jury room during

13 your deliberations, so to the extent that you're taking notes,

14 don't feel compelled to take notes during these oral

15 instructions, but you may certainly do so if you choose to do

16 that.

17           You have two duties as a jury.  Your first duty is

18 to decide the facts of this case from the testimony and

19 evidence that you've heard and seen in court during this trial.

20 That is your job and yours alone.  I play no part in finding

21 the facts.  You should not take anything I may have said or

22 done during the trial as indicating what I think of the

23 evidence or what I might think about what your verdict should

24 be.

25           Do not attempt to interpret my rulings on evidence

as somehow indicating who I believe should prevail in this case.  Upon allowing testimony or other evidence to be introduced over the objection of an attorney, the Court does not indicate any opinion as to the weight or effect of such evidence.  As stated before, you, the jurors, are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

Your second duty is to apply the law upon which I instruct you to the facts as you find them to be.  I will now explain to you the legal principles that must guide you in your decision.  You must apply my instructions carefully.  Each of the instructions is important and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be.  You must apply the law that I give to you, whether you agree with it or not.  It would be a violation of your sworn duty as jurors to base a verdict on any view of the law other than that given in these instructions of the Court, just as it would also be a violation of your sworn duty as judges of the facts to base a verdict upon anything other than the proven evidence in the case.

Whatever your verdict is, it will have to be unanimous.  All of you will have to agree on it or there will be no verdict.  In the jury room, you are to discuss the case amongst yourselves, but ultimately each of you will have to make up your own mind.  This is a responsibility that each of

1 you as an individual has and a responsibility you cannot avoid.

2        During your deliberations, you must not communicate

3 with or provide any information to anyone by any means about

4 this case.  You may not use any electronic device or media,

5 such as the telephone, cell phone, Smartphone, iPhone,

6 Blackberry or computer, the Internet, any Internet service, any

7 text or instant messaging service, any Internet chat room, blog

8 or website such as Facebook, Snapchat, Instagram, LinkedIn,

9 YouTube or Twitter to communicate to anyone any information

10 about this case or to conduct any research about this case

11 until I accept your verdict.  In other words, you can't talk to

12 anyone on the phone, correspond with anyone or electronically

13 communicate with anyone about this case.  You can only discuss

14 the case in the jury room with your fellow jurors during your

15 deliberations.

16        You may not use these electronic means to

17 investigate or communicate about the case because it's

18 important that you decide the case based solely on the evidence

19 presented in this courtroom.  You are only permitted to discuss

20 the case with your fellow jurors during deliberations because

21 they have seen and heard the same evidence you have.  In our

22 judicial system, it is important that you are not influenced by

23 anything or anyone outside of this courtroom.

24        Perform these duties fairly and impartially.  Do not

25 allow sympathy, prejudice, fear, or public opinion to influence

1  you.  You should also not be influenced by any person's race,

2  color, religion, national ancestry, gender, sexual orientation,

3  profession, occupation, celebrity, economic circumstances or

4  position in life or in the community.

5          During the trial, each of you was supplied with a

6  notebook for the purpose of taking notes.  You should remember

7  that notes taken by any juror are not evidence in the case and

8  must not take precedence over your independent recollection of

9  the testimony and the evidence presented during the trial.

10  Notes are only an aid to your recollection.  They're not

11  entitled to any greater weight than that which the evidence

12  actually is.  Any notes taken by any juror concerning this case

13  should not be disclosed to anyone other than a fellow juror.

14          You are not obligated to take notes.  If you did not

15  take notes, you should not be influenced by the notes of

16  another juror, but you should rely upon your own recollection

17  of the evidence.

18          If any reference by the Court or by counsel to

19  matters of testimony or exhibits does not coincide with your

20  own recollection of that evidence, it is your recollection

21  which should control during your deliberations and not the

22  statements of the Court or of counsel.  You are the sole judges

23  of the evidence received in this case.

24          The word "evidence" has been used extensively in

25  this case.  You must make your decision in the case based only

1  on the testimony, exhibits and stipulations you heard and saw

2  in the courtroom.  Do not let rumors, suspicions or anything

3  else that you may have seen or heard outside of court influence

4  your decision in any way.

5           The evidence from which you are to find the facts

6  consists of the following:

7             A, the testimony of witnesses.

8             B, documents, photographs, or other things admitted

9  into evidence as exhibits.

10            C, any fact or other witness testimony that was

11  stipulated, that is, formally agreed to by the parties.

12            The following are not evidence:

13            The indictment.  Please remember that the indictment

14  is simply the description of the charge made by the government

15  against Mr. Warren.  But it is not evidence that he committed a

16  crime.  You should also remember that Mr. Warren has pleaded

17  not guilty to the charges.

18            Statements and arguments of the lawyers for the

19  parties this case are not evidence.

20            Also, not evidence are questions by the lawyers and

21  questions that I might have asked.

22            Objections by lawyers and especially including

23  objections in which a lawyer stated facts are not evidence.

24            Further, any testimony I struck or told you to

25  disregard is not evidence and anything you may have seen or

heard about this case outside the courtroom is not evidence.

Ladies and gentlemen, you should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events and give such evidence whatever weight you believe it deserves.  If your experience and common sense tells you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

As I told you in my preliminary instructions, the rules of evidence control what can be received into evidence. During the trial, the lawyers objected when they thought that evidence was being offered that was not permitted by the rules of evidence.  These objections simply meant that the lawyers were asking me to decide whether the evidence should be allowed under the rules.  You should not be influenced by the fact that an objection was made.  It's the duty of the attorney on each side of the case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible.  You should not hold it against an attorney or their client because the attorney has made objections.  You should also not be influenced by my rulings on objections or any sidebar conferences you may have overheard.  When I overruled an objection, the question was answered, or the exhibit was received as evidence and you should treat that testimony or exhibit like any other.  When I allowed evidence

for a limited purpose only, I instructed you to consider that
evidence only for that limited purpose and you must do just
that.

When I sustained an objection, the question was not
answered or the exhibit was not received as evidence.  You must
disregard the question or the exhibit entirely.  Do not think
about or guess what the witness might have said in answer to
the question.  Do not think about or guess what the exhibit
might have shown.  Sometimes a witness may have already
answered before a lawyer objected or before I ruled on the
objection.  If that happened and if I sustained the objection,
you must disregard the answer that was given.

Also, if I ordered that some testimony or other
evidence be stricken or removed from the record, you must
disregard that evidence.  When you're deciding this case, you
must not consider or be influenced in any way by the testimony
or other evidence that I told you to disregard.

Although the lawyers may call your attention to
certain facts or factual conclusions that they thought were
important, what the lawyers say is not evidence and is not
binding on you.  It is your own recollection and interpretation
of the evidence that controls your decision in this case.

Also, do not assume from anything I may have done or
said during the trial that I have any opinion about any of the
issues in this case or about what your verdict should be.

1          As I told you in my preliminary instructions, ladies

2    and gentlemen, you may consider direct evidence and

3    circumstantial evidence.  You may use both types of evidence in

4    reaching your verdict.

5          Direct evidence is simply evidence which, if

6    believed, directly proves a fact.  An example of direct

7    evidence occurs when a witness testifies about something the

8    witness knows from his or her own senses.  Something the

9    witness has personally experienced, has individually seen,

10   touched, heard or smelled.

11         Circumstantial evidence is receive which, if

12   believed, indirectly proves a fact.  It is evidence that proves

13   one or more facts from which you could reasonably find or infer

14   the existence of some other fact or facts.  A reasonable

15   inference is simply a deduction or conclusion that reason,

16   experience, and common sense lead you to make from the

17   evidence.  A reasonable inference is not a suspicion or a

18   guess.  It is a reasoned, logical decision to find that a

19   disputed fact exists on the basis of another fact.

20         Remember my rain example.  Although you can hardly

21   see outside from this room, if one or more people walked in

22   with a wet trench coat or a dripping umbrella, it would be

23   reasonable and logical to conclude from that circumstantial or

24   indirect evidence that it had been raining outside.  You would

25   not have to find that it was raining, but you could.

1          Sometimes different inferences may be drawn from the
2   same set of facts.  The government may ask you to draw one
3   inference and the defense may ask you to draw another.  You and
4   you alone must decide what reasonable inferences you will draw
5   based on all the evidence and your reason, experience and
6   common sense.

7          You should consider all the evidence that is
8   presented in this trial, direct and circumstantial.  The law
9   makes no distinction between the weight that you should give to
10  either direct or circumstantial evidence.  It requires only
11  that you weigh all of the evidence before you may return a
12  verdict.  It is for you to decide how much weight to give to
13  any evidence.

14         Your decision on the facts in this case should not
15  be determined by the number of witnesses testifying for or
16  against a party.  The number of witnesses who testify for one
17  side or the other is not controlling.  The weight of the
18  evidence also does not necessarily depend on the quantity of
19  evidence presented.  What is more important than numbers or
20  quantity is how believable the witnesses were and how much
21  weight you think their testimony deserves.  You must consider
22  all of the evidence and determine what the facts are and
23  whether the government has proven its case and all the elements
24  thereof as I will define them beyond a reasonable doubt.

25         In order to arrive at the true facts and draw the

reasonable and proper inferences therefrom, you must decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of the witnesses.  Credibility refers to whether a witness is worthy of belief.  Was the witness truthful?  Was the witness' testimony accurate?  You may believe everything a witness says or only part of it or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave and all the other evidence in the case, just as you would in any important matter where you try to decide if a person is truthful, straightforward, and accurate in his or her recollection.  In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may consider a number of factors; these include the opportunity and ability of the witness to see or hear or know the things about which the witness testified; the quality of the witness' knowledge, understanding and memory; the witness' appearance, behavior and manner while testifying; whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; any relation the witness may have with a party in the case and any effect the verdict might have on the witness; whether the witness said or wrote anything before trial that was different

from the witness' testimony in court; whether the witness'
testimony was consistent or inconsistent with other evidence
that you believe; and any other factor that bears on whether
the witness should be believed.

Inconsistencies or discrepancies in a witness'
testimony or between the testimony of different witnesses may
or may not cause you to disbelieve a witness' testimony.  Two
or more persons witnessing an event may simply see or hear it
differently.  Mistaken recollection, like failure to recall, is
a common human experience.  Weighing the effect of an
inconsistency, you should also consider whether it was about a
matter of importance or an insignificant detail.  You should
also consider whether the inconsistency was innocent or
intentional.

You are not required to accept the testimony of a
witness, even if the testimony was not contradicted and the
witness was not impeached.  You may decide that the witness is
not worthy of belief because of the witness' bearing and
demeanor or because of the inherent improbability of the
testimony or for other reasons that are sufficient to you.

If you believe that a witness knowingly testified
falsely concerning an important matter, you may distrust the
witness' testimony concerning other matters.  You may reject
all of the testimony or may accept such parts of the testimony
that you believe are true and give it such weight as you think

1   it deserves.

2          After you make your own judgment about the

3   believability of a witness, you can then attach to the

4   testimony of that witness the importance or weight that you

5   think it deserves.

6          Although the government is required to prove the

7   guilt of the defendant beyond a reasonable doubt, the

8   government is not required to present all possible evidence

9   related to the case or to produce all possible witnesses who

10   might have some knowledge about the facts of the case.   In

11   addition, the defendant is not required to present any evidence

12   or produce any witnesses at all.

13          The rules of evidence ordinarily do not permit

14   witnesses to state their own opinions about important questions

15   in a trial, but there are exception to these rules.   In this

16   case, you heard testimony from William Best and Travis Johnson.

17   Because of his knowledge, skill, experience, training or

18   education in the fields of toolmarks analysis, firearm

19   operability, and serial number restoration, Mr. Best was

20   permitted to offer opinions in those fields and the reasons for

21   those opinions.   Because of his knowledge, skill, experience,

22   training or education in the fields of CAD drafting and 3D

23   modeling, Mr. Johnson was permitted to offer opinions in those

24   fields and the reasons for those opinions.

25          Ladies and gentlemen, the opinions these witnesses

1  stated should receive whatever weight you think appropriate,

2  given all the other evidence in the case.  In weighing this

3  opinion testimony, you may consider the witness'

4  qualifications, the reasons for the witness' opinions, and the

5  reliability of the information supporting the witness'

6  opinions, as well as the other factors discussed in these

7  instructions for weighing the testimony of witnesses.  You may

8  disregard an opinion entirely if you decide that the witness'

9  opinion is not based on sufficient knowledge, skill,

10 experience, training or education.  You may also disregard an

11 opinion if you conclude that the reasons given in support of

12 the opinion are not sound or if you conclude that the opinion

13 is not supported by the facts shown by the evidence, or if you

14 think that the opinion is outweighed by other evidence.

15         The parties have agreed what Special Agent Kevin

16 Kaufman's testimony would be if called as a witness.  You

17 should consider that testimony in the same way as if it had

18 been given here in court by that witness.

19         One of the issues in this case is whether Mr. Warren

20 is the same person who committed the offense charged in the

21 indictment.  The government, as I've explained, has the burden

22 of proving every element, including identity beyond a

23 reasonable doubt.  Although it is not essential that a witness

24 testifying about the identification be free from doubt as to

25 the accuracy or correctness of the identification, you must be

1  satisfied beyond a reasonable doubt based upon all of the

2  evidence in the case that Atiba Warren is the person who

3  committed the offense charged.  If you're not convinced beyond

4  a reasonable doubt that Atiba Warren is the person who

5  committed the offense charged in the indictment, then you must

6  find him not guilty.

7           Identification testimony is the expression of an

8  opinion or belief by the witness.  The value of the

9  identification depends upon the witness' opportunity to observe

10 the person who committed the crime at the time of the offense

11 and the witness' ability to make a reliable identification at a

12 later time based upon those observations.

13          You must decide whether you believe the witness'

14 testimony and whether you find beyond a reasonable doubt that

15 the identification is correct.  You should evaluate the

16 testimony of a witness who makes an identification in the same

17 manner as you would any other witness.  In addition, as you

18 evaluate a witness' identification testimony, you should

19 consider the following questions as well as any other questions

20 you believe are important.

21          First, you should ask whether the witness was able

22 to observe and had an adequate opportunity to observe the

23 person who committed the offense charged.  Many factors affect

24 whether a witness had an adequate opportunity to observe the

25 person who committed the offense charged.  Those factors

include the length of time during which the witness observed
the person, the distance between the witness and the person,
the lighting conditions, how closely the witness was paying
attention to the person, whether the witness was under stress
while observing the person who committed the offense, whether
the witness knew the person from some prior experience, whether
the witness and person committing the crime were of different
races and whether other factors that you regard -- and any
other factors that you regard as important.

Second, you should ask whether the witness is
positive in the identification and whether the witness'
testimony remained positive and unqualified after
cross-examination.  If the witness' identification testimony is
positive and unqualified, then you should ask whether the
witness' certainty is well founded.

The defendant, Atiba Warren, has pleaded not guilty
to the offense charged.  He is presumed to be innocent.  As I
previously instructed you, Mr. Warren started the trial with a
clean slate, with no evidence against him.  The presumption of
innocence stays with the defendant unless and until the
government has presented evidence that overcomes that
presumption by convincing you beyond a reasonable doubt that
Mr. Warren is guilty of the offense charged.  The presumption
of innocence requires that you find the defendant not guilty,
unless you are satisfied that the government has proven his

1 guilt beyond a reasonable doubt.

2          The presumption of innocence means that Mr. Warren

3 has no burden or obligation to present any evidence at all or

4 to prove that he is not guilty.  The burden or obligation of

5 proof is on the government at all times to prove that

6 Mr. Warren is guilty and this burden stays with the government

7 throughout the trial.

8          Atiba Warren did not testify in this case.  The

9 defendant has an absolute constitutional right not to testify.

10 The burden of proof remains with the prosecution throughout the

11 entire trial and never shifts to the defendant.  The defendant

12 is never required to prove that he is innocent.  You must not

13 attach any significance to the fact that Atiba Warren did not

14 testify.  You must not draw any adverse inference against him

15 because he did not take the witness stand.  Do not consider for

16 any reason at all the fact that Mr. Warren did not testify.  Do

17 not discuss that fact during your deliberations or let it

18 influence your decision in any way.

19          In order for you to find that Mr. Warren is guilty

20 of the offense charged, the government must convince you that

21 the defendant is guilty beyond a reasonable doubt.  That means

22 that the government must prove each and every element of an

23 offense charged beyond a reasonable doubt.  A defendant may not

24 be convicted based on suspicion or conjecture, but only on

25 evidence proving guilt beyond a reasonable doubt.

1            Proof beyond a reasonable doubt does not mean proof
2  beyond all possible doubt or to mathematical certainty.
3  Possible doubts or doubts based on conjecture, speculation or
4  hunch are not reasonable doubts.  A reasonable doubt is a fair
5  doubt based on reason, logic, common sense or experience.  It
6  is a doubt that an ordinary, reasonable person will have after
7  carefully weighing all of the evidence and it is a doubt of the
8  sort that would cause a reasonable person to hesitate to act in
9  matters of importance in his or her own life.  It may arise
10 from the evidence or from the lack of evidence or from the
11 nature of the evidence.

12            If, having now heard all the evidence, you are
13 convinced that the government has proven each and every element
14 of the offense charged beyond a reasonable doubt, you should
15 return a verdict of guilty.  However, if you have a reasonable
16 doubt as to one or more of the elements of the offense charged,
17 then you must return a verdict of not guilty.

18            As you know, the defendant, Atiba Warren, is charged
19 in the indictment with violating federal law, specifically,
20 with knowingly being in possession of a firearm in or affecting
21 interstate or foreign commerce on or about October 23, 2012, in
22 the Western District of Pennsylvania, after having been
23 convicted of a crime punishable by imprisonment for a term
24 exceeding one year.

25            As I explained at the beginning of the trial, an

indictment is just the formal way of specifying the exact crime

the defendant is accused of committing.  An indictment is

simply a description of the charge against the defendant.  It

is an accusation only.  An indictment is not evidence of

anything and you should not give any weight to the fact that

Mr. Warren has been indicted in making your decision in this

case.

Your only concern as I've said is to determine

whether or not the evidence admitted in this trial proves the

defendant's guilt beyond a reasonable doubt.  The government

and the defendant, Atiba Warren, are equal before the law.  No

greater or lesser weight should be given to the testimony of a

witness connected with either party.

You've also heard the testimony of law enforcement

officers.  The fact that a witness is employed as a law

enforcement officer does not mean that his testimony

necessarily deserves more or less consideration or greater or

lesser weight than that of any other witness.

At the same time, it is quite legitimate for defense

counsel to try and attack the believability of a law

enforcement witness on the ground that his testimony may be

colored by personal or professional interest in the outcome of

the case.

You, as the jury, must decide after reviewing all

the evidence whether you believe the testimony of the law

1   enforcement witness or witnesses and how much weight, if any,

2   it deserves.

3          The government has introduced evidence that the

4   defendant, Mr. Warren, made statements to law enforcement.  You

5   must decide whether Mr. Warren did, in fact, make those

6   statements.  If you find that Mr. Warren did make the

7   statements, then you must decide what weight, if any, you feel

8   the statements deserve.  In making this decision, you should

9   consider all matters in evidence having to do with the

10  statements, including those concerning Mr. Warren himself and

11  the circumstances under which the statements were made.

12         If after considering the evidence you determine that

13  a statement was made voluntarily, you may give it such weight

14  as you feel it deserves under the circumstances.  On the other

15  hand, if you determine that the statement was not made

16  voluntarily, you must disregard it.  In determining whether any

17  alleged statement was made voluntarily, you should consider

18  Mr. Warren's age, training, education, occupation and physical

19  and mental condition and his treatment while in custody or

20  under interrogation as shown by the evidence in the case.

21  Also, consider all other circumstances in evidence surrounding

22  the making of the alleged statement.

23         Mr. Warren is not on trial for committing any act

24  not charged in the indictment.  You may not consider any

25  evidence of another act as a substitute for proof that he

committed the crime charged.  You may not use such evidence to

conclude that because Mr. Warren may have committed some other

act, he must also have committed any act charged in the

indictment.

Do not return a guilty verdict as to the offense

charged against Mr. Warren unless the government has proven

such crime as charged in the indictment beyond a reasonable

doubt.

I will now tell you the essential elements of the

crime charged against the defendant in the indictment.

The indictment charges the defendant, Atiba Warren,

with being a felon in possession of a firearm on or about

October 23, 2012, 2012, which is a violation of federal law.

In order to find the defendant guilty of this

offense, you must find that the government proved each of the

following three elements beyond a reasonable doubt.

First, that Mr. Warren has been convicted of a

felony, that is, a crime punishable by imprisonment for a term

exceeding one year.

Second, that after this conviction, Mr. Warren

knowingly possessed the firearm described in the indictment on

or about October 23, 2012.

And, third, that Mr. Warren's possession was in or

affecting interstate or foreign commerce.

In order to find the defendant, Atiba Warren, guilty

1  of this offense, you must find that the government proved that

2  before on or about October 23, 2012, Mr. Warren had been

3  convicted of a crime punishable by imprisonment for a term

4  exceeding one year.

5          The parties have stipulated that Atiba Warren was

6  convicted of a crime in state court, that that crime is

7  punishable by imprisonment for a term exceeding one year, and

8  that this prior conviction occurred before October 23, 2012.

9  The parties have also stipulated that this conviction occurred

10 prior to the time that Atiba Warren is alleged to have

11 possessed the firearm charged in this indictment.

12         You may treat that stipulation as a proven fact, but

13 you are not required to do so because you are the sole judge of

14 the facts.

15         The stipulation that the defendant was convicted

16 before this incident of a crime punishable by imprisonment for

17 a term exceeding one year was brought to your attention only in

18 conjunction with one of the elements of a crime of possession

19 of a firearm by a convicted felon, as set forth in the

20 indictment.  You are not to speculate as to the nature of the

21 conviction.  You may not consider the prior conviction in

22 deciding whether Atiba Warren was in knowing possession of the

23 firearm that he is charged with possessing in this case.

24 Whether he was in knowing possession of a firearm on or about

25 October 23, 2012 is a disputed issue in this case.

1              The fact that the defendant was found guilty of

2    another crime on another occasion does not mean that he

3    committed this crime on or about October 23, 2012.  You must

4    not use that conviction as proof of the crime charged in this

5    case, except for the one element of this crime which I've

6    mentioned.  You may find the defendant guilty of the crime

7    charged in this case only if the government has proved beyond a

8    reasonable doubt all of the elements of the crime charged in

9    this case.

10             To establish the second element of the offense, the

11   government must prove beyond a reasonable doubt that

12   Atiba Warren possessed the firearm in question.

13             The term "firearm" means any weapon which will expel

14   or is designed to or may readily be converted to expel a

15   projectile by the action of an explosive.  The term includes

16   the frame or receiver of any such weapon.

17             To "possess" means to have something within a

18   person's control.  The government does not have to prove that

19   Mr. Warren physically held the firearm, that is, had actual

20   possession of it, as long as the firearm was within

21   Mr. Warren's control, he possessed it.  If you find that

22   Mr. Warren either had actual possession of the firearm or had

23   the power and intention to exercise control of it, even though

24   it was not in Mr. Warren's physical possession, that is, that

25   Mr. Warren had the ability to take actual possession of the

object when Mr. Warren wanted to do so, you may find that the government has proven possession.  Possession may be momentary or fleeting.

Mere proximity to the firearm or mere presence on the property where it is located or mere association with the person who does control the firearm or the property is not sufficient to support a finding of possession.

Proof of ownership of the firearm is not required.

The government must prove that Mr. Warren knowingly possessed the firearm described in the indictment.  This means that Atiba Warren possessed the firearm purposefully and voluntarily and not by accident or mistake.  It also means that Atiba Warren knew the object was a firearm.

The third element that the government must prove beyond a reasonable doubt is that the firearm specified in the indictment was in or affecting interstate or foreign commerce. This means that the government must prove that at some time before the defendant's possession, the firearm had traveled in foreign or interstate commerce.

It is sufficient for the government to satisfy this element by proving that any time prior to the date charged in the indictment the firearm crossed the state line or the United States border.  The government does not need to prove that the defendant himself carried it across the state line or the border or to prove who carried it across or how it was

1  transported.  It is also not necessary for the government to

2  prove that Atiba Warren knew that the firearm had traveled in

3  foreign or interstate commerce.

4         The parties have stipulated that the firearm in

5  question was manufactured in a different country than the state

6  where Atiba Warren is charged with possessing it.  You are

7  permitted to infer from this fact that the firearm traveled in

8  foreign or interstate commerce.  However, you are not required

9  to do so.

10        Ladies and gentlemen, that concludes my instructions

11 explaining the law regarding the testimony and other evidence

12 and the offense charged.  Now, let me explain some things about

13 your deliberations in the jury room and your possible verdicts.

14        The first thing you should do in the jury room is

15 choose someone to be your foreperson.  This person will speak

16 for the jury here in court.  He or she will also preside over

17 your discussions.  However, the views and vote of the

18 foreperson are entitled to no greater weight than those of any

19 other juror.

20        Second, I want to remind you that your verdict,

21 whether it is guilty or not guilty, must be unanimous.  To find

22 Atiba Warren guilty of the offense, every one of you must agree

23 that the government has overcome the presumption of innocence

24 with evidence that proves each element of that offense beyond a

25 reasonable doubt.  To find Atiba Warren not guilty, every one

1 of you must agree that the government has failed to convince

2 you beyond a reasonable doubt.

3          To assist you, a verdict form has been prepared for

4 you to record your verdict.

5          Mr. Babik, if you would pass a copy out for the

6 jury.

7          We'll show you a copy of the form now so you can see

8 what it looks like and I'll explain it to you.

9          Our alternates at the end can look over the form of

10 your neighbor.

11          As I've said, ladies and gentlemen, to assist you in

12 that process, a verdict form has been prepared for you to

13 record your verdict.  We have given you a copy to look at as I

14 explain this.

15          If you find unanimously that the government has

16 proved beyond a reasonable doubt each of the elements of the

17 offense as charged in the indictment, then you should find

18 Mr. Warren guilty and your foreperson should note "guilty" in

19 the space provided on the verdict form for the offense.

20 However, if you find unanimously that the government has not

21 proved beyond a reasonable doubt each element of the offense

22 charged in the indictment, then you must find Mr. Warren not

23 guilty of that offense and your foreperson should note "not

24 guilty" in the space provided on the verdict form.  You should

25 remember that the burden is always on the government to prove

1 beyond a reasonable doubt each and every element of an offense

2 charged in an indictment.  Once you have reached your unanimous

3 verdict, your consideration of the charge in this case is then

4 concluded and you should sign and date the verdict form as

5 noted and activate the signal that you've reached a verdict.

6            If you could pass those verdict forms back down for

7 Mr. Babik to retrieve.

8            Thank you, Mr. Babik.

9            Ladies and gentlemen, remember, Mr. Warren is not on

10 trial for any act or conduct not specifically charged in the

11 indictment.  Your job is limited to deciding whether the

12 government has proved beyond a reasonable doubt the crime

13 charged in the indictment.

14            If Mr. Warren is found guilty, it will be my duty to

15 decide what the punishment will be.  You should not be

16 concerned with punishment of Mr. Warren.  It should not enter

17 into your consideration or discussions in any way.

18            In conducting your deliberations and returning your

19 verdict, there are certain rules you must follow.

20            When you retire, I suggest that you conduct your

21 deliberations in a business-like manner in order to determine

22 the issues of fact in this case using these instructions as

23 your guide.  You should engage in a rational discussion of the

24 evidence which you've heard and seen for the purpose of

25 reaching a unanimous verdict.

1    Your verdict must represent the considered judgment

2 of each juror.  In order to return a verdict, it is necessary

3 that each juror agree to it, in other words, your verdict must

4 be unanimous.

5    If during your deliberations you determine that you

6 have the need to communicate with me, please reduce your

7 message or question to writing signed by the foreperson and

8 flip the signaling button in the jury room and give that note

9 to Mr. Babik, my courtroom deputy, who will bring it to my

10 attention.

11    I will then confer as necessary with the attorneys

12 regarding your inquiry and then we'll respond to you as

13 reasonably soon as possible either in writing or by having you

14 return to the courtroom so that I can speak to you personally.

15    Mr. Babik will provide supplies in that regard,

16 should you need to communicate with the Court.

17    I caution you, however, with regard to any message

18 or question you might send that you should never state, specify

19 or even hint at any numerical vote division which may exist

20 among you at any time.

21    It is your duty as jurors to consult with one

22 another and to deliberate in an effort to reach agreement, if

23 you can do so without violence to individual judgment.  Each of

24 you must decide the case for yourself but only after an

25 impartial consideration of the evidence in the case with your

1 fellow jurors.

2          Talk with each other, listen carefully and

3 respectfully to each other's views and keep an open mind as you

4 listen to what your fellow jurors have to say.  In the course

5 of your deliberations, do not hesitate to re-examine your own

6 views and change your opinion if you become convinced that it

7 is erroneous.  But do not surrender your honest conviction has

8 to the weight or effect of the evidence solely because of the

9 opinion of your fellow jurors or for the mere purpose of

10 returning a verdict.

11          No one will be allowed to hear your discussions in

12 the jury room and no record will be made of what you say.  You

13 should all feel free to speak your minds.

14          If you elected to take notes during the trial, your

15 notes should be used only as a memory aid.  You should not give

16 your notes greater weight than your independent recollection of

17 the evidence.  You should rely upon your own independent

18 recollection of the evidence or lack of evidence, and you

19 should not be unduly influenced by the notes of other jurors.

20 Notes are not entitled to any more weight than the memory or

21 impression of each juror.

22          Remember at all times you are not partisans, you are

23 judge, judges of the facts.  Your sole interest is to seek the

24 truth from the evidence presented in the case.

25          Your verdict must be based solely on the evidence

1   and on the law which I have given you in my instructions.  I

2   repeat, you cannot return a verdict as to the one charge in

3   this case, whether guilty or not guilty, unless it is agreed to

4   by all of you unanimously.

5           Finally, the verdict slip form we have prepared is

6   simply the written notice of the decision that you reach in

7   this case.  There is space for twelve signatures on the verdict

8   slip and all of you must sign it.  I have reviewed that form

9   with you.

10          It is proper to add the caution that nothing said in

11  these instructions and nothing in your verdict slip prepared

12  for your convenience is meant to suggest or convey in any way

13  or manner any intimation as to what verdict I think you should

14  find.  What the verdict shall be is your sole and exclusive

15  duty and responsibility.

16          If you have not reached a verdict by 4:30 p.m.

17  today, you may continue to deliberate later, but only if all of

18  you unanimously agree and your foreperson so advises me by

19  sending a signal and note to Mr. Babik in writing.  If you do

20  not unanimously agree to continue deliberations, you may leave

21  at 4:30 p.m. after notifying Mr. Babik that is your intention,

22  then report to the jury room tomorrow morning at 9:00 a.m. to

23  continue with your deliberations.  You are instructed that

24  during deliberations, you're not permitted to engage in any

25  research on your own.  You should not seek information

1  regarding any aspect of this trial from any source outside of

2  the courtroom.  It would be improper for you to discuss any of

3  the issues in this case with any person, including members of

4  your family, until your deliberations have been concluded.

5           Please, remember my instruction to not read about

6  the case should there be any articles in the newspaper and not

7  listen to any radio broadcasts or television broadcasts should

8  there be any concerning this case.

9           You will note from the oath that had been taken by

10  my deputy, Mr. Babik, and the other members of the Court staff

11  that they, too, as well as all others are forbidden to

12  communicate in any way or manner with any member of the jury on

13  any subject touching the merits of this case.  During your

14  deliberations, you must continue to observe all of the

15  restrictions I've instructed you on throughout the trial.  Do

16  not speak at all with any of the parties, the witnesses or the

17  attorneys, do not permit anyone to discuss the case with you,

18  do not even remain in the presence of anyone that might be

19  discussing the case.  If anyone approaches you and tries to

20  talk with you about the case, please report that to me through

21  Mr. Babik immediately.

22           While I do not know whether there is any news

23  coverage of this case, do not watch or listen to any news

24  reports concerning this trial on television or radio and do not

25  read any news accounts of this trial in a newspaper or on the

1  Internet or anywhere else.  Do not use the Internet to search

2  for information about the parties, witnesses, lawyers or

3  anything else associated with the trial.  Do not visit the

4  scene of the alleged offense or conduct any kind of

5  investigation of your own.  The only information you're allowed

6  to consider in deciding this case is what you learned in this

7  courtroom during the trial.

8          In a moment I'll ask Mr. Babik to assist the twelve

9  seated members of our jury up to the jury room so that you may

10 begin the work that I've described.

11         Shortly thereafter, Mr. Babik and other members of

12 my staff will deliver to the jury room copies of the

13 instructions as I promised they would be provided to you, the

14 exhibits that had been entered into trial.

15         As you saw, some of the materials presented by

16 counsel were through the use of the visual screens in the

17 courtroom.  We have made arrangements that we will have

18 available to you in the courtroom a laptop computer.  It's

19 capable of doing one thing and one thing only and that's

20 showing the content of a thumb drive that is marked as

21 containing some of the exhibits in this case.  Another member

22 of the Court's staff skilled in computer matters will bring

23 that computer up to the jury room.  He, too, will have been

24 sworn, just as Mr. Babik and my staff was, and will show how

25 the computer is to be activated.

1           It is your choice and your choice alone how and

2   whether you consider any of those materials, including the use

3   of the computer.  It's being provided for your convenience if

4   you find that is something you want to do.  You're not required

5   to use it or to not use it.

6           I will ask Alternate No. 1 and Alternate No. 2 to

7   remain in the courtroom after Mr. Babik has assisted the other

8   twelve seated members of the jury to the jury room to begin

9   their deliberations.

10          Ms. King and Mr. Ortiz, are there any other matters

11  that you believe the Court should address with the jury at this

12  time?

13          MS. KING:  No, Your Honor.  Thank you.

14          THE COURT:  Mr. Sindler, any matters you believe the

15  Court should address with the jury at this time?

16          MR. SINDLER:  No.

17          THE COURT:  I see in the back of the courtroom

18  Mr. Shawn Fox of the Court's technology staff.

19          If you could please come forward to be sworn as jury

20  bailiff.

21      (Administration of the oath.)

22          THE COURT:  Mr. Fox, you've now been duly sworn as a

23  jury bailiff.  At the appropriate time as designated by

24  Mr. Babik, deliver the computer we've identified earlier up to

25  the jury room.

1          Mr. Babik, would you please assist the jury as they

2  retire to the jury room to commence their deliberations.

3          (Jury is dismissed from the courtroom.)

4          THE COURT:  The Court will now address Alternate

5  Juror No. 1 and Alternate Juror No. 2.

6          I'm reminded of a piece of wisdom I wish I could say

7  who it's attributed to, but I believe it says, those who wait

8  also serve.  I think it probably should have been written for

9  folks that are called to serve as alternate jurors.

10          You are not yet discharged from jury duty because

11  those who wait also serve.

12          We will place you in the hands of Mr. Greer of my

13  staff who you met earlier.  He will escort you down to the jury

14  room on the third floor where you can be comfortable.  There is

15  a staff member from the Court down there.

16          Later this afternoon, Mr. Greer will check in with

17  you and he'll advise you either to come back up here because I

18  have some activity that I'm required to take regarding your

19  service, or he may advise you that you're to report to the jury

20  room on the third floor at or about nine o'clock tomorrow

21  morning.  We'll know the answer to that a little later.

22          All of the admonitions and directions and cautions

23  that I have been giving throughout the trial and that I gave to

24  the twelve seated members of the jury moments ago apply 100

25  percent full force and effect for you.  For purposes of our

1  trial because you're serving while waiting and might, if there

2  was a need, be called upon to begin participating as a

3  deliberating juror, you may not and should not seek out or

4  receive any information regarding this case, its participants

5  or its issues from any source, human, technological, printed,

6  broadcast or otherwise.  You may not discuss the issues and

7  matters involved in this case even with one another or any

8  member of the Court staff, family, friends, or otherwise until

9  I advise you otherwise.  And should anyone attempt to do any of

10 those things with you, please notify a member of the Court

11 staff immediately and we would act in an appropriate fashion.

12            Ms. King and Mr. Ortiz, do you believe there's

13 anything else we should advise the alternate jurors of?

14            MS. KING:  No, Your Honor.

15            THE COURT:  Anything else we should advise the

16 alternate jurors of?

17            MR. SINDLER:  No.

18            THE COURT:  Mr. Greer, please assist our alternate

19 jurors and their belongings to the jury assembly room on the

20 third floor.  I believe we have previously alerted a member of

21 the Court staff that they will be coming down.

22            Please rise for the alternate jurors.

23       (Alternate jurors are dismissed from the courtroom.)

24            THE COURT:  Mr. Fox, could you please step forward,

25 sir.

1          Mr. Fox, you're a member of not only now a jury

2 bailiff in this case but you're a member of the Court's IT

3 staff.  Mr. Fox, it's the Court's understanding that the Court

4 has a laptop computer, that it is maintained for purposes such

5 as these and that it does not have the ability to access the

6 Internet or any other external source and otherwise, has a

7 clean drive.  There is nothing else on it and that you have

8 personally confirmed that.

9          Is all of that true?

10          MR. FOX:  That is correct.

11          THE COURT:  Ms. King and Mr. Ortiz, do you have any

12 voir dire of Mr. Fox in those regards, or do you want to

13 personally examine the laptop?

14          MS. KING:  No.  Thank you.

15          THE COURT:  Mr. Sindler?

16          MR. SINDLER:  Same answer.

17          THE COURT:  Mr. Fox, I authorize and direct you to

18 accompany Mr. Babik at the time designated by Mr. Babik when he

19 delivers the exhibits to the jury room with the laptop computer

20 to display to the jury how to activate and use the computer if

21 in their election they decide to do so.

22          Mr. Fox, anything that you'd like to bring to the

23 Court's attention or any questions you think you need my

24 answers to?

25          MR. FOX:  No.

1              THE COURT:  At this point, we'll recess the Court.

2              Mr. Babik will review the materials that will be

3    delivered up to the jury room.

4              Ms. King and Mr. Ortiz, do you have any objections

5    to the Court's instructions to the jury as delivered in open

6    court.

7              MS. KING:  Actually one.

8              THE COURT:  Please bring it to the Court's

9    attention.  If you could reference the paragraph.

10             MS. KING:  Paragraph 60.

11             THE COURT:  I'm there.

12             MS. KING:  The Court said:  Do not return a verdict

13   of guilty as to the offense, and my written copy says any

14   offense.

15             THE COURT:  It did.  I modified that as I was

16   speaking since there was one count in the indictment that was

17   otherwise consistent.

18             MS. KING:  I agree with the modification, if it

19   could just be changed.

20             THE COURT:  Mr. Sindler, do you think "any" should

21   be changed?

22             MR. SINDLER:  I have already done it.

23             THE COURT:  I take that as you agree it should?

24             MR. SINDLER:  Yes.

25             THE COURT:  That change will be made.

1          Ms. King and Mr. Ortiz, otherwise, any objections or

2  corrections to the charge as delivered to the jury?

3          MS. KING:  No.

4          THE COURT:  Mr. Sindler, same question of you?

5          MR. SINDLER:  No.

6          THE COURT:  Mr. Babik, I'll arrange for that change

7  to be made by Mrs. Dressler and she will deliver twelve copies

8  to you for delivery to the jury room.

9          Ms. King and Mr. Ortiz, any other matters that we

10  should take care of --

11          I will say that once we know at or about 4:30 as to

12  whether the jury is continuing today or electing to conclude

13  for the day and come back tomorrow, Mr. Babik will notify

14  counsel.  I do not require counsel to remain within the

15  environs of the courtroom.  You're welcome to.  We'll make

16  those arrangements, but we simply need to make sure Mr. Babik

17  knows how to get ahold of you.  Once we know what the jury's

18  intentions are, we'll make sure counsel is brought aware of

19  that.

20          With that, Ms. King, anything else we should take up

21  here?

22          MS. KING:  No.

23          THE COURT:  Mr. Sindler, same question?

24          MR. SINDLER:  No.

25          THE COURT:  Mr. Babik, you can recess the Court.

1          (Court adjourned.)

2

3                    I-N-D-E-X

4  <u>WITNESS</u>          <u>Direct</u>      <u>Cross</u>      <u>Redirect</u>      <u>Recross</u>

5  Travis Johnson        2          27          --            --

6

7                    <u>CERTIFICATE</u>

8          I, Juliann A. Kienzle, certify that the foregoing is a
   correct transcript from the record of proceedings in the
9  above-titled matter.

10
   s/Juliann A. Kienzle, RMR, CRR
11 _____
   Juliann A. Kienzle, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25